Victor A. Sahn (CA Bar No. 97299)
   victor.sahn@gmlaw.com
**GREENSPOON MARDER LLP**
1875 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: 213.626.2311
Facsimile: 954.771.9264

Attorneys for 9300 Wilshire LLC
Chapter 11 Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| In re | Case No. 2:23-BK-10918-ER |
|---|---|
| 9300 WILSHIRE LLC, | Chapter 11 |
| Debtor. | **MOTION OF CHAPTER 11 DEBTOR UNDER 11 U.S.C. §363 AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO SELL DEBTOR'S INTEREST IN REAL PROPERTY AT WILSHIRE & LINDEN IN BEVERLY HILLS, CALIFORNIA TO E.D. FLORES, LLC OR ITS NOMINEE BY PRIVATE SALE; DECLARATION OF LEONID PUSTILNIKOV IN SUPPORT OF MOTION; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | [Application for Order Shortening Time Filed Concurrently Herewith] |
| | Date:    To Be Set By the Court
Time:    To Be Set By the Court
Place:    Edward R. Roybal Federal Building
             and Courthouse
             255 E. Temple Street,
             Courtroom 1568
             Los Angeles, CA 90012 |
| | The Hon. Ernest Robles |

VAS 54759390v3

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. The Debtor ............................................................................................................1

II. Bankruptcy Filing ..............................................................................................2

III. The Redondo Beach Property and Power Plant ................................................3

    A.    The Historic Land Use Designations of the Power Plaint.............................4

    B.    The City's Efforts To Close The Redondo Beach Power Plant Site And Eliminate Any Economically Viable Reuse Of The Site ................................5

    C.    Background on AES Redondo Beach and its Parent AES .........................12

    D.    Acquisition by Debtor of Interest in Redondo Beach Property ...............13

    E.    Environmental Issues ...............................................................................13

    F.    Problems that Led to Chapter 11 Filing ..................................................13

IV. Debtor's Motion to Sell ...................................................................................14

    A.    Term and Conditions of Tenancy in Common Agreement ......................16

V. Memorandum of Points and Authorities ...........................................................16

    A.    The Proposed Sale Is In The Best Interests Of The Estate......................16

        1.    Sound Business Purpose...............................................................17

        2.    Reasonable Purchase Price ...........................................................18

        3.    Notice of the Sale Is Proper.........................................................19

        4.    It is Appropriate and Necessary that the Sale Proceed by Private Sale ..............................................................................................19

        5.    The Sale Was Negotiated In Good Faith......................................21

        6.    Buyer Is a Good Faith Purchaser..................................................21

        7.    Waiver Of The Fourteen (14) Day Period For Effectiveness Of Sale Order...........................................................................................22

        8.    Tax Consequences........................................................................23

VI. Conclusion .....................................................................................................23

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

## <u>CASES</u>

4

*Comm. of Equity Sec. Holders v. Lionel Corp.* (In re Lionel Corp.),
    722 F.2d 1063 (2d Cir. 1983) .............................................................. 17, 20

*In re Carter,*
    1988 WL 1607919 (Bankr., S.D. GA, 1988) ..................................... 21

In re Chateaugav Corp.,
    973 F.2d 141 (2d Cir.1992) ............................................................... 20

*In re Continental Air Lines, Inc.,*
    780 F.2d 1223 (5th Cir. 1986) .......................................................... 17

In re Global Crossing Ltd.,
    295 B.R. 726 (Bankr.S.D.N.Y.2003) ................................................ 20

In re Integrated Res., Inc.,
    147 B.R. 650 (Bankr.S.D.N.Y.1992) ................................................ 21

*In re Lahijani,*
    325 B.R. 282 (B.A.P. 9th Cir. 2005) ................................................ 17

*In re M Capital Corp.,*
    290 B.R. 743 (B.A.P. 9th Cir. 2003) ................................................ 22

*In re Slates,*
    2012 WL 5359489 (B.A.P. 9th Cir. Oct. 31, 2012) ......................... 17

*In re Walter,*
    83 B.R. 14 (B.A.P. 9th Cir. 1988) .................................................... 17

*In re Wilde Horse Enters., Inc.,*
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ............................................. 17

Smith v. Van Gorkom,
    488 A.2d 858 (Del.1985).................................................................... 21

## <u>STATUTES</u>

11 U.S. C. § 363(b) ..................................................................................... 20

11 U.S.C. § 363 ...................................................................................... 16, 21, 23

11 U.S.C. § 363(b)(1) ........................................................................ 16, 17, 19, 20

11 U.S.C. § 363(m) .................................................................................. 21, 22

**<u>RULES</u>**

FRBP 2002(a)(2) ........................................................................................................... 19

FRBP 6004 ...................................................................................................................... 22

FRBP 6004(f) .................................................................................................................. 21

FRBP 6004(g) .................................................................................................................. 22

FRBP 6004(h) ............................................................................................................ 22, 23

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, THE TWENTY LARGEST UNSECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND PARTIES ENTITLED TO NOTICE:**

## I.

### The Debtor

9300 Wilshire LLC, the debtor in possession in above-captioned case ("Debtor") is a limited liability corporation organized under the laws of the State of Delaware.  Debtor is the holder of a 21.4% ownership interest in the real property that is located at 1100 N. Harbor Drive, Redondo Beach, California (the "Redondo Beach Property").  Debtor also has an interest in the following, separate real property entities:

A.    Wilshire & Linden -10.55% interest held by Debtor

B.    Pier Kinney -22.50% interest held by Debtor

C.    1241-1247 3rd Street (via 1247 3rd Street, LLC)-ownership interest held via SMLLC (Single Member LLC) (20% ownership interest)

D.    346 N. Maple Drive (via Beachside Suites, LLC)-ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

E.    1127-1137 Horn Avenue (via Beachside Suites, LLC)- ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

F.    201 S. Arnaz Drive (via Beachside Suites, LLC)- ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

G.    232 S. Tower Drive (via Beachside Suites, LLC)- ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

Debtor's interests in the properties referenced above have substantial value and will be crucial to Debtor's reorganization efforts.

The partial owners of the Redondo Beach Property are:

| | |
|---|---|
| 9300 Wilshire LLC | 21.45% |
| 1112 Investment Company, LLC | 18.45% |
| ED Flores, LLC | 19.85% |
| 9300 Wilshire Fee, LLC | 10.00% |
| David Dromy | 3.75% |

| | |
|---|---|
| 1650 Veteran, LLC | 10.02% |
| Outdoor Billboard, LLC | 1.58% |
| BH Karka, LLC | 2.60% |
| 5th Street Investment Company, LLC | 4.45% |
| 505 Investment Company, LLC | 1.45% |
| SLH Fund, LLC | 3.45% |
| Peak Alcott, LLC | 3.00% |
| **Total** | **100.00%** |

The principals of the two entities who hold the interests in Debtor are Alex Hotel and Mr. Leonid Pustilnikov. Each of them hold a 50% interest in Debtor. Alex Hotel is an entity owned and controlled by Mr. Ely Dromy. Mr. Dromy and Mr. Pustilnikov are investors in numerous projects other than the Redondo Beach property.

Generally stated, Mr. Pustilnikov and Mr. Dromy, as well as others with whom Mr. Pustilnikov has invested in or developed real estate, engage in this business on a full time basis. Mr. Pustilnikov is 37 years old. He came to the United States with his family at the age of 4 years old from the USSR (now Ukraine). He started developing or owning real properties when he saved money while still in high school and used it to purchase a condominium in North Hollywood, California for his grandparents. When they did not want to move into the condominium to live, Mr. Pustilnikov sold it for a profit and has been buying and selling and developing real estate ever since that time. Mr. Pustilnikov is a true rags to riches story, as he started with no capital and no backing-he saved, invested, sold at a profit and kept on investing. Today, he holds an interest in or owns and operates real properties throughout Southern California and in Manhattan, New York worth several hundred million dollars. He has bought and sold over his business career properties valued in excess of $1 Billion.

## II.

## Bankruptcy Filing

This particular Chapter 11 case represents the first time that an entity owned or managed by Mr. Pustilnikov has filed a bankruptcy case. Debtor's reorganization is going to be around the properties in which the Debtor holds an interest including the Redondo Beach Property. The Chapter 11 filing was precipitated by a foreclosure on the Redondo Beach Property by the

1  Property's secured creditor, AES-Redondo Beach, LLC.  The considerable value in these

2  properties are crucial to this bankruptcy case.

3  ### III.

4  ### The Redondo Beach Property and Power Plant

5  The Redondo Beach Property is a very unique property with an unusual history.  The

6  Property is approximately 50 acres.

7  The Power Plant site dates back to 1897, when G. J. Lindsay constructed an 1100-volt

8  generator on the site.[1] In the early 1900s, San Gabriel Electric Company purchased the land and

9  replaced Lindsay's generator with an electric substation. When San Gabriel Electric Company

10  became Pacific Light and Power Corporation ("Pacific Light") a few years later, Pacific Light built

11  a new concrete and metal steam plant on the site, taking advantage of its close proximity to the

12  ocean for cooling. With the rapid population increase attributable to the growth of the railroad at

13  the time, the demand for electricity increased dramatically in Southern California. The generators

14  were later supplemented to meet this sharp increase in demand. When Henry Huntington (the

15  founder and owner of Pacific Light) completed his brand new state-of-the art hydroelectric plant in

16  "Big Creek" (near Fresno, California), electric lines were constructed to efficiently transmit the

17  electric power to Southern California, resulting in Pacific Light's Redondo Beach Power Plant

18  being relegated to backup status.

19  In or around 1917, Southern California Edison ("SCE") acquired Pacific Light, including

20  the Redondo Beach steam-generated power plant. SCE continued to use the Redondo Beach facility

21  
---
22  [1] This portion of the Memorandum starting at page 4 is largely adopted from the "Cross-Complaint

23  for Inverse Condemnation (Regulatory Taking) and Illegal Spot Zoning" filed in the action entitled
"City of Redondo Beach, a municipal corporation; City of Hermosa Beach, a municipal

24  corporation, Petitioners vs. California State Water Resources Control Board, Respondent" and
"AES Southland Energy, LLC; AES Southland Energy Holdings II, et. al., Real Parties in Interest"

25  and "9300 Wilshire LLC, et. al., Real Parties in Interest and Cross-Complainants vs. City of
Redondo Beach, a municipal corporation, ROES 1-50 Petitioner and Cross-Defendants," Case No.

26  20STCP03193, Superior Court of the State of California, For the County of Los Angeles, Central
District."  Statements or actions attributed to AES Southland Energy or AES Redondo Beach or

27  the City of Redondo Beach are very likely, in many instances, disputed by them and nothing
contained in this narrative is meant to necessarily stand for the truth of assertions which are

28  disputed by them

1    until in or around the mid-1930s, when SCE permanently shut down the steam- generated plant.

2         With another rapid increase in population growth in the 1940s, SCE decided to replace the

3    then abandoned generators with a new, state-of-the-art facility to handle the rapid increase in

4    population growth in Southern California at that time. SCE constructed four new power units

5    which went online in or around 1948 and 1949. Two additional power units went online in or

6    around 1956, and an additional two power units went online in or around 1968. This new Power

7    Plant continued to operate for several decades and is currently operating today.

8         **A.**    **The Historic Land Use Designations of the Power Plaint**

9         The Power Plant site is located in the Coastal Zone and falls within the jurisdiction of the

10   California Coastal Commission ("Commission"). The California Coastal Act ("Coastal Act")

11   requires each local government with land located within the Coastal Zone to prepare a local

12   coastal program ("LCP") for management of land uses. Once certified by the Commission, the

13   authority to issue Coastal Development Permits (required for any new development within the

14   Coastal Zone) lies with the local jurisdiction. In Redondo Beach, Coastal Development Permits

15   are issued directly by the City of Redondo Beach ("City").

16        The City adopted, and the Commission certified, the original LCP for Redondo Beach in

17   1981. Prior to that point in time, the Power Plant site was designated "Industrial/Commercial,"

18   allowing for a multitude of industrial and commercial uses.. The 1981 LCP, however, called for

19   "Planned Industrial" uses for the Power Plant site, also allowing for various industrial, commercial

20   and mixed-use developments. The 1981 LCP acknowledged the problems with large industrial

21   uses within the Coastal Zone and advocated for "more commercial uses" within the Coastal Zone

22   in keeping with the Commission's policies. Under the original 1981 LCP, therefore, the Power

23   Plant site could have been redeveloped with alternative, economically viable uses that were

24   welcomed by the Commission and fully consistent with the City's land-use designations and the

25   Commission's policies.  Because the Power Plant site was subject to the exclusive jurisdiction of

26   the California Energy Commission ("CEC"), the LCP, General Plan and Zoning Ordinance

27   designations were only relevant to the future redevelopment of the site and conversion of the Power

28   Plant operations to non-energy-generating uses that would be excluded from the CEC's exclusive

1  jurisdiction.

2      **B.**  **The City's Efforts To Close The Redondo Beach Power Plant Site And**

3      **Eliminate Any Economically Viable Reuse Of The Site**

4          The existence of the Power Plant has long been a source of acrimony with the more vocal

5  residents of the community and community activists, notwithstanding the fact that it is needed to

6  provide power to the region and predates their arrival to the community by decades.

7          In the mid-to-late 1990s, SCE decided to sell some of its power generating stations,

8  including the Power Plant in Redondo Beach. On or about December 16, 1997, the California

9  Public Utilities Commission approved SCE's proposed sale of the site to AES Corp.  9300

10  Wilshire LLC believes that AES Corp. acquired SCE's Redondo Beach power plant site and

11  adjoining properties, along with SCE's Huntington Beach and Los Alamitos power plants, for over

12  $780 million.

13          Around the same time, community residents and activists began advocating for the

14  downsizing and/or elimination of the Power Plant. Because the Power Plant was subject to the

15  exclusive jurisdiction of the CEC (including jurisdiction over all land-use decisions), the City

16  needed to obtain AES' cooperation to downsize or remove the Power Plant voluntarily. In or

17  around the time SCE conveyed the Power Plant to AES, the City began to assert an interpretation

18  of its utility users tax ("UUT") that would allow the City, for the first time, to tax the utilities used

19  by AES for generating electricity. AES disputed the validity of the City's asserted interpretation

20  and further disputed the legality of the tax as applied to the AES facility. In turn, the City placed

21  an initiative on the ballot for the electorate to decide whether or not to tax the AES facility (and

22  only the AES facility).

23          Rather than continue to fight the City on the UUT, AES entered into negotiations with the

24  City to voluntarily downsize and modernize the generating units on the site, with the City agreeing

25  to cooperate with AES on plans for an economically viable redevelopment of the portions of the site

26  that would no longer be needed for the downsized and modernized generating units. On or about

27  December 8, 1998, AES and the City entered into a Memorandum of Understanding ("MOU"),

28  which (1) required the City to withdraw the initiative it placed on the ballot concerning the UUT,

1  and (2) required the City and AES to cooperate in the development of a master plan for the site.

2  The master plan for the site called for the removal of the existing generating units (except units 7

3  and 8), with the balance of the site to be used for a new, modernized generating unit with a 1,000

4  mega-watt capacity and new commercial development. At that time, the City registered its strong

5  desire that the footprint of the Power Plant be downsized and that the portions of this waterfront

6  site that would no longer be used for electric generation be redeveloped for commercial uses.

7  Section 3(a) of the MOU thus stated:

8        *"AES Redondo and the City agree to cooperate in the initiation, processing and*

9        *development of the [Master] Plan for the Property in its entirety. The [Master]*

10        *Plan will allocate a portion of the Property to be used for the development of an*

11        *additional electric power generating facility of approximately 1000 MW; the*

12        *remainder of the Property (excluding the Property associated with Units 7 and*

13        *8), shall be allocated to commercial and other uses in conformance with the land*

14        *use and zoning laws of the State and City and other applicable laws."*

15  As mandated by the MOU, AES and the City worked cooperatively to develop a

16  plan to downsize the Power Plant and to redevelop the balance of the site. The end result of this

17  effort was the preparation of a new specific plan for the vicinity known as the "Heart of the City

18  Specific Plan" ("HOTCSP"), which the City Council approved in March 2002. The HOTCSP

19  contemplated a much needed revitalization of the area and uses that would serve to rebuild the

20  City's "downtown" area. The HOTCSP called for economically viable alternative uses of the

21  Power Plant site upon the downsizing (or closure) of the Power Plant. The HOTCSP proposed the

22  development of 2,998 residential units and 657,000 square feet of commercial space on the many

23  acres of land that were included in the plan. The many acres currently devoted to parking lots

24  serving the Power Plant would be converted to pedestrian-friendly shopping districts. The

25  HOTCSP also addressed the dire need for affordable housing in the community. Most importantly

26  to many residents, the HOTCSP called for reducing the Power Plant to approximately 1/3 of its

27  size at the time.

28        Despite the huge community benefits that would be derived from the HOTCSP and the

removal of 6 of the 8 generating units comprising the Power Plant, some community activists were not happy with the proposed redevelopment and submitted a referendum petition on the HOTCSP and related zoning and land use amendments. As a result of the petition, in or around June 2002, the City Council repealed the HOTCSP in its entirety.

The City thereafter undertook further efforts to plan for the downsizing of the Power Plant and redevelopment of the balance of the Power Plant site. The City retained David Taussig and Associates ("DTA") to develop alternative financial plans for the comprehensive redevelopment of the area that was formerly subject to the HOTCSP. The alternative plans called for either (1) the City's acquisition of approximately 76.5 acres for parks and recreational purposes (at a cost to the City of approximately $350,000,000 based on the independent and objective valuation analyses of DTA), or (2) the private redevelopment of the area with two hotels, 450 residential units (including 53 low-income senior units), and an 18.5 acre park for the community.

Once again, the planning efforts were met with significant opposition from community activists preferring to see no redevelopment of the area and, instead, the conversion of the Power Plant site to a City park at little to no cost to the City. In a document authored by the now-Mayor Brand, James Light, and Don Vangeloff entitled "Heart of the City Visions Fiscal Study in Perspective" and dated November 8, 2004, the South Bay Parkland Conservancy ("Parkland Conservancy") registered its strong objection to the proposed redevelopment of the area and any acquisition of the land for parks at the values determined by the City's independent consultant, DTA. The Parkland Conservancy attacked the DTA analyses and advocated for a "Heart Park" proposal that would convert the Power Plant site into a City park, at little to no cost to the City. Once again, due to intense community opposition, the DTA proposal was not approved.

In August 2005, the City Council adopted a series of ordinances which purported to amend the City's LCP, Zoning Ordinance, and the Harbor/Civic Center Specific Plan. As they related to the Power Plant site, the measures purported to reestablish the land-uses and development standards that existed prior to the HOTCSP. Curiously, the City Council also allowed for a new "open space/parklands" designation for the Power Plant site that had not been allowed previously.

1  The 2005 amendments to the LCP were not submitted to the Commission for certification at that

2  time.

3      In May 2008, the City Council approved another series of ordinances and companion

4  resolutions proposing amendments to the LCP which would allow for an economically viable re-

5  use of the Power Plant site. The proposed amendments created 5 new "coastal commercial" zones,

6  allowing for a net increase of 400,000 square feet of development within "Area 2" of the LCP,

7  including retail sales, restaurants, bars, night clubs, offices, hotels, timeshares and similar uses.

8  The 2008 amendments to the LCP were only "proposed" and would not take effect until the

9  Commission certified the amendments. The 2008 amendments to the LCP were not submitted to

10 the Commission for certification at that time.

11     Again dissatisfied by the City Council's attempts to provide for an orderly and economic

12 revitalization of the Power Plant site, community activists such as the now-Mayor Brand and Mr.

13 Light, went to work to prevent the City Council from approving any such plan unless it was also

14 approved by the City's electorate. "Building a Better Redondo," a political action committee

15 chaired and founded by Mr. Light, authored Measure "DD" with the assistance of current Mayor

16 Brand. Measure "DD" proposed to add Article XXVII to the City's Charter. Among other things,

17 Article XXVII required any "major change" in land use in the City to be approved both by the City

18 Council and a "majority" of voters in the City. The term "major change" was defined as any

19 proposed amendment to the coastal zoning ordinance that significantly increased traffic, density or

20 intensity of use above the baseline conditions. Generally, all covered "major changes" would need

21 to be approved by the City Council and then be submitted to the electorate for approval, unless

22 denial of the land use application would constitute a taking. Measure DD was passed by the

23 Redondo Beach voters in the November 2008 election and became effective as of December 16,

24 2008. Although the City submitted the 2008 amendments to the LCP (called for in Measure DD) to

25 the Commission for certification, the Commission denied certification, suggesting modifications

26 to provide for further protection of environmentally sensitive habitat areas and marine resources.

27     In April 2010, the City Council approved the modifications suggested by the Commission,

28 but determined not to put the changes to a vote of the electorate at that time. The City Council

1    justified its decision on the grounds that only certain portions of the LCP amendments constituted

2    a "major change" within the meaning of Article XXVII (adopted by Measure DD). The City

3    Council deferred issuing the order for a public vote as to those provisions until a later date subject

4    to "further resolution."

5        On or about May 20, 2010, Building a Better Redondo, Inc., founded and chaired by Mr.

6    Light, filed a petition for writ of mandate seeking to compel the City Council to order a public

7    vote on the entirety of the amendments affecting Area 2. The Los Angeles Superior Court granted

8    the writ of mandate, declaring that the subject amendments (from 2005 and 2008) to the LCP were

9    never certified by the Commission prior to the effective date of Article XXVII and, thus, had to be

10   approved by the City's electorate in a public vote.

11       In August 2010, the City Council elected to comply with the trial court's writ of mandate

12   while concurrently appealing the decision. The City Council ordered that a new measure (Measure

13   G) be placed on the ballot for the November 2, 2010 regular election. Measure G, which was

14   approved by the voters, broke "Area 2" into three main areas, including the "harbor/pier" area, a

15   21-acre area along Catalina Avenue, and the approximately 50-acre Power Plant site. As for the

16   Power Plant site, Measure G changed the site's designation from Industrial to "Generating Plant"—

17   a new designation that did not previously exist within the City's zoning provisions and is used only

18   for this site. The only uses allowed under the Generating Plant designation apart from the continued

19   operation of the Power Plant and related facilities are parks and open space, provided that the site is

20   "acquired" for such uses. Measure G amended Policy 9 of Section VI of the LCP to allow for the

21   "modernization of the AES Redondo Beach Generating Plant . . . and permit[s] the AES Redondo

22   Beach Generating Plant site to be converted to parks, open space, and recreational facilities *if the*

23   *site is acquired for such purposes in the future*." (Emphasis added.)

24       In or around the same time, the State Water Resources Control Board ("Water Board")

25   adopted a new "Once Through Cooling" ("OTC") policy dramatically impacting the future

26   operations of power plants located along the California coast that use ocean water to cool their

27   operations. The OTC policy adopted by the Water Board called for the ultimate termination of

28   power plant operations that use ocean water for cooling. As it pertained to the Power Plant, the

1    OTC policy necessitated either: (1) a modernization of the Power Plant facilities needed to

2    eliminate ocean water cooling; or (2) the termination of all Power Plant operations prior to

3    December 31, 2020. The new OTC policy provided another tool for the community activists to

4    remove all vestiges of the Power Plant in Redondo Beach.

5         The objective of merely shutting down the Power Plant was not enough for the City and

6    community activists like Mayor Brand and Mr. Light, however. In 2013, current Mayor Brand and

7    Mr. Light co-authored a measure (Measure A) that would have compelled the closure of the Power

8    Plant by 2020 and the removal of the physical plant facilities by the end of 2020. Measure A would

9    have also required 60% of the site to be converted to public recreation and open space. Measure A

10   was narrowly defeated with 6,552 votes against, and 6,295 votes in favor.

11        In direct conflict with the City's own objectives, as set forth in the LCP, the City further

12   attempted to stifle AES' efforts to comply with the OTC Policy by enacting an Emergency

13   Moratorium on Development of Electrical Generating Facilities on December 3, 2013, followed by

14   the adoption of Ordinance No. 3134-15 and Resolution No. CC-1506-050, prohibiting the

15   construction of any power generating facilities of 50 megawatts or more—i.e., less than 5% of the

16   existing and approved generation capacity of the Power Plant. In addition, when AES sought relief

17   from the California Energy Commission, the City appealed, manufacturing a claim that a portion of

18   the Power Plant site (specifically, various lined "tank pads" and pits) had been converted to

19   jurisdictional wetlands within the meaning of the Coastal Act. AES' lawsuit challenging the

20   wetlands determination is still pending in the Los Angeles Superior Court.

21        With the intense public outcry concerning the continued operations of the Power Plant, the

22   new OTC policy adopted by the Water Board, AES attempted to rezone the Power Plant site to

23   allow it to be transitioned to another economically viable use in full compliance with the Measure

24   DD requirement that major land use changes be submitted to both the City Council and electorate

25   for approval, in March 2015, AES sponsored an initiative (Measure B) to satisfy the community's

26   desire to eliminate the Power Plant and to provide for economically viable reuses of the Power

27   Plant site upon its closure. Measure B abandoned the possible downsizing and modernization of

28   the power plant facilities in order to comply with the new OTC policy (a concept that was rejected

1   by the community when it passed a referendum on the HOTCSP that allowed for a new, smaller

2   and modernized plant), and, instead, called for the redevelopment of the entire approximately 50-

3   acre site, as needed to generate revenue to offset the costs of closing the Power Plant and to attract

4   investors who were needed to completely revitalize the site. Measure B nonetheless proposed a

5   very modest reuse of the Power Plant site at roughly half the density and intensity that had

6   formerly been called for in HOTCSP. Importantly, Measure B would have provided for residential

7   development in a region and State where housing was, and still is, in extremely short supply.

8   Specifically, Measure B would have allowed a maximum of 600 residential dwelling units of

9   various types, 85,000 square feet of new commercial development, 250 hotel rooms and a full 10

10  acres of the approximately 50-acre site to be devoted to public open space. In the March 2015

11  special election, the voters narrowly defeated Measure B, with 6,684 votes against and 6,072 votes

12  in favor.

13          As it currently stands, the Power Plant operations will cease as of December 31, 2023. If

14  the City has its way in this proceeding, the Power Plant operations may have to shut down earlier.

15          Through the initiative, referendum and City Council measures alleged hereinabove, the City

16  has successfully eliminated any potential economically viable redevelopment of the Power Plant

17  upon the Power Plant's closure. The electorate's refusal to approve the relatively modest alternative

18  re-use of the Power Plant site through Measure B demonstrates the City's insistence that the

19  property be converted to parklands for the enjoyment of the public upon the closure of the Power

20  Plant. As the Mayor recently boasted in the "Easy Reader News," ***"parks and open space are . . .***

21  ***the only permitted use on the site."*** Without an economically viable reuse of the site, funds will not

22  even be available to tear down the existing Power Plant facilities

23          On or about September 1, 2020, the Water Board approved an extension of operations at

24  the Power Plant through December 31, 2023, when the operations of the Power Plant are required

25  to comply with the OTC policy. According to the current LCP and land-use designations, there

26  will be no alternative use of the Power Plant site upon its closure as the present owners did not

27  acquire it with the intent of converting it to open space. The City's efforts to convert the available

28  land uses to open space and parklands for the benefit of the City was (and is) designed to reduce to

1   zero the value of the site the City has long coveted for a public park. Once the Power Plant is

2   required to close—which if the City gets its way will happen at the earliest possible time—the site

3   will have no economically viable use under the existing zoning, and the City has already

4   repeatedly demonstrated its unwillingness to rezone the site to allow it to be redeveloped.[2]

5          **C.    Background on AES Redondo Beach and its Parent AES**

6          AES is part of "The AES Corporation", a Delaware Corporation having its main offices in

7   Arlington, Virginia. It is publicly traded on the New York Stock Exchange under the symbol

8   'AES'. According to its Form 10-K filed on March 1, 2023, AES had revenues in 2022 of $12.6

9   Billion and total assets of $38 Billion. It has a global workforce of 9,100 employees and serves 2.6

10  Million Utility customers. They have businesses in the United States, Puerto Rico & El Salvador,

11  Mexico, Central America and the Caribbean, Chile, Columbia, Argentina and Brazil, and Europe

12  and Asia. They own six utility companies and have 47 generation facilities like the one that they

13  operate in Redondo Beach on the Property. In California, "AES Southland is one of the largest

14  generation operators in California by aggregate installed capacity, with an installed gross capacity

15  of 3,799 MW at the end of 2022. The five coastal power plants comprising AES Southland are in

16  areas that are critical for local reliability and play an important role in integrating the increasing

17  amounts of renewable generation resources in California. AES Southland is composed of three

18  once-through cooling ("OTC") power plants, two combined cycle gas-fired generation facilities

19  and an interconnected battery-based energy storage facility. A(AES Form 10-K, pg. 21 under

20  "AES Southland"). According to AES' Form 10-K, they are obligated to cease operations at the

21  power  plant which is on Debtor's property on December 31, 2023.

22

23

24  _____

    [2] Some of the statements from the Cross-Complaint are disputed by the City of Redondo Beach
25  and perhaps other parties.  In response to the Cross-Complaint, the City of Redondo Beach filed
    an anti-Slapp motion.  This motion was denied.  However, the City filed an appeal of this denial
26  and asked that the underlying Superior Court proceeding be stayed until the appeal of the anti-
    Slapp denial becomes final.  Recently, a stipulation was entered into which provided for relief
27  from the automatic stay for the appeal of the anti-Slapp ruling to move forward before the
    California Court of Appeals.
28

**D.**     **Acquisition by Debtor of Interest in Redondo Beach Property**

Debtor acquired its fractional interest in the Redondo Beach Property from AES Redondo in 2018 and 2020.  Debtor leased the Redondo Beach Property back to AES Redondo and the property has continued to be operated as power plant by AES Redondo.  Originally, the entire facility was supposed to be shuttered on December 31, 2020, however, extensions of the date have now been extended to December 31, 2023.

**E.**     **Environmental Issues**

In that this Redondo Beach Property has been operated as a power plant for many years, there are environmental issues associated with it.  Debtor has diligently, for the last three years, worked on a plan to clean up the Redondo Beach Property including the soil, and has retained highly qualified environmental engineers and consultants to determine what needs to be done, where the work needs to be done, and the extent, nature and cost of this work.  Under the environmental laws, a work plan must be submitted to the State of California Department of Toxic Substances Control ("DTSC").  A clean-up plan has been generated by Debtor's retained consultants over the years prior to the filing of this bankruptcy case.  There is additional access to the Redondo Beach Property which Debtor's consultants need in order to finish their proposed work order, and conclude its submission to and approval by DTSC.  Debtor has tried without success to gain access to the Property through AES Redondo, but that access to finish up this very important task has not been granted by AES to date.  Debtor is not sure of the reason for this, however, Debtor has again inquired through counsel, to gain this access and conclude the work plan for the clean-up of the Property.

The environmental issue(s) were not a factor in filing this Chapter 11 case.  As the foregoing demonstrates, Debtor has been working for years before this Chapter 11 filing and starting after its acquisition of the Redondo Beach Property on getting this clean up task ascertained, and approved by the DTSC with the State of California.

**F.**     **Problems that Led to Chapter 11 Filing**

There are a number of factors which led to Debtor's Chapter 11 filing.  It is presently involved in litigation with the City of Redondo Beach under a takings' action or inverse

condemnation of the Property.  That litigation was pending before the Chapter 11 case was filed and remains ongoing.  Debtor has retained special litigation counsel to continue with Debtor's representation in this action.  It is entitled "City of Redondo Beach, a municipal corporation; City of Hermosa Beach, a municipal corporation, Petitioners vs. California State Water Resources Board, Respondent; and real parties in interest AES Southland Energy, LLC, AES Southland Energy Holdings II, et. al.  Cross-claims were filed by Debtor and each of the additional co-owners of the Redondo Beach Property against the City of Redondo Beach.  The Case Number is 20STCP03193 in the Los Angeles Superior Court-Central Division.  A second issue concerned Debtor's secured obligation to AES Redondo.  There is a dispute which will likely be resolved by the Bankruptcy Court regarding this dispute.  Debtor was in the midst of negotiating toward a resolution of this dispute notwithstanding the filing of a Notice of Default by AES Redondo, the parties continued to negotiate toward a resolution that would take into account: (a) extensions of operations of the power plant which usually go in one or two year increments.  Therefore the question of the power plant being shuddered is a constant issue that the parties need to focus on, usually each year; (b) Debtor addressing the environmental issues and AES Redondo funding a portion of those obligations under its agreement(s) with Debtor; and (c) paying the remaining balance due under Debtor's purchase of the Redondo Beach Property and resolving Debtor's disputes with AES Redondo, including the dispute regarding the amount of their debt.

## IV.

### Debtor's Motion to Sell

In this Motion, Debtor hereby seeks to sell its interest in the real property at 9740 Wilshire Boulevard, Beverly Hills, CA  90212. ("Real Property")   Debtor has received an offer from Ed Flores, LLC and/or assignee to purchase this interest for $4,300,000.00 .  <u>Ed Flores, LLC is an insider of Debtor</u>.  Debtor wishes to proceed with this sale by <u>private sale</u>.  Debtor's interest in the Real Property which is referred to in its bankruptcy schedules and statement of financial affairs as "Wilshire & Linden."  Debtor's holds a 10.55% interest in the Real Property.  Debtor's bankruptcy schedules indicate that the value of the Real Property is $40,000,000.  Debtor's amended Schedule B indicates that the secured indebtedness against the Real Property is $13,600,000.  This leaves an

equity in the Real Property totaling $26,400,000. Debtor's percentage ownership is 10.55%. The means that Debtor's "equity" in the Real Property is valued at $2,785,200 ($26,400,000 x 10.55%). A copy of Debtor's amended Schedule A/B which shows this valuation is attached hereto as **Exhibit "A"**.

The "net" proceeds" means that subtracted from this price will be the Debtor's pro rata share of the East West Bank total loan of $13,600,000 (i.e., approximately $1,435,000 plus or minus depending on whether default interest is being charged by East West Bank) and Debtor's pro rata share of $250,000 in other loans due will be paid at close. The estate will therefore net some between $2,600,000 and $2,815,000 after these adjustments are made. Under a $2,600,000 sale, Debtor shall receive $1,600,000 received at close and $1,000,000 received within 180 days of close. If the sale price after adjustments is $2,815,000, Debtor will receive $1,800,000 at close and $1.015,000 within 180 days after the close.

The other owners of the Wilshire & Linden Property are as follows:

A.    1112 Investment Company LLC-5.00%

B.    **ED Flores LLC-2.50%**

C.    9300 Wilshire Fee LLC-43.95%

D.    9300 Wilshire LLC/Debtor-10.55%

E.    Dromy 1995 Family Trust-28%

F.    EJT Wilshire Linden, LLC-10%

The purchase price for Debtor's 10.55% interest in the Wilshire & Linden project is $4,300,000.00 (subject to deductions or adjustments described below). A true and correct copy of the "Commercial Purchase Agreement and Joint Escrow Instructions," with addendums, is attached hereto as **Exhibit "B"** and is incorporated herein by this reference.

Under the sale transaction, a broker's commission will be paid to LND Realty who is acting as broker for both the Buyer and the Seller. LND Realty will earn a commission of 1% in connection with its representation of the Buyer and Seller as their respective agent(s). LND Realty is an insider of Debtor and of the Purchaser of Debtor's interest in Wilshire & Linden. The

In connection with the purchase transaction, there is also provided and executed a

1  "Tenancy in Common Purchase ("TIC") Addendum.  A true and correction copy of the TIC

2  Addendum is attached hereto as **Exhibit "C"** and is incorporated herein by this reference.  Also in

3  connection with the purchase transaction, the parties have prepared and executed a "Contingency

4  Removal No. 1" a true and correct copy is attached here to as **Exhibit "D"** and is incorporated

5  herein by this reference.  A true and correct copy of the Tenancy In Common Agreement ("TIC

6  Agreement") between the Debtor and the other co-owners of the Real Property, which is dated

7  December 28, 2020, is attached hereto as **Exhibit E** and incorporated herein by this reference.

8        **A.**    **Term and Conditions of Tenancy in Common Agreement**

9        9300 Wilshire, LLC, a Delaware Limited Liability Company which is identified in the TIC

10  Agreement as "Tenant 4".

11        While the net purchase price to Debtor could be as little as $2,600,000 which is less than

12  the estimated value of its interest in the Real Property up to a maximum that is $80,000 more than

13  the estimated value of this asset in its bankruptcy schedules ($2,865,200-$2,785,200).  The asset is

14  one held in a closely held entity whose co-owners are largely overlapping individually in their

15  participation in this real estate TIC, and the TIC contains a "Right of First Offer" ("ROFR") which

16  is found in paragraph 4(b) on page 3 of the TIC Agreement.  Accordingly, due to the closely held

17  nature of the asset and the fact that the price being offered is in excess of the value of the asset, it

18  is highly likely that the price being obtained is far more than the asset is worth or if the asset were

19  seriously marketed among other potential third party buyers.  On the basis of the price being paid

20  and the terms and conditions of the TIC Agreement concerning the ROFR (and the fact that

21  Debtor only holds 10.55% of ownership of the asset) makes it clear that the price being paid is

22  more than fair and should be approved by this Court.

23                                 **V.**

24                **Memorandum of Points and Authorities**

25        **A.**    **The Proposed Sale Is In The Best Interests Of The Estate**

26        Under 11 U.S.C. § 363, a trustee is empowered to sell assets of the estate outside the

27  ordinary course of business "after notice and a hearing."  The standards for approval of a sale

28  pursuant to 11 U.S.C. § 363(b)(1) require that the proponent of the sale establish that: "(1) a sound

1   business purpose exists for the sale; (2) the sale is in the best interest of the estate, i.e., the sale

2   price is fair and reasonable; (3) notice to creditors was proper; and (4) the sale is made in good

3   faith." *In re Slates*, 2012 WL 5359489 (B.A.P. 9th Cir. Oct. 31, 2012) (unpublished) (citing *In re*

4   *Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); *Comm. of Equity Sec.*

5   *Holders v. Lionel Corp.* (In re Lionel Corp.), 722 F.2d 1063, 1069 (2d Cir. 1983)).  Debtor's

6   proposed Sale of the Estate's Interest in Debtor's 10.55% interest in the Wilshire & Linden project

7   meets this standard.

8   **1.    Sound Business Purpose**

9       The decision to sell property out of the ordinary course of a debtor's business must be

10  based on the reasonable business judgment of the debtor.  *In re Continental Air Lines, Inc.*, 780

11  F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2nd Cir. 1983).  In

12  determining whether the business purpose is justified under 11 U.S.C. § 363(b)(1), bankruptcy

13  courts apply a flexible, case-by-case approach. See *In re Walter*, 83 B.R. 14, 19 (B.A.P. 9th Cir.

14  1988) ("the bankruptcy judge should consider all salient factors pertaining to the proceeding and,

15  accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.")

16  (quoting *Continental Air*, 780 F.2d at 1226).  The court should approve a sale of property under 11

17  U.S.C. § 363(b)(1) if the trustee has established a sound business purpose for the proposed

18  transaction.  *Walter,* 83 B.R. at 16; *Wilde Horse*, 136 B.R. at 841 (Bankr. C.D. Cal. 1991).  The

19  business judgment standard is deferential. *In re Lahijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005)

20  ("Ordinarily, the position of the trustee is afforded deference, particularly where business

21  judgment is entailed in the analysis or where there is no objection.").

22      The facts reflect that Debtor's decision to sell the Estate's Interest in the 10.55% ownership

23  interest in the Wilshire & Linden Property is supported by sound business judgment because the

24  Purchase Price is fair and reasonable (discussed above and in the Declaration of Leo Pustilnikov)

25  and the Sale will generate cash proceeds for the Estate.  The purchase price is in excess of the

26  value given to the 10.55% interest by Debtor in Debtor's bankruptcy schedules.  This justifies

27  having the sale be held as a private sale rather than being one subject to overbid.  There are a

28  number of reasons for this position:

1      1)     There is a pressing need to refinance the Wilshire & Linden property and obtaining

2 such refinancing cannot take place without Debtor's ownership interest being removed and sold so

3 that the new financing will be unaffected by this bankruptcy case.

4      2)     The purchase price for the 10.55% interest is more than fair and is, in fact, $80,000

5 in excess of the value given to this asset in Debtor's bankruptcy schedules.

6      3)     The sale is of a minority interest in the Wilshire & Linden project.  Such interests

7 are hardly ever of interest to third party buyers because the majority ownership in the Wilshire &

8 Linden project is among a group holding a much larger interest than Debtor's interest and these

9 parties are business associates who also have ownership interests together in other real estate

10 projects like the Wilshire & Linden project.

11      4)     The TIC Agreement in paragraph 4(b) on page 3 provides the other co-owners with

12 a right of first refusal so any offer from a third party can be matched and such matching offer will

13 be the successful one in an auction context.  This is a significant disincentive to a third party

14 buying the asset.

15      5)     The indebtedness owing to East West Bank became all due and payable by its

16 terms in May, 2023.  Further, when the Debtor filed its bankruptcy case, the bankruptcy filing by

17 one of the co-owners was a further default under Wilshire & Linden's loan with East West.

18      6)     The secured indebtedness owed to East West Bank is all due and payable as of

19 May, 2023.  Further, a default in this loan occurred when the Debtor, as one of the Real Property's

20 co-owners, filed its bankruptcy case before this Court.

21         **2.**    **<u>Reasonable Purchase Price</u>**

22      The purchase price being paid for the 10.55% interest represents fair market value for the

23 Estate's Interest in the Asset.  The purchase price is slightly greater than the value given to the

24 10.55% interest in Debtor's bankruptcy schedules.  When it concerns the sale of a minority interest

25 in a closely-held limited liability company where the other members have a Right of First Offer to

26 match the offer from any third party, the price offered represents a good price for Debtor's interest

27 in the Wilshire & Linden property.

28

### 3.    Notice of the Sale Is Proper

In compliance with 11 U.S.C. § 363(b)(1), FRBP 2002(a)(2), and 6004(a), Debtor will serve notice of the Sale to Debtor, the United States Trustee, and all creditors.  Debtor plans to ask for a shortened time hearing because of the pressure to complete a refinancing of the Wilshire & Linden project.  The Debtor is asking for approval of a private sale and believes that under the circumstances of this case, having the sale noticed on this basis is appropriate and in compliance with the sited statutes and Section 102(1)(A) of the Bankruptcy Code.

### 4.    It is Appropriate and Necessary that the Sale Proceed by Private Sale

There are a number of reasons why the Court can and should approve a private sale in this case.

First, the ownership of the Wilshire & Linden Property is as follows-

A.    Debtor-10.55%

B.    1112 Investment Company, LLC-5.00%

C.    Ed Flores, LLC-2.50%

D.    9300 Wilshire Fee, LLC-43.95%

E.    Dromy 1995 Family Trust-28%

F.    EJT Wilshire Linden, LLC-10%

These six co-owners are all involved as investors in other real estate projects on an ongoing basis.  While not every one of these investors are in all of the same projects, they are in many of them.  The sale of a minority interest in a business entity like this one, where all of the other co-investors have a pre-existing business relationship with each other, is highly unlikely to be of any interest to a third party who does not know the other co-investors.  Minority interest holder rights in these circumstances are highly circumscribed and such an interloper would be out-voted on every topic of disagreement that he/she/it has with the other investors.

Second, Debtor's interest is a minority interest in the Wilshire & Linden Property.

Third, the price which ED Flores, LLC is offering for Debtor's interest in the Wilshire & Linden Property is a fair price and is in excess of the value given to Debtor's interest in its amended Bankruptcy Schedules and Statement of Financial Affairs.

1    Fourth, the TIC Agreement gives any of the investors in the Wilshire & Linden Property

2    the right to match the offer of any third party for Debtor's interest in the property.

3    Fifth, Debtor is under pressure to sell its interest in the Wilshire & Linden property quickly

4    so that it can refinance the property with a third party lender who is unwilling to lend to a

5    borrower that is involved in a bankruptcy case.  Many lenders will not lend to borrowers who are

6    involved in a bankruptcy case.

7    Sixth, Debtor anticipates filing a reorganization plan which will pay its creditors, over

8    time, in full.  Therefore, even if Debtor's interest in the Wilshire & Linden property were being

9    sold for an inadequate price (which it is not), the only party who will ultimately be prejudiced by

10    this fact are the holders of equity in Debtor.  These holders are insiders of Debtor, Mr. Leonid

11    Pustilnikov and Alex Hotel LLC (which is connected to Mr. Ely Dromy, an investor with Mr.

12    Pustilnikov in multiple other real estate projects).  The equity holders in Debtor both consent to

13    the private sale to ED Flores LLC.

14    Section 363(b)(1) of the Bankruptcy Code provides that debtors "may use, sell, or lease,

15    other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In

16    approving a sale conducted pursuant to section 363(b)(1), courts consider whether the debtor

17    exercised sound business judgment. *See In re Chateaugay Corp.,* 973 F.2d 141, 144–45 (2d

18    Cir.1992) (finding that section 363(b) was applicable because sound business judgment supported

19    the sale of assets); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d

20    1063, 1072 (2d Cir.1983) (holding that the application of section 363(b) must be supported by

21    "some articulated business justification, other than appeasement of major creditors" and that "a

22    judge determining a § 363(b) application [must] expressly find from the evidence presented before

23    him at the hearing a good business reason to grant such an application"); *In re Global Crossing

24    Ltd.,* 295 B.R. 726, 743 (Bankr.S.D.N.Y.2003) (citing *Lionel Corp.,* 722 F.3d at 1071)

25    (emphasizing the business judgment standard).

26    Although the determination of what constitutes a sufficient business reason depends on the

27    facts and circumstances of each case, a debtor often satisfies the business judgment standard if

28    "the directors of a corporation acted on an informed basis, in good faith and in the honest belief

1   that the action taken was in the best interests of the company." *In re Integrated Res., Inc.,* 147

2   B.R. 650, 656 (Bankr.S.D.N.Y.1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872

3   (Del.1985). Courts should not generally interfere with business decisions absent a showing of "bad

4   faith, self-interest, or gross-negligence." *Integrated Res.,* 147 B.R. at 656.

5         The Court is permitted to authorize the conduct by Debtor of a private sale under Section

6   363 of the Bankruptcy Code.  *In re Carter,* 1988 WL 1607919 (Bankr., S.D. GA, 1988) (not pub'l)

7   ("As a result I cannot read <u>Section 363(k)</u> as mandating that public sales be conducted. Rather, it is

8   simply a provision giving the secured party the right to bid at a public sale if, in fact, there is one,

9   unless the Court for cause orders otherwise. The power to order otherwise certainly must include

10  the power to approve a public sale. Moreover, Bankruptcy Rule 6004(f) expressly permits sale to

11  be conducted by public auction or public sale. Accordingly, I conclude as a general proposition

12  that given the proper showing, the sale by a Chapter 12 debtor may be approved even though it is

13  a private sale.").

14        Private sales are permitted where Debtor's decision to conduct them is based upon sound

15  business judgment.  Those standards have been met in this Memorandum (directly above) and in

16  the Declaration of Mr. Leonid Pustilnikov and should therefore be approved by this Court.

17          **5.**    **<u>The Sale Was Negotiated In Good Faith</u>**

18        As further detailed in the attached declarations of the Mr. Pustilnikov, notwithstanding the

19  fact that the Buyer is an insider of Debtor, the Buyer is paying significantly more than the value of

20  Debtor's interest in the Wilshire & Linden project.  This fact and the fact that there has been

21  thorough disclosure of the related parties overcomes any good faith concerns with respect to the

22  sale.

23        In sum, Debtor has satisfied each of the elements governing the proposed Sale of the

24  Estate's Interest in the 10.55% interest in the Wilshire & Linden property  and has articulated

25  sound business reasons for entering into and seeking consummation of the Sale.  The Court should

26  therefore approve the Sale.

27          **6.**    **<u>Buyer Is a Good Faith Purchaser</u>**

28        Under 11 U.S.C. § 363(m), in relevant part, if a sale order is subsequently reversed or

1    modified on appeal, such reversal or modification does not affect the validity of the sale if the

2    purchase was a good faith purchaser and no stay pending appeal was obtained.  Although the

3    Bankruptcy Code does not define the term "good faith", courts have found that a "good faith

4    purchaser" is one who buys 'in good faith' and "for value".  *In re M Capital Corp.*, 290 B.R. 743,

5    746 (B.A.P. 9th Cir. 2003).  "Typically, lack of good faith is shown by fraud, collusion between

6    the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of

7    other bidders".  Id. at 746-47.  The burden of proof to show "good faith" is on the proponent of

8    good faith or, in this case, Debtor.  See id. at 747.

9        Here, the Buyer should be deemed to be a good faith purchaser for purposes of this Sale

10   under 11 U.S.C. § 363(m) because the Sale was negotiated in good faith.  Notwithstanding the fact

11   that the Buyer is an insider of Debtor, this Sale was negotiated at arms-length and no special

12   treatment or consideration was given to the Buyer.  The asset being sold is a minority interest in

13   the Wilshire & Linden property where the other co-owners are very familiar with each other and

14   own interests together in other real estate projects in the Los Angeles area.  Further, any of the

15   other co-owners of the Wilshire & Linden entity have first right of refusal rights meaning that any

16   one of them can match an offer from a third party and be deemed the successful purchaser of the

17   asset. Accordingly, because there are no facts raising the specter of bad faith, collusion, or calling

18   into question the propriety of the Sale, the Court should deem the Buyer, or any similarly situated

19   Overbidder, to be a good faith purchaser under 11 U.S.C. § 363(m) for purposes of this Sale.

20       **7.    Waiver Of The Fourteen (14) Day Period For Effectiveness Of Sale**

21           **Order**

22       Rule 6004(h) provides that "An order authorizing the use, sale, or lease of property other

23   than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the

24   court orders otherwise." FRBP 6004(h).  The legislative history to Rule 6004 provides:

25   The court may, in its discretion, order that Rule 6004(g) [now 6004(h)] is not applicable so that

26   the property may be used, sold, or leased immediately in accordance with the order entered by the

27   court.  Alternatively, the court may order that the stay under Rule 6004(g) [now 6004(h)] is for a

28   fixed period less than 10 [now 14] days.

1    Given the notice and full opportunity to object, respond, unless there are objections to the

2   Motion that are not consensually resolved, it is appropriate and good cause exists for the Court to

3   order that Rule 6004(h) is not applicable, and the Estate's Interest in the Wilshire & Linden project

4   may be sold immediately.  Waiving the fourteen (14) day stay will allow the Buyer to move

5   forward with the sale once the sale order is entered..  Accordingly, Debtor requests that the Court

6   authorize the Sale to be effectuated immediately upon entry of the order approving this Motion.

7              **8.    <u>Tax Consequences</u>**

8    It is anticipated that there will no tax liability generated from the Sale because Debtor

9   carries significant carry forward loses.  The Sale is therefore in the best interest of the Estate

10  because the Estate will likely not suffer an adverse tax consequence from the Sale.

11                              **VI.**

12                          **<u>Conclusion</u>**

13    Debtor asks that the Bankruptcy Estate's sale of its 10.55% interest in the Wilshire &

14  Linden project to E.D. Flores, LLC, a California Limited Liability Company be approved under

15  Section 363 of the Bankruptcy Code, Bankruptcy Rule 6004, and related applicable law.  Debtor

16  requests such other and further relief as is just and appropriate in the circumstances.

17  DATED:  June 28, 2023            Respectfully submitted,

18                              **GREENSPOON MARDER LLP**

19

20                       By:  _____*/s/ Victor A. Sahn*_____

21                            Victor A. Sahn

22                            Attorneys for 9300 Wilshire LLC,
                             Debtor in Possession

23

24

25

26

27

28

## **Declaration of Leonid Pustilnikov in Support of Motion for Approval of Sale**

I, Leonid Pustilnikov, hereby declare:

1.      I am over the age of 18 years. I have personal knowledge of the facts stated herein. I can testify that these facts are true and correct.

2.      I am the Manager of 9300 Wilshire LLC, a Delaware limited liability company (the "Debtor").

3.      I have been the Manager of Debtor since its inception on March 9, 2018.

4.      In my capacity as Manager of Debtor, I am involved in its day-to-day operations including issues regarding financial matters, issues regarding operational concerns, and all related matters to its doing business.

5.      I make this declaration in support of the attached Motion of the Chapter 11 Debtor for Authorization to Sell its interest in the real estate project known as Wilshire & Linden for $4,300,000.

6.      I have personal knowledge of the facts stated herein. If called upon to do so, I could and would testify to the facts set forth herein.

7.      Debtor is a limited liability corporation organized under the laws of the State of Delaware.  Debtor is the holder of a 21.4% ownership interest in the real property that is located at 1100 N. Harbor Drive, Redondo Beach, California (the "Redondo Beach Property").  Debtor also has an interest in the following, separate real property entities:

        A.      Wilshire & Linden -10.55% interest held by Debtor

        B.      Pier Kinney -22.50% interest held by Debtor

        C.      1241-1247 3rd Street (via 1247 3rd Street, LLC)-ownership interest held via SMLLC (Single Member LLC) (20% ownership interest)

        D.      346 N. Maple Drive (via Beachside Suites, LLC)-ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

        E.      1127-1137 Horn Avenue (via Beachside Suites, LLC)- ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

        F.      201 S. Arnaz Drive (via Beachside Suites, LLC)- ownership interest held

via SMLLC (Single Member LLC) (85% ownership interest)

    G.  232 S. Tower Drive (via Beachside Suites, LLC)- ownership interest held via SMLLC (Single Member LLC) (85% ownership interest)

  Debtor's interests in the properties referenced above have substantial value and will be crucial to Debtor's reorganization efforts.

  8.  The partial owners of the Redondo Beach Property are:

| | |
|---|---|
| 9300 Wilshire LLC | 21.45% |
| 1112 Investment Company, LLC | 18.45% |
| ED Flores, LLC | 19.85% |
| 9300 Wilshire Fee, LLC | 10.00% |
| David Dromy | 3.75% |
| 1650 Veteran, LLC | 10.02% |
| Outdoor Billboard, LLC | 1.58% |
| BH Karka, LLC | 2.60% |
| 5th Street Investment Company, LLC | 4.45% |
| 505 Investment Company, LLC | 1.45% |
| SLH Fund, LLC | 3.45% |
| Peak Alcott, LLC | 3.00% |
| **Total** | **100.00%** |

The principals of the two entities who hold the interests in Debtor are Alex Hotel and me.  Each of us hold a 50% interest in Debtor.  Alex Hotel is an entity owned and controlled by Ely Dromy.

  9.  Generally stated, Mr. Dromy and I as well as others with whom I have invested in or developed real estate engage in this business on a full time basis.  I am 37 years old.  I came to the United States with my family at the age of 4 years from the USSR (what is now Ukraine).  I started developing or owning real properties when I saved money while still in high school and used it to purchase a condominium in North Hollywood, California for my grandparents.  When they did not want to move into the condominium to live, I sold it for a profit and have been buying and selling and developing real estate ever since that time.  With no capital and no backing-I saved, invested, sold at a profit and kept on investing.  Today, I hold an interest in or own and operate real properties throughout Southern California and in Manhattan, New York that is worth several hundred million dollars.  I have bought and sold over my business career properties valued in excess of $1 Billion.

10.     The Redondo Beach Property is a very unique property with an unusual history. The Property is approximately 50 acres. It fronts the Pacific Ocean in Redondo Beach.  The further history of the property and power plant located upon it is found on page 4 through page 13 of this Motion.  That narrative in this Motion including the development of the property as a power plant, the politics behind its development and continued operations and the rest of the information regarding the Redondo Beach Property is incorporated herein by reference.

11.     The Chapter 11 Debtor in Possession hereby files this Motion to sell its interest in the real property at 9740 Wilshire Boulevard, Beverly Hills, CA   90212. ("Real Property") Debtor's interest in the Real Property.  Debtor has received an offer from Ed Flores, LLC and/or assignee/nominee to purchase this interest for net proceeds to Debtor totaling $2,865,200.  Ed Flores, LLC is an insider of Debtor.  Ed Flores, LLC is already an investor in the Wilshire & Linden Property and many or all of the other real estate projects in which Mr. Dromy and I are also investors also include Ed Flores, LLC as an investor.  The principal of Ed Flores, LLC is Mr. Ely Dromy.  Debtor's interest in the Real Property which is referred to in its bankruptcy schedules and statement of financial affairs as "Wilshire & Linden."  Debtor's holds a 10.55% interest in the Real Property.  Debtor's bankruptcy schedules indicate that the value A ) indicates that the secured indebtedness against the Real Property is $13,600,000.  This leaves an equity in the Real Property totaling $26,400,000.  Debtor's percentage ownership is 10.55%.  The means that Debtor's "equity" in the Real Property is $2,785,200 ($26,400,000 x 10.55%).  A true and correct copy of Debtor's amended Schedule A/B which shows this valuation is attached hereto as **Exhibit "A"**.

The other owners of the Wilshire & Linden Property are as follows:

A.     1112 Investment Company LLC-5.00%

B.     **ED Flores LLC-2.50%**

C.     9300 Wilshire Fee LLC-43.95%

D.     9300 Wilshire LLC/Debtor-10.55%

E.     Dromy 1995 Family Trust-28%

F.     EJT Wilshire Linden, LLC-10%

12.     The purchase price for Debtor's 10.55% interest in the Wilshire & Linden project is

1    $2,865,200 in net proceeds to Debtor.  A true and correct copy of the "Commercial Purchase

2    Agreement and Joint Escrow Instructions" is attached hereto as **Exhibit "B"** and is incorporated

3    herein by this reference.

4           13.     Under the sale transaction, a broker's commission will be paid to LND Realty who

5    is acting as broker for both the Buyer and the Seller.  LND Realty will earn a commission of 1% in

6    connection with its representation of the Buyer and Seller as their respective agent(s).  LND

7    Realty is an insider of Debtor and of the Purchaser of Debtor's interest in Wilshire & Linden.

8    Additionally, Debtor's pro rata share of the East West Bank total loan of $13,600,000 (i.e.,

9    approximately $1,435,000 plus or minus depending on whether default interest is being charged)

10    and Debtor's pro rata share of $250,000 in other loans due will be paid at close.  The estate will

11    therefore net approximately $2,600,000, with $1,600,000 received at close and $1,000,000

12    received within 180 days of close.

13           14.     In connection with the purchase transaction, In connection with the purchase

14    transaction, there is also provided and executed a "Tenancy in Common Purchase ("TIC")

15    Addendum.  A true and correction copy of the TIC Addendum is attached hereto as **Exhibit "C"**

16    and is incorporated herein by this reference.  Also in connection with the purchase transaction, the

17    parties have prepared and executed a "Contingency Removal No. 1, " a true and correct copy of

18    which is attached here to as **Exhibit "D"** and is incorporated herein by this reference.

19           15.     <u>Term and Conditions of Tenancy in Common Agreement:</u>  A true and correct copy

20    of the Tenancy in Common Agreement regarding the Wilshire & Linden property ("TIC

21    Agreement") is attached hereto as **Exhibit "E"** and incorporated herein by this reference.  That

22    specifically includes as a co-owner 9300 Wilshire, LLC, a Delaware Limited Liability Company

23    which is identified in the TIC Agreement as "Tenant 4".

24           16.     While the purchase price is $80,000 more than the estimated value of this asset in

25    its bankruptcy schedules ($2,865,200-$2,785,200), the asset is one held in a closely held entity

26    whose co-owners are largely overlapping individually in their participation in this real estate TIC,

27    and the TIC contains a "Right of First Offer" which is found in paragraph 4(b) on page 3 of the

28    TIC Agreement.  Accordingly, due to the closely held nature of the asset and the fact that the price

being offered is well in excess of the value of the asset, it is highly likely that the price being

obtained is far more than the asset is worth or if the asset were seriously marketed among other

potential third party buyers.  On the basis of the price being paid and the terms and conditions of

the TIC Agreement concerning the right of first refusal (and the fact that Debtor only holds

10.55% of ownership of the asset) makes it clear that the price being paid is more than fair and

should be approved by this Court.

17.    There are a number of reasons why the Court can and should approve a private sale

in this case.

First, the ownership of the Wilshire & Linden Property is as follows-

A.    Debtor-10.55%

B.    1112 Investment Company, LLC-5.00%

C.    Ed Flores, LLC-2.50%

D.    9300 Wilshire Fee, LLC-43.95%

E.    Dromy 1995 Family Trust-28%

F.    EJT Wilshire Linden, LLC-10%

These six co-owners are all involved as investors in other real estate projects on an

ongoing basis.  While not every one of these investors are in all of the same projects, they are in

many of them.  The sale of a minority interest in a business entity like this one, where all of the

other co-investors have a pre-existing business relationship with each other, is highly unlikely to

be of any interest to a third party who does not know the other co-investors.  Minority interest

holder rights in these circumstances are highly circumscribed and such an interloper would be

over-voted on every topic of disagreement that he/she/it has with the other investors.

Second, Debtor's interest is a minority interest in the Wilshire & Linden Property.

Third, the price which ED Flores, LLC is offering for Debtor's interest in the Wilshire &

Linden Property is a fair price and is in excess of the value given to Debtor's interest in its

amended Bankruptcy Schedules and Statement of Financial Affairs.

Fourth, the TIC Agreement gives any of the investors in the Wilshire & Linden Property

the right to match the offer of any third party for Debtor's interest in the property.

Fifth, Debtor is under pressure to sell its interest in the Wilshire & Linden property quickly so that it can refinance the property with a third party lender who is unwilling to lend to a borrower that is involved in a bankruptcy case. Many lenders will not lend to borrowers who are involved in a bankruptcy case.

Sixth, Wilshire & Linden has the new loan available to it once the sale of Debtor's interest in the property is sold for the fair and reasonable price that is being offered in this case.    Seventh, the East West Bank (EWB) loan matured May 5, 2023 and due to Debtors Chapter 11 filing, EWB refuses to grant further extensions. Further Debtor's Chapter 11 filing constitutes a default under the East West loan.

Seventh, 9744 Wilshire is a leasehold which limits the pool of buyers given the unique nature of the asset.

Eighth, the Right of First Refusal ("ROFR") in the TIC Agreement further reduces the pool of buyers as few wish to spend money studying a property where a ROFR will likely ultimately be exercised.

Ninth, placing this asset in the open market may yield bids significantly lower than the offered price and given the ROFR, an affiliate can step in at a discounted price.

Tenth, for these reasons, we respectfully request that the Court shorten time with respect to the hearing on the Motion to Sell from twenty-one (21) days to ten (10) days.

Eleventh, and last, Debtor anticipates filing a reorganization plan which will pay its creditors, over time, in full. Therefore, even if Debtor's interest in the Wilshire & Linden property were being sold for an inadequate price (which it is not), the only party who will ultimately be prejudiced by this fact are the holders of equity in Debtor. These holders are insiders of Debtor, Alex Hotel LLC (which is connected to Mr. Ely Dromy, an investor with me in multiple other real estate projects) and me. The equity holders in Debtor both consent to the private sale to ED Flores LLC.

18.    There is a necessity, at present, to refinance the secured indebtedness on the Wilshire & Linden property. The secured indebtedness owed by the Wilshire & Linden property

is to East West Bank and totals $13,600,000.  In order to obtain the financing that it needs, the ownership interest in the Wilshire & Linden property held by the Chapter 11 Debtor must be removed as the financing commitment that exists is contingent upon that interest being removed before the financing will be put in place.  Like many lenders, particularly real estate lenders, the new lender for the Wilshire & Linden property will not lend to an entity whose ownership, in whole or in part, is in a Chapter 11 proceeding.

19.    The terms of the purchase of Debtor's 10.55% interest will be a down payment at closing to Debtor of $1,850,000 and a payment of the balance of $1,015,200 six months after the closing date.  The adjustments to the purchase price found on page 15, lines 6-15 are incorporated herein.

I declare the matters stated herein to be true under the penalty of perjury.

Executed this 28th day of June, 2023 at Los Angeles, California.

_____
Leonid Pustilnikov

# EXHIBIT A

| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br>Victor A. Sahn (CA Bar No. 97299)<br>  *victor.sahn@gmlaw.com*<br>Steve Burnell (CA Bar No. 286557)<br>  *steve.burnell@gmlaw.com*<br>**GREENSPOON MARDER LLP**<br>a Florida limited liability partnership<br>1875 Century Park East<br>Suite 1900<br>Los Angeles, CA 90067<br>Telephone: 213.626.2311<br>Facsimile: 954.771.9264<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for Debtor in Possession* | FOR COURT USE ONLY |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -. LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br>9300 WILSHIRE LLC, a Delaware limited liability company,<br><br><br><br><br>Debtor(s) | CASE NO.: 2:23-bk-10918-ER<br><br>CHAPTER: 11<br><br><br>**SUMMARY OF AMENDED SCHEDULES,**<br>**MASTER MAILING LIST,**<br>**AND/OR STATEMENTS**<br>**[LBR 1007-1(c)]** |

A filing fee is required to amend Schedules D or E/F (see Abbreviated Fee Schedule on the Court's website www.cacb.uscourts.gov). A supplemental master mailing list (do not repeat any creditors on the original) is required as an attachment if creditors are being added to the Schedule D or E/F.
Are one or more creditors being added? ☐ Yes ☒ No

The following schedules, master mailing list or statements (check all that apply) are being amended:

☒ Schedule A/B    ☐ Schedule C    ☐ Schedule D    ☐ Schedule E/F    ☐ Schedule G
☐ Schedule H    ☐ Schedule I    ☐ Schedule J    ☐ Schedule J-2    ☐ Statement of Financial Affairs
☐ Statement About Your Social Security Numbers ☐ Statement of Intention ☐ Master Mailing List
☒ Other *(specify)* 206SUM - Summary of Assets and Liabilities for Non-Individuals

I/we declare under penalty of perjury under the laws of the United States that the amended schedules, master mailing list, and or statements are true and correct.

Date: April 28, 2023

Debtor 1 Signature                                          Leonid Pustilnikov, Manager


Debtor 2 (Joint Debtor) Signature (if applicable)

***NOTE***: It is the responsibility of the Debtor, or the Debtor's attorney, to serve copies of all amendments on all creditors listed in this Summary of Amended Schedules, Master Mailing List, and/or Statements, and to complete and file the attached Proof of Service of Document.

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California

*December 2015*                         Page 1                         **F 1007-1.1.AMENDED.SUMMARY**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1875 Century Park East, Suite 1900, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled *(specify)*: **SUMMARY OF AMENDED SCHEDULES, MASTER MAILING LIST, AND/OR STATEMENTS [LBR 1007-1 (c)]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *(date)* 04/28/2023                , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Melissa Boey** melissa.boey@morganlewis.com
- **Steve Burnell** Steve.Burnell@gmlaw.com, sburnell@ecf.courtdrive.com;
  sburnell@ecf.inforuptcy.com;cheryl.caldwell@gmlaw.com;denise.walker@gmlaw.com
- **Abigail V O'Brient** avobrient@mintz.com, docketing@mintz.com;
  DEHashimoto@mintz.com;nleali@mintz.com;ABLevin@mintz.com
- **Victor A Sahn** victor.sahn@gmlaw.com, vsahn@ecf.courtdrive.com; pdillamar@ecf.courtdrive.com;
  patricia.dillamar@gmlaw.com,Karen.Files@gmlaw.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Craig A Wolfe** craig.wolfe@morganlewis.com
- **Hatty K Yip** hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:   On *(date)*                     , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *(date)*                     , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 28, 2023 | Karen L. Files | /s/Karen L. Files |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California

*December 2015*                                    Page 2                    **F 1007-1.1.AMENDED.SUMMARY**

Fill in this information to identify the case:

Debtor name   9300 Wilshire LLC

United States Bankruptcy Court for the:   CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)   2:23-bk-10918-ER

☒ Check if this is an
amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.   Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.**   Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.   18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☒ Amended *Schedule*   A/B
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☒ Other document that requires a declaration   Amended 206SUM

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   April 28, 2023      X _____
                                           Signature of individual signing on behalf of debtor

                                       Leonid Pustilnikov
                                       Printed name

                                       Manager
                                       Position or relationship to debtor

Software Copyright (c) 1996-2023 Best Case, LLC - www.bestcase.com                                              Best Case Bankruptcy

**Fill in this information to identify the case:**

Debtor name ___9300 Wilshire LLC___

United States Bankruptcy Court for the: ___CENTRAL DISTRICT OF CALIFORNIA___

Case number (if known) ___2:23-bk-10918-ER___

☒ Check if this is an
amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals                                12/15

| Part 1: | Summary of Assets |
|---|---|

1. **Schedule A/B: Assets-Real and Personal Property** (Official Form 206A/B)

   **1a. Real property:**
   Copy line 88 from *Schedule A/B*........................................................................................ $ _____29,761,156.00_

   **1b. Total personal property:**
   Copy line 91A from *Schedule A/B*.................................................................................... $ _____47,041.83_

   **1c. Total of all property:**
   Copy line 92 from *Schedule A/B*...................................................................................... $ _____29,808,197.83_

| Part 2: | Summary of Liabilities |
|---|---|

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*.................... $ _____48,600,000.00_

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   **3a. Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*.............................................. $ _____0.00_

   **3b. Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*............................. +$ _____766,523.37_

4. **Total liabilities** ..................................................................................................
   Lines 2 + 3a + 3b                                                                                     $ _____49,366,523.37_

**Fill in this information to identify the case:**

Debtor name _____ 9300 Wilshire LLC _____

United States Bankruptcy Court for the: _____ CENTRAL DISTRICT OF CALIFORNIA _____

Case number (if known) _____ 2:23-bk-10918-ER _____

☒ Check if this is an
amended filing

# Official Form 206A/B
# Schedule A/B: Assets - Real and Personal Property        12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest.
Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties
which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts
or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write
the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an
additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset
schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the
debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---|---|

**1. Does the debtor have any cash or cash equivalents?**

☐ **No.** Go to Part 2.
☒ **Yes** Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | | | | Current value of debtor's interest |
|---|---|---|---|---|

3.   **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*
     Name of institution (bank or brokerage firm)             Type of account          Last 4 digits of account number

     3.1.  Wells Fargo Bank, N.A.                              Checking                 6543                    $1,367.83

4.   **Other cash equivalents** *(Identify all)*

5.   **Total of Part 1.**

     Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.          $1,367.83

| Part 2: | Deposits and Prepayments |
|---|---|

**6. Does the debtor have any deposits or prepayments?**

☒ **No.** Go to Part 3.
☐ **Yes** Fill in the information below.

| Part 3: | Accounts receivable |
|---|---|

**10. Does the debtor have any accounts receivable?**

☐ **No.** Go to Part 4.
☒ **Yes** Fill in the information below.

11.   **Accounts receivable**

      11a. 90 days old or less:          162,945.00          -          146,981.00          = ....          $15,964.00
                                         face amount                    doubtful or uncollectible accounts

Debtor    9300 Wilshire LLC

Name

Case number (If known)    2:23-bk-10918-ER

| 11b. Over 90 days old: | 416,749.00 | - | 387,039.00 | =.... | $29,710.00 |
| | face amount | | doubtful or uncollectible accounts | | |

12.    **Total of Part 3.**

Current value on lines 11a + 11b = line 12.   Copy the total to line 82.

$45,674.00

| Part 4: | **Investments** |

**13. Does the debtor own any investments?**

☒ No.   Go to Part 5.
☐ Yes Fill in the information below.

| Part 5: | **Inventory, excluding agriculture assets** |

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☒ No.   Go to Part 6.
☐ Yes Fill in the information below.

| Part 6: | **Farming and fishing-related assets (other than titled motor vehicles and land)** |

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☒ No.   Go to Part 7.
☐ Yes Fill in the information below.

| Part 7: | **Office furniture, fixtures, and equipment; and collectibles** |

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☒ No.   Go to Part 8.
☐ Yes Fill in the information below.

| Part 8: | **Machinery, equipment, and vehicles** |

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☒ No.   Go to Part 9.
☐ Yes Fill in the information below.

| Part 9: | **Real property** |

**54. Does the debtor own or lease any real property?**

☐ No.   Go to Part 10.
☒ Yes Fill in the information below.

55.    **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest [1] |
| --- | --- | --- | --- | --- |
| | | | | |

1 - See Attachment 9 to Amended Schedule A/B

Software Copyright (c) 1996-2023 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

| Debtor | 9300 Wilshire LLC | | | Case number *(If known)* | 2:23-bk-10918-ER |
|---|---|---|---|---|---|
| | Name | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 55.1. | 9740-9744 Wilshire Blvd., Beverly Hills, CA 90212, and 125 & 129 S Linden Dr., Beverly Hills, CA 90212 APN: 4328-009-021 (125 S. Linden), 4328-009-007 (129 S. Linden) | Leasehold Interest & Tenancy in common | Unknown | Debtor's own estimate | $ 2,785,200.00 |
| 55.2. | 174 Kinney St & 169-177 Pier, Santa Monica, CA 90045 APN: 4288-008-008 | Tenancy in common | Unknown | Debtor's own estimate | $1,237,500.00 |
| 55.3. | 1100 N. Harbor Blvd. Redondo Beach, CA 90012 | Tenancy in common | Unknown | Debtor's own estimate | $19,688,000.00 |
| 55.4. | 1241-1251 3rd St Santa Monica, CA 90401 Via 1247 3rd Street, LLC | Ownership via SMLLC | Unknown | Debtor's own estimate | ($112,015.00) |
| 55.5. | 346 N Maple Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Ownership via SMLLC | Unknown | Debtor's own estimate | $1,554,642.00 |
| 55.6. | 1127-1137 Horn Ave West Hollywood, CA 90069 via Beachside Suites, LLC | Ownership via SMLLC | Unknown | Debtor's own estimate | $ 1,855,049.00 |
| 55.7. | 201 S Arnaz Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Ownership via SMLLC | Unknown | Debtor's own estimate | $ 1,355,264.00 |
| 55.8. | 232 S Tower Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Ownership via SMLLC | Unknown | Debtor's own estimate | $1,397,516.00 |

**56.** **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
Copy the total to line 88.

| $29,761,156.00 |
|---|

Official Form 206A/B    Schedule A/B Assets - Real and Personal Property    page 3

| Debtor | 9300 Wilshire LLC | Case number *(if known)* | 2:23-bk-10918-ER |
| | Name | | |

57.    **Is a depreciation schedule available for any of the property listed in Part 9?**
☒ No
☐ Yes

58.    **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
☒ No
☐ Yes

---

| Part 10: | Intangibles and intellectual property |

59. **Does the debtor have any interests in intangibles or intellectual property?**

☒ No.   Go to Part 11.
☐ Yes Fill in the information below.

---

| Part 11: | All other assets |

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☒ No.   Go to Part 12.
☐ Yes Fill in the information below.

---

Software Copyright (c) 1996-2023 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

Debtor    9300 Wilshire LLC
                Name

Case number *(If known)*  2:23-bk-10918-ER

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $1,367.83 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $45,674.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.....................................................>* | | $29,761,156.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $47,041.83 | + 91b. $ 29,761,156.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $29,808,197.83 |

**In re: 9300 Wilshire LLC**
**USBC Case No.: 2:23-bk-10918-ER**

**Attachment 9 to Amended Schedule A/B**

Re: Schedule A, Part 9 Real Property

55.1 - Debtor holds a 21.40% interest in 9740-9744 Wilshire Blvd., Beverly Hills, CA 90212, and 125 & 129 S Linden Dr., Beverly Hills, CA 90212.  The full value of these properties is $40,000,000.00.  However, a broker opinion of value recently put the properties, cumulatively, at $50,000,000.  The current value of Debtor's interest/equity in these properties is $2,785,200.00 based upon the $40,000,000 valuation.  Based upon a $50,000,000 valuation, the current value of the Debtor's interest in these properties is $3,840,200.00.  Finally, these properties are contiguous to each other.  The intention is to develop these properties as one integrated project.  Such a development would have a significantly higher value than $50,000,000 and would result in the Debtor's interest in the properties being significantly more valuable.  The debt against this property is secured by the value of the entire property.

55.2 - Debtor holds a 22.50% interest in 174 Kinney St & 169-177 Pier, Santa Monica, CA 90045. The full value of these properties is $12,500,000.00.  The current value of Debtor's interest/equity in these properties is $1,237,500.00.  Again, there are valuations of these properties that are higher than what is listed here, resulting in a higher valuation of the Debtor's interest in it.  The debt against this property is secured by the value of the entire property.

55.3 - Debtor holds a 21.40% interest in 1100 N. Harbor Blvd., Redondo Beach, CA 90012.  The full value of the property is $120,000,000.00.  The current value of Debtor's interest in these properties is $19,688,000.  The debt against this property is secured by the value of the entire property.

Please see the below chart listing all ownership interests and Debtor's equity calculations in the above subject properties.  The chart also includes all ownership interests and Debtor's interests/equity in properties (Scheule A/B Line nos. 55.4-55.8) held by Debtor's single-member LLCs (1247 3rd Street, LLC and Beachside Suites, LLC).

[Continued on next page]

| Schedule A/B Line No. | Property | Ownership | Loan Balance | Value of Entire Property | Total Equity | Debtor's Interest/Equity in the Property (Total Equity x Debtor's fractional interest) |
|---|---|---|---|---|---|---|
| 55.1 | 9740-9744 Wilshire Blvd Beverly Hills, CA 90212 & 125 & 129 S Linden Dr Beverly Hills, CA 90212 | Dromy 1995 Family Trust: 28% 9300 Wilshire LLC: 10.55% 9300 Wilshire Fee, LLC: 43.95% E.D. Flores, LLC: 2.5% 1112 Investment Co., LLC: 5% EJT Wilshire Linden, LLC: 10% | $13,600,000 | $40,000,000 | $26,400,000 | $2,785,200 |
| 55.2 | 174 Kinney St & 169-177 Pier Santa Monica, CA 90405 | 362 Camden Fee, LLC: 38.55% 9300 Wilshire LLC: 22.50% BH Karka, LLC: 28.95% EJT Kinney Pier, LLC: 10% | $7,000,000 | $12,500,000 | $5,500,000 | $1,237,500 |
| 55.3 | AES 1100 N Harbor Dr Redondo Beach, CA 90277 | 9300 Wilshire LLC: 21.40% 1112 Investment Co., LLC: 18.45% E.D. Flores, LLC: 19.85% 9300 Wilshire Fee, LLC: 10.00% David Dromy: 3.75% 1650 Veteran, LLC: 10.02% Outdoor Billboard, LLC: 1.58% BH Karka, LLC: 2.60% 5th Street Inv. Co., LLC: 4.45% 505 Investment Co., LLC: 1.45% SLH Fund, LLC: 3.45% Peak Alcott, LLC: 3.00% | $28,000,000 | $120,000,000 | $92,000,000 | $19,688,000 |

| | | | | | | |
|---|---|---|---|---|---|
| 55.4 | 1241-1251 3rd St Santa Monica, CA 90401 via 1247 3rd Street, LLC | 1241 3rd Street, LLC (E.D. Flores): 60% 1247 3rd Street, LLC (9300 Wilshire): 20% EJT 3rd Street Promenade, LLC: 20% | $18,000,000 | $18,560,082 | ($560,082) | ($112,015) |
| 55.5 | 346 N Maple Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $4,500,000 | $2,671,010 | $1,828,990 | $1,554,642 |
| 55.6 | 1127-1137 Horn Ave West Hollywood, CA 90069 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $5,000,000 | $2,817,590 | $2,182,410 | $1,855,049 |
| 55.7 | 201 S Arnaz Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $3,500,000 | $1,905,537 | $1,594,463 | $1,355,264 |
| 55.8 | 232 S Tower Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $4,250,000 | $2,605,863 | $1,644,137 | $1,397,516 |
| | | Totals | $83,850,000 | $201,060,082 | $130,589,918 | $29,761,156 |

# EXHIBIT B



# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
### (As required by the Civil Code)
### (C.A.R. Form AD, Revised 12/21)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k), and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

## SELLER'S AGENT

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:

    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.

    (b)  A duty of honest and fair dealing and good faith.

    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## BUYER'S AGENT

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:

    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.

    (b)  A duty of honest and fair dealing and good faith.

    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## AGENT REPRESENTING BOTH SELLER AND BUYER

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:

    (a)  A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.

    (b)  Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

## SELLER AND BUYER RESPONSIBILITIES

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE SECOND PAGE.**

☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ *ED Flores, LLC and/or assignee* Date _____

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date _____

Agent _____ *LND Realty* _____ DRE Lic. # *00582069* _____

                             Real Estate Broker (Firm)

By _____ *Adam Kanizo* DRE Lic. # *02008361* _____ Date _____

           (Salesperson or Broker-Associate, if any)

© 2021, California Association of REALTORS®, Inc.

**AD REVISED 12/21 (PAGE 1 OF 2)**



## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings:

**(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

2079.14. A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgement of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

2079.15. In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17(a) As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION: **(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form:

Seller's Brokerage Firm _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

2079.18 (Repealed pursuant to AB-1289)

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 **(a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

2079.23 **(a)** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**AD REVISED 12/21 (PAGE 2 OF 2)**

# DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)

**FAIR HOUSING AND DISCRIMINATION ADVISORY**
(C.A.R. Form FHDA, Revised 6/22)

1. **EQUAL ACCESS TO HOUSING FOR ALL:** All housing in California is available to all persons. Discrimination as noted below is prohibited by law. Resources are available for those who have experienced unequal treatment under the law.
2. **FEDERAL AND STATE LAWS PROHIBIT DISCRIMINATION AGAINST IDENTIFIED PROTECTED CLASSES:**
   **A.** FEDERAL FAIR HOUSING ACT ("FHA") Title VIII of the Civil Rights Act; 42 U.S.C. §§ 3601-3619; Prohibits discrimination in sales, rental or financing of residential housing against persons in protected classes;
   **B.** CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA") California Government Code ("GC") §§ 12900-12996,12955; 2 California Code of Regulations ("CCR") §§ 12005-12271; Prohibits discrimination in sales, rental or financing of housing opportunity against persons in protected classes by providers of housing accommodation and financial assistance services as related to housing;
   **C.** CALIFORNIA UNRUH CIVIL RIGHTS ACT ("Unruh") California Civil Code ("CC") § 51; Prohibits business establishments from discriminating against, and requires full and equal accommodation, advantages, facilities, privileges, and services to persons in protected classes;
   **D.** AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§ 12181-12189; Title III of the ADA prohibits discrimination based on disability in public accommodations; and
   **E.** OTHER FAIR HOUSING LAWS: § 504 of Rehabilitation Act of 1973 29 U.S.C. § 794; Ralph Civil Rights Act CC § 51.7.; California Disabled Persons Act; CC §§ 54-55.32; any local city or county fair housing ordinances, as applicable.
3. **POTENTIAL LEGAL REMEDIES FOR UNLAWFUL DISCRIMINATION: Violations of fair housing laws may result in monetary civil fines, injunctive relief, compensatory and/or punitive damages, and attorney fees and costs.**
4. **PROTECTED CLASSES/CHARACTERISTICS:** Whether specified in Federal or State law or both, discrimination against persons if based on that person's belonging to, association with, or perceived membership in, certain classes or categories, such as the following, is prohibited. Other classes, categories or restrictions may also apply.

| Race | Color | Ancestry | National Origin | Religion |
|---|---|---|---|---|
| Age | Sex, Sexual Orientation | Gender, Gender Identity, Gender expression | Marital Status | Familial Status (family with a child or children under 18) |
| Citizenship | Immigration Status | Primary Language | Military/Veteran Status | Source of Income (e.g., Section 8 Voucher) |
| Medical Condition | Disability (Mental & Physical) | Genetic Information | Criminal History (non-relevant convictions) | Any arbitrary characteristic |

5. **THE CALIFORNIA DEPARTMENT OF REAL ESTATE REQUIRES TRAINING AND SUPERVISION TO PREVENT HOUSING DISCRIMINATION BY REAL ESTATE LICENSEES:**
   **A.** California Business & Professions Code ("B&PC") § 10170.5(a)(4) requires 3 hours of training on fair housing for DRE license renewal; Real Estate Regulation § 2725(f) requires brokers who oversee salespersons to be familiar with the requirements of federal and state laws relating to the prohibition of discrimination.
   **B.** Violation of DRE regulations or real estate laws against housing discrimination by a real estate licensee may result in the loss or suspension of the licensee's real estate license. B&PC §10177(l)(1); 10 CCR § 2780
6. **REALTOR® ORGANIZATIONS PROHIBIT DISCRIMINATION:** NAR Code of Ethics Article 10 prohibits discrimination in employment practices or in rendering real estate license services against any person because of race, color, religion, sex, disability, familial status, national origin, sexual orientation, or gender identity by REALTORS®.
7. **WHO IS REQUIRED TO COMPLY WITH FAIR HOUSING LAWS?**
   Below is a non-exclusive list of providers of housing accommodations or financial assistance services as related to housing who are most likely to be encountered in a housing transaction and who must comply with fair housing laws.

   - Sellers
   - Real estate licensees
   - Mobilehome parks
   - Insurance companies
   - Landlords
   - Real estate brokerage firms
   - Homeowners Associations ("HOAs");
   - Government housing services
   - Sublessors
   - Property managers
   - Banks and Mortgage lenders
   - Appraisers

8. **EXAMPLES OF CONDUCT THAT MAY NOT BE MOTIVATED BY DISCRIMINATORY INTENT BUT COULD HAVE A DISCRIMINATORY EFFECT:**
   **A.** Prior to acceptance of an offer, asking for or offering buyer personal information or letters from the buyer, especially with photos. Those types of documents may inadvertently reveal, or be perceived as revealing, protected status information thereby increasing the risk of **(i)** actual or unconscious bias, and **(ii)** potential legal claims against sellers and others by prospective buyers whose offers are rejected.
   **B.** Refusing to rent **(i)** an upper-level unit to an elderly tenant out of concern for the tenant's ability to navigate stairs or **(ii)** a house with a pool to a person with young children out of concern for the children's safety.
9. **EXAMPLES OF UNLAWFUL OR IMPROPER CONDUCT BASED ON A PROTECTED CLASS OR CHARACTERISTIC:**
   **A.** Refusing to negotiate for a sale, rental or financing or otherwise make a housing opportunity unavailable; failing to present offers due to a person's protected status;
   **B.** Refusing or failing to show, rent, sell or finance housing; "channeling" or "steering" a prospective buyer or tenant to or away from a particular area due to that person's protected status or because of the racial, religious or ethnic composition of the neighborhood;
   **C.** "Blockbusting" or causing "panic selling" by inducing a listing, sale or rental based on the grounds of loss of value of property, increase in crime, or decline in school quality due to the entry or prospective entry of people in protected categories into the neighborhood;
   **D.** Making any statement or advertisement that indicates any preference, limitation, or discrimination;

© 2022, California Association of REALTORS®, Inc.
**FHDA REVISED 6/22 (PAGE 1 OF 2)**



**FAIR HOUSING AND DISCRIMINATION ADVISORY (FHDA PAGE 1 OF 2)**

**E.** Inquiring about the children or characteristics (such as disability) of an applicant or the race of prospective purchasers if they have children or are planning to have children;

**F.** Using criminal history information before otherwise affirming eligibility, and without a legally sufficient justification;

**G.** Failing to assess financial standards based on the portion of the income responsible by a tenant who receives government subsidies (such as basing an otherwise neutral rent to income ratio on the whole rent rather than just the part of rent that is the tenant's responsibility);

**H.** Denying a home loan or homeowner's insurance;

**I.** Offering inferior terms, conditions, privileges, facilities or services;

**J.** Using different qualification criteria or procedures for sale or rental of housing such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements;

**K.** Harassing a person;

**L.** Taking an adverse action based on protected characteristics;

**M.** Refusing to permit a reasonable modification to the premises, as requested by a person with a disability (such as refusing to allow a tenant who uses a wheelchair to install, at their own expense, a ramp over front or rear steps, or refusing to allow a tenant with a physical disability from installing, at their own expense, grab bars in a shower or bathtub);

**N.** Refusing to make reasonable accommodation in policies, rules, practices, or services for a person with a disability (such as the following, if an actual or prospective tenant with a disability has a service animal or support animal):
    **(i)**  Failing to allow that person to keep the service animal or emotional support animal in rental property,
    **(ii)**  Charging that person higher rent or increased security deposit, or
    **(iii)**  Failing to show rental or sale property to that person who is accompanied by the service animal or support animal, and;

**O.** Retaliating for asserting rights under fair housing laws.

**10. EXAMPLES OF POSITIVE PRACTICES:**

**A.** Real estate licensees working with buyers or tenants should apply the same objective property selection criteria, such as location/neighborhood, property features, and price range and other considerations, to all prospects.

**B.** Real estate licensees should provide complete and objective information to all clients based on the client's selection criteria.

**C.** Real estate licensees should provide the same professional courtesy in responding to inquiries, sharing of information and offers of assistance to all clients and prospects.

**D.** Housing providers should not make any statement or advertisement that directly or indirectly implies preference, limitation, or discrimination regarding any protected characteristic (such as "no children" or "English-speakers only").

**E.** Housing providers should use a selection process relying on objective information about a prospective buyer's offer or tenant's application and not seek any information that may disclose any protected characteristics (such as using a summary document, e.g. C.A.R. Form SUM-MO, to compare multiple offers on objective terms).

**11. FAIR HOUSING RESOURCES:** If you have questions about your obligations or rights under the Fair Housing laws, or you think you have been discriminated against, you may want to contact one or more of the sources listed below to discuss what you can do about it, and whether the resource is able to assist you.

**A.** Federal: **https://www.hud.gov/program_offices/fair_housing_equal_opp**

**B.** State: **https://www.dfeh.ca.gov/housing/**

**C.** Local: local Fair Housing Council office (non-profit, free service)

**D.** DRE: **https://www.dre.ca.gov/Consumers/FileComplaint.html**

**E.** Local Association of REALTORS®. List available at: **https://www.car.org/en/contactus/rosters/localassociationroster**

**F.** Any qualified California fair housing attorney, or if applicable, landlord-tenant attorney.

**12. LIMITED EXCEPTIONS TO FAIR HOUSING REQUIREMENTS: No person should rely on any exception below without first seeking legal advice about whether the exception applies to their situation. Real estate licensees are not qualified to provide advice on the application of these exceptions.**

**A.** Legally compliant senior housing is exempt from FHA, FEHA and Unruh as related to age or familial status only;

**B.** An owner of a single-family residence who resides at the property with one lodger may be exempt from FEHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental;

**C.** An owner of a single-family residence may be exempt from FHA for sale or rental purposes, PROVIDED **(i) no real estate licensee is involved** in the sale or rental and **(ii)** no discriminatory advertising is used, and **(iii)** the owner owns no more than three single-family residences. Other restrictions apply;

**D.** An owner of residential property with one to four units who resides at the property, may be exempt from FHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental; and

**E.** Both FHA and FEHA do not apply to roommate situations. See, *Fair Housing Council v Roommate.com LLC*, 666 F.3d 1216 (2019).

**F.** Since both the 14th Amendment of the U.S. Constitution and the Civil Rights Act of 1866 prohibit discrimination based on race; the FHA and FEHA exemptions do not extend to discrimination based on race.

Buyer/Tenant and Seller/Landlord have read, understand and acknowledge receipt of a copy of this Fair Housing & Discrimination Advisory.

| Buyer/Tenant | *ED Flores, LLC and/or assignee* | Date |
| --- | --- | --- |
| Buyer/Tenant | | Date |
| Seller/Landlord | *9300 Wilshire, LLC* | Date |
| Seller/Landlord | | Date |

© 2022, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**FHDA REVISED 6/22 (PAGE 2 OF 2)**

**FAIR HOUSING AND DISCRIMINATION ADVISORY (FHDA PAGE 2 OF 2)**



# WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY
### (C.A.R. Form WFA, Revised 12/21)

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA  90212* _____ ("Property").

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFERS ADVISORY:

The ability to communicate and conduct business electronically is a convenience and reality in nearly all parts of our lives. At the same time, it has provided hackers and scammers new opportunities for their criminal activity. Many businesses have been victimized and the real estate business is no exception.

While wiring or electronically transferring funds is a welcome convenience, we all need to exercise extreme caution. Emails attempting to induce fraudulent wire transfers have been received and have appeared to be legitimate. Reports indicate that some hackers have been able to intercept emailed transfer instructions, obtain account information and, by altering some of the data, redirect the funds to a different account. It also appears that some hackers were able to provide false phone numbers for verifying the wiring or funds transfer instructions. In those cases, the victim called the number provided to confirm the instructions, and then unwittingly authorized a transfer to somewhere or someone other than the intended recipient.

## ACCORDINGLY, YOU ARE ADVISED:

1. **Obtain phone numbers and account numbers only from Escrow Officers, Property Managers, or Landlords at the beginning of the transaction.**
2. **DO NOT EVER WIRE OR ELECTRONICALLY TRANSFER FUNDS PRIOR TO CALLING TO CONFIRM THE TRANSFER INSTRUCTIONS. ONLY USE A PHONE NUMBER YOU WERE PROVIDED PREVIOUSLY. Do not use any different phone number or account number included in any emailed transfer instructions.**
3. **Orally confirm the transfer instruction is legitimate and confirm the bank routing number, account numbers and other codes before taking steps to transfer the funds.**
4. **Avoid sending personal information in emails or texts.  Provide such information in person or over the telephone directly to the Escrow Officer, Property Manager, or Landlord.**
5. **Take steps to secure the system you are using with your email account. These steps include creating strong passwords, using secure WiFi, and not using free services.**

If you believe you have received questionable or suspicious wire or funds transfer instructions, immediately notify your bank, and the other party, and the Escrow Office, Landlord, or Property Manager. The sources below, as well as others, can also provide information:

Federal Bureau of Investigation: https://www.fbi.gov/; the FBI's IC3 at www.ic3.gov; or 310-477-6565

National White Collar Crime Center: http://www.nw3c.org/

On Guard Online: https://www.onguardonline.gov/

**NOTE: There are existing alternatives to electronic and wired fund transfers such as cashier's checks. By signing below, the undersigned acknowledge that each has read, understands and has received a copy of this Wire Fraud and Electronic Funds Transfer Advisory.**

Buyer/Tenant _____ *ED Flores, LLC and/or assignee* Date _____

Buyer/Tenant _____ Date _____

Seller/Landlord _____ *9300 Wilshire, LLC* Date _____

Seller/Landlord _____ Date _____

©2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**WFA REVISED 12/21 (PAGE 1 OF 1)**

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY (WFA PAGE 1 OF 1)

**CALIFORNIA ASSOCIATION OF REALTORS®**

# COMMERCIAL PURCHASE AGREEMENT
# AND JOINT ESCROW INSTRUCTIONS
### (C.A.R. Form CPA, Revised 12/22)

Date Prepared: _June 14, 2023_

**1. OFFER:**

  **A.** **THIS IS AN OFFER FROM** _____ED Flores, LLC and/or assignee_____ ("Buyer").
    ☐ Individual(s), ☐ A Corporation, ☐ A Partnership, ☒ An LLC, ☐ Other _____ .

  **B.** **THE PROPERTY** to be acquired is _____9740 Wilshire Blvd_____ , situated
    in _____Beverly Hills_____ (City), _____ (County), California, _____90212_____ (Zip Code),
    Assessor's Parcel No(s). _____4328-009-003_____ ("Property").
    **(Postal/Mailing address may be different from city jurisdiction.  Buyer is advised to investigate.)**

  **C.** **THE TERMS OF THE PURCHASE ARE SPECIFIED BELOW AND ON THE FOLLOWING PAGES.**

  **D.** Buyer and Seller are referred to herein as the "Parties." Brokers and Agents are **not** Parties to this Agreement.

**2. AGENCY:**

  **A.** **DISCLOSURE:** The Parties each acknowledge receipt of a "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD) if represented by a real estate licensee. Buyer's Agent is not legally required to give to Seller's Agent the AD form Signed by Buyer. Seller's Agent is not legally obligated to give to Buyer's Agent the AD form Signed by Seller.

  **B.** **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction.

    **Seller's Brokerage Firm** _____LND Realty_____ License Number _____00582069_____
    Is the broker of (check one): ☐ the Seller; or ☒ both the Buyer and Seller (Dual Agent).
    **Seller's Agent** _____Adam Kanizo_____ License Number _____02008361_____
    Is (check one): ☐ the Seller's Agent (Salesperson or broker associate); or ☒ both the Buyer's and Seller's Agent (Dual Agent).
    **Buyer's Brokerage Firm** _____LND Realty_____ License Number _____00582069_____
    Is the broker of (check one): ☐ the Buyer; or ☒ both the Buyer and Seller (Dual Agent).
    **Buyer's Agent** _____Adam Kanizo_____ License Number _____02008361_____
    Is (check one): ☐ the Buyer's Agent (Salesperson or broker associate); or ☒ both the Buyer's and Seller's Agent (Dual Agent).

  **C.** ☐ More than one Brokerage represents ☐ Seller, ☐ Buyer. See, Additional Broker Acknowledgement (C.A.R. Form ABA).

  **D.** **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent (C.A.R. Form PRBS).

**3. TERMS OF PURCHASE AND ALLOCATION OF COSTS:** The items in this paragraph are contractual terms of the Agreement. Referenced paragraphs provide further explanation. This form is 17 pages. The Parties are advised to read all 17 pages.

| | Paragraph # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| **A** | 5, 5B (cash) | **Purchase Price** | $ _4,300,000.00_ | ☐ All Cash |
| **B** | | **Close of Escrow (COE)** | ☒ _30_ Days after Acceptance OR on _____ (date) (mm/dd/yyyy) | |
| **C** | 39A | **Expiration of Offer** | 3 calendar days after all Buyer Signature(s) or _____ (date) at 5PM or _____ ☐ AM/ ☐ PM | |
| **D(1)** | 5A(1) | **Initial Deposit Amount** | $ _1,000.00_ ( _0.02_ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | within 3 (or _____) business days after Acceptance by wire transfer **OR** ☐ _____ |
| **D(2)** | 5A(2) | ☐ **Increased Deposit** (Money placed into escrow after the initial deposit. Use form DID at time increased deposit is made.) | $ _____ ( _____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | Upon removal of all contingencies **OR** ☐ _____ (date) **OR** ☐ _____ |
| **E(1)** | 5C(1) | **Loan Amount(s):**   First     Interest Rate     Points     If FHA or VA checked, Deliver list of lender required repairs | $ _2,450,000.00_ ( _56.98_ % of purchase price) Fixed rate or ☐ Initial adjustable rate, • not to exceed _____% • Buyer to pay up to _____ points to obtain rate above 17 (or _____) Days after Acceptance | Conventional or, if checked, ☐ Seller Financing ☒ Assumed Financing ☐ Subject To Financing ☐ Other: _____ |
| **E(2)** | 5C(2) |   Additional Financed Amount     Interest Rate     Points | $ _____ ( _____ % of purchase price) Fixed rate or ☐ Initial adjustable rate • not to exceed _____% • Buyer to pay up to _____ points to obtain rate above | Conventional or, if checked, ☐ Seller Financing ☐ Assumed Financing ☐ Subject To Financing ☐ Other: _____ |
| **E(3)** | 7A | **Occupancy Type** | Investment | |
| **F** | 5D | **Balance of Down Payment** | $ _1,849,000.00_ | |
| | | **PURCHASE PRICE TOTAL** | $ _4,300,000.00_ | |

© 2022, California Association of REALTORS®, Inc.

**CPA REVISED 12/22 (PAGE 1 OF 17)**

Buyer's Initials _____ / _____    Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 1 OF 17)**

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA  90212*                              Date: *June 14, 2023*

| | Paragraph # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| **G(1)** | 5E | **Seller Credit, if any, to Buyer** | ☐ $_____ (_____% of purchase price) (% number above is for calculation purposes and is not a contractual term) | Seller credit to be applied to closing costs OR Other: _____ |
| **G(2)** | | **ADDITIONAL FINANCE TERMS:** *at closing approx $1,850,000 in cash and the balance less debt assumed and customary prorations within 6 months of closing.* ||||
| **G(3)** | 21 | ☐ **Seller agrees to pay the obligation of Buyer to compensate Buyer's Broker under a separate agreement** (C.A.R. Form SPBB attached). Seller's Broker's offer, if any, to compensate Buyer's Broker is unaffected unless Otherwise Agreed. ||||
| **H(1)** | 5B | **Verification of All Cash** (sufficient funds) | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| **H(2)** | 6A | **Verification of Down Payment and Closing Costs** | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| **H(3)** | 6B | **Verification of Loan Application** | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | ☐ Prequalification ☐ Preapproval |
| **I** | | **Intentionally Left Blank** ||||
| **J** | 19 | **Final Verification of Condition** | 5 (or _____) Days prior to COE | |
| **K** | 26 | **Assignment Request** | 17 (or _____) Days after Acceptance | |
| **L** | 8 | **CONTINGENCIES** | **TIME TO REMOVE CONTINGENCIES** | **CONTINGENCY REMOVED** |
| **L(1)** | 8A | **Loan(s)** | 17 (or _____) Days after Acceptance | ☒ No loan contingency |
| **L(2)** | 8B | **Appraisal:** Appraisal contingency based upon appraised value at a minimum of purchase price or ☐ $_____ | 17 (or _____) Days after Acceptance | ☒ No appraisal contingency  Removal of appraisal contingency does not eliminate appraisal cancellation rights in FVAC. |
| **L(3)** | 8C, 15 | **Investigation of Property** | 17 (or _____) Days after Acceptance | REMOVAL OR WAIVER OF CONTINGENCY: |
| | | **Informational Access to Property** Buyer's right to access the Property for informational purposes only is **NOT** a contingency, does **NOT** create cancellation rights, and applies even if contingencies are removed. | 17 (or _____) Days after Acceptance | Any contingency in L(1)-L(7) may be removed or waived by checking the |
| **L(4)** | 8D, 17A | **Review of Seller Documents** | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | applicable box above or attaching a Contingency Removal (C.A.R. Form CR) and checking the applicable |
| **L(5)** | 8E, 16A | **Preliminary ("Title") Report** | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | box therein.  Removal or Waiver at time of offer is against Agent advice. |
| **L(6)** | 8F, 11C | **Common Interest Disclosures** required by Civil Code § 4525 or this Agreement | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | See **paragraph 8H**. |
| **L(7)** | 8G, 9B(6) | **Review of leased or liened items** (Such as for solar panels or propane tanks or PACE or HERO liens) | 17 (or _____) Days after Acceptance, or 5 Days after Delivery, whichever is later | ☐ **CR attached** |
| **L(8)** | 8J | **Sale of Buyer's Property** Sale of Buyer's property is not a contingency, UNLESS checked here: ☐ **C.A.R. Form COP attached** | | |
| **M** | | **Possession** | **Time for Performance** | **Additional Terms** |
| **M(1)** | | **Vacant Units;** Tenant Occupied Units being delivered subject to tenant rights | Upon notice of recordation On COE date | ☐ Tenant Occupied Unit(s) to be delivered vacant (#s _____) |
| **M(2)** | 7C | **Seller Occupied** | Upon notice of recordation, OR ☐ 6 PM or _____ ☐ AM/ ☐ PM COE date or, if checked below, ☐ _____ days after COE (29 or fewer days) ☐ _____ days after COE (30 or more days) | C.A.R. Form SIP attached if 29 or fewer days. C.A.R. Form CL attached if 30 or more days. |
| **N** | | **Documents/Fees/Compliance** | **Time for Performance** | |
| **N(1)** | 17A | Seller Delivery of Documents | 7 (or _____) Days after Acceptance | |
| **N(2)** | 22B | Sign and return Escrow Holder General Provisions, Supplemental Instructions | 5 (or _____) Days after Delivery | |
| **N(3)** | 11C(2) | Time to pay fees for ordering HOA Documents | 3 (or _____) Days after Acceptance | |
| **N(4)** | 10B(1) | Install smoke alarm(s), CO detector(s), water heater bracing | 17 (or _____) Days after Acceptance | |
| **N(5)** | 35 | Evidence of representative authority | 3 Days after Acceptance | |

**CPA REVISED 12/22 (PAGE 2 OF 17)**          Buyer's Initials _____ / _____   Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 2 OF 17)**



Property Address: *9740 Wilshire Blvd, Beverly Hills, CA 90212*                                    Date: *June 14, 2023*

| O | | Intentionally Left Blank | | |
|---|---|---|---|---|
| **P** | **Items Included and Excluded** | | | |
| **P(1)** | 9 | **Items Included** - All items specified in Paragraph 9B are included and the following, if checked:<br>☐ _____.  ☐ _____.  ☐ _____. | | |
| **P(2)** | 9 | **Excluded Items:**<br>☐ _____;  ☐ _____;  ☐ _____; | | |
| **Q** | **Allocation of Costs** | | | |

| Q | Paragraph # | Item Description | Who Pays (if Both is checked, cost to be split equally unless Otherwise Agreed) | Additional Terms |
|---|---|---|---|---|
| **Q(1)** | 10A, 11D | Natural Hazard Zone Disclosure Report, including tax information | ☒ Buyer ☐ Seller ☐ Both _____<br>☐ Provided by: *MyNHD **Best Value*** | ☐ Environmental<br>☐ Other _____ |
| **Q(2)** | 15B(1)(D) | Environmental Survey | ☒ Buyer ☐ Seller ☐ Both _____ | |
| **Q(3)** | | _____ Report | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(4)** | 10B(1) | Smoke alarms, CO detectors, water heater bracing | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(5)** | 10A 10B(2) | Government Required Point of Sale **inspections, reports** | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(6)** | 10B(2)(A) | Government Required Point of Sale **corrective/remedial actions** | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(7)** | 22B | Escrow Fees | ☒ Buyer ☐ Seller ☐ Both _____<br>☐ Each to pay their own fees | Escrow Holder: *Orange Coast Title* _____ |
| **Q(8)** | 16 | Owner's title insurance policy | ☒ Buyer ☐ Seller ☐ Both _____ | Title Company (If different from Escrow Holder): *Orange Coast Title* _____ |
| **Q(9)** | | Buyer's Lender title insurance policy | Buyer | Unless Otherwise Agreed, Buyer shall purchase any title insurance policy insuring Buyer's lender. |
| **Q(10)** | | County transfer tax, fees | ☐ Buyer ☒ Seller ☐ Both _____ | |
| **Q(11)** | | City transfer tax, fees | ☐ Buyer ☒ Seller ☐ Both _____ | |
| **Q(12)** | 11C(2) | HOA fee for preparing disclosures | Seller | |
| **Q(13)** | | HOA certification fee | Buyer | |
| **Q(14)** | | HOA transfer fees | ☐ Buyer ☐ Seller ☐ Both _____ | Unless Otherwise Agreed, Seller shall pay for separate HOA move-out fee and Buyer shall pay for separate HOA move-in fee. Applies if separately billed or itemized with cost in transfer fee. |
| **Q(15)** | | Private transfer fees | Seller, or if checked, ☐ Buyer ☐ Both | |
| **Q(16)** | 10B(4) | Installation of safety features, required by law | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **Q(17)** | | _____ fees or costs | ☐ Buyer ☐ Seller ☐ Both _____ | |
| **R** | | **Additional Tenancy Documents:** ☐ Income and Expense Statements ☐ Tenant Estoppel Certificate | | |
| **S** | | **OTHER TERMS:** *1.subject to tic right of first offer process*<br>*2. Closing to occur 30 days after court approval.*<br>*3. Subject to bankruptcy court approval* | | |

**4.   PROPERTY ADDENDA AND ADVISORIES:** (check all that apply)

    **A.   PROPERTY TYPE ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:

      ☐ Probate Agreement Purchase Addendum (C.A.R. Form PA-PA)
      ☒ Other *TIC Addendum*

    **B.   OTHER ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:

      ☐ Addendum # _____ (C.A.R. Form ADM)    ☐ Assumed Financing Addendum (C.A.R. Form AFA)
                                      ☐ Short Sale Addendum (C.A.R. Form SSA)
      ☐ Back Up Offer Addendum (C.A.R. Form BUO)    ☒ Court Confirmation Addendum (C.A.R. Form CCA)
      ☐ Septic, Well, Property Monument and Propane Addendum (C.A.R. Form SWPI)
      ☐ Buyer Intent to Exchange Addendum (C.A.R. Form BXA)    ☐ Seller Intent to Exchange Addendum (C.A.R. Form SXA)
      ☐ Other _____

**CPA REVISED 12/22 (PAGE 3 OF 17)**          Buyer's Initials _____ / _____          Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 3 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com          **9740 Wilshire**

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA 90212*                                    Date: *June 14, 2023*

**C.   BUYER AND SELLER ADVISORIES:** (Note: All advisories below are provided for reference purposes only and are not intended to be incorporated into this Agreement.)

☒ Buyer's Investigation Advisory (C.A.R. Form BIA)                ☒ Fair Housing and Discrimination Advisory (C.A.R. Form FHDA)
☒ Wire Fraud Advisory (C.A.R. Form WFA)                          ☒ Cal. Consumer Privacy Act Advisory (C.A.R. Form CCPA)
                                   (Parties may also receive a privacy disclosure from their own Agent.)

☐ Wildfire Disaster Advisory (C.A.R. Form WFDA)                  ☐ Statewide Buyer and Seller Advisory (C.A.R. Form SBSA)
☐ Trust Advisory (C.A.R. Form TA)                                ☐ Short Sale Information and Advisory (C.A.R. Form SSIA)
☐ REO Advisory (C.A.R. Form REO)                                 ☐ Probate Advisory (C.A.R. Form PA)
☐ Other: _____                            ☐ Other: _____

**5.   ADDITIONAL TERMS AFFECTING PURCHASE PRICE:** Buyer represents that funds will be good when deposited with Escrow Holder.
   **A.   DEPOSIT:**
   (1)   **INITIAL DEPOSIT:** Buyer shall deliver deposit directly to Escrow Holder. If a method other than wire transfer is specified in **paragraph 3D(1)** and such method is unacceptable to Escrow Holder, then upon notice from Escrow Holder, delivery shall be by wire transfer.
   (2)   **INCREASED DEPOSIT:** Increased deposit to be delivered to Escrow Holder in the same manner as the Initial Deposit. If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount by signing a new liquidated damages clause (C.A.R. Form DID) at the time the increased deposit is delivered to Escrow Holder.
   (3)   **RETENTION OF DEPOSIT: Paragraph 36, if initialed by all Parties or otherwise incorporated into this Agreement, specifies a remedy for Buyer's default. Buyer and Seller are advised to consult with a qualified California real estate attorney: (i) Before adding any other clause specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase. Any such clause shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code; and (ii) Regarding possible liability and remedies if Buyer fails to deliver the deposit.**
   **B.   ALL CASH OFFER:** If an all cash offer is specified in **paragraph 3A**, no loan is needed to purchase the Property. This Agreement is NOT contingent on Buyer obtaining a loan. Buyer shall, within the time specified in **paragraph 3H(1)**, Deliver written verification of funds sufficient for the purchase price and closing costs.
   **C.   LOAN(S):**
   (1)   **FIRST LOAN:** This loan will provide for conventional financing **UNLESS** FHA, VA, Seller Financing (C.A.R. Form SFA), Subject To Financing, Assumed Financing, or Other is checked in **paragraph 3E(1)**.
   (2)   **ADDITIONAL FINANCED AMOUNT:** If an additional financed amount is specified in **paragraph 3E(2)**, that amount will provide for conventional financing **UNLESS** Seller Financing (C.A.R. Form SFA), Subject To Financing, Assumed Financing, or Other is checked in **paragraph 3E(2)**.
   (3)   **BUYER'S LOAN STATUS:** Buyer authorizes Seller and Seller's Authorized Agent to contact Buyer's lender(s) to determine the status of any Buyer's loan specified in **paragraph 3E**, or any alternate loan Buyer pursues, whether or not a contingency of this Agreement. If the contact information for Buyer's lender(s) is different from that provided under the terms of **paragraph 6B**, Buyer shall Deliver the updated contact information within 1 Day of Seller's request.
   (4)   **ASSUMED OR SUBJECT TO FINANCING:** Seller represents that Seller is not delinquent on any payments due on any loans. If the Property is acquired subject to an existing loan, Buyer and Seller are advised to consult with legal counsel regarding the ability of an existing lender to call the loan due, and the consequences thereof.
   (5)   Buyer shall, within the time specified in **paragraph 3E(1)**, Deliver to Seller written notice (C.A.R. Form RR or AEA) **(i)** of any lender requirements that Buyer requests Seller to pay for or otherwise correct or **(ii)** that there are no lender requirements.
   **D.   BALANCE OF PURCHASE PRICE (DOWN PAYMENT) (including all-cash funds)** to be deposited with Escrow Holder pursuant to Escrow Holder instructions.
   **E.   LIMITS ON CREDITS TO BUYER:** Any credit to Buyer, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender, if any, and made at Close Of Escrow. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then **(i)** the Contractual Credit from Seller shall be reduced to the Lender Allowable Credit, and **(ii)** in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

**6.   ADDITIONAL FINANCING TERMS:**
   **A.   VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Written verification of Buyer's down payment and closing costs may be made by Buyer or Buyer's lender or loan broker pursuant to **paragraph 6B**.
   **B.   VERIFICATION OF LOAN APPLICATIONS:** Buyer shall Deliver to Seller, within the time specified in **paragraph 3H(3)** a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in **paragraph 3E**. If any loan specified in **paragraph 3E** is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate.
   **C.   BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including, but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price, and to sell to Buyer in reliance on Buyer's specified financing. Buyer shall pursue the financing specified in this Agreement, even if Buyer also elects to pursue an alternative form of financing. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in this Agreement but shall not interfere with closing at the purchase price on the COE date (**paragraph 3B**) even if based upon alternate financing. Buyer's inability to obtain alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.

**7.   CLOSING AND POSSESSION:**
   **A.   OCCUPANCY:** Buyer intends to occupy the Property as indicated in **paragraph 3E(3)**. Occupancy may impact available financing.

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 4 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com                9740 Wilshire

**B.  CONDITION OF PROPERTY ON CLOSING:**

(1)  Unless Otherwise Agreed: (i) the Property shall be delivered "As-Is" in its PRESENT physical condition as of the date of Acceptance; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow or at the time possession is delivered to Buyer, if not on the same date. If items are not removed when possession is delivered to Buyer, all items shall be deemed abandoned. Buyer, after first Delivering to Seller written notice to remove the items within 3 Days, may pay to have such items removed or disposed of and may bring legal action, as per this Agreement, to receive reasonable costs from Seller.

(2)  **Buyer is strongly advised to conduct investigations of the entire Property in order to determine its present condition. Seller and Agents may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property improvements may not be built according to code, in compliance with current Law, or have had all required permits issued and/or finalized.**

**C.  SELLER REMAINING IN POSSESSION AFTER CLOSE OF ESCROW:** If Seller has the right to remain in possession after Close Of Escrow pursuant to **paragraph 3M(2)** or as Otherwise Agreed, **(i)** the Parties are advised to consult with their insurance and legal advisors for information about liability and damage or injury to persons and personal and real property; **(ii)** Buyer is advised to consult with Buyer's lender about the impact of Seller's occupancy on Buyer's loan; and **(iii)** consult with a qualified California real estate attorney where the Property is located to determine the ongoing rights and responsibilities of both Buyer and Seller with regard to each other, including possible tenant rights, and what type of written agreement to use to document the relationship between the Parties.

**D.  At Close Of Escrow: (i)** Seller assigns to Buyer any assignable warranty rights for items included in the sale; and **(ii)** Seller shall Deliver to Buyer available Copies of any such warranties. Agents cannot and will not determine the assignability of any warranties.

**E.**  Seller shall, on Close Of Escrow unless Otherwise Agreed and even if Seller remains in possession, provide keys, passwords, codes and/or means to operate all locks, mailboxes, security systems, alarms, home automation systems, intranet and Internet-connected devices included in the purchase price, garage door openers, and all items included in either **paragraph 3P** or **paragraph 9**. If the Property is a condominium or located in a common interest development, Seller shall be responsible for securing or providing any such items for Association amenities, facilities, and access. Buyer may be required to pay a deposit to the Owners' Association ("HOA") to obtain keys to accessible HOA facilities.

**8.  CONTINGENCIES AND REMOVAL OF CONTINGENCIES:**

**A.  LOAN(S):**

(1)  This Agreement is, **unless otherwise specified in paragraph 3L(1) or an attached CR form**, contingent upon Buyer obtaining the loan(s) specified. If contingent, Buyer shall act diligently and in good faith to obtain the designated loan(s). **If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan and Buyer is able to satisfy lender's non-appraisal conditions for closing the loan.**

(2)  Buyer is advised to investigate the insurability of the Property as early as possible, as this may be a requirement for lending. Buyer's ability to obtain insurance for the Property, including fire insurance, is part of Buyer's Investigation of Property contingency. Failure of Buyer to obtain insurance may justify cancellation based on the Investigation contingency but not the loan contingency.

(3)  Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement, unless Otherwise Agreed.

(4)  If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.

(5)  **NO LOAN CONTINGENCY:** If "No loan contingency" is checked in **paragraph 3L(1)**, obtaining any loan specified is NOT a contingency of this Agreement. If Buyer does not obtain the loan specified, and as a result is unable to purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

**B.  APPRAISAL:**

(1)  This Agreement is, **unless otherwise specified in paragraph 3L(2) or an attached CR form**, contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the amount specified in **paragraph 3L(2)**, without requiring repairs or improvements to the Property. Appraisals are often a reliable source to verify square footage of the subject Property. However, the ability to cancel based on the measurements provided in an appraisal falls within the Investigation of Property contingency. The appraisal contingency is solely limited to the value determined by the appraisal. For any cancellation based upon this appraisal contingency, Buyer shall Deliver a Copy of the written appraisal to Seller, upon request by Seller.

(2)  **NO APPRAISAL CONTINGENCY:** If "No appraisal contingency" is checked in **paragraph 3L(2)**, then Buyer may not use the loan contingency specified in **paragraph 3L(1)** to cancel this Agreement if the sole reason for not obtaining the loan is that the appraisal relied upon by Buyer's lender values the property at an amount less than that specified in **paragraph 3L(2)**. If Buyer is unable to obtain the loan specified solely for this reason, Seller may be entitled to Buyer's deposit or other legal remedies.

(3)  ☒ **Fair Appraisal Act:** The Parties acknowledge receipt of the attached Fair Appraisal Act Addendum (C.A.R. Form FAAA).

**C.  INVESTIGATION OF PROPERTY:** This Agreement is, as specified in **paragraph 3L(3)**, contingent upon Buyer's acceptance of the condition of, and any other matter affecting, the Property.

**D.  REVIEW OF SELLER DOCUMENTS:** This Agreement is, as specified in **paragraph 3L(4)**, contingent upon Buyer's review and approval of Seller's documents required in **paragraph 16A**.

**E.  TITLE:**

(1)  This Agreement is, as specified in **paragraph 3L(5)**, contingent upon Buyer's ability to obtain the title policy provided for in **paragraph 16G** and on Buyer's review of a current Preliminary Report and items that are disclosed or observable even if not on record or not specified in the Preliminary Report, and satisfying Buyer regarding the current status of title. Buyer is advised to review all underlying documents and other matters affecting title, including, but not limited to, any documents or deeds referenced in the Preliminary Report and any plotted easements.

(2)  Buyer has **5 Days** after receipt to review a revised Preliminary Report, if any, furnished by the Title Company and cancel the transaction if the revised Preliminary Report reveals material or substantial deviations from a previously provided Preliminary Report.

**F.  CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES (IF APPLICABLE):** This Agreement is, as specified in **paragraph 3L(6)**, contingent upon Buyer's review and approval of Common Interest Disclosures required by Civil Code § 4525 and under **paragraph 11C** ("CI Disclosures").

**CPA REVISED 12/22 (PAGE 5 OF 17)**        Buyer's Initials _____/_____        Seller's Initials _____/_____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 5 OF 17)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com        9740 Wilshire

Property Address: *9740 Wilshire Blvd, Beverly Hills CA, 90212;* Date: *June 14, 2023*

**G.  BUYER REVIEW OF LEASED OR LIENED ITEMS CONTINGENCY:** Buyer's review of and ability and willingness to assume any lease, maintenance agreement or other ongoing financial obligation, or to accept the Property subject to any lien, disclosed pursuant to **paragraph 9B(6)**, is, as specified in **paragraph 3L(7)**, a contingency of this Agreement. Any assumption of the lease shall not require any financial obligation or contribution by Seller. Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement if Buyer, by the time specified in **paragraph 3L(7)**, refuses to enter into any necessary written agreements to accept responsibility for all obligations of Seller disclosed leased or liened items.

**H.  REMOVAL OR WAIVER OF CONTINGENCIES WITH OFFER: Buyer shall have no obligation to remove a contractual contingency unless Seller has provided all required documents, reports, disclosures, and information pertaining to that contingency.** If Buyer does remove a contingency without first receiving all required information from Seller, Buyer is relinquishing any contractual rights that apply to that contingency. **If Buyer removes or waives any contingencies without an adequate understanding of the Property's condition or Buyer's ability to purchase, Buyer is acting against the advice of Agent.**

**I.  REMOVAL OF CONTINGENCY OR CANCELLATION:**
(1)  **For any contingency specified in paragraph 3L, 8, or elsewhere, Buyer shall, within the applicable period specified, remove the contingency or cancel this Agreement.**
(2)  For the contingencies for review of Seller Documents, Preliminary Report, and Condominium/Planned Development Disclosures, Buyer shall, within the time specified in **paragraph 3L** or **5 Days** after Delivery of the applicable Seller Documents, Preliminary Report, or CI Disclosures, whichever occurs later, remove the applicable contingency in writing or cancel this Agreement.
(3)  If Buyer does not remove a contingency within the time specified, Seller, after first giving Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), shall have the right to cancel this Agreement.

**J.  SALE OF BUYER'S PROPERTY:** This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer unless the Sale of Buyer's Property (C.A.R. Form COP) is checked as a contingency of this Agreement in **paragraph 3L(8)**.

**9.  ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**

**A.  NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the Multiple Listing Service (MLS), flyers, marketing materials, or disclosures are NOT included in the purchase price or excluded from the sale unless specified in this paragraph or **paragraph 3P** or as Otherwise Agreed. Any items included herein are components of the Property and are not intended to affect the price. All items are transferred without Seller warranty.

**B.  ITEMS INCLUDED IN SALE:**
(1)  All EXISTING fixtures and fittings that are attached to the Property;
(2)  EXISTING electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar power systems, built-in appliances and appliances for which special openings or encasements have been made (whether or not included in **paragraph 3P**), window and door screens, awnings, shutters, window coverings (which includes blinds, curtains, drapery, shutters or any other materials that cover any portion of the window) and any associated hardware and rods, attached floor coverings, television antennas, satellite dishes, air coolers/conditioners, pool/spa equipment (including, but not limited to, any cleaning equipment such as motorized/automatic pool cleaners, pool heaters, pool nets, pool covers), garage door openers/remote controls, mailbox, in-ground landscaping, water features and fountains, water softeners, water purifiers, light bulbs (including smart bulbs) and all items specified as included in **paragraph 3P, if currently existing and owned by Seller at the time of Acceptance.**
Note: If Seller does not intend to include any item specified as being included above because it is not owned by Seller, whether placed on the Property by Agent, stager, tenant, or other third party, the item should be listed as being excluded in **paragraph 3P(2)** or excluded by Seller in a counter offer.
(3)  Security System includes any devices, hardware, software, or control units used to monitor and secure the Property, including but not limited to, any motion detectors, door or window alarms, and any other equipment utilized for such purpose. If checked in **paragraph 3P**, all such items are included in the sale, whether hard wired or not. Buyer is advised to use **paragraph 3P(1)** or an addendum to address more directly specific items to be included. Seller is advised to use a counter offer to address more directly any items to be excluded.
(4)  Home Automation (Smart Home Features) includes any electronic devices and features including, but not limited to, thermostat controls, kitchen appliances not otherwise excluded, and lighting systems, that are connected (hard wired or wirelessly) to a control unit, computer, tablet, phone, or other "smart" device. Any Smart Home devices and features that are physically affixed to the real property, and also existing light bulbs, are included in the sale. Buyer is advised to use **paragraph 3P(1)** or an addendum to address more directly specific items to be included. Seller is advised to use a counter offer to address more directly any items to be excluded.
(5)  Non-Dedicated Devices: All smart home and security system control devices are included in the sale, except for any non-dedicated personal computer, tablet, or phone used to control such features. Buyer acknowledges that a separate device and access to wifi or Internet may be required to operate some smart home features and Buyer may have to obtain such device after Close Of Escrow. Seller shall de-list any devices from any personal accounts and shall cooperate with any transfer of services to Buyer. Buyer is advised to change all passwords and ensure the security of any smart home features.
(6)  **LEASED OR LIENED ITEMS AND SYSTEMS:** Seller, within the time specified in **paragraph 3N(1)**, shall (**i**) disclose to Buyer if any item or system specified in **paragraph 3P** or **9B** or otherwise included in the sale is leased, or not owned by Seller, or is subject to any maintenance or other ongoing financial obligation, or specifically subject to a lien or other encumbrance or loan, and (**ii**) Deliver to Buyer all written materials (such as lease, warranty, financing, etc.) concerning any such item.
(7)  Seller represents that all items included in the purchase price, unless Otherwise Agreed, (**i**) are owned by Seller and shall be transferred free and clear of liens and encumbrances, except the items and systems identified pursuant to **paragraph 9B(6)**, and (**ii**) are transferred without Seller warranty regardless of value. Seller shall cooperate with the identification of any software or applications and Buyer's efforts to transfer any services needed to operate any Smart Home Features or other items included in this Agreement, including, but not limited to, utilities or security systems.
(8)  A complete inventory of all personal property of Seller currently used in the operation of the Property and included in the purchase price shall be delivered to Buyer within the time specified in **paragraph 3N(1)**.
(9)  Seller shall deliver title to the personal property by Bill of Sale, free of all liens and encumbrances, and without warranty of condition.
(10)  As additional security for any note in favor of Seller for any part of the purchase price, Buyer shall execute a UCC-1 Financing Statement to be filed with the Secretary of State, covering the personal property included in the purchase, replacement thereof, and insurance proceeds.

**CPA REVISED 12/22 (PAGE 6 OF 17)**          Buyer's Initials _____ / _____          Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 6 OF 17)**

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA, 90212;*      Date: *June 14, 2023*

**C. ITEMS EXCLUDED FROM SALE:** Unless Otherwise Agreed, the following items are excluded from sale: **(i)** All items specified in **paragraph 3P(2); (ii)** audio and video components (such as flat screen TVs, speakers and other items) if any such item is not itself attached to the Property, even if a bracket or other mechanism attached to the Property, or component or item is attached to the Property; **(iii)** furniture and other items secured to the Property for earthquake or safety purposes. **Unless otherwise specified in paragraph 3P(1),** brackets attached to walls, floors or ceilings for any such component, furniture or item will be removed and holes or other damage shall be repaired, but not painted.

**10. ALLOCATION OF COSTS:**

**A. INSPECTIONS, REPORTS, TESTS, AND CERTIFICATES:** Paragraphs **3Q(1-3) and (5)** only determines who is to pay for the inspection, report, test, certificate or service mentioned; **it does not determine who is to pay for any work recommended or identified in any such document. Agreements for payment of required work should be specified elsewhere in paragraph 3Q, or 3S, or in a separate agreement (such as C.A.R. Forms RR, RRRR, ADM or AEA).** Any reports in these paragraphs shall be Delivered in the time specified in **Paragraph 3N(1).**

**B. GOVERNMENT REQUIREMENTS AND CORRECTIVE OR REMEDIAL ACTIONS:**

  (1) **LEGALLY REQUIRED INSTALLATIONS AND PROPERTY IMPROVEMENTS:** Any required installation of smoke alarm or carbon monoxide device(s) or securing of water heater shall be completed within the time specified in **paragraph 3N(4).** If Buyer is to pay for these items, Buyer, as instructed by Escrow Holder, shall deposit funds into escrow or directly to the vendor completing the repair or installation. Prior to Close Of Escrow, Seller shall Deliver to Buyer written statement(s) of compliance in accordance with any Law, unless Seller is exempt. If Seller is to pay for these items and does not fulfill Seller's obligation in the time specified, and Buyer incurs costs to comply with lender requirements concerning those items, Seller shall be responsible for Buyer's costs.

  (2) **POINT OF SALE REQUIREMENTS:**

    (A) Point of sale inspections, reports and repairs refer to any such actions required to be completed before or after Close Of Escrow that are required in order to close under any Law. Unless Parties Otherwise Agree to another time period, any such repair, shall be completed prior to final verification of Property. If Buyer agrees to pay for any portion of such repair, Buyer, shall **(i)** directly pay to the vendor completing the repair or **(ii)** provide an invoice to Escrow Holder, deposit funds into escrow sufficient to pay for Buyer's portion of such repair and request Escrow Holder pay the vendor completing the repair.

    (B) Buyer shall be provided, within the time specified in **paragraph 3N(1)**, unless Parties Otherwise Agree to another time period, a Copy of any required government-conducted or point-of-sale inspection report prepared pursuant to this Agreement or in anticipation of this sale of the Property.

  (3) **REINSPECTION FEES:** If any repair in **paragraph 10B(1)** is not completed within the time specified and the lender requires an additional inspection to be made, Seller shall be responsible for any corresponding reinspection fee. If Buyer incurs costs to comply with lender requirements concerning those items, Seller shall be responsible for those costs.

  (4) **INSTALLATION OF SAFETY FEATURES:**

    (A) The following installations shall be completed prior to final verification of condition unless Otherwise Agreed: **(i)** approved fire extinguisher(s), sprinkler(s), and hose(s), if required by law; and **(ii)** drain cover and anti-entrapment device or system meeting the minimum requirements permitted by the U.S. Consumer Products and Safety Commission for any pool or spa.

    (B) If Buyer is to pay for these installations, Buyer, as instructed by Escrow Holder, shall deposit funds into escrow or directly to the vendor completing the installation.

  (5) **INFORMATION AND ADVICE ON REQUIREMENTS:** Buyer and Seller are advised to seek information from a knowledgeable source regarding local and State mandates and whether they are point of sale requirements or requirements of ownership. Agents do not have expertise in this area and cannot ascertain all of the requirements or costs of compliance.

**11. SELLER DISCLOSURES**

**A. WITHHOLDING TAXES:** Buyer and Seller hereby instruct Escrow Holder to withhold the applicable required amounts to comply with federal and California withholding Laws and forward such amounts to the Internal Revenue Service and Franchise Tax Board, respectively. However, no federal withholding is required if, prior to Close Of Escrow, Seller Delivers **(i)** to Buyer and Escrow Holder a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law (FIRPTA); **OR (ii)** to a qualified substitute (usually a title company or an independent escrow company) a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law AND the qualified substitute Delivers to Buyer and Escrow Holder an affidavit signed under penalty of perjury (C.A.R. Form QS) that the qualified substitute has received the fully completed Seller's affidavit and the Seller states that no federal withholding is required; **OR (iii)** to Buyer other documentation satisfying the requirements under Internal Revenue Code § 1445 (FIRPTA). No withholding is required under California Law if, prior to Close Of Escrow, Escrow Holder has received sufficient documentation from Seller that no withholding is required, and Buyer has been informed by Escrow Holder.

**B. NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet Web site maintained by the United States Department of Transportation at **http://www.npms.phmsa.dot.gov/**. To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet Website. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

**C. CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES:**

  (1) Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer whether the Property is a condominium or is located in a planned development, other common interest development, or otherwise subject to covenants, conditions, and restrictions (C.A.R. Form SPQ or ESD).

  (2) If the Property is a condominium or is located in a planned development or other common interest development with a HOA, Seller shall, within the time specified in **paragraph 3N(3)**, order from, and pay any required fee for the following items to the HOA (C.A.R. Form HOA-IR): **(i)** Copies of any documents required by Law (C.A.R. Form HOA-RS); **(ii)** disclosure of any pending or anticipated claim or litigation by or against the HOA; **(iii)** a statement containing the location and number of designated parking and storage spaces; **(iv)** Copies of the most recent 12 months of HOA minutes for regular and special meetings; **(v)** the names and contact information of all HOAs governing the Property; **(vi)** pet restrictions; and **(vii)** smoking restrictions ("CI Disclosures"). Seller shall itemize and Deliver to Buyer all CI Disclosures received from the HOA and any CI Disclosures in Seller's possession. Seller shall, as directed by Escrow Holder, deposit funds into escrow or direct to HOA or management company to pay for any of the above.

**CPA REVISED 12/22 (PAGE 7 OF 17)**      Buyer's Initials _____ / _____      Seller's Initials _____ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com      **9740 Wilshire**

**D. SOLAR SYSTEMS:** For properties with any solar panels or solar power systems, Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer all known information about the solar panels or solar system. Seller may use the Solar Advisory and Questionnaire (C.A.R. Form SOLAR).

**E. NATURAL AND ENVIRONMENTAL HAZARDS:** Seller shall, within the time specified in **paragraph 3N(1)**, if required by Law: **(i)** Deliver to Buyer the earthquake guide and environmental hazards booklet, and for all residential property with 1-4 units and any manufactured or mobile home built before January 1, 1960, fully complete and Deliver the Residential Earthquake Risk Disclosure Statement; and **(ii)** even if exempt from the obligation to provide a NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and **(iii)** disclose any other zone as required by Law and provide any other information required for those zones.

**F. WATER CONSERVING PLUMBING DEVICES:** Civil Code § 1101.5 requires all multi-family residential and commercial real property be equipped with water-conserving plumbing devices. Seller shall, within the time specified in **paragraph 3N(1)**, disclose in writing whether the property includes any noncompliant plumbing fixtures. Seller may use C.A.R. Form SPQ or ESD. See C.A.R. Form WCMD for more information.

**G. SURVEY, PLANS, AND ENGINEERING DOCUMENTS:** Seller, within the time specified in **paragraph 3N(1)**, shall provide to Buyer, Copies of surveys, plans, specifications, and engineering documents, if any, prepared on Seller's behalf on in Seller's possession.

**H. PERMITS:** Seller, within the time specified in **paragraph 3N(1)**, shall provide to Buyer, if in Seller's possession, copies of all permits and approvals, certificates of occupancy, conditional use permits, development plans, and licenses and permits pertaining to the operation of the Property.

**I. STRUCTURAL MODIFICATIONS:** Seller, within the time specified in **paragraph 3N(1)**, shall in writing disclose to Buyer, known structural additions or alterations to, or the installation, alteration, repair or replacement of, significant components of the structure(s) upon the Property.

**J. GOVERNMENTAL COMPLIANCE:** Within the time specified in **paragraph 3N(1)**,
  (1) Seller shall disclose to Buyer any improvements, additions, alterations, or repairs to the Property made by Seller, or known to Seller to have been made, without required governmental permits, final inspections, and approvals
  (2) Seller shall disclose to Buyer if Seller has actual knowledge of any notice of violations of Law filed or issued against the Property.

**K. VIOLATION NOTICES:** Within the time specified in **paragraph 3N(1)**, Seller shall disclose any notice of violations of any Law filed or issued against the Property and actually known to Seller

**L. KNOWN MATERIAL FACTS:** Seller shall, within the time specified in **paragraph 3N(1)**, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including, but not limited to, known insurance claims within the past five years, or provide Buyer with permission to contact insurer to get such information (C.A.R. Form ARC), and make any and all other disclosures required by Law.

**M. COMMERCIAL SELLER PROPERTY QUESTIONNAIRE:** Seller shall, within the time specified in **paragraph 3N(1)**, complete and provide Buyer with a Commercial Seller Property Questionnaire (C.A.R. Form CSPQ).

**N. SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information, or representations previously provided to Buyer, Seller shall promptly Deliver a subsequent or amended disclosure or notice, in writing, covering those items. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies of which Buyer is otherwise aware or which are disclosed in reports provided to or obtained by Buyer or ordered and paid for by Buyer.**

**12. TENANCY RELATED DISCLOSURES:** Within the time specified in **paragraph 3N(1)**, and subject to Buyer's right of review, Seller shall disclose, make available or Deliver, as applicable, to Buyer the following information:

**A. RENTAL/SERVICE AGREEMENTS: (i)** All current leases, rental agreements, service contracts, and other agreements pertaining to the operation of the Property; **(ii)** A rental statement including names of tenants, rental rates, period or rental, date of last rent increase, security deposits, rental concessions, rebates or other benefits, if any, and a list of delinquent rents and their duration. Seller represents that no tenant is entitled to any rebate, concession, or other benefit, except as set forth in these documents. Seller represents that the documents to be furnished are those maintained in the ordinary and normal course of business.

**B. INCOME AND EXPENSE STATEMENTS:** If checked in **paragraph 3R**, the books and records for the Property, if any, including a statement of income and expense for the 12 months preceding Acceptance. Seller represents that the books and records are those maintained in the ordinary and normal course of business and used by Seller in the computation of federal and state income tax returns.

**C. TENANT ESTOPPEL CERTIFICATES:** If checked in **paragraph 3R**, Tenant Estoppel Certificates (C.A.R. Form TEC). Tenant Estoppel Certificates shall be completed by Seller or Seller's agent and delivered to tenant(s) for tenant(s) to sign and acknowledge: **(i)** that tenant(s)' rental or lease agreements are unmodified and in full force and effect, (or if modified, stating all such modifications); **(ii)** that no lessor defaults exist; and **(iii)** stating the amount of any prepaid rent or security deposit. Seller shall exercise good faith to obtain signed tenant(s)' signature(s), but Seller cannot guarantee tenant(s)' cooperation. In the event Seller cannot obtain signed Tenant Estoppel Certificates within the time specified above, Seller shall notify Buyer and provide the unsigned one that was provided to tenant(s). If, after the time specified for Seller to Deliver the TEC to Buyer, any tenant(s) sign and return a TEC to Seller, Seller shall Deliver that TEC to Buyer.

**D. SELLER REPRESENTATIONS:** Unless otherwise disclosed under **paragraph 11**, **paragraph 12**, or under any disclosure Delivered to Buyer:
  (1) Seller represents that Seller has no actual knowledge that any tenant(s): **(i)** has any current pending lawsuit(s), investigation(s), Inquiry(ies), action(s), or other proceeding(s) affecting the Property of the right to use and occupy it; **(ii)** has any unsatisfied mechanics or materialman lien(s) affecting the Property; and **(iii)** is the subject of a bankruptcy. If Seller receives any such notice, prior to Close Of Escrow, Seller shall immediately notify Buyer.
  (2) Seller represents that no tenant is entitled to any rebate, concessions, or other benefit, except as set forth in the rental service agreements.
  (3) Seller represents that the documents to be furnished are those maintained in the ordinary and normal course of business and the income and expense statements are and used by Seller in the computation of federal and state income tax returns.

**13. CHANGES DURING ESCROW:**

**A.** Prior to Close Of Escrow, Seller may engage in the following acts ("Proposed Changes"), subject to Buyer's rights in **paragraph 13B: (i)** rent or lease any vacant unit or other part of the premises; **(ii)** alter, modify, or extend any existing rental or lease agreement; **(iii)** enter into, alter, modify, or extend any service contract(s); or **(iv)** change the status of the condition of the Property.

**B.** (1) At least **7 Days** prior to any Proposed Changes, Seller shall Deliver written notice to Buyer of such Proposed Change
  (2) Within **5 Days** after receipt of such notice, Buyer, in writing, may give Seller notice of Buyer's objection to the Proposed Changes in which case Seller shall not make the Proposed Changes.

**CPA REVISED 12/22 (PAGE 8 OF 17)**     Buyer's Initials _____ / _____     Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 8 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com     9740 Wilshire

Property Address: **9740 Wilshire Blvd, Beverly Hills, CA, 90212**                                              Date: **June 14, 2023**

**14. SECURITY DEPOSITS:** Security deposits, if any, to the extent they have not been applied by Seller in accordance with any rental agreement and current Law, shall be transferred to Buyer on Close Of Escrow. Seller shall notify each tenant, in compliance with the California Civil Code.

**15. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

   **A.** Buyer shall, within the time specified in **paragraph 3L(3)**, have the right, at Buyer's expense unless Otherwise Agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations").

   **B.** Buyer Investigations include, but are not limited to:
   (1) Inspections regarding any physical attributes of the Property or items connected to the Property, such as:
   (A) A general inspection.
   (B) An inspection for lead-based paint and other lead-based paint hazards.
   (C) An inspection specifically for wood destroying pests and organisms. Any inspection for wood destroying pests and organisms shall be prepared by a registered Structural Pest Control company; shall cover the main building and attached structures; may cover detached structures; shall NOT include water tests of shower pans on upper level units unless the owners of property below the shower consent; shall NOT include roof coverings; and, if the Property is a unit in a condominium or other common interest subdivision, the inspection shall include only the separate interest and any exclusive-use areas being transferred, and shall NOT include common areas; and shall include a report ("Pest Control Report") showing the findings of the company which shall be separated into sections for evident infestation or infection (Section 1) and for conditions likely to lead to infestation or infection (Section 2).
   (D) A phase one environmental survey, paid for and obtained by the party indicated in **paragraph 3Q(2)**. If Buyer is responsible for obtaining and paying for the survey, Buyer shall act diligently and in good faith to obtain such survey within the time specified in **paragraph 3L(3)**. Buyer has **5 Days** after receiving the survey to remove this portion of the Buyer's Investigation contingency.
   (2) Investigations of any other matter affecting the Property, other than those that are specified as separate contingencies. Buyer Investigations include, but are not limited to, an investigation of the availability and cost of general homeowner's insurance, flood insurance, and fire insurance. See, Buyer's Investigation Advisory (C.A.R. Form BIA) for more.

   **C.** Without Seller's prior written consent, Buyer shall neither make nor cause to be made: **(i)** invasive or destructive Buyer Investigations, except for minimally invasive testing required to prepare a Pest Control Report, which shall not include any holes or drilling through stucco or similar material; or **(ii)** inspections by any governmental building or zoning inspector or government employee, unless required by Law.

   **D.** Seller shall make the Property available for all Buyer Investigations. Seller is not obligated to move any existing personal property. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is delivered to Buyer. Buyer shall, **(i)** by the time specified in **paragraph 3L(3)**, complete Buyer Investigations and satisfy themselves as to the condition of the Property, and either remove the contingency or cancel this Agreement, and **(ii)** by the time specified in **paragraph 3L(3)** or **3 Days** after receipt of any Investigation report, whichever is later, give Seller at no cost, complete Copies of all such reports obtained by Buyer, which obligation shall survive the termination of this Agreement. This Delivery of Investigation reports shall not include any appraisal, except an appraisal received in connection with an FHA or VA loan.

   **E.** **Buyer indemnity and Seller protection for entry upon the Property:** Buyer shall: **(i)** keep the Property free and clear of liens; **(ii)** repair all damage arising from Buyer Investigations; and **(iii)** indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

**16. TITLE AND VESTING:**

   **A.** Buyer shall, within the time specified in **paragraph 3N(1)**, be provided a current Preliminary Report by the person responsible for paying for the title report in **paragraph 3Q(8)**. If Buyer is responsible for paying, Buyer shall act diligently and in good faith to obtain such Preliminary Report within the time specified. The Preliminary Report is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. The company providing the Preliminary Report shall, prior to issuing a Preliminary Report, conduct a search of the General Index for all Sellers except banks or other institutional lenders selling properties they acquired through foreclosure (REOs), corporations, and government entities.

   **B.** Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except for: **(i)** monetary liens of record unless Buyer is assuming those obligations or taking the Property subject to those obligations; and **(ii)** those matters which Seller has agreed to remove in writing. For any lien or matter not being transferred upon sale, Seller will take necessary action to deliver title free and clear of such lien or matter.

   **C.** Seller shall within **7 Days** after request, give Escrow Holder necessary information to clear title.

   **D.** Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer all matters known to Seller affecting title, whether of record or not.

   **E.** If Buyer is a legal entity and the Property purchase price is at least $300,000 and the purchase price is made without a bank loan or similar form of external financing, a Geographic Targeting Order (GTO) issued by the Financial Crimes Enforcement Network, U.S. Department of the Treasury, requires title companies to collect and report certain information about the Buyer, depending on where the Property is located. Buyer agrees to cooperate with the title company's effort to comply with the GTO.

   **F.** Buyer shall, after Close Of Escrow, receive a recorded grant deed or any other conveyance document required to convey title (For example, for stock cooperative or tenancy in common, respectively, an assignment of stock certificate or assignment of seller's interest in the real property), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's vesting instructions. The recording document shall contain Buyer's post-closing mailing address to enable Buyer's receipt of the recorded conveyance document from the County Recorder. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

   **G.** Buyer shall receive a Standard Coverage Owner's CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and shall pay any increase in cost.

**CPA REVISED 12/22 (PAGE 9 OF 17)**          Buyer's Initials _____ / _____          Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 9 OF 17)**

Property Address: **9740 Wilshire Blvd, Beverly Hills, CA, 90212,**      Date: *June 14, 2023*

**17. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:** The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).

**A. SELLER DELIVERY OF DOCUMENTS:** Seller shall, within the time specified in **paragraph 3N(1),** Deliver to Buyer all reports, disclosures and information ("Reports") for which Seller is responsible as specified in **paragraphs 9B(6), 9B(8), 10, 11A, 11C-L, 12, 16A, 16D, and 35.**

**B. BUYER REVIEW OF DOCUMENTS; REPAIR REQUEST; CONTINGENCY REMOVAL OR CANCELLATION**
(1) Buyer has the time specified in **paragraph 3** to perform Buyer Investigations; review all disclosures, Reports, lease documents to be assumed by Buyer pursuant to **paragraph 9B(6),** and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property.
(2) Buyer may, within the time specified in **paragraph 3L(3),** request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests (C.A.R. Form RR or RRRR). If Seller does not agree or does not respond, Buyer is not contractually entitled to have the repairs or other requests made and may only cancel based on contingencies in this Agreement.
(3) Buyer shall, by the end of the times specified in **paragraph 3L** (or as Otherwise Agreed), Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement (C.A.R. Form CR or CC). However, if any report, disclosure, or information for which Seller is responsible, is not Delivered within the time specified in **paragraph 3N(1),** then Buyer has **5 Days** after Delivery of any such items, or the times specified in **paragraph 3L,** whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement. If Delivery of any Report occurs after a contractual contingency pertaining to that Report has already been waived or removed, the Delivery of the Report does not revive the contingency but there may be a right to terminate for a subsequent or amended disclosure under **paragraph 11L.**
(4) Continuation of Contingency: Even after the end of the time specified in paragraph 3L and before Seller cancels, if at all, pursuant to **paragraph 17C,** Buyer retains the right, in writing, to either (i) remove remaining contingencies, or (ii) cancel this Agreement based on a remaining contingency. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to **paragraph 17C(1).**

**C. SELLER RIGHT TO CANCEL:**
(1) **SELLER RIGHT TO CANCEL; BUYER CONTINGENCIES:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement, then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.
(2) **SELLER RIGHT TO CANCEL; BUYER CONTRACT OBLIGATIONS:** Seller, after first Delivering to Buyer a Notice to Buyer to Perform, may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): **(i)** Deposit funds as required by **paragraph 3D(1)** or **3D(2)** or if the funds deposited pursuant to **paragraph 3D(1)** or **3D(2)** are not good when deposited; **(ii)** Deliver updated contact information for Buyer's lender(s) as required by **paragraph 5C(3); (iii)** Deliver a notice of FHA or VA costs or terms, if any, as specified by **paragraph 5C(5)** (C.A.R. Form RR); **(iv)** Deliver verification, or a satisfactory verification if Seller reasonably disapproves of the verification already provided, as required by **paragraph 5B** or **6A; (v)** Deliver a letter as required by **paragraph 6B; (vi)** In writing assume or accept leases or liens specified in **paragraph 8G; (vii)** Cooperate with the title company's effort to comply with the GTO as required by **paragraph 16E; (viii)** Sign or initial a separate liquidated damages form for an increased deposit as required by **paragraph 5A(2)** and **36; (ix)** Provide evidence of authority to Sign in a representative capacity as specified in **paragraph 35;** or **(x)** Perform any additional Buyer contractual obligation(s) included in this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees allocated to Seller in this Agreement and already paid by Escrow prior to cancellation of this Agreement and notification to Escrow.
(3) **SELLER RIGHT TO CANCEL; SELLER CONTINGENCIES:** Seller may cancel this Agreement by good faith exercise of any Seller contingency included in this Agreement, or Otherwise Agreed, so long as that contingency has not already been removed or waived in writing.

**D. BUYER RIGHT TO CANCEL:**
(1) **BUYER RIGHT TO CANCEL; SELLER CONTINGENCIES:** If, by the time specified in this Agreement, Seller does not Deliver to Buyer a removal of the applicable contingency or cancellation of this Agreement, then Buyer, after first Delivering to Seller a Notice to Seller to Perform (C.A.R. Form NSP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees allocated to Seller in the Agreement and already paid by Escrow prior to cancellation of this Agreement and notification to Escrow.
(2) **BUYER RIGHT TO CANCEL; SELLER CONTRACT OBLIGATIONS:** If, by the time specified, Seller has not Delivered any item specified in paragraph 3N(1) or Seller has not performed any Seller contractual obligation included in this Agreement by the time specified, Buyer, after first Delivering to Seller a Notice to Seller to Perform, may cancel this Agreement.
(3) **BUYER RIGHT TO CANCEL; BUYER CONTINGENCIES:** Buyer may cancel this Agreement by good faith exercise of any Buyer contingency included in this Agreement, or Otherwise Agreed, so long as that contingency has not already been removed in writing.

**E. NOTICE TO BUYER OR SELLER TO PERFORM:** The Notice to Buyer to Perform or Notice to Seller to Perform shall: **(i)** be in writing; **(ii)** be Signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 Days** after Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform or Notice to Seller to Perform may not be Delivered any earlier than **2 Days** prior to the Scheduled Performance Day to remove a contingency or cancel this Agreement or meet an obligation specified in **paragraph 17,** whether or not the Scheduled Performance Day falls on a Saturday, Sunday or legal holiday. If a Notice to Buyer to Perform or Notice to Seller to Perform is incorrectly Delivered or specifies a time less than the agreed time, the notice shall be deemed invalid and void and Seller or Buyer shall be required to Deliver a new Notice to Buyer to Perform or Notice to Seller to Perform with the specified timeframe.

**F. EFFECT OF REMOVAL OF CONTINGENCIES:**
(1) **REMOVAL OF BUYER CONTINGENCIES:** If Buyer removes any contingency or cancellation rights, unless Otherwise Agreed, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of Reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for the non-delivery of any Reports, disclosures or information outside of Seller's control and for any Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.
(2) **REMOVAL OF SELLER CONTINGENCIES:** If Seller removes any contingency or cancellation rights, unless Otherwise Agreed, Seller shall conclusively be deemed to have: **(i)** satisfied themselves regarding such contingency, **(ii)** elected to proceed with the transaction; and (iii) given up any right to cancel this Agreement based on such contingency.

**CPA REVISED 12/22 (PAGE 10 OF 17)**      Buyer's Initials _____ / _____      Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 10 OF 17)**

**G. DEMAND TO CLOSE ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a Demand to Close Escrow (C.A.R. Form DCE). The DCE shall: **(i)** be Signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 Days** after Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** prior to the Scheduled Performance Day for the Close Of Escrow. If a DCE is incorrectly Delivered or specifies a time less than the agreed time, the DCE shall be deemed invalid and void and Seller or Buyer shall be required to Deliver a new DCE.

**H. EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign and Deliver mutual instructions to cancel the sale and escrow and release deposits, if any, to the Party entitled to the funds, less (i) fees and costs paid by Escrow Holder on behalf of that Party, if required by this Agreement; and **(ii)** any escrow fee charged to that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. A release of funds will require mutual Signed release instructions from the Parties, judicial decision or arbitration award. **A Party may be subject to a civil penalty of up to $1,000 for refusal to Sign cancellation instructions if no good faith dispute exists as to which Party is entitled to the deposited funds (Civil Code § 1057.3). Note: Neither Agents nor Escrow Holder are qualified to provide any opinion on whether either Party has acted in good faith or which Party is entitled to the deposited funds. Buyer and Seller are advised to seek the advice of a qualified California real estate attorney regarding this matter.**

**18. REPAIRS:** Repairs shall be completed prior to final verification of condition unless Otherwise Agreed. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. Buyer acknowledges that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: **(i)** obtain invoices and paid receipts for Repairs performed by others; **(ii)** prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and **(iii)** provide Copies of invoices and paid receipts and statements to Buyer prior to final verification of condition.

**19. FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final verification of the Property condition within the time specified in **paragraph 3J,** NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: **(i)** the Property is maintained pursuant to **paragraph 7B; (ii)** Repairs have been completed as agreed; and **(iii)** Seller has complied with Seller's other obligations under this Agreement (C.A.R. Form VP).

**20. PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless Otherwise Agreed, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, Seller rental payments, HOA regular assessments due prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. Seller shall pay any HOA special or emergency assessments due prior to Close Of Escrow. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special or emergency assessments that are due after Close Of Escrow. Property will be reassessed upon change of ownership. Any supplemental tax bills delivered to Escrow Holder prior to closing shall be prorated and paid as follows: **(i)** for periods after Close Of Escrow, by Buyer; and **(ii)** for periods prior to Close Of Escrow, by Seller (see C.A.R. Form SPT or SBSA for further information). Seller agrees all service fees, maintenance costs and utility bills will be paid current up and through the date of Close Of Escrow. TAX BILLS AND UTILITY BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

**21. BROKERS AND AGENTS:**

**A. COMPENSATION:** Seller or Buyer, or both, as applicable, agree to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer. Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer. If Seller agrees to pay Buyer's Broker (see **paragraph 3G(2)**), Seller shall be entitled to a copy of the portion of the written compensation agreement between Buyer and Buyer's Broker identifying the compensation to be paid. See C.A.R. Form SPBB for further information.

**B. SCOPE OF DUTY:** Buyer and Seller acknowledge and agree that Agent: **(i)** Does not decide what price Buyer should pay or Seller should accept; **(ii)** Does not guarantee the condition of the Property; **(iii)** Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; **(iv)** Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; **(v)** Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Agent; **(vi)** Shall not be responsible for inspecting public records or permits concerning the title or use of Property; **(vii)** Shall not be responsible for identifying the location of boundary lines or other items affecting title; **(viii)** Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; **(ix)** Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; **(x)** Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and **(xi)** Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

**C. BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations, and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify and hold the other, the Brokers specified herein and their agents, harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representation in this paragraph.

**22. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**

**A.** The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: **paragraphs 1, 3A, 3B, 3D-G, 3N(2), 3Q, 3S, 4A, 4B, 5A(1-2) 5D, 5E, 10B(2)(A), 10B(3), 11A, 11C(2), 16 (except 16D), 17H, 20, 21A, 22, 26, 32, 33, 34, 35, 39, 40, and paragraph 3 of the Real Estate Brokers Section.** If a Copy of the separate compensation agreement(s) provided for in **paragraph 21A** or **paragraph 3** of the Real Estate Brokers Section is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned.

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          9740 Wilshire

**B.** Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller shall Sign and return Escrow Holder's general provisions or supplemental instructions within the time specified in **paragraph 3N(2)**. Buyer and Seller shall execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow and, as directed by Escrow Holder, within **3 Days**, shall pay to Escrow Holder or HOA or HOA management company or others any fee required by **paragraphs 3, 8, 10, 11**, or elsewhere in this Agreement.

**C.** A Copy of this Agreement including any counter offer(s) and addenda shall be delivered to Escrow Holder within **3 Days** after **Acceptance**. Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title Company when received from Seller, if a separate company is providing title insurance. If Seller delivers an affidavit to Escrow Holder to satisfy Seller's FIRPTA obligation under **paragraph 11A**, Escrow Holder shall deliver to Buyer, Buyer's Agent, and Seller's Agent a Qualified Substitute statement that complies with federal Law. If Escrow Holder's Qualified Substitute statement does not comply with federal law, the Parties instruct escrow to withhold all applicable required amounts under **paragraph 11A**.

**D.** Agents are not a party to the escrow except for the sole purpose of receiving compensation pursuant to **paragraph 21A and paragraph 3 of the Real Estate Brokers Section**. If a Copy of the separate compensation agreement(s) provided for in either of those paragraphs is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s).Buyer and Seller irrevocably assign to Brokers compensation specified in **paragraph 21A**, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.

**E.** Buyer and Seller acknowledge that Escrow Holder may require invoices for expenses under this Agreement. Buyer and Seller, upon request by Escrow Holder, within **3 Days** or within a sufficient time to close escrow, whichever is sooner, shall provide any such invoices to Escrow Holder.

**F.** Upon receipt, Escrow Holder shall provide Buyer, Seller, and each Agent verification of Buyer's deposit of funds pursuant to **paragraph 5A(1) and 5A(2)**. Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify each Agent: **(i)** if Buyer's initial or any additional deposit or down payment is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller instruct Escrow Holder to cancel escrow.

**G.** A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within **3 Days** after mutual execution of the amendment.

**23. SELECTION OF SERVICE PROVIDERS:** Agents do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Agent or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.

**24. MULTIPLE LISTING SERVICE ("MLS"):** Agents are authorized to report to the MLS that an offer has been accepted and, upon Close Of Escrow, the sales price and other terms of this transaction shall be provided to the MLS to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS. Buyer acknowledges that: **(i)** any pictures, videos, floor plans (collectively, "Images") or other information about the Property that has been or will be inputted into the MLS or internet portals, or both, at the instruction of Seller or in compliance with MLS rules, will not be removed after Close Of Escrow; **(ii)** California Civil Code § 1088(c) requires the MLS to maintain such Images and information for at least three years and as a result they may be displayed or circulated on the Internet, which cannot be controlled or removed by Seller or Agents; and **(iii)** Seller, Seller's Agent, Buyer's Agent, and MLS have no obligation or ability to remove such Images or information from the Internet.

**25. ATTORNEY FEES AND COSTS:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in **paragraph 37A**.

**26. ASSIGNMENT/NOMINATION:** Buyer shall have the right to assign all of Buyer's interest in this Agreement to Buyer's own trust or to any wholly owned entity of Buyer that is in existence at the time of such assignment. Otherwise, Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the separate written consent of Seller to a specified assignee. Such consent shall not be unreasonably withheld. Prior to any assignment, Buyer shall disclose to Seller the name of the assignee and the amount of any monetary consideration between Buyer and assignee. Buyer shall provide assignee with all documents related to this Agreement including, but not limited to, the Agreement and any disclosures. If assignee is a wholly owned entity or trust of Buyer, that assignee does not need to re-sign or initial all documents provided. Whether or not an assignment requires seller's consent, at the time of assignment, assignee shall deliver a letter from assignee's lender that assignee is prequalified or preapproved as specified in **paragraph 6B**. Should assignee fail to deliver such a letter, Seller, after first giving Assignee an Notice to Buyer to Perform, shall have the right to terminate the assignment. Buyer shall, within the time specified in **paragraph 3K**, Deliver any request to assign this Agreement for Seller's consent. If Buyer fails to provide the required information within this time frame, Seller's withholding of consent shall be deemed reasonable. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless Otherwise Agreed by Seller (C.A.R. Form AOAA). Parties shall provide any assignment agreement to Escrow Holder within 1 Day after the assignment. Any nomination by Buyer shall be subject to the same procedures, requirements, and terms as an assignment as specified in this paragraph.

**27. SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

**28. ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: **(i)** Federal, state, and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; **(ii)** Agent(s) has/have made no representation concerning the applicability of any such Law to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; **(iii)** Agent(s) has/have made no representation concerning the existence, testing, discovery, location, and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property; and **(iv)** Buyer and Seller are each advised to consult with technical and legal experts concerning the existence, testing, discover, location and evaluation of/for, and, risks posed by, environmentally hazardous substances, in any, located on or potentially affecting the Property.

**CPA REVISED 12/22 (PAGE 12 OF 17)**     Buyer's Initials _____ / _____     Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 12 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com        9740 Wilshire

Property Address: **9740 Wilshire Blvd, Beverly Hills, CA  90212**                    Date: **June 14, 2023**

29. **AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. Residential properties are not typically covered by the ADA, but may be governed by its provisions if used for certain purposes. The ADA can require, among other things, that building be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary and injunctive remedies may be incurred if the Property is not in compliance. A real estate broker or agent does not have the technical expertise to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact a qualified California real estate attorney, contractor, architect, engineer, or other qualified professional of Buyer or Seller's own choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

30. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.

31. **COPIES:** Seller and buyer each represent that Copies of all reports, certificates, approvals, and other documents that are furnished to the other are true, correct, and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

32. **DEFINITIONS and INSTRUCTIONS:** The following words are defined terms in this Agreement, shall be indicated by initial capital letters throughout this Agreement, and have the following meaning whenever used:

   A. **"Acceptance"** means the time the offer or final counter offer is fully executed, in writing, by the recipient Party and is Delivered to the offering Party or that Party's Authorized Agent.

   B. **"Agent"** means the Broker, salesperson, broker-associate or any other real estate licensee licensed under the brokerage firm identified in **paragraph 2B**.

   C. **"Agreement"** means this document and any counter offers and any incorporated addenda or amendments, collectively forming the binding agreement between the Parties. Addenda and amendments are incorporated only when Signed and Delivered by all Parties.

   D. **"As-Is"** condition: Seller shall disclose known material facts and defects as specified in this Agreement. Buyer has the right to inspect the Property and, within the time specified, request that Seller make repairs or take other corrective action, or exercise any contingency cancellation rights in this Agreement. Seller is only required to make repairs specified in this Agreement or as Otherwise Agreed.

   E. **"Authorized Agent"** means an individual real estate licensee specified in the Real Estate Broker Section.

   F. **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the Parties.

   G. **"Close Of Escrow"**, including **"COE"**, means the date the grant deed, or other evidence of transfer of title, is recorded for any real property, or the date of Delivery of a document evidencing the transfer of title for any non-real property transaction.

   H. **"Copy"** means copy by any means including photocopy, facsimile and electronic.

   I. **Counting Days** is done as follows unless Otherwise Agreed: (1) The first Day after an event is the first full calendar date following the event, and ending at 11:59 pm. For example, if a Notice to Buyer to Perform (C.A.R. form NBP) is Delivered at 3 pm on the 7th calendar day of the month, or Acceptance of a counter offer is personally received at 12 noon on the 7th calendar day of the month, then the 7th is Day "0" for purposes of counting days to respond to the NBP or calculating the Close Of Escrow date or contingency removal dates and the 8th of the month is Day 1 for those same purposes. (2) All calendar days are counted in establishing the first Day after an event. (3) All calendar days are counted in determining the date upon which performance must be completed, ending at 11:59 pm on the last day for performance ("Scheduled Performance Day"). (4) After Acceptance, if the Scheduled Performance Day for any act required by this Agreement, including Close Of Escrow, lands on a Saturday, Sunday, or Legal Holiday, the performing party shall be allowed to perform on the next day that is not a Saturday, Sunday or Legal Holiday ("Allowable Performance Day"), and ending at 11:59 pm. "Legal Holiday" shall mean any holiday or optional bank holiday under Civil Code §§ 7 and 7.1 and any holiday under Government Code § 6700. (5) For the purposes of COE, any day that the Recorder's office in the County where the Property is located is closed or any day that the lender or Escrow Holder under this Agreement is closed, the COE shall occur on the next day the Recorder's office in that County, the lender, and the Escrow Holder are open. (6) COE is considered Day 0 for purposes of counting days Seller is allowed to remain in possession, if permitted by this Agreement.

   J. **"Day"** or **"Days"** means calendar day or days. However, delivery of deposit to escrow is based on business days.

   K. **"Deliver", "Delivered" or "Delivery"** of documents, unless Otherwise Agreed, means and shall be effective upon personal receipt of the document by Buyer or Seller or their Authorized Agent. Personal receipt means **(i)** a Copy of the document, or as applicable, link to the document, is in the possession of the Party or Authorized Agent, regardless of the Delivery method used (i.e. e-mail, text, other), or **(ii)** an electronic Copy of the document, or as applicable, link to the document, has been sent to any of the designated electronic delivery addresses specified in the Real Estate Broker Section on page 16. After Acceptance, Agent may change the designated electronic delivery address for that Agent by, in writing, Delivering notice of the change in designated electronic delivery address to the other Party. Links could be, for example, to DropBox or GoogleDrive or other functionally equivalent program. If the recipient of a link is unable or unwilling to open the link or download the documents or otherwise prefers Delivery of the documents directly, Recipient of a link shall notify the sender in writing, within **3 Days** after Delivery of the link (C.A.R. Form RFR). In such case, Delivery shall be effective upon Delivery of the documents and not the link. Failure to notify sender within the time specified above shall be deemed consent to receive, and Buyer opening, the document by link.

   L. **"Electronic Copy"** or "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law. Unless Otherwise Agreed, Buyer and Seller agreed to the use of Electronic Signatures. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.

   M. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.

   N. **"Legally Authorized Signer"** means an individual who has authority to Sign for the principal as specified in **paragraph 39** or **paragraph 40**.

   O. **"Otherwise Agreed"** means an agreement in writing, signed by both Parties and Delivered to each.

   P. **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.

   Q. **"Sign" or "Signed"** means either a handwritten or Electronic Signature on an original document, Copy or any counterpart.

**CPA REVISED 12/22 (PAGE 13 OF 17)**          Buyer's Initials _____/_____          Seller's Initials _____/_____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 13 OF 17)**

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA, 90212*                                                                              Date: *June 14, 2023*

33. **TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the terms and conditions herein. The individual Liquidated Damages and Arbitration of Disputes paragraphs are incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a Counter Offer or addendum. **If at least one but not all Parties initial, a Counter Offer is required until agreement is reached.** Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance and to market the Property for backup offers after Acceptance. The Parties have read and acknowledge receipt of a Copy of the offer and agree to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing. By signing this offer or any document in the transaction, the Party Signing the document is deemed to have read the document in its entirety.

34. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as Otherwise Agreed, this Agreement shall be interpreted, and disputes shall be resolved in accordance with the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

35. **LEGALLY AUTHORIZED SIGNER:** Wherever the signature or initials of the Legally Authorized Signer identified in **paragraph 39** or **40** appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Legally Authorized Signer **(i)** represents that the entity for which that person is acting already exists and is in good standing to do business in California and **(ii)** shall Deliver to the other Party and Escrow Holder, within as specified in **paragraph 3N(5)**, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code § 18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

**CPA REVISED 12/22 (PAGE 14 OF 17)**                    Buyer's Initials _____ / _____            Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 14 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          9740 Wilshire

Property Address: **9740 Wilshire Blvd, Beverly Hills, CA  90212**                                              Date: **June 14, 2023**

**36. LIQUIDATED DAMAGES:**
   **If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT THE TIME OF ANY INCREASED DEPOSIT BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R. FORM DID).**

   Buyer's Initials _____ / _____                              Seller's Initials _____ / _____

**37. MEDIATION:**
   **A.**  The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. The mediation shall be conducted through the C.A.R. Real Estate Mediation Center for Consumers **(www.consumermediation.org)** or through any other mediation provider or service mutually agreed to by the Parties. The Parties **also agree to mediate any disputes or claims with Agents(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Agent.** Mediation fees, if any, shall be divided equally among the Parties involved, and shall be recoverable under the prevailing party attorney fees clause. If, for any dispute or claim to which this paragraph applies, any Party **(i)** commences an action without first attempting to resolve the matter through mediation, or **(ii)** before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.
   **B.**  **ADDITIONAL MEDIATION TERMS: (i) Exclusions from this mediation agreement are specified in paragraph 38B; (ii) The obligation to mediate does not preclude the right of either Party to seek a preservation of rights under paragraph 38C; and (iii) Agent's rights and obligations are further specified in paragraph 38D. These terms apply even if the Arbitration of Disputes paragraph is not initialed.**

**38. ARBITRATION OF DISPUTES:**
   **A.**  **The Parties agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Agents(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Agent. The arbitration shall be conducted through any arbitration provider or service mutually agreed to by the Parties. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of transactional real estate Law experience, unless the Parties mutually agree to a different arbitrator. Enforcement of, and any motion to compel arbitration pursuant to, this agreement to arbitrate shall be governed by the procedural rules of the Federal Arbitration Act, and not the California Arbitration Act, notwithstanding any language seemingly to the contrary in this Agreement. The Parties shall have the right to discovery in accordance with Code of Civil Procedure § 1283.05. The arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction.**
   **B.**  **EXCLUSIONS: The following matters are excluded from mediation and arbitration: (i) Any matter that is within the jurisdiction of a probate, small claims or bankruptcy court; (ii) an unlawful detainer action; and (iii) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code § 2985.**
   **C.**  **PRESERVATION OF ACTIONS: The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, provided the filing party concurrent with, or immediately after such filing, makes a request to the court for a stay of litigation pending any applicable mediation or arbitration proceeding; or (iii) the filing of a mechanic's lien.**
   **D.**  **AGENTS: Agents shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Agents(s) participating in mediation or arbitration shall not be deemed a party to this Agreement.**
   **E.**  **"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**

   **"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

   Buyer's Initials _____ / _____                              Seller's Initials _____ / _____

**CPA REVISED 12/22 (PAGE 15 OF 17)**          Buyer's Initials _____ / _____     Seller's Initials _____ / _____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 15 OF 17)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201    www.lwolf.com                9740 Wilshire

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA  90212*                                    Date: *June 14, 2023*

**39.  OFFER**

**A.  EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless by the date and time specified in **paragraph 3C**, the offer is Signed by Seller and a Copy of the Signed offer is Delivered to Buyer or Buyer's Authorized Agent. **Seller has no obligation to respond to an offer made.**

**B.  [X] ENTITY BUYERS: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

(1)  One or more Buyers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

(2)  This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 35** for additional terms.

(3)  The name(s) of the Legally Authorized Signer(s) is/are: _____ *Ely Dromy* _____, _____ .

(4)  If a trust, identify Buyer as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).

(5)  If the entity is a trust or under probate, the following is the full name of the trust or probate case, including case #:

_____
_____ .

**C.**  The CPA has 17 pages. Buyer acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

**D.  BUYER SIGNATURE(S):**

(Signature) By, _____  Date: _____

Printed name of BUYER: *ED Flores, LLC and/or assignee* _____

[X] Printed Name of Legally Authorized Signer: _____ *Ely Dromy* _____  Title, if applicable, _____

(Signature) By, _____  Date: _____

Printed name of BUYER: _____

[ ] Printed Name of Legally Authorized Signer: _____  Title, if applicable, _____

[ ] IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

**40.  ACCEPTANCE**

**A.  ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement and authorizes Agent to Deliver a Signed Copy to Buyer.

**Seller's acceptance is subject to the attached Counter Offer or Back-Up Offer Addendum, or both, checked below.**
Seller shall return and include the entire agreement with any response.

[ ] **Seller Counter Offer** (C.A.R. Form SCO or SMCO)

[ ] **Back-Up Offer Addendum** (C.A.R. Form BUO)

**B.  [X] Entity Sellers: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure form (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

(1)  One or more Sellers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

(2)  This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 35** for additional terms.

(3)  The name(s) of the Legally Authorized Signer(s) is/are: _____ *Leonid Pustilnikov* _____, _____ .

(4)  If a trust, identify Seller as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).

(5)  If the entity is a trust or under probate, the following is the full name of the trust or probate case, including case #:

_____
_____ .

**C.**  The CPA has 17 pages. Seller acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

**D.  SELLER SIGNATURE(S):**

(Signature) By, _____  Date: _____

Printed name of SELLER: *9300 Wilshire, LLC* _____

[X] Printed Name of Legally Authorized Signer: _____ *Leonid Pustilnikov* _____  Title, if applicable, _____

(Signature) By, _____  Date: _____

Printed name of SELLER: _____

[ ] Printed Name of Legally Authorized Signer: _____  Title, if applicable, _____

[ ] IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

**OFFER NOT ACCEPTED:** _____/_____  No Counter Offer is being made. This offer was not accepted by Seller _____ (date)
Seller's Initials

**CPA REVISED 12/22 (PAGE 16 OF 17)**



**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 16 OF 17)**

Property Address: *9740 Wilshire Blvd, Beverly Hills, CA. 90212*                                    Date: *June 14, 2023*

**REAL ESTATE BROKERS SECTION:**

1. **Real Estate Agents are not parties to the Agreement between Buyer and Seller.**
2. **Agency relationships are confirmed as stated in paragraph 2.**
3. **Cooperating Broker Compensation:** Seller's Broker agrees to pay Buyer's Broker and Buyer's Broker agrees to accept, out of Seller's Broker's proceeds in escrow, the amount specified in the MLS, provided Buyer's Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS. If Seller's Broker and Buyer's Broker are not both Participants of the MLS, or a reciprocal MLS, in which the Property is offered for sale, then compensation must be specified in a separate written agreement (C.A.R. Form CBC). Declaration of License and Tax (C.A.R. Form DLT) may be used to document that tax reporting will be required or that an exemption exists.
4. **Presentation of Offer:** Pursuant to the National Association of REALTORS® Standard of Practice 1-7, if Buyer's Agent makes a written request, Seller's Agent shall confirm in writing that this offer has been presented to Seller.
5. **Agents' Signatures and designated electronic delivery address:**

   **A.** Buyer's Brokerage Firm *LND Realty* _____ Lic. # *00582069* _____
   By _____ *Adam Kanizo* Lic. # *02008361* _____ Date _____
   By _____ Lic. # _____ Date _____
   Address _____ City _____ State _____ Zip _____
   Email *adam@diico.com* _____ Phone # _____
   ☐ More than one agent from the same firm represents Buyer. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
   ☐ More than one brokerage firm represents Buyer. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.

   **Designated Electronic Delivery Address(es) (check all that apply):**
   ☐ Email above ☐ Text to Phone # above ☐ Alternate: _____

   **B.** Seller's Brokerage Firm *LND Realty* _____ Lic. # *00582069* _____
   By _____ *Adam Kanizo* Lic. # *02008361* _____ Date _____
   By _____ Lic. # _____ Date _____
   Address _____ City _____ State _____ Zip _____
   Email *adam@lndrealty.com* _____ Phone # _____
   ☐ More than one agent from the same firm represents Seller. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
   ☐ More than one brokerage firm represents Seller. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.

   **Designated Electronic Delivery Address(es) (To be filled out by Seller's Agent) (check all that apply):**
   ☐ Email above ☐ Text to Phone # above ☐ Alternate: _____

---

**ESCROW HOLDER ACKNOWLEDGMENT:**

Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____), Counter Offer numbers _____ and _____, and agrees to act as Escrow Holder subject to **paragraph 22** of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised by _____ that the date of Acceptance of the Agreement is _____

Escrow Holder _____ Escrow # _____

By _____ Date _____

Address _____

Phone/Fax/E-mail _____

Escrow Holder has the following license number # _____

☐ Department of Financial Protection and Innovation, ☐ Department of Insurance, ☐ Department of Real Estate.

---

**PRESENTATION OF OFFER:** _____/_____ Seller's Brokerage Firm presented this offer to Seller on _____ (date).
Broker or Designee Initials

© 2022, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**CPA REVISED 12/22 (PAGE 17 OF 17)**                Buyer's Initials _____/_____            Seller's Initials _____/_____

**COMMERCIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (CPA PAGE 17 OF 17)**

**BUYER'S INVESTIGATION ADVISORY**
(C.A.R. Form BIA, Revised 12/21)

CALIFORNIA
ASSOCIATION
OF REALTORS®

**Property Address** _9740 Wilshire Blvd, Beverly Hills, CA  90212_

1. **IMPORTANCE OF PROPERTY INVESTIGATION:** The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation. A general physical inspection typically does not cover all aspects of the Property nor items affecting the Property that are not physically located on the Property. If the professionals recommend further investigations, including a recommendation by a pest control operator to inspect inaccessible areas of the Property, you should contact qualified experts to conduct such additional investigations.

2. **BROKER OBLIGATIONS:** Brokers do not have expertise in all areas and therefore cannot advise you on many items, such as those listed below. If Broker gives you referrals to professionals, Broker does not guarantee their performance.

3. **YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO THE FOLLOWING. IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS.**

   A. **GENERAL CONDITION OF THE PROPERTY, ITS SYSTEMS AND COMPONENTS:** Foundation, roof (condition, age, leaks, useful life), plumbing, heating, air conditioning, electrical, mechanical, security, pool/spa (cracks, leaks, operation), other structural and non-structural systems and components, fixtures, built-in appliances, any personal property included in the sale, and energy efficiency of the Property.

   B. **SQUARE FOOTAGE, AGE, BOUNDARIES:** Square footage, room dimensions, lot size, age of improvements and boundaries. Any numerical statements regarding these items are APPROXIMATIONS ONLY and have not been verified by Seller and cannot be verified by Brokers. Fences, hedges, walls, retaining walls and other barriers or markers do not necessarily identify true Property boundaries.

   C. **WOOD DESTROYING PESTS:** Presence of, or conditions likely to lead to the presence of wood destroying pests and organisms.

   D. **SOIL STABILITY:** Existence of fill or compacted soil, expansive or contracting soil, susceptibility to slippage, settling or movement, and the adequacy of drainage.

   E. **WATER AND UTILITIES; WELL SYSTEMS AND COMPONENTS; WASTE DISPOSAL:** Water and utility availability, use restrictions and costs. Water quality, adequacy, condition, and performance of well systems and components. The type, size, adequacy, capacity and condition of sewer and septic systems and components, connection to sewer, and applicable fees.

   F. **ENVIRONMENTAL HAZARDS:** Potential environmental hazards, including, but not limited to, asbestos, lead-based paint and other lead contamination, radon, methane, other gases, fuel oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants).

   G. **EARTHQUAKES AND FLOODING:** Susceptibility of the Property to earthquake/seismic hazards and propensity of the Property to flood.

   H. **FIRE, HAZARD, AND OTHER INSURANCE:** The availability and cost of necessary or desired insurance may vary. The location of the Property in a seismic, flood or fire hazard zone, and other conditions, such as the age of the Property and the claims history of the Property and Buyer, may affect the availability and need for certain types of insurance. Buyer should explore insurance options early as this information may affect other decisions, including the removal of loan and inspection contingencies.

   I. **BUILDING PERMITS, ZONING, GOVERNMENTAL REQUIREMENTS, AND ADDRESS:** Permits, inspections, certificates, zoning, other governmental limitations, restrictions, and requirements affecting the current or future use of the Property, its development or size. Postal/mailing address and zip code may not accurately reflect the city which has jurisdiction over the property.

   J. **RENTAL PROPERTY RESTRICTIONS:** The State, some counties, and some cities impose restrictions that limit the amount of rent that can be charged, the maximum number of occupants, and the right of a landlord to terminate a tenancy. Deadbolt or other locks and security systems for doors and windows, including window bars, should be examined to determine whether they satisfy legal requirements.

   K. **SECURITY AND SAFETY:** State and local Law may require the installation of barriers, access alarms, self-latching mechanisms and/or other measures to decrease the risk to children and other persons of existing swimming pools and hot tubs, as well as various fire safety and other measures concerning other features of the Property.

© 2021, California Association of REALTORS®, Inc.

**BIA REVISED 12/21 (PAGE 1 OF 2)**

EQUAL HOUSING
OPPORTUNITY

**BUYER'S INVESTIGATION ADVISORY (BIA PAGE 1 OF 2)**

**L. NEIGHBORHOOD, AREA, SUBDIVISION CONDITIONS; PERSONAL FACTORS:** Neighborhood or area conditions, including schools, law enforcement, crime statistics, registered felons or offenders, fire protection, other government services, availability, adequacy and cost of internet connections or other technology services and installations, commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally protected sites or improvements, cemeteries, facilities and condition of common areas of common interest subdivisions, and possible lack of compliance with any governing documents or Homeowners' Association requirements, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Buyer.

**By signing below, Buyers acknowledge that they have read, understand, accept and have received a Copy of this Advisory. Buyers are encouraged to read it carefully.**

Buyer _____ *ED Flores, LLC and/or assignee* Date _____

Buyer _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**BIA REVISED 12/21 (PAGE 2 OF 2)**

**BUYER'S INVESTIGATION ADVISORY (BIA PAGE 2 OF 2)**

**CALIFORNIA ASSOCIATION OF REALTORS®**

### FAIR APPRAISAL ACT ADDENDUM
**(C.A.R. Form FAAA, 6/22)**

The following terms and conditions are hereby incorporated in and made a part of the Purchase Agreement, OR ☐ Other
_____ ("Agreement"),
dated _06/14/2023_ , on property known as _____*9740 Wilshire Blvd, Beverly Hills, CA  90212*_____ ("Property"),
in which _____*9300 Wilshire, LLC*_____ is referred to as ("Seller")
and _____*ED Flores, LLC and/or assignee*_____ is referred to as ("Buyer").

Any appraisal of the property is required to be unbiased, objective, and not influenced by improper or illegal considerations, including, but not limited to, any of the following: race, color, religion (including religious dress, grooming practices, or both), gender (including, but not limited to, pregnancy, childbirth, breastfeeding, and related conditions, and gender identity and gender expression), sexual orientation, marital status, medical condition, military or veteran status, national origin (including language use and possession of a driver's license issued to persons unable to provide their presence in the United States is authorized under federal law), source of income, ancestry, disability (mental and physical, including, but not limited to, HIV/AIDS status, cancer diagnosis, and genetic characteristics), genetic information, or age.

If a buyer or seller believes that the appraisal has been influenced by any of the above factors, the seller or buyer can report this information to the lender or mortgage broker that retained the appraiser and may also file a complaint with the Bureau of Real Estate Appraisers at https://www2.brea.ca.gov/complaint/ or call (916) 552-9000 for further information on how to file a complaint.

**By signing below, Buyer and Seller has each read, understands and acknowledges receipt of a copy of this Fair Appraisal Act Addendum.**

Buyer _____ Date _____
*ED Flores, LLC and/or assignee*

Buyer _____ Date _____

Seller _____ Date _____
*9300 Wilshire, LLC*

Seller _____ Date _____

© 2022, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**FAAA 6/22 (PAGE 1 OF 1)**

Adam Kanizo, 225 MONTANA AVE SANTA MONICA CA 90403                Phone: 8182921346            Fax: (818)292-1346            9740 Wilshire
Adam Kanizo                        Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201    www.lwolf.com



# POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER
## OR SELLER - DISCLOSURE AND CONSENT
### (C.A.R. Form PRBS, Revised 12/21)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the seller's willingness to accept a price less than the listing price or the buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller - Disclosure and Consent and agrees to the agency possibilities disclosed.**

Seller _____ *9300 Wilshire, LLC* Date _____

Seller _____ Date _____

Buyer _____ *ED Flores, LLC and/or assignee* Date _____

Buyer _____ Date _____

Buyer's Brokerage Firm *LND Realty* _____ DRE Lic # *00582069*

By _____ DRE Lic # *02008361* Date _____
   *Adam Kanizo*

Seller's Brokerage Firm *LND Realty* _____ DRE Lic # *00582069*

By _____ DRE Lic # *02008361* Date _____
   *Adam Kanizo*

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**PRBS REVISED 12/21 (PAGE 1 OF 1)**

**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)**

**CALIFORNIA ASSOCIATION OF REALTORS®**

# CALIFORNIA CONSUMER PRIVACY ACT ADVISORY, DISCLOSURE AND NOTICE
### (C.A.R. Form CCPA, Revised 12/22)

The California Consumer Privacy Act (commencing with Civil Code § 1798.100) ("CCPA"), as amended by California voters in 2020, grants to California residents certain rights in their private, personal information ("PI") that is collected by companies with whom they do business. Under the CCPA, PI is defined broadly to encompass non-public records information that could reasonably be linked directly or indirectly to you. PI could potentially include photographs of, or sales information about, your property.

During the process of buying and selling real estate your PI will be collected and likely shared with others, including real estate licensees, a Multiple Listing Service, real estate internet websites, service providers, lenders, and title and escrow companies, to name several possibilities. Businesses that are covered by the CCPA are required to grant you various rights in your PI, including the right to know what PI is collected, the right to know what PI is sold or shared and to whom, the right to request that the business correct or delete your PI, the right to "opt out" or stop the transfer of your PI to others, and the right to limit the use of certain PI which is considered "sensitive." You may get one or more notices regarding your CCPA rights from businesses you interact with in a real estate transaction. However, not all businesses that receive or share your PI are obligated to comply with the CCPA. Moreover, businesses that are otherwise covered under the CCPA may have a legal obligation to maintain PI, notwithstanding your instruction to the contrary. For instance, regardless of whether they are covered by CCPA, under California law, brokers and Multiple Listing Services are required to maintain their records for 3 years. If you wish to exercise your rights under CCPA, where applicable, you should contact the respective business directly.

You can obtain more information about the CCPA and your rights under the law from the State of California Department of Justice (oag.ca.gov/privacy/ccpa). Additionally, the California Privacy Protection Agency is authorized to promulgate regulations which may further clarify requirements of the CCPA (cppa.ca.gov/regulations/).

**I/we acknowledge receipt of a copy of this California Consumer Privacy Act Advisory, Disclosure and Notice.**

Buyer/Seller/Landlord/Tenant _____ Date _____
*ED Flores, LLC and/or assignee*

Buyer/Seller/Landlord/Tenant _____ Date _____

© 2022, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**CCPA REVISED 12/22 (PAGE 1 OF 1)**

**CALIFORNIA CONSUMER PRIVACY ACT ADVISORY (CCPA PAGE 1 OF 1)**



CALIFORNIA
ASSOCIATION
OF REALTORS®

## ADDENDUM No. _1_

**(C.A.R. Form ADM, Revised 12/21)**

The following terms and conditions are hereby incorporated in and made a part of the Purchase Agreement, OR ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right to rescind), ☐ Other _____,

dated _____*June 26, 2023*_____ , on property known as _____*9740 Wilshire Blvd*_____
_____*Beverly Hills, CA  90212*_____ ("Property/Premises"),

in which _____*ED Flores, LLC and/or assignee*_____ is referred to as ("Buyer/Tenant")

and _____*9300 Wilshire, LLC*_____ is referred to as ("Seller/Landlord").

Buyer/Tenant and Seller/Landlord are referred to as the "Parties."

*1. Seller to pay LND Realty a commission equal to 1% of the agreed upon purchase price.*

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this Addendum.**

Buyer/Tenant _____    Date _____

*ED Flores, LLC and/or assignee*

Buyer/Tenant _____    Date _____

Seller/Landlord _____    Date _____

*9300 Wilshire, LLC*

Seller/Landlord _____    Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**ADM REVISED 12/21 (PAGE 1 OF 1)**

EQUAL HOUSING
OPPORTUNITY

**COURT CONFIRMATION ADDENDUM**

(C.A.R. Form CCA, Revised 12/21)

This is an addendum to the Purchase Agreement, OR ☐ Counter Offer No. _____ , ☐ Other _____
_____, ("Agreement"),
dated _____*June 14, 2023*_____ , on property known as _____*9740 Wilshire Blvd, Beverly Hills, CA  90212*_____ ("Property"),
between _____*ED Flores, LLC and/or assignee*_____ ("Buyer"),
and _____*9300 Wilshire, LLC*_____ ("Seller").
Buyer and Seller are referred to as the "Parties."

The Agreement is contingent upon court confirmation on or before _____ (date). If court confirmation is not obtained by that date, either Buyer or Seller may cancel the Agreement in writing. Court confirmation may be required in probate, conservatorship, guardianship, receivership, bankruptcy, divorce or other proceedings. The court may allow open, competitive bidding, resulting in the Property being sold to the highest bidder. Broker recommends that Buyer appear at the court confirmation hearing. Buyer understands that **(i)** Broker and others may continue to market the Property; and **(ii)** Broker may represent other competitive bidders prior to and at the court confirmation.

**By signing below Buyer and Seller acknowledge that each has read, understands, has received a copy of and agrees to the terms of this Court Confirmation Addendum.**

Buyer _____*ED Flores, LLC and/or assignee* Date _____

Buyer _____ Date _____

Seller _____*9300 Wilshire, LLC* Date _____

Seller _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**CCA REVISED 12/21 (PAGE 1 OF 1)**

**COURT CONFIRMATION ADDENDUM (CCA PAGE 1 OF 1)**

# EXHIBIT C

**TENANCY IN COMMON ("TIC") PURCHASE ADDENDUM**
(C.A.R. Form TIC-PA, 12/21)

The following terms and conditions are hereby incorporated in and made a part of the Purchase Agreement, OR ☐ Counter Offer No. _____, ☐ Other _____ ("Agreement"), dated _06/14/2023_ , on property known as _____ _9740 Wilshire Blvd, Beverly Hills, CA  90212_ _____ ("Property"), between _____ _ED Flores, LLC and/or assignee_ _____ ("Buyer"), and _____ _9300 Wilshire, LLC_ _____ ("Seller").

**1. BUYER'S OCCUPANCY RIGHTS:** Subject to Buyer entering into a TIC Agreement, as provided in **paragraph 2**, defining all exclusive use and other rights and obligations associated with the purchase of an undivided interest in an existing (or ☐ **if checked**, a newly created) Tenancy-In-Common (TIC):
   **A.** Buyer is purchasing a _10.550_ percent undivided interest in the Property.
   **B.** Buyer shall have the exclusive right to occupy unit _____.
   **C.** Buyer shall have the exclusive right to use the following areas **(check all that apply)**:
       **(1)** ☐ Parking space(s) identified as _____.
       **(2)** ☐ Storage space(s) identified as _____.
       **(3)** ☐ Deck(s) identified as _____.
       **(4)** ☐ Yard and/or patio identified as _____.
       **(5)** ☐ Other exclusive use common area(s) identified as _____.

**2. TENANCY-IN-COMMON AGREEMENT:** Buyer is cautioned not to proceed without a TIC Agreement in place. Buyer shall sign the TIC Agreement, and any amendments to it, prior to the Close Of Escrow ("COE").
   **A.** Seller, within 7 (or _____) **Days** after Acceptance, shall deliver to Buyer a copy of the TIC Agreement, with all amendments, if any, and any other document requiring Buyer's signature prior to transfer of title. ☐ **(If checked)** Buyer has already received the TIC Agreement.   ☐ **(If checked)** Buyer will retain a qualified California real estate attorney to create the TIC Agreement.
   **B.** This Agreement is contingent upon Buyer's approval of the TIC Agreement with all amendments, if any, fully signed by all TIC co-owners and the other documents delivered pursuant to **paragraph 2A**, and all disclosures, including but not limited to the financial disclosure in **paragraph 5**. This contingency shall be removed within 17 (or _____) **Days** after Acceptance OR ☒ Buyer acknowledges receipt of the TIC Agreement and removes this TIC contingency.
   **C.** If the TIC Agreement requires the other TIC co-owners' written consent to the sale of Seller's interest, Seller shall have 17 (or _____) **Days** after Acceptance to deliver such consent to Buyer. If Seller is not able to do so, either Buyer or Seller may cancel this Agreement.

**3. FINANCING (check all that apply):** Buyer will finance the amount specified in this Agreement as follows:
   **A.** ☐ **Fractional TIC Loan:** Buyer will obtain individual financing using a "fractional TIC loan," loan secured only by Buyer's percentage interest in the Property.
   **B.** ☒ **Assumption of a Group Loan:** Buyer will assume a portion of an existing group loan. The dollar amount of the loan that the Buyer will assume is $_____ **or (if checked)** ☒ Buyer's share of that existing loan obligation is _____ percent of the outstanding loan balance. Obtaining approval of the lender of the group loan is **or (if checked)** ☒ is not a contingency of this Agreement. Buyer shall pay any lender fees required for lender approval. If lender approval is not obtained within **17 (or _____) Days** after Acceptance, either Buyer or Seller may cancel this Agreement.
   **C.** ☐ **Participation in a New Group Loan:** Buyer will participate in a new group loan under the terms of the TIC Agreement. Buyer agrees to cooperate with other TIC owners by providing all required information to a lender or loan Broker. Seller or other TIC owners shall deliver to Buyer a copy of the new group loan terms within 3 (or _____) **Days** after receipt from lender. This Agreement is contingent upon Buyer's approval of the new group loan. Buyer shall remove this contingency within **5 Days** after receipt of the new group loan terms.
   **D.** ☐ **Seller Release:** If within 7 (or _____) **Days** before closing, Seller is not released from the loan(s) secured by the Property in which Seller is obligated at Acceptance, Seller may cancel this Agreement.
   **E.** ☐ **Seller Financing:** Buyer will obtain seller financing pursuant to the terms listed in an attached Seller Financing Addendum and Disclosure.
   **F.** ☐ **Cash:** Buyer chooses to forego financing. The full sales price will be paid in cash. If a group loan exists on the Property, Buyer is advised to seek legal advice regarding the effect of the group loan on Buyer's interest in the Property.

**4. CONDOMINIUM CONVERSION:** ☐ If this Property is purchased with the intent to convert the TIC interests into condominiums, Buyer is advised **(i)** to review the TIC Ownership Advisory (C.A.R. Form TIC-OA), and **(ii)** during Buyer's investigation period, consult with a qualified California real estate attorney familiar with condominium conversion law.

**5. FINANCIAL AND OPERATIONAL DISCLOSURES:** Seller shall Deliver to Buyer within 7 (or _____) **Days** after Acceptance a completed TIC Financial Disclosure Statement (C.A.R. Form TIC-FD) and, if applicable, the most recent 12 months meeting minutes, if applicable, and documents related to management of the TIC.

**TIC-PA 12/21 (PAGE 1 OF 2)**         Buyer's Initials _____ / _____         Seller's Initials _____ / _____

**TENANCY IN COMMON ("TIC") PURCHASE ADDENDUM (TIC-PA PAGE 1 OF 2)**

**6.** ☐ **(If checked) SIMULTANEOUS SALE OF OTHER TIC INTERESTS:**

  **A.** This Agreement is contingent upon Seller **(i)** entering into contracts to sell other TIC interests in the Property, and **(ii)** the sale of other TIC interests.

  **B.** If **(i)** within 30 (**or** _____) **Days** after Acceptance, Seller has not in writing removed the contingency to sell other TIC interests, Buyer may cancel this Agreement, or **(ii)** within 90 (**or** _____) Days after Acceptance, Seller has not entered into contracts to sell the other TIC interests,  either Buyer or Seller may cancel this Agreement.

  **C.** If one or more buyers of other TIC interests cancels or breaches the other agreement, then Buyer may cancel this Agreement.

**7. CLOSING REQUIREMENTS:**

  **A. SALE OF INDIVIDUAL TIC INTEREST:**

  **(1)** If Buyer is purchasing an interest in an existing TIC, Buyer shall reimburse Seller at Close Of Escrow for any funds Seller has remaining in the TIC group's reserve account or operating account, to the extent it can be determined by the TIC, or pay into the TIC reserve a sum equal to Seller's share, as determined by the TIC, for the following: ☐ repairs and maintenance, ☐ taxes, ☐ mortgage payments, ☐ insurance, ☐ other _____.

  **(2)** Seller shall deliver to Buyer **(i)** written consent from other TIC owners, and **(ii)** any other document required by the TIC Agreement prior to transfer of title to Buyer.

  **(3)** Buyer shall sign all documents necessary to transfer Seller's interest to Buyer that where delivered to Buyer as specified in **paragraph 2A.**

  **B. SIMULTANEOUS SALE OF OTHER TIC INTERESTS:**

  **(1)** If checked in **paragraph 6**, Close Of Escrow shall occur simultaneously with the sale of other TIC interests, which shall be **45** (**or** _____) **Days** after Seller **(i)** removes the contingency for the sale of other TIC interests, or **(ii)** notifies Buyer that Seller has entered into contracts to sell the other TIC interests.

  **OR (2)** ☐ (**If checked**) Close Of Escrow shall occur as specified in the Agreement independently of the sale of other TIC interests and Seller shall remain a party responsible under the TIC Agreement until all other TIC interests are sold.

**8. TIC AGREEMENT COSTS:** Seller shall pay for any new TIC Agreement. Amendments to an existing TIC Agreement required by Buyer's lender, or which are necessary to the transfer of this TIC interest, shall be paid by Buyer.

**9. If any discrepancies exist between this Addendum and the TIC Agreement, the TIC Agreement shall control. Buyer is advised to seek qualified legal counsel to ensure the terms of the TIC Agreement accurately reflect the terms of the Purchase Agreement.**

**10. BUYER ACKNOWLEDGEMENTS:** Buyer acknowledges receipt of a ☒ TIC Ownership Advisory (C.A.R. Form TIC-OA).

**11. SALE OF 5 OR MORE UNITS: A public report is required from the Subdivisions Office of the California Department of Real Estate (DRE) prior to the sale of a TIC interest by a seller who owns five or more TIC interests in the real property.  If this building contains 5 or more TIC interests that are being sold by one seller, the DRE must have pre-approved the language of this Agreement and this Addendum prior to their use. Accordingly, the advice of a qualified California real estate attorney should be obtained.**

**12. ADDITIONAL TERMS:** *1. Subject to bankruptcy court approval.*

*2. Subject to tic right of first offer process*

*3. Closing to occur 30 days after court approval.*

**By signing below Buyer and Seller acknowledge that each has read, understands, has received a copy of, and agrees to the terms of this Tenant in Common Purchase Addendum.**

| | | |
|---|---|---|
| Buyer | *ED Flores, LLC and/or assignee* | Date _____ |
| Buyer | | Date _____ |
| Seller | *9300 Wilshire, LLC* | Date _____ |
| Seller | | Date _____ |

BROKERS/AGENTS CAN ADVISE ON REAL ESTATE TRANSACTION ONLY. FOR LEGAL OR TAX ADVICE, CONSULT A QUALIFIED CALIFORNIA REAL ESTATE ATTORNEY OR CPA.

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.  This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.  It is not intended to identify the user as a REALTOR®.  REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**TIC-PA 12/21 (PAGE 2 OF 2)**

**TENANCY IN COMMON ("TIC") PURCHASE ADDENDUM (TIC-PA PAGE 2 OF 2)**

# EXHIBIT D

**CONTINGENCY REMOVAL No.** _____1_____

**(C.A.R. Form CR, Revised 12/21)**

In accordance with the terms and conditions of the Purchase Agreement, OR ☐ Request For Repair (C.A.R. Form RR), ☐ Response
And Reply To Request For Repair (C.A.R. Form RRRR), ☐ Other _____
_____ dated _____, ("Agreement"),
on property known as _____*9740 Wilshire Blvd, Beverly Hills, CA 90212*_____ ("Property"),
between _____*ED Flores, LLC and/or assignee*_____ ("Buyer")
and _____*9300 Wilshire, LLC*_____ ("Seller").
Buyer and Seller are referred to as the "Parties."

1. **BUYER REMOVAL OF BUYER CONTINGENCIES:** With respect to any contingency and cancellation right that Buyer removes,
   unless Otherwise Agreed in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have:
   **(i)** completed all Buyer Investigations and review of reports and other applicable information and disclosures; **(ii)** elected to proceed
   with the transaction; and **(iii)** assumed all liability, responsibility and expense, **if any,** for Repairs, corrections, or for the inability to
   obtain financing. Waiver of statutory disclosures is prohibited by law.

2. **Buyer removes ONLY the following individually checked Buyer contingencies:** (Paragraph numbers refer to C.A.R. Form RPA.
   Applicable paragraph numbers may be different for different forms.)
   **A.** ☒ Loan (Paragraph 3L(1) and 8A)
   **B.** ☒ Appraisal (Paragraph 3L(2) and 8B)
   **C.** Investigation of Property (Paragraph 3L(3), 8C, and 12)
      (1) ☐ Entire Buyer's Investigation Contingency (Paragraph 12)
      OR (2) ☐ Only the part of the Investigation related to inspections concerning physical attributes of the Property (Paragraph
         12B(1))
      OR (3) ☐ All Buyer Investigations other than the physical attributes (Paragraph 12B(2))
      OR (4) ☐ Entire Buyer's Investigation Contingency, EXCEPT _____
   **D.** Review of Seller Documents:
      (1) ☐ Review of All Seller Documents (Paragraph 3L(4), 8D, 9B(6), 10A, and 11)
      OR (2) ☐ Review of All Seller Documents, EXCEPT ☐ Government Reports (Paragraph 10A); ☐ Statutory and other Disclosures
         (Paragraph 11); ☐ Other _____
   **E.** ☐ Preliminary ("Title") Report (Paragraph 3L(5), 8E, and 13)
   **F.** ☐ Common Interest (HOA or OA) Disclosures (Paragraph 3L(6), 8F and 11L)
   **G.** ☐ Review of leased or liened items (Paragraph 3L(7), 8G, and 9B(6))
   **H.** ☐ Sale of Buyer's Property (Paragraph 3L(8) and 8J, C.A.R. Form COP, paragraph 1B and C)(check one or both boxes below)
      ☐ Entering into contract for Buyer's Property   ☐ Close of Escrow on Buyer's Property
   **I.** ☐ Other: _____

3. ☒ **ALL Buyer contingencies are removed, EXCEPT:** ☐ Loan Contingency (Paragraph 3L(1) and 8A); ☐ Appraisal Contingency
   (Paragraph 3L(2) and 8B); ☐ Contingency for the Close of Buyer's Property (Paragraph 3L(8) and 8J); ☐ Condominium/Planned
   Development (HOA) Disclosures (Paragraph 3L(6), 8F and 11L); ☒ Other *Court Confirmation and approval of sale.*

4. ☐ **BUYER HEREBY REMOVES ANY AND ALL BUYER CONTINGENCIES.**

5. Once all contingencies are removed, whether or not Buyer has satisfied themselves regarding all contingencies or
   received any information relating to those contingencies, Buyer may not be entitled to a return of Buyer's deposit if Buyer
   does not close escrow. This could happen even if, for example, Buyer does not approve of some aspect of the Property
   or lender does not approve Buyer's loan.

**NOTE:** If this form is attached to a Request for Repairs (C.A.R. Form RR), Seller Response and Buyer Reply to Request for Repairs
(C.A.R. Form RRRR), or another form or document such as an addendum (C.A.R. Form ADM) or Amendment to Existing Agreement
(C.A.R. Form AEA) it is only valid if Buyer and Seller agree to the requests made on that form or document.

**Buyer** _____ *ED Flores, LLC* **Date** _____

**Buyer** _____ **Date** _____

6. **SELLER REMOVAL OF SELLER CONTINGENCIES:**
   **NOTE:** This section is solely for the purpose of removing Seller contingencies and should only be signed by Seller if they are
   removing Seller contingencies.
   Seller hereby removes the following Seller contingencies:
   ☐ Finding of replacement property (C.A.R. Form SPRP); ☐ Closing on replacement property (C.A.R. Form SPRP)
   ☐ Other _____

**Seller** _____ **Date** _____

**Seller** _____ **Date** _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this
form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE
CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC
TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE,
CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California
Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by
members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**CR REVISED 12/21 (PAGE 1 OF 1)**

## CONTINGENCY REMOVAL (CR PAGE 1 OF 1)

# EXHIBIT E

TENANCY IN COMMON AGREEMENT

This TENANCY IN COMMON AGREEMENT (this "**Agreement**") is made as of December **28**, 2020 by and between EJT WILSHIRE LINDEN, LLC, a California limited liability company ("**Tenant 1**"), 1112 INVESTMENT COMPANY, LLC, a California limited liability company ("**Tenant 2**"), 9300 WILSHIRE, LLC, a Delaware limited liability company ("**Tenant 3**"), 9300 WILSHIRE FEE, LLC, a Delaware limited liability company ("**Tenant 4**"), E.D. FLORES, LLC, a California limited liability company ("**Tenant 5**"), and DROMY 1995 FAMILY TRUST DATED DECEMBER 12, 1995 ("**Tenant 6**"), collectively, the "**Co-Owners**" and individually, each a "**Co-Owner**."

RECITALS

A.    The Co-Owners own, as tenants in common, a fee interest in the real property located at 125-129 S. Linden Dr., Beverly Hills, CA and a hold interest in the real property, with all improvements thereon, located at 9740-9744 Wilshire Blvd., Beverly Hills, CA (collectively, the "**Property**").

B.    The Co-Owners desire to enter into this Agreement to memorialize certain agreements with respect to the joint ownership of the Property.

C.    This Agreement and the activities of the Co-Owners are intended to comply with the provisions of Internal Revenue Service Revenue Procedure 2002-22, 2002-14 I.R.B. 438 (March 19, 2002) and Private Letter Ruling 201622008.

AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Co-Owners hereby agree as follows:

1.    Ownership of the Property.  The Co-Owners have intended expressly to create a tenancy in common with regard to the joint ownership of the Property.  The Co-Owners shall hold title to the Property as tenants-in-common in the following undivided interests:

| | |
|---|---|
| Tenant 1 | 10% |
| Tenant 2 | 5% |
| Tenant 3 | 10.55% |
| Tenant 4 | 43.95% |
| Tenant 5 | 2.5% |
| Tenant 6 | 28% |

The interest of each Co-Owner in the Property is herein referred to as such Co-Owner's "**Ownership Interest**," and the percentage interest of the Property which each Co-Owner owns (as set forth above) is herein referred to as such Co-Owner's "**Ownership Percentage**."  Each of the Co-Owners shall be entitled to a portion of the income and cash flow from the Property, and shall bear a portion of the expenses of the Property, in accordance with such Co-Owner's Ownership Percentage.  For the avoidance of doubt, in the event the Property generates any cash available for distribution, whether from operations, refinancing, casualty or condemnation

proceeds, sale, or otherwise, each Co-Owner shall receive such cash flow in proportion to its Ownership Percentage.

2.    No Partnership.  Neither this Agreement nor the tenancy in common constitutes a partnership, joint venture, association or agency relationship and none of the Co-Owners shall have the right to bind any other Co-Owner except as expressly set forth herein.  None of the Co-Owners shall file a partnership tax return in connection with this Agreement or their ownership of the Property, or otherwise hold themselves out as partners, shareholders or members of a business entity or conduct business under a common name.  The Co-Owners shall file an election to be excluded from subchapter K of the Internal Revenue Code of 1986, as amended, in accordance with Treasury Regulations Section 1.761-2(a)(2).

3.    Management of the Property.

3.1    Management Generally.    The Co-Owners shall jointly manage the Property. Decisions regarding the Property which require unanimous consent of the Co-Owners shall include all major decisions in accordance with guidance set forth by United States Internal Revenue Service Revenue Procedure 2002-22, and shall include, without limitation, the payment of any fees to any Co-Owners or any affiliates thereof, contracts related to the Property exceeding $500,000 in value and not pursuant to a unanimously agreed upon budget, the hiring of any Property Manager (as defined and more particularly set forth in Section 3.2 below), the lease of or re-lease of all or a portion of the Property, or the sale, exchange, financing, refinancing, creation or modification of a blanket lien on the Property or other disposition of the Property in whole or in part.  For all other actions, except for those day-to-day decisions set forth in Section 3.2 below, the Co-Owners agree to be bound by the vote of a majority count of the unaffiliated Co-Owners at the time any such decision shall be made, regardless of each Co-Owner's Ownership Percentage at such time (eg, 2 out of 3 Co-Owners as of the date hereof, 3 out of 5 Co-Owners if there shall be 5 unaffiliated Co-Owners at some time in the future, etc). All leases of the Property shall be bona fide leases for federal tax purposes.  Rents paid by a lessee shall reflect the fair market value for the use of the Property and shall not be based on upon a percentage of net income from the property, cash flow, increases in equity or similar arrangements.

3.2    Day-to-Day Management.  Day-to-day management of the Property, such as collection of rent, hiring of service contractors on an as-needed basis and payment of expenses, shall be handled by Tenant 3 (the "**TiC Manager**"), subject to any consent required from the Co-Owners as described in Section 3.1.  In the event Leonid Pustilnikov is unable or unwilling to serve as the managing principal of Tenant 3, the Co-Owners agree to be bound by the vote of a majority count of the unaffiliated Co-Owners at the time any such decision shall be made, regardless of each Co-Owner's Ownership Percentage at such time (eg, 4 out of 6 Co-Owners as of the date hereof, 3 out of 5 Co-Owners if there shall be 5 unaffiliated Co-Owners at some time in the future, etc). The Co-Owners may agree, by unanimous consent, to a third party property manager (the "**Property Manager**") to manage the Property and provide such property management, construction management, asset management, leasing and debt placement services as may be required for operation of the Property and as shall be set forth in a property management agreement with an initial one (1) year term subject to annual renewal, and which shall set forth the Property Manager's duties, responsibilities and compensation.  Any annual extension of the term of the Management Agreement must be approved by all of the Co-

2

Owners. Property Manager shall be responsible for maintaining a common bank account on behalf of the Co-Owners for the collection and deposit of rents.

4.      <u>Sale or Transfer of the Property</u>.

       (a)      <u>General</u>. Subject to Section 4(b), a Co-Owner may not make or undertake any "Transfer" (as hereinafter defined) made which: (a) violates any provision of this Agreement, (b) violates any loan that encumbers the entire Property or (c) results in more than 35 persons being tenants in common of the Property. For purposes of the foregoing sentence, a husband and wife shall be treated as a single person and all persons who acquire interests from a Co-Owner by inheritance shall be treated as a single person. A **"Transfer,"** for purposes of this Agreement, shall be deemed to include, but not be limited to: (i) any sale, transfer, assignment, pledge or other disposition of, or creation of a security interest in, all or any portion of a Co-Owner's Ownership Interest, (ii) a consolidation or merger to which a Co-Owner is a party, or (iii) any sale, transfer or assignment of a general partner's interest or any portion thereof in a Co-Owner if such Co-Owner is a general partnership, or any sale, transfer, or assignment of a member's interest or any portion thereof in a Co-Owner if an such Co-Owner is a limited liability company.

       (b)      <u>Right of First Offer</u>. If a Co-Owner desires to sell its Ownership Interest to a third party purchaser, such Co-Owner (the **"Selling Co-Owner"**) shall first allow the other Co-Owners (each, an **"Offeror,"** and collectively, the **"Offerors"**) to make an offer to purchase the Selling Co-Owner's Ownership Interest pursuant to the terms and conditions set forth in this section. A Selling Co-Owner shall provide written notice (the **"ROFO Notice"**) of its intent to sell its Ownership Interest to each Offeror. The Offerors shall have the right, within fourteen (14) days after receipt of such ROFO Notice, to deliver a written offer to the Selling Co-Owner to purchase the Selling Co-Owner's Ownership Interest. If the Selling Co-Owner does not accept an offer from any of the Offerors within fourteen (14) days after receipt of such each offer, then for the following one hundred twenty (120) days, the Selling Co-Owner shall be free to sell its interest in the Property to a purchaser other than an Offeror, provided that the sale of the Selling Co-Owner's Ownership Interest to a purchaser (other than an Offeror) is for a price greater than any purchase price offered by an Offeror pursuant to this Section and is in compliance with the terms of any loan encumbering the entire Property. If a sale is not consummated within such one hundred twenty day period, then the rights of the Offerors to notice and first offer as aforesaid will again apply as to any sale occurring subsequent to such period. The rights contained herein shall be subject and subordinate to the terms of any loan documents encumbering the entire Property. For the avoidance of doubt, however, a third party purchaser shall not be deemed to include any Co-Owners, their principals, or any entities under majority common ownership or control with such Co-Owners or principals.

     5.      <u>Partition</u>. Each Co-Owner agrees that prior to instituting an action for partition that involves an actual physical division of the Property as described in California Code of Civil Procedure Sections 872.810 and 873.210 to 873.290, such Co-Owner will first offer the other Co-Owners the right to purchase its Ownership Interest at fair market value, pursuant to the provisions of Section 4 or Section 6, as applicable. Additionally, any action for partition shall be subject to any restrictions required by a lender and that are consistent with customary commercial lending practices.

6.    <u>General Provisions regarding the Tenancy in Common.</u>

  6.1    <u>Advances Among Co-Owners</u>.  No Co-Owner nor the Property Manager may advance funds to another Co-Owner to meet expenses associated with the Property, unless the advance is recourse and is not for a period exceeding one (1) year.

  6.2    <u>Proportionate Sharing of Debt</u>.  In the event the Co-Owners unanimously agree to obtain indebtedness to be secured by the Property, each Co-Owner shall share in such indebtedness in proportion to their Ownership Percentage.

  6.3    <u>No Business Activities</u>.  The activities of the Co-Owners in regards to the Property shall be limited to those customarily performed in connection with the maintenance and repair of rental real estate.

  6.4    <u>Loan Agreements</u>.    The lender of any indebtedness secured by the Property shall not be a related person to any Co-Owner, the Property Manager, any lessee of the Property or any affiliate of the Co-Owner, Property Manager or any lessee of the Property, unless otherwise unanimously agreed to by the Co-Owners in writing.

7.    <u>Miscellaneous.</u>

  7.1    <u>Entire Agreement; Amendments</u>.  This Agreement constitutes the final, complete, and exclusive statement of the terms of the agreement between the Co-Owners with respect to the Property and may be amended only by an agreement in writing signed by the party to be charged.

  7.2    <u>Partial Invalidity</u>.  If a court or arbitrator of competent jurisdiction holds any portion of this Agreement to be invalid or unenforceable in whole or in part for any reason, the validity and enforceability of the remaining clauses, or portions of them, shall not be affected.

  7.3    <u>Successors and Assigns</u>.  Subject to the restrictions on transfer contained herein, this Agreement shall bind and benefit the Co-Owners to this Agreement and their legal representatives and successors in interest.

  7.4    <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of California.

  7.5    <u>Attorneys' Fees</u>.  In the event any party to this Agreement brings an action against another to enforce or interpret this Agreement, then the non-prevailing party shall pay the attorney's fees and costs and expert witness fees and costs of the prevailing party.

  7.6    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts.

  7.7    <u>Legal Counsel; Mutual Drafting</u>.    Each party hereto recognizes that this is a legally binding contract, and acknowledges and agrees that he, she or it, as applicable, has read and understands this Agreement, is entering into it freely and voluntarily, and has had ample opportunity to consult with legal counsel of his, her or its choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any

construction to be made of this Agreement, the same shall not be construed against any party on the basis of that party or its counsel being the drafter of such language.

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**CO-OWNERS**:

TENANT 1:

EJT WILSHIRE LINDEN, LLC,
a California limited liability company

By: _____
        Eli Taban, Manager


TENANT 2:

1112 INVESTMENT COMPANY, LLC,
a California limited liability company

By: _____
        Ely Dromy, Manager


TENANT 3:

9300 WILSHIRE, LLC,
a Delaware limited liability company

By: _____
        Leonid Pustilnikov, Manager


TENANT 4:

9300 WILSHIRE FEE, LLC,
a Delaware limited liability company

By:    505 Investment Company, LLC
Its:    Managing Member

        By: _____
                Ely Dromy, Manager

Signature page to
Tenancy In Common Agreement

TENANT 5:

E.D. FLORES, LLC,
a California limited liability company

By: _____
       Ely Dromy, Manager


TENANT 6:

DROMY 1995 FAMILY TRUST DATED DECEMBER 12, 1995

By: _____
       Ely Dromy, Trustee

By: _____
       Judy Dromy, Trustee

EXHIBIT 1

DESCRIPTION OF THE PROPERTY

125 - 129 South Linden Fee:

LOTS 38, 39, AND 40 OF TRACT NO. 6648 IN THE CITY OF BEVERLY HILLS, IN THE
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN
BOOK 71, PAGE 48 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

APN(s): 4328-009-007 and 4328-009-021

9740-9744 Wilshire Leasehold:

A leasehold interest in a five (5) story office building located at 9740 and 9744 Wilshire Boulevard in the City of Beverly Hills, County of Los Angeles, State of California, with a legal description for the land thereunder of:

LOTS 35 AND 36 OF TRACT 6648, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 71 PAGE 48 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 4328-009-003

The leasehold interest is more particularly described as:

A leasehold estate as created by that certain unrecorded lease dated August 29, 1957, executed by Security-First National Bank of Los Angeles, as Trustee under the Will of Grace K. Burt, deceased as lessor and 9740 Wilshire Building, a Limited Partnership as lessee, as disclosed by a Lease – Short Form for Recording recorded September 27, 1957 as Instrument No. 1606 in Book 55719, Page 14 of Official Records. Said lease was amended and assigned as follows:

a. that certain unrecorded Amendment to Lease dated May 29, 1959;

b. that certain Amendment to Lease dated May 29, 1959 and recorded June 24, 1959 as Document No. 1852;

c. that certain Assignment of Undivided Interest in Lease dated January 3, 1961 and recorded
January 4, 1961 as Document No. 1567;

d. that certain Assignment of Undivided Interest in Lease dated January 3, 1961 and recorded
January 4, 1961 as Document No. 1568;

e. those certain unrecorded Assignment of Lessee's Interest in Lease dated March 2, 1979;

f. those certain unrecorded Assignments of Lessee's Interest in Lease dated March 21, 1980;

g. that certain unrecorded Assignment of Lessee's Interest in Lease dated March 26, 2003;

4

h. that certain unrecorded Assignment of Leasehold Interest dated July 27, 2012;

i.  that certain Assignment of Lease dated October 25, 2019 and recorded October 28, 2019 as Document No. 20191155144;

j.  that certain Assignment of Leasehold Interest dated December 28, 2020 and recorded January ___, 2021 as Document No. _____;

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1875 Century Park East, Suite 1900, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (*specify*): **MOTION OF CHAPTER 11 DEBTOR UNDER 11 U.S.C. §363 AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO SELL DEBTOR'S INTEREST IN REAL PROPERTY AT WILSHIRE & LINDEN IN BEVERLY HILLS, CALIFORNIA TO E.D. FLORES, LLC OR ITS NOMINEE BY PRIVATE SALE; DECLARATION OF LEONID PUSTILNIKOV IN SUPPORT OF MOTION; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 28, 2023  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following

- **Melissa Boey** melissa.boey@morganlewis.com
- **Steve Burnell** Steve.Burnell@gmlaw.com, sburnell@ecf.courtdrive.com; sburnell@ecf.inforuptcy.com;cheryl.caldwell@gmlaw.com;denise.walker@gmlaw.com
- **Clifford P Jung** clifford@jyllp.com, ry@jyllp.com; jessica@jyllp.com
- **Abigail V O'Brient** avobrient@mintz.com, docketing@mintz.com; DEHashimoto@mintz.com; nleali@mintz.com; ABLevin@mintz.com
- **Alan G Tippie** Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com; Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **Victor A Sahn** victor.sahn@gmlaw.com, vsahn@ecf.courtdrive.com; pdillamar@ecf.courtdrive.com; patricia.dillamar@gmlaw.com, Karen.Files@gmlaw.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Craig A Wolfe** craig.wolfe@morganlewis.com
- **Hatti K Yip** hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  June 28, 2023 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Debtor**
9300 Wilshire LLC
9744 Wilshire Blvd, Ste 203
Los Angeles, CA 90212-1812

Office of the U.S. Trustee
915 Wilshire Blvd #1850,
Los Angeles, CA 90017

Abagail V. O'Brien,
Mintz Levin  Cohn Ferris Glossy & Popeo,
2049 Century Park East, Suite 300,
Los Angeles, CA 90067.

Hon. Ernest Robles
United States Bankruptcy Court
Central District of California
Edward R. Royal Federal Building and Courthouse
255 E. Temple Street, Suite 1560 / Courtroom 1568
Los Angeles, CA 90012

☒ Service information continued on attached page.

PMD 54759240v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                             **F 9013-3.1. PROOF.SERVICE**

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 28, 2023 | Denise Walker | */s/ Denise Walker* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

<u>Additional Service Information</u>

**2. <u>SERVED BY UNITED STATES MAIL</u>:**

<u>20 Largest Unsecured Creditors</u>

CBRE
Attn Neal Golub
1840 Century Park East Suit 900
Los Angeles, CA 90067-2110

Cohen Law Group
Attn Marc Cohen
547 S. Spring Street, Suite 1208
Los Angeles, CA 90013

Englander Knave Allen & Associates
LLC
Attn Erik Rose
801 S. Figueroa St, Ste 1050
Los Angeles, CA 90017-5507

KFA
Attn John Arnold
3573 Hayden Ave
Culver City, CA 90232-2412

KPFF
Attn Sharad Ganja
700 S Flower St, Ste 2100
Los Angeles, CA 90017-4208

Manella & Company
Attn Limo Amrani
6300 Wilshire Blvd. Suite 2030
Los Angeles, CA 90048-5268

Newmeyer Dillion
Attn Michael Shonafelt
895 Dove St, 5th FL
Newport Beach, CA 92660-2999

Rutan Tucker
Attn Doug Dennington
18575 Jamboree Rd, 9th FL
Irvine, CA 92612-2559

Sturgis Holdings LLC
Attn Jason Sturgis
1515 Foothill Road
Gardnerville Nevada 89460

<u>Additional Creditors</u>

Jones Day
Attn Thomas Donnelly
555 California Street 26th Floor
San Francisco, CA 94104-1503

Los Angeles Division
255 East Temple Street,
Los Angeles, CA 90012-3332

1112 Investment Company, LLC
Attn: Ely Dormy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

1247 3rd Street LLC
Attn Leonid Postilion
9744 Wilshire Blvd., Ste. 203
Beverly Hills, CA 90212-1812

1650 Veteran, LLC
Attn: Ely Dormy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

362 Camden Fee, LLC
Attn Daniel Dromy
9744 Wilshire Blvd., Ste. 203
Beverly Hills, CA 90212-1812

505 Investment Company, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

5th Street Investment Company, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

9300 Wilshire Fee, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

Manela & Company
Attn Limor Amrani
6300 Wilshire Blvd. Suite 2030
Los Angeles, CA 90048-5268

AES Redondo Beach LLC
1100 N Harbor Dr
Redondo Beach CA 90277-2017

AES Redondo Beach LLC
Attn Marc Miller
690 Studebaker Rd
Long Beach CA 90803-2221

AES Redondo Beach LLC
co AER US Services LLC
1065 Woodman Dr
Dayton OH 45432-1423

AES Redondo Beach, L.L.C.
Attn Eric Pendergraft Vice President
690 Studebaker Road
Long Beach, CA 90803-2221

AES Redondo Beach, LLC
co AER US Services LLC
1065 Woodman Drive
Dayton, Ohio 45432-1423

Alex Hotel LLC
Attn: Marc Cohen
541 S. Spring Street, Suite 1208
Los Angeles, CA 90013-1667

BH Karka, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

Melissa Y. Boey
1400 Page Mill Road
Palo Alto, CA 94304-1177

California State Water Resources
Control Boa
1001 I Street
Sacramento, CA 95814-2828

City of Redondo Beach
Attn Michael Web City Attorney
415 Diamond Street
Redondo Beach, CA 90277-2836

Mintz Levin Cohn Ferris Glovsky and
Popeo, P
Attn Jonathan Welner
2043 Century Park East Suite 300
Los Angeles, CA 90067

Craig A. Wolfe
600 Anton Blvd., Ste. 1800
Costa Mesa, CA 92626-7653

David Dromy
Attn: David Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

Dromy 1995 Family Trust
Attn Ely Dromy
9744 Wilshire Blvd., Ste. 203
Beverly Hills, CA 90212-1812

E.D. Flores, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

EJT Kinney Pier, LLC
co EJT Ventures, LLC
10433 Wilshire Blvd #1206
Los Angeles, CA 90024-4635

EJT Wilshire Linden, LLC
co BLP
1100 Glendon Ave., 15th Floor.
Los Angeles, CA 90024-3519

East West Bank
Attn May Kwong, FVP-Relationship
Manager
135 N. Los Robles Ave., 6th Fl.
Pasadena, CA 91101-4526

East West Bank
Attn Michael Joe
135 N Los Robles Ave 6th Flr
Pasadena CA 91101-4526

Valley National Bank fka
Bank Leumi USA
Attn Michael Reed Vice President
555 West 5th St Ste 3300
Los Angeles CA 90013-1073

Ellison Schneider Harris & Donlan
Attn Jeffrey Harris
2600 Capital Avenue Ste 400
Sacramento, CA 95816-5931

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

GenOn California South GP LLC
co Jones Day Attn Thomas Donnelly
555 California Street 26th Floor
San Francisco, CA 94104-1503

Valley National Bank
Attn Michael Reed, Vice President
555 West 5th Street, Ste 3300
Los Angeles, CA 90013-1073

KPFF
Attn Sharad Ganju
700 S Flower St, Ste 2100
Los Angeles, CA 90017-4208

Los Angeles County Treasurer and Tax
Collector
Attn: Bankruptcy Unit
PO Box 54110
Los Angeles CA 90054-0110

Morgan Lewis & Bockius LLP
Attn Charles J. Malaret
300 South Grand Avenue 22nd Floor
Los Angeles, CA 90071-3132

Newmeyer Dillion
Attn Michael Shonafelt
895 Dove St, 5th FL
Newport Beach, CA 92660-2999

Outdoor Billboard, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

Peak Alcott, LLC
Attn: Ely Dromy
9744 Wilshire Blvd, #203
Beverly Hills, CA 90212-1812

East West Bank
135 N Los Robles Ave 7th Flr
Pasadena CA 91101-4526

SLH Fund, LLC
Attn: Marc Cohen
541 S. Spring Street, Suite 1208
Los Angeles, CA 90013-1667

Sturgis Holdings LLC
Agent For Service of Process
Attn Terrie Prodhon
768 Pleasant Valley Rd, Ste 300
Diamond Springs, CA 95619-9260

Franchise Tax Board
Bankruptcy Section MS A340
PO Box 2952
Sacramento, CA 95812

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001