Victor A. Sahn (CA Bar No. 97299)
  victor.sahn@gmlaw.com
Daniel A. Lev (CA Bar No. 129622)
  daniel.lev@gmlaw.com
Steve Burnell (CA Bar No. 286557)
  steve.burnell@gmlaw.com
**Greenspoon Marder LLP**
1875 Century Park East, Suite 1900
Los Angeles, California  90067
Telephone: 213.626.2311
Facsimile: 954.771.9264

Attorneys for 9300 Wilshire LLC, Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-10918-VZ |
| 9300 WILSHIRE, LLC, | Chapter 11 |
| Debtor. | **DEBTOR AND DEBTOR IN POSSESSION'S OMNIBUS REPLY TO OBJECTIONS OF AES REDONDO BEACH, L.L.C. AND THE CITY OF REDONDO BEACH TO MOTION TO APPROVE ADEQUACY OF DEBTOR AND DEBTOR IN POSSESSION'S DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION** |
| | DATE:       August 15, 2024<br>TIME:       11:00 a.m.<br>PLACE:     Courtroom "1368" |

_Greenspoon Marder LLP_
_1875 Century Park East, Suite 1900_
_LOS ANGELES, CALIFORNIA  90067_
_TEL. 213.626.2311 • FAX 954.771.9264_

DAL 58134923v2

1            9300 Wilshire, LLC, a Delaware limited liability company (the "Debtor"),

2  debtor and debtor in possession herein, hereby submits the "Debtor and Debtor in

3  Possession's Omnibus Reply to Oppositions of AES Redondo Beach, L.L.C. and the City

4  of Redondo Beach to Motion to Approve Adequacy of Debtor and Debtor in Possession's

5  Disclosure Statement and Plan of Reorganization" (the "Reply"), in response to the

6  "Objection of AES Redondo Beach, L.L.C. to Debtor's Motion to Approve Adequacy of

7  Disclosure Statement" (the "AES Objection") filed by AES Redondo Beach, L.L.C.

8  ("AES") and the "Objection of the City of Redondo Beach to (1) Debtor and Debtor in

9  Possession's Disclosure Statement; and (2) Motion to Approve Adequacy of Disclosure

10  Statement" (the "City Objection" and together with the AES Objection, collectively, the

11  "Objections") filed by the City of Redondo Bech (the "City" and together with AES, the

12  "Objectors"), filed in response to the "Notice of Motion and Motion to Approve Adequacy

13  of Disclosure Statement of Debtor Who Is Not An Individual" (the "Motion"), filed by the

14  Debtor in support of the "Debtor and Debtor in Possession's Disclosure Statement and

15  Plan of Reorganization (the "Initial Disclosure Statement" or the "Initial Plan"), and

16  represents as follows:

17                              **I.**

18                  **PREFATORY STATEMENT**

19            While AES is hell bent on forcing the Debtor's liquidation, the Debtor's Initial

20  Plan should be understood and felt as a significant and measurable step toward its

21  reorganization.[1]  This is not hyperbole.  For eighteen months, the Debtor has waded

22  through complex litigation and has been forced to navigate an unfamiliar process, often

23  times powerless to remove or even influence AES obstacles to proposing a confirmable

24  plan.  Upon approval of its disclosure statement, all creditors, including AES, will have the

25

26  ————————————————

27  [1] Unless otherwise stated, the use of capitalized terms herein shall have the meaning ascribed to them in
the "Debtor and Debtor in Possession's Disclosure Statement and Plan of Reorganization," filed on July 1,
28  2024 [Docket No. 388].

1  opportunity to speak, by voting for or against the chapter 11 plan, and moving the

2  Debtor's case a sizeable step closer to finality.

3       With this end finally in sight, familiar parties, with not so hidden agendas,

4  seek to stand in the way of progress toward a long-awaited resolution.  The objecting

5  parties have lodged a barrage of dramatic objections to the Initial Disclosure Statement,

6  the bulk of which are objections to confirmation of the Initial Plan.  AES has used the

7  objection process cynically to create self-serving delay and a litigation advantage by

8  mischaracterizing the Initial Plan provisions and importing confirmation arguments that

9  have nothing to do with approval of the Initial Disclosure Statement.  AES is hoping the

10  Court is gullible enough to buy its contrived objections, hoping this will streamline its own

11  plan which calls for the hasty liquidation, not reorganization, of the Debtor.

12       The Debtor will be modifying the Initial Disclosure Statement to detail more

13  explicitly the issues raised below, and any other issues the Court believes need more

14  explanation or detail.  The Debtor strenuously disagrees with the Objectors' assertion that

15  the Initial Disclosure Statement is inadequate, or the Initial Plan is so deficient that it

16  cannot be confirmed and that the Initial Disclosure Statement should not be approved as

17  a result.  The Objectors' assertion that the Initial Plan is "patently unconfirmable" is a high

18  standard that none of the Oppositions have met. These challenges to the merits of the

19  Plan are properly addressed in the context of confirmation and not in the context of

20  disclosure.

21       Nevertheless, by this Reply, the Debtor responds to the Objections filed to

22  the Motion, and is committed to addressing legitimate concerns and providing the Court

23  and creditors a comprehensive roadmap for evaluating and approving the Disclosure

24  Statement.  To this end, the Debtor will continue to work toward consensual resolution of

25  any disclosure-related objections and, therefore, the Debtor invites parties to submit to

26  Debtor's counsel prior to the hearing any additional disclosures that they propose to

27  include in the forthcoming First Amended Disclosure Statement ("FADS"), and the Debtor

28  will work with its stakeholders on these issues.

**II.**

**Responses to AES Objections to Disclosure Statement**

1. "The Debtor's Proposed Funding Sources are Confusing, Misleading, and Infeasible":

A. Objection: The lack of reasonable and demonstrable evidence of actual financial ability fails the adequate disclosure standard and also the requirement of feasibility, rendering the Debtor's Plan patently unconfirmable.—The best evidence of the Debtor's ability to pay the remaining obligations due under its Plan is the fact that Mssrs. Pustilnikov and Dromy have already paid AES $37 Million on their indebtedness. Why does AES, from the inception of this case, ignore that inconvenient fact? The obligations due under the Plan, even considering what the environmental obligations may become, are barely more than what has already been paid. AES files objections and acts like the same source, paying in the same manner as the $37 Million that was previously paid, is suddenly a source that is to be doubted or a source which, standing alone, makes the Debtor's Plan fail in the feasibility requirement. AES' concerns are transparently illusory. AES also falsely complains that Mr. Dromy did not use his "…plentiful fortune…" to pay the Debtor's obligations prior to the filing of this bankruptcy case, thereby making the bankruptcy filing unnecessary.

As demonstrated above, Mr. Dromy and Mr. Pustilnikov have used their fortunes for the benefit of this property and for the specific benefit of AES. Further, when they complain about the failure of Mr. Dromy and Mr. Pustilnikov to pay the Debtor's obligations, they forget about their own abysmal and bad faith performance under the Asset Purchase Agreements and their amendments. From the inception of this bankruptcy case, AES has attempted to deflect attention away from their own conduct by calling the Debtor names. Their accusations are vacuous. and their arguments do not withstand the most cursory scrutiny.

Without limitation and as alleged in the "Third Amended Complaint For Declaratory Relief, Breach Of Contract, Indemnification, Contribution And Setoff Under 11 U.S.C.

1   §553 Of The Bankruptcy Code, And Objection To Proof Of Claim Of AES Redondo

2   Beach, LLC; Avoidance Of Fraudulent Transfers (11 U.S.C. §§544 And 548)" filed in this

3   Bankruptcy Case:

4                  B.    Failure to Assign Purchase, Sale and Easement Modification

5   Agreement: AES failed to assign to the Debtor and its co-owners the "Purchase, Sale,

6   and Easement Modification Agreement" ("Easement Modification Agreement").  The

7   parties to the Easement Modification Agreement are Southern California Edison

8   Company ("SCE") and AES King Harbor, LLC, a Delaware Limited Liability Company

9   ("King Harbor" or "Buyer").  Under the Purchase Agreement and each of the

10  amendments to the Purchase Agreement, AES was obligated to obtain from SCE certain

11  consents as provided in the Easement Modification Agreement. AES nonetheless failed

12  to satisfy its obligations, in breach of its commitments under the Purchase Agreement

13  and each of the amendments thereto. This promise was a condition precedent to closing

14  and AES never fulfilled its obligations with respect to this contractual requirement.

15  Without reference to other claims in this Complaint, the failure of this condition precludes

16  AES from accruing interest on the unpaid balance due to it under the Purchase

17  Agreement and Amendments thereto. AES has never done this, in flagrant breach of their

18  obligations under the Purchase and Sale Agreement with the Debtor and its affiliated co-

19  owners.

20                 C.    Failure to Abide by Their Obligation Under the Ground Lease of the

21  Redondo Property to Indemnify the Debtor and its Co-Owners against Any Claims Such

22  as the Claim Filed by the California Coastal Commission in the Amount of $35,430,000:

23  AES continues to fail to abide by its obligations to indemnify and protect the Debtor and

24  its affiliates against claims by the California Coastal Commission. All that they have done

25  is put in a letter from their counsel that they intend to abide by this obligation.  That letter

26  is meaningless.  Debtor has required AES to do what the Ground Lease requires which is

27  to formally indemnify the Debtor **and** provide a bond for the entirety of the California

28  Coastal Commission claim.  In spite of written demand that AES abide by their

1  contractual obligations, they have failed and continue fail and refuse to do what is

2  required of them.

3      Not only have they failed in this obligation, but now the City of Redondo Beach

4  (who can typically be found walking in lock-step with AES) is claiming that they have

5  been harmed by the same claim as the one made by the California Coastal Commission

6  and assert the $35,430,000 claim as a portion of their proof of claim in this bankruptcy

7  case.  This has further damaged the Debtor because the City of Redondo Beach now

8  asks that the Debtor address this claim in its Plan, all because AES has failed to adhere

9  to his contractual obligations.

10      D.      Damage to the Debtor by Reason of the Option Agreement for the

11  City of Redondo Beach to Purchase a Portion of the Redondo Beach Property:  In order

12  to induce the Debtor and its affiliated owners to enter into the Third Amendment to the

13  Purchase and Sale Agreement, AES required the Debtor to agree that the City of

14  Redondo Beach would receive an option to purchase a portion of the Redondo Property

15  for a dramatically reduced price compared to its value, and which portion of the property

16  could not be used for any future development.  The size of the parcel that they could

17  purchase would increase based upon whether the extension received by AES to operate

18  the power generating facility was one, two or three years.

19

20      The City of Redondo Beach has jealously protected this Option in this bankruptcy

21  case, including it as a significant part of their filed claim in this bankruptcy case to be

22  liquidated (they say) in the event the purchase option is terminated for some reason.

23  Then, after the Third Amendment is signed, after the Option is granted, the City objected

24  to the extension granted to operate the power generating facility, thereby undermining

25  their own precious purchase option.  Now as a result of this "coincidental" occurrence, all

26  of the benefits received by the Debtor under the Third Amendment were lost, the lower

27  interest rate, and according to AES, the allocation of payments made on their debt toward

28  payment of the environmental liability due and owing (the Environmental Escrow

1   established under the third amendment).  But the power generating facility goes on to

2   operate for another three years until December 31, 2023, or the maximum extension

3   contemplated by the Third Amendment which resulted in the City's purchase option

4   attaching to the largest possible parcel or portion of the Redondo Beach property.  And

5   instead of interest accruing at 2% and then 1% under the AES indebtedness, it accrued

6   instead at seven (7%) percent.

7           Now this matter has devolved into litigation and after requesting an estoppel letter

8   with regard to the Option to Purchase granted to the City, AES wrote the following on July

9   15, 2024:

10          "2.    Grantee (AES) obtained an **Approved Extension** through

11  December 31, 2023. Grantee obtained a one-year **Approved Extension** to operate the

12  facility from January 1, 2021 to December 31, 2021 that was not final and non-appealable

13  until after November 30, 2020.  Grantee received a second **Approved Extension** to

14  operate the facility from January 1, 2022 through December 31, 2023 on October 19,

15  2021." (emphasis added)

16          Despite this, AES took the position prior to bankruptcy that an "Approved

17  Extension" did not take place and that the accrual on the debt to them from the Debtor

18  and its affiliates was at the rate of seven (7%) percent per annum.  This dispute along

19  with the multiple other breaches by AES of the Purchase and Sale Agreement and its

20  Amendments made this Bankruptcy filing necessary.  When AES baldly tells this Court

21  that this Bankruptcy Case resulted from the failure of Mr. Dromy to pay the Debtor's

22  obligations is an act of sophistry that makes a mockery of ethical, professional advocacy.

23          E.    AES-Redondo Beach LLC Failed to Obtain the Consent of Southern

24  California Edison to the Purchase and Sale Agreement and the "Purchase, Sale, and

25  Easement Modification Agreement" [2]

26  _____

27  [2] AES-Redondo Beach, LLC's only defense to this and similar allegations regarding their failure of
    performance is to state that they executed non-specific general assignments of the relevant
28  (footnote continued)

DAL 58134923v2                                7

1

(1)      AES has not obtained the consent of Southern California

2  Edison to the sale transaction between the Plaintiff and AES. This has broad and

3  negative applications to the PSA and related agreements. The terms and conditions of

4  the "Purchase, Sale and Easement Modification Agreement" ("PEMSA") is where consent

5  from SCE must also be obtained.

6

(2)      Section 7.4 from the PEMSA states that assignment without

7  consent is at least a material breach of that agreement. No executed consent was ever

8  provided but AES represented on the officer's certification which they executed at the

9  closing of the purchase and sale that they met all the conditions of article 7 of the PSA

10  including securing consents per exhibit 7.1(d) which was a condition of closing. AES

11  never informed Plaintiff prior to closing that this required consent was never obtained.

12

F.     <u>AES Failed to Assign the Corrective Action Consent Agreement to</u>

13  <u>the Debtor</u>: The Corrective Action Consent Agreement ("CACA") is the now definitive

14  agreement with the Department of Toxic Substances Control ("DTSC") of the State of

15  California regarding the environmental remediation of the Redondo Beach property.  AES

16  viewed these obligations as so important to it, that it required an Environmental Deed of

17  Trust as part of the sale transaction for the sole purpose of "indemnifying" AES in the

18  event a monetary obligation were ever imposed upon them to clean the Redondo Beach

19  property.  As the Court is aware, AES holds a first deed of trust on the Redondo Beach

20  Property which secures an obligation, if they ever have one, to remediate the Redondo

21  Beach Property.

22

23

_____

24  agreements to the Plaintiff. However, AES-Redondo Beach, without limitation, was and is well aware
that these contracting counterparties, in every instance, must consent to an assignment of their

25  agreement(s) with AES-Redondo Beach LLC and its affiliated entities to such third parties. AES has
failed and refused and continues to fail and refuse to fulfill its legal obligations to obtain consent for

26  these assignments of crucial agreements to the original and amended Purchase and Sale Agreement
between the parties. However, unlike other agreements where AES takes this position, it is clear as

27  stated above that AES is required to obtain the "consent" of Southern California Edison to the
agreements being assigned to Plaintiff. AES has failed to fulfill this central provision to their contract

28  with the Debtor and its affiliated co-owners.

1    Debtor has made significant payments to AES since 2020 as detailed above.

2  Debtor has undertaken significant efforts to address the environmental ascertainment of

3  the Property, all at its cost.  Debtor has done this despite the bad faith, at every stage of

4  this transaction, shown by AES toward it since the closing of this sale transaction at the

5  end of 2020.  Debtor will reorganize in spite of these circumstances, it will address AES'

6  secured claim and it will address in this case and in its Plan the phantom and spurious

7  claims filed in bad faith by the City of Redondo Beach.  Their claims will be estimated at

8  zero and disallowed in the pending contested matter including under Section 502(e)(1) of

9  the Bankruptcy Code.

10    2.    "Exhibit D contains individual financial statements for each property in

11  which the Debtor owns minority interests. See Debtor's Plan, Ex. D at 110 et seq. The

12  Debtor offers Exhibit D in support of plan feasibility but instead consists of pure fiction.

13  The Debtor has not taken a distribution from any of these properties at any time during or

14  prior to the bankruptcy and is not projected to receive any such distributions from these

15  properties.":  All of the Debtor's properties will be pledged to AES as additional collateral

16  under the Debtor's amended reorganization plan.  These properties have substantial

17  value in them, and no one has said to the contrary in response to the Debtor's statements

18  regarding these valuations.  There is no information, none, in the AES Disclosure

19  Statement and Plan regarding the value of the Debtor's real properties or interests in real

20  properties.

21    Even worse, AES shows unique ignorance about real estate and real estate

22  development.  Mssrs. Dromy and Pustilnikov own hundreds of properties through the

23  partnerships or LLC's who own the various fractional interests in the Debtor's properties

24  and in many other properties which are not part of this Bankruptcy Case.  Recently, in the

25  news, the following was reported:

26    "Skid Row homeless housing portfolio set to be sold to Leo Pustilnikov

27    A Beverly Hills developer has agreed to pay $10 million to acquire one of the

28    largest portfolios of homeless housing in Los Angeles.

1        Leo Pustilnikov, 38, will buy 17 buildings owned by the nonprofit Skid Row

2  Housing Trust, which had financially collapsed into receivership last year.

3  The properties, made up of single-room occupancy hotels and small

4  apartment complexes, contain 1,200 units intended for formerly homeless

5  tenants, many of whom are elderly, disabled or suffer from mental health

6  problems. The deal requires judicial approval, which is scheduled in Los

7  Angeles County Superior Court next month." *Los Angeles Times,* July 29,

8  2024.

9        About the properties in this bankruptcy case, the objections are correct, they do

10  not generate any distributable revenue.  Any revenues that they generate are put back

11  into them to service debt or improve their condition.  With regard to these properties,

12  Mssrs. Dromy and Pustilnikov own ninety (90%) percent of them.  Other than the property

13  at 174 Kinney Street and 169-175 Pier Avenue, Santa Monica, CA which will shortly be

14  sold after notice and an opportunity for hearing and the Debtor will receive its twenty-two

15  point five percent (22.5%) interest in it, the balance of the properties have substantial

16  equities in them and as part of their guarantee and commitment to the success of this

17  reorganization, Mssrs. Dromy and Pustilnikov will contribute their non-debtor interests in

18  these properties to pay the Debtor's obligation under the Plan.  The Debtor's amended

19  reorganization plan will describe these properties and interests and show interested

20  parties and this Court how this additional source of funding will create further assurance

21  that the Debtor will satisfy its obligations without default and without risk.  These interests

22  will be pledged as collateral to AES.

23        The Objections of AES at page 5 complains that the Debtor proposes to pay the

24  claims of creditors "…through other property sales or by refinancing the properties in this

25  bankruptcy case…"  The funding to be provided under the Plan shall come from funding

26  from Mr. Dromy who will personally guarantee payments due under the Debtor's

27  confirmed Plan and from contributions of equity in real estate which they will both pledge

28

1   to make payments due under the Plan including equity in those properties that is not the

2   Debtor's interests in those properties.

3       3.      AES Complains that the Reorganization Plan's Success is Dependent Upon

4   Successful Litigation: This is completely untrue.  Litigation is listed in the Disclosure

5   Statement to inform parties of its existence and what is in dispute.  As a matter of

6   formatting, the listed litigation matters are described in the section of the Plan which

7   discusses sources of payment to creditors under the Plan.  None of the litigation matters

8   listed are necessary to a successful reorganization plan.  Some of them such as the

9   litigation against the City of Redondo Beach (which recently lost its appeal of the Superior

10  Court's denial of their anti-Slapp motion) have the potential to recover 100's of millions of

11  dollars for the Debtor, but that recovery is not a contingency of the Debtor's performance

12  under the Plan.   Some specific statements are outright misrepresentations or worse-

13      A.      "The Debtor's other litigation suits, which revolve around the future of

14  whether the Harbor Drive Property can be rezoned, are also contradictory. In one

15  litigation, the Debtor seeks compensation for the City of Redondo Beach's alleged "failure

16  and refusal to zone the Harbor Drive Property" that has "eliminated all economically

17  viable use" of the property, since upon the closure of the power plant, the site will be

18  "stripped of all economically viable use." See Debtor's Plan at 52. This is the same

19  property, however, which the Debtor claims is valued at $110,000,000 "as

20  is," see id., Ex. F at 142, and for which the Debtor claims that it will be able to receive

21  $50,000 per month in rent in January 2025, increasing upwards to $250,000 per month in

22  rent in January 2026, see Debtor's Plan, Ex. D at pp. 113-115 (line items for "Rental

23  Income"). That is, the Debtor expects to be paid substantial rent for a property that has

24  no economic use." (emphasis added)

25          (1)      This statement at page 8 of the AES Objections is an

26  argument based upon an outright fabrication.  AES and the City know full well that the

27  Debtor has brought litigation to both promote the development of the Redondo Property

28  just as its principals have done in other Cities throughout Southern California while

1   simultaneously protecting itself from potentially deleterious outcomes from that litigation

2   by suing the City of Redondo Beach (who with AES is doing everything that they can,

3   legal or not, to prevent the development of the Redondo Beach Property) for inverse

4   condemnation and an illegal taking under applicable Constitutional law.  AES knows this

5   as does the City and pointing to the allegations in these respective complaints as an

6   admission of anything is nothing less than a deliberate attempt to mislead this Court.

7      B. "The Debtor's lack of clarity, and lack of actual assurances, around

8   its proposed funding sources appears to be an attempt to "see what sticks." Without

9   precision and transparency as to what the Debtor's funding sources actually are, as well

10  as a comprehensive discussion of the risks and costs relating to such funding, creditors

11  are simply unable to assess the feasibility of the Debtor's Plan." (AES Objections, pg. 9,

12  lines 3-7, Docket No. 426)—Nothing written here is accurate.   Debtor has been clear

13  regarding its funding sources.  No one knows them better than AES as they have

14  received $37 Million from this same source.  Can they really claim confusion on this

15  issue?  Debtor's additional funding sources will be real property sales where the Debtor

16  will not only claim its equity in each sale, but also Mssrs. Dromy and Pustilnikov will put

17  their other non-debtor interests toward payment of obligations due under the

18  Reorganization Plan—and pledge them under this Plan as collateral to AES.

19     4. AES Objects and States that Debtor has Falsely Characterized the AES

20  Environmental Claim:  AES and the City of Redondo Beach estimate that the remediation

21  cost for the Redondo Property is $94 Million.  They offer no support for this estimate.

22  Their proof of claim offers nothing, other than a number without substantiation.  Their own

23  reorganization plan, a perfect opportunity for them to provide detail about their wild

24  estimate, gives no information whatsoever about this cost.  Debtor has worked very hard

25  with its advisors to estimate it.  It has detailed and accurate estimates and these will be

26  presented to the Court and interested parties at the earliest practicable time.

27    Instead of substantiating their claim (to which the Debtor has objected), AES and

28  the City of Redondo Beach hurl insults and allegations.  None of those equal evidence.

1   The Debtor's Plan and Disclosure Statement sets out, in detail, exactly how the

2   ascertainment and remediation process work.  *See Disclosure Statement, pg. 31-34; pg.*

3   *83, line 6 through pg. 91, line 3; Corrective Action Consent Agreement, Bate-Stamped*

4   *pg. 366-380; Exhibit G, "Toxicity Criteria for Human Health Risk Assessments, Screening*

5   *Levels, and Remediation Goals in Support of Disclosure Statement and Plan, Bate-*

6   *Stamped pages 381-385; Final Judgment Pursuant to Stipulation, Bate-Stamped pages*

7   *386-423*

8             A.       Debtor Discusses the Environmental Issues in Detail:  Debtor spends

9   considerable time talking about the environmental issues attendant to the Redondo

10  Beach Property as the above-citations make clear.  Unlike AES who signed the

11  Corrective Action Consent Agreement in 2015 and proceeded for five years to do

12  absolutely nothing and who took by assignment in 1997 the Stipulated Judgment and

13  Decree entered into by Southern California Edison with DTSC in 1995 and did nothing to

14  perform under its terms and conditions between 1997 and 2015, Debtor is acting and is

15  taking definitive and well-advised action to move the ascertainment and remediation

16  process forward.

17            B.       AES Claims that the Debtor Feigns Ignorance of the Environmental

18  Liability:  The truth is that the Debtor does not have any environmental liability.  Debtor

19  has provided AES with an "Indemnity".  Definitionally, an indemnity is not triggered,

20  "(E)xpress **indemnity** refers to an obligation that arises " 'by virtue of

21  express **contractual** language establishing a duty in one party to save another harmless

22  upon the occurrence of specified circumstances.' " *Prince v. Pacific Gas & Electric Co.,*

23  45 Cal.4th 1151, 1157( citing *Bay Development Ltd. v. Superior Court,*, 50 Cal.3d 1012 at

24  p. 1029) (emphasis in original).

25        To compound their misstatements in their Objections, AES states at page 11 of

26  their Objections "The Debtor has previously shown this Court a City-sponsored report

27  that estimated remediation, demolition, and cleanup – as of twenty years ago – at

28  $80,580,604. See Docket No. 70, Ex. 1 at 27. The Debtor cannot reject these estimates

1    out of hand while pleading ignorance. And the Debtor cannot credibly propose treatment

2    for AES's Class 4b claim without knowing the extent of its full obligation thereunder, nor

3    can it expect to confirm its proposed plan when feasibility is fatally undermined by a

4    drastic underestimation of its environmental costs."

5         AES cannot even point to their own admissible evidence on this issue, they point

6    to a report which they say the Debtor "showed" to this Court at some past date.  Debtor

7    has not feigned ignorance of these issues—its Disclosure Statement (unlike the AES

8    Disclosure Statement which says nothing about this issue) speaks to the Environmental

9    issues in detail and with specific and clear knowledge.

10         C.        AES' Objections Mischaracterize the Environmental Obligations:

11   AES waxes on at pages 12 and 13 of their Objections how the Debtor minimizes and

12   mischaracterizes its environmental obligation.  They cite contractual provisions between

13   the parties and other information which they say supports their view.  Simply stated, AES

14   evidences a fundamental misapprehension of the environmental laws and how they

15   operate.  Debtor's evidence on this will show the following, and specifically in reference to

16   the information in the Plan and Disclosure Statement at page 87 and the succeeding

17   pages starting with the flow chart that accurately and completely describes the

18   environmental ascertaination and remediation process. Over the next few years, Debtor

19   will continue to follow the required rules and protocols for ascertaining the environmental

20   issues with the Redondo Beach property, exactly as has been done by the Debtor since it

21   purchased the Property at the end of 2020.  As the flow chart on page 87 and the

22   following narrative makes clear, the RCRA Facility Investigation is the step where the

23   Debtor is now, having done and completed the RCRA Facility Assessment (something

24   that AES did not do since 2015 and further did nothing at all under the Southern

25   California Edison Consent Decree since 1997 when AES purchased the Redondo

26   Property from SCE).  The RCRA Facility Investigation involved the following additional

27   work of ascertainment-the "Human Health Risk Assessment" which is described on page

28   88 from lines 10-22 of the Disclosure Statement, the "Ecological Risk Assessment which

1   is described on page 88 from lines 23-28 to page 89, lines 1-3, the "Risk Management"

2   phase which is described in page 88, from lines 4-14 of the Disclosure Statement and the

3   "Statement of Basis" which is described at page 89, lines 15-24.  All of these steps or

4   tasks and reports are done in concert with DTSC as their approval and suggestions for

5   proceeding in consultation with the Debtor's consultants makes certain that when the

6   time for approval of these different studies comes, DTSC and the property owner are on

7   the same page and the approval process is a non-event from a risk standpoint because

8   the parties have been working closely together.

9        The owner of the Property is under a duty to protect the "health and welfare" of the

10  local citizens and individuals who live or work or meet the Property or the areas around it.

11  Not surprisingly, that is the number one concern of DTSC and the State of California.

12  The condition of the Redondo Beach property has been in place for **29 years** even since

13  the Consent Decree was entered into between DTSC and SCE.  If there were an

14  immediate health and safety concern that the Property presented, the complete inaction

15  of SCE and then AES as the property owners 25 of those 29 years would never have

16  been permitted.  They would have been required to act immediately.  But they were not.

17  That is because the Property for reasons that the Debtor will demonstrate does not

18  presently pose any threat to the health and safety of the Redondo Beach area.

19       Does AES and the City really believe that something dramatic has changed, that

20  there is an actual threat to the health and safety of the citizens of Redondo Beach that

21  the Redondo Beach Property suddenly presents?  Or is the hysteria raised in the

22  objections of AES and the City of Redondo Beach nothing more than hyperbole and an

23  attempt to create fear where there is no reason for it and where the current property

24  owner, for the first time since 1995, is finally taking responsible action to ascertain and

25  remediate the Property.

26       D.    Contrary to the Statements on Page 13 of the AES Objections from

27  Lines 18-25, Debtor Has Not Capped the Environmental Deed of Trust Claim at $14

28  Million

DAL 58134923v2

1    The EDOT claim is not capped at $14 Million.  The Debtor shall comply with its

2    obligations under the Third Amendment to the Purchase and Sale Agreement if it prevails

3    in that litigation and if it does not prevail in that litigation.  The reference to $14 Million

4    anticipates one of the results (and not the only possible result) of the pending litigation on

5    the AES Claim and the Court's interpretation of the Third Amendment to the Purchase

6    and Sale Agreement.

7    $14 Million is not necessary as the amount needed to complete the ascertainment

8    process described above is under $2.0 Million and is the amount needed over the next

9    few years  The Debtor will spend exactly what is necessary to spend in order to

10   remediate the environmental issues at the Redondo Beach Property when such

11   expenditures become necessary and required following approval of the "Statement of

12   Basis" which is referenced on page 87 of the Plan and Disclosure Statement and which is

13   then described in the succeeding pages at page 89, lines 15-24.

14   5.   AES' Objections Based Upon the California Coastal Commission Claim:

15   AES' objection here is incomprehensible.  Found at page 14 of the AES Objections, they

16   seem to criticize how the Debtor describes this claim.  AES has already indicated, in

17   writing, that they will indemnify the Debtor with respect to this claim.  However, they have

18   failed to do so by not meeting the requirement of the agreements between them for AES

19   to put up a bond for the full amount of their claim.  And as for resolving the Coastal

20   Commission claim, the Debtor fully expects to do so soon.

21   6.   Objections Based Upon Flawed Value of Real Estate:  This objection is

22   grounded in the absurd notion that AES has an environmental deed of trust claim in this

23   case totaling approximately $94 Million as set forth in their proof of claim.  The Debtor

24   has no idea where this amount comes from; Debtor will provide information to the Court

25   regarding what it projects the environmental costs may be, but that is only part of the

26   picture.  The more important question is when these potential sums will have to be

27   expended.  That is action which takes place in concert with the DTSC and is something

28   which will not be known for some time.  Presently with respect to the two deeds of trust

1  held by AES, there is only a default under the Performance Deed of Trust.  There is no

2  default under the Environmental Deed of Trust and as the Court will see when evidence

3  is presented, the Debtor intends to continue to comply with the EDOT and with its

4  obligations as the Property Owner to ascertainment and when the time comes, remediate

5  the environmental issues at the Redondo Beach Property.

6      The valuation provided to the Court in the Plan and Disclosure Statement is an "as

7  is" valuation and contains a second valuation based upon the Property being developed.

8  Debtor does not understand what is unusual or objectionable about this (other than AES'

9  apparent need to object to everything possible).  "As is" valuations and valuation based

10  upon highest and best use or after development takes place are customary approaches

11  to valuing real estate.  The valuation as a development based upon the Development

12  Plan submitted to the City of Redondo Beach and rejected by them (presumably because

13  it proposes 500 low income housing units in compliance with California law, something

14  which the City of Redondo Beach has publicly and repeatedly said they would oppose

15  under any circumstances) is appropriately described and the contingencies attendant to it

16  are described in the appraisal.  Debtor has not hidden anything from the Court or parties

17  with respect to the valuation of the Property.

18      As Debtor has stated repeatedly, it is going to pay the unpaid indebtedness to

19  AES and to all other creditors in this bankruptcy case.  It will do that while the

20  environmental ascertainment process continues and while the development process

21  continues.  The attainment of a development plan is not a contingency of the Plan.  This

22  is what developers of properties do all the time while the various obstacles put up by

23  parties like AES and the City of Redondo Beach (who are clearly acting in concert in this

24  matter) are addressed and efforts made to overcome them, cooperatively or otherwise.

25      A.    The  Value of the Debtor's Other Real Estate Assets: Debtor has

26  provided Bankruptcy Schedules in this case which value its interests in the various real

27  properties which are property of the bankruptcy estate.  When AES complains about the

28  failure to provide those valuations, AES is wrong.  Debtor relies upon its statements in its

1   bankruptcy schedules regarding property valuation and will as necessary introduce

2   additional valuation testimony at the confirmation hearing on its Plan.

3       7.      AES Complains that the Treatment of their Performance Deed of Trust

4   Claim is "incomprehensible"-pg. 15-19 of the AES Objections—The treatment of AES'

5   performance deed of Trust claim is not incomprehensible.  It is simple and straight-

6   forward.  Because the Debtor does not know the precise amount of AES' prepetition

7   claim, Debtor has estimated it at $14 Millon.  AES will receive interest only payments at a

8   rate which it calculates at between 8.0-8.5%.  The first payment will be due on the first

9   day of the first month after Plan Confirmation and will continue each month in the amount

10  of $99,166.67.  Over 30 months, those payments will equal $2,975,000.  On the first day

11  of the thirtieth (30) after confirmation of the Plan, in addition to the regular monthly

12  payment, Debtor will pay AES $14,000,000.  In the event that AES' secured claim winds

13  up being more than $14 Million, that "difference" will be paid from months 31 through 48

14  following Plan Confirmation at the same rate of interest on the "difference", with the

15  balance on this "difference all due and payable on the first day of the forty-eighth month

16  following confirmation of the Plan.

17      Whatever arguments AES attempts to conjure up in response to the treatment

18  accorded their Performance Deed of Trust clam that differs from the foregoing is wrong.

19  The "incomprehension" does not rest with what the Debtor has presented.  The

20  incomprehension rests with the inability of AES to understand it.

21      8.      The Debtor's Liquidation Analysis is Contradictory and Self-Serving

22      The next complaint in the AES objections is that the Debtor's liquidation analysis is

23  self-serving.  The liquidation analysis is predicated upon a simple business proposition.

24  The Debtors are real estate developers who are involved with many dozens of parcels of

25  real estate in which they have invested.  As a result of their success, and because the

26  properties demand it, they are constantly funding these properties in terms of payment of

27  costs of operation and/or payments of debt service on them.  If this case were converted

28  to a Chapter 7 liquidation, these individuals would not be paying the obligations of the

1   Debtor's properties any longer.  AES and the City of Redondo Beach would endeavor to

2   press their right to foreclose on the Redondo Beach Property and the same would hold

3   true of the other properties in which the Debtor holds an interest as a co-owner or in

4   which the Debtor is an investor.

5        The idea that upon conversion to Chapter 7 a Trustee might have an opportunity

6   to market and sell the properties or the interests in properties that the Debtor holds does

7   apply to those properties in which the Debtor holds its interest as a Tenant in Common.

8   If a Bankruptcy Trustee could come forward and sell these properties under Section

9   363(h) of the Bankruptcy Code, there is some prospect or potential for the Bankruptcy

10   Estate to realize something for distribution to administrative claimants in Chapter 11 and

11   Chapter 7 and something left for priority claimants.  However, as to those properties in

12   which the Debtor simply holds only an interest as an investor versus as a co-owner, the

13   Trustee cannot sell the entirety of such Property because Section 363(h) does not apply

14   to permit the sale of the entirety of the said property.

15        9.      <u>The Chapter 11 Plan Seeks to Provide its Co-Owners with Impermissible</u>

16        <u>Releases</u>

17

18        The next objection accuses the Debtor of giving impermissible releases to Third

19   Parties.   There are no releases of liability under the Debtor's Plan.  Each of the  co-

20   owners of the Redondo Property and the other properties continue to be liable under the

21   AES indebtedness exactly as they are now.  AES should show this Court where any non-

22   debtor who is a co-owner is no longer liable on the AES indebtedness.  It simply does not

23   exist.  There is not a non-debtor who is discharged of any indebtedness and accordingly

24   the cases (pg. 21, line 7 and line 20) cited by AES are simply not applicable.

25        10.     <u>AES' Objections that the Plan and Disclosure Statement of the Debtor</u>

26        <u>Contains Inaccuracies Are either Not Correct or are not Material</u>

27        These objections starting on page 21 of the AES Objections are AES simply trying

28   to litigate issues that are ongoing in litigation between the Parties.  Additionally, they are

1  not material to the question of whether AES is receiving adequate information which

2  would enable it to cast an informed vote in favor of or about Confirmation of the Debtor's

3  Plan. Debtor sees nothing productive to be gained by responding to objections which

4  attempt to rewrite the Third Amendment to the Asset Purchase Agreement (Third

5  Objection in this Section on page 22, starting at line 10) by having the Debtor state

6  something in its Disclosure Statement which is a matter of dispute between the Parties.

7  There is nothing to be gained by talking about a  lease agreement where AES did not

8  even pay the $1 that they were obligated to pay.  The "fourth" and "fifth" are again

9  litigation positions that will be adjudicated in due course.

10        11.    The AES Objections are Baseless, or Raise Confirmation Issues and

11             Should be Completely Overruled

12

13        AES' objections are either without a factual basis, are legally unsupported or

14  constitute confirmation objections to the Debtor's Plan.  They should be overruled and the

15  Debtor's Amended Plan and Disclosure Statementshould be approved and set for

16  hearing on Confirmation of its Plan Scheduled.

17                              **III.**

18  **Responses to Objections of the City of Redondo Beach to the  Disclosure Statement**

19

20        The City of Redondo Beach objections overlap the AES objections to the extent

21  that they complaint about the sources of funding of the Plan (pg. 11-14), objections

22  regarding the risks to implementation of the Plan (pg. 14-17) and the Plan is not feasible

23  (pg. 18-19).  Debtor will make the following points with respect to the City's objections.

24        1.    Counsel for the City Attaches Email Communications Which were Done, in

      Part as Settlement Discussions Concerning the City's Claim and were in any Case

25  Communications that Were Intended to Be Confidential

26        Perhaps because the attachment of email correspondence between the City's

27  counsel and the Debtor's counsel constitute an intentional violation of Federal Rule of

28

1    Evidence 408 and Evidence Code 1152, Debtor brings it up first.  The correspondence

2    does not mean anything other than discussions that should have been kept confidential

3    and in another time, in an earlier generation of lawyers, would have been kept

4    confidential.  It is unfortunate not because what was written is meaningful, but because

5    including it is unethical.

6          2.      The Factual Introduction in the Objections is Inaccurate

7          Without any evidence and without any factual support, the introductory paragraphs

8    of the City of Redondo Beach's Objections state that"…the Debtor and its affiliates

9    focused their financial resources on a campaign of litigation against the City…"  The City

10   also states that the Debtor is "Driven by the speculative upside of changing the law, the

11   Debtor and its principals have ramped up that campaign over the past five years, while

12   forcing creditors to serve as the Debtor's involuntary financiers. To date, the Debtor's

13   litigation campaign has failed miserably, and the Debtor's principals (alleged multi-

14   millionaires) have kept the Debtor sparsely capitalized in the event they decide to cut

15   their losses and run." (Objections, pg. 1, lines 18-22).

16         Why lawyers spend their time thinking up such wild and baseless accusations is

17   difficult to understand.  Since 1995, first Southern California Edison and then AES

18   Redondo Beach LLC have ignored their obligations under the Consent Decree entered

19   into by SCE and the Department of Toxic Substances Control and then by AES after

20   SCE's obligations under the Consent Decree were assigned to it and AES, like SCE did

21   nothing to address their obligations under it.  Then, in 2015, AES and the DTSC entered

22   into the Corrective Action Consent Agreement ("CACA") regarding the environmental

23   remediation of the Redondo Beach property.  Again, between 2015 and 2020, AES did

24   nothing other than sell the Property to the Debtor and attempt to foist the environmental

25   remediation obligations upon the Debtor.

26         The Debtor wonders why the City was not as responsible and aggressive in

27   addressing the "claims" that they also possessed against Southern California Edison and

28   AES as they have been toward the Debtor?

1    And what has the Debtor done, unlike SCE and AES?  They have hired highly

2    qualified environmental consultants at EFI Global and AECOM, the later of whom is the

3    largest or one of the largest infrastructure consulting firms in the world, traded on the

4    New York Stock Exchange under the symbol 'ACM'.  AECOM employs 87,000 people.

5    Debtor has already spent millions on environmental ascertainment for the Redondo

6    Beach Property, a process which is described in great and accurate detail starting at

7    page 87 of the Disclosure Statement.  Debtor is the first owner of this Property, ever, who

8    has taken action to ascertain the environmental issues.  Indeed in the four years that

9    Debtor has owned the Redondo Beach Property, AES refused access to it in order to

10   permit environmental testing to take place.  Only now, after operations at the power

11   generating facility have ceased as of the end of 2023 has the Debtor been permitted

12   access to do this necessary work.  However, for six months after closure, AES still would

13   not permit access to the Property except for one inspection.  Debtor is pushing ahead

14   now, while the outcome of this Bankruptcy Case remains in doubt, and performing its

15   environmental ascertainment work having now been permitted to do so for the first time.

16   And the Debtor has paid AES $37 Million toward the purchase price.  Does that

17   sound like someone who is trying to own a property on the backs of the creditors in this

18   bankruptcy case?  And the Debtor is willing to pay the balance that it owes to AES and it

19   is willing to and can ascertainment and remediate the environmental issues provided for

20   in the CACA described above.  Only when AES took the misguided position with respect

21   to the Third Amendment to the Purchase and Sale Agreement that there was not a final

22   and non-appealable grant of AES to operate at the facility did this situation devolve into

23   litigation.  Litigation regarding development rights occur all the time.  This Debtor is not in

24   bankruptcy because of litigation regarding development rights.

25   The truth is that the City is highly opposed to the 500 units of minority housing

26   proposed for the Property site in the Debtor's development plan because the City does

27

28

1  not want minorities living within its borders.  The City Council and the City's former and

2  present Mayor have made no secret of their opposition to such a development.[3]

3       3.    <u>The City Has Only a Contingent Claim for Transfer Taxes Traced Back to

4  the Sale of the Redondo Beach Property to the Debtor</u>:  The City's rights under the

5  Option Agreement are a matter that will be determined in litigation.  Either they have

6  them or they do not.  Under no circumstances will the outcome of that litigation, were it

7  held that the City did not have the Option, entitle the City to a claim for damages which is

8  what this claim is based upon.  Second, the City's piggy-backing on to the AES claim in

9  order to shoe-horn their way into standing to appear and be heard in this case is likewise

10  going to be unsuccessful.  By their admission, the City's claim for environmental

11  remediation (if that is what it is) is not a claim that is presently owing under the

12  environmental laws and is duplicative of AES' claim which is itself secured by a first trust

13  deed on a real property whose "as is" value is $110,000,000.  The third part of the City's

14  claim is traced to the claim filed by the California Coastal Commission in this case. This

15  time, instead of piggy-backing with AES, the City chooses the Coastal Commission.  Is

16  the Debtor supposed to pay these claims twice-once to AES under their first trust deed

17  environmental deed of trust and once under the Coastal Commission claim for which

18  AES is fully liable?  This is not meant as a complete statement or anything resembling it

19  of the Debtor's rights against AES, but they should not be allowed to be heard.  The

20  transfer tax claim is going to be funded at 100% of its amount on the Effective Date of the

21  Debtor's Plan.   That will leave the City with what is already knows it has, nothing.  Their

22  objections should be ignored on that basis alone.

23

24  _____

25  [3] <u>The City and AES have Organized the Campaign Waged through the AES Plan of
Reorganization to Take the Redondo Beach Property from the </u>Debtor--The AES Plan of

26  Reorganization has been planned for some time.  At City Council meetings,
arrangements have been made for the purchase of the Redondo Property from AES by

27  the City after the City confirms their Plan of Reorganization in this Bankruptcy Case.
After call, what use does a power generating company have for a power plant that is no

28  longer operational?  These meetings are a matter of public record.

4.      Objections from the City that the Disclosure Statement Contains Inadequate Information

A.      Objections Regarding Funding of the Plan:  The Plan is going to be funded from two sources-first the resources of Mr. Ely Dromy and Mr. Leo Pustilnikov. Second from the sales of real properties in which the Debtor holds an interest as a Tenant in Common, however, under the Debtor's amended Plan, these properties in their entirety will be pledged to AES as additional collateral (beyond the personal guarantee of Mr. Dromy).  This pledge will not only include the Debtor's percentage interest in these properties, it will also include the ownership interests of non-debtors.

As stated above, this Plan's success is not dependent upon recoveries in litigation or income from operations.  As repeatedly stated to this Court, the Debtor's insiders have been funding operations out of their own resources in this Bankruptcy case including payment of millions of dollars to the secured creditors on the properties which are collateral to East West Bank and to Valley National Bank.  Those same sources that paid those debt service payments, and paid $1.5 Million in property taxes in April, 2024 will be making the payments under the Plan.  Does the City want to see if the insiders' other investment properties are current on their property taxes or their debt service payments to the secured lenders on their properties?  Perhaps if they did, even the City (and AES) might understand that the resources of the insiders of this Debtor are more than substantial enough to make the payments due under the Plan because they have done nothing but pay indebtedness for all their properties.  This includes $37 Million paid on the Redondo Property.  Why do the City and AES have such a hard time acknowledging these facts?

B.      Additional Information Objections by the City (pgs. 15-17 of Objections)

The first objection is the Debtor does not provide estimates of the cost of environmental remediation for the Redondo Property.  Second, the City complains about a lack of information regarding risks associated with the Property's development.  Third,

1   the City complains that there is not adequate information regarding the risks that funding

2   will take place under the Plan.

3        The first objection (and the objections of the City and AES are inter-changeable) is

4   interesting because in their Plan, AES provides no information regarding the basis and

5   source of information for their $94 Million environmental remediation claim.  The

6   information referred to in this objection of the City will come forward in greater detail in

7   motion practice addressing the Debtor's liabilities to AES under the Environmental and

8   Performance deeds of trust and requests of the Court for a determination of those claims.

9   This is information that AES and the City care about and the Debtor is certain that the

10  City will tag along and participate in the confirmation litigation regarding the two claims of

11  AES. They will receive sufficient information then as will the Court when this Motion

12  practice transpires before it.

13       The City has apparently not heard the Debtor tell the Court and all parties,

14  repeatedly, that the Debtor's performance under the Plan is not dependent upon there

15  ever being development rights granted and that all payments to be made under the Plan

16  will undoubtedly be made and retired long before there is any development of the

17  Redondo Beach property.  So the Debtor will say it again now, this information is not

18  necessary for the Debtor to comply with Section 1125 of the Bankruptcy Code with

19  respect to its Disclosure Statement.

20       Debtor does not view there being any risk that funding needed under the Plan will

21  not take place.  The Debtor knows this because it understands the reasons why payment

22  to AES stopped which triggered their foreclosure and this bankruptcy filing.  Debtor

23  remains ready and willing to pay AES as the payments provided for under the Plan

24  demonstrate.  If the Court wishes for there to be additional information on this, the Debtor

25  will provide it.

26       5.    Entitlement to Vote Acceptance or Rejection of the Plan

27       All interested parties and creditors must follow the Bankruptcy Code and

28  Bankruptcy Rules regarding their voting rights under the Debtor's Plan.  There is nothing

1  in a Motion by the Debtor for Approval of its Disclosure Statement that permits the Court

2  to modify the  requirements respecting voting in connection with a Plan of

3  Reorganization.  Accordingly, the argument, if it is one, put forward by the City at page

4  21, from lines 6-21 of their Objections should be rejected to the extent it is not consistent

5  with the law, which what they advocate clearly is not.

6                                          **IV.**

7  **THE INITIAL DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION**

8  **OR WILL BE UPDATED TO ASSURE ITS SUFFICIENCY**

9              Section 1125(b) of the Code requires That a disclosure statement contain

10  "adequate information" enabling claim holders entitled to vote on a plan to "make an

11  informed judgment about the plan."  See 11 U.S.C. § 1125(a)(1).  Stated differently, the

12  information in a disclosure statement must be "reasonably practicable" to allow voting

13  creditors to make this "informed judgment."  See In re Momentum Mfg. Corp., 25 F.3d

14  1132, 1136 (2d Cir. 1994).  A disclosure statement, however, "need not include such

15  information about any other possible or proposed plan" and, in determining the adequacy

16  of a disclosure statement, the "court shall consider the complexity of the case, the benefit

17  of additional information to creditors and other parties in interest, and the cost of

18  providing additional information."  See 11 U.S.C. § 1125(a)(1).

19              Further, the adequacy of information in a disclosure statement is

20  determined on a case-by-case basis, and the Court has broad discretion in determining

21  whether a disclosure statement contains adequate information.  See In re Ionosphere

22  Clubs, Inc., 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995); In re WorldCom, Inc., 2003 WL

23  21498904, at *10 (S.D.N.Y. Jun. 30, 2003); see also H.R. Rep. No. 595, at 408-09 (1977)

24  ("In reorganization cases, there is frequently great uncertainty.  Therefore, the need for

25  flexibility is greatest.")

26              In this inquiry, the Court need not consider specialized issues that a

27  particular creditor may wish to raise with respect to a plan, nor is a debtor required to

28  explain why its chapter 11 plan is superior to other, hypothetical plans.  See 11 U.S.C. §

DAL 58134923v2                                26

1    1125(a)(1).  The "adequate information" standard also does not require that a disclosure

2    statement include information about every aspect of a debtor's organization, its proposed

3    plan, or claims asserted against the debtor.  Rather, "adequate information" is limited to

4    "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that

5    would enable such a hypothetical investor of the relevant class to make an informed

6    judgment about the plan."  <u>Id.</u>

7        The Debtor addresses each category of Objections raised by the Objectors

8    as follows:

9        **A.**     **<u>The Source of Funding for the Plan is Adequately Described</u>**

10       The Debtor will be amending the source of funding section in the FADS and these

11   proposed revisions will ensure that there is no debate over whether the source of funding

12   is adequately disclosed.  Under the FADS, the source of funding will be three-fold: (1) Mr.

13   Dromy's personal guarantee of all chapter 11 plan payment obligations (including

14   environmental remediation costs), (2) the sale of a restaurant and retail spaces located at

15   174 Kinney Street and 169-175 Pier Avenue, Santa Monica, CA 90505 (collectively, "<u>Pier</u>

16   <u>Kinney Property</u>"), and (3) the pledge of an additional $22.2 million in non-Debtor real

17   estate equity as collateral.

18       As for Mr. Dromy's personal guarantee, contrary to the Objectors' position that

19   Dromy's guarantee is a hollow promise, as all these parties are well-aware, a confirmed

20   chapter 11 plan is a new contract.  Thus, upon confirmation, Mr. Dromy would be

21   contractually obligated to guarantee the payments required under the confirmed chapter

22   11 plan.  Nonetheless, Mr. Dromy is willing to enter into more formal guarantee

23   agreements if the Court believes the related extra costs to the Estate is necessary.

24       Second, the FADS will be amended to include the Debtor's plan to sell Pier

25   Kinney.  <u>See</u> Debtor's amended schedules A/B filed on April 28, 2023 [Docket no. 48].

26       In conjunction with Mr. Dromy's personal guarantee of the chapter 11 plan

27   obligations, and further supporting the feasibility of Mr. Dromy's financial ability to fund

28   the plan, the FADS will also be revised to include the new pledge additional $22.2 million

1   in non-Debtor real estate equity as collateral.  As described in the Debtor's amended

2   schedule A/B, the Debtor owns fractional ownership interests in several real properties

3   whose combined equity total is $33,670,000 (excluding the Harbor Drive Property and the

4   Pier Kinney Property).  Of that total equity, approximately $8,947,671 is the Estate's

5   equity, and $24.7 million belongs to non-Debtor entities.  Through various means of

6   ownership, Mr. Dromy and Mr. Pustilnikov effectively control 90% of that $22.47 million

7   non-Debtor equity.  As such, Mr. Dromy and Mr. Pustilnikov have agreed to pledge that

8   $22.2 million ($24.7 million x 90%) of equity as collateral towards for plan funding.  In

9   other words, Mr. Dromy and Mr. Pustilnikov have agreed that the Debtor may, as

10   necessary during the term of the plan, sell the other real properties in which the Debtor

11   has fractional interests in and the Debtor's equity ($8,947,671) plus the 90% of non-

12   Debtor equity ($22.2 million) will go towards plan funding.

13       Finally, notwithstanding the Objectors attempts to characterize Debtor's plan as

14   being dependent on success in pending litigation related to development of the Harbor

15   Drive Property and against AES, <u>see</u> AES Obj. 7-9; City Obj. 15-17, the Debtor has

16   already stated in its Initial Disclosure Statement that its reorganization efforts are not

17   dependent on any such results.  Rather, and in particular about the pending adversary

18   proceeding against AES, the outcome of that litigation will simply liquidate the amount of

19   AES's claim under its Performance Deed of Trust ("<u>PDOT</u>") classified in Class 4b.  The

20   Debtor intends to fully pay the amount of AES's Class 4b claim- irrespective of the results

21   of the AES adversary proceeding.

22       In sum, the Initial Disclosure Statement contains adequate information for a

23   hypothetical investor to make an informed judgment about the Initial Plan.  The Debtor

24   intends to provide additional detail and information in its forthcoming FADS.

25   **B.**   **The FADS Will Contain Adequate Information Regarding Claim**

26       **Amounts and Treatments**

27       The Objectors both objected to the treatment of their claim.  <u>See</u> <u>AES</u> Obj.

28   9-13; City Obj. 10-11.  The Debtor addresses each below individually.

1      ### 1.   <u>AES Class 4b Claim (EDOT)</u>

2      AES's Class 4b claim is based on that certain "Environmental Performance Deed

3   of Trust" (the "EDOT") recorded a first-priority lien against the Harbor Drive Property to

4   secure Debtor's obligations to indemnify AES for environmental remediation of the Habor

5   Drive.  <u>See</u> AES Obj. 9:17-21; Initial Plan 83-86.  AES estimates that remediation will

6   cost $134 million; the Debtor disputes this amount and believes it will be significantly

7   less.

8      What is undisputable, however, is that as of the Petition Date and as of this

9   writing, the Debtor owes $0.00 to AES under the EDOT because the EDOT does not

10  secure any monetary obligation owed by the Debtor (and the co-owners of the Harbor

11  Drive Property) to AES.  Rather, based on the contractual provisions in the underlying

12  documents, the EDOT secures the Debtor's "promise" to remediate the Habor Drive

13  Property.  If the Debtor fails to follow through on its "promise," AES may foreclose on the

14  EDOT.

15     And as admitted by AES, there has been no default under EDOT; rather the only

16  default that has allegedly occurred was under that certain "Performance Deed of Trust"

17  (the "<u>PDOT</u>") recorded as a second-priority lien on the Harbor Drive Property which

18  secures the repayment of the purchase price for the Harbor Drive Property.  <u>See</u> AES

19  Obj. 16:10-11 ("The PDOT was the basis for the foreclosure proceeding that triggered

20  this bankruptcy case."); Initial Plan 13.

21     Additionally, under applicable bankruptcy law, AES's Class 4b claim cannot be

22  allowed because it is a contingent, unliquidated indemnification claim.  <u>See</u> 11 U.S.C. §

23  502(e)(1) ("[T]he court shall disallow any claim for reimbursement or contribution of an

24  entity that is liable with the debtor…to the extent that… such claim for reimbursement or

25  contribution is contingent as of the time of allowance or disallowance of such claim for

26  reimbursement or contribution[.]").

27     Accordingly, the Debtor intends to revise the FADS to reaffirm its indemnification

28  obligations due to AES and leave AES's Class 4b claim unimpaired.  And because there

1    is no contractual or legal basis for making direct monetary payments to AES, or any

2    requirement to fund an escrow account, based on AES's contingent, unliquidated

3    indemnification claim, no direct monetary payments or reserve funding will be provided

4    for AES under the terms of the FADS.  In the event the Debtor fails to uphold its

5    indemnification "promise," AES will retain all its unimpaired rights and remedies under the

6    EDOT.

7                        **2.    <u>AES Class 4c Claim (PDOT)</u>**

8         AES Class 4c claim is based on the unpaid amounts due for purchase of the

9    Harbor Drive Property.  There is no ambiguity regarding the treatment to be accorded to

10   Class 4c, but to be certain that AES is not confused, the Debtor will revise the treatment

11   of AES's Class 4c claim to avoid any ambiguity.

12        The amount of the debt is dependent upon whether there was an "Approved

13   Extension" prior to the "Extension Deadline" as described in the Third Amendment to the

14   PSA.  <u>See</u> AES Obj. 24:1-6.

15        Additionally, whether there was such an extension affects the interest rate that

16   was applicable to the unpaid principal balance.  If AES is correct, and there was no such

17   extension, the Debtor owes an additional $13.2 million.

18        Considering the foregoing, the Debtor will be amending the Initial Disclosure

19   Statement to provide for the following treatment:

20             (1) beginning on the Effective Date of the plan, and ending on first day of

21   the 30th month after the Effective Date, the Debtor will make 30 monthly payments in the

22   amount of $99,166.67 to AES (for a total of $2,975,000);

23             (2) on the first day of the 31st month after the Effective Date, the Debtor will

24   make a balloon payment of $14 million to the Debtor;

25        Accordingly, after 30 months under the confirmed plan, the Debtor will have paid

26   $16,975,000 directly to AES.

27

28

DAL 58134923v2                          30

### 3. City Unclassified Transfer Tax Claim

After the Initial Plan was filed, the City filed amended proof of claim no. 8-2 on August 1, 2024 (the "City Amended POC").  The City deleted its claim for attorneys' fees. Accordingly, the FADS will not include such claim.

As for the Transfer Tax Claim in the amount of $142,166, which the City claims is entitled to priority under Section 507(a)(8), the Debtor will likely include a provision in the FADS for escrowing funds to pay the Transfer Tax Claim pending a final resolution of the Debtor and the co-owners' appeal of the Los Angeles County's tax assessment.  See City Amended POC 5; City Obj. 10:23-11:1.

### 4. City Option Agreement Claim

The City Option Agreement claim is based on the City's disputed and contingent rights under that certain Option Agreement to purchase 15 acres of the Harbor Drive Property.  See City Amended POC 4-5; City Obj. 6:16-21.  The validity of the Option Agreement is subject to litigation in the Adversary Proceeding.  As such, the Debtor will provide for the City's Option Agreement Claim to be unimpaired in the FADS.  There is no contractual or bankruptcy law requirement that the Debtor make any direct monetary payments to the City on account of its disputed and contingent Option Agreement Claim. Accordingly, the City will receive similar treatment under the FADS with the monetary amounts owed to the City under the Option Agreement Claim being $0.00, and the City retaining all its rights and remedies, if any, under the disputed and contingent Option Agreement, subject to later adjudication.

### 5. City Environmental Claim

The City Environmental Claim is based on disputed, unliquidated, and contingent claims related to the same environmental remediation claim underlying AES's Class 4b claim.  Like AES, the City asserts that "the Debtor is liable for significant environmental remediation…. In the amount of at least $134,000,000."  City Obj. 6:22-7:2.  And like the AES claim, there is no *direct* monetary obligation owed to the City.  In fact, the City has not identified any environmental remediation that the Debtor has failed to perform.  See

1  *generally* City Amended POC 5-6; City Obj. 6.  Accordingly, the City will receive similar

2  treatment under the FADS with the monetary amounts owed to the City under the City

3  Environmental Claim being $0.00, and the City retaining all of its rights and remedies, if

4  any, under the disputed, unliquidated, and contingent Environment Claim, , subject to

5  later adjudication.

6       **6.** **City Wetlands Claim**

7     The City Wetlands Claim is based on disputed, unliquidated, and contingent

8  claims related to the same alleged prepetition violations of the California Coastal Act and

9  City of Redondo Beach's Local Coastal Program (the "Wetlands Claim").  See City

10  Amended POC 6-7; City Obj. 7.  Like the AES claim, there is no *direct* monetary

11  obligation owed to the City under this claim.  Moreover, this claim is duplicative of the

12  California Coastal Commission's claim, which the Debtor is consensually resolving.

13  Accordingly, the City will receive similar treatment under the FADS with the current

14  monetary amounts owed to the City under the Wetlands Claim being $0.00, and the City

15  retaining all of its rights and remedies, if any, under the disputed, unliquidated, and

16  contingent Wetlands Claim, subject to later adjudication.

17      **C.** **The Best Interests of Creditor's Test Will Be Updated**

18     AES and the City object to the Debtor's "best interests of creditors" test on pages

19  68-69 of the Initial Disclosure Statement.  See AES Obj. 17-18 ; City Obj. 19-20.  The

20  Debtor will be amending the liquidation analysis in the FADS; the end result, however,

21  will not change.  The Debtor has correctly analyzed and disclosed that in chapter 7,

22  creditors will receive less than under the Debtor's forthcoming amended chapter 11 plan

23  for three main reasons.  First, Mr. Dromy is guaranteeing the payment of all obligations

24  under the FADS.  Mr. Dromy is making no such guarantee if the case were in chapter 7.

25  Similarly, the new pledge of $117 million worth of real estate is only to serve as collateral

26  for the payment of the chapter 11 plan payments.  Neither Mr. Dromy nor Mr. Pustilnikov

27  would make such a pledge of non-Debtor real estate collateral in chapter 7.  Third, a

28  chapter 7 trustee cannot reject the environmental remediation obligations required under

DAL 58134923v2

1   the EDOT.  Accordingly, without the guarantee of Mr. Dromy and the pledge of extra real

2   estate collateral, creditors will not fare better in chapter 7 than under the Debtor's FADS.

3                                          **V.**

4               **THE INITIAL PLAN IS NOT PATENTLY UNCONFIRMABLE**

5               Many of the objections prematurely and improperly raise issues that should be

6   addressed in connection with confirmation of the Initial Plan.  These objections are made

7   under the guise that the Initial Plan cannot be confirmed and that the Initial  Disclosure

8   Statement cannot be approved as a result.  However, "[a]t disclosure statement hearings,

9   courts should refuse to hear issues that are confirmation rather than disclosure issues,

10  such as classification of claims, feasibility, whether the plan has been proposed in good

11  faith, or whether a plan is fair and equitable," unless it is obvious at the disclosure

12  statement stage that the plan is patently unconfirmable.  7 Collier On Bankruptcy, ¶

13  1125.03 (16th ed. 2023); In re Am. Cap. Equip., LLC, 688 F.3d 145, 154 (3d Cir. 2012).

14              "A plan is patently unconfirmable where (1) confirmation defects [cannot] be

15  overcome by creditor voting results; and (2) those defects concern matters upon which all

16  material facts are not in dispute or have been fully developed at the disclosure statement

17  hearing."  Am. Cap., 688 F.3d at 154-55; see also In re Phoenix Petrol. Co., 278 B.R.

18  385, 394 (Bankr. E.D. Pa. 2001) (finding that unless "the disclosure statement describes

19  a plan that is so 'fatally flawed' that confirmation is 'impossible'" the court should approve

20  a disclosure statement that otherwise adequately describes the chapter 11 plan at issue).

21  Importantly, "care must be taken to ensure that the hearing on the disclosure statement

22  does not turn into a confirmation hearing."  In re Copy Crafters Quickprint, Inc., 92 B.R.

23  973, 980 (Bankr. N.D.N.Y. 1988).  Indeed, disputed issues related to confirmation are not

24  relevant to assessing whether a disclosure statement contains "adequate information."

25  See, e.g., In re Hyatt, 509 B.R. 707, 711 (Bankr. D.N.M. 2014).

26              Contrary to AES's plan, which, on its face, is unconfirmable for a variety of

27  reasons, none of the identified, anticipated objections to the Debtor's Plan deem it

28  "patently unconfirmable."  These objections are premature and do not present a basis for

1  denying the Motion without providing the Debtor an opportunity to amend the Initial

2  Disclosure Statement.  For example, Mr. Dromy's financial "wherewithal" and the

3  evidence in support of his personal guarantee is a factual dispute to be resolved during

4  the confirmation process.  The Debtor's plan must ultimately meet the confirmation

5  requirements in Section 1129 of the Code, and the Debtor will show that it has carried its

6  burden to confirm its chapter 11 plan when that time comes.  The time to do that is at

7  confirmation, not at the stage of approving a disclosure statement.  The Objectors will

8  have the opportunity to prosecute their confirmation objections in connection with the

9  confirmation hearing to the extent those issues remain disputed.  As such, the evaluation

10 of any objections to confirmation of the Plan should be deferred until the confirmation

11 hearing.

12         In sum, the objections that the Plan is not feasible is a factual inquiry that the

13 Court must defer to the confirmation stage.  As this Court knows, the feasibility

14 requirement is set forth at Section 1129(a)(11) which requires that "[c]onfirmation of the

15 plan is not likely to be followed by the liquidation, or the need for further financial

16 reorganization, of the debtor ... unless such liquidation or reorganization is proposed in

17 the plan." In re Harbin, 486 F.3d 510, 517 (9th Cir. 2007); Prudential Ins. Co. of America

18 v. Monnier Brothers (In re Monnier Brothers), 755 F.2d 1336, 1341 (8th Cir. 1985); In re

19 Roberts Rocky Mountain Equip. Co., Inc., 76 B.R. 784, 790 (Bankr. D. Mont. 1987).  As

20 noted, the Bankruptcy Appellate Panel has has defined feasibility as a factual

21 determination, and "as whether the things which are to be done after confirmation can be

22 done as a practical matter under the facts." In re Jorgensen, 66 B.R. 104, 108 (B.A.P.

23 9th Cir. 1986) (citing In re Clarkson, 767 F.2d 417 (8th Cir. 1985); see also In re Ambanc

24 La Mesa Ltd. Partnership, 115 F.3d 650, 657 (9th Cir. 1997).

25                                          **VI.**

26                                    **<u>CONCLUSION</u>**

27 .        The Objections of the City and AES are confirmation objections.  The Court knows

28 the law regarding when and under what circumstances such objections should be

1  considered at a Disclosure Statement hearing and when they should not be considered.

2  The Debtor will not repeat those standards here.

3      The desire of AES to take the Redondo Property away from the Debtor is

4  stunning.  The virulence of their actions and those of the City are a surprise.  Debtor

5  believes that this is going to be a long, and extraordinarily expensive confirmation battle,

6  full-blown litigation that will take a very long time and perhaps millions in fees and costs

7  to adjudicate.  That is not a certainty, but that is the appearance of this matter.  Debtor is

8  confident that it will prevail because it is willing to pay just as it has paid for the right to

9  own the Redondo Property and service its obligations.  It has never asked anyone for a

10  free ride, and the millions it has paid since this case was filed to the secured creditors on

11  these properties and millions in property taxes is testament to the Debtor's willingness

12  and wherewithal to pay for the privilege of owning the Properties that it now has as their

13  Owner.

14      Debtor's counsel has reached out to one of the most well-known and well-

15  respected mediators on the West Coast about conducting a mediation of this matter.

16  This is again not because the Debtor does not adamantly believe that it will prevail but

17  because making every effort to settle these matters is the responsible action to take.  The

18  mediator that Debtor's counsel contacted is not someone who he has used before or who

19  he knows.  And certainly, if AES wishes to participate in a mediation, doing so could be

20  productive and is certainly an expense worth taking on because of the savings it would

21  entail to the clients in this case.

22      Again, Debtor does not make this suggestion as a sign of weakness or concern.

23  Debtor hopes that the Court accepts this truthful representation.

24      The Debtor's Disclosure Statement as submitted or as amended should be

25  approved at the hearing on August 15, 2024.  The Disclosure Statement of AES

26  describes a patently unconfirmable Plan and is seriously deficient in meeting the

27  requirements of Section 1125 of the Bankruptcy Code.  It should be disapproved and the

28  Debtor's Plan immediately put out for vote by creditors and parties entitled to vote on the

1  Plan.  Debtor prays for such other and further relief as is just and appropriate in the

2  circumstances.

3  DATED: August 8, 2024                **GREENSPOON MARDER LLP**

4

5                                        By: /s/ *Victor A. Sahn*
                                              Victor A. Sahn
6                                             Attorneys for 9300 Wilshire, LLC, Debtor and
7                                             Debtor in Possession

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is
1875 Century Park East, Suite 1900, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR AND DEBTOR IN POSSESSION'S OMNIBUS
REPLY TO OBJECTIONS OF AES REDONDO BEACH, L.L.C. AND THE CITY OF REDONDO BEACH TO MOTION TO
APPROVE ADEQUACY OF DEBTOR AND DEBTOR IN POSSESSION'S DISCLOSURE STATEMENT AND PLAN OF
REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-
2(d); and **(b)** in the manner stated below:

---

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and
LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 8, 2024  I checked
the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following

- **Todd M Arnold** tma@lnbyg.com
- **Melissa Boey** melissa.boey@morganlewis.com
- **Steve Burnell** Steve.Burnell@gmlaw.com, sburnell@ecf.courtdrive.com;
  sburnell@ecf.inforuptcy.com;cheryl.caldwell@gmlaw.com;denise.walker@gmlaw.com
- **Jason M Caruso** jason.caruso@ndlf.com
- **Michael J Gomez** mgomez@frandzel.com, dmoore@frandzel.com
- **Maya Hill** mhill@ttc.lacounty.gov
- **Joseph Isenstadt** joseph.isenstadt@doj.ca.gov
- **Clifford P Jung** clifford@jyllp.com, ry@jyllp.com;jessica@jyllp.com
- **Daniel A Lev** daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Kelly L Morrison** kelly.l.morrison@usdoj.gov
- **David L. Neale** dln@lnbyg.com
- **Abigail V O'Brient** aobrient@cov.com, docketing@cov.com
- **Aron M Oliner** roliner@duanemorris.com
- **Mitchell E Rishe** mitchell.rishe@doj.ca.gov
- **Victor A Sahn** victor.sahn@gmlaw.com, vsahn@ecf.courtdrive.com;
  pdillamar@ecf.courtdrive.com;patricia.dillamar@gmlaw.com,Karen.Files@gmlaw.com
- **Alan Schindler** alan.schindler@gmlaw.com, lindsay.broderick@gmlaw.com
- **Alan G Tippie** Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com;
  Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Craig A Wolfe** craig.wolfe@morganlewis.com
- **Hatty K Yip** hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)  August , 2024 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage
prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later
than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each
person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or
entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile
transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to,
the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| August 8, 2024 | Patricia Dillamar | */s/ Patricia Dillamar* |
| *Date* | *Printed Name* | *Signature* |

---

PMD 58298174v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                        **F 9013-3.1. PROOF.SERVICE**