1 | Victor A. Sahn (CA Bar No. 97299)
victor.sahn@gmlaw.com
2 | Daniel A. Lev (CA Bar No. 129622)
daniel.lev@gmlaw.com
3 | Steve Burnell (CA Bar No. 286557)
steve.burnell@gmlaw.com
4 | **Greenspoon Marder LLP**
1875 Century Park East, Suite 1900
5 | Los Angeles, California 90067
Telephone: 213.626.2311
6 | Facsimile: 954.771.9264

7 | Attorneys for 9300 Wilshire LLC, Debtor and Debtor in Possession

8

### UNITED STATES BANKRUPTCY COURT

9

### CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

10

| In re | Case No. 2:23-bk-10918-VZ |
|---|---|
| 9300 WILSHIRE, LLC, | Chapter 11 |
| Debtor. | **FIRST AMENDED DEBTOR AND DEBTOR IN POSSESSION'S DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION** |
| | DATE: August 15, 2024 |
| | TIME: 11:00 a.m. |
| | PLACE: Courtroom "1368" |

*Greenspoon Marder LLP*
1875 Century Park East, Suite 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

1    On February 21, 2023 (the "Petition Date"), 9300 Wilshire, LLC, a Delaware

2    limited liability company, debtor and debtor in possession herein, caused to be filed its

3    voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

4    "Bankruptcy Code" or "Code").  This "First Amended Debtor and Debtor in Possession's

5    Disclosure Statement and Plan of Reorganization" (the "Disclosure Statement and Plan")

6    is *both* the disclosure statement (the "Disclosure Statement") and plan of reorganization

7    (the "Plan").

## PLAN PROPONENT

9    9300 Wilshire, LLC, a Delaware limited liability company (the "Debtor" or

10    "Proponent"), debtor and debtor in possession herein, is the party who caused the

11    Disclosure Statement and Plan to be filed in this case.

## DISCLOSURE STATEMENT

13    Sections I - VII and XI constitute the Disclosure Statement and describe

14    the assumptions that underlie the Plan and how the Plan will be executed.  The Debtor

15    believes the Disclosure Statement meets the standard for adequate information set forth

16    in 11 U.S.C. § 1125(a).  The information disclosed is for explanatory purposes only and is

17    as accurate as possible.

## PLAN OF REORGANIZATION

19    The terms of the Plan, located at Sections VIII - X, comply with the

20    requirements of 11 U.S.C. § 1123, including the proposed treatment of claims of the

21    Debtor's creditors and, if applicable, the interests of shareholders or partners.  The Court

22    has not yet confirmed the Plan, which means the terms of the Plan are not now binding

23    on anyone; however, if the Plan is confirmed, the terms will bind the Debtor and any

24    holders of claims or interests treated by the Plan.

## ADDITIONAL INFORMATION

26    Any interested party desiring further information should contact the

27    attorneys for the Debtor identified at the top of page 1 of this Disclosure Statement and

28    Plan, using the contact information provided.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

---

## NOTE ABOUT CITATIONS

**"Chapter, section, and §" references** are to 11 U.S.C. §§ 101-1532 of the Bankruptcy Code.

**"FRBP" references** are to the Federal Rules of Bankruptcy Procedure.

**"LBR" references** are to the Local Bankruptcy Rules for the Central District of California.

---

## TABLE OF CONTENTS

| DISCLOSURE STATEMENT | | | Page |
|---|---|---|---|
| I. | | General Disclaimer | 4 |
| II. | | Type of Plan of Reorganization; Important Dates | 8 |
| III. | | Description of Debtor's Past and Future Business and Events Precipitating Bankruptcy Filing | 9 |
| IV. | | Definitions and Preliminary Information | 40 |
| V. | | Source of Money to Pay Claims and Interest-Holders | 45 |
| VI. | | Assets and Liabilities of the Estate | 58 |
| VII | | Treatment of Nonconsenting Members of a Consenting Class | 70 |
| **PLAN OF REORGANIZATION** | | | |
| VIII. | | Plan Provisions: Treatment of Claims | 71 |
| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 72 |
| | B. | Unsecured Claims: That Must Be Treated As Required By 11 U.S.C. § 1129(a)(9)(A) and 11 U.S.C. § 1129(a)(9)(C), Unless a Claimant Consents to a Different Treatment | 74 |
| | C. | CLASS # 1: Unsecured Claims That Must Be Treated As Required By 11 U.S.C. § 1129(a)(9)(B) | 81 |
| | D | CLASS # 2: Other Unsecured Claims | 81 |
| | E. | CLASS # 3, # 4 and # 5: Secured Claims | 84 |
| | F. | Shareholder or Partner Interests | 100 |
| | | Additional Claims (if any) Not Identified in Sections VIII.A - VIII.F | EXH H, I, etc. |
| IX. | | Unclaimed or Undeliverable Plan Distributions | 101 |
| X. | | Effect of Confirmation | 102 |
| XI. | LIST OF EXHIBITS AND DECLARATIONS | | 102 |
| | | **Mandatory Exhibits** | |
| | | Declaration in Support of Disclosure Statement and Plan | EXH A |
| | | List of all Claims | EXH B |
| | | List of all Property and Valuation of Property as of Confirmation Date | EXH C |
| | | Projected Income, Expenses and Payments by Month/Quarter | EXH D |
| | | Financial Records | EXH E |
| | | **Optional Exhibits** | |
| | | Additional Declarations | EXH F |

| | Additional Exhibits | **EXH G** |
|---|---|---|
| | Listing and analysis of non-Debtor interests which will be pledged as additional collateral to AES on account of their Performance Deed of Trust obligation that is due and payable on or before 30 months after the Effective Date of the Plan. | **EXH H** |

I.

## GENERAL DISCLAIMER

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY.  IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  IT ALSO IDENTIFIES THE TREATMENT THAT CLAIMANTS (CREDITORS) AND ANY INTEREST HOLDERS (SHAREHOLDERS OR PARTNERS) CAN EXPECT TO RECEIVE UNDER THE PLAN, IF THE PLAN IS CONFIRMED BY THE COURT.  IT ALSO EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN.

THE SOURCES OF FINANCIAL DATA RELIED UPON TO FORMULATE THIS DOCUMENT ARE SET FORTH IN EXHIBIT A AND THE DECLARATIONS OF LEONID PUSTILNIKOV, ELY DROMY, AND JACK ALEXANDER AFFIXED TO THIS DISCLOSURE STATEMENT AND PLAN.  ALL REPRESENTATIONS ARE TRUE TO THE PROPONENT'S BEST KNOWLEDGE.

NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE INCONSISTENT WITH ANYTHING CONTAINED IN THIS DISCLOSURE STATEMENT AND PLAN ARE AUTHORIZED EXCEPT TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

AFTER CAREFULLY REVIEWING THIS DISCLOSURE STATEMENT AND PLAN AND THE ATTACHED EXHIBITS AND DECLARATIONS, PLEASE REFER TO THE SEPARATELY FILED NOTICE OF DATES RELATED TO A HEARING ON PROPONENT'S MOTION TO APPROVE THE ADEQUACY OF THE DISCLOSURE STATEMENT, OR A HEARING ON PROPONENT'S MOTION TO CONFIRM THE PLAN.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    EACH NOTICE WILL IDENTIFY DATES AND DEADLINES TO FILE A RESPONSE,

2    OPPOSITION, OR OTHER OBJECTION, OR TO SUBMIT A BALLOT IF YOU ARE

3    ENTITLED TO VOTE ON THE PLAN.

4    IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH

5    HOLDER OF A CLAIM OR INTEREST MUST RELY ON ITS OWN EXAMINATION OF

6    THE DEBTOR, AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND

7    RISKS INVOLVED, AS DESCRIBED IN THE DISCLOSURE STATEMENT.  IN

8    ADDITION, CONFIRMATION, AND CONSUMMATION OF THE PLAN MAY BE

9    SUBJECT TO CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT

10   EACH OF THESE CONDITIONS WILL BE SATISFIED OR WAIVED, AS PROVIDED IN

11   THE PLAN, OR THAT THE PLAN WILL BE CONSUMMATED. EVEN AFTER THE

12   EFFECTIVE DATE, DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO

13   SUBSTANTIAL DELAYS FOR HOLDERS OF CLAIMS THAT ARE DISPUTED.

14   SOME MATTERS DISCUSSED HEREIN OR IN ACCOMPANYING

15   EXHIBITS, SUCH AS PROJECTIONS OR FORECASTS, ARE "FORWARD LOOKING

16   STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION

17   REFORM ACT OF 1995. SUCH FORWARD LOOKING STATEMENTS ARE SUBJECT

18   TO RISKS, UNCERTAINTIES, AND OTHER FACTORS THAT COULD CAUSE ACTUAL

19   RESULTS TO DIFFER MATERIALLY FROM FUTURE RESULTS EXPRESSED OR

20   IMPLIED BY SUCH FORWARD LOOKING STATEMENTS.  FURTHERMORE, THE

21   FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF

22   AN AUDIT.  ANY PROJECTED PERCENTAGE OF DISTRIBUTIONS REPRESENTS

23   THE DEBTOR'S GOOD FAITH ESTIMATE OF WHAT CREDITORS WILL RECEIVE

24   PURSUANT TO THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE

25   NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS

26   CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; OR (B) THE

27   DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

28

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    NO PARTY IS AUTHORIZED BY THE DEBTOR TO GIVE ANY

2    INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN

3    OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

4        NO REPRESENTATIONS OR INFORMATION CONCERNING THE

5    DEBTOR, ITS PRESENT OR FUTURE BUSINESS OPERATIONS, OR THE VALUE OF

6    ITS ASSETS HAVE BEEN AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET

7    FORTH HEREIN.  ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN

8    YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE DIFFERENT FROM

9    OR INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS

10   CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY

11   HOLDERS OF CLAIMS OR INTERESTS VOTING ON THE PLAN.

12       THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN

13   ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN

14   ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER

15   APPLICABLE NON-BANKRUPTCY LAW.  ENTITIES HOLDING OR TRADING IN OR

16   OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST,

17   INTERESTS IN, OR SECURITIES OF, THE DEBTOR SHOULD EVALUATE THE

18   DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS

19   PREPARED.

20       THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR

21   DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC")

22   OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC,

23   GOVERNMENTAL OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR

24   ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF

25   THE STATEMENTS CONTAINED HEREIN.

26       WITH RESPECT TO CONTESTED MATTERS, ADVERSARY

27   PROCEEDINGS, AND OTHER PENDING OR THREATENED ACTIONS (WHETHER

28   PENDING OR NOT), THE DISCLOSURE STATEMENT AND THE INFORMATION

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  CONTAINED HEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR

2  STIPULATION BY ANY ENTITY, BUT RATHER STATEMENTS MADE IN

3  SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES

4  OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT.

5  THE CONTENTS OF THE DISCLOSURE STATEMENT SHOULD NOT BE

6  CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  EACH CREDITOR AND

7  INTEREST HOLDER SHOULD CONSULT ITS OWN LEGAL COUNSEL AND

8  ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING ITS

9  CLAIM OR INTEREST.

10  UNDER THE BANKRUPTCY CODE, A VOTE FOR ACCEPTANCE OR

11  REJECTION OF A PLAN MAY NOT BE SOLICITED UNLESS THE CLAIMANT HAS

12  RECEIVED A COPY OF A DISCLOSURE STATEMENT THAT IS ULTIMATELY

13  APPROVED BY THE BANKRUPTCY COURT.  WITH THIS DISCLOSURE

14  STATEMENT, THE DEBTOR IS SOLICITING ACCEPTANCES OF THE PLAN BY

15  CREDITORS WHO ARE IMPAIRED BY, AND ENTITLED TO VOTE UNDER, THE

16  PLAN.  THIS SOLICITATION OF VOTES TO ACCEPT THE PLAN IS GOVERNED BY

17  THE PROVISIONS OF SECTION 1125(f) OF THE BANKRUPTCY CODE.  VIOLATIONS

18  OF SECTION 1125(f) OF THE BANKRUPTCY CODE MAY RESULT IN SANCTIONS BY

19  THE BANKRUPTCY COURT, INCLUDING DISALLOWANCE OF ANY IMPROPERLY-

20  SOLICITED VOTE.

21  **NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING**

22  **THE DEBTOR OR CONCERNING THE PLAN ARE AUTHORIZED BY THE DEBTOR**

23  **OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  YOU SHOULD**

24  **NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY**

25  **PERSON TO SECURE YOUR VOTE OTHER THAN THOSE IN THIS DISCLOSURE**

26  **STATEMENT IN DETERMINING WHETHER TO VOTE FOR OR AGAINST THE PLAN.**

27  **ANY ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE**

28

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  **REPORTED TO COUNSEL FOR THE DEBTOR WHO RESERVES THE RIGHT TO**

2  **DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT.**

3      **THIS IS A SOLICITATION SOLELY BY THE DEBTOR AND IS NOT A**

4  **SOLICITATION BY ANY ATTORNEY, FINANCIAL ADVISOR, ACCOUNTANT, OR**

5  **OTHER PROFESSIONAL OF THE DEBTOR.  THE REPRESENTATIONS, IF ANY,**

6  **MADE IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE DEBTOR AND NOT**

7  **OF ANY ATTORNEY, FINANCIAL ADVISOR, ACCOUNTANT, OR OTHER**

8  **PROFESSIONAL OF THE DEBTOR, EXCEPT AS MAY BE OTHERWISE**

9  **SPECIFICALLY AND EXPRESSLY INDICATED.**

10      THE DISCLOSURE STATEMENT SETS FORTH INFORMATION FROM

11  AND ABOUT THE DEBTOR WITHOUT PROFESSIONAL COMMENT, OPINION, OR

12  VERIFICATION AND DOES NOT SUGGEST COMPREHENSIVE OR EXHAUSTIVE

13  TREATMENT HAS BEEN GIVEN TO MATTERS IDENTIFIED HEREIN.  AGAIN, EACH

14  HOLDER OF A CLAIM OR INTEREST, AND ANY OTHER PARTY IN INTEREST, IS

15  URGED TO CONSULT WITH INDEPENDENT PROFESSIONALS AND INVESTIGATE

16  ANY SUCH MATTERS PRIOR TO RELIANCE.[1]

17                              **II.**

18      **TYPE OF PLAN OF REORGANIZATION; IMPORTANT DATES**

19      Payments and treatments under the Plan have a starting date (the

20  "Effective Date"), a period of time after the Effective Date to continue payments (the "Plan

21  Term"), and a final payment date (the "Final Payment").

22

23

| Plan Type | Effective Date | Plan Term | Final Payment Date |
|---|---|---|---|
| ☐ Liquidating: *See Section V.A.2 below for anticipated sale(s)* | ☒ 14 days after order confirming Plan | ☒ The Plan Term varies based on the type | The Final Payment Date varies based on the type of |

24

25

26  _____
[1] To assist the Court and parties in interest, the Debtor has opted to incorporate the contents of the Disclosure Statement and Plan found on the Court's website into this pleading rather than using the form itself.  Given the amount of information, the Debtor believes this to be more conducive for the Court and parties in interest.

27

28

| ☒ Operating: *See Section III below* | ☐ Other date: | of Claim or Interest and the manner in which each Claim or Interest is classified under the Plan.  See Section VIII herein; or<br><br>☐<br>months | Claim or Interest and the manner in which each Claim or Interest is classified under the Plan.  See Section VIII herein. |
|---|---|---|---|

III.

**DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS**

**PRECIPITATING BANKRUPTCY FILING**

A.      **Past and Future Business Operations**

The Debtor is organized as a limited liability company under the internal laws of the State of Delaware.  Since its inception, the Debtor has conducted one-hundred percent (100%) of its business activity in Redondo Beach, Santa Monica, West Hollywood, and Beverly Hills, California.  Before this chapter 11 case was commenced on February 21, 2023 (the "Petition Date"), the Debtor was in the business of investing in real estate.  Among other things, the Debtor is the holder of a 21.45% ownership interest in certain real property located at 1100 N. Harbor Drive, Redondo Beach, California 90277 (the "Harbor Drive Property" "Redondo Beach Property" or "Property").

The following are the partial owners of the Harbor Drive Property:

| Owner | Percentage Interest |
|---|---|
| 9300 Wilshire, LLC | 21.45% |
| 1112 Investment Company, LLC | 18.45% |
| E.D. Flores, LLC | 19.85% |
| 9300 Wilshire Fee, LLC | 10.00% |
| David Dromy | 3.75% |
| 1650 Veteran, LLC | 10.02% |
| Outdoor Billboard, LLC | 1.58% |

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

-9-

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

| | |
|---|---|
| BH Karka, LLC | 2.60% |
| 5th Street Investment Company, LLC | 4.45% |
| 505 Investment Company, LLC | 1.45% |
| SLH Fund, LLC | 3.45% |
| <u>Peak Alcott, LLC</u> | <u>3.00%</u> |
| Total | 100.00% |

The Debtor also has interests in the following real properties:

- 9740-9744 Wilshire Boulevard, Beverly Hills, California 90212

- 125 S. Linden Drive, Beverly Hills, California 90212

- 129 S. Linden Drive, Beverly Hills, California 90212

- 174 Kinney Street, Santa Monica, California 90405

- 169-177 Pier Avenue, Santa Monica, California 90405

- 1241-1251 3rd Street, Santa Monica, California 90401

- 346 N. Maple Drive, Beverly Hills, California 90211

- 1127-1137 Horn Avenue, West Hollywood, California 90069

- 201 S. Arnaz Drive, Beverly Hills, California 90211

- 232 S. Tower Drive, Beverly Hills, California 90211

The Debtor's interests in the foregoing properties have substantial value and will be crucial to the Debtor's reorganization efforts.  See <u>Exhibit C</u> for a detailed description of the Debtor's property or properties including, as relevant and applicable, locations, size of lot(s), stage of development, etc.

The principals of the two entities who hold interests in the Debtor are primarily Ely Dromy and Leonid Pustilnikov.

The Debtor will continue with its business operations and regular course of conduct after confirmation of the Plan.

The Debtor is not a small business debtor within the meaning of 11 U.S.C. § 101(51)(d).

**B.    <u>Factors That Led to Filing the Bankruptcy Case</u>**

1    There are a number of factors which precipitated the Debtor's chapter 11

2    filing, most notably, the threatened foreclosure of the Harbor Drive Property by AES-

3    Redondo Beach, L.L.C. ("AES Redondo").

4    In sum, on October 5, 2018, New Commune DT LA, LLC ("New Commune")

5    entered into a purchase agreement (the "Purchase Agreement") to acquire the Harbor

6    Drive Property, consisting of 49.9 acres of property on the coastline of Redondo Beach,

7    California, from AES Redondo.  Since 1998, AES Redondo, through one of its affiliates,

8    has operated an electric power generating facility (the "Power Generating Facility" or

9    "Facility") on the Harbor Drive Property.  Following a series of assignments of the

10    Purchase Agreement, the Debtor and its affiliates stepped in as the owners of the Harbor

11    Drive Property.

12    The intent of the initial purchaser was to redevelop the Harbor Drive

13    Property, which also remains the intent of the Debtor.  To that end, the parties anticipated

14    that AES Redondo would shut down the Facility either on or before the original closing

15    date, or at some time thereafter.  If the Power Generating Facility was shut down before

16    the closing of the sale, then title to the Harbor Drive Property would have passed to the

17    Debtor and its affiliates at closing.  However, if operations of the Power Generating

18    Facility continued after the closing of the sale transaction, then pursuant to a ground

19    lease (the "Ground Lease") between the Debtor, its affiliates, and AES Redondo, AES

20    Redondo would continue operations and pay "rent" to the Debtor and its affiliates in the

21    amount of $1.00 per year.

22    AES Redondo did exercise its option to enter into the Ground Lease, which

23    became effective as of October 5, 2019, and amended on March 27, 2020.  The outside

24    date for AES Redondo to at least begin shutdown procedures for the Facility was

25    December 31, 2020 (the "Facility Shutdown Date"), a date tied to a policy of the California

26    State Water Resources Control Board (the "Water Board") referred to as the Once

27    Through Cooling Policy (the "OTC Policy").

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1  In March 2020, the parties entered into a Third Amendment to the Purchase

2  Agreement (the "Third Amendment").  The Third Amendment was driven by AES

3  Redondo's desire to continue operating the Facility beyond the Facility Shutdown Date.

4  To do that, the parties needed to obtain an extension of the OTC Policy by the Water

5  Board.  In exchange for allowing AES Redondo to continue operating the Facility, AES

6  Redondo agreed to grant the Debtor and its affiliates a multi-million dollar funding

7  commitment (the "Funding Commitment") for the orderly retirement of the Facility and

8  remediation of environmental issues at the Harbor Drive Property.

9  The Debtor and its affiliates reluctantly agreed to restricting a portion of the

10  Harbor Drive Property to open space and providing the City of Redondo Beach an option

11  to purchase a portion of the Harbor Drive property (the "Land Use Covenant") as AES

12  Redondo argued no extension was possible absent support from the City. However, the

13  Debtor's agreement to enter into the Third Amendment was expressly conditioned upon,

14  at a minimum, (i) the agreement of AES Redondo to fund the environmental escrow

15  reserve account with certain sums depending upon the duration of the extension granted,

16  and (ii) the agreement of AES Redondo to pay the Debtor on the balance due on AES

17  Redondo's indebtedness at an interest rate that started at two percent (2%) per annum,

18  which would then be  decreased to one percent(1%) per annum (the "Interest Rate

19  Provisions").[2]

20  AES Redondo obtained the extension it desired, continued to operate the

21  Facility for an additional three years through December 31, 2023, continued to negotiate

22  modifications to the Land Use Covenant pursuant to the extension it obtained, but has

23

---

24  [2] The entire idea of interest being owed to AES Redondo is in dispute because, as the Debtor has alleged
in the pending litigation before this Court, AES Redondo was obligated to get approval for the assignment
of the PEMSA (Purchase Easement Modification and Sale Agreement) between Southern California Edison

25  and AES Redondo before the closing of the sale to the Debtor in 2020.  AES failed to obtain that approval.
To date, AES Redondo has also continued to fail to obtain the requisite assignment of the California

26  Coastal Commission claim that is presently in litigation in the Los Angeles Superior Court, and the
Corrective Action Consent Agreement between AES Redondo and the Department of Toxic Substances

27  Control has yet to be assigned to the Debtor.  Express approval of these assignments by the non-AES
Redondo parties to them was  required, something about which AES Redondo was well aware.

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1  taken the position that the consideration provided to the Debtor and its  affiliates for these

2  significant benefits did not take place under the Third Amendment.  AES Redondo takes

3  the position that the funding of the environmental escrow (which will take place under the

4  Plan) by AES Redondo and the reduction of the interest rate on the remaining balance as

5  set forth in the Interest Rate Provisions did not take place because the "extension" to

6  operate the Power Generating Facility did not take place as provided in the Third

7  Amendment. This matter is the subject of pending litigation before this Court.[3]

8          As a result of the significant disputes between the parties regarding the

9  Debtor's secured obligations to AES Redondo principally arising out of the Third

10  Amendment, and AES Redondo's threatened foreclosure sale, the Debtor was forced to

11  commence this chapter 11 case to preserve its interests in the Harbor Drive Property.  As

12  just mentioned, after the Petition Date, the Debtor commenced an adversary proceeding

13  in this Court against AES Redondo to address and resolve the numerous differences

14  between the parties including the breaches by AES of the Purchase and Sale Agreement

15  with the Debtor.

16          A second factor precipitating the chapter 11 filing was the pendency of state

17  court litigation between the Debtor, the City of Redondo Beach, and other parties, under

18  a takings' action or inverse condemnation of the Harbor Drive Property.  This litigation

19  was pending before the chapter 11 case was filed and remains ongoing, although it was

20  temporarily stayed pending the outcome of an appeal filed by the City that was ruled on

21  in the Debtor's favor pursuant to an order entered on June 6, 2024.[4]  A third factor that

22  led to this chapter 11 filing is state court litigation between the Debtor, AES Redondo, the

23  City of Redondo Beach, and the California Coastal Commission regarding development

24  rights  respecting the Harbor Drive Property.

25  _____

26  [3] As detailed later in the Disclosure Statement, the action is styled against 9300 Wilshire, LLC, etc. v. AES-Redondo Beach, L.L.C., et al., bearing Adv. No. 2:23-ap-01163-VZ.

27  [4] As detailed later in the Disclosure Statement, the action is styled City of Redondo Beach and City of Hermosa Beach v. California State Water Resources Control Board, et al., bearing Case No.

28  20STCP903193, pending in the Superior Court of the State of California, County of Los Angeles.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1    There are significant disagreements between the Debtor and its affiliates,

2    on the one hand, and the City of Redondo Beach and the California Coastal Commission,

3    on the other hand, regarding what constitutes permitted development of the Harbor Drive

4    Property.  As the Debtor and its affiliates have repeatedly represented to this Court, the

5    Debtor's performance of its obligations, including its payment obligations, under this Plan

6    is not dependent upon the outcome of any disputes or any development plans that the

7    Debtor has for the Harbor Drive Property.

8

9

10    **History of the Harbor Drive Property**

11    The Harbor Drive Property is a flat parcel of land that is comprised of four

12    APNs (7503-013-014, 015, 819, 820) containing 2,134,279 SF (49.90 acres), and houses

13    the AES Redondo Beach power plant (the "Power Plant").  The Power Plant site dates

14    back to 1897, when G.J. Lindsay constructed an 1100-volt generator on the site.  In the

15    early 1900's, San Gabriel Electric Company ("San Gabriel Electric") purchased the land

16    and replaced G.J. Lindsay's generator with an electric substation.  When San Gabriel

17    Electric became Pacific Light and Power Corporation ("Pacific Light") a few years later,

18    Pacific Light built a new concrete and metal steam plant on the site, taking advantage of

19    its close proximity to the ocean for cooling.

20    With the rapid population increase attributable to the growth of the railroad at

21    the time, the demand for electricity increased dramatically in Southern California.  The

22    generators were later supplemented to meet this sharp increase in demand.  When Henry

23    Huntington (the founder and owner of Pacific Light) completed his state-of-the-art

24    hydroelectric plant in "Big Creek" (near Fresno, California), electric lines were constructed

25    to efficiently transmit the electric power to Southern California, resulting in Pacific Light's

26    Redondo Beach Power Plant being relegated to backup status.

27    In or around 1917, Southern California Edison ("SCE") acquired Pacific

28    Light, including the Redondo Beach steam-generated power plant.  SCE continued to use

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1  the Redondo Beach facility until the mid-1930's, when SCE permanently shut down the

2  steam-generated plant.

3          With another rapid increase in population growth in the 1940's, SCE

4  decided to replace the then abandoned generators with a new, state-of-the-art facility to

5  handle the rapid increase in population growth in Southern California.  SCE constructed

6  four new power units which went online in 1948 and 1949.  Two additional power units

7  went online in 1956, and an additional two power units went online in 1968.  This new

8  facility included the creation of the man-made harbor the community cherishes which was

9  necessary to protect plant cooling infrastructure of the plant.  This new Power Plant also

10 continued to operate for several decades and was operating up until its recent

11 decommissioning in 2023.  Over this period of time, certain of the power units located at

12 the Power Generating Facility were shut down and operations and the generation of

13 power were reduced based upon this fact.

14          **The Historic Land Use Designations of the Power Plant Site**

15          The Power Plant site is located in the Coastal Zone and falls within the

16 jurisdiction of the California Coastal Commission (the "Commission" or "Coastal

17 Commission").  The California Coastal Act (the "Coastal Act") requires each local

18 government with land located within the Coastal Zone to prepare a local coastal program

19 (a "LCP") for management of land uses.  Once certified by the Commission, the authority

20 to issue Coastal Development Permits (required for any new development within the

21 Coastal Zone) lies with the local jurisdiction.  In Redondo Beach, coastal development

22 permits are issued directly by the City.

23          The City adopted, and the Commission certified, the original LCP for

24 Redondo Beach in 1981.  Prior to that point in time, the Power Plant site was designated

25 "Industrial/Commercial," allowing for a multitude of industrial and commercial uses.  The

26 1981 LCP, however, called for "Planned Industrial" uses for the Power Plant site, also

27 allowing for various industrial, commercial, and mixed-use developments.  The 1981 LCP

28 acknowledged the problems with large industrial uses within the Coastal Zone and

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    advocated for "more commercial uses" within the Coastal Zone in keeping with the

2    Commission's policies.  Under the original 1981 LCP, therefore, the Power Plant site

3    could have been redeveloped with alternative, economically viable uses that were

4    welcomed by the Commission and fully consistent with the City's land-use designations

5    and the Commission's policies.

6          Because the Power Plant site was subject to the exclusive jurisdiction of the

7    California Energy Commission ("CEC"), the LCP, General Plan, and Zoning Ordinance

8    designations were only relevant to the future redevelopment of the site and conversion of

9    the Power Plant operations to non-energy-generating uses that would be excluded from

10   the CEC's exclusive jurisdiction.

11   **The City's Efforts to Close the Power Plant Site and Eliminate any Economically**

12   **Viable Reuse of the Harbor Drive Property**

13         The existence of the Power Plant has long been a source of acrimony with

14   the more vocal residents of the community and community activists, notwithstanding the

15   fact that it is needed to provide power to the region and predates their arrival to the

16   community by decades.[5]  In the mid-to-late 1990's, SCE decided to sell some of its power

17   generating stations, including the Power Plant site.  On December 16, 1997, the

18   California Public Utilities Commission approved SCE's proposed sale of the site to AES

19   Corp. ("AES").  The Debtor believes that AES acquired SCE's Redondo Beach Power

20   Plant site and adjoining properties, along with SCE's Huntington Beach and Los Alamitos

21   power plants, for over $780,000,000.

22         Around the same time, community residents and activists began advocating

23   for the downsizing and/or elimination of the Power Plant.  Because the Power Plant was

24   subject to the exclusive jurisdiction of the CEC (including jurisdiction over all land-use

25

26   [5] The purpose of this portion of the Disclosure Statement is for the Debtor to provide its best understanding of the history surrounding the Power Generating Facility and the local community.  The Debtor understands that the City, AES Redondo, and the Commission may have different views of this history.  Hence, the Debtor will consider including an alternate "version" of this history in its approved Disclosure Statement if requested by the City, AES Redondo, or the Commission, and authorized by this Court.

27

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  decisions), the City needed to obtain AES's cooperation to downsize or remove the

2  Power Plant voluntarily.  Around the time SCE conveyed the Power Plant to AES, the

3  City began to assert an interpretation of its utility users tax ("UUT") that would allow the

4  City, for the first time, to tax the utilities used by AES for generating electricity.

5         AES disputed the validity of the City's asserted interpretation and further

6  disputed the legality of the tax as applied to AES's Facility.  In turn, and presumably to

7  maximize its leverage against AES, the City placed an initiative on the ballot for the

8  electorate to decide whether or not to tax the AES Facility (and only the AES Facility).

9         Rather than continue to fight the City on the UUT, AES entered into

10  negotiations with the City to voluntarily downsize and modernize the generating units on

11  the site, with the City agreeing to cooperate with AES on plans for an economically viable

12  redevelopment of the portions of the site that would no longer be needed for the downsized

13  and modernized generating units.  On December 8, 1998, AES and the City entered into a

14  Memorandum of Understanding (the "MOU"), which (i) required the City to withdraw the

15  initiative it placed on the ballot concerning the UUT, and (ii) required the City and AES to

16  cooperate in the development of a master plan for the site.[6]

17         The master plan for the site called for the removal of the existing generating

18  units (except units 7 and 8), with the balance of the site to be used for a new, modernized

19  generating unit with a 1,000 mega-watt capacity and new commercial development.  At

20  that time, the City registered its strong desire that the footprint of the Power Plant be

21  downsized and that the portions of this waterfront site that would no longer be used for

22  electric generation be redeveloped for commercial uses.  Section 3(a) of the MOU thus

23  stated:

24         AES Redondo and the City agree to cooperate in the

25         initiation, processing and development of the [Master] Plan

26  _____

27  [6] As described in this Disclosure Statement, there is pending litigation in non-bankruptcy forums over these issues and facts.  Nothing contained herein is meant to prejudice the rights or state the rights of any party,

28  including the Debtor and its affiliates, with respect to the facts in these various litigation matters.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    for the Property in its entirety.  The [Master] Plan will allocate

2    a portion of the Property to be used for the development of

3    an additional electric power generating facility of

4    approximately 1000 MW; the remainder of the Property

5    (excluding the Property associated with Units 7 and 8), shall

6    be allocated to commercial and other uses in conformance

7    with the land use and zoning laws of the State and City and

8    other applicable laws.

9    As mandated by the MOU, AES and the City worked cooperatively to

10    develop a plan to downsize the Power Plant and to redevelop the balance of the site.

11    The end result of this effort was the preparation of a new specific plan for the vicinity

12    known as the "Heart of the City Specific Plan" (the "HOTCSP"), which the City Council

13    approved in March 2002.  The HOTCSP contemplated a much needed revitalization of

14    the area and uses that would serve to rebuild the City's "downtown" area.  The HOTCSP

15    called for economically viable alternative uses of the Power Plant site upon the

16    downsizing (or closure) of the Power Plant.

17    The HOTCSP proposed the development of 2,998 residential units and

18    657,000 square feet of commercial space on the many acres of land that were included in

19    the plan.  The acres currently devoted to parking lots serving the Power Plant would be

20    converted to pedestrian-friendly shopping districts.  The HOTCSP also addressed the

21    dire need for affordable housing in the community.  Most importantly to many residents,

22    the HOTCSP called for reducing the Power Plant to approximately 1/3 of its size at the

23    time.

24    Crucially, the HOTSCP received a certified Environmental Impact Report

25    (the "EIR") which contemplated and permitted land farming as a method for the

26    environmental remediation of the Harbor Drive Property.  The Debtor and its affiliates'

27    submission of their development plan was modeled after the approved HOTSCP and the

28    EIR which remains in full force and effect.  In fact, this EIR was relied on for Measure G

1    in 2009, which is what the City of Redondo Beach passed changing the land use of the

2    site from industrial to generating plant.

3         Despite the huge community benefits that would be derived from the

4    HOTCSP, and the removal of 6 of the 8 generating units comprising the Power Plant,

5    some community activists were unhappy with the proposed redevelopment and submitted

6    a referendum petition on the HOTCSP and related zoning and land use amendments.  As

7    a result of the petition, in June 2002, the City Council repealed the HOTCSP in its

8    entirety.

9         In 2002, the City requested to segment its Coastal Land Use Plan (LUP)

10   due to being unable to resolve the use of the Power Plant site which proved to be locally

11   controversial.  As a result, the City adopted an LUP for Area 1 (which included a majority

12   of the city) but not Area 2 (which included the Pier, Harbor, and Power Plant) although

13   the HOTCSP Environmental Impact Report (EIR) remained certified and was relied upon

14   for Measure G (discussed below) in 2010 that finally resulted in an LUP for Area 2.

15        The City thereafter undertook further efforts to plan for the downsizing of

16   the Power Plant and redevelopment of the balance of the Power Plant site.  The City

17   retained David Taussig & Associates ("DTA") to develop alternative financial plans for

18   the comprehensive redevelopment of the area that was formerly subject to the

19   HOTCSP.  The alternative plans called for either (i) the City's acquisition of

20   approximately 76.5 acres for parks and recreational purposes (at a cost to the City of

21   approximately $350,000,000 based on the independent and objective valuation

22   analyses of DTA), or (ii) the private redevelopment of the area with two hotels, 450

23   residential units (including 53 low-income senior units), and an 18.5 acre park for the

24   community.

25        Once again, the planning efforts were met with significant opposition from

26   community activists preferring to see no redevelopment of the area and, instead, the

27   conversion of the Power Plant site to a City park at little to no cost to the City.  In a

28   document authored by the then-Mayor Brand, James Light, and Don Vangeloff, entitled

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  "Heart of the City Visions Fiscal Study in Perspective," dated November 8, 2004, the

2  South Bay Parkland Conservancy (the "Parkland Conservancy") registered its strong

3  objection to the proposed redevelopment of the area and any acquisition of the land for

4  parks at the values determined by the City's independent consultant, DTA.

5       The Parkland Conservancy attacked the DTA analyses and advocated for

6  a "Heart Park" proposal that would convert the Power Plant site into a city park, at little

7  to no cost to the City.  Once again, due to intense community opposition, the DTA

8  proposal was not approved.

9       In August 2005, the City Council adopted a series of ordinances which

10  purported to amend the City's LCP, Zoning Ordinance, and the Harbor/Civic Center

11  Specific Plan.  As they related to the Power Plant site, the measures purported to

12  reestablish the land-uses and development standards that existed prior to the HOTCSP.

13  Curiously, the City Council also allowed for a new "open space/parklands" designation for

14  the Power Plant site that had not been allowed previously.  The 2005 amendments to the

15  LCP were not submitted to the Commission for certification at that time.

16       In May 2008, the City Council approved another series of ordinances and

17  companion resolutions proposing amendments to the LCP which would allow for an

18  economically viable re-use of the Power Plant site.  The proposed amendments created

19  five new "coastal commercial" zones, allowing for a net increase of 400,000 square feet

20  of development within "Area 2" of the LCP, including retail sales, restaurants, bars, night

21  clubs, offices, hotels, timeshares, and similar uses.  The 2008 amendments to the LCP

22  were only "proposed" and would not take effect until the Commission certified the

23  amendments.  The 2008 amendments to the LCP were not submitted to the Commission

24  for certification at that time.

25       Again dissatisfied by the City Council's attempts to provide for an orderly

26  and economic revitalization of the Power Plant site, community activists, including then-

27  Mayor Brand and present-appointed Mayor Light, worked to prevent the City Council from

28  approving any such plan unless it was also approved by the City's electorate.  "Building a

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Better Redondo, Inc." ("Building a Better Redondo"), a political action committee chaired and founded by Mayor Light, authored Measure "DD" with the assistance of then-Mayor Brand.

Measure "DD" proposed to add Article XXVII to the City's Charter.  Among other things, Article XXVII required any "major change" in land use in the City to be approved both by the City Council and a "majority" of voters in the City.  The term "major change" was defined as any proposed amendment to the coastal zoning ordinance that significantly increased traffic, density, or intensity of use above the baseline conditions.

Generally, all covered "major changes" would need to be approved by the City Council and then submitted to the electorate for approval, unless denial of the land use application would constitute a taking.  Measure DD was passed by the Redondo Beach voters in the November 2008 election and became effective as of December 16, 2008.  Although the City submitted the 2008 amendments to the LCP (called for in Measure DD) to the Commission for certification, the Commission denied certification, suggesting modifications to provide for further protection of environmentally sensitive habitat areas and marine resources.

In April 2010, the City Council approved the modifications suggested by the Commission, but determined not to put the changes to a vote of the electorate at that time.  The City Council justified its decision on the grounds that only certain portions of the LCP amendments constituted a "major change" within the meaning of Article XXVII (adopted by Measure DD).  The City Council deferred issuing the order for a public vote as to those provisions until a later date subject to "further resolution."

On May 20, 2010, Building a Better Redondo filed a petition for writ of mandate seeking to compel the City Council to order a public vote on the entirety of the amendments affecting Area 2.  The Superior Court granted the writ of mandate, declaring that the subject amendments (from 2005 and 2008) to the LCP were never certified by the Commission prior to the effective date of Article XXVII and, thus, had to be approved by the City's electorate in a public vote.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    In August 2010, the City Council elected to comply with the trial court's writ

2    of mandate while concurrently appealing the decision.  The City Council ordered that a

3    new measure (Measure G) be placed on the ballot for the November 2, 2010, regular

4    election.  Measure G, which was approved by the voters, broke "Area 2" into three main

5    areas, including the "harbor/pier" area, a 21-acre area along Catalina Avenue, and the

6    approximately 50-acre Power Plant site.

7    As for the Power Plant site, Measure G changed the site's designation from

8    Industrial to "Generating Plant" - a new designation that did not previously exist within the

9    City's zoning provisions and is used only for this site.  The only uses allowed under the

10   Generating Plant designation, apart from the continued operation of the Power Plant and

11   related facilities with additions or changes subject to a conditional use permit, are parks

12   and open space, provided that the site is "acquired" for such uses.  Measure G amended

13   Policy 9 of Section VI of the LCP to allow for the "modernization of the AES Redondo

14   Beach Generating Plant . . . and permit[s] the AES Redondo Beach Generating Plant site

15   to be converted to parks, open space, and recreational facilities *if the site is acquired for*

16   *such purposes in the future.*"  (Emphasis added).

17   Around the same time, the Water Board, as mentioned earlier, adopted the

18   OTC Policy, dramatically impacting the future operations of power plants located along

19   the California coast that use ocean water to cool their operations.  The OTC Policy

20   adopted by the Water Board called for the ultimate termination of power plant operations

21   that use ocean water for cooling.  As it pertained to the Power Plant site, the OTC Policy

22   necessitated either (i) a modernization of the Power Plant facilities needed to eliminate

23   ocean water cooling, or (ii) the termination of all Power Plant operations prior to

24   December 31, 2020.  As a result, the new OTC Policy provided another tool for the

25   community activists to remove all vestiges of the Power Plant in Redondo Beach.

26   The objective of merely shutting down the Power Plant was not enough for

27   the City and community activists like then-Mayor Brand and Mayor Light, however.  In

28   2013, then-Mayor Brand and Mr. Light co-authored a measure (Measure A) that would

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1   have compelled the closure of the Power Plant by 2020 and the removal of the physical

2   plant facilities by the end of 2020.  Measure A would have also required 60% of the site to

3   be converted to public recreation and open space.  Measure A was narrowly defeated with

4   6,552 votes against, and 6,295 votes in favor.

5          In direct conflict with the City's own objectives, as set forth in the LCP, the

6   City further attempted to stifle AES's efforts to comply with the OTC Policy by enacting an

7   Emergency Moratorium on Development of Electrical Generating Facilities on December

8   3, 2013, followed by the adoption of Ordinance No. 3134-15 and Resolution No. CC-1506-

9   050, prohibiting the construction of any power generating facilities of 50 megawatts or

10   more, in other words, less than 5% of the existing and approved generation capacity of the

11   Power Plant.  In addition, when AES sought relief from the CEC, the City appealed,

12   manufacturing a claim that a portion of the Power Plant site (specifically, various lined

13   "tank pads" and pits) had been converted to jurisdictional wetlands within the meaning of

14   the Coastal Act.  AES's lawsuit challenging the wetlands determination is still pending in

15   the Superior Court.

16          With the intense public outcry concerning the continued operations of the

17   Power Plant under the Water Board's new OTC Policy, AES attempted to rezone the

18   Power Plant site to allow it to be transitioned to another economically viable use in full

19   compliance with the Measure DD requirement that major land use changes be submitted

20   to both the City Council and electorate for approval.  In March 2015, AES sponsored an

21   initiative (Measure B) to satisfy the community's desire to eliminate the Power Plant and

22   provide for economically viable reuses of the Power Plant site upon its closure.

23          Measure B abandoned the possible downsizing and modernization of the

24   power plant facilities in order to comply with the new OTC Policy (a concept that was

25   rejected by the community when it passed a referendum on the HOTCSP that allowed for

26   a new, smaller and modernized plant), and, instead, called for the redevelopment of the

27   entire approximately 50-acre site, as needed to generate revenue to offset the costs of

28   closing the Power Plant and to attract investors who were needed to completely revitalize

1    the site.  Measure B nonetheless proposed a very modest reuse of the Power Plant site

2    at roughly half the density and intensity that had formerly been called for in HOTCSP.

3         Importantly, Measure B would have provided for residential development in

4    a region and state where housing was, and still is, in extremely short supply.  Specifically,

5    Measure B would have allowed a maximum of 600 residential dwelling units of various

6    types, 85,000 square feet of new commercial development, 250 hotel rooms and a full 10

7    acres of the approximately 50-acre site to be devoted to public open space.  In the March

8    2015 special election, the voters narrowly defeated Measure B, with 6,684 votes against

9    and 6,072 votes in favor.

10         As it currently stands, the Power Plant operations ceased as of December

11    31, 2023.

12         As illustrated, the City has voiced its strong opposition to the continued

13    operation of the Power Plant for decades.  When AES acquired the Power Plant site from

14    SCE in 1997, the City acted quickly to use its taxing power to gain leverage against AES

15    to voluntarily downsize the Power Plant, with the promised development of a Master Plan

16    allowing for an economically viable re-use of the site.  However, when community

17    activists sought to eliminate redevelopment of the area for anything other than a city park,

18    a scheme was hatched to remove the City Council's authority to approve any

19    redevelopment without the express approval of the Redondo Beach citizenry.

20         By adopting Measure DD, the citizens required any potential redevelopment

21    of the site to be approved by the Redondo Beach electorate.  The electorate thereafter

22    failed to approve even the very modest redevelopment proposed in AES-sponsored

23    Measure B.

24         The City attempted to interfere with AES's 2020 application to the Water

25    Board for an extension of time to operate the Power Plant.  The OTC Policy required

26    AES to either modernize the aging Power Plant to eliminate ocean water cooling, or

27    shut down the operations requiring such cooling.  When the City's electorate refused to

28    approve the proposed plans to downsize the Power Plant and reconstruct a new

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    modernized generating plant, AES was left with no other choice but to plan for the

2    ultimate closure of the Power Plant.

3           AES saw the writing on the wall in or around the 2013-2014 timeframe,

4    when, due to the extreme opposition to the continued operation of the Power Plant,

5    SCE decided not to renew its long-term contract with AES as an electrical supplier.  The

6    Water Board originally called for the closure of the existing operations (that did not

7    comply with the Water Board's OTC Policy) by December 31, 2020.  AES, however,

8    sought an extension from the Water Board to operate for an additional three years.

9    Mayor Brand, community activists, the City, and a host of other "influential" parties

10    mounted a "fierce" opposition to the extension.

11           However, on September 1, 2020, the Water Board approved an extension

12    of operations at the Power Plant through December 31, 2021, when the operations of the

13    Power Plant were required to comply with the OTC Policy.  According to the current LCP

14    and land-use designations, there would  be no alternative use of the Power Plant site

15    upon its closure as the present owners did not acquire it with the intent of converting it to

16    open space.  The City's efforts to convert the available land uses to open space and

17    parklands for the benefit of the City was (and is) designed to reduce to zero the value of

18    the site the City has long coveted for a public park.  Once closed, the Power Plant site

19    will have no economically viable use under the existing zoning, as the City repeatedly has

20    demonstrated its unwillingness to rezone the site to allow it to be redeveloped.

21    **The Debtor's Acquisition of the Harbor Drive Property from AES Redondo**

22           As referenced earlier, 9300 Wilshire LLC initially acquired the Harbor Drive

23    Property from AES Redondo.  The purpose of the acquisition was to redevelop the

24    property.  As noted, at the time of the acquisition, the property was being operated as a

25    1300-Megawatt natural gas fire generating facility by an affiliate of AES Redondo.  As a

26    result, New Commune (and later the Debtor and its affiliates) leased the property back to

27    AES Redondo under an agreement which provided, *inter alia*, for monthly rental

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1    payments in the event that operations of the power generating facility extended past

2    December 31, 2020.

3            At the end of 2020, AES Redondo shut down plant 8 at the Facility for

4    necessary air credits so that it could reopen its Los Alamitos plant in February 2021.

5    Since that closure, AES Redondo has only operated at 840 MW using plants 5-7 on the

6    property until the recent shutdown.  The Debtor and AES Redondo anticipated the

7    Facility would be retired prior to the anticipated closing date of the sale under the

8    Purchase Agreement, however, that did not take place.

9            Despite that anticipation, the parties also contemplated the possibility the

10   Facility would not be retired before closing and, as a consequence, entered into the

11   previously discussed Ground Lease, pursuant to which New Commune, as lessor, and

12   AES Redondo, as lessee, would lease back the property underlying the Facility until such

13   time as the Facility was retired.  If the Facility was not retired, the parties expected it

14   would continue to operate as a power generating facility.

15                   **First Amendment to Purchase Agreement**

16           The First Amendment to the Purchase Agreement (the "First Amendment")

17   was entered into as of April 15, 2019.  It recites that AES Redondo and the Debtor (and

18   its affiliates) were to consummate a "Final Closing" (as defined in the Purchase

19   Agreement) by March 31, 2019.  The parties subsequently elected to amend the

20   Purchase Agreement and entered into the First Amendment.  Under the First

21   Amendment, AES Redondo waived the alleged default arising from the failure to meet the

22   Final Closing date as specified in the Purchase Agreement.  AES Redondo further

23   agreed to postpone the Final Closing Outside Date to May 30, 2019, provided the Debtor

24   made a payment of $2,000,000 on or before May 3, 2019.

25           In the same First Amendment, the Debtor was given the option to postpone

26   the Final Outside Closing Date to July 19, 2019, in exchange for an additional payment of

27   $4,000,000 to be made on or before May 30, 2019.  And to postpone the Final Closing

28   Outside Date to August 30, 2019, a payment of $6,000,000 had to be made by July 19,

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1    2019.  Interest at the rate of seven percent (7%) per annum was to accrue on the sum of

2    $41,000,000 (which sum was deemed to be a portion of the Final Closing Payment) less

3    any Extension Fee(s) paid.  The purchase price for the Harbor Drive Property also was

4    increased from $50,000,000 to $55,000,000.

5        Section 2.4(c) of the Purchase Agreement was amended to replace

6    $41,000,000 with $46,000,000, which became a portion of the payment(s) due to AES

7    Redondo upon closing (the "Final Closing Payment" in the Purchase Agreement).  There

8    are references in the Purchase Agreement and the First Amendment to the Initial Closing

9    Outside Date and the Final Closing.  The Initial Closing Outside Date refers to closing the

10   sale of real properties separate from the Harbor Drive Property on which the Facility sits,

11   which other properties are identified as the "Sea Lab Parcels" and the "Sports Parking

12   Parcels".  These parcels are not property of the Debtor's estate.

13       The Final Closing refers to the purchase of the Harbor Drive Property which

14   is identified as the "Main Property" in the Purchase Agreement and in the First

15   Amendment.

16   ### Second Amendment to Purchase Agreement

17       The Second Amendment to the Purchase Agreement (the "Second

18   Amendment") is dated February 11, 2020.  The stated purpose of the Second

19   Amendment was to address the option under the First Amendment, where the Debtor

20   and its affiliates could postpone the Final Closing Outside Date to August 30, 2019, if

21   they made a payment of a Third Extension Fee in the amount of $6,000,000 on or before

22   July 19, 2019, and, if the payment was not made, the Debtor and its affiliates were

23   obligated to consummate the purchase of the property by paying the remaining amounts

24   due and owing.  As acknowledged in the Second Amendment, this extension payment

25   was not made.

26       The Debtor and its affiliates conceded that failing to pay the extension fee

27   or close the acquisition on or prior to July 19, 2019, constituted a breach of their

28   obligations under the Purchase Agreement.  However, if Debtor and its affiliates agreed

1   to consummate the closing as provided in the Second Amendment, the default would be

2   waived.  There was an acknowledgment by AES Redondo that Extension Fee Payments

3   in the aggregate amount of $11,977,705.63 had been made.  AES Redondo, therefore,

4   agreed to postpone the Final Closing Outside Date to February 28, 2020, provided the

5   Debtor and its affiliates paid through escrow the sum of $3,472,294.37 on or before

6   February 5, 2020, which payment was to be applied to the Final Closing Payment due

7   under the Purchase Agreement.

8          The term "Deferred Payment" was amended to mean $33,050,000 and the

9   term "Purchase Price" was changed from $55,000,000 to $31,950,000.  Sections 2.4(d)

10  and 2.4(e) of the Purchase Agreement were deleted in their entirety and replaced with a

11  new Section 2.4(d).  Under new Section 2.4(d), within five business days of execution of

12  the Second Amendment, the Debtor and its affiliates were required to pay AES Redondo

13  $4,050,000, $5,000,000 by no later than February 27, 2020, and $24,000,000 by no later

14  than May 29, 2020.

15         Section 5 of the First Amendment was replaced in its entirety with language

16  that provided (i) from March 31, 2019, through December 31, 2019, interest at the rate of

17  seven percent (7%) per annum shall accrue on the sum of $41,000,000, less the amount

18  of any Extension Fees paid and released to AES Redondo, and (ii) from January 1, 2020,

19  through the date upon which the Deferred Payment (as defined therein) has been paid in

20  full, interest at the rate of five and one-half percent (5.5%) per annum shall accrue upon

21  the sum of $41,000,000, less (a) the amount of any Extension Fees (as defined therein)

22  paid or released to AES Redondo , and (b) less the Final Closing Payment (as defined

23  therein) paid and released to AES Redondo, for so long as such sum remains

24  outstanding.

### Third Amendment to Purchase Agreement

26         The Third Amendment, dated as of March 26, 2020, contains important

27  provisions that are central to the dispute in the Debtor's pending adversary proceeding

28  against AES Redondo.  Under the Purchase Agreement, the parties contemplated the

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1 shut-down of the Facility on December 31, 2020.  In contrast, under the Third

2 Amendment, the parties agreed to extend the deadline for the Facility shutdown for an

3 additional three years to December 31, 2023 (a one-year extension followed by a two-

4 year extension).  The parties further agreed to establish a funding commitment by AES

5 Redondo of the orderly retirement of the Facility and to cover environmental remediation

6 of the property.

7        The projected date to secure approval of an extension to retire operations

8 at the Facility was the earlier of November 30, 2020, or the date that the Water Board

9 declared that it would not provide an approved extension.  AES Redondo was then to

10 deposit funds into escrow pursuant to the terms of an Escrow Agreement in form and

11 substance reasonably satisfactory to the parties to fund the environmental remediation

12 liabilities.

13        The funding of the escrow account established with Chicago Title Company

14 was governed by the following (i) if an extension of one year were granted through

15 December 31, 2021, AES Redondo was to deposit $1,000,000 in escrow in twelve

16 monthly installments within 30 days after the end of each calendar month, and no later

17 than 45 days after the commencement of calendar year 2021, an additional $500,000

18 (the "Transmission Line Removal Fee"); (ii) if an extension of two years were granted

19 through December 31, 2022, AES Redondo was to deposit $4,500,000 into escrow in

20 equal monthly installments within 30 days after the end of each month during such

21 calendar year and, within 45 days after the start of the calendar year, another $500,000

22 (the "2022 Open Space Planning Fee"); (iii) if an extension of three years were granted

23 through December 31, 2023, and if the Facility were subject to a resource adequacy or

24 other market-based contract (an "RA Contract") with a California load serving entity (an

25 "LSE") for all or any portion of 2023, then, starting with the first month in which AES

26 Redondo received RA Contract revenue in 2023, and continuing until post-December 31,

27 2023, AES Redondo was to deposit $6,500,000 into escrow for the calendar year

28 payable in equal installments within 30 days after the end of each month.  Accordingly, in

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1    total, if the granted extensions were for three years (which they were), AES Redondo's

2    funding commitment to the environmental escrow reserve was $12,500,000.

3    However, if AES Redondo was required to operate pursuant to a Reliability

4    Must Run, Capacity Procurement Mechanism (as defined in the California Independent

5    Operator System tariff or any successor tariff), rather than an RA Contract with an LSE,

6    the Facility was not to be deemed subject to an RA Contract or an LSE.  Regardless, in

7    no event shall there be paid less than $4,225,000 and, no later than 45 days after the

8    commencement of calendar year 2023, an additional $1,000,000 (the "Open Space

9    Planning Fee").  The designated payments identified above all pertain to the Harbor Drive

10    Property.  The payments for calendar year 2021 and 2022 by AES Redondo are past

11    due, and there are payments due and owing for calendar year 2023.  AES Redondo has

12    not made any of these payments.

13    If the Debtor and its affiliates do not make all Deferred Payments required

14    by Section 2.4(d) of the Purchase Agreement, or a Purchaser Default (as defined in the

15    Purchase Agreement) otherwise exists, then AES Redondo is not obligated to fund the

16    escrow.  However, if AES Redondo fails to deposit funds to the Post Close Escrow as

17    required, then the Debtor and its affiliates may set off the amount of such shortfall against

18    funds due to AES Redondo under the Deferred Payment provisions.

19    The Purchase Price in the Purchase Agreement was also amended from

20    $31,950,000 to $33,000,000, and the "Final Closing Outside Date" was changed to March

21    27, 2020, provided purchaser paid $6,268,813.28 on or before March 17, 2020.  As of

22    Final Closing, the Debtor and its affiliates shall have delivered $37,000,000 to AES

23    Redondo (which, in fact, the Debtor and its affiliates have done).  Section 2.4(d) of the

24    Purchase Agreement includes the following (i) an acknowledgement that on February 10,

25    2020, the Debtor and its affiliates paid AES Redondo $4,000,000, (ii) the Final Deferred

26    Payment of $28,000,000 is to be paid as follows (a) if an approved extension is granted

27    through the end of 2021, there shall be paid directly to AES Redondo (i) $10,000,000 by

28    December 10, 2020, and (ii) $18,000,000 by November 30, 2021, (b) if an approved

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  extension is granted through the end of calendar year 2022, purchaser is to pay to AES

2  Redondo (i) $7,000,000 by December 10, 2020, (ii) $9,000,000 by November 30, 2021,

3  and (iii) $12,000,000 by November 30, 2022, or (c) if an approved extension is granted

4  through end of calendar year 2023, purchaser is to pay to AES Redondo (i) $5,000,000

5  by December 10, 2020, (ii) $6,500,000 by November 30, 2021, (iii) $7,500,000 by

6  November 30, 2022, and (iv) $9,000,000 by November 30, 2023.

7          As discussed, the parties negotiated and entered into a Ground Lease to

8  govern AES Redondo's continued operation of the Facility.  The parties also entered into

9  an "Open Space Covenant and Option Offer Agreement" (the "Open Space Covenant").

10  The operation of the Purchase Agreement, including the grant of the Open Space

11  Covenant, was applicable depending upon whether operations of the Power Plant was

12  extended for a period one, two, or three years.

13          Throughout the contract discussions and agreements reached with AES,

14  AES certified that they had met all of the closing conditions of the purchase and sale

15  agreement.  In fact, they had not met many of those conditions and as a result, the

16  closing of the sale was premature because AES failed to follow their contractual

17  obligations with respect to a closing. In reliance upon the fact that AES had met these

18  conditions, Debtor has proceeded forward with the Property and has paid AES $37

19  Million dollars on an indebtedness that was represented by an unpaid purchase price

20  whose closing conditions AES failed to meet and knowingly failed to meet.

21          The City of Redondo Beach had the option to purchase up to 15 acres of

22  the Harbor Drive Property at the price of $2,000,000 per acre if a 3-year extension was

23  granted.  However, it required an option payment of $100 the City never tendered and, as

24  such, the City does not have the purchase option.  Additionally, AES Redondo disputes

25  whether an approved extension of any duration took place yet, nevertheless, the Open

26  Space Covenant in favor of the City remains an encumbrance on the Harbor Drive

27  Property and AES Redondo believes that should continue to be the case.

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1    The City repudiated the Open Space Covenant by suing the Water Board

2 over its approval to extend operations at the Power Generating Plant at the end of 2020.

3 That resulted in the Debtor's and its affiliates' countersuit for inverse condemnation which

4 is still pending in the Los Angeles Superior Court.

5    This Court will now decide the respective rights of the parties, which will

6 have an impact on the Plan.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

### Discussion of Environmental Issues

Vital to this case is the Corrective Action Consent Agreement ("CACA"), referenced earlier, which is an agreement entered into by AES Redondo with the California Department of Toxic Substances Control ("DTSC").[7] Prior to the CACA, which is dated September 8, 2016, SCE entered into a settlement in 1995 with DTSC under the Hazardous Waste Control Act (HWCA) regarding hazardous waste at the Harbor Drive Property which was memorialized in a final judgment (the "Final Judgment").[8] From the time of the Final Judgment, in 1995, until AES Redondo purchased the Harbor Drive Property on May 18, 1998, SCE did nothing to remediate the Property under the terms of the Final Judgment. Between 1998 and 2016, when the CACA was entered into, AES Redondo also did nothing to remediate the Property. From and after the date the CACA was entered into in 2016 and the Debtor's purchase of the Harbor Drive Property, AES Redondo did nothing to remediate the Property as required by the CACA.

Under the purchase agreement between AES Redondo and the Debtor and its affiliates, the Debtor executed an Environmental Deed of Trust (sometimes referred to as the "EDOT") under which the Debtor agreed to indemnify AES Redondo with regard to its liability under the CACA and to achieve "Site Closure" or "Environmental Closure." Environmental Closure means completion of defined environmental activities in accordance with applicable environmental laws such that a release, covenant not to sue, no further action letter, or other written approval by a Governmental Authority with jurisdiction over the remediation process is issued by such Governmental Authority or is established by operation of law. In the case of the Harbor Drive Property, satisfaction of the CACA is what will achieve Environmental Closure, relieve the Debtor of its obligations under the EDOT, and cause AES Redondo to reconvey the EDOT and remove it as an encumbrance on the Property.

---

[7] A true and correct copy of the CACA is attached hereto as Exhibit G.

[8] A true and correct copy of the Final Judgment is attached hereto as Exhibit G.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    The Debtor has now employed the services of EFI Global, Inc. ("EFI") and

2  AECOM who are expert in ascertaining environmental issues in need of remediation to

3  act as its consultants with respect to the remediation of the Harbor Drive Property.  EFI

4  (www.efiglobal.com) is a global consulting and engineering company who employs more

5  than 500 professionals around the world.  EFI's environmental services are very diverse

6  and include, relative to the Harbor Drive Property, remediation oversight and monitoring

7  where they supervise investigation, oversight and review of the activities slated towards

8  the mitigation of the environmental issues attendant to any particular real property or its

9  improvements.  EFI determines appropriate clean-up options, measures, and strategies

10  to mitigate an environmental issue in an appropriate and cost-efficient manner.  The

11  kinds of environmental situations which EFI is called upon to address include soil and

12  groundwater contamination, hazardous waste and non-hazardous waste and, as

13  applicable, hydrocarbons from underground storage tanks/above-ground storage tanks.

14    EFI's services also include site assessments and remediation and provide

15  such work for financial institutions, real estate developers, property management firms,

16  attorneys, and the manufacturing industry.  Their assessment investigative services

17  include Resource Conservation & Recovery Act (RCRA) closures, Brownfield sites, soil

18  and groundwater investigations and monitoring, risk assessments and risk based clean

19  up, remediation engineering design and construction, operation and management, and

20  asbestos and lead-based paint management.  EFI also has experience from engineering

21  design to implementation of remedial action plans for a variety of pollutants that can

22  impact property.

23    AECOM (www.aecom.com) is the second consulting/engineering firm

24  employed by the Debtor to work on the environmental remediation issues at the Harbor

25  Drive Property.  AECOM is the largest environmental consulting and remediation services

26  firm in the world and is a publicly-traded company with over 87,000 employees.[9]

27

28

---

[9] It was reported on June 11, 2024 that AECOM was hired to serve as the technical advisor for the restoration of Ukraine's hydropower infrastructure.

1   AECOM's environmental services including remediation, restoration, and redevelopment

2   of environmentally impacted sites, water, waste and natural resources management,

3   along with other environmental services.  There is no overlap of services in that AECOM

4   and EFI have separate and important functions to perform in leading to the complete

5   ascertainment and remediation and Site or Environmental Closure of the Harbor Drive

6   Property.

7           As part of the confirmation process, the Debtor will introduce any

8   documentary or oral evidence demonstrating both the extent and anticipated cost of the

9   environmental remediation of the Property consistent with the requirements of the CACA.

10  To reiterate, for over four years prior to selling the Harbor Drive Property to the Debtor,

11  AES Redondo failed to take a single step to address or comply with the requirements of

12  the CACA.  The Debtor stresses this point because it anticipates that AES Redondo will

13  attempt to introduce grossly inflated estimates of the cost of the environmental clean-up

14  of the Harbor Drive Property based upon estimates that it provided to the Debtor.  If

15  necessary, the Debtor is prepared to preview those estimates and supply the work cost

16  estimates for the complete remediation of the Property which is what AES Redondo says

17  is necessary (even though its fully aware that is not the case).

18          As highlighted, the Debtor is undertaking the necessary work that needs to

19  be completed since this work could not be done prior to the Power Generating Facility's

20  closing on December 31, 2023.  This work was delayed since AES Redondo would not

21  permit the Debtor's consultants to have access to the Property in order to perform the

22  necessary work in spite of agreeing to such during the discussions of the Third

23  Amendment as a way to complete certain elements for the CACA without delay after site

24  closure.  Since December 31, 2023, AES Redondo has been engaged in the shut down

25  process of the Facility and has only permitted access to the Property in the days

26  preceding this Disclosure Statement.

27          That being said, the Debtor recognizes the cooperation being provided by

28  AES Redondo prior to the anticipated turnover of the Property to the Debtor on or about

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    October 23, 2024, at which time Debtor's consultants will not have to seek permission

2    from AES Redondo in order to do perform their complete site assessment work.

3    However, based upon the CACA and the work done to date, some preliminary estimates

4    of the cost of the Property's remediation consistent with the CACA has been formulated.

5    It is set forth below and is subject to further work and  further fine-tuning as property

6    inspections become more frequent in satisfaction of the extent of work that EFI and

7    AECOM need to accomplish in order to complete their designated responsibilities.

8       C.    **Future Financial Outlook**

9         The Debtor believes its economic health has, or will, improve from its pre-

10   bankruptcy state for the following reasons:

11        The Debtor continues forward with the development of its properties which

12   are located at  (i) 346 N. Maple Drive, Beverly Hills, California 90211; (ii) 125-129 S.

13   Linden Drive Beverly Hills, California 90212;  (iii) 232 S. Tower Drive, Beverly Hills,

14   California 90211; and (iv) the Harbor Drive Property.

15        The aggregate value given by the Debtor to the real properties in which it

16   holds various interests in its schedules and statement of financial affairs is no less than

17   $176,025,000.  See "Summary of Amended Schedules, Master Mailing List, and/or

18   Statements [LBR 1007-1(c)]" filed on April 28, 2023 [Docket No. 48].  As detailed in

19   Exhibit C affixed hereto, the aggregate value of the Debtor's interest in entities holding

20   interests in various real properties is no less than $29,761,156.  Affixed to Exhibit C is a

21   chart listing all ownership interests and the Debtor's equity calculations in the foregoing

22   properties.  The chart, which was attached to the "Summary of Amended Schedules,

23   Master Mailing List, and/or Statements [LBR 1007-1(c)]" filed on April 28, 2023 [Docket

24   No. 48], also includes all ownership interests and the Debtor's interests/equity in

25   properties held by the Debtor's single-member LLCs (1247 3rd Street, LLC and

26   Beachside Suites, LLC).  A further description of the properties other than the Harbor

27   Drive Property is as follows:

28        •    9740-9744 Wilshire Boulevard, Beverly Hills, California 90212

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

- 125 S. Linden Drive, Beverly Hills, California 90212

- 129 S. Linden Drive, Beverly Hills, California 90212

- 174 Kinney Street, Santa Monica, California 90405

- 169-177 Pier Avenue, Santa Monica, California 90405

- 1241-1251 3rd Street, Santa Monica, California 90401

- 346 N. Maple Drive, Beverly Hills, California 90211

- 1127-1137 Horn Avenue, West Hollywood, California 90069

- 201 S. Arnaz Drive, Beverly Hills, California 90211

- 232 S. Tower Drive, Beverly Hills, California 90211

Further, the Debtor and its affiliated co-owners will continue the development of the Harbor Drive Property.  In that regard, the Debtor and its affiliates have submitted to the City of Redondo Beach a significant redevelopment plan for the Power Plant site.  The waterfront site development submitted by the Debor for the Harbor Drive Property is a mixed-use village-style project with 2,700 housing units.  The development would add approximately 500 low-cost housing units thereby meeting the legislation of the California legislature regarding the construction and development of low cost housing in order to house California residents throughout the state who suffer from a critical shortage of available and quality housing.  Again, the Debtor emphasizes that this described development is one which AES Redondo, the City of Redondo Beach, and/or the Commission state may not occur.  A description of their contrary view is stated here. The ultimate determination of that issue, however, will be as a result of pending litigation in the California courts.

The Debtor also looks forward to the further development and improvement in income of its other described properties which will increase the value of those properties, and the Debtor's interests, and also create additional cash flow for the Debtor.

Up to the present time, the Debtor's two primary investors, Leonid Pustilnikov and Ely Dromy, have funded significant sums to the Debtor since the Petition Date.  As of the date of this Disclosure Statement and Plan, these fundings total

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1   $850,512.50.  As necessary, Mr. Pustilnikov and/or Mr. Dromy shall continue to fund the

2   payments which are due under this Plan after the Plan is confirmed by this Court through

3   capital contributions.

4        **D.**     **Proposed Management of the Debtor**

5        Subject to the terms and conditions of the Plan, on the Effective Date, the

6   managers, officers, and directors of the Reorganized Debtor will be identical to the

7   current managers, officers, and directors of the Debtor.  In addition, corporate

8   governance for the Reorganized Debtor, including charters, bylaws, operating

9   agreements, or other organization or formation documents, as applicable, shall be

10  consistent with 11 U.S.C. § 1123(a)(6).

11       **1.**     **Names of Persons Who Will Manage the Debtor's Business**

12       **Affairs**

13  Leonid Pustilnikov

14  Ely Dromy

15       **2.**     **Proposed Compensation to Persons Listed Above**

16       No direct compensation will be paid by the Debtor to either Leonid

17  Pustilnikov or Ely Dromy for their services to the Debtor.  Mr. Pustilnikov is one of the

18  managers of, and investors in, the Debtor and the various properties owned by the

19  Debtor.

20       **3.**     **Qualifications of Persons Listed Above**

21       Leonid Pustilnikov and Ely Dromy are long experienced in the acquisition,

22  development, entitlement, construction, management, and sale of real estate throughout

23  Southern California, including the most highly desirable parts of Los Angeles County,

24  such as West Los Angeles, downtown Los Angeles, and Beverly Hills.  Over the years

25  they own or have owned several high-end properties, including the following:

26       •     9300 Wilshire Boulevard, Beverly Hills, California 90212

27       •     415 N. Crescent Drive, Beverly Hills, California 90210

28       •     362 N. Camden Drive, Beverly Hills, California 90210

1    • 2650 E. Olympic Boulevard, Los Angeles, California 90023

2    • 501-515 S. Spring Street, Los Angeles, California 90013

3    **4.** **Affiliation of Persons Listed Above to Debtor**

4    Leonid Pustilnikov is one of the managers of, and investors in, the Debtor

5    and the various properties owned by the Debtor.

6    Ely Dromy is one of the managers of, and investors in, the Debtor and the

7    various properties owned by the Debtor.

8

9    **5.** **Job Description**

10    Leonid Pustilnikov is one of the managers of, and investors in, the Debtor

11    and the various properties owned by the Debtor.  His job responsibilities include the

12    oversight of real property assets and the associated legal, entitlement, and financing

13    issues attendant to the redevelopment of the properties.

14    Ely Dromy is one of the managers of, and investors in, the Debtor and the

15    various properties owned by the Debtor.  His job responsibilities include the oversight of

16    the day-to-day operations, redevelopment, and management of various real property

17    assets.

18    **E.** **Proposed Disbursing Agent**

19    The Reorganized Debtor shall serve as the Disbursing Agent and shall be

20    responsible for paying all amounts due under the Plan from an account hereby

21    authorized to be opened.  This account shall be maintained in a segregated, interest-

22    bearing account in a depository approved by the United States trustee for the Central

23    District of California for deposits of funds by trustees.  As Disbursing Agent, the

24    Reorganized Debtor shall be the sole and exclusive representative of the Debtor and the

25    Reorganized Debtor's estate, and shall be imbued and vested with the rights, powers,

26    and duties under 11 U.S.C. §§ 1106, 1107, 1108, and 1123.  The Reorganized Debtor

27    shall, among other things, be vested with the sole and exclusive authority to (a)

28    consummate the Plan, (b) settle, adjust, retain, enforce, commence, continue to pursue

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1   or prosecute, or abandon any of claims or adversary proceedings, and (c) take such

2   further actions with respect to property of the estate or claims against the estate as is

3   necessary to effectuate the terms of the Plan.  The Reorganized Debtor, as

4   representative of the Debtor and the Reorganized Debtor's Estate, shall pay all allowed

5   claims in accordance with applicable provisions of the Plan.

6         1.    **Name of Person Responsible for Collecting Money Intended for**

7                **Distribution to Claimants and Transmitting it to Claimants**

8   Leonid Pustilnikov.

9         2.    **Disbursing Agent's Address**

10  9744 Wilshire Boulevard, Suite 203, Beverly Hills, California 90212.

11        3.    **Disbursing Agent's Phone Number**

12  (818) 425-9776.

13        4.    **Proposed Compensation for Person Listed Above**

14  None.

15        5.    **Qualifications of Person Listed Above**

16        Leonid Pustilnikov and Ely Dromy are long experienced in the acquisition,

17  development, entitlement, construction, management, and sale of real estate throughout

18  Southern California, including the most highly desirable parts of Los Angeles County,

19  such as West Los Angeles, downtown Los Angeles, and Beverly Hills.  As noted, over the

20  years they own or have owned several high-end properties, including the following:

21        •    9300 Wilshire Boulevard, Beverly Hills, California 90212

22        •    415 N. Crescent Drive, Beverly Hills, California 90210

23        •    362 N. Camden Drive, Beverly Hills, California 90210

24        •    2650 E. Olympic Boulevard, Los Angeles, California 90023

25        •    501-515 S. Spring Street, Los Angeles, California 90013

26        6.    **Affiliation of Person Listed Above to Debtor**

27  Leonid Pustilnikov is one of the Debtor's managers.

28        7.    **Job Description**

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1    Leonid Pustilnikov's duties include, but are not limited to, the entitlement

2  and repositioning of new projects as well as the rehabilitation of properties purchased by

3  entities owned or controlled by Ely Dromy and Mr. Pustilnikov.  Leonid Pustilnikov is also

4  responsible for the management of properties owned or controlled by Ely Dromy and Mr.

5  Pustilnikov and is responsible for the acquisition and sale of properties owned or

6  controlled by Ely Dromy and Mr. Pustilnikov.

7

8    **7.    Ely Dromy Guarantee of Payment to AES Redondo on**

9    **Environmental Deed of Trust and Performance Deed of Trust**

10    Ely Dromy will personally guarantee, by signing a formal written guarantee,

11  of the payments to be made under this Plan to AES Redondo on account of the

12  Environmental Deed of Trust and Performance Deed of Trust.

13    **IV.**

14    **DEFINITIONS AND PRELIMINARY INFORMATION**

15    **A.    Claims and Interests**

16    A "claim" refers to all obligations of the Debtor or against property of the

17  Debtor.  Claims treated under the Plan are included whether the claim arose before or

18  after the bankruptcy case was filed, and whether or not an obligation involves a cash

19  payment.  A claimant refers to holder of a claim treated under the Plan, even if the party

20  did not file a proof of claim.  An "interest" represents an ownership stake in the Debtor.

21  An interest holder refers to holder of an interest treated under the Plan, even if the party

22  did not file a proof of interest.

23    A claim or interest is allowed if it is (a) timely and properly scheduled or

24  filed, and not objected to; (b) objected to, and was resolved by settlement of the parties

25  or a court order; or (c) deemed allowed.  A claim is deemed allowed if the claim is listed

26  on the Debtor's schedules and is not scheduled as disputed, contingent, or unliquidated.

27  An interest is deemed allowed if it is included on the list of equity security holders filed by

28

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  the Debtor with the court and is not scheduled as disputed.  Allowed claims and interests

2  are provided for in the Plan in the relevant category or class.

3         A claim or interest is disallowed if it was timely objected to by a party in

4  interest and the court ordered that the claim or interest be disallowed in part or entirely.

5  Disallowed claims and interests are not treated under the Plan.

6         A claim or interest is disputed if a ruling on allowance has not been made,

7  and (a) a proof of claim or interest has been filed or deemed filed and a party in interest

8  has filed an objection; or (b) a proof of claim or interest has not been filed and the Debtor

9  scheduled such claim or interest as disputed, contingent, unliquidated, or unknown.

10        In this case, pursuant to a "Notice of Bar Date for Filing Proofs of Claim in a

11  Chapter 11 Case [LBR 3003-1]" filed on April 28, 2023 [Docket No. 47], the Court has

12  scheduled June 28, 2023, as the deadline by which creditors and interest holders were

13  required to file a proof of claim or interest (the "Bar Date").[10]  However, the Court did not

14  set a deadline by which the Debtor was required to file an objection to claim or interest.

15        Nevertheless, there are several claim objections or adversary proceedings

16  pending regarding those claims or interests identified as "disputed" in <u>Exhibit B</u>,

---

[10] Exceptions to the Bar Date include, but are not limited to, the following:

     (i)  Executory contracts/unexpired leases.  For claims arising from rejection of any executory contract or unexpired lease, the last day to file a Proof of Claim is the later of (a) the Bar Date or (b) 30 days after the date of entry of an order authorizing the rejection of such contract or lease or after any automatic rejection of such contract or lease.  See 11 U.S.C. §§ 365(d)(4) and 502(g).

     (ii) Governmental units.  For claims of governmental units, the last day to file a Proof of Claim is the later of (a) the Bar Date or (b) before 180 days after the Petition Date.  See 11 U.S.C. §§ 101(27) and 502(b)(9).

     (iii) Avoidance.  For claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code (11 U.S.C. § 544 and following), the last day to file a Proof of Claim is the later of (a) the Bar Date or (b) 30 days after the entry of judgment avoiding the transfer.  See 11 U.S.C. § 502(h).

     (iv) Agreed claims.  If a claim is listed on the Debtor's official bankruptcy schedules of assets and liabilities (Schedules) and it is not listed as disputed, contingent, unliquidated, or unknown, then your claim is deemed filed in the amount set forth in those Schedules.  11 U.S.C. § 1111(a).  But, if your claim is not listed on the Schedules, or is listed as disputed, contingent, unliquidated, or unknown, or if you disagree with the amount or description of your claim (e.g., its description as unsecured or non-priority), then you must timely filed a Proof of Claim as set forth in the Bar Date notice.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    particularly the claim of AES Redondo, who is both a secured creditor and a tenant on

2    the Harbor Drive Property, and whose claim is subject to litigation before this Court in the

3    action styled 9300 Wilshire, LLC, etc. v. AES-Redondo Beach, LLC, et al., bearing Adv.

4    No. 2:23-ap-01163-VZ.  In addition, on May 17, 2024, the Debtor caused to be filed its

5    "Objection to Proof of Claim No. 8 Filed by the City of Redondo Beach; Counterclaims of

6    9300 Wilshire LLC and Other Property Co-Owners Against the City of Redondo Beach"

7    [Docket No. 343] pursuant to which, among other things, the Debtor has objected to

8    portions of the claim filed by the City of Redondo Beach.  The Debtor has also objected

9    to the claim of the Commission pursuant to the "Chapter 11 Debtor's:  (1) Objection to

10   Claim Number 9 of the California Coastal Commission and (2) Third Party Complaint for

11   Declaratory Relief, Breach of Contract Against AES Redondo Beach LLC, and Objection

12   to Proof of Claim of California Coastal Commission" [Docket No. 200] filed on October 6,

13   2023 through which, among other things, the Debtor filed an additional claim against AES

14   Redondo for indemnity and contribution in regard to any liability that AES Redondo has

15   for the Commission's claim.

16       Under the Plan, among other things, the Debtor shall be exercising its setoff

17   rights against the alleged secured claim of AES Redondo by the $35,000,000 claim filed

18   by the Commission.[11]  AES Redondo has stated in writing that it will indemnify the Debtor

19   and its  affiliates in connection with this claim.If necessary, given the admission by AES

20   Redondo that it is responsible to indemnify the Debtor, the Debtor will be filing a motion

21   for partial summary judgment on its indemnification claim against AES Redondo as the

22   Commission's claim is based upon the terms and conditions of the Ground Lease and

23   AES Redondo's confirmation that it will be indemnifying the Debtor.

24       If the holder of a claim or interest wants to vote, but holds a claim or interest

25   that has either (a) been objected to, or (b) has been scheduled by the Debtor as

26

-----

27   [11] On August 9, 2024, Debtor and the California Coastal Commission filed a
     Stipulation to resolve the claim filed by the Coastal Commission and the Debtor's
28   objection to it.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    contingent, disputed, unliquidated, or unknown, and the holder has not filed a proof of

2    claim or interest, the holder must file a motion to have its claim or interest allowed for

3    voting purposes in time for that motion to be heard before the hearing on confirmation of

4    the Plan.

5          No distribution will be made on the disputed portion of a claim or interest

6    unless allowed by a final non-appealable order.  Rule 9019 of the Federal Rules of

7    Bankruptcy Procedure authorizes the Debtor to settle disputed claims with court

8    approval, but, court approval is not required for any settlement on or after the Effective

9    Date.  The Debtor is required to reserve funds to pay the amount claimants would receive

10   if the claim is allowed in full (unless the court approves a different amount).  To the extent

11   a disputed claim is disallowed, (a) the funds that had been reserved for such claims will

12   be distributed as provided in the Plan to other creditors of the same class (or as ordered

13   by the court); or (b) if this box is checked ☒ then such funds will be distributed to the

14   Debtor.

15      **B.**     **Potential 11 U.S.C. § 1111(b) Elections**

16          11 U.S.C. § 1111(b) allows a partially secured claim to be treated as fully

17   secured under certain conditions, notwithstanding 11 U.S.C. § 506(a).  Claimants should

18   consult their attorney to evaluate if a 11 U.S.C. § 1111(b) election is available and is in

19   their best interest, and to identify the deadline for making an election.

20      **C.**     **Voting and Objections to Confirmation of Plan**

21          "Voting" to accept or reject the Plan is different from "objecting" to

22   confirmation of the Plan.  Voting by ballot means a claimant entitled to vote completes the

23   ballot enclosed with this Disclosure Statement and Plan and returns it to the Debtor.

24   Objecting to confirmation means a party in interest files and serves either a "preliminary

25   objection" to confirmation of the Plan, or an opposition to the motion to confirm the Plan.

26        **1.**     **Who May Object to Confirmation of the Plan**

27

28

1   Any party in interest may object to confirmation of the Plan; but, as

2   explained below, not all claimants and interest holders are entitled to vote to accept or

3   reject the Plan.

4       **2.**   **Who May Vote (11 U.S.C. § 1124)**

5   It requires both an allowed and impaired claim, or allowed and impaired

6   interest, in order to vote either to accept or reject the Plan.

7   Impaired claimants include those whose legal, equitable, and contractual

8   rights are altered by the Plan even if the alteration is beneficial to the claimant.  Impaired

9   interest holders include those whose legal, equitable, and contractual rights are altered

10  by the Plan, even if the alteration is beneficial to the interest holder.

11  Claims and interests are placed into classes consistent with 11 U.S.C. §

12  1122.  Members of unimpaired classes do not vote, though they may file an objection to

13  confirmation of the Plan.

14  Many claimants are treated by the Bankruptcy Code as having accepted or

15  rejected the Plan without a vote.  Some types of claims are required to be treated a

16  certain way by the Bankruptcy Code and, for that reason, they are considered

17  unimpaired.  Holders of such claims cannot vote.  In addition, the Bankruptcy Code treats

18  some claimants as having rejected the Plan without a vote if (a) the claimant is to receive

19  no distribution under the Plan; (b) an objection has been filed to that claimants' claim and

20  the objection has not been resolved prior to filing the Plan; or (c) the Debtor scheduled a

21  claim as contingent, disputed, unliquidated, or unknown and the creditor has not filed a

22  proof of claim.

23

| **Classes Entitled to Vote Because the Class is Impaired:** | **Classes Not Entitled to Vote Because the Class is Unimpaired:** |
|---|---|
| **Class 2b, Class 4a, Class 4c, and 4d** | **None** |

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    A party that disputes the Debtor's characterization of its claim or interest as

2    unimpaired and wants to vote, may request a finding of impairment from the Court in

3    order to obtain the right to vote.

4              **3.      Votes Necessary to Confirm the Plan**

5    The Court may confirm the Plan if at least one non-insider impaired class of

6    claims has accepted and certain statutory requirements are met as to both

7    nonconsenting members within a consenting class and as to dissenting classes.  A class

8    of claim has accepted the Plan when more than one half in number and at least two-

9    thirds in amount of the allowed claims actually voting, vote in favor of the Plan.  A class

10   of interest has accepted when more than one half in number and at least two-thirds in

11   amount of the allowed interests of such class actually voting have accepted it.  It is

12   important to remember that even if the requisite number of votes to confirm the Plan are

13   obtained, the Plan will not bind the parties unless and until the Court makes an

14   independent determination that confirmation is appropriate.  That is the subject of any

15   upcoming confirmation hearing.

16             **4.      How to Vote**

17   The Debtor will file and serve two notices: (a) a "Notice of Hearing on

18   Adequacy of Disclosure Statement" (the "Notice of Disclosure Statement Hearing"); and

19   (b) a "Notice of Dates Related to Confirmation of Plan and Deadlines to Submit Ballot,

20   File Preliminary Objections to Confirmation of Plan, and File Responses to Motion to

21   Confirm Plan" (the "Notice of Deadlines Related to Confirmation").

22   A ballot will accompany the Notice of Deadlines Related to Confirmation.  A

23   voting claimant must follow the instructions set forth in the Notice of Deadlines Related to

24   Confirmation.  A claimant whose claim is allowed as partly secured and partly unsecured

25   is entitled to vote in each capacity by delivering one ballot for the secured part of the

26   claim and another ballot for the unsecured portion of the claim.

27                              **V.**

28             **SOURCE OF MONEY TO SATISFY CLAIMS AND INTERESTS**

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

The Plan cannot be confirmed unless the Court finds that it is "feasible," which means that Proponent has timely submitted evidence establishing that the Debtor will have sufficient funds available to satisfy all expenses, including the scheduled payments to claimants discussed in Section VIII below.

A.     **Non-Income Sources to Fund Plan**

See Exhibit D and Exhibit F for verification of income and other capital contributions that will fund the Plan.  If additional funding sources (non-income) are needed, see below:

Loan or Line of Credit:

☒ None  ☐ Loans or Lines of Credit are as follows:

| NAME OF LENDER | | CONTRIBUTION TYPE | TERM | INT RATE | PROCEEDS |
|---|---|---|---|---|---|
| (a) | | ☐ Loan ☐ Credit Line | | % | $ |
| (b) | | ☐ Loan ☐ Credit Line | | % | $ |

1.     **Funding and Guarantee from Mr. Ely Dromy and Mr. Leo Pustilnikov:** As discussed, additional interests in properties held by the Debtor which are held by non-Debtor entities which are 90% controlled by Mssrs. Dromy and Pustilnikov will be provided as additional collateral to AES on account of their Performance Deed of Trust obligation.  And one of the properties located at 125 & 129 Linden, Beverly Hills, CA will be sold and additional proceeds beyond the Debtor's interest in that property totaling $18,377,873 will be provided to help fund the Plan. *See Exhibit __ to this Plan and Disclosure Statement.*

2.     Funding from Mr. Dromy: Based upon prior funding of $37 Million to AES by Mr. Dromy plus funds he has paid toward payment of property expenses of properties in which the Debtor holds an interest and toward property tax payments on their properties, Mr. Dromy's funding shall continue.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

3.     **Sales of Property**

☐      None as of the date of the Disclosure Statement and Plan.

☐      All or substantially all of Debtor's assets will be sold.  The terms of the proposed sale and evidence of the financial solvency of the proposed buyer is attached in Exhibit         .

☒      The specified property of Debtor is planned to be sold as follows: _____.

| PROPERTY DESCRIPTION: | | PROPOSED SALE DATE | PROPOSED SALE PRICE | PROCEEDS TO FUND THE PLAN |
|---|---|---|---|---|
| (a) | ☒ Property in CLASS #3, #4 or #5: **Check only ONE**:<br><br>☐ 3a<br>3b ☐ 3c ☐<br>3d ☐ 3e<br><br>☒ 4a<br>4b ☐ 4c ☐<br>4d ☐ 4e<br><br>☐ 5a<br>5b ☐ 5c ☐<br>5d ☐ 5e | Prior to due date of AES Performance Deed of Trust provided for under this Plan.  Property to be sold is at 125 & 127 Linden, Beverly Hills, CA. | $27,500,000 | $18,377,873.00<br><br>The proceeds will either be used to fund the payoff of the Performance Deed of Trust obligation to AES in Class 4b under the Plan or will be held as a reserve in order to pay for continuing environmental ascertainment and remediation costs if the AES Class 4b claim has been paid by the time that the sale closes. However, this property sale is not necessary either to pay off the remaining indebtedness due to AES nor is it necessary to enable the Debtor to fund any of the environmental ascertainment and remediation costs for the Redondo Beach Property. |

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| (b) | ☐ Property in CLASS #3 or #4: **Check only ONE**: | | $ | $ |
|---|---|---|---|---|
| | ☐ 3a ☐ 3b ☐ 3c ☐ 3d ☐ 3e | | | |
| | ☐ 4a ☐ 4b ☐ 4c ☐ 4d ☐ 4e | | | |
| | ☐ 5a ☐ 5b ☐ 5c ☐ 5d ☐ 5e | | | |

☐ See Exhibit _____ for additional anticipated sales of specific property.

### B.    PAYMENTS ON THE EFFECTIVE DATE

This section demonstrates the Plan is feasible on the Effective Date.

| (1) CLAIMS AND EXPENSES TO BE PAID ON THE EFFECTIVE DATE | AMOUNT |
|---|---|
| Cure Payments: Executory Contracts, Unexpired Leases:  Section VIII.B.2. | $None |
| Administrative claims + Statutory Costs/Charges:  Section VIII.C.1. + court costs | $800,000 (est.) |
| Nominal Unsecured Claims:  Section VIII.E.1. | $None |
| First Payments:  General Unsecured Claims:  Section VIII.E.2. | $43,565 |
| Arrearages + First Payments:  Secured Claims:  Sections VIII.F. – VIII.G. | $350,000 (est.) |
| TOTAL TO BE PAID ON THE EFFECTIVE DATE: | $1,193,565 |
| **(2) SOURCE OF FUNDS ON THE EFFECTIVE DATE** | |
| Cash on Hand: | $185,000 |
| New Value: ☒ Contributor Name (*identify*): Mr. Ely Dromy | $1,008.565 |
| Loan or Line of Credit:  Described above in: ☐ V.A.(1a)    ☐ V.A.(1b) | $N/A |
| Sale of Property: Described above in: ☐ V.A.(2a)    ☐ V.A.(2b) | $N/A |
| Adversary Proceeding Recovery: Described above in: ☐ V.A.(3a)    ☐ V.A.(3b) | $None |
| Other Sources: ☐ (*identify*): | $ |
| TOTAL FUNDS AVAILABLE ON THE EFFECTIVE DATE: | $1,008,565 |
| **(3) CASH AVAILABLE AFTER PAYMENTS MADE ON THE EFFECTIVE DATE:** | $TBD |

### C.    PAYMENTS DURING THE PLAN TERM

1    As noted earlier, as necessary, Leonid Pustilnikov and/or Ely Dromy shall

2    continue to fund the payments which are due under this Plan after the Plan is confirmed

3    by this Court through capital contributions.  However, notwithstanding this source of

4    funding, Exhibit D evidences cash flow projections for the duration of the Plan to help

5    determine that the Plan is feasible during the plan term.

6    **D.**    **FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER**

7          **PROPOSED PAYMENT IS FEASIBLE**

8    Please see Exhibit D and Exhibit F for financial documents and evidence to

9    help determine that the Plan is feasible during the plan term.

10   **E.**    **EXPLANATION OF RISK FACTORS AND POTENTIAL FLUCTUATIONS**

11         **WHEN IMPLEMENTING THE PLAN**

12   HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND

13   CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE

14   OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND PLAN

15   (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH) PRIOR TO VOTING

16   TO ACCEPT OR REJECT THE PLAN.

17

18   **1.**    **Insufficient Proceeds to Fund Plan**

19   The success of the Plan is dependent on the sufficient cash being available

20   as of the Effective Date and during the duration of the Plan from the following sources:

21   (a) the Debtor's cash on hand on the Effective Date, (b) post-Petition Date exit financing,

22   if any, (c) capital contributions or loans from Ely Dromy in such amounts as are

23   necessary to fund plan payments, and (d) any damages recovered by the Debtor from

24   the Amended AES Redondo Complaint or such other rights of action, claims for relief, or

25   causes of action, including avoidance power claims under chapter 5 of the Bankruptcy

26   Code.[12]  The Debtor projects that there will be sufficient proceeds from these sources

27   _____

28   [12] As of the date of this Disclosure Statement and Plan, Ely Dromy has made the following post-petition
capital contributions to the Debtor:

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  and assets to pay all claims according to the treatment afforded by the terms of the Plan.

2  However, if the Debtor is unable to obtain exit financing, capital contributions, loans, or

3  damages from the Amended AES Redondo Complaint, or such other rights of action,

4  claims for relief, or causes of action, including avoidance power claims under chapter 5 of

5  the Bankruptcy Code, as applicable, or if the estate's expenses or claims are greater than

6  expected or projected, the estate may have less net cash which may impair the Debtor's

7  ability to fund all of the distributions provided for by the Plan.

8

9  **2.    Substantially Increased Amount of Claims**

10  The Debtor set forth in this Disclosure Statement an analysis of the amount

11  of the claims that it believes will need to be paid pursuant to the Plan.  This analysis is

12  based, in primary part, upon the Debtor's books and records and upon the disputed

13  claims upon which the Debtor is aware.  The Debtor believes that the sources of funding

14  will be sufficient to pay the distributions required under the Plan on account of the claims

15  that the Debtor anticipates will be allowed against the estate.  However, if a substantially

16  higher amount of administrative claims, tax claims, secured claims, or non-insider,

17  general unsecured claims is asserted against the Debtor, then the estate may not have

18  cash sufficient to pay all of the obligations under the Plan.

19

20

| Date | Amount |
|------|--------|
| 02/21/2023 | $210,000 |
| 05/21/2023 | $4,612.50 |
| 07/27/2023 | $15,000 |
| 09/08/2023 | $146,500 |
| 10/13/2023 | $18,000 |
| 11/02/2023 | $16,000 |
| 11/30/2023 | $24,000 |
| 12/15/2023 | $200,000 |
| 12/19/2023 | $70,000 |
| 12/31/2023 | $10,000 |
| 01/04/2024 | $23,400 |
| 02/09/2024 | $23,000 |
| 06/05/2024 | $90,000 |

21
22
23
24
25
26
27
28

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

1    The Plan anticipates every possible outcome regarding the filed claims as

2   the claims bar date has passed so all claims to be addressed under the Plan are known

3   and may be found on Exhibit B attached hereto.  Additionally, the potential outcome of

4   the Debtor's adversary proceeding against AES Redondo and City of Redondo Beach

5   which will, in part, determine the amount of AES Redondo's pre-petition secured claim

6   has been anticipated in this Plan.  Finally, the amount of AES Redondo's claim under its

7   Environmental Deed of Trust has been anticipated and provided for in the Plan consistent

8   with both the Third Amendment and what the Debtor believes is the wildly and falsely

9   inflated Environmental Deed of Trust claim that AES Redondo has filed in this case.

10    **3.    Tax Implications**

11    The Debtor has not obtained rulings from the Internal Revenue Service

12   regarding possible tax implications of the Plan, but has described possible tax effects of

13   the Plan below.

14    **4.    Non-Confirmation of Plan**

15    Even if all classes of claims or interests that are entitled to vote accept the

16   Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the

17   Bankruptcy Code sets forth the requirements for confirmation and requires, among other

18   things, that the confirmation of a plan of reorganization is not likely to be followed by the

19   liquidation or the need for further financial reorganization of the Debtor, and that the value

20   of distributions to dissenting creditors and equity security holders not be less than the

21   value of distributions such creditors and equity security holders would receive if the

22   Debtor was liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that

23   the Plan satisfies all the requirements for confirmation of a plan of reorganization under

24   the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court

25   will also conclude that the requirements for confirmation of the Plan have been satisfied.

26    **5.    Non-Occurrence of Effective Date of Plan**

27    Even if all classes of claims and interests that are entitled to vote accept the

28   Plan, the Effective Date may not occur.  The Plan sets forth conditions to the occurrence

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1  of the Effective Date of the Plan which may not be satisfied.  The Debtor believes that all

2  requirements for confirmation required under the Plan will be satisfied.  There can be no

3  assurance, however, that the Bankruptcy Court will also conclude that the requirements

4  for confirmation of the Plan have been satisfied.

5        **6.**    **Risks Related to Implementation of Plan**

6       The Debtor anticipates no risks to the implementation of the Plan at this

7  time.

8       **F.**    **TAX CONSEQUENCES OF THE PLAN**

9       THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN OF THE

10  SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE

11  DEBTOR'S ESTATE AND TO HOLDERS OF CLAIMS AND IS BASED ON THE

12  INTERNAL REVENUE CODE OF 1986, AS AMENDED TO THE DATE HEREON (THE

13  "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED

14  THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES

15  AND PRONOUNCEMENTS OF THE INTERNAL REVENUE SERVICE ("IRS") AS IN

16  EFFECT ON THE DATE HEREOF.  CHANGES IN SUCH RULES OR NEW

17  INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX

18  CONSEQUENCES DESCRIBED BELOW.  NO RULINGS HAVE BEEN REQUESTED

19  FROM THE IRS.  MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED

20  FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.

21       THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF

22  THE PLAN TO THE HOLDERS OF CLAIMS MAY VARY BASED UPON THE

23  INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  IN ADDITION, THIS

24  DISCUSSION DOES NOT COVER ALL ASPECTS OF STATE OR FEDERAL INCOME

25  TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR THE HOLDERS OF

26  ALLOWED CLAIMS, NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES

27  PECULIAR TO CERTAIN TYPES OF TAXPAYERS (SUCH AS DEALERS IN

28  SECURITIES, S CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 ♦ FAX 954.771.9264

1    INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS, AND FOREIGN TAXPAYERS).

2    THIS DISCUSSION DOES NOT ADDRESS THE TAX CONSEQUENCES TO HOLDERS

3    OF CLAIMS WHO DID NOT ACQUIRE SUCH CLAIMS ON ORIGINAL ISSUE.  NO

4    ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS

5    ADDRESSED.

6         THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE

7    FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL

8    CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  HOLDERS OF CLAIMS OR

9    INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR FOR THE

10    FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES TO THEM UNDER

11    THE PLAN.

12         1.    **Introduction**

13         The Plan, among other things, contemplates that, on or subsequent to the

14    Effective Date, certain holders of claims will receive cash on account of their allowed

15    claims.  The Plan contemplates that all funds of the estate shall be transferred to the

16    Disbursing Agent for distribution to creditors.  The federal income tax consequences of

17    the implementation of the Plan to a holder of a claim will depend, among other things,

18    upon the origin of the holder's claim, when the holder's claim becomes an allowed claim,

19    when, and if, the holder receives payment in respect to such claim, whether the holder

20    reports income using the accrual or cash method of accounting, whether the holder has

21    taken a bad debt deduction or worthless security deduction with respect to such claim

22    and whether the holder's claim constitutes a "security" for federal income tax purposes.

23         2.    **Consequences to the Debtor's Estate**

24         The Debtor is a limited liability company which is a "pass-through" entity,

25    meaning that profits and losses go directly to the owners and are reported on individual

26    owner tax returns.  For limited liability companies, business income is taxed as

27    employment tax, and limited liability company owners are considered to be self-employed

28    and pay self-employment tax toward Social Security and Medicare.  It should be noted,

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1   however, that a limited liability companies can elect to be taxed as a Subchapter S

2   Corporation and considered a pass-through entity that does not pay taxes.  Therefore,

3   the Debtor anticipates that any tax consequences relating to the Plan, including any tax

4   gains or losses, will pass through to the Debtor's members and owners.  As such, the

5   Debtor does not expect to incur any substantial tax liability as a result of implementation

6   of the Plan.  Payments of interest, dividends, and certain other payments are generally

7   subject to withholding unless the payee of such payment furnishes such payee's correct

8   taxpayer identification number (social security number or employer identification number)

9   to the payor.  The Debtor, on behalf of the estate, may be required to withhold the

10  applicable percentage of any payment made to a holder who does not provide its

11  taxpayer identification number.  Backup withholding is not an additional tax, but an

12  advance payment that may be refunded to the extent it results in an overpayment of tax.

### 3.   Consequences to Holders of Allowed Administrative Expenses Claims

15  Holders of allowed administrative expense claims generally will be paid, in

16  full, in cash, on, or subsequent to, the Effective Date.  Such holders that are subject to

17  U.S. federal income tax must include such amounts in their gross income in the taxable

18  year in which such amounts are actually or constructively received by them.

### 4.   Holders of Allowed General Unsecured Claims

20  Pursuant to the Plan, holders of allowed general unsecured claims will be

21  paid varying amounts, in cash, during the duration of the Plan.  Such holders that are

22  subject to U.S. federal income tax must include such amounts in their gross income in the

23  taxable year in which such amounts are actually or constructively received by them.

24  As a general rule, a creditor whose existing claims are satisfied with

25  payments under the Plan will recognize gain or loss on the actual or constructive

26  exchange of such creditor's existing creditor claims (other than claims for accrued

27  interest) for the consideration received equal to the difference between (i) the "amount

28  realized" in respect of such claims, and (ii) the creditor's tax basis in such claims.  The

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  "amount realized" will be equal to the sum of the cash and (i) as to a cash-basis taxpayer,

2  the fair market value of all other consideration received, and (ii) as to an accrual-basis

3  taxpayer, the fair market value of the other consideration received, less any amounts

4  allocable to interest, unstated interest or original issue discount.

5  The general rule governing gain/loss and exchanges is qualified, with the

6  actual gain/loss realized affected by, among other things, the application of tax free

7  treatment in certain situations, including, without limitation, whether the exchange would

8  otherwise qualify as a reorganization, or as the exchange of a "security" under Internal

9  Revenue Code § 354.  Again, creditors are advised to seek their own tax counsel to

10  properly assess the tax consequences in their particular situation.

11  Pursuant to Internal Revenue Code § 1223, the aggregate tax basis in the

12  items received by a creditor will equal the amount realized in respect of such items (other

13  than amounts allocable to any accrued interest).  The holding period for items received in

14  the exchange will begin on the day following the exchange.

15  In addition, the holder of a claim may recognize a loss on the Effective Date

16  to the extent that the amount received is less than the amount of their claim.  The

17  character of such loss will be determined by a number of factors, including the

18  characteristics of the claim in the hands of the holder.

19  Under the general rule governing exchanges under the Internal Revenue

20  Code, in the case of a creditor whose existing claims constitute capital assets in such

21  creditor's hands, the gain required to be recognized will be classified as a capital gain,

22  except to the extent of interest (including accrued market discount, if any), with any gain

23  recognized thereon generally treated as ordinary income to the extent of accrued market

24  discount.  In this regard, it should be noted that Internal Revenue Code § 582(c) provides

25  that the sale or exchange of a bond, debenture, note or certificate, or other evidence of

26  indebtedness by a bank or certain other financial institutions shall not be considered the

27  sale or exchange of a capital asset.  Accordingly, in this context, any gain recognized by

28  such creditors as a result of the Plan's implementation would presumably be ordinary

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1   income, notwithstanding the nature of their claims.  As a general rule, any capital gain

2   recognized by a creditor will be long-term capital gain with respect to those claims for

3   which the creditor's holding period is more than one year, and short-term capital gain with

4   respect to such claims for which the creditor's holding period is one year or less.  Again,

5   the actual characterization of gain/loss in this particular instance pursuant to the general

6   rules governing exchanges is qualified by, among other things, the qualifications noted

7   above with respect to realization of gain/loss and exchanges.  Creditors are advised to

8   seek their own tax counsel to properly assess the tax consequences in their particular

9   situation.

10          If a creditor has a lower tax basis in one of the Debtor's obligations than its

11  face amount, the difference may constitute market discount under Internal Revenue Code

12  § 1276. (Certain obligations are excluded from the operation of this rule, such as

13  obligations with a fixed maturity date not exceeding one year from the date of issue,

14  installment obligations to which Internal Revenue Code § 453B applies and, in all

15  likelihood, demand instruments).

16          Holders in whose hands the Debtor's obligations are market discount bonds

17  will be required to treat as ordinary income any gain recognized upon the exchange of

18  such obligations to the extent of the market discount accrued during the holder's period of

19  ownership, unless the holder has elected to include such market discount in income as it

20  accrued.

21          **5.    Equity Interests**

22          Holders of interests may realize a loss on the Effective Date to the extent of

23  such holder's basis in such interest.  The character of this loss (i.e., long-term, short-

24  term, capital, or ordinary) will be determined by a number of factors, including the

25  characteristics of such interest in the hands of the holder.

26          **6.    Distributions in Discharge of Accrued Unpaid Interest**

27          Pursuant to the Plan, distributions received in respect of allowed claims will

28  be allocated only to the principal amount of such claims, with no portion allocated to

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  unpaid accrued interest.  However, there is no assurance that the IRS, for federal income

2  tax purposes, would respect such allocation.  In general, to the extent that an amount

3  received by a holder of debt is received in satisfaction of interest that accrued during its

4  holding period, such amount will be taxable to the holder as interest income (if not

5  previously included in the holder's gross income).  Conversely, a holder generally

6  recognizes a deductible loss to the extent any accrued interest claimed was previously

7  included in its gross income and is not paid in full.  Each holder of a claim is urged to

8  consult its own tax advisor regarding the allocation of consideration and the deductibility

9  of unpaid interest for income tax purposes.

10  **7.**    **Information Reporting and Withholding**

11  Distributions to holders of allowed claims and interests under the Plan may

12  be subject to applicable withholding (including employment tax withholding).  Under

13  federal tax income tax law, interest, dividends, and other reportable payments may,

14  under certain circumstances, be subject to "backup withholding" at a rate of 30%.

15  Backup withholding generally applies if the holder (a) fails to furnish its social security

16  number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c)

17  fails properly to report interest or dividends, or (d) under certain circumstances, fails to

18  provide a certified statement, signed under penalty of perjury, that the TIN provided is its

19  correct number and that it is not subject to backup withholding.  Backup withholding is not

20  an additional tax but merely an advance payment, which may be refunded to the extent it

21  results in an overpayment of tax.  Certain persons are exempt from backup withholding,

22  including, in certain circumstances, corporations and financial institutions.  Absent a

23  written opinion from the tax advisor of the estate that federal, state, or local withholding

24  taxes are required with regard to any distributions, all distributions made shall be free and

25  clear of any federal, state, local, or foreign withholding taxes.

26  THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR

27  INFORMATIONAL PURPOSES ONLY.  NEITHER THE DEBTOR NOR ITS COUNSEL

28  ARE EXPERTS IN TAX MATTERS.  NEITHER THE DEBTOR NOR THE DEBTOR'S

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  PROFESSIONALS HAVE IN ANY WAY ATTEMPTED TO PROVIDE TAX ADVICE TO

2  ANY OF THE DEBTOR'S CREDITORS OR EQUITY SECURITY HOLDERS.  EACH

3  HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX

4  ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX

5  CONSEQUENCES APPLICABLE UNDER THE PLAN.

6                                         **VI.**

7                    **ASSETS AND LIABILITIES OF THE ESTATE**

8       A.      **Assets**

9              The identity and fair market value of the estate's assets are described in the

10  Disclosure Statement and are listed in <u>Exhibit C</u> so that the reader can assess what

11  assets are at least theoretically available to satisfy claims and to evaluate the overall

12  worth of the bankruptcy estate.  Any proposed sale of these assets is discussed in

13  Section V.A.2 above.  In sum, the equity in the Debtor's assets in excess of debt is no

14  less than $40,000,000.

15             1.      <u>Description of Pending Litigation Matters in Bankruptcy and Non-</u>

16  <u>Bankruptcy Forums</u>-the below litigation matters mostly concern matters where rights in

17  property versus claims for recovery of money are being sought.  The below descriptions

18  will make clear which one of these the identified litigation matters fall into.

19                    (a)      **Adversary Proceedings**

20             The pending adversary proceedings are as follows:

21                    (i)      **9300 Wilshire, LLC, etc. v. AES-Redondo Beach,**

22  **LLC and the City of Redondo Beach (Adv. No. 2:23-ap-01163-VZ)**

23             On May 30, 2023, the Debtor, for itself and on behalf of 1112 Investment

24  Company, LLC; E.D. Flores, LLC; 9300 Wilshire Fee, LLC; David Dromy; 1650 Veteran,

25  LLC; Outdoor Billboard Company, LLC; BH Karka LLC; 6th Street Investment Company,

26  LLC; 505 Investment Company, LLC; SLH Fund, LLC; and Peak Alcott, LLC, as plaintiffs,

27  caused to be filed that certain "Complaint for Declaratory Relief, Breach of Contract, and

28  Objection to Proof of Claim of AES Redondo Beach, LLC" (the "AES Redondo

Complaint"), against AES-Redondo Beach, L.L.C., as defendant, styled 9300 Wilshire, LLC, etc. v. AES-Redondo Beach, L.L.C. and the City of Redondo Beach, bearing Adv. No. 2:23-ap-01163-VZ (the "AES Redondo Action"), as amended by that certain "First Amended Complaint for Declaratory Relief, Breach of Contract, and Objection to Proof of Claim of AES Redondo Beach, LLC" (the "Amended AES Redondo Complaint"), filed on August 21, 2023, and as further amended by the "Second Amended Complaint for Declaratory Relief, Breach of Contract, Indemnification, Contribution and Setoff Under 11 U.S.C. § 553 of the Bankruptcy Code, and Objection to Proof of Claim of AES Redondo Beach, LLC; Avoidance of Fraudulent Transfers (11 U.S.C. §§ 554 and 548)" (the "Second Amended AES Redondo Complaint"), filed on June 14, 2024.

On July 3, 2023, AES Redondo caused to be filed "AES Redondo Beach, L.L.C.'s Counterclaims for Declaratory Relief Against 9300 Wilshire, LLC, for itself and on behalf of 1112 Investment Company, LLC; E.D. Flores, LLC; 9300 Wilshire Fee, LLC; David Dromy; 1650 Veteran, LLC; Outdoor Billboard Company, LLC; BH Karka LLC; 6th Street Investment Company, LLC; 505 Investment Company, LLC; SLH Fund, LLC; and Peak Alcott, LLC" (the "AES Redondo Counterclaim").

On July 26, 2023, the Debtor, for itself and on behalf of 1112 Investment Company, LLC; E.D. Flores, LLC; 9300 Wilshire Fee, LLC; David Dromy; 1650 Veteran, LLC; Outdoor Billboard, LLC; BH Karka LLC, 6th Street Investment Company, LLC; 505 Investment Company, LLC; SLH Fund, LLC; and Peak Alcott, LLC, caused to be filed its "Answer of 9300 Wilshire, LLC to Counterclaims of Defendant and Counter-Claimant AES Redondo Beach, LLC" (the "Counterclaim Answer").

On April 29, 2024, AES Redondo caused to be filed "AES Redondo Beach, L.L.C.'s Amended Answer to First Amended Complaint" (the "AES Redondo Answer"). Debtor has since filed a Second and Third Amended Complaint. The Second Amended Complaint was filed on June 14, 2024 (Docket No. 136) and adds The City of Redondo Beach as a party defendant.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    Among other things, the Amended AES Redondo Complaint seeks the

2  following relief:

3    •    The Debtor contends an Approved Extension (as defined in the

4  Amended AES Redondo Complaint) of three years (to December 31, 2023) was timely

5  issued under the Third Amendment (as defined in the Amended AES Redondo

6  Complaint), thereby triggering a number of provisions of the Third Amendment.  In

7  particular, the Debtor asserts that (i) the provisions of paragraph 2(a)(iii) apply to the

8  funding requirements of AES Redondo to the Post Close Escrow (as defined in the

9  Amended AES Redondo Complaint); (ii) the provisions of paragraph 4(d) (modifying the

10  terms of Section 2.4(d) of the Purchase Agreement (as defined in the Amended AES

11  Redondo Complaint)), are triggered so that the payment obligations of Purchaser (as

12  defined in the Amended AES Redondo Complaint) are governed by Section 2(d)(ii)(C);

13  and (iii) the provisions of paragraph 4(e)(ii) govern the accrual of interest in replacement

14  of Section 5 of the Purchase Agreement and Section 5(f) of the Second Amendment (as

15  defined in the Amended AES Redondo Complaint);

16    •    The Debtor alleges that AES Redondo disputes the position asserted

17  by the Debtor and asserts that an Approved Extension was not issued;

18    •    As such, the Debtor requires a judicial declaration that its

19  interpretation of the Third Amendment as set forth in paragraph 26 of the Amended AES

20  Redondo Complaint is the correct interpretation and the parties must be bound by the

21  implications arising therefrom;

22    •    The Debtor contends that AES Redondo has defaulted under the

23  terms of the Purchase Agreement and Amendments (as defined in the Amended AES

24  Redondo Complaint) and, as a result, the Debtor has been damaged in an amount

25  currently estimated to be no less than $7,000,000;

26    •    The Debtor contends that AES Redondo asserts a claim against the

27  estate in excess of $38,000,000;

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1    • The Debtor objects to AES Redondo's claim since, among other

2    things, the amount owing is overstated by at least $23,000,000;

3    • As such, the Debtor is entitled to offset its damages against any

4    allowed claim held by AES Redondo;

5    • Alternatively, the Debtor requires a judicial declaration regarding the

6    rights and liabilities of the parties to the litigation in consideration of the grant by the

7    Debtor of the Option Agreement to the City of Redondo Beach;

8    • The Debtor contends that the Option Agreement was specifically

9    contingent upon the receipt of an Approved Extension, and, thus, in the event AES

10   Redondo prevails on its claim that it did not obtain an Approved Extension, the Option

11   Agreement should be deemed unenforceable as a matter of law for lack of consideration;

12   .• The Debtor contends that the conduct of AES Redondo is causing a

13   tortious breach and interference of contract of the Option Agreement for which it should

14   be held liable in damages;

15   • The Debtor contends that the City has failed to exercise its rights

16   under the Option Agreement and, based upon the failure to exercise its rights under the

17   Option Agreement, the City no longer has any rights under that agreement and the

18   Option Agreement constitutes an encumbrance on the Harbor Drive Property in favor of

19   the City which it received without consideration;

20   • The Debtor contends that the receipt by the City of its rights under

21   the Option Agreement, in the alternative, and to the extent that such rights continue to

22   survive, constitute an avoidable fraudulent transfer;

23   • The Debtor contends that AES Redondo has breached the Purchase

24   Agreement by failing to deliver on its contractual obligation to obtain the consent of SCE

25   to the transaction including the assignment of the PEMSA to the Debtor and, by its

26   failure, without limitation, to deliver this consent, SCE may take the position that a portion

27   of the Harbor Drive Property which was transferred to the Debtor and its affiliates was, in

28   fact, not transferred to the Debtor;

1    • The Debtor contends that by failing to fulfill this condition, and by

2    misrepresenting in the Purchase Agreement, in three amendments to the Purchase

3    Agreement and in its Officer's Certificate that it had fulfilled this condition, AES Redondo

4    caused the Debtor to prematurely pay AES Redondo $37,000,000, plus incurring

5    significant additional obligations and making further payments in order to address

6    environmental issues under the Environmental Deed of Trust as well as related

7    obligations to the Harbor Drive  Property's development.  Debtor shall also seek costs

8    and attorneys' fees for this matter;

9    • The Debtor contends that it has suffered damages by reason of AES

10    Redondo's breach of the Purchase Agreement, and requires a judicial declaration

11    regarding its rights and the rights and responsibilities of AES Redondo concerning the

12    assignment of agreements and approval of SCE for the sale transaction.

13    • Causes of Action against the City of Redondo Beach and AES for

14    Declaratory Relief, Breach of Contract and Avoidance of Fraudulent Transfers;

15    • Objections to Claim of the City of Redondo Beach under Section 502

16    of the Bankruptcy Code; and

17    • Attorneys' fees and costs incurred in connection with this matter.

18    Among other things, the AES Redondo Counterclaim seeks the following

19    relief:

20    • A declaratory judgment that (i) an Approved Extension (as defined in

21    the Amended Redondo Counterclaim) was not obtained by the Extension Deadline (as

22    defined in the Amended Redondo Counterclaim) in accordance with the terms of the

23    Third Amendment (as defined in the Amended Redondo Counterclaim), (ii) that Joint

24    Owners (as defined in the Amended Redondo Counterclaim) were obligated to pay AES

25    Redondo the sum of $28,000,000 within 90 days of the Extension Deadline, with

26    $10,000,000 paid on or before December 10, 2020, (iii) Deferred Payment and Late

27    Payment Interest (as defined in the Amended Redondo Counterclaim) in the Third

28    Amendment are calculated based on those provisions that are applicable if an Approved

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1    Extension was not obtained by the Extension Deadline, and (iv) AES Redondo has no

2    Funding Obligations (as defined in the Amended Redondo Counterclaim) under Section 2

3    of the Third Amendment;

4        • A declaratory judgment that Joint Owners' alleged oral agreement to

5    modify the terms of Third Amendment is invalid because no extensions, alterations,

6    modifications, or other amendments have been made in writing and signed by all parties

7    to the Third Amendment and such an alleged oral agreement is invalid as a matter of law

8    pursuant to California Code of Civil Procedure §§ 1624 and 1698;• Attorneys' fees and

9    costs in accordance with the terms of Sale Agreement and Amendments (as defined in

10    the Amended Redondo Counterclaim) thereto.

11    **B.    City of Redondo Beach and City of Hermosa Beach v. California State**

12    **Water Resources Control Board, et al., (Case No. 20STCP903193)**

13        On October 1, 2020, the City of Redondo Beach ("Redondo Beach") and

14    the City of Hermosa Beach commenced an action against the California State Water

15    Resources Control Board, styled City of Redondo Beach and City of Hermosa Beach v.

16    California State Water Resources Control Board, et al., bearing Case No.

17    20STCP903193, pending in the Superior Court of the State of California, County of Los

18    Angeles (the "Redondo Beach Action").  The Debtor was named as a real party in interest

19    in the Redondo Beach Action.

20        On April 15, 2022, the Debtor, for itself and on behalf of 1112 Investment

21    Company, LLC; E.D. Flores, LLC; 9300 Wilshire Fee, LLC; David Dromy; 1650 Veteran,

22    LLC; Outdoor Billboard Company, LLC; BH Karka LLC; 6th Street Investment Company,

23    LLC; 505 Investment Company, LLC; SLH Fund, LLC; and Peak Alcott, LLC, as cross-

24    complainants, caused to be filed that certain "First Amended Cross-Complaint for Inverse

25    Condemnation (Regulatory Taking) and Illegal Spot Zoning" (the "Amended Redondo

26    Beach Cross-Claim") against Redondo Beach, as defendant, in the Redondo Beach

27    Action.

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    Among other things, the Amended Redondo Beach Cross-Claim seeks the

2   following relief:

3    • Redondo Beach's failure and refusal to zone the Harbor Drive

4   Property to allow any economically viable reuse of the Power Plant site dramatically

5   interfered with the distinct, investment-backed expectations of Cross-Complainants' and

6   Cross-Complainants' predecessors-in-interest, effecting a taking of private property for

7   public use without just compensation;

8    • By effectively downzoning the alternative uses of the Power Plant

9   site to "open space," and refusing to restore the zoning to allow another use, even upon

10   the legally required closure of the Power Plant, Cross-Defendants eliminated all

11   economically viable use of Cross-Complainants' Power Plant site.  Cross-Defendants'

12   actions constitute a *per se* categorical taking requiring the payment of just compensation;

13    • Cross-Defendants continued this pattern since Cross-Complaints'

14   acquisition of the Power Plant site, as demonstrated through Redondo Beach's continued

15   failure and refusal to take action to rezone the Power Plant site, notwithstanding the

16   imminent closure and turnover of the Power Plant;

17    • Upon the then-impending closure and turnover of the Power Plant

18   around October, 2024, the Power Plant site will be stripped of all economically viable use;

19    • Cross-Complainants are entitled to an award of "just compensation"

20   for the categorical *per se* taking to be determined by a jury based on proof to be

21   submitted at trial;

22    • Cross-Defendants' land-use restrictions were adopted exclusively for

23   the Power Plant site and apply to no other properties within Redondo Beach.  The

24   burdens arising out of Cross-Defendants' actions were (and are) designed to benefit the

25   entire community, yet Cross-Defendants, through their myriad land-use restrictions,

26   required Cross-Complainants to shoulder the entirety of the economic burden necessary

27   to provide this benefit to the Redondo Beach citizenry;

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1      •      Cross-Defendants made it no secret that they not only wanted the

2  Power Plant closed permanently, but wanted to eliminate Cross-Complainants' ability to

3  repurpose the Power Plant site for alternative economically viable uses.  By reducing the

4  available alternative uses of the site to an island of open space in a sea of economically

5  viable residential and commercial uses, Redondo Beach "spot zoned" the Power Plant

6  site in a manner that ensured that the owners of the property bore the entire economic

7  burden of Redondo Beach's effort to provide the public at large with a massive swath of

8  open space at the Redondo Beach waterfront;

9      •      Cross-Defendants have refused to withdraw the offending land-use

10  restrictions, notwithstanding the Power Plant owners' repeated attempts to obtain

11  approvals for some alternative economically viable reuse of the site.  As a direct result of

12  Cross-Defendants' actions, the fair market value of the Power Plant site has fallen

13  dramatically.  Upon the closure of the Power Plant, the site will only be suitable for "open

14  space," if acquired for such purpose, or, as the Redondo Beach Mayor openly declared, a

15  "City park" to be used and enjoyed by the Redondo Beach citizens;

16      •      Cross-Defendants' orchestrated scheme to use their land-use,

17  initiative and referendum powers to close the Power Plant and convert all alternative uses

18  to "open space" most assuredly "goes too far;"

19      •      Cross-Complainants have been damaged by the taking of their

20  property in an amount to be proven at trial. Cross-Complainants are informed and believe

21  and thereon allege that the fair market value of the Power Plant site will be reduced to

22  nominal value when the Power Plant is forced to permanently close by the end of 2023;

23      •      Article I, § 19 of the California Constitution provides in pertinent part:

24  "Private property may be taken or damaged for a public use and only when just

25  compensation, ascertained by a jury unless waived, has first been paid to or into court for

26  the owner;"

27

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1          •      The Takings Clause in the California Constitution has been held to

2 provide at least the equivalent protection to landowners as that provided in the Takings

3 Clause of the United States Constitution;

4          •      Cross-Defendants' actions have effected a taking under Article I, §

5 19, of the California Constitution;

6          •      Cross-Complainants seek "just compensation" for the taking of the

7 Power Plant site;

8          •      By re-designating the Power Plant site as "Generating Plant,"

9 removing any alternative available re-use of the site other than "open space" and

10 "parklands," applying such designation only to the Power Plant site, and failing and

11 refusing to rezone the Power Plant site to allow an economically viable use of the site

12 upon the closure of the plant (even in the face of a legal mandate to designate additional

13 property within the City for residential uses to satisfy the City's RHNA), Cross-Defendants

14 have treated the Power Plant site materially differently from every other property in

15 Redondo Beach, without any rational basis for doing so;

16          •      The actions of Cross-Defendants are wholly arbitrary and capricious,

17 and designed to make Cross-Complainants, and only Cross-Complainants, shoulder the

18 entire burden associated with providing new parkland for the community's benefit without

19 any compensation;

20          •      Cross-Defendants' actions purposely spot-zoning Cross-

21 Complainants' property violate the equal protection clause of the Fourteenth Amendment

22 to the United States Constitution;

23          •      Cross-Complainants assert their equal protection claim under 42

24 U.S.C. § 1983, and seek compensatory damages attributable to the above-described

25 actions, as well as reasonable attorney's fees, expert fees, costs and other litigation

26 expenses pursuant to 42 U.S.C. § 1988;

27          •      The Due Process Clauses of Fifth and Fourteenth Amendments to

28 the United States Constitution provides heightened protection against government

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  interference with certain rights and liberty interests, including the "specific freedoms

2  protected by the Bill of Rights;"

3       • In the land-use context, the Due Process Clauses provide for

4  "substantive" relief against government actors who enact arbitrary, capricious or

5  discriminatory land-use restrictions;

6       • By re-designating the Power Plant site as "Generating Plant,"

7  removing any alternative available re-use of the site to "open space" and "parklands," and

8  applying such designation only to the Power Plant site, and failing and refusing to rezone

9  the Power Plant site to allow an economically viable use of the site upon the closure of

10 the plant (even in the face of a legal mandate to designate additional property within the

11 City for residential uses to satisfy the City's RHNA),Cross-Defendants have treated the

12 Power Plant site materially differently from every other property in Redondo Beach,

13 without any rational basis for doing so;

14      • The actions of Cross-Defendants are wholly arbitrary and capricious,

15 and designed to make Cross-Complainants, and only Cross-Complainants, shoulder the

16 entire burden associated with providing new parkland for the community's benefit without

17 any compensation;

18      • Cross-Defendants' actions violate Cross-Complainants' due process

19 rights guaranteed by the United States Constitution, and violate 42 U.S.C. § 1983;

20      • An actual controversy has arisen between Cross-Complainants, on

21 the one hand, and Cross-Defendants, on the other, with respect to the legal impact of

22 Cross-Defendants' land use restrictions and, specifically, the extent to which such actions

23 effected a "taking" of the Power Plant site.  Cross-Complainants contend that such

24 actions constitute a taking, whereas Cross-Defendants assert they do not; and

25      • Cross-Complainants seek declaratory judgment confirming the

26 existence of a taking.[13]

27  _____

28  [13] The Redondo Beach Action and the Amended Redondo Beach Cross-Claim were stayed pending
resolution of the City's appeal of the Superior Court's denial of its anti-SLAPP motion filed in the Redondo

C. **Miscellaneous Non-Bankruptcy Forum Actions**

There are two other non-bankruptcy forum actions, as described below:

1. **Housing Element Writ**

The so-called "Housing Element Writ" initiated by New Commune and Leonid Pustilnikov against the City of Redondo Beach has no bearing on the Harbor Drive Property or the pending litigation against AES Redondo in this Court.  The judgment is on appeal and the ruling on the effective date of substantial compliance for the City of Redondo Beach's housing element is counter to the plain reading of the Housing Accountability Act, every other ruling (e.g., the cities of Beverly Hills and La Canada) on the matter including the New Commune "Builders Remedy Writ" (discussed below), and HCD memorandum and technical assistance letters.  Additionally, the court clearly misunderstood applicable law and it is the Debtor's expectation that the court of appeal will invalidate the City of Redondo Beach's deficient housing element and once again subject the City to further builder's remedy projects.

2. **New Commune Builders Remedy Writ**

Here, the court ruled that (i) the builders remedy applied at the time of the SB 330 applications (in direct conflict with the ruling above), (ii) that the builders remedy applied within the coastal zone, and (iii) within the coastal zone, it was limited to sites zoned for residential.  The third part of the ruling is nowhere enumerated within the Coastal Act.  The Debtor believes the third part of the court's decision is in error on

_____

Beach Action. On June 4, 2024, however, the Court of Appeals confirmed the holding of the trial court denying the City's motion holding, among other things, that zoning decisions, which are the subject of the taking and inverse condemnation action by the Debtor, are not protected activity, and while the owners' complaint includes extensive allegations about the history of the Property and how the City reached its zoning decisions, these allegations simply put the City's zoning decisions into a certain context:  they demonstrate the history of the zoning, and support the owners' contention that the City had a certain motive for making the zoning decisions that it did (to accomplish the alleged taking at a low cost to the City).  The City's statements, however, were not the basis for the owners' causes of action, as the owners' claims focus on the restrictions on the use of the Property and how those restrictions impact the owners.  The causes of action do not rely upon any motives or intentions guiding the City's actions, and "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute."  Because no part of the takings and due process claims arise from protected activity, the owners' claims are allowed to proceed.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1    multiple grounds that will be addressed on appeal.  While AES Redondo's builders

2    remedy writ has been stayed pending resolution of this appeal, the ruling, as applied to

3    AES Redondo, would be favorable given that the City claims the land use is "Public or

4    Institutional" and Redondo's Land Use Element allows for "public benefits (e.g.,

5    affordable housing)."  To qualify for a builders remedy, an applicant, by definition must

6    submit for an affordable housing development.  Thus, there is good basis to conclude the

7    AES Redondo writ will be decided differently than the New Commune writ.  This is further

8    supported by the judgment and order entered into between the City of Malibu, which is

9    wholly within the coastal zone, and the Attorney General regarding their requirement to

10    process builders remedy applications while they remain non-compliant.

11

12        **B.**    **Liabilities**

13        **Exhibit B** shows the scheduled and filed claims against the estate, claims

14    whose treatment is explained in detail in Section VIII below.

15

16        **C.**    **Summary**

17        As set forth in **Exhibit C**, the of the Debtor's various percentage ownership

18    interests in its assets is no less than $50,000,000 based upon the Debtor's ownership

19    interest in the nine real properties.  The total equity in those properties in excess of

20    liabilities is $125,000,000 or more (this does not take into account the "as entitled" value

21    of the Harbor Drive Property at $600,000,000 based upon its planned development).

22    These assets are valuations of the Debtor's interest in the various real properties which

23    are property of this bankruptcy estate.  If the same percentage ownership interests were

24    applied to the indebtedness against each of these properties, the amount of the total debt

25    would be substantially less than the amounts said to be due in the various debt

26    instruments held by the real properties' secured creditors.

27

28

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    Total scheduled and claimed liabilities on all of the real properties in which

2    the Debtor holds an interest is approximately $191,227,202.[14]  It is important to note that

3    this is only an estimate, and this is the indebtedness for all of the properties in which the

4    Debtor holds an interest for the entirety of each property even though the Debtor only

5    owns a percentage interest in each one.

6    **VII.**

7    **TREATMENT OF NON-CONSENTING MEMBERS OF CONSENTING CLASS**

8    The Plan must provide that a non-consenting impaired claimant or interest

9    holder of a consenting class receive at least as much as would be available had the

10    Debtor filed a chapter 7 petition instead.  In a chapter 7 case, the general rule is that the

11    Debtor's assets are sold by a trustee.  Unsecured claims generally share in the proceeds

12    of sale only after secured creditors and administrative claimants are paid.  Certain

13    unsecured claims get paid before other unsecured claims do.  Unsecured claims with the

14    same priority share in proportion to the amount of their allowed claim in relationship to the

15    total amount of allowed claims.

16    Here, a claimant would recover from the assets of the bankruptcy estate

17    less under chapter 7 than under chapter 11 for a number of reasons including (i) for the

18    reasons detailed in <u>Exhibit C</u>, the liquidation value of Debtor's assets is less than their

19    aggregate fair market value; (ii) in a chapter 7 case a trustee is appointed and is entitled

20    to compensation from the bankruptcy estate as reflected in the chart below; and (iii) an

21    individual debtor is permitted to exempt a certain amount of the sales proceeds before

22    unsecured claims are paid anything.

| CALCULATION OF ESTIMATED PERCENT RECOVERY | CHAPTER 7 | CHAPTER 11 |
|---|---|---|
| **(a)**    <u>Total value of the Debtor's assets:</u><br>    See Exhibit C for a list of all property of the bankruptcy | **$Unknown but negligible without support** | **$50,000,000** |

---

[14] Nothing contained herein shall act as a waiver, admission, or release of any claim, defense, or right of the Debtor to object to all or a portion of any scheduled or filed claim, and all such claims, defenses, and rights are hereby reserved.  Moreover, as detailed in the Disclosure Statement, there is pending litigation and objections to numerous claims against the estate.

| | | of Debtor's insiders | |
|---|---|---|---|
| | estate, valuations, and valuation methods. | | |
| **(b)** | Administrative Expense Claims: | **<$250,000>** | **<$800,000>** |
| **(c)** | Tax Claims: | **<$26,068>** | **<$26,068>** |
| **(d)** | Other Unsecured Claims to be Paid Before General Unsecured Claims: | **<$None>** | **<$None>** |
| **(e)** | Trustee's Fees:  Assuming the chapter 7 trustee disburses the net liquidation value of assets to claimants, 11 U.S.C. § 326 indicates the chapter 7 trustee is entitled to fees of:<br><br> * 25% on the first $5,000 of all moneys disbursed = **$1,250**,<br> * 10% on any amount over $5,000 but less than $50,000 = **$4,500**,<br> * 5% on any amount over $50,000 but not in excess of $1 million = **$47,500**,<br> * 3% on all amounts over $1 million) = **$300,000**,<br><br>**TOTAL TRUSTEE'S FEES =** | **<$353,250>** | **N/A** |
| **(f)** | New Value | **N/A** | **$20,000,000 (approx.), plus costs associated with obtaining Site Cloisure upon remediation of Harbor Drive Property, which cost analysis is underway** |
| **(g)** | Dollar Amount Available for General Unsecured Claims: (a) plus (f) minus (b), (c), (d) and (e) = | **$0.00** | **$434,654** |
| **(h)** | Dollar Amount of General Unsecured Claims: = | **$434,654** | **$434,654** |
| **(i)** | **% recovery on general unsecured claims:** [(g) divided by (h)] x 100% = | 0% | 100% |

## VIII.

## PLAN PROVISIONS AND TREATMENT OF CLAIMS

Below is a summary of who gets paid what and when and from what source.  The Proponent is usually not required by law to pay the holder of an unsecured claim or interest everything it would otherwise be entitled to, had a bankruptcy case not commenced.

**PLEASE NOTE THAT, AS NECESSARY, ALL PAYMENTS TO BE MADE UNDER THE PLAN WILL BE GUARANTEED BY ELY DROMY.  A SUMMARY OF THE**

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

**FINANCIAL STRENGTH OF MR. DROMY IS DISCUSSED IN <u>EXHIBIT F</u> AFFIXED TO THE DISCLOSURE STATEMENT**.

A.   <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 365)</u>

1.   ☐   There are no executory contracts or unexpired leases.

2.   ☒   **Assumption**

The post-confirmation Debtor will perform all related obligations whether arising before or after confirmation of the Plan.  Any arrearages arising before confirmation of the Plan will be paid by the first day of the month following the Effective Date, unless the parties agree otherwise or the Court finds that a longer payment schedule still provides the creditor with timely cure and adequate assurance of future performance.  Obligations that arise after confirmation of the Plan will be paid as they come due.

☐   **Previously Assumed:**

| DESCRIPTION OF EXECUTORY CONTRACT OR UNEXPIRED LEASE | DATE OF ORDER TO ASSUME | CURE AMOUNT: Must be paid on Effective Date |
|---|---|---|
| (a)  Ground Lease of real property located at 9740 Wilshire Boulevard, Beverly Hills, California 90212 with Sturgis Holdings, LLC, a Nevada limited liability company[15] | September 11, 2023 | $0.00 (cure already paid, nothing due on Effective Date) |
| (b) | | $ |

☒   **To be Assumed on the Effective Date:**

| DESCRIPTION OF EXECUTORY CONTRACT OR UNEXPIRED LEASE | CURE AMOUNT: Must be paid on Effective Date |
|---|---|

---

[15] See "Order Granting Debtor's First Amended Notice of Motion and Motion for Authorization to Assume Nonresidential Lease of Real Property, for Approval of Stipulation Between Sturgis Holdings, LLC, a Nevada limited liability company and 9300 Wilshire, LLC Regarding assumption of Real Property Lease Under Section 365 of the Bankruptcy Code and Notice and An Opportunity for Hearing," entered on September 11, 2023 [Docket No. 163].

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

| (a) | Third Amendment to Purchase and Sale Agreement, dated March 26, 2020[16] | $TBD |
| (b) | | $ |

### 3.    ☐    **Rejection**

| DESCRIPTION OF EXECUTORY CONTRACT OR UNEXPIRED LEASE | | |
|---|---|---|
| (a) | | ☐ Rejected: ☐ Order Entered on: <br> ☐ Deemed Rejected on: <br> ☐ To be Rejected on the Effective Date |
| (b) | | ☐ Rejected: ☐ Order Entered on: <br> ☐ Deemed Rejected on: <br> ☐ To be Rejected on the Effective Date |

☐    See Exhibit _____ for additional executory contracts and unexpired leases to be assumed or rejected.

**B.    Unsecured Claims That Must Be Treated As Required By 11 U.S.C. § 1129(a)(9)(A) and 11 U.S.C. § 1129(a)(9)(C), Unless a Claimant Consents to a Different Treatment**

11 U.S.C. §§ 1129(a)(9)(A) and (C) require that certain claims be treated one at a time, rather than as a class. Even if another claimant votes to accept a lesser treatment, the claims listed below are not altered. The Debtor must prove to the Court that claims are either being treated as 11 U.S.C. § 1129(a)(9) requires, or that the claimant agreed to some other treatment.

**1.    Administrative Expense Claims – 11 U.S.C. § 507(a)(2) and 11 U.S.C. § 1129(a)(9)(A)**

---

[16] The "Third Amendment to Purchase and Sale Agreement," previously was discussed in Section III.B. of the Disclosure Statement. The interpretation of the Third Amendment is currently the subject of litigation before this Court. Accordingly, the Debtor has separately classified the obligations under the Environmental Deed of Trust and the Performance Deed of Trust as they are separate obligations secured by separate deeds of trust on the Harbor Drive Property. It may be that, after confirmation of the Plan, when the pending litigation against AES Redondo is adjudicated, the Third Amendment will be interpreted to be in full force and effect.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    These include (i) court-approved claims of attorneys and other

2  professionals, and (ii) Office of the United States Trustee fees due and owing under 28

3  U.S.C. chapter 123.

4    ☐ The deadline to file administrative expensive claims is (*date*) _____.

5    ☐ There are no administrative expense claims.

6    ☒ All administrative expense claims ☐ have been filed and/or ☒ are
   anticipated to be filed, and the claims and amounts indicated below are the
7    amounts requested or anticipated to be requested:

**Claimant:** Greenspoon Marder LLP

| Claim Amount (less paid to date) ☐ Actual ☒ Estimated | Interest Rate (if any) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |
| $500,000 | N/A | $500,000, or when final allowance takes place | ☐ Monthly ☐ Quarterly | $ | $ | Unless otherwise agreed to between the Debtor and the holder of the Administrative Expense Claim, in full satisfaction, settlement, release, discharge, and extinguishment of, and in exchange for, such Administrative Expense Claim, the unpaid portion of the Allowed amount of the Administrative Expense Claim shall be paid in full on the later of (or as soon thereafter as reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |

**Claimant:** Newmeyer & Dillion LLP

| Claim Amount (less paid to date) ☐ Actual ☒ Estimated | Interest Rate (if any) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| $125,000 | N/A | $125,000, or when final allowance takes place | ☐ Monthly ☐ Quarterly | $ | $ | Unless otherwise agreed to between the Debtor and the holder of the Administrative Expense Claim, in full satisfaction, settlement, release, discharge, and extinguishment of, and in exchange for, such Administrative Expense Claim, the unpaid portion of the Allowed amount of the Administrative Expense Claim shall be paid in full on the later of (or as soon thereafter as reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |

**Claimant:** Rutan & Tucker, LLP

| Claim Amount (less paid to date) ☐ Actual ☒ Estimated | Interest Rate (if any) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |
| $175,000 | N/A | $175,000, or when final allowance takes place | ☐ Monthly ☐ Quarterly | $ | $ | Unless otherwise agreed to between the Debtor and the holder of the Administrative Expense Claim, in full satisfaction, settlement, release, discharge, and extinguishment of, and in exchange for, such Administrative Expense Claim, the unpaid portion of the Allowed amount of the Administrative Expense Claim shall be paid in full on the later of (or as soon thereafter as |

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| | | | | | | reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |
|---|---|---|---|---|---|---|

**Claimant:** Office of the United States Trustee[17]

| Claim Amount (less paid to date) ☒ Actual ☐ Estimated | Interest Rate (if any) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |
| $0.00 | N/A | $0.00 | ☐ Monthly ☐ Quarterly | N/A | N/A | N/A |

**Claimant:** Clerk's Office[18]

| Claim Amount (less paid to date) ☐ Actual ☒ Estimated | Interest Rate (if any) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |
| $1,000 | N/A | $1,000 | ☐ Monthly ☐ Quarterly | $ | $ | |

## 2.    <u>Tax Claims – 11 U.S.C. § 507(a)(8) and 11 U.S.C. § 1129(a)(9)(C)</u>

Tax claims must be paid in full within five (5) years after the Petition Date.

☐    There are no tax claims.

☒    All tax claims have been filed or scheduled, and are indicated below:

**Claimant:** Internal Revenue Service

| Claim Amount (less paid to date) ☒ Actual ☐ Estimated | Interest Rate (§ 511) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |

---

[17] The Debtor is unaware of any amount that will be due and owing to the Office of the United States Trustee as of the Effective Date.  However, in the event fees are due and owing, they will be paid, in full, on the Effective Date, or as soon as practicable thereafter.

[18] The Debtor is unaware of any amount that will be due and owing to the Clerk's Office as of the Effective Date, however, the Debtor has estimated the sum of $1,000.  In the event fees are due and owing, they will be paid, in full, on the Effective Date, or as soon as practicable thereafter.

| $18,350 | 0.00% (or as otherwise may be required, ordered, or allowed by the Court) | $18,350 | ☐ Monthly ☐ Quarterly | $ | $ | The Allowed amount of the Tax Claim shall be paid in full on the later of (or as soon thereafter as reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |

**Claimant:** Franchise Tax Board

| Claim Amount (less paid to date) ☒ Actual ☐ Estimated | Interest Rate (§ 511) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |
| $7,718.93 | 0.00% (or as otherwise may be required, ordered, or allowed by the Court) | $7,718.93 | ☐ Monthly ☐ Quarterly | $ | $ | The Allowed amount of the Tax Claim shall be paid in full on the later of (or as soon thereafter as reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |

**Claimant:** California Coastal Commission (Disputed)

| Claim Amount (less paid to date) ☒ Actual ☐ Estimated | Interest Rate (§ 511) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

| $2,500,000[19] | 0.00% (or as otherwise may be required, ordered, or allowed by the Court) | $0.00 | ☐ Monthly ☐ Quarterly | $ | $ | The Allowed amount of the Tax Claim shall be paid in full on the later of (or as soon thereafter as reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |

**Claimant:** City of Redondo Beach (Disputed)

| Claim Amount (less paid to date) ☐ Actual ☒ Estimated | Interest Rate (§ 511) | Amount Paid on Effective Date | Amount Paid After Effective Date | | | |
|---|---|---|---|---|---|---|
| | | | Frequency | Each Payment | Balloon Pymts | Term of Pymts |

---

[19] The $2,500,000 plan payment represents a compromised amount of Claim No. 7-1 filed by the California Coastal Commission (the "Commission"). The Commission has agreed to amend (not withdraw) its proof of claim to reduce the pre-petition penalty amount to a $2,500,000 priority claim (11 U.S.C. § 507(a)(8)). This amount is based on recalculating the penalty as if there is only a single violation and using a daily penalty amount that is near the lowest possible amount (from the highest possible amount set forth in Claim No. 7-1). As a result, the Debtor's objection to the Commission's claim shall be withdrawn. The parties agree that nothing in the Plan shall affect any rights the Commission may have against the Debtor for post-petition penalties. The parties further agree that nothing in the Plan shall affect any rights the Commission may have against AES Redondo and non-debtor affiliates and/or owners of the Harbor Drive Property for penalties and/or injunctive relief, including appropriate restoration requirements. The parties further agree that final determination of the pre-petition penalty amount of Commission's claim shall be subject to an administrative hearing before the Commission, or other judicial tribunal having jurisdiction over the matter with the right of judicial review, pursuant to Coastal Act § 30821.3, which shall not be subject to the automatic stay (11 U.S.C. § 362). The Debtor agrees to cooperate and not interfere with AES Redondo's efforts to secure a CDP to remove the dewatering system, to implement the CDP once issued, and to conduct any other required restoration. The parties further agree that the resolution of the Commission's claim shall not waive, limit, or prejudice the Commission's right to seek injunctive relief with respect to the matters set forth in the Commission's May 26, 2020 Notice of Violation (V-9-20-0041), and the parties further agree than any proceeding for injunctive relief shall not be subject to the automatic stay (11 U.S.C. § 362). If a settlement is not reached with the Commission, then payment of its claim will be made upon a final order from a court of competent jurisdiction regarding the amount of its claim.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| $142,166[20] | 0.00% (or as otherwise may be required, ordered, or allowed by the Court) | $0.00 | ☐ Monthly ☐ Quarterly | $ | $ | The Allowed amount of the Tax Claim shall be paid in full on the later of (or as soon thereafter as reasonably practicable): (a) the Effective Date; or (b) the entry of a Final Order allowing such claim. |
|---|---|---|---|---|---|---|

☐   **See Exhibit _____** for additional unsecured claims (not listed in VII.C) on which voting is not allowed.

☐   **11 U.S.C. § 507(a)(2)** – Administrative Expense Claims.

☐   **11 U.S.C. § 507(a)(8)** – Tax Claims.

---

[20] As detailed in <u>Exhibit B</u> affixed hereto, there are five components of the City of Redondo Beach's claim:

(1)    First Element of Redondo Beach's Claim:  The environmental remediation portion of Redondo Beach's is not a claim that the Debtor intends to in any fashion.  The Plan proposes to keep Redondo Beach's environmental claim, in other words, that portion of its claim that appears to replicate AES Redondo's contractual claim) unaffected by the Plan.

(2)    Second Element of Redondo Beach's Claim:  The Superior Court's denial of Redondo Beach's anti-SLAPP motion has been upheld by the appellate court.  .  Debtor believes that the City has amended its claim to reflect the fact that the anti-Slapp claim is not longer a part of their claim in this bankruptcy case.  The City has attempted to portray the action in which the anti-Slapp appeal was heard has been stayed in April, 2024.  While that may have been the case while the appeal of the anti-Slapp denial was pursued by the City, now that the City has lost, Debtor/Plaintiff in that proceeding will be moving the Superior Court to lift the stay because the appeal has been fully and finally resolved.

(3)    Third Element of Redondo Beach's Claim:  The Plan intends to leave Redondo Beach's transfer tax claim unimpaired.  Presently, Redondo Beach contends that the amount due and owing is approximately $142,166.  However, when that claim is adjudicated by this Court or such other non-bankruptcy forum, the Plan will pay the claim according to governing law.

(4)    Fourth Element of Redondo Beach's Claim:  The portion of Redondo Beach's claim attributable to the alleged harm caused by violations (by AES Redondo, not the Debtor) of the Coastal Act and the LCP is duplicative of the claim filed by the Commission in the amount of $35,430,000.  The Debtor contends that the indemnification provided by AES Redondo satisfies Redondo Beach's claim, however, the Debtor is prepared to seek relief on its indemnification rights from this Court through the pending claim objection.

(5)    Fifth Element of Redondo Beach's Claim:  The portion of Redondo Beach's claim related to an option to purchase a portion of the Harbor Drive Property is the last element of their filed proof of claim.  The Debtor previously advised Redondo Beach in the course of the litigation with AES Redondo that Redondo Beach's rights under the applicable option agreement would remain unaffected by the outcome of the AES Redondo litigation.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

☐      **11 U.S.C. § 507(a)(3)** – Involuntary Gap Claims Allowed Under 11 U.S.C. § 502(f).

C.      **Unsecured Claims That Must Be Treated As Required By 11 U.S.C. § 1129(a)(9)(B) – Class 1**

11 U.S.C. § 1129(a)(9)(B) requires certain unsecured claims to be treated with priority over general unsecured claims, and pay them in full on the Effective Date, or as soon as practicable after the Effective Date, unless claimants vote as a class to accept deferred payments.  If so, claims are impaired and claimants are entitled to vote to accept or reject the Plan.

☒      There are no claims in Class 1.

☐      **CLASS 1a:  11 U.S.C. § 507(a)(1) - Wage and Commission Claims**

| Claimant: | | | | | | |
|---|---|---|---|---|---|---|
| **Claim Amount** (less paid to date) ☐ Actual ☐ Estimated | **Interest Rate** (if any) | **Amount Paid on Effective Date** | **Amount Paid After Effective Date** | | | |
| | | | **Frequency** | **Each Payment** | **Balloon Pymts** | **Term of Payments** |
| $ | % | $ | ☐ Monthly ☐ Quarterly | $ | $ | months |

☐  See Exhibit _____ for additional unsecured claims (not listed above) in Class 1:

☐      **Class 1(a)**: 11 U.S.C. § 507(a)(4) **-** Wage and Commission Claims.

☐      **Class 1(b)**: 11 U.S.C. § 507(a)(5) – Employee Benefit Plan Contribution Claims.

☐      **Class 1(c)**: 11 U.S.C. § 507(a)(6) – Grain Producer and Fisherman Claims.

☐      **Class 1(d)**: 11 U.S.C. § 507(a)(7) – Consumer Deposit Claims.

D.      **Other Unsecured Claims – Class 2**

☐  There are no claims in **Class 2**.

☒  See <u>Exhibit B</u> for a list of all **Class 2** claimants and amount owed to each.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1.    ☐    **Class 2a**:  **Nominal Unsecured Claims**.  These include "nominal" claims of $_____ or less, and any larger unsecured claims whose claimant agreed to reduce its claim to this amount.  Claimants are **not entitled to vote** to accept or reject the Plan.  Claimants will be paid the nominal amount on the Effective Date, or as soon as practicable thereafter.  Estimated total payments are $_____.

2.    ☒    **Class 2b**:  **General Unsecured Claims Other than Claim of the City of Redondo Beach**.  These are unsecured claims not included in **Class 2a** and will be paid as follows.  Claimants are **entitled to vote** to reject or accept the Plan.

☒    **Percent Plan**.  Each claimant in Class 2b will be paid 100% of its claim beginning the first relevant date after the Effective Date:

a.    Over eight months after the Effective Date, with the first installment in the amount of 10% of the allowed claim paid on the Effective Date, or as soon thereafter as is reasonably practicable, with the second installment in the amount of 35% of the allowed claims paid on the last business day of the month that is four months after the Effective Date, with the final installment in the amount of 55% of the allowed claim paid on the last business day of the month that is eight months after the Effective Date;

b.    ☐ with interest at the rate of _____% per annum, or ☒ without interest; and

c.    The amount each claimant receives depends on the total amount of allowed claims in this Class.

☐    **Pot Plan**.  Each member of Class 2b will be paid a *pro rata* share of a fund totaling $_____, created by the Debtor's payment:

a.    *Pro rata* means the entire fund amount divided by the total of all allowed claims in this Class;

b.    Payment amount is $_____ per ☐ month ☐ quarter for a period of _____ months/quarters;

c.    Payments will begin on (*date*): _____.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1          ☐   **Other**:  See Exhibit _____.

2          3.   ☒   **Class 2c General Unsecured Claim of the City of Redondo**

3   **Beach Other than the Prepetition Disputed Transfer Tax Claim.** This is the General

4   Unsecured Claim of the City of Redondo Beach, other than their claim for payment of

5   transfer taxes, if they otherwise have one.  This Claimant is **not entitled** to vote to accept

6   or reject the Debtor's Plan (although Debtor may initiate motion practice on that point).

7   The General Unsecured Claim of the City of Redondo Beach which is discussed at

8   footnote 19 on page 77 of this Disclosure Statement and Plan of Reorganization and at

9   Exhibit B hereto will retain their legal and equitable rights with respect to their claim, if

10   they have one.  Those legal and equitable rights will not be determined until after

11   confirmation of the Debtor's Plan.  At such time as the City of Redondo Beach is

12   determined to have a final, allowable claim in this bankruptcy case with all rights of

13   appeal having been exhausted, beginning on the first day of the first quarter after such

14   final, non-appealable allowance of their claim takes place, Debtor will make payments on

15   the first day of each quarter in the calendar year, and will pay such claim in twelve (12)

16   equal quarterly installments; provided, however, that any payment by any party toward

17   the alleged elements of the City of Redondo Beach claim including the Coastal

18   Commission Claim, the Environmental Claim or the claim based upon the Option

19   Agreement shall be credited against any amount due to the City by the Debtor under this

20   Plan.

21          ☒   **Percent Plan**.  Each claimant in Class 2c will be paid 100% of its

22   claim beginning the first relevant date after the Effective Date as described directly

23   above.

24                a.      At such time as the City of Redondo Beach is determined to

25   have a final, allowable claim in this bankruptcy case with all rights of appeal having been

26   exhausted, beginning on the first day of the first quarter after such final, non-appealable

27   allowance of their claim takes place, Debtor will make payments on the first day of each

28   quarter in the calendar year, and will pay such claim in twelve (12) equal quarterly

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

installments; provided, however, that any payment by any party toward the alleged

elements of the City of Redondo Beach claim including the Coastal Commission Claim,

the Environmental Claim or the claim based upon the Option Agreement shall be credited

against any amount due to the City by the Debtor under this Plan.

        b.      ☐ with interest at the rate of _____% per annum, or ☒

without interest; and

        ☐ **Pot Plan**.  Each member of Class 2b will be paid a *pro rata*

share of a fund totaling $_____, created by the Debtor's payment:

        a.      *Pro rata* means the entire fund amount divided by the total of

all allowed claims in this Class;

        b.      Payment amount is $_____ per ☐ month ☐ quarter for a

period of _____ months/quarters;

        c.      Payments will begin on (*date*): _____.

        ☐ **Other**:  See Exhibit _____

E.     **Secured Claims – Class 3, Class 4, and Class 5**

     1.     **Class 3 - Unimpaired Non-Insider Claims**

Claimants are not entitled to vote to accept or reject the Plan.  Until claims

are fully paid, claimants retain their interest in the property securing the claim.  Treatment

is:

        ☒      Class 3a is the Unimpaired Environmental Deed of Trust Claim of

AES Redondo Beach LLC.

| ☒ **Class 3a** | **Claimant:** AES Redondo Beach, L.L.C. (Disputed) |
|---|---|
| | **Basis for secured status:** Environmental Deed of Trust |
| | **Priority of lien:** Senior |
| | ☒ Lien is not modified in any way. |
| | ☐ Lien is modified as follows: |

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly payments | Final Payment date |
|---|---|---|---|---|---|---|---|
| The EDOT does not yet create a monetary obligation because the work that needs to be done and the cost to do it have not been ascertained. The purpose of the EDOT is to indemnify AES Redondo for any liability that it has under the CACA or under the applicable environmental laws.[21] The below chart illustrates this process and was received by the Debtor from its environmental consultants at EFI. See discussion directly below entitled "Environmental Ascertainment and Remediation Process that is Applicable to the Redondo Beach Property". However, since this is a claim for indemnity and no claim has yet been | Having already started and continuing immediately after confirmation of the Plan, based upon estimates that will be provided to the Debtor and this Court, deposits will be made in a separate account for the estimated cost of "RCRA Facility Investigation" as described in the Vertical Flow Chart, below. After completion of this aspect of the environmental ascertainment, , will undertakethe next aspect which is  the Corrective Measures Study as described in the Vertical Flowchart below and in the following description.  The work will be done when it is needed and necessary to do based upon the Debtor consulting with the Department of Toxic Substances Control.  In connection with this Plan, the Debtor will provide specific estimates of what this work will cost when the time comes that it needs to be done. Begfore this next aspect of the environmental remediation needs to be done, the same separate account will be funded in order to pay for | Not applicable | Payment of the amount necessary to pay for the RCRA Facility Investigation will be funded on or before the Effective Date of the Plan. Each subsequent funding as each requirement for environmental remediation shown in the Vertical Flowchart below is reached will take place after the Plan's Effective Date | RCRA Facility investigation is anticipated to be funded through operations. Interim measures will be implemented at this time and Corrective Measures will be implemented at a later time.  The CACA was first entered nearly 30 years ago and the site is closed off to the public so there is no reuse that necessitates full implementation of the corrective measures at this time absent a future plan for the site.  The equity in the site is sufficient for implementing the anticipated clean up costs and the EDOT will remain pending a plan for the site with interim measures implemented until such time, the **first payment date** is RCRA Facility Investigation will be funded from the Effective Date on an ongoing basis as needed and is reflected on the exhibit of cash flows.  **Debtor estimates that for the first eighteen (18) months following Plan Confirmation, that payments in the amount of $50,000 should be sufficient to complete the RCRA Facility** | The Debtor shall comply in all respects with the Third Amendment to the Purchase Agreement. | Not applicable | Not Applicable |

---

[21] The Debtor is not aware of any other liabilities other than the cost to comply with the CACA with the DTSC.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | made against AES for the implementation or payment of any environmental remediation of the Redondo Beach Property, there are no payments required other than those payments which the Debtor has made and will continue to make in order to complete the ascertainment process and to identify, implement and correct any actual or potential releases of hazardous waste or hazardous constituents from regulated units, solid waste management units, and other sources or areas at the facility which may present an endangerment to human health or the environment. | the cost of this work. When this work is completed and necessary approvals obtained, notice of this will be given. Thereafter as necessary and as required by DTSC, notice of the "Statement of Basis" process will be given, the cost estimate from the Debtor's consultants also provided and that cost will be funded into the separate account described herein in order to pay for this aspect of the Remediation Process. When that process has been completed, notice of its completion will be given to AES Redondo (as with the other notices described hereinunder) and subsequently, notice of Corrective Measure Implementation and its commencement will be given along with the Debtor's consultants' estimate of the cost to complete this part of the environmental remediation process. Once the Corrective Measures Implementation is finished, notice of its completion will be given to AES Redondo. Subsequently, the commencement of Site Closure as described in the Vertical Flowchart below will be given and the cost of this provided by the Debtor's environmental consultants. When that takes | | | Investigation. | | | |

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

place, notice of it shall be given to AES Redondo along with the conditions of Site Closure.  At any point in this process when Site Closure is agreed upon between the Debtor and DTSC, notice shall be given to AES and the City.  At this point, the Environmental Deed of Trust's conditions will have been satisfied and Debtor will request that AES reconvey the EDOT.In conformance with the description of work to be done and the estimates for completing it which are provided by the Debtor's consultant(s), the necessary sums to do the work when it needs to be done will be provided.

**Address or Other Description of Collateral Securing Claim 4b:** 1100 N. Harbor Drive, Redondo Beach, California 90277 (APN Nos. 7503-013-819,820/7503-013-014,015)

| Value: $110,000,000 ("As Is" Market Value) $600,000,000 ("As Entitled" Market Value) | Valuation Method Sales Comparison Approach | ☐ Order on motion or stipulation ☒ Declaration: Certified appraiser (see Declaration of Jack Alexander, attached hereto) ☒ Other: Appraisal dated February 28, 2023, as updated June 14, 2024 |
|---|---|---|

☒    Additional Comments relating to Class 3a:

Claimant contends that the amount of its claim is no less than

$134,816,699.11 (Claim No. 5-1).  The Debtor disputes the claim and contends that AES

Redondo is not owed monies under the Environmental Deed of Trust.  As noted, among

1  other things, the Environmental Deed of Trust does not yet create a monetary obligation

2  because the work that needs to be done and the cost to do it have not been ascertained.

3  **The Environmental Ascertainment and Remediation Process that is Applicable to**

4  **the Harbor Drive Property**



20    The above flow chart gives an illustration of the process of ascertaining and

21  remediating the environmental issues at the Harbor Drive Property.  The top of the

22  horizontal flow chart is the beginning of the process and the bottom of the flow chart is

23  the end of the process.  The Harbor Drive Property is at the "RCRA Investigation" stage

24  at this time.  The terms specified in the flow chart have the following meanings:

25    •    RCRA Facility Assessment:  This is the assessment of what must be done

26  to ascertain and correct the environmental condition at a property and have the DTSC

27  oversee the implementation of the plan to remediate the environmental condition.  The

28  acronym "RCRA" means "Resource Conservation and Recovery Act of 1976".  The

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    RCRA Facility Assessment is the first step of the corrective action process as authorized

2    by the Hazardous and Solid Waste Amendments to the RCRA.

3         •     RCRA Facility Investigation:  The RCRA Facility Investigation includes the

4    collection of site specific data to evaluate any human health and/or ecological impacts of

5    contamination from the site.  It is the Debtor's responsibility in this case, to supply all of

6    the personnel, materials, and services necessary for performance of the RCRA Facility

7    Investigation.  This is the stage at which the Debtor has reached at the present time.  The

8    Debtor is the first party to take material steps to address and remediate the Harbor Drive

9    Property "within the context of the RCRA closure process." AES Redondo has performed

10   some groundwater monitoring to date that will assist with Site Closure at the end of the

11   day.

12        •     Human Health Risk Assessment:  From DTSC's website, the following

13   information is provided on the Human Health Risk Assessment - "On September 4, 2018,

14   the Toxicity Criteria for Human Health Risk Assessments, Screening Levels, and

15   Remediation Goals rule was approved by the Office of Administrative Law and became

16   immediately effective."  DTSC's site includes the enacting statutes on the Human Health

17   Risk Assessment and states under Section 68400.5: "For any release of hazardous

18   waste or hazardous constituents, the human health risk assessment calculations,

19   including, but not limited to, all cancer risk and non-cancer hazard screening levels and

20   corrective action objectives, shall use the toxicity criteria specified in California Code of

21   Regulations, title 22, section 69021 and attain the human health protection specified in

22   section 69022, subdivisions (a) and (b)."   A true and correct copy of the "Toxicity Criteria

23   for Human Health Risk Assessments, Screening Levels, and Remediation Goals" is

24   attached hereto as Exhibit G.

25        •     Ecological Risk Assessment:  Another stage of the RCRA Facility

26   Investigation is the Ecological Risk Assessment.  The DTSC has published guidelines

27   known as "Ecological Risk Assessments at Hazardous Waste Sites and Permitted

28   Facilities."  This contains the description of the DTSC-recommended phased method for

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311  •  FAX 954.771.9264

1    conducting an ecological risk assessment.  Outlined are the contents of a Scoping

2    Assessment, a Phase I Predictive Assessment, a Phase II Validation Study, and a Phase

3    III Impact Assessment.  DTSC provides additional documents and flow charts describing

4    the process with a text description of the decision points and work products needed to

5    complete this aspect of the study.

6        •    Risk Management:  The third aspect of the RCRA Facility Investigation is

7    the "Risk Assessment."  This actually breaks down into two areas of inquiry; the first is

8    the Human Health Risk Assessment and the second is the Ecological Risk Assessment.

9    Each of these are specifically controlled by statute which are California Code of

10   Regulations 68400.5, 69020-69022.  To quote from the DTSC's website:  "The Toxicity

11   Criteria Rule protects human health by ensuring that human health risk assessments,

12   risk-based screening levels, and risk-based remediation goals for hazardous waste and

13   hazardous substance cleanup sites in California use the appropriate toxicity criteria

14   specified in section 69021 of the rule.  Toxicity criteria are chemical-specific numerical

15   values that describe the potency of a chemical or contaminant."

16       •    Statement of Basis:  This is the publicly circulated plan of DTSC which

17   presents a proposed final remedy which describes in detail exactly what steps will be

18   taken to remediate the specific environmental harm that has resulted from the steps

19   taken which are described above, in this case, concerning the Harbor Drive Property.

20   The typical sections of such reports include (i) introduction of the issue; (ii) proposed

21   remedy stating exactly what will be done, in the case of the Debtor's Property, in

22   connection with whatever soil remediation is necessary; (iii) summary of RCRA Facility

23   Investigations; (iv) summary or remedial alternatives; (v) recommendation for final

24   remedy; and (vi) public participation-solicitation of public comment typically for a period of

25   thirty (30) days

26       •    Interim Measures: The Environmental Protection Agency has stated that the

27   purpose of Interim Measures are to identify and correct any actual or potential releases of

28   hazardous waste or hazardous constituents from regulated units, solid waste

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

1    management units, and other sources or areas at the facility which may present an

2    endangerment to human health or the environment.

3    &bull;    Corrective Measures Implementation:  From the DTSC website:  "The

4    purpose of the Corrective Measures Implementation (CMI) program is to design,

5    construct, operate, maintain and monitor the performance of the corrective measure or

6    measures selected by the Department. Corrective measures are intended to protect

7    human health and/or the environment from hazardous waste releases from the Facility.

8    The Owner/Operator or Respondent will furnish all personnel, materials and services

9    necessary to implement the corrective measures program."  The clarity of this description

10    makes a further discussion or description of it unnecessary.

11    &bull;    Site Closure:  Once conditions at a site are deemed low risk (low-threat) by

12    the oversight agency, the environmental case is closed.  This does not mean that the

13    owner will never have to deal with its contamination problem again.  Environmental case

14    closure is conditional.  The closure letter typically has two parts.  In the first part, the letter

15    certifies that investigation and cleanup of contamination meets all regulatory

16    requirements for case closure, and no further action is necessary.  In the second part, the

17    letter states the conditions of closure, such as the discovery of additional or previously

18    unidentified contamination at the site that may require additional investigation and

19    cleanup.  However, excluded are post-closed operation and maintenance requirements

20    that may remain (such as post-closure groundwater monitoring, cap inspections, etc.).

21    Those activities may continue for significant periods, or in perpetuity, and the end point of

22    this process will not be tied to the post-closure requirements.

23    The regulatory oversight agency, local health agency, and the appropriate local

24    planning and building departments, must be notified prior to any changes in land use,

25    grading activities, excavation, or dewatering.  This notification must include a statement

26    that residual soil and groundwater pollution underlie the property and nearby properties.

27    The first condition means that if any new contamination or contamination above

28    levels deemed appropriate for closure are encountered, the case may be reopened.  The

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1   second condition means that any changes in property use must be declared to the

2   regulatory oversight agency, local health agency, and the appropriate local planning and

3   building departments.  Oftentimes implementation of a soil and groundwater

4   management plan prepared at closure is required.

5          The condition of the Site Closure may or may not mean that further controls

6   are necessary.  Examples of further controls include monitoring of the project

7   going forward and periodic reporting to DTSC based upon this monitoring process.

| ☐ Class 3b | Claimant:<br><br>Basis for secured status:<br><br>Priority of lien: | | | | | | |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly Payments | Final Payment date |
|---|---|---|---|---|---|---|---|
| $ | $ | % | | $ | | $ | |

| Address or Other Description of Collateral Securing Class 3b: | |
|---|---|
| Value:<br>$ | Valuation Method | ☐ Order on motion or stipulation  ☐ Declaration:<br>☐ Other: |

          ☐      Additional Comments relating to Class 3b:

| ☐ Class 3c | Claimant:<br><br>Basis for secured status:<br><br>Priority of lien: | | | | | | |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly Payment | Final Payment date |
|---|---|---|---|---|---|---|---|
| $ | $ | $ | $ | $ | $ | $ | |

| Address or Other Description of Collateral Securing Class 3c: | |
|---|---|
| Value:<br>$ | Valuation Method | ☐ Order on motion or stipulation  ☐ Declaration: Certified appraiser |

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

|  |  | ☐ Other: |
|---|---|---|

☐ Additional Comments relating to Class 3c:

| ☐ **Class 3d** | **Claimant:** |
|---|---|
| | **Basis for secured status:** |
| | **Priority of lien:** |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly Payments | Final Payment date |
|---|---|---|---|---|---|---|---|
| | $ | % | | $ | | $ | |

| Address or Other Description of Collateral Securing Class 3d: | |
|---|---|
| **Value:** $ | **Valuation Method** ☐ Order on motion or stipulation ☐ Declaration: Certified appraiser<br>☐ Other: |

☐ Additional Comments relating to Class 3d:

☐ See Exhibit _____ for more unimpaired secured claims.  Label as Class 3e, Class 3f, etc.

## 2. **Class 4 - Impaired Non-Insider Claims**

Claimants are entitled to vote to accept or reject the Plan.  Until claims are fully paid, claimants retain their interest in the property securing the claim.  Treatment is:

☐ There are no claims in Class 4.

| ☒ **Class 4a** | **Claimant:** East West Bank |
|---|---|
| | **Basis for secured status:** Deed of Trust |
| | **Priority of lien:** Senior |
| | ☒ Lien is not modified in any way. |
| | ☐ Lien is modified as follows: |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly payments | Final Payment date |
|---|---|---|---|---|---|---|---|
| $13,376,615.39 | $13,376,615.3 | Interest to | $105,352.39 | $105,352.39, | Monthly | $13,376,615.39, | December |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9, plus allowed interest, late fees, charges, and attorneys' fees and expenses | be paid pursuant to that certain loan evidenced by a "Promissory Note" dated as of August 8, 2019 | in March 2024 | some paid in advance | from March 5, 2024 through December 31, 2024 | plus allowed interest, late fees, charges, and attorneys' fees and expenses | 31, 2024. Debt is all due and payable on December 31, 2024, after which, if Esat West Bank is not in full, they may foreclose on the real property that constitutes their collateral |

**Address or Other Description of Collateral Securing Claim 4a:** 9740-9744 Wilshire Boulevard, Beverly Hills, California 90212; 125 S. Linden Drive, Beverly Hills, California 90012 (APN No. 4328-009-021); 129 S. Linden Drive, Beverly Hills, California 90012 (APN No. 4328-009-007)

| **Value:** $40,000,000 | **Valuation Method** | ☐ Order on motion or stipulation ☐ Declaration: Certified appraiser ☐ Other: |
|---|---|---|

☒    Additional Comments relating to Class 4a:

Claimant contended that the amount of its claim was $13,645,885.30 (Claim No. 4-1). However, pursuant to that certain "Temporary Loan Payment Modification and Partial Forbearance Agreement," dated March 2024, by and between the Debtor, 9300 Wilshire Fee LLC, The Dromy Family Trust, Dated December 12, 1995, 1112 Investment Company, LLC, E.D. Fores, LLC, on the one hand, and East West Bank, on the other hand, the parties reaffirmed that, as of the date of the agreement, the outstanding principal balance and accrued interest of the loan is $13,376,615.39, plus any and all sums due at the execution of the agreement. Under the existing forbearance agreement, the remaining indebtedness is due on October 2, 2024. However, under this alternative, what is stated above in Class 4a will be the treatment that East West Bank will receive under the Plan.

| ☒ **Class 4b** | **Claimant:** AES Redondo Beach, L.L.C. (Disputed) |
|---|---|
| | **Basis for secured status:** Performance Deed of Trust |
| | **Priority of lien:** Second Deed of Trust - so-called Performance Deed of Trust as defined in the Purchase Agreement |
| | ☒ Lien is not modified in any way. |
| | ☐ Lien is modified as follows: |

| Total Amount of | Total Amount of Payments Over | Interest Rate | First | Amount of Each | Frequency of | Total Yearly | Final Payment date |
|---|---|---|---|---|---|---|---|

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| Allowed Claim | Time to Satisfy Secured Claim | | Payment Date | Installment | Payments | payments | |
|---|---|---|---|---|---|---|---|
| $14,000,000, or the actual amount owing as of the filing date of this bankruptcy case plus interest from Petition Date to Confirmation. This is the minimum Performance Deed of Trust claim that AES shall receive and this claim shall be paid as set forth herein immediately after the Plan's Effective Date. | $16,975,000 or as adjusted based upon accrued interest as of the Chapter 11 filing date plus interest from the Chapter 11 filing date until confirmation of the Plan less any payments made by the Debtor to AES. | 8.0-8.5%, or whatever rate the Debtor introduces as a fair rate of interest under the Bankruptcy Code. | Plan's Effective Date, to an Escrow Account established pursuant to the Plan, or when objections to AES Redondo's claim are determined and the amount of AES Redondo's liability under the claim of the Commission is determined. Since the claim of the Commission is $35,000,000 and, therefore, exceeds the amount of the claim of AES Redondo under the Performance Deed of Trust, payments shall be made into an escrow account established pursuant to the Plan until such time as objections to AES Redondo's claim are resolved and the indemnification obligation of AES Redondo to the Debtor on account of the Coastal Commission's claim is determined. The Bankruptcy | $99,166.67 plus an additional amount based upon the amount of AES' claim as of Plan Confirmation | Monthly | $1,190,000 plus an additional amount based upon the amount of AES' claim as of Plan Confirmation | First day of the 30th month following Plan Confirmation, Debtor shall pay AES $14,000,000 in order to satisfy the undisputed portion of their claim as of Plan Confirmation.. With regard to the further pending disputes being litigated before this Court regarding the AES Performance Deed of Trust Claim, if the obligation of the Debtor is determined, as of Plan Confirmation to be more than $14,000,000, plus interest, from the Petition Date to Confirmation (the "Differential Claim"), the Debtor will pay the Differential Claim from the 31st through the 48rd month after Plan Confirmation, with payments of interest only on the Differential Claim amount at 8.0%-8.5% interest, or whatever rate the Debtor introduces as a fair rate of interest under the Bankruptcy Code or what the Bankruptcy |

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| | | | | | | | Court finds to be the fair rate of interest, with the balance of the Differential Claim due and payable on the first day of the 48th month following confirmation of the Plan |
|---|---|---|---|---|---|---|---|
| | | | Court shall retain exclusive jurisdiction to determine the disposition of the funds in the Escrow Account to either AES Redondo or the Commission either based upon the parties' agreement or a hearing before the Court after notice is provided | | | | |

**Address or Other Description of Collateral Securing Claim 4c:** 1100 N. Harbor Drive, Redondo Beach, California 90277 (APN Nos. 7503-013-819,820/7503-013-014,015)

| **Value:** $110,000,000 ("As Is" Market Value) **$600,000,000** ("As Entitled" Market Value) | **Valuation Method** Sales Comparison Approach | ☐ Order on motion or stipulation  ☒ Declaration: Certified appraiser (see Declaration of Jack Alexander, attached hereto) ☒ Other: Appraisal dated February 28, 2023, as updated June 14, 2024 |
|---|---|---|

☒   Additional Comments relating to Class 4c:

A.   Claimant contends that the amount of its claim is no less than $134,816,699.11 (Claim No. 5-1) although this "claim" is not allocated between the Environmental Deed of Trust claim and the Performance Deed of Trust Claim.  The Debtor disputes the claim and contends that AES Redondo is owed no more than $14,000,000 of the Performance Deed of Trust claim. There are no offsets to this claim, save and except for: (a) any liability that the Debtor pays to the California Coastal Commission on their claim and (b) any liability that AES has to the Debtor by reason of its breaches of the Asset Purchase Agreement between them as amended.  AES Redondo's claim might be increased by certain sums based upon the claims asserted by AES Redondo in the pending litigation between them before the Bankruptcy Court.  Further determination of this claim shall be made after confirmation of the Plan as the result of adjudication of the litigation claims filed by the Debtor against AES Redondo and as a

1  further result of determination of the Debtor's rights of indemnity with respect to the

2  $35,000,000 claim filed by the Commission for environmental harm done to the Harbor

3  Drive Property by AES Redondo during its operation of the Power Generating Facility.

4  As described, all payments on account of this indebtedness shall be made to an escrow

5  account established pursuant to the confirmed Plan until these issues are determined by

6  final and non-appealable orders or judgments.  If the obligation of the Debtor is

7  determined, as of Plan confirmation to be more than $14,000,000, plus interest from the

8  Petition Date to the date of Plan confirmation (the "Differential Claim"), the Debtor will pay

9  the difference between $14,000,000 and the actual amount of AES Redondo's

10  Performance Deed of Trust claim from the 31st through the 48th month after Plan

11  confirmation, with payments of interest only on the Differential Claim amount at 8.0% to

12  8.5% interest, or whatever rate the Debtor introduces as a fair rate of interest under the

13  Bankruptcy Code, with the balance of the Differential Claim due and payable on the first

14  day of the 48rd month following confirmation of the Plan. .

15          B.      Additional Collateral to Secure Repayment of the AES Performance

16  Deed of Trust (Class 4b) and the Unimpaired Class 3a Environmental Deed of Trust

17  Claim to Pay for the Cost of Environmental Ascertainment and Remediation

18          Mr. Eli Dromy and Mr. Pustilnikov shall pledge their non-Debtor assets from

19  the following properties which have the following values:

20          See Exhibit __ hereto which demonstrates that the equities held in the listed

21  properties on that Exhibit total $33,935,596 subject to introduction of valuation testimony

22  and the equity held in those properties through non-Debtor entities owned or controlled

23  by Mr. Dromy and Mr. Pustilnikov total $31,243,611 which will be additional collateral

24  under the Debtor's Plan which AES does not have a collateral security interest in now

25  and which equities are not property of the Bankruptcy Estate in this Bankruptcy Case.

26  Only ten (10%) percent of the equity in these properties is owned by a third party(ies), so

27  the pledging of membership/ownership interests held by entities which are not the Debtor

28  is a substantial addition to the collateral package that AES shall receive in addition to the

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  substantial equity in the Redondo Beach Property that the appraisal testimony for it

2  demonstrates exists for its benefit.

| ☒ **Class 4d** | **Claimant:** Valley National Bank fka Bank Leumi |
| --- | --- |
| | **Basis for secured status:** Deed of Trust |
| | **Priority of lien:** Senior |
| | ☒ Lien is not modified in any way. |
| | ☐ Lien is modified as follows: |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly payments | Final Payment date |
| --- | --- | --- | --- | --- | --- | --- | --- |
| $7,000,000 | $7,000,000 plus allowed interest, late fees, charges, and attorneys' fees and expenses | Interest to be paid pursuant to Sections 3.3 and 3.5 of the "Loan Agreement" dated as of May 5, 2021 | $400,000 in April 2024 | $45,000 per month from April 10, 2024 through November 10, 2024 | Monthly from April 10, 2024 through November 10, 2024 | $7,000,000 plus allowed interest, late fees, charges, and attorneys' fees and expenses | November 30, 2024 |

| **Address or Other Description of Collateral Securing Claim 4d:** 174 Kinney Street, Santa Monica, California 90405; 169-177 Pier Street, Santa Monica, California 904045 (APN No. 4288-008-008) | | |
| --- | --- | --- |
| **Value:** $12,500,000 | **Valuation Method** | ☐ Order on motion or stipulation ☐ Declaration: Certified appraiser ☐ Other: |

☒  Additional Comments relating to Class 4d:

Claimant contends that the amount of its claim is $7,000,000, plus allowed

interest, late fees, charges, and attorneys' fees and expenses (Claim No. 10-1).  The

Debtor contends that its interest/equity in the subject real properties is no less than

$1,237,500.  The payment terms were memorialized in that certain "Stipulation Regarding

Adequate Protection Payments, and Relief From Automatic Stay" (the "Valley Bank

Stipulation") approved by the Court pursuant to its order entered on May 16, 2024

[Docket No. 339].  According to the terms of the Valley Bank Stipulation, among other

things, default rate interest shall accrue continuously from August 1, 2023, provided,

however, that if (i) there is no uncured default of a monthly payment, property taxes, or

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

insurance, (ii) there are no other defaults under the Valley Bank Stipulation, and (iii) all

sums due under the underlying loan are paid in full by November 30, 2024, then default

rate interest that has accrued since August 1, 2023, shall be waived.

| ☐ Class 4e | Claimant: |
| | Basis for secured status: |
| | Priority of lien: |
| | ☐ Lien is not modified in any way. |
| | ☐ Lien is modified as follows: |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly payments | Final Payment date |
|---|---|---|---|---|---|---|---|
| $ | $ | % | | $ | | $ | |

| Address or Other Description of Collateral Securing Claim 4e: | | |
|---|---|---|
| Value: $ | Valuation Method | ☐ Order on motion or stipulation  ☐ Declaration: Certified appraiser  ☐ Other: |

    ☐    Additional Comments relating to Class 4e:

    ☐    See Exhibit _____ for more impaired secured claims.  Label as Class

4f, Class 4g, etc.

    **3.**    <u>**Class 5 – Insider Claims**</u>

These are claims of persons defined in 11 U.S.C. § 101(31).  Essentially,

an insider is a person with a close relationship with the Debtor other than a creditor-

debtor relationship.  Treatment is:

    ☒    There are no claims in Class 5.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| ☐ **Class 5a** | **Claimant:** |
|---|---|
| | **Basis for secured status:** |
| | **Priority of lien:** |
| | ☐ Lien is not modified in any way. |
| | ☐ Lien is modified as follows: |

| Total Amount of Allowed Claim | Total Amount of Payments Over Time to Satisfy Secured Claim | Interest Rate | First Payment Date | Amount of Each Installment | Frequency of Payments | Total Yearly payments | Final Payment date |
|---|---|---|---|---|---|---|---|
| $ | $ | % | | $ | | $ | |

| Address or Other Description of Collateral Securing Claim 5a: | | |
|---|---|---|
| **Value:** $ | **Valuation Method** | ☐ Order on motion or stipulation  ☐ Declaration: Certified appraiser  ☐ Other: |

☐    Additional Comments relating to Class 5a:

☐    See Exhibit _____ for more insider secured claims.  Label as Class 5b, Class 5c, etc.

### F.    **Shareholder or Partner Interests**

☒    Under the Plan, Shareholders simply retain their shares of stock.

☐    Shareholders redeem their shares of stock and receive the following consideration:          .

☐    Partner's interest(s) in partnership Debtor:

**1.**    Each partner's interest in the Debtor shall remain as it is now.  The identity of the Debtor's members are Alex Hotel, LLC; E.D. Flores, LLC; SLH Fund, LLC.,,

**2**.    The identity of the investors in the Redondo Beach Property are 1650 Veteran LLC, 505 Investment Company LLC, 5th Street Investment Company, BH Karka LLC, Outdoor Billboard, LLC, Peak Alcott LLC, 1112 Investment Co., LLC, E.D. Flores LLC, David Dromy, an individual, SLH Fund LLC, Alex Hotel LLC and 9300

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

1  Wilshire Fee LLC.  Unlike the reorganization plan offered by AES which wipes these

2  interests out and gives them zero on account of their interest in the Redondo Beach

3  Property and provides releases with respect to the litigation claims thereby rendering the

4  claims asserted in those litigation matters also without any value, the Debtor's

5  reorganization plan preserves the investments of these third parties in the Redondo

6  Beach Property and preserves their rights in the litigation claims as well.

7          **3,**      The investors in the Debtor who are listed in sub-paragraph 1,

8  above, and the investors in each of the Properties in which the Debtor is an interest

9  holder shall all retain their interests in the different properties in which the Debtor holds

10  an interest under the Plan.

11          There ☐ are no limited partners.

12          There ☐ are limited partners and their identities are as follows:          .

13          **2.**      The interest of ☐ some or ☐ all of the partners changes under the

14  Plan as follows:          .

15          ☐ The ☐ Articles of Incorporation or ☐ Bylaws have been changed to

16  include a provision prohibiting the issuance of nonvoting equity securities as required by

17  11 U.S.C. § 1123(a)(6).

18                              **IX.**

19                    **UNCLAIMED OR UNDELIVERABLE PLAN DISTRIBUTIONS**

20          Payments or other distributions made under the Plan that are unclaimed or

21  undeliverable for six (6) months after the attempted distribution will revest in the post-

22  confirmation debtor free of restrictions.  Any entitlement to distribution will be barred.

23                              **X.**

24                    **EFFECT OF CONFIRMATION**

25  A.    **General Comments**

26          The provisions of a confirmed plan bind the debtor, any entity acquiring

27  property under the plan, and any claimant, interest holder, or general partner of the

28  debtor, even those who do not vote to accept the plan.

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    The confirmation of the Plan will vest all property of the estate in the Debtor.

2    The automatic stay is lifted upon confirmation as to property of the estate.

3 However, the stay continues to prohibit collection or enforcement of pre-petition claims

4 against the Debtor or the Debtor's property until the date the Debtor receives a

5 discharge, if any.  If the Debtor does not seek a discharge, the discharge is deemed

6 denied and the stay as to the Debtor and the Debtor's property terminates on entry of the

7 order confirming the Plan.

8    **B.**    **Discharge of Liability for Payment of Debts; Termination of Rights and**

9        **Interests of Equity Security Holders and General Partners Provided for**

10        **by the Plan**

11    ☒    The Debtor will seek an order of discharge pursuant to 11 U.S.C. §

12 1141(d)(5)(C).

13    ☐    The Debtor is not eligible for a discharge pursuant to 11 U.S.C. §

14 1141(d)(3) because:

15        ☐    the Plan provides for the liquidation of all, or substantially all,

16 of the property of the estate;

17        ☐    the Debtor will not engage in business after consummation of

18 the Plan; or

19        ☐    the Debtor would be denied a discharge under 11 U.S.C. §

20 727(a) if the case were a case under chapter 7.

21        ☒    The Debtor is a corporate debtor thus pursuant to 11 U.S.C. §

22 1141(d)(5)-(6), "[t]he confirmation of the plan does not discharge the debtor from any

23 debt of a kind specified in 11 U.S.C. § 523(a)(2)(A)-(B) that is owed to a domestic

24 governmental unit, or owed to a person as the result of an action filed under subchapter

25 III of chapter 37 of title 31 or any similar State statute, or for a tax or customs duty with

26 respect to which the debtor made a fraudulent tax return or willfully attempted in any

27 manner to evade or to defeat such tax or such customs duty."

28    **C.**    **Modification of the Plan**

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    The Proponent may modify the Plan pursuant to 11 U.S.C. § 1127.

2    **D.**    **Final Decree**

3    Once the Plan has been consummated, a final decree may be entered upon

4    motion of the Proponent.  The effect of the final decree is to close the bankruptcy case.

5    After such closure, a party seeking any type of relief relating to a Plan provision can seek

6    such relief in a state court of general jurisdiction.

7    **XI.**

8    **LIST OF EXHIBITS AND DECLARATIONS**

9    **A.**    **Mandatory**

10    **Exhibit A:**    Declaration of Leonid Pustilnikov to support all assertions in

11    this Disclosure Statement, and all information provided in all other exhibits.

12    **Exhibit B:**    List of all claims (*next to each claim, indicate whether or not*

13    *the claim is disputed and scheduled or unscheduled, and include the class number*).

14    **Exhibit C:**    List of all property of the estate (including cash on hand) and

15    going concern and liquidation valuations of all listed property as of the date of plan

16    confirmation.  Include appendices to describe valuation methods such as order entered

17    determining value, declaration of appraiser with approach used, qualifications as expert,

18    etc.  For rental property include average monthly cash flow, deducting for debt service

19    and ordinary, necessary operating expenses for the past three months and the past two

20    years.  Estimates of collections and likelihood of collections of accounts receivable and

21    lawsuits should also be provided.

22    **Exhibit D:**    Projected income, expenses, and plan payments prepared as

23    of the date of this Disclosure Statement and Plan, to support that the Plan is feasible

24    during the Plan term, as referred to in Section V.C.  Details include proposed Plan

25    payments to be made on the Effective Date and for each month and/or quarter of the

26    Plan Term.  Sources and uses of funds and any expense fluctuations are explained.

27    **Exhibit E:**    Financial records:

28

1   ☐   Balance sheets, income and expense statements, cash flow

2   statements for the period including the most recent twelve-month calendar year and all

3   months subsequent thereto.  Sources and uses of funds and any expense fluctuations

4   are explained.

5   The Disclosure Statement and Plan is not reliant on operating income or

6   projected cash-flow.  As such, there are no balance sheets, income and expense

7   statements, or cash flow statements for the period covering the duration of the Plan.

8   ☒   Evidence of funds constituting the source of funds on the Effective

9   Date.

10   **B.** **Optional**

11   ☒   **Exhibit F:**

12   Declarations:   ☒   Certified Appraisers (Jack Alexander)

13   ☒   Contributor of New Value (regarding ability to

14   provide funding)

15   ☐   Other:

16   ☒   **Exhibit G:**

17   Other Exhibits:

18   (a)   Corrective Action Consent Agreement

19   (b)   Toxicity Criteria for Human Health Risk Assessments, Screening

20   Levels, and Remediation Goals

21   (c)   Real Property interests provided as additional collateral to AES

22   Redondo Beach on account of their Performance Deed of Trust claim

23   **C.** **Additional Claims That are Unable to be Identified in Sections VIII.A –**

24   **VIII.F**

25   ☐   **Exhibit H:**   Additional Claim(s):

26   Sec.☐ VIII.A   ☐ VIII.B   ☐ VIII.C   ☐ VIII.D   ☐ VIII.E   ☐ VIII.F

27   ☐   **Exhibit I:**   Additional Claim(s):

28   Sec.☐ VIII.A   ☐ VIII.B   ☐ VIII.C   ☐ VIII.D   ☐ VIII.E   ☐ VIII.F

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57955327v5

☐ **Exhibit J:** Additional Claim(s):

Sec. ☐ VIII.A ☐ VIII.B ☐ VIII.C ☐ VIII.D ☐ VIII.E ☐ VIII.F

☐ **Exhibit K:** Additional Claim(s):

Sec. ☐ VIII.A ☐ VIII.B ☐ VIII.C ☐ VIII.D ☐ VIII.E ☐ VIII.F

☐ **Exhibit L:** Additional Claim(s):

Sec. ☐ VIII.A ☐ VIII.B ☐ VIII.C ☐ VIII.D ☐ VIII.E ☐ VIII.F

*[Remainder of page intentionally left blank]*

DATED: August 12, 2024                     **Greenspoon Marder LLP**


By: /s/ *Victor A. Sahn*
Victor A. Sahn
Attorneys for 9300 Wilshire, LLC, Debtor and
Debtor in Possession

**APPROVED AS TO FORM AND CONTENT:**

**9300 Wilshire, LLC, a Delaware limited liability company**


By: /s/ *Leonid Pustilnikov*
Leonid Pustilnikov
Managing Member

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1

**EXHIBIT A**

2

**(DECLARATION OF LEONID PUSTILNIKOV IN SUPPORT OF DISCLOSURE**

3

**STATEMENT AND PLAN)**

4

I, Leonid Pustilnikov, hereby declare and state as follows:

5

1.     I have personal knowledge of the facts set forth in this declaration.  I

6

am the Managing Member of 9300 Wilshire, LLC, a Delaware limited liability company

7

(the "Debtor"), the debtor and debtor in possession in the above-captioned case.

8

2.     In such capacity, I am actively involved in, and oversee, and am

9

intimately familiar with, all aspects of the Debtor's business and operations, including, but

10

not limited to, the Debtor's assets and liabilities.

11

3.     The name of the individuals who prepared or assisted in the

12

preparation of the "Debtor and Debtor in Possession's Disclosure Statement and Plan of

13

Reorganization" (the "Disclosure Statement and Plan"), and/or the accompanying

14

exhibits, are the Debtor's bankruptcy counsel (Victor A. Sahn, Daniel A. Lev, and Steve

15

Burnell, Greenspoon Marder, LLP).  These professionals prepared the Disclosure

16

Statement and Plan, and accompanying exhibits, with my assistance and the assistance

17

of the Debtor's other professionals, consultants, and agents who provided information

18

and other data necessary, and which was used, for the preparation and completion of the

19

Disclosure Statement and Plan, and accompanying exhibits.

20

4.     The source of all financial data is the Debtor.

21

5.     All facts and representations in the Disclosure Statement and Plan

22

are true to the best of my knowledge.

23

6.     No fact has been omitted that is material to a claimant or equity

24

security holder in voting to accept or reject the proposed plan described by the Disclosure

25

Statement and Plan.

26

7.     Together with the Debtor's professionals, consultants, and agents, I

27

prepared or assisted in the preparation of the financial documents that are detailed in the

28

Disclosure Statement and Plan.  I was acting within my capacity as managing Member of

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA  90067
TEL. 213.626.2311  •  FAX 954.771.9264

the Debtor in preparing or assisting in the preparation of the financial documents that are detailed in the Disclosure Statement and Plan.

8.    Where applicable, the accounting methods used to prepare the financial documents are based upon generally accepted accounting principles and are consistent with the Debtor's historical and current financial information.          .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of July, 2024, at Los Angeles, California.

Leonid Pustilnikov

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

# EXHIBIT B

# (LIST OF ALL CLAIMS (NEXT TO EACH CLAIM, INDICATE WHETHER OR NOT THE CLAIM

# IS DISPUTED AND SCHEDULED OR UNSCHEDULED, AND INCLUDE THE CLASS

# NUMBER)

| Claimant Name | Scheduled Amount | Proof of Claim Amount | Disputed | Class |
|---|---|---|---|---|
| Internal Revenue Service | Unscheduled | $18,350 Claim No. 2-2 | | N/A |
| State of California Franchise Tax Board | Unscheduled | $7,718.93 Claim No. 3-1 | | N/A |
| California Coastal Commission | Unscheduled | $35,430,000 Claim No. 7-1 | Yes | N/A |
| City of Redondo Beach | Unscheduled | $134,142,366[21] | Yes | N/A |

---

[21] According to Claim No. 8-1, Redondo Beach's claim is based on and comprised of the following:

Redondo Beach bases its claim on its alleged rights and interests, and the Debtor's alleged liabilities, arising in connection with (i) an the Redondo Beach Action pending before the Superior Court of the State of California, County of Los Angeles, bearing Case No. 20STCP903193; (ii) that certain "Open Space Covenant and Option Offer Agreement," dated as of March 26, 2020, among, *inter alia*, the Debtor and AES Redondo (the "Option Agreement"); (iii) all unpaid transfer tax (the "Transfer Tax Claim") related to the real property located at 1100 N. Harbor Drive, Redondo Beach, California 90277 (the "Harbor Drive Property"); (iv) the remediation of the Harbor Drive Property (the "Remediation Claim"); and (v) its police and regulatory powers under California Public Resources Code Division 20 (the "Coastal Act") and the City of Redondo Beach Certified Local Coastal Program (the "LCP").

(1)      **The Redondo Beach Action:**  On October 1, 2020, Redondo Beach and the City of Hermosa Beach commenced the Redondo Beach Action against the California State Water Resources Control Board.  The Debtor was named as a real party in interest in the Redondo Beach Action.  On April 15, 2022, the Debtor, among others, filed the Amended Redondo Beach Cross-Complaint in the Redondo Beach Action.  In response to the Amended Redondo Beach Cross-Complaint, Redondo Beach filed a "Special Motion to Strike the First Amended Cross-Complaint Pursuant to California Code of Civil Procedure § 425.16" (the "Anti-SLAPP Motion"), which was denied.  Thereafter, on December 7, 2022, Redondo Beach filed a "Notice of Appeal" of the order denying the Anti-SLAPP Motion, thereby commencing City of Redondo Beach v. California State Water Resources Control Board, bearing Case No. B325839 (the "Appeal"), which is currently pending in the Court of Appeal of the State of California, Second Appellate District.  In the event Redondo Beach prevails on its Appeal and the Anti-SLAPP Motion, Redondo Beach alleges it will be statutorily entitled to recover attorneys' fees incurred in connection with the Anti-SLAPP Motion and the Appeal from the Debtor.

(2)      **The Option Agreement:**  Redondo Beach alleges that it is the beneficiary of certain rights and interests under the Option Agreement.  Among other things, the Option Agreement provides that, upon the occurrence of certain conditions, Redondo Beach has the right to exercise an option to purchase fifteen (15) acres of the Harbor Drive Property (the "Subject Property") on specified terms (the "Option").  The question of whether Redondo Beach has repudiated the Option is at issue in the AES Redondo Action pending before this Court.  Redondo Beach commenced by the Debtor.  To the extent the Debtor may seek to strip Redondo Beach of its rights under the Option Agreement, including its rights with respect to the Option, Redondo Beach reserves all rights under the Bankruptcy Code and applicable non-bankruptcy law,

including the right to exercise the Option and purchase the Harbor Drive Property on the terms set forth in the Option Agreement, as well as the right to assert a claim for any related damages arising from the Debtor's alleged breach of, or other failure to perform, pursuant to the Option Agreement.

(3)     **The Transfer Tax Claim:**  Redondo Beach reserves its alleged rights with respect to the Debtor's alleged liability to Redondo Beach for any unpaid transfer tax in connection with its acquisition of the Harbor Drive Property. With respect to transfers of real property within the City of Redondo Beach, the Redondo Beach Municipal Code § 8-7.01 et seq. imposes a real property transfer tax at the rate of $1.10 for each $500 of the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrances remaining thereon at the time of sale), and provides that the buyer and seller are jointly and severally liable for payment of such tax.  The Debtor allegedly valued the Harbor Drive Property at $28,000,000 when it recorded the deed.  The Los Angeles County (the "County") Assessor allegedly valued the Harbor Drive Property at $64,598,000.  The Debtor and its co-owners have appealed the County's assessment.  Redondo Beach allegedly is entitled to any unpaid transfer tax based on the value of the property conveyed, once the Harbor Drive Property's value is determined.  Redondo Beach estimates the Transfer Tax due is approximately $142,166 based on the County's $64,598,000 assessment of the Harbor Drive Property.  Redondo Beach reserves its rights to amend its Proof of Claim to include penalties and interest in accordance with applicable law.

(4)     **The Remediation Claim:**  For nearly a century, an operating power generation facility (the "Facility") has been located on the Harbor Drive Property.  As a result, the Harbor Drive Property requires significant environmental remediation prior to any use (or reuse) of such property for any purpose other than housing the Facility.  Pursuant to the Option Agreement Claim, Redondo Beach allegedly has a potential ownership interest in the Subject Property.  Moreover, the Option Agreement allegedly requires the owners (including the Debtor) to remediate the Subject Property and to remove any structures relating to the generation of electricity by the time of closing (and specifies that $15 million of the purchase price will be held in escrow until the Subject Property is remediated and the structures have been removed).  Thus, upon exercise of the Option, pursuant to the terms of the Option Agreement, the Debtor allegedly is liable to Redondo Beach to the extent any portion of such purchase price is not used in accordance with the terms of the Option Agreement.  Additionally, Redondo Beach allegedly owns property neighboring the Harbor Drive Property.  To the extent contamination has or might spread to Redondo Beach's properties, the Debtor allegedly is liable to Redondo Beach for any costs or damages related to contamination of Redondo Beach's properties.  Further, under California Constitution, Article XI, § 7, Redondo Beach allegedly has the police power to take actions to protect the public health, safety and welfare.  Redondo Beach Municipal Code, Title 4, Chapter 10 specifically authorizes Redondo Beach to identify and abate private and public nuisances.  The extent of contamination allegedly present at the Harbor Drive Property and/or spreading from the Harbor Drive Property is not currently known, in large part because the owners, including the Debtor, have not yet completed the environmental studies necessary to remediate the Harbor Drive Property pursuant to the Resources Conservation and Recovery Act, under the supervision of the California Department of Toxic Substances Control.  If contamination is found that is a threat to public health, safety, or welfare, Redondo Beach allegedly is entitled to, *inter alia*, abate such contamination and recover the associated costs from and impose penalties on the Debtor.  In 2019, the Debtor's manager allegedly stated in writing that the estimated cost to purchase and remediate the Harbor Drive Property exceeded $175,000,000; based on the allegations of the Debtor in the AES Redondo Action, the acquisition cost of the Harbor Drive Property was $41,000,000, resulting in an alleged remediation cost of approximately $134,000,000.

(5)     **Claim Related to the Coastal Act and LCP:**  Pursuant to the Coastal Act, Redondo Beach has a certified LCP in place.  The Harbor Drive Property is located within the LCP area.  Within the LCP area, Redondo Beach is responsible for ensuring that development is in compliance with the requirements of the Coastal Act and the LCP.  As set forth by the Coastal Commission: Local governments play an essential role in coastal management, as partner agencies with a shared stewardship responsibility to protect and enhance coastal resources.  The Coastal Act requires that local governments develop Local Coastal Programs (LCPs) (consisting of Land Use Plans and Implementing ordinances) to carry out

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

| | | | | |
|---|---|---|---|---|
| | | Claim No. 8-1 | | |
| East West Bank | $13,600,000 | $13,645,885.30+ Claim No. 4-1 | | 4a |
| AES Redondo Beach, L.L.C. | $28,000,000 | $134,816,699.11+ Claim No. 5-1 | Yes | 4b |
| Valley National Bank fka Bank Leumi | $7,000,000 | $7,000,000+ Claim No. 10-1 | | 4c |
| Los Angeles County Treasurer and Tax Collector | Unscheduled | $0.00[22] Claim No. 1-1 | Yes | N/A |
| CBRE, Inc. | $70,000 | $79,556.39 Claim No. 6-1 | | 2b |
| Rutan & Tucker, LLP | $25,848.56 | $25,847.66 | | 2b |

policies of the California Coastal Act at the local level.  Once certified by the Coastal Commission as consistent with and adequate to carry out the Coastal Act, responsibility for issuance of most Coastal Development Permits under the certified LCP is delegated to the local government. (https://www.coastal.ca.gov/rflg; Pub. Res. Code § 30519(a)).  The primary goals of the Coastal Act include the protection of natural resources; special protection of environmentally sensitive habitat areas, such as wetlands; minimizing contamination of water and natural resources; and maximizing public access to those resources. (Pub. Code §§ 30210-30214, 30230-30231, 30240).  In 2015, the California Coastal Commission (the "Commission") identified 5.93 acres of Commission-jurisdictional wetlands on the Harbor Drive Property.  See Commission's 30413(d) Report for the Proposed AES Southland, LLC Redondo Beach Energy Project – Application for Certification #12-AFC-03.  Pursuant to the Coastal Act and the LCP, Redondo Beach allegedly has the authority and obligation to ensure the protection of these wetlands; to prevent their degradation and promote their restoration; and to provide public access to this coastal resource.  Redondo Beach is also the primary governmental entity vested with development review authority to ensure the Harbor Drive Property is developed in accordance with the terms of the Coastal Act and the LCP, and reserves all rights with respect thereto.  In violation of the Coastal Act and the LCP, the prior owner installed a "dewatering system" to drain the wetlands area, without obtaining a Coastal Development Permit.  In 2019 and 2020, Redondo Beach demanded that the prior owner dismantle and remove the dewatering system.  To avoid enforcement, the Harbor Drive Property's prior owner agreed to stop draining the wetlands area and submitted a Coastal Development Permit to remove the dewatering system.  The application allegedly was not completed and the Harbor Drive Property still contains a dewatering system that violates the Coastal Act and LCP.  Redondo Beach reserves the right to require the Debtor to remove the dewatering system; restore the wetlands; remediate any contamination impacting the wetlands; and/or to seek damages and penalties for this ongoing violation of the Coastal Act, all in accordance with applicable law.

Nothing contained herein shall act as a waiver, admission, or release of any claim, defense, or right of the Debtor to object to all or a portion of Redondo Beach's claim, and all such claims, defenses, and rights are hereby reserved.

[22] On February 23, 2023, the Los Angeles County Treasurer and Tax Collector originally filed a claim in the amount of $1,762,367.70 as Claim No. 1-1.  However, after determining that the indebtedness that formed the basis of the claim had been paid, in full, on May 13, 2024, the Los Angeles County Treasurer and Tax Collector filed its "Withdrawal of Claim" [Docket No. 336] pursuant to which Claim No. 1-1 was withdrawn in its entirety.  As a result, the Los Angeles County Treasurer and Tax Collector has no claim against the Debtor's estate.

Claim No. 7-1

| | | |
|---|---|---|
| Cohen Law Group | $190,000 | 2b |
| Englander Knabe Allen & Associates LLC | $5,625 | 2b |
| KFA | $99,500 | 2b |
| KPFF | $30,000 | 2b |
| Manela & Company | $18,260 | 2b |
| Newmeyer Dillion | $14,680.50 | 2b |
| Sturgis Holdings | $0.00[23] | N/A |

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

---

[23] The scheduled amount of Sturgis Holdings' claim was $312,609.31. However, Sturgis Holdings received post-petition payments from non-debtor sources that reduced the balance of its claim to $0.00 as of the date of this Disclosure Statement and Plan.

**EXHIBIT C**

**(LIST OF ALL PROPERTY OF THE ESTATE (INCLUDING CASH ON HAND) AND GOING CONCERN AND LIQUIDATION VALUATIONS OF ALL LISTED PROPERTY AS OF THE DATE OF PLAN CONFIRMATION)**

**ASSETS:**

Current Assets:

|  |  |
|---|---|
| Cash: | $185,000 |
| Accounts Receivable: | $45,674 |
| Real Property: | $50,000,000 to $275,000.000+/-[24] |

---

[24] The Debtor holds a 21.40% interest in the real properties located at 9740-9744 Wilshire Boulevard, Beverly Hills, California 90212, 125 S. Linden Drive, Beverly Hills, California 90212, and 129 S. Linden Drive, Beverly Hills, California 90212.  The full value of these properties is $40,000,000.  However, a broker opinion of value recently put the properties, cumulatively, at $50,000,000.  The current value of the Debtor's interest/equity in these properties is $2,785,200 based upon a $40,000,000 valuation and $3,840,200 based upon a $50,000,000 valuation.  These properties are contiguous to each other.  The intention is to develop these properties as one integrated project.  Such a development would have a significantly higher value than $50,000,000 and would result in the Debtor's interest in the properties being significantly more valuable.  The Debtor also holds a 22.50% interest in 174 Kinney Street, Santa Monica, California 90405, and 169-177 Pier Avenue, Santa Monica, California 90405.  The full value of these properties is $12,500,000.  The current value of the Debtor's interest/equity in these properties is $1,237,500.  There are valuations of these properties that are higher than scheduled, resulting in a higher valuation of the Debtor's interests.  The Debtor also holds a 21.45% interest in 1100 N. Harbor Boulevard, Redondo Beach, California 90012.  The full "as is" fair market value of the Harbor Drive Property is $110,000,000, and the "as entitled" fair market value of the Harbor Drive Property is $600,000,000.  The current value of the Debtor's interest in this property, therefore, is between $23,595,000 and $128,700,000.  Affixed to this Exhibit C is a true and correct copy of a chart listing all ownership interests and the Debtor's equity calculations in the foregoing properties.  The chart, which was attached to the "Summary of Amended Schedules, Master Mailing List, and/or Statements [LBR 1007-1(c)]" filed on April 28, 2023 [Docket No. 48], also includes all ownership interests and the Debtor's interests/equity in properties held by the Debtor's single-member LLCs (1247 3rd Street, LLC and Beachside Suites, LLC).  With respect to proposed stages of development, (i) the Debtor intends to renovate the real properties located at 9740-9744 Wilshire Boulevard, Beverly Hills, California 90212, 125 S. Linden Drive, Beverly Hills, California 90212, and 129 S. Linden Drive, Beverly Hills, California 90212, which, as noted, are contiguous to each other, potentially as a hotel expansion and one of the tallest condominium towers in Beverly Hills, California, (ii) the Debtor intends to renovate the real properties located at 174 Kinney Street, Santa Monica, California 90405, and 169-177 Pier Avenue, Santa Monica, California 90405, to possibly include a new restaurant concept, (iii) the Debtor intends to renovate the real property located at 1241-1251 3rd Street, Santa Monica, California 90401, by other redeveloping the property into a luxury tower or re-tenanting the property, (iv) the Debtor intends to renovate the real property located at 346 N. Maple Drive, Beverly Hills, California 90211, by entitling it as a luxury apartment tower, (v) the Debtor intends to renovate the real property located at 1127-1137 Horn Avenue, West Hollywood, California 90069, by stabilizing the property as an historical apartment complex, (vi) the Debtor intends to renovate the real property located at 201 S. Arnaz Drive, Beverly Hills, California 90211, by renovating the existing property or by entitling it for micro-apartments, and (vii) the Debtor intends to renovate the real property located at 232 S. Tower Drive, Beverly Hills,

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1    |    Litigation Claims:        $37,000,000+/-

2    |    **Total Assets:**          **$87,230,674-$312,230,674+/-**

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

California 90211, by entitling it for a 40-50 unit apartment complex.  The Disclosure Statement explains in detail the Debtor's redevelopment plans with respect to the Harbor Drive Property.

DAL 57943048v1

| Schedule A/B Line No. | Property | Ownership | Loan Balance | Value of Entire Property | Total Equity | Debtor's Interest/Equity in the Property (Total Equity x Debtor's fractional interest) |
|---|---|---|---|---|---|---|
| 55.1 | 9740-9744 Wilshire Blvd Beverly Hills, CA 90212 & 125 & 129 S Linden Dr Beverly Hills, CA 90212 | Dromy 1995 Family Trust: 28% 9300 Wilshire LLC: 10.55% 9300 Wilshire Fee, LLC: 43.95% E.D. Flores, LLC: 2.5% 1112 Investment Co., LLC: 5% EJT Wilshire Linden, LLC: 10% | $13,600,000 | $40,000,000 | $26,400,000 | $2,785,200 |
| 55.2 | 174 Kinney St & 169-177 Pier Santa Monica, CA 90405 | 362 Camden Fee, LLC: 38.55% 9300 Wilshire LLC: 22.50% BH Karka, LLC: 28.95% EJT Kinney Pier, LLC: 10% | $7,000,000 | $12,500,000 | $5,500,000 | $1,237,500 |
| 55.3 | AES 1100 N Harbor Dr Redondo Beach, CA 90277 | 9300 Wilshire LLC: 21.40% 1112 Investment Co., LLC: 18.45% E.D. Flores, LLC: 19.85% 9300 Wilshire Fee, LLC: 10.00% David Dromy: 3.75% 1650 Veteran, LLC: 10.02% Outdoor Billboard, LLC: 1.58% BH Karka, LLC: 2.60% 5th Street Inv. Co., LLC: 4.45% 505 Investment Co., LLC: 1.45% SLH Fund, LLC: 3.45% Peak Alcott, LLC: 3.00% | $28,000,000 | $120,000,000 | $92,000,000 | $19,688,000 |

| 55.4 | 1241-1251 3rd St Santa Monica, CA 90401 via 1247 3rd Street, LLC | 1241 3rd Street, LLC (E.D. Flores): 60% 1247 3rd Street, LLC (9300 Wilshire): 20% EJT 3rd Street Promenade, LLC: 20% | $18,000,000 | $18,560,082 | ($560,082) | ($112,015) |
|---|---|---|---|---|---|---|
| 55.5 | 346 N Maple Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $4,500,000 | $2,671,010 | $1,828,990 | $1,554,642 |
| 55.6 | 1127-1137 Horn Ave West Hollywood, CA 90069 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $5,000,000 | $2,817,590 | $2,182,410 | $1,855,049 |
| 55.7 | 201 S Arnaz Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $3,500,000 | $1,905,537 | $1,594,463 | $1,355,264 |
| 55.8 | 232 S Tower Dr Beverly Hills, CA 90211 via Beachside Suites, LLC | Beachside Suites, LLC: 85% Oak Investment Company, LLC: 15% | $4,250,000 | $2,605,863 | $1,644,137 | $1,397,516 |
| | | Totals | $83,850,000 | $201,060,082 | $130,589,918 | $29,761,156 |

1    **<u>EXHIBIT D</u>**

2    **<u>(PROJECTED INCOME, EXPENSES, AND PLAN PAYMENTS PREPARED AS OF DATE OF</u>**

3    **<u>DISCLOSURE STATEMENT AND PLAN, TO SUPPORT THAT THE PLAN IS FEASIBLE</u>**

4    **<u>DURING THE PLAN TERM)</u>**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57943048v1

## 9300 Wilshire, LLC - Budget

Properties: 1100 N Harbor Dr
Period Range: Nov 2024 to Oct 2030

| Account Name | 11/30/24 | 12/31/24 | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | 10/31/25 | 11/30/25 | 12/31/25 | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 0 | 0 | 50,000 | 50,000 | 150,000 | 150,000 | 150,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Total Scheduled Rent | 0 | 0 | 50,000 | 50,000 | 150,000 | 150,000 | 150,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | | | | | | | | | | | | | | | | | | | | | | |
| Late Fees Income | | | | | | | | | | | | | | | | | | | | | | |
| Parking Income - Monthly | | | | | | | | | | | | | | | | | | | | | | |
| Operating Expenses Recovery Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Operating Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Income | 0 | 0 | 50,000 | 50,000 | 150,000 | 150,000 | 150,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | | | | | | | | | | | | | | | | | | | | | | |
| Total Repairs & Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | | | | | | | | | | | | | | | | | | | | | | |
| Total Contracted Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 0 | | | | | | | | | | | | | | | | | | | | | |
| Total Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 507,367 | 0 | 0 | 0 | 507,367 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 517,515 | 0 | 0 | 517,515 | 0 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total General & Administrative | 0 | 507,367 | 0 | 0 | 0 | 507,367 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 517,515 | 0 | 0 | 517,515 | 0 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Insurance | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Operating Expenses | 180,000 | 507,367 | 0 | 0 | 0 | 507,367 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 517,515 | 0 | 0 | 517,515 | 0 | 0 | 0 | 0 | 0 |
| Total Operating Expense | 180,000 | 507,367 | 0 | 0 | 0 | 507,367 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 517,515 | 0 | 0 | 517,515 | 0 | 0 | 0 | 0 | 0 |
| NOI - Net Operating Income | (180,000) | (507,367) | 50,000 | 50,000 | 150,000 | (357,367) | 150,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 20,000 | (317,515) | 250,000 | 250,000 | (267,515) | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Paydown of Asset** | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Paydown | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Paydown of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 25,000 | 25,000 | 50,000 | 25,000 | 25,000 | 50,000 | 25,000 | 25,000 | 50,000 | 25,000 | 25,000 | 50,000 | 25,000 | 25,000 | 50,000 | 25,000 | 25,000 | 50,000 | 25,000 | 25,000 | 50,000 | 25,000 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 |
| Total Entity Expenses | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating Expenses | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 |
| Total Other Expense | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 |
| Net Other Income | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) |
| Net Income | (304,168) | (631,535) | (99,168) | (74,168) | 25,832 | (506,535) | 25,832 | 75,832 | 50,832 | 75,832 | 50,832 | 50,832 | (104,168) | (441,682) | 100,832 | 125,832 | (416,682) | 125,832 | 125,832 | 100,832 | 125,832 | 125,832 |
| Beginning Cash | 141,067 | 1,899 | 384 | 6,197 | 2,029 | 27,861 | 1,326 | 27,159 | 102,991 | 153,823 | 229,656 | 305,488 | 356,320 | 252,153 | 470 | 101,302 | 227,135 | 352,967 | 1,285 | 127,117 | 252,949 | 353,782 |
| Net Cash Flow | (304,168) | (631,535) | (99,168) | (74,168) | 25,832 | (506,535) | 25,832 | 75,832 | 50,832 | 75,832 | 50,832 | 50,832 | (104,168) | (441,682) | 100,832 | 125,832 | (416,682) | 125,832 | 125,832 | 100,832 | 125,832 | 125,832 |
| Equity Contribution from Ely Dromy | 165,000 | 630,000 | 105,000 | 70,000 | 0 | 480,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 190,000 | 0 | 0 | 65,000 | 0 | 0 | 0 | 0 | 0 |
| Ending Cash | 1,899 | 384 | 6,197 | 2,029 | 27,861 | 1,326 | 27,159 | 102,991 | 153,823 | 229,656 | 305,488 | 356,320 | 252,153 | 470 | 101,302 | 227,135 | 352,967 | 1,285 | 127,117 | 252,949 | 353,782 | 479,614 |

| | 9/30/26 | 10/31/26 | 11/30/26 | 12/31/26 | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | 10/31/27 | 11/30/27 | 12/31/27 | 1/31/28 | 2/29/28 | 3/31/28 | 4/30/28 | 5/31/28 | 6/30/28 | 7/31/28 | 8/31/28 | 9/30/28 | 10/31/28 | 11/30/28 | 12/31/28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 527,865 | 0 | 0 | 0 | 527,865 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 538,422 | 0 | 0 | 0 | 538,422 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 549,191 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 527,865 | 0 | 0 | 0 | 527,865 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 538,422 | 0 | 0 | 0 | 538,422 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 549,191 |
| | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 |
| | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 |
| | 0 | 180,000 | 0 | 527,865 | 0 | 0 | 0 | 527,865 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 538,422 | 0 | 0 | 0 | 538,422 | 0 | 0 | 0 | 0 | 0 | 180,000 | 0 | 549,191 |
| | 250,000 | 250,000 | 70,000 | (277,865) | 250,000 | 250,000 | 250,000 | (277,865) | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 70,000 | (288,422) | 250,000 | 250,000 | 250,000 | (288,422) | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 70,000 | (299,191) | | |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (14,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (14,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 25,000 | 0 | 25,000 | 0 |
| | 50,000 | | | | 50,000 | | | 50,000 | | | 50,000 | | | 50,000 | | | 50,000 | | | 50,000 | | | 50,000 | | | 50,000 | | |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 99,168 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 |
| | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 124,168 | 124,168 | 149,168 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 | 383,333 | 358,333 | 358,333 |
| | (124,168) | (149,168) | (124,168) | (124,168) | (149,168) | (124,168) | (124,168) | (14,149,168) | (358,333) | (358,333) | (383,333) | (358,333) | (358,333) | (383,333) | (358,333) | (358,333) | (383,333) | (358,333) | (358,333) | (383,333) | (358,333) | (358,333) | (383,333) | (358,333) | (358,333) | (383,333) | (358,333) | (358,333) |
| | 125,832 | 100,832 | 125,832 | 125,832 | 100,832 | 125,832 | 125,832 | (14,427,033) | (108,333) | (108,333) | (133,333) | (108,333) | (108,333) | (133,333) | (108,333) | (108,333) | (133,333) | (108,333) | (108,333) | (133,333) | (108,333) | (108,333) | (133,333) | (108,333) | (108,333) | (133,333) | (288,333) | (657,524) |
| | 479,814 | 605,446 | 706,279 | 652,111 | 250,078 | 350,911 | 476,743 | 602,575 | 25,543 | 7,209 | 876 | 2,543 | (95,791) | 876 | 2,543 | 4,209 | 7,454 | 120 | 1,787 | 1,454 | 4,698 | 1,365 | 31 | 1,698 | 365 | 1,031 | 2,698 | 1,365 |
| | 125,832 | 100,832 | (54,168) | (402,033) | 100,832 | 125,832 | 125,832 | (14,427,033) | (108,333) | (108,333) | (133,333) | (108,333) | (108,333) | (133,333) | (646,756) | (133,333) | (108,333) | (671,756) | (133,333) | (108,333) | (133,333) | (108,333) | (133,333) | (108,333) | (133,333) | (133,333) | (288,333) | (657,524) |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,850,000 | 90,000 | 102,000 | 135,000 | 10,000 | 205,000 | 135,000 | 290,000 | 650,000 | 126,000 | 110,000 | 108,000 | 675,000 | 105,000 | 107,000 | 135,000 | 107,000 | 109,000 | 135,000 | 287,000 | 657,000 |
| | 605,446 | 706,279 | 652,111 | 250,078 | 350,911 | 476,743 | 602,575 | 25,543 | 7,209 | 876 | 2,543 | (95,791) | 876 | 2,543 | 4,209 | 7,454 | 120 | 1,787 | 1,454 | 4,698 | 1,365 | 31 | 1,698 | 365 | 1,031 | 2,698 | 1,365 | 841 |



**9300 Wilshire, LLC - Budget**

Properties: 1727 Horn
Period Range: Nov 2024 to Oct 2030

| Account Name | ###### | ###### | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | ###### | ###### | ###### | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 | 9/30/26 | ###### |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 |
| **Total Scheduled Rent** | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Operating Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Operating Income** | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 22,734 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 23,416 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| **Total Repairs & Maintenance** | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 |
| **Total Contracted Services** | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 505 | 482 | 589 | 954 | 710 | 771 | 584 | 455 | 515 | 505 | 506 | 615 | 515 | 492 | 601 | 973 | 724 | 786 | 596 | 464 | 525 | 515 | 516 | 627 |
| **Total Utilities** | 505 | 482 | 589 | 954 | 710 | 771 | 584 | 455 | 515 | 505 | 506 | 615 | 515 | 492 | 601 | 973 | 724 | 786 | 596 | 464 | 525 | 515 | 516 | 627 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 14,486 | 0 | 0 | 0 | 14,486 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total General & Administrative** | 0 | 14,486 | 0 | 0 | 0 | 14,486 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 |
| **Total Insurance** | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 973 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 |
| **Total Operating Expenses** | 2,394 | 16,857 | 2,478 | 2,843 | 2,599 | 17,146 | 2,473 | 2,344 | 2,404 | 2,394 | 2,395 | 2,504 | 2,443 | 17,195 | 2,529 | 2,901 | 2,652 | 17,490 | 2,524 | 2,392 | 2,453 | 2,443 | 2,444 | 2,555 |
| **Total Operating Expense** | 2,394 | 16,857 | 2,478 | 2,843 | 2,599 | 17,146 | 2,473 | 2,344 | 2,404 | 2,394 | 2,395 | 2,504 | 2,443 | 17,195 | 2,529 | 2,901 | 2,652 | 17,490 | 2,524 | 2,392 | 2,453 | 2,443 | 2,444 | 2,555 |
| **NOI - Net Operating Income** | 20,340 | 5,877 | 20,256 | 19,891 | 20,135 | 5,588 | 20,261 | 21,072 | 21,012 | 21,022 | 21,021 | 20,912 | 20,973 | 6,221 | 20,888 | 20,515 | 20,754 | 5,926 | 20,893 | 21,727 | 21,665 | 21,676 | 21,675 | 21,564 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss On Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cost of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Gain/Loss On Sale of Assets** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| **Total Entity Expenses** | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating Expenses** | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| **Total Other Expense** | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| **Net Other Income** | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) |
| **Net Income** | 7,688 | (6,775) | 7,604 | 7,239 | 7,483 | (7,064) | 7,609 | 8,420 | 8,360 | 8,370 | 8,369 | 8,260 | 8,321 | (6,431) | 8,235 | 7,863 | 8,112 | (6,726) | 8,240 | 9,075 | 9,013 | 9,024 | 9,023 | 8,911 |
| Beginning Cash | 0 | 7,688 | 913 | 8,517 | 15,756 | 23,239 | 16,175 | 23,784 | 32,205 | 40,565 | 48,935 | 57,304 | 65,564 | 73,885 | 67,454 | 75,689 | 83,552 | 91,664 | 84,938 | 93,179 | 102,253 | 111,287 | 120,290 | 129,313 |
| Net Cash Flow | 7,688 | (6,775) | 7,604 | 7,239 | 7,483 | (7,064) | 7,609 | 8,420 | 8,360 | 8,370 | 8,369 | 8,260 | 8,321 | (6,431) | 8,235 | 7,863 | 8,112 | (6,726) | 8,240 | 9,075 | 9,013 | 9,024 | 9,023 | 8,911 |
| Equity Contribution from Ely Dromy | | | | | | | | | | | | | | | | | | | | | | | | |
| Ending Cash | 7,688 | 913 | 8,517 | 15,756 | 23,239 | 16,175 | 23,784 | 32,205 | 40,565 | 48,935 | 57,304 | 65,564 | 73,885 | 67,454 | 75,689 | 83,552 | 91,664 | 84,938 | 93,179 | 102,253 | 111,287 | 120,290 | 129,313 | 138,224 |



| ###### | ###### | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | ###### | ###### | ###### | 1/31/28 | 2/29/28 | 3/31/28 | 4/30/28 | 5/31/28 | 6/30/28 | 7/31/28 | 8/31/28 | 9/30/28 | ###### | ###### | ###### | 1/31/29 | 2/28/29 | 3/31/29 | 4/30/29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 |
| 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,119 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 24,842 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 | 25,588 |
| 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 |
| 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 |
| 525 | 501 | 613 | 993 | 739 | 802 | 608 | 473 | 536 | 525 | 526 | 640 | 536 | 512 | 625 | 1,012 | 753 | 818 | 620 | 483 | 547 | 536 | 537 | 653 | 547 | 522 | 638 | 1,033 | 769 | 835 |
| 525 | 501 | 613 | 993 | 739 | 802 | 608 | 473 | 536 | 525 | 526 | 640 | 536 | 512 | 625 | 1,012 | 753 | 818 | 620 | 483 | 547 | 536 | 537 | 653 | 547 | 522 | 638 | 1,033 | 769 | 835 |
| 0 | 15,071 | 0 | 0 | 0 | 15,071 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,680 | 0 | 0 | 0 | 15,680 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 15,071 | 0 | 0 | 0 | 15,071 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,680 | 0 | 0 | 0 | 15,680 |
| 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,138 | 1,138 | 1,138 | 1,138 |
| 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,052 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,094 | 1,138 | 1,138 | 1,138 | 1,138 |
| 2,494 | 17,541 | 2,581 | 2,961 | 2,707 | 17,842 | 2,576 | 2,442 | 2,504 | 2,494 | 2,495 | 2,608 | 2,546 | 17,895 | 2,635 | 3,023 | 2,764 | 18,201 | 2,630 | 2,493 | 2,557 | 2,546 | 2,547 | 2,663 | 2,601 | 18,256 | 2,692 | 3,087 | 2,823 | 18,569 |
| 2,494 | 17,541 | 2,581 | 2,961 | 2,707 | 17,842 | 2,576 | 2,442 | 2,504 | 2,494 | 2,495 | 2,608 | 2,546 | 17,895 | 2,635 | 3,023 | 2,764 | 18,201 | 2,630 | 2,493 | 2,557 | 2,546 | 2,547 | 2,663 | 2,601 | 18,256 | 2,692 | 3,087 | 2,823 | 18,569 |
| 21,625 | 6,578 | 21,538 | 21,158 | 21,412 | 6,277 | 21,543 | 22,401 | 22,338 | 22,349 | 22,348 | 22,234 | 22,296 | 6,948 | 22,207 | 21,819 | 22,076 | 6,641 | 22,212 | 23,094 | 23,031 | 23,041 | 23,040 | 22,924 | 22,987 | 7,332 | 22,896 | 22,501 | 22,765 | 7,019 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 |
| (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) |
| 8,973 | (6,074) | 8,885 | 8,506 | 8,759 | (6,375) | 8,891 | 9,748 | 9,686 | 9,696 | 9,695 | 9,582 | 9,644 | (5,704) | 9,555 | 9,167 | 9,426 | (6,011) | 9,560 | 10,442 | 10,378 | 10,389 | 10,388 | 10,272 | 10,335 | (5,321) | 10,244 | 9,849 | 10,113 | (5,633) |
| 138,224 | 147,197 | 141,122 | 150,008 | 158,513 | 167,273 | 160,898 | 169,788 | 179,537 | 189,223 | 198,919 | 208,814 | 218,196 | 227,840 | 222,136 | 231,690 | 240,857 | 250,284 | 244,272 | 253,832 | 264,274 | 274,653 | 285,042 | 295,430 | 305,702 | 316,037 | 310,716 | 320,959 | 330,808 | 340,921 |
| 8,973 | (6,074) | 8,885 | 8,506 | 8,759 | (6,375) | 8,891 | 9,748 | 9,686 | 9,696 | 9,695 | 9,582 | 9,644 | (5,704) | 9,555 | 9,167 | 9,426 | (6,011) | 9,560 | 10,442 | 10,378 | 10,389 | 10,388 | 10,272 | 10,335 | (5,321) | 10,244 | 9,849 | 10,113 | (5,633) |
| 147,197 | 141,122 | 150,008 | 158,513 | 167,273 | 160,898 | 169,788 | 179,537 | 189,223 | 198,919 | 208,814 | 218,196 | 227,840 | 222,136 | 231,690 | 240,857 | 250,284 | 244,272 | 253,832 | 264,274 | 274,653 | 285,042 | 295,430 | 305,702 | 316,037 | 310,716 | 320,959 | 330,808 | 340,921 | 335,287 |

| 5/31/29 | 6/30/29 | 7/31/29 | 8/31/29 | 9/30/29 | ###### | ###### | ###### | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | ###### | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25,588 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 27,146 | 27,146 | 27,146 | 27,146 | 27,146 | 1,766,708 |
| 25,588 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 27,146 | 27,146 | 27,146 | 27,146 | 27,146 | 1,766,708 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 25,588 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 26,355 | 27,146 | 27,146 | 27,146 | 27,146 | 27,146 | 1,766,708 |
| 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 14,976 |
| 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 14,976 |
| 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 50,976 |
| 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 708 | 50,976 |
| 632 | 493 | 558 | 547 | 548 | 473 | 558 | 532 | 650 | 1,053 | 784 | 851 | 645 | 502 | 569 | 557 | 559 | 483 | 44,973 |
| 632 | 493 | 558 | 547 | 548 | 473 | 558 | 532 | 650 | 1,053 | 784 | 851 | 645 | 502 | 569 | 557 | 559 | 483 | 44,973 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 0 | 0 | 0 | 182,758 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 0 | 0 | 0 | 182,758 |
| 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 76,893 |
| 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 1,138 | 76,893 |
| 2,686 | 2,547 | 2,612 | 2,601 | 2,602 | 2,528 | 2,612 | 18,580 | 2,704 | 3,107 | 2,838 | 18,899 | 2,699 | 2,557 | 2,623 | 2,612 | 2,613 | 2,537 | 370,577 |
| 2,686 | 2,547 | 2,612 | 2,601 | 2,602 | 2,528 | 2,612 | 18,580 | 2,704 | 3,107 | 2,838 | 18,899 | 2,699 | 2,557 | 2,623 | 2,612 | 2,613 | 2,537 | 370,577 |
| 22,901 | 23,809 | 23,743 | 23,754 | 23,753 | 23,828 | 23,743 | 7,775 | 23,651 | 23,248 | 23,517 | 7,456 | 23,656 | 24,589 | 24,523 | 24,534 | 24,333 | 24,609 | 1,416,132 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 910,961 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 910,961 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 12,652 | 910,961 |
| (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (12,652) | (910,961) |
| 10,249 | 11,156 | 11,091 | 11,102 | 11,101 | 11,175 | 11,091 | (4,877) | 10,998 | 10,595 | 10,865 | (5,196) | 11,004 | 11,937 | 11,871 | 11,882 | 11,681 | 11,957 | 505,170 |
| 335,287 | 345,536 | 356,692 | 367,784 | 378,886 | 389,987 | 401,162 | 412,254 | 407,376 | 418,375 | 428,970 | 439,835 | 434,639 | 445,643 | 457,580 | 469,451 | 481,333 | 493,214 | 505,170 |
| 10,249 | 11,156 | 11,091 | 11,102 | 11,101 | 11,175 | 11,091 | (4,877) | 10,998 | 10,595 | 10,865 | (5,196) | 11,004 | 11,937 | 11,871 | 11,882 | 11,881 | 11,957 |  |
| 345,536 | 356,692 | 367,784 | 378,886 | 389,987 | 401,162 | 412,254 | 407,376 | 418,375 | 428,970 | 439,835 | 434,639 | 445,643 | 457,580 | 469,451 | 481,333 | 493,214 | 505,170 | 505,170 |

**9300 Wilshire, LLC – Budget**

Properties: 232 S Tower
Period Range: Nov 2024 to Oct 2030

| Account Name | ###### | ###### | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | ###### | ###### | ###### | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 | 9/30/26 | ###### |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 20,475 | 20,475 | 20,475 | 20,475 | 20,475 |
| Total Scheduled Rent | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 20,475 | 20,475 | 20,475 | 20,475 | 20,475 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Operating Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Income | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,300 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 19,879 | 20,475 | 20,475 | 20,475 | 20,475 | 20,475 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| Total Repairs & Maintenance | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 |
| Total Contracted Services | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 31 | 1,517 | 42 | 1,387 | 54 | 1,400 | 31 | 925 | 48 | 1,859 | 48 | 1,484 | 32 | 1,547 | 43 | 1,415 | 55 | 1,428 | 32 | 944 | 49 | 1,897 | 49 | 1,493 |
| Total Utilities | 31 | 1,517 | 42 | 1,387 | 54 | 1,400 | 31 | 925 | 48 | 1,859 | 48 | 1,484 | 32 | 1,547 | 43 | 1,415 | 55 | 1,428 | 32 | 944 | 49 | 1,897 | 49 | 1,493 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 26,465 | 0 | 0 | 0 | 26,465 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,994 | 0 | 0 | 0 | 26,994 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total General & Administrative | 0 | 26,465 | 0 | 0 | 0 | 26,465 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,994 | 0 | 0 | 0 | 26,994 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,548 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,775 | 0 |
| Total Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,548 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,775 | 0 |
| Total Operating Expenses | 2,323 | 30,274 | 2,334 | 3,679 | 2,346 | 30,157 | 2,323 | 3,217 | 2,340 | 4,151 | 6,888 | 3,756 | 2,324 | 30,834 | 2,335 | 3,707 | 2,347 | 30,714 | 2,324 | 3,236 | 2,341 | 4,189 | 7,116 | 3,785 |
| Total Operating Expense | 2,323 | 30,274 | 2,334 | 3,679 | 2,346 | 30,157 | 2,323 | 3,217 | 2,340 | 4,151 | 6,888 | 3,756 | 2,324 | 30,834 | 2,335 | 3,707 | 2,347 | 30,714 | 2,324 | 3,236 | 2,341 | 4,189 | 7,116 | 3,785 |
| **NOI - Net Operating Income** | 16,977 | (10,974) | 16,966 | 15,621 | 16,954 | (10,857) | 16,977 | 16,662 | 17,539 | 15,728 | 12,991 | 16,123 | 17,555 | (10,955) | 17,544 | 16,172 | 17,532 | (10,835) | 17,555 | 17,240 | 18,134 | 16,287 | 13,359 | 16,690 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss On Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cost of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Gain/Loss On Sale of Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 |
| Total Entity Expenses | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating Expenses | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 |
| Total Other Expense | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 |
| **Net Other Income** | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) |
| **Net Income** | 5,276 | (22,675) | 5,265 | 3,920 | 5,253 | (22,558) | 5,276 | 4,961 | 5,838 | 4,026 | 1,290 | 4,422 | 5,854 | (22,656) | 5,843 | 4,471 | 5,830 | (22,537) | 5,854 | 5,538 | 6,433 | 4,585 | 1,658 | 4,989 |
| Beginning Cash | 0 | 5,276 | (17,400) | (12,135) | (8,216) | (2,963) | (25,522) | (20,246) | (15,286) | (9,448) | (5,422) | (4,133) | 289 | 6,143 | (16,513) | (10,670) | (6,199) | (369) | (22,906) | (17,052) | (11,513) | (5,081) | (495) | 1,162 |
| Net Cash Flow | 5,276 | (22,675) | 5,265 | 3,920 | 5,253 | (22,558) | 5,276 | 4,961 | 5,838 | 4,026 | 1,290 | 4,422 | 5,854 | (22,656) | 5,843 | 4,471 | 5,830 | (22,537) | 5,854 | 5,538 | 6,433 | 4,585 | 1,658 | 4,989 |
| Equity Contribution from Ely Dromy | | | | | | | | | | | | | | | | | | | | | | | | |
| Ending Cash | 5,276 | (17,400) | (12,135) | (8,216) | (2,963) | (25,522) | (20,246) | (15,286) | (9,448) | (5,422) | (4,133) | 289 | 6,143 | (16,513) | (10,670) | (6,199) | (369) | (22,906) | (17,052) | (11,513) | (5,081) | (495) | 1,162 | 6,151 |



| | 6/30/29 | 7/31/29 | 8/31/29 | 9/30/29 | ###### | ###### | ###### | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | ###### | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 23,045 | 23,045 | 23,045 | 23,045 | 23,045 | 1,518,810 |
| | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 23,045 | 23,045 | 23,045 | 23,045 | 23,045 | 1,516,810 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 22,374 | 23,045 | 23,045 | 23,045 | 23,045 | 23,045 | 1,516,810 |
| | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 4,824 |
| | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 4,824 |
| | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 160,200 |
| | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 2,225 | 160,200 |
| | 1,001 | 52 | 2,013 | 52 | 962 | 34 | 1,675 | 46 | 1,531 | 60 | 1,546 | 34 | 1,021 | 53 | 2,053 | 53 | 982 | 54,293 |
| | 1,001 | 52 | 2,013 | 52 | 962 | 34 | 1,675 | 46 | 1,531 | 60 | 1,546 | 34 | 1,021 | 53 | 2,053 | 53 | 982 | 54,293 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 29,219 | 0 | 0 | 0 | 29,219 | 0 | 0 | 0 | 0 | 0 | 0 | 333,888 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 29,219 | 0 | 0 | 0 | 29,219 | 0 | 0 | 0 | 0 | 0 | 0 | 333,888 |
| | 0 | 0 | 0 | 5,528 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,805 | 30,935 |
| | 0 | 0 | 0 | 5,528 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,805 | 30,935 |
| | 3,293 | 2,344 | 4,305 | 7,872 | 3,254 | 2,326 | 33,186 | 2,338 | 3,823 | 2,352 | 33,057 | 2,326 | 3,313 | 2,345 | 4,345 | 8,149 | 3,274 | 584,140 |
| | 3,293 | 2,344 | 4,305 | 7,872 | 3,254 | 2,326 | 33,186 | 2,338 | 3,823 | 2,352 | 33,057 | 2,326 | 3,313 | 2,345 | 4,345 | 8,149 | 3,274 | 584,140 |
| | 19,081 | 20,030 | 18,069 | 14,502 | 19,120 | 20,048 | (10,812) | 20,036 | 18,551 | 20,022 | (10,683) | 20,048 | 19,732 | 20,700 | 18,700 | 14,896 | 19,772 | 932,670 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 842,507 |
| | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 842,507 |
| | | | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | | | 0 |
| | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 842,507 |
| | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 11,701 | 842,507 |
| | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (11,701) | (842,507) |
| | 7,379 | 8,329 | 6,368 | 2,800 | 7,418 | 8,346 | (22,514) | 8,334 | 6,849 | 8,321 | (22,385) | 8,346 | 8,030 | 8,999 | 6,999 | 3,194 | 8,070 | 90,162 |
| | 27,278 | 34,657 | 42,985 | 49,353 | 52,154 | 59,572 | 67,918 | 45,404 | 53,738 | 60,588 | 68,908 | 46,524 | 54,870 | 62,901 | 71,899 | 78,898 | 82,092 | 90,162 |
| | 7,379 | 8,329 | 6,368 | 2,800 | 7,418 | 8,340 | (22,514) | 8,334 | 6,849 | 8,321 | (22,385) | 8,346 | 8,030 | 8,999 | 6,999 | 3,194 | 8,070 | |
| | 34,657 | 42,985 | 49,353 | 52,154 | 59,572 | 67,918 | 45,404 | 53,738 | 60,588 | 68,908 | 48,524 | 54,870 | 62,901 | 71,899 | 78,898 | 82,092 | 90,162 | 90,162 |

**9300 Wilshire, LLC - Budget**

Properties: 201 S Arnaz
Period Range: Nov 2024 to Oct 2030

| Account Name | ###### | ###### | ##### | ##### | ##### | 4/30/25 | ##### | ##### | ##### | ##### | ##### | ###### | ###### | ##### | ##### | ##### | ##### | 4/30/26 | ##### | ##### | ##### | ##### | ##### | ###### | ###### |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 16,108 | 16,108 |
| **Total Scheduled Rent** | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 16,108 | 16,108 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Operating Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Operating Income** | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,184 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 15,639 | 16,108 | 16,108 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 |
| **Total Repairs & Maintenance** | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| **Total Contracted Services** | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 |
| **Total Utilities** | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 20,583 | 0 | 0 | 0 | 20,583 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,995 | 0 | 0 | 0 | 20,995 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total General & Administrative** | 0 | 20,583 | 0 | 0 | 0 | 20,583 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,995 | 0 | 0 | 0 | 20,995 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 517 |
| **Total Insurance** | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 517 |
| **Total Operating Expenses** | 1,776 | 22,359 | 1,776 | 1,776 | 1,776 | 22,359 | 1,776 | 1,776 | 1,776 | 1,776 | 1,776 | 1,776 | 1,795 | 22,790 | 1,795 | 1,795 | 1,795 | 22,790 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,815 |
| **Total Operating Expense** | 1,776 | 22,359 | 1,776 | 1,776 | 1,776 | 22,359 | 1,776 | 1,776 | 1,776 | 1,776 | 1,776 | 1,776 | 1,795 | 22,790 | 1,795 | 1,795 | 1,795 | 22,790 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,795 | 1,815 |
| **NOI - Net Operating Income** | 13,408 | (7,175) | 13,408 | 13,408 | 13,408 | (7,175) | 13,408 | 13,408 | 13,408 | 13,408 | 13,408 | 13,863 | 13,844 | (7,150) | 13,844 | 13,844 | 13,844 | (7,150) | 13,844 | 13,844 | 13,844 | 13,844 | 13,844 | 14,313 | 14,293 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss On Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cost of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Gain/Loss On Sale of Assets** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 |
| **Total Entity Expenses** | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating Expenses** | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 |
| **Total Other Expense** | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 |
| **Net Other Income** | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) |
| **Net Income** | 4,851 | (15,732) | 4,851 | 4,851 | 4,851 | (15,732) | 4,851 | 4,851 | 4,851 | 4,851 | 4,851 | 5,307 | 5,287 | (15,707) | 5,287 | 5,287 | 5,287 | (15,707) | 5,287 | 5,287 | 5,287 | 5,287 | 5,287 | 5,757 | 5,737 |
| Beginning Cash | 13,000 | 17,851 | 2,119 | 6,970 | 11,821 | 16,672 | 940 | 5,791 | 10,642 | 15,493 | 20,345 | 25,196 | 30,502 | 35,790 | 20,082 | 25,370 | 30,657 | 35,945 | 20,238 | 25,525 | 30,812 | 36,100 | 41,387 | 46,675 | 52,431 |
| Net Cash Flow | 4,851 | (15,732) | 4,851 | 4,851 | 4,851 | (15,732) | 4,851 | 4,851 | 4,851 | 4,851 | 4,851 | 5,307 | 5,287 | (15,707) | 5,287 | 5,287 | 5,287 | (15,707) | 5,287 | 5,287 | 5,287 | 5,287 | 5,287 | 5,757 | 5,737 |
| Equity Contribution from Ely Dromy | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ending Cash | 17,851 | 2,119 | 6,970 | 11,821 | 16,672 | 940 | 5,791 | 10,642 | 15,493 | 20,345 | 25,196 | 30,502 | 35,790 | 20,082 | 25,370 | 30,657 | 35,945 | 20,238 | 25,525 | 30,812 | 36,100 | 41,387 | 46,675 | 52,431 | 58,168 |



| | 7/31/29 | 8/31/29 | 9/30/29 | ###### | ###### | ###### | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | ###### | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 17,089 | 17,089 | 17,089 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 18,130 | 1,181,523 |
| | 17,089 | 17,089 | 17,089 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 18,130 | 1,181,523 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 17,089 | 17,089 | 17,089 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 17,602 | 18,130 | 1,181,523 |
| | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 11,880 |
| | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 11,880 |
| | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 14,976 |
| | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 14,976 |
| | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 66,600 |
| | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 66,600 |
| | 0 | 0 | 0 | 0 | 0 | 22,725 | 0 | 0 | 0 | 22,725 | 0 | 0 | 0 | 0 | 0 | 0 | 259,860 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 22,725 | 0 | 0 | 0 | 22,725 | 0 | 0 | 0 | 0 | 0 | 0 | 259,860 |
| | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 37,778 |
| | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 37,778 |
| | 1,857 | 1,857 | 1,857 | 1,857 | 1,857 | 24,582 | 1,857 | 1,857 | 1,857 | 24,582 | 1,857 | 1,857 | 1,857 | 1,857 | 1,857 | 1,857 | 390,914 |
| | 1,857 | 1,857 | 1,857 | 1,857 | 1,857 | 24,582 | 1,857 | 1,857 | 1,857 | 24,582 | 1,857 | 1,857 | 1,857 | 1,857 | 1,857 | 1,857 | 390,914 |
| | 15,232 | 15,232 | 15,232 | 15,745 | 15,745 | (6,980) | 15,745 | 15,745 | 15,745 | (6,980) | 15,745 | 15,745 | 15,745 | 15,745 | 15,745 | 16,273 | 790,610 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 616,083 |
| | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 616,083 |
| | | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | | 0 |
| | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 616,083 |
| | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 8,557 | 616,083 |
| | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (8,557) | (616,083) |
| | 6,676 | 6,676 | 6,676 | 7,188 | 7,188 | (15,537) | 7,188 | 7,188 | 7,188 | (15,537) | 7,188 | 7,188 | 7,188 | 7,188 | 7,188 | 7,716 | 174,526 |
| | 118,975 | 125,651 | 132,326 | 139,002 | 146,190 | 153,378 | 137,841 | 145,030 | 152,218 | 159,406 | 143,869 | 151,057 | 158,245 | 165,434 | 172,622 | 179,810 | 187,526 |
| | 6,676 | 6,676 | 6,676 | 7,188 | 7,188 | (15,537) | 7,188 | 7,188 | 7,188 | (15,537) | 7,188 | 7,188 | 7,188 | 7,188 | 7,188 | 7,716 | |
| | 125,651 | 132,326 | 139,002 | 146,190 | 153,378 | 137,841 | 145,030 | 152,218 | 159,406 | 143,869 | 151,057 | 158,245 | 165,434 | 172,622 | 179,810 | 187,526 | 187,526 |

**9300 Wilshire, LLC - Budget**

Properties: 348 N Maple
Period Range: Nov 2024 to Oct 2030

| Account Name | ###### | ###### | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | ###### | ###### | ###### | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 | 9/30/26 | ###### |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,782 | 22,782 | 22,782 |
| **Total Scheduled Rent** | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,782 | 22,782 | 22,782 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Operating Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Operating Income** | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 21,474 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,118 | 22,782 | 22,782 | 22,782 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| **Total Repairs & Maintenance** | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **Total Contracted Services** | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 3 | 1,964 | 20 | 1,942 | 23 | 1,743 | 23 | 1,743 | 42 | 1,750 | 37 | 1,912 | 3 | 2,003 | 20 | 1,981 | 23 | 1,778 | 23 | 1,778 | 43 | 1,785 | 38 | 1,850 |
| **Total Utilities** | 3 | 1,964 | 20 | 1,942 | 23 | 1,743 | 23 | 1,743 | 42 | 1,750 | 37 | 1,912 | 3 | 2,003 | 20 | 1,981 | 23 | 1,778 | 23 | 1,778 | 43 | 1,785 | 38 | 1,850 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 26,226 | 0 | 0 | 0 | 26,226 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,751 | 0 | 0 | 0 | 28,751 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total General & Administrative** | 0 | 26,226 | 0 | 0 | 0 | 26,226 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,751 | 0 | 0 | 0 | 28,751 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 0 | 0 | 3,768 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,954 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Insurance** | 0 | 0 | 3,768 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,954 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Operating Expenses** | 713 | 28,900 | 4,496 | 2,652 | 733 | 28,679 | 733 | 2,453 | 752 | 2,460 | 747 | 2,622 | 713 | 29,464 | 4,685 | 2,691 | 733 | 29,238 | 733 | 2,488 | 753 | 2,495 | 748 | 2,660 |
| **Total Operating Expense** | 713 | 28,900 | 4,496 | 2,652 | 733 | 28,679 | 733 | 2,453 | 752 | 2,460 | 747 | 2,622 | 713 | 29,464 | 4,685 | 2,691 | 733 | 29,238 | 733 | 2,488 | 753 | 2,495 | 748 | 2,660 |
| **NOI - Net Operating Income** | 20,761 | (7,426) | 16,978 | 18,822 | 20,741 | (7,205) | 20,741 | 19,021 | 20,722 | 19,658 | 21,371 | 19,496 | 21,405 | (7,345) | 17,434 | 19,428 | 21,385 | (7,120) | 21,385 | 19,631 | 21,366 | 20,287 | 22,034 | 20,122 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss On Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cost of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Gain/Loss On Sale of Assets** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| **Total Entity Expenses** | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating Expenses** | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| **Total Other Expense** | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| **Net Other Income** | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) |
| **Net Income** | 8,767 | (19,420) | 4,984 | 6,828 | 8,747 | (19,199) | 8,747 | 7,027 | 8,728 | 7,664 | 9,377 | 7,502 | 9,411 | (19,339) | 5,440 | 7,434 | 9,391 | (19,114) | 9,391 | 7,637 | 9,372 | 8,293 | 10,040 | 8,128 |
| Beginning Cash | 11,000 | 19,767 | 347 | 5,331 | 12,160 | 20,907 | 1,708 | 10,455 | 17,482 | 26,210 | 33,875 | 43,252 | 50,755 | 60,166 | 40,827 | 46,266 | 53,700 | 63,091 | 43,977 | 53,368 | 61,004 | 70,376 | 78,669 | 88,709 |
| Net Cash Flow | 8,767 | (19,420) | 4,984 | 6,828 | 8,747 | (19,199) | 8,747 | 7,027 | 8,728 | 7,664 | 9,377 | 7,502 | 9,411 | (19,339) | 5,440 | 7,434 | 9,391 | (19,114) | 9,391 | 7,637 | 9,372 | 8,293 | 10,040 | 8,128 |
| Equity Contribution from Ely Dromy | | | | | | | | | | | | | | | | | | | | | | | | |
| Ending Cash | 19,767 | 347 | 5,331 | 12,160 | 20,907 | 1,708 | 10,455 | 17,482 | 26,210 | 33,875 | 43,252 | 50,755 | 60,166 | 40,827 | 46,266 | 53,700 | 63,091 | 43,977 | 53,368 | 61,004 | 70,376 | 78,669 | 88,709 | 96,837 |

| ###### | ###### | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | ###### | ###### | ###### | 1/31/28 | 2/29/28 | 3/31/28 | 4/30/28 | 5/31/28 | 6/30/28 | 7/31/28 | 8/31/28 | 9/30/28 | ###### | ###### | ###### | 1/31/29 | 2/28/29 | 3/31/29 | 4/30/29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 |
| 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 22,782 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 | 24,169 |
| 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| 3 | 2,043 | 21 | 2,020 | 24 | 1,813 | 24 | 1,813 | 44 | 1,821 | 38 | 1,989 | 3 | 2,084 | 21 | 2,061 | 24 | 1,850 | 24 | 1,850 | 45 | 1,857 | 39 | 2,029 | 3 | 2,126 | 22 | 2,102 | 25 | 1,887 |
| 3 | 2,043 | 21 | 2,020 | 24 | 1,813 | 24 | 1,813 | 44 | 1,821 | 38 | 1,989 | 3 | 2,084 | 21 | 2,061 | 24 | 1,850 | 24 | 1,850 | 45 | 1,857 | 39 | 2,029 | 3 | 2,126 | 22 | 2,102 | 25 | 1,887 |
| 0 | 27,288 | 0 | 0 | 0 | 27,288 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27,831 | 0 | 0 | 0 | 27,831 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,388 | 0 | 0 | 0 | 28,388 |
| 0 | 27,288 | 0 | 0 | 0 | 27,288 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27,831 | 0 | 0 | 0 | 27,831 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,388 | 0 | 0 | 0 | 28,388 |
| 0 | 0 | 4,152 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,578 | 0 | 0 | 0 |
| 0 | 0 | 4,152 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,578 | 0 | 0 | 0 |
| 713 | 30,039 | 4,883 | 2,730 | 734 | 29,809 | 734 | 2,523 | 754 | 2,531 | 748 | 2,699 | 713 | 30,625 | 5,091 | 2,771 | 734 | 30,391 | 734 | 2,560 | 755 | 2,567 | 749 | 2,739 | 713 | 31,224 | 5,309 | 2,812 | 735 | 30,985 |
| 713 | 30,039 | 4,883 | 2,730 | 734 | 29,809 | 734 | 2,523 | 754 | 2,531 | 748 | 2,699 | 713 | 30,625 | 5,091 | 2,771 | 734 | 30,391 | 734 | 2,560 | 755 | 2,567 | 749 | 2,739 | 713 | 31,224 | 5,309 | 2,812 | 735 | 30,985 |
| 22,069 | (7,257) | 17,899 | 20,052 | 22,048 | (7,027) | 22,048 | 20,259 | 22,028 | 20,935 | 22,717 | 20,766 | 22,752 | (7,160) | 18,375 | 20,695 | 22,731 | (6,925) | 22,731 | 20,906 | 22,711 | 21,502 | 23,420 | 21,430 | 23,456 | (7,054) | 18,860 | 21,357 | 23,434 | (6,815) |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 |
| (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) |
| 10,075 | (19,251) | 5,905 | 8,057 | 10,054 | (19,021) | 10,054 | 8,265 | 10,034 | 8,941 | 10,723 | 8,772 | 10,758 | (19,154) | 6,381 | 8,701 | 10,737 | (18,920) | 10,737 | 8,912 | 10,717 | 9,608 | 11,426 | 9,436 | 11,462 | (19,048) | 6,866 | 9,363 | 11,440 | (18,809) |
| 96,837 | 106,911 | 87,660 | 93,565 | 101,623 | 111,877 | 92,656 | 102,710 | 110,975 | 121,009 | 129,949 | 140,672 | 149,445 | 160,203 | 141,049 | 147,429 | 156,130 | 166,867 | 147,947 | 158,684 | 167,596 | 178,313 | 187,921 | 199,347 | 208,783 | 220,246 | 201,197 | 208,063 | 217,427 | 228,867 |
| 10,075 | (19,251) | 5,905 | 8,057 | 10,054 | (19,021) | 10,054 | 8,265 | 10,034 | 8,941 | 10,723 | 8,772 | 10,758 | (19,154) | 6,381 | 8,701 | 10,737 | (18,920) | 10,737 | 8,912 | 10,717 | 9,608 | 11,426 | 9,436 | 11,462 | (19,048) | 6,866 | 9,363 | 11,440 | (18,809) |
| 106,911 | 87,660 | 93,565 | 101,623 | 111,877 | 92,656 | 102,710 | 110,975 | 121,009 | 129,949 | 140,672 | 149,445 | 160,203 | 141,049 | 147,429 | 156,130 | 166,867 | 147,947 | 158,684 | 167,596 | 178,313 | 187,921 | 199,347 | 208,783 | 220,246 | 201,197 | 208,063 | 217,427 | 228,867 | 210,058 |

| | 5/31/29 | 6/30/29 | 7/31/29 | 8/31/29 | 9/30/29 | ###### | ###### | ###### | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | ###### | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24,169 | 24,169 | 24,169 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 25,641 | 25,641 | 25,641 | 1,679,348 |
| | 24,169 | 24,169 | 24,169 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 25,641 | 25,641 | 25,641 | 1,679,348 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 24,169 | 24,169 | 24,169 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 24,894 | 25,641 | 25,641 | 25,641 | 1,679,348 |
| | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 25,200 |
| | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 25,200 |
| | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 25,920 |
| | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 25,920 |
| | 25 | 1,887 | 45 | 1,894 | 40 | 1,813 | 3 | 2,168 | 22 | 2,144 | 25 | 1,924 | 25 | 1,924 | 46 | 1,932 | 41 | 1,850 | 70,146 |
| | 25 | 1,887 | 45 | 1,894 | 40 | 1,813 | 3 | 2,168 | 22 | 2,144 | 25 | 1,924 | 25 | 1,924 | 46 | 1,932 | 41 | 1,850 | 70,146 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,956 | 0 | 0 | 0 | 28,956 | 0 | 0 | 0 | 0 | 0 | 0 | 330,874 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,956 | 0 | 0 | 0 | 28,956 | 0 | 0 | 0 | 0 | 0 | 0 | 330,874 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,806 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,616 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,806 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,616 |
| | 735 | 2,597 | 755 | 2,604 | 750 | 2,523 | 713 | 31,834 | 5,539 | 2,854 | 735 | 31,590 | 735 | 2,634 | 756 | 2,642 | 751 | 2,560 | 477,756 |
| | 735 | 2,597 | 755 | 2,604 | 750 | 2,523 | 713 | 31,834 | 5,539 | 2,854 | 735 | 31,590 | 735 | 2,634 | 756 | 2,642 | 751 | 2,560 | 477,756 |
| | 23,434 | 21,573 | 23,414 | 22,290 | 24,144 | 22,371 | 24,181 | (6,940) | 19,356 | 22,040 | 24,159 | (6,696) | 24,159 | 22,260 | 24,138 | 22,999 | 24,890 | 23,082 | 1,201,592 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 863,570 |
| | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 863,570 |
| | | | | | | | | | | | | | | | | | | | 0 |
| | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 863,570 |
| | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 11,994 | 863,570 |
| | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (11,994) | (863,570) |
| | 11,440 | 9,579 | 11,420 | 10,296 | 12,150 | 10,377 | 12,187 | (18,934) | 7,362 | 10,046 | 12,165 | (18,690) | 12,165 | 10,266 | 12,144 | 11,005 | 12,896 | 11,088 | 338,022 |
| | 210,058 | 221,498 | 231,077 | 242,497 | 252,793 | 264,943 | 275,320 | 287,508 | 268,574 | 275,936 | 285,982 | 298,147 | 279,458 | 291,623 | 301,889 | 314,033 | 325,038 | 337,934 | 349,022 |
| | 11,440 | 9,579 | 11,420 | 10,296 | 12,150 | 10,377 | 12,187 | (18,934) | 7,362 | 10,046 | 12,165 | (18,690) | 12,165 | 10,266 | 12,144 | 11,005 | 12,896 | 11,088 | |
| | 221,498 | 231,077 | 242,497 | 252,793 | 264,943 | 275,320 | 287,508 | 268,574 | 275,936 | 285,982 | 298,147 | 279,458 | 291,623 | 301,889 | 314,033 | 325,038 | 337,934 | 349,022 | 349,022 |

**9300 Wilshire, LLC - Budget**

Properties: 1241-1251 3rd St
Period Range: Nov 2024 to Oct 2030

| Account Name | 11/30/24 | 12/31/24 | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | 10/31/25 | 11/30/25 | 12/31/25 | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 115,301 | 118,760 | 118,760 | 138,260 | 138,260 | 138,260 | 138,260 | 138,260 | 138,260 | 138,260 | 153,260 | 153,260 | 153,260 | 156,822 | 160,492 | 160,492 | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 |
| Total Scheduled Rent | 115,301 | 118,760 | 118,760 | 138,260 | 138,260 | 138,260 | 138,260 | 138,260 | 138,260 | 138,260 | 153,260 | 153,260 | 153,260 | 156,822 | 160,492 | 160,492 | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 2,693 | 2,693 | 2,693 | 2,693 | 2,693 | 2,693 | 2,693 | 3,141 | 3,293 | 3,175 | 3,293 | 3,227 | 3,293 | 54,468 | 3,759 | 3,549 | 3,759 | 94,737 | 3,759 | 3,549 | 5,029 | 4,592 |
| Total Other Operating Income | 2,693 | 2,693 | 2,693 | 2,693 | 2,693 | 2,693 | 2,693 | 3,141 | 3,293 | 3,175 | 3,293 | 3,227 | 3,293 | 54,468 | 3,759 | 3,549 | 3,759 | 94,737 | 3,759 | 3,549 | 5,029 | 4,592 |
| Operating Income | 117,994 | 121,453 | 121,453 | 140,953 | 140,953 | 140,953 | 140,953 | 141,401 | 141,552 | 141,434 | 156,552 | 156,487 | 156,552 | 211,290 | 164,251 | 164,041 | 101,255 | 192,233 | 101,255 | 101,045 | 102,525 | 102,088 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Total Repairs & Maintenance | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Contracted Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 |
| Total Utilities | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 186,251 | 0 | 0 | 0 | 186,251 | 0 | 0 | 0 | 0 | 0 | 0 | 189,976 | 0 | 0 | 0 | 0 | 189,976 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total General & Administrative | 0 | 186,251 | 0 | 0 | 0 | 186,251 | 0 | 0 | 0 | 0 | 0 | 0 | 189,976 | 0 | 0 | 0 | 0 | 189,976 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,774 | 1,774 |
| Total Insurance | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,535 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,658 | 1,774 | 1,774 |
| Total Operating Expenses | 2,097 | 187,911 | 2,097 | 1,660 | 2,097 | 187,911 | 2,097 | 1,660 | 2,220 | 1,783 | 2,220 | 1,978 | 2,220 | 191,759 | 2,220 | 1,783 | 2,220 | 191,759 | 2,220 | 1,783 | 2,336 | 1,899 |
| Total Operating Expense | 2,097 | 187,911 | 2,097 | 1,660 | 2,097 | 187,911 | 2,097 | 1,660 | 2,220 | 1,783 | 2,220 | 1,978 | 2,220 | 191,759 | 2,220 | 1,783 | 2,220 | 191,759 | 2,220 | 1,783 | 2,336 | 1,899 |
| **NOI - Net Operating Income** | 115,896 | (66,458) | 119,355 | 139,293 | 138,855 | (46,958) | 138,855 | 139,741 | 139,332 | 139,651 | 154,332 | 154,509 | 154,332 | 19,532 | 162,031 | 162,258 | 99,035 | 474 | 99,035 | 99,262 | 100,189 | 100,189 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss on Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cost of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Gain/Loss On Sale of Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| Total Entity Expenses | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating Expenses | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| Total Other Expense | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| **Net Other Income** | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) |
| **Net Income** | 9,822 | (172,533) | 13,281 | 33,218 | 32,781 | (153,033) | 32,781 | 33,666 | 33,258 | 33,577 | 48,258 | 48,434 | 48,258 | (86,543) | 55,956 | 56,184 | (7,040) | (105,600) | (7,040) | (6,813) | (5,885) | (5,885) |
| Beginning Cash | 0 | 9,822 | 2,289 | 15,570 | 48,788 | 81,569 | 538 | 33,317 | 66,983 | 100,241 | 133,818 | 182,075 | 230,510 | 278,767 | 192,224 | 248,181 | 304,364 | 297,324 | 191,724 | 184,684 | 177,872 | 171,986 |
| Net Cash Flow | 9,822 | (172,533) | 13,281 | 33,218 | 32,781 | (153,033) | 32,781 | 33,666 | 33,258 | 33,577 | 48,258 | 48,434 | 48,258 | (86,543) | 55,956 | 56,184 | (7,040) | (105,600) | (7,040) | (6,813) | (5,885) | (5,885) |
| Equity Contribution from Ely Dromy | | 165,000 | | | | 72,000 | | | | | | | | | | | | | | | | |
| Ending Cash | 9,822 | 2,289 | 15,570 | 48,788 | 81,569 | 538 | 33,317 | 66,983 | 100,241 | 133,818 | 182,075 | 230,510 | 278,767 | 192,224 | 248,181 | 304,364 | 297,324 | 191,724 | 184,684 | 177,872 | 171,986 | 166,101 |

| | 9/30/26 | 10/31/26 | 11/30/26 | 12/31/26 | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | 10/31/27 | 11/30/27 | 12/31/27 | 1/31/28 | 2/29/28 | 3/31/28 | 4/30/28 | 5/31/28 | 6/30/28 | 7/31/28 | 8/31/28 | 9/30/28 | 10/31/28 | 11/30/28 | 12/31/28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 |
| | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 | 97,496 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 5,029 | 4,787 | 5,029 | 198,368 | 5,029 | 4,592 | 5,029 | 198,368 | 5,029 | 4,592 | 5,154 | 4,716 | 5,154 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 5,029 | 4,787 | 5,029 | 198,368 | 5,029 | 4,592 | 5,029 | 198,368 | 5,029 | 4,592 | 5,154 | 4,716 | 5,154 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 102,525 | 102,283 | 102,525 | 295,864 | 102,525 | 102,088 | 105,450 | 298,788 | 105,450 | 105,013 | 105,575 | 105,137 | 105,575 | 100,421 | 100,421 | 100,421 | 100,421 | 100,421 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 | 150,631 |
| | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 |
| | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 |
| | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 455 | 0 |
| | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 437 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 446 | 0 | 455 | 0 |
| | 0 | 0 | 0 | 193,775 | 0 | 0 | 0 | 193,775 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 197,651 | 0 | 0 | 0 | 197,651 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 201,604 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 193,775 | 0 | 0 | 0 | 193,775 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 197,651 | 0 | 0 | 0 | 197,651 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 201,604 |
| | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 |
| | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,774 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 1,898 | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 |
| | 2,336 | 2,094 | 2,336 | 195,674 | 2,336 | 1,899 | 2,336 | 195,674 | 2,336 | 1,899 | 2,461 | 2,023 | 2,461 | 2,218 | 2,469 | 199,674 | 2,469 | 2,023 | 2,469 | 199,674 | 2,469 | 2,023 | 2,602 | 2,156 | 2,602 | 2,351 | 2,611 | 203,750 |
| | 2,336 | 2,094 | 2,336 | 195,674 | 2,336 | 1,899 | 2,336 | 195,674 | 2,336 | 1,899 | 2,461 | 2,023 | 2,461 | 2,218 | 2,469 | 199,674 | 2,469 | 2,023 | 2,469 | 199,674 | 2,469 | 2,023 | 2,602 | 2,156 | 2,602 | 2,351 | 2,611 | 203,760 |
| | 100,189 | 100,189 | 100,189 | 100,189 | 100,189 | 100,189 | 103,114 | 103,114 | 103,114 | 103,114 | 103,114 | 103,114 | 103,114 | 103,114 | 98,203 | 97,952 | (99,253) | 97,952 | 98,398 | 148,162 | (49,043) | 148,162 | 148,608 | 148,029 | 148,475 | 148,029 | 148,280 | 148,020 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 |
| | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) |
| | (5,885) | (5,885) | (5,885) | (5,885) | (5,885) | (5,885) | (2,960) | (2,960) | (2,960) | (2,960) | (2,960) | (2,960) | (2,960) | (7,872) | (8,123) | (205,328) | (8,123) | (7,677) | 42,088 | (155,117) | 42,088 | 42,534 | 41,955 | 42,401 | 41,955 | 42,206 | 41,946 | (159,203) |
| | 166,101 | 160,216 | 154,330 | 148,445 | 142,560 | 136,674 | 130,789 | 127,828 | 124,868 | 121,907 | 118,947 | 115,987 | 113,026 | 110,066 | 102,194 | 94,071 | 3,743 | 820 | 443 | 42,531 | 2,414 | 44,501 | 87,035 | 128,989 | 171,390 | 213,345 | 255,550 | 297,496 |
| | (5,885) | (5,885) | (5,885) | (5,885) | (5,885) | (5,885) | (2,960) | (2,960) | (2,960) | (2,960) | (2,960) | (2,960) | (2,960) | (7,872) | (8,123) | (205,328) | (8,123) | (7,677) | 42,088 | (155,117) | 42,088 | 42,534 | 41,955 | 42,401 | 41,955 | 42,206 | 41,946 | (159,203) |
| | | | | | | | | | | | | | | | | 115,000 | 5,000 | 7,500 | 115,000 | | | | | | | | | |
| | 160,216 | 154,330 | 148,445 | 142,560 | 136,674 | 130,789 | 127,828 | 124,868 | 121,907 | 118,947 | 115,987 | 113,026 | 110,066 | 102,194 | 94,071 | 3,743 | 620 | 443 | 42,531 | 2,414 | 44,501 | 87,035 | 128,989 | 171,390 | 213,345 | 255,550 | 297,496 | 138,293 |

| | 1/31/29 | 2/28/29 | 3/31/29 | 4/30/29 | 5/31/29 | 6/30/29 | 7/31/29 | 8/31/29 | 9/30/29 | 10/31/29 | 11/30/29 | 12/31/29 | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | 10/31/30 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 150,631 | 150,831 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 9,581,044 |
| | 150,631 | 150,831 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 9,581,044 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 666,352 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 666,352 |
| | 150,631 | 150,831 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 155,150 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 159,805 | 10,247,395 |
| | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 9,000 |
| | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 9,000 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 1,170 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 195 | 1,170 |
| | 455 | 0 | 455 | 0 | 455 | 0 | 455 | 0 | 455 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 16,059 |
| | 455 | 0 | 455 | 0 | 455 | 0 | 455 | 0 | 455 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 464 | 0 | 16,059 |
| | 0 | 0 | 0 | 201,604 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 205,636 | 0 | 0 | 0 | 205,636 | 0 | 0 | 0 | 0 | 0 | 0 | 2,349,786 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 201,604 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 205,636 | 0 | 0 | 0 | 205,636 | 0 | 0 | 0 | 0 | 0 | 0 | 2,349,786 |
| | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,326 | 2,326 | 2,326 | 2,326 | 138,004 |
| | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 | 2,031 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,173 | 2,326 | 2,326 | 2,326 | 2,326 | 138,004 |
| | 2,611 | 2,156 | 2,611 | 203,760 | 2,611 | 2,156 | 2,753 | 2,298 | 2,753 | 2,493 | 2,762 | 207,934 | 2,762 | 2,298 | 2,762 | 207,934 | 2,762 | 2,298 | 2,914 | 2,451 | 2,914 | 2,646 | 2,512,019 |
| | 2,611 | 2,156 | 2,611 | 203,760 | 2,611 | 2,156 | 2,753 | 2,298 | 2,753 | 2,493 | 2,762 | 207,934 | 2,762 | 2,298 | 2,762 | 207,934 | 2,762 | 2,298 | 2,914 | 2,451 | 2,914 | 2,646 | 2,512,019 |
| | 148,020 | 148,475 | 152,539 | (48,610) | 152,539 | 152,994 | 152,397 | 152,852 | 152,397 | 152,657 | 152,388 | (52,784) | 152,388 | 152,852 | 157,042 | (48,130) | 157,042 | 157,506 | 156,890 | 157,354 | 156,890 | 157,159 | 7,735,376 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 7,637,361 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 7,637,361 |
| | | | | | | | | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | | | | | | | | 0 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 7,637,361 |
| | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 106,074 | 7,637,361 |
| | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (106,074) | (7,637,361) |
| | 41,946 | 42,401 | 46,465 | (154,684) | 46,465 | 46,920 | 46,323 | 46,777 | 46,323 | 46,582 | 46,313 | (158,859) | 46,313 | 46,777 | 50,968 | (154,204) | 50,968 | 51,432 | 50,816 | 51,280 | 50,816 | 51,085 | 98,015 |
| | 138,293 | 180,239 | 222,639 | 269,104 | 114,420 | 160,885 | 207,804 | 254,127 | 300,904 | 347,227 | 393,809 | 440,123 | 281,264 | 327,578 | 374,355 | 425,323 | 271,119 | 322,087 | 373,519 | 424,335 | 475,814 | 526,430 | 577,515 |
| | 41,946 | 42,401 | 46,465 | (154,684) | 46,465 | 46,920 | 46,323 | 46,777 | 46,323 | 46,582 | 46,313 | (158,859) | 46,313 | 46,777 | 50,968 | (154,204) | 50,968 | 51,432 | 50,816 | 51,280 | 50,816 | 51,085 | |
| | 180,239 | 222,639 | 269,104 | 114,420 | 160,885 | 207,804 | 254,127 | 300,904 | 347,227 | 393,809 | 440,123 | 281,264 | 327,578 | 374,355 | 425,323 | 271,119 | 322,087 | 373,519 | 424,335 | 475,814 | 526,430 | 577,515 | 577,515 |

# 9300 Wilshire, LLC - Budget

**Properties:** Pier Kinney
**Period Range:** Nov 2024 to Nov 2024

| Account Name | 11/30/24 | Total |
|---|---|---|
| **Operating Income & Expense** | | |
| **Operating Income** | 0 | 0 |
| **Expense** | | |
| **Total Operating Expense** | 0 | 0 |
| | | |
| **NOI - Net Operating Income** | 0 | 0 |
| | | |
| **Other Income & Expense** | | |
| **Total Gain/Loss On Sale of Assets** | 6,500,000 | 6,500,000 |
| **Other Expense** | | |
| **Total Other Expense** | 0 | 0 |
| | | |
| **Net Other Income** | 6,500,000 | 6,500,000 |
| | | |
| **Net Income** | 6,500,000 | 6,500,000 |

**9300 Wilshire, LLC - Budget**

Properties: Pier Kinney
Period Range: Nov 2024 to Oct 2030

| Account Name | ######## | ######## | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | ######## | ######## | ######## | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 | 9/30/26 | ######## |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 34,819 | 34,819 | 74,819 | 74,819 | 74,819 | 74,819 | 74,819 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 79,163 | 79,163 | 79,163 | 79,163 | 79,163 |
| **Total Scheduled Rent** | 34,819 | 34,819 | 74,819 | 74,819 | 74,819 | 74,819 | 74,819 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 76,858 | 79,163 | 79,163 | 79,163 | 79,163 | 79,163 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 |
| **Total Other Operating Income** | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 |
| **Operating Income** | 46,832 | 46,832 | 86,832 | 86,832 | 86,832 | 86,832 | 86,832 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 88,871 | 91,176 | 91,176 | 91,176 | 91,176 | 91,176 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 |
| **Total Repairs & Maintenance** | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| **Total Contracted Services** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 2,195 | 482 | 589 | 954 | 710 | 771 | 584 | 455 | 515 | 505 | 506 | 615 | 2,239 | 492 | 601 | 973 | 724 | 788 | 596 | 464 | 525 | 515 | 516 | 627 |
| **Total Utilities** | 2,195 | 482 | 589 | 954 | 710 | 771 | 584 | 455 | 515 | 505 | 506 | 615 | 2,239 | 492 | 601 | 973 | 724 | 788 | 596 | 464 | 525 | 515 | 516 | 627 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 14,486 | 0 | 0 | 0 | 14,486 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total General & Administrative** | 0 | 14,486 | 0 | 0 | 0 | 14,486 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 14,776 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 |
| **Total Insurance** | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,016 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 | 2,097 |
| **Total Operating Expenses** | 4,636 | 17,409 | 3,030 | 3,395 | 3,151 | 17,698 | 3,025 | 2,896 | 2,956 | 2,946 | 2,947 | 3,056 | 4,761 | 17,789 | 3,122 | 3,495 | 3,246 | 18,084 | 3,117 | 2,986 | 3,047 | 3,037 | 3,038 | 3,149 |
| **Total Operating Expense** | 4,636 | 17,409 | 3,030 | 3,395 | 3,151 | 17,698 | 3,025 | 2,896 | 2,956 | 2,946 | 2,947 | 3,056 | 4,761 | 17,789 | 3,122 | 3,495 | 3,246 | 18,084 | 3,117 | 2,986 | 3,047 | 3,037 | 3,038 | 3,149 |
| **NOI - Net Operating Income** | 41,996 | 29,223 | 83,602 | 83,237 | 83,481 | 68,934 | 83,607 | 85,975 | 85,915 | 85,925 | 85,924 | 85,815 | 84,110 | 71,082 | 85,748 | 85,376 | 85,625 | 70,787 | 85,753 | 88,191 | 88,129 | 88,140 | 88,139 | 88,027 |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss On Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cost of Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Gain/Loss On Sale of Assets** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Income** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| **Total Entity Expenses** | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Non-Operating Expenses** | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| **Total Other Expense** | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| **Net Other Income** | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (45,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) |
| **Net Income** | (3,004) | (15,777) | 38,602 | 38,237 | 38,481 | 23,934 | 38,607 | 40,975 | 40,915 | 40,925 | 40,924 | 40,815 | 39,110 | 31,082 | 45,748 | 45,376 | 45,625 | 30,787 | 45,753 | 48,191 | 48,129 | 48,140 | 48,139 | 48,027 |
| Beginning Cash | 20,000 | 16,996 | 1,219 | 39,821 | 78,058 | 116,540 | 140,474 | 179,081 | 220,055 | 260,970 | 301,895 | 342,819 | 383,633 | 422,743 | 453,825 | 499,573 | 544,949 | 590,574 | 621,361 | 667,114 | 715,305 | 763,434 | 811,574 | 859,713 |
| Net Cash Flow | (3,004) | (15,777) | 38,602 | 38,237 | 38,481 | 23,934 | 38,607 | 40,915 | 40,915 | 40,925 | 40,924 | 40,815 | 39,110 | 31,082 | 45,748 | 45,376 | 45,625 | 30,787 | 45,753 | 48,191 | 48,129 | 48,140 | 48,139 | 48,027 |
| Equity Contribution from Ely Dromy | | | | | | | | | | | | | | | | | | | | | | | | |
| Ending Cash | 16,996 | 1,219 | 39,821 | 78,058 | 116,540 | 140,474 | 179,081 | 220,055 | 260,970 | 301,895 | 342,819 | 383,633 | 422,743 | 453,825 | 499,573 | 544,949 | 590,574 | 621,361 | 667,114 | 715,305 | 763,434 | 811,574 | 859,713 | 907,740 |

| ###### | ###### | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | 10/31/27 | 11/30/27 | 12/31/27 | 1/31/28 | 2/29/28 | 3/31/28 | 4/30/28 | 5/31/28 | 6/30/28 | 7/31/28 | 8/31/28 | 9/30/28 | 10/31/28 | 11/30/28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79,163 | 79,163 | 79,163 | 79,163 | 79,163 | 79,163 | 79,163 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 83,984 | 83,984 | 83,984 | 83,984 | 83,984 | 83,984 |
| 79,163 | 79,163 | 79,163 | 79,163 | 79,163 | 79,163 | 79,163 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 81,538 | 83,984 | 83,984 | 83,984 | 83,984 | 83,984 | 83,984 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 |
| 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 |
| 91,176 | 91,176 | 91,176 | 91,176 | 91,176 | 91,176 | 91,176 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 93,551 | 95,997 | 95,997 | 95,997 | 95,997 | 95,997 | 95,997 |
| 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 |
| 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 |
| 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| 2,284 | 501 | 613 | 993 | 739 | 802 | 608 | 473 | 536 | 525 | 526 | 640 | 2,329 | 512 | 625 | 1,012 | 753 | 818 | 620 | 483 | 547 | 536 | 537 | 653 | 2,376 |
| 2,284 | 501 | 613 | 993 | 739 | 802 | 608 | 473 | 536 | 525 | 526 | 640 | 2,329 | 512 | 625 | 1,012 | 753 | 818 | 620 | 483 | 547 | 536 | 537 | 653 | 2,376 |
| 0 | 15,071 | 0 | 0 | 0 | 15,071 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 15,071 | 0 | 0 | 0 | 15,071 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 15,373 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,358 |
| 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,181 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,268 | 2,358 |
| 4,889 | 18,178 | 3,218 | 3,598 | 3,344 | 18,479 | 3,213 | 3,079 | 3,141 | 3,131 | 3,132 | 3,245 | 5,022 | 18,577 | 3,318 | 3,705 | 3,446 | 18,884 | 3,312 | 3,176 | 3,229 | 3,229 | 3,230 | 3,345 | 5,159 |
| 4,889 | 18,178 | 3,218 | 3,598 | 3,344 | 18,479 | 3,213 | 3,079 | 3,141 | 3,131 | 3,132 | 3,245 | 5,022 | 18,577 | 3,318 | 3,705 | 3,446 | 18,884 | 3,312 | 3,176 | 3,229 | 3,229 | 3,230 | 3,345 | 5,159 |
| 86,287 | 72,998 | 87,958 | 87,578 | 87,832 | 72,698 | 87,963 | 90,472 | 90,410 | 90,421 | 90,419 | 90,306 | 88,529 | 74,974 | 90,234 | 89,846 | 90,105 | 74,668 | 90,239 | 92,822 | 92,758 | 92,769 | 92,768 | 92,652 | 90,838 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | | |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) |
| 46,287 | 32,998 | 47,958 | 47,578 | 47,832 | 32,698 | 47,963 | 50,472 | 50,410 | 50,421 | 50,419 | 50,306 | 48,529 | 34,974 | 50,234 | 49,846 | 50,105 | 34,668 | 50,239 | 52,822 | 52,758 | 52,769 | 52,768 | 52,652 | 50,838 |
| 907,740 | 954,027 | 987,026 | 1,034,984 | 1,082,562 | 1,130,394 | 1,163,092 | 1,211,055 | 1,261,528 | 1,311,937 | 1,362,358 | 1,412,777 | 1,463,083 | 1,511,613 | 1,546,587 | 1,596,821 | 1,646,667 | 1,696,772 | 1,731,440 | 1,781,678 | 1,834,500 | 1,887,258 | 1,940,027 | 1,992,795 | 2,045,447 |
| 46,287 | 32,998 | 47,958 | 47,578 | 47,832 | 32,698 | 47,963 | 50,472 | 50,410 | 50,421 | 50,419 | 50,306 | 48,529 | 34,974 | 50,234 | 49,846 | 50,105 | 34,668 | 50,239 | 52,822 | 52,758 | 52,769 | 52,768 | 52,652 | 50,838 |
| 954,027 | 987,026 | 1,034,984 | 1,082,562 | 1,130,394 | 1,163,092 | 1,211,055 | 1,261,528 | 1,311,937 | 1,362,358 | 1,412,777 | 1,463,083 | 1,511,613 | 1,546,587 | 1,596,821 | 1,646,667 | 1,696,772 | 1,731,440 | 1,781,678 | 1,834,500 | 1,887,258 | 1,940,027 | 1,992,795 | 2,045,447 | 2,098,285 |

| 12/31/28 | 1/31/29 | 2/28/29 | 3/31/29 | 4/30/29 | 5/31/29 | 6/30/29 | 7/31/29 | 8/31/29 | 9/30/29 | 10/31/29 | 11/30/29 | 12/31/29 | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | 10/31/30 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 83,984 | 83,984 | 83,984 | 83,984 | 83,984 | 83,984 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 89,099 | 89,099 | 89,099 | 89,099 | 89,099 | 5,784,403 |
| 83,984 | 83,984 | 83,984 | 83,984 | 83,984 | 83,984 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 86,504 | 89,099 | 89,099 | 89,099 | 89,099 | 89,099 | 5,784,403 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 864,936 |
| 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 12,013 | 864,936 |
| 95,997 | 95,997 | 95,997 | 95,997 | 95,997 | 95,997 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 98,517 | 101,112 | 101,112 | 101,112 | 101,112 | 101,112 | 6,649,339 |
| 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 12,600 |
| 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 12,600 |
| 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 18,000 |
| 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 18,000 |
| 522 | 638 | 1,033 | 769 | 835 | 632 | 493 | 558 | 547 | 548 | 473 | 2,423 | 532 | 650 | 1,053 | 784 | 851 | 645 | 502 | 569 | 557 | 559 | 483 | 55,634 |
| 522 | 638 | 1,033 | 769 | 835 | 632 | 493 | 558 | 547 | 548 | 473 | 2,423 | 532 | 650 | 1,053 | 784 | 851 | 645 | 502 | 569 | 557 | 559 | 483 | 55,634 |
| 15,680 | 0 | 0 | 0 | 15,680 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 0 | 0 | 0 | 182,758 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15,680 | 0 | 0 | 0 | 15,680 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 15,994 | 0 | 0 | 0 | 0 | 0 | 0 | 182,758 |
| 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 159,333 |
| 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 2,358 | 159,333 |
| 18,985 | 3,421 | 3,816 | 3,552 | 19,298 | 3,416 | 3,276 | 3,341 | 3,330 | 3,331 | 3,257 | 5,207 | 19,309 | 3,434 | 3,837 | 3,567 | 19,628 | 3,428 | 3,286 | 3,352 | 3,341 | 3,342 | 3,266 | 428,325 |
| 18,985 | 3,421 | 3,816 | 3,552 | 19,298 | 3,416 | 3,276 | 3,341 | 3,330 | 3,331 | 3,257 | 5,207 | 19,309 | 3,434 | 3,837 | 3,567 | 19,628 | 3,428 | 3,286 | 3,352 | 3,341 | 3,342 | 3,266 | 428,325 |
| 77,012 | 92,576 | 92,181 | 92,445 | 76,699 | 92,582 | 95,241 | 95,176 | 95,187 | 95,186 | 95,260 | 93,310 | 79,208 | 95,083 | 94,680 | 94,950 | 78,889 | 95,089 | 97,826 | 97,760 | 97,771 | 97,770 | 97,846 | 6,221,014 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 2,945,000 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 2,945,000 |
| | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 2,945,000 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 2,945,000 |
| (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (2,945,000) |
| 37,012 | 52,576 | 52,181 | 52,445 | 36,699 | 52,582 | 55,241 | 55,176 | 55,187 | 55,186 | 55,260 | 53,310 | 39,208 | 55,083 | 54,680 | 54,950 | 38,889 | 55,089 | 57,826 | 57,760 | 57,771 | 57,770 | 57,846 | 3,276,014 |
| 2,096,285 | 2,133,297 | 2,185,874 | 2,238,055 | 2,290,501 | 2,327,200 | 2,379,782 | 2,435,023 | 2,490,199 | 2,545,386 | 2,600,572 | 2,655,832 | 2,709,142 | 2,748,350 | 2,803,433 | 2,858,114 | 2,913,063 | 2,951,952 | 3,007,041 | 3,064,867 | 3,122,627 | 3,180,398 | 3,238,168 | 3,296,014 |
| 37,012 | 52,576 | 52,181 | 52,445 | 36,699 | 52,582 | 55,241 | 55,176 | 55,187 | 55,186 | 55,260 | 53,310 | 39,208 | 55,083 | 54,680 | 54,950 | 38,889 | 55,089 | 57,826 | 57,760 | 57,771 | 57,770 | 57,846 | |
| 2,133,297 | 2,185,874 | 2,238,055 | 2,290,501 | 2,327,200 | 2,379,782 | 2,435,023 | 2,490,199 | 2,545,386 | 2,600,572 | 2,655,832 | 2,709,142 | 2,748,350 | 2,803,433 | 2,858,114 | 2,913,063 | 2,951,952 | 3,007,041 | 3,064,867 | 3,122,627 | 3,180,398 | 3,238,168 | 3,296,014 | 3,296,014 |

# 9300 Wilshire, LLC - Budget

**Properties:** Wilshire/Linden
**Period Range:** Nov 2024 to Jul 2025

| Account Name | 11/30/24 | 12/31/24 | 1/31/25 | 2/28/25 | 3/31/25 |
|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | |
| Operating Income | 111,219 | 111,219 | 111,219 | 111,219 | 111,219 |
| **Expense** | | | | | |
| Total Operating Expense | 21,122 | 146,283 | 21,376 | 21,958 | 19,284 |
| NOI - Net Operating Income | 90,097 | (35,064) | 89,843 | 89,261 | 91,935 |
| **Other Income & Expense** | | | | | |
| Total Gain/Loss On Sale of Assets | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | |
| Total Other Expense | 137,852 | 137,852 | 137,852 | 125,352 | 125,352 |
| Net Other Income | (137,852) | (137,852) | (137,852) | (125,352) | (125,352) |
| Net Income | (47,755) | (172,916) | (48,009) | (36,091) | (33,417) |

| 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | Total |
|---|---|---|---|---|
| 111,219 | 111,219 | 114,532 | 114,532 | 1,007,598 |
| 144,786 | 18,578 | 17,117 | 21,896 | 432,401 |
| (33,567) | 92,641 | 97,415 | 92,636 | 575,197 |
| 0 | 0 | 0 | 49,185,379 | 49,185,379 |
| 125,352 | 105,352 | 105,352 | 105,352 | 1,105,668 |
| (125,352) | (105,352) | (105,352) | 49,080,027 | 48,079,711 |
| (158,919) | (12,711) | (7,937) | 49,172,663 | 48,654,908 |

**9300 Wilshire, LLC - Budget**

Properties: Wilshire/Linden
Period Range: Nov 2024 to Oct 2030

| Account Name | 11/30/24 | 12/31/24 | 1/31/25 | 2/28/25 | 3/31/25 | 4/30/25 | 5/31/25 | 6/30/25 | 7/31/25 | 8/31/25 | 9/30/25 | 10/31/25 | 11/30/25 | 12/31/25 | 1/31/26 | 2/28/26 | 3/31/26 | 4/30/26 | 5/31/26 | 6/30/26 | 7/31/26 | 8/31/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income & Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | | | | | |
| **Scheduled Rent** | | | | | | | | | | | | | | | | | | | | | | |
| Rental Income | 110,446 | 110,446 | 110,446 | 110,446 | 110,446 | 110,446 | 110,446 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 117,172 | 117,172 | 117,172 |
| Total Scheduled Rent | 110,446 | 110,446 | 110,446 | 110,446 | 110,446 | 110,446 | 110,446 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 113,759 | 117,172 | 117,172 | 117,172 |
| **Other Operating Income** | | | | | | | | | | | | | | | | | | | | | | |
| Application Processing Fee Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Late Fees Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income - Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses Recovery Income | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 |
| Total Other Operating Income | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 |
| Operating Income | 111,219 | 111,219 | 111,219 | 111,219 | 111,219 | 111,219 | 111,219 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 114,532 | 117,945 | 117,945 | 117,945 |
| **Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| **Repairs & Maintenance** | | | | | | | | | | | | | | | | | | | | | | |
| Repairs & Maintenance (R&M) | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| Total Repairs & Maintenance | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| **Contracted Services** | | | | | | | | | | | | | | | | | | | | | | |
| Contracted Services | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 |
| Total Contracted Services | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 |
| **Utilities** | | | | | | | | | | | | | | | | | | | | | | |
| Utilities | 9,585 | 7,373 | 9,839 | 10,421 | 7,747 | 5,876 | 7,041 | 5,580 | 10,359 | 13,746 | 14,891 | 14,075 | 9,777 | 7,520 | 10,036 | 10,629 | 7,902 | 5,994 | 7,182 | 5,692 | 10,566 | 14,021 |
| Total Utilities | 9,585 | 7,373 | 9,839 | 10,421 | 7,747 | 5,876 | 7,041 | 5,580 | 10,359 | 13,746 | 14,891 | 14,075 | 9,777 | 7,520 | 10,036 | 10,629 | 7,902 | 5,994 | 7,182 | 5,692 | 10,566 | 14,021 |
| **General & Administrative** | | | | | | | | | | | | | | | | | | | | | | |
| Property Taxes Expense | 0 | 127,373 | 0 | 0 | 0 | 127,373 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 129,921 | 0 | 0 | 0 | 129,921 | 0 | 0 | 0 | 0 |
| Management Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ground Lease Rent Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total General & Administrative | 0 | 127,373 | 0 | 0 | 0 | 127,373 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 129,921 | 0 | 0 | 0 | 129,921 | 0 | 0 | 0 | 0 |
| **Insurance** | | | | | | | | | | | | | | | | | | | | | | |
| Property, Fire & General Liability Insurance Expense | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 |
| Total Insurance | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,691 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 | 2,799 |
| Total Operating Expenses | 21,122 | 146,283 | 21,376 | 21,958 | 19,284 | 144,786 | 18,578 | 17,117 | 21,896 | 25,283 | 26,428 | 25,612 | 21,421 | 149,086 | 21,680 | 22,274 | 19,547 | 147,559 | 18,826 | 17,336 | 22,211 | 25,666 |
| Total Operating Expense | 21,122 | 146,283 | 21,376 | 21,958 | 19,284 | 144,786 | 18,578 | 17,117 | 21,896 | 25,283 | 26,428 | 25,612 | 21,421 | 149,086 | 21,680 | 22,274 | 19,547 | 147,559 | 18,826 | 17,336 | 22,211 | 25,666 |
| NOI - Net Operating Income | 90,097 | (35,064) | 89,843 | 89,281 | 91,935 | (33,567) | 92,641 | 97,415 | 92,636 | 89,249 | 88,104 | 88,920 | 93,111 | (34,553) | 92,852 | 92,258 | 94,986 | (33,027) | 95,706 | 100,609 | 95,734 | 92,280 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **Other Income & Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Gain/Loss On Sale of Assets** | | | | | | | | | | | | | | | | | | | | | | |
| Sales Price | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Payoff | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Gain/Loss On Sale of Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Expense** | | | | | | | | | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| **Entity Expenses** | | | | | | | | | | | | | | | | | | | | | | |
| Payroll Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees & Consulting Expense | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounting / Audit Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Expense | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Franchise Taxes Withholding Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entity Filing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Fee Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage Principal + Interest Expense | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| Total Entity Expenses | 125,352 | 125,352 | 125,352 | 125,352 | 125,352 | 125,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| **Non-Operating** | | | | | | | | | | | | | | | | | | | | | | |
| Non-Operating (CapEx & UT) | 12,500 | 12,500 | 12,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating | 12,500 | 12,500 | 12,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Non-Operating Expenses | 137,852 | 137,852 | 137,852 | 125,352 | 125,352 | 125,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| Total Other Expense | 137,852 | 137,852 | 137,852 | 125,352 | 125,352 | 125,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| Net Other Income | (137,852) | (137,852) | (137,852) | (125,352) | (125,352) | (125,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) |
| | | | | | | | | | | | | | | | | | | | | | | |
| Net Income | (47,755) | (172,916) | (48,009) | (36,091) | (33,417) | (158,919) | (12,711) | (7,937) | (12,716) | (16,103) | (17,248) | (16,432) | (12,241) | (139,905) | (12,500) | (13,094) | (10,366) | (138,379) | (9,646) | (4,743) | (9,618) | (13,072) |
| | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash | 26,000 | 3,245 | 5,329 | 2,320 | 1,229 | 2,812 | 3,892 | 1,181 | 1,045 | 1,329 | 1,227 | 1,979 | 1,547 | 1,306 | 1,401 | 1,901 | 1,807 | 1,441 | 3,063 | 1,416 | 1,173 | 1,556 |
| Net Cash Flow | (47,755) | (172,916) | (48,009) | (36,091) | (33,417) | (158,919) | (12,711) | (7,937) | (12,716) | (16,103) | (17,248) | (16,432) | (12,241) | (139,905) | (12,500) | (13,094) | (10,366) | (138,379) | (9,646) | (4,743) | (9,618) | (13,072) |
| Equity Contribution from Ely Dromy | 25,000 | 175,000 | 45,000 | 35,000 | 35,000 | 160,000 | 10,000 | 7,800 | 13,000 | 16,000 | 18,000 | 18,000 | 12,000 | 140,000 | 13,000 | 13,000 | 10,000 | 140,000 | 8,000 | 4,500 | 10,000 | 13,000 |
| Ending Cash | 3,245 | 5,329 | 2,320 | 1,229 | 2,812 | 3,892 | 1,181 | 1,045 | 1,329 | 1,227 | 1,979 | 1,547 | 1,306 | 1,401 | 1,901 | 1,807 | 1,441 | 3,063 | 1,416 | 1,173 | 1,556 | 1,483 |

| 9/30/26 | 10/31/26 | 11/30/26 | 12/31/26 | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | 10/31/27 | 11/30/27 | 12/31/27 | 1/31/28 | 2/29/28 | 3/31/28 | 4/30/28 | 5/31/28 | 6/30/28 | 7/31/28 | 8/31/28 | 9/30/28 | 10/31/28 | 11/30/28 | 12/31/28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 |
| 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 117,172 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 120,687 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 |
| 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 |
| 117,945 | 117,945 | 117,945 | 117,945 | 117,945 | 117,945 | 117,945 | 117,945 | 117,945 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 121,460 | 125,081 | 125,081 | 125,081 | 125,081 | 125,081 | 125,081 | 125,081 | 125,081 |
| 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 |
| 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 |
| 15,189 | 14,357 | 9,972 | 7,671 | 10,236 | 10,842 | 8,060 | 6,113 | 7,325 | 5,805 | 10,778 | 14,301 | 15,493 | 14,644 | 10,172 | 7,824 | 10,441 | 11,059 | 8,221 | 6,238 | 7,472 | 5,922 | 10,993 | 14,587 | 15,802 | 14,937 | 10,375 | 7,981 |
| 15,189 | 14,357 | 9,972 | 7,671 | 10,236 | 10,842 | 8,060 | 6,113 | 7,325 | 5,805 | 10,778 | 14,301 | 15,493 | 14,644 | 10,172 | 7,824 | 10,441 | 11,059 | 8,221 | 6,236 | 7,472 | 5,922 | 10,993 | 14,587 | 15,802 | 14,937 | 10,375 | 7,981 |
| 0 | 0 | 0 | 132,519 | 0 | 0 | 0 | 132,519 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135,170 | 0 | 0 | 0 | 135,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 137,873 |
| 0 | 0 | 0 | 132,519 | 0 | 0 | 0 | 132,519 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135,170 | 0 | 0 | 0 | 135,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 137,873 |
| 0 | 0 | 0 | 132,519 | 0 | 0 | 0 | 132,519 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135,170 | 0 | 0 | 0 | 135,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 137,873 |
| 2,799 | 2,799 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,148 | 3,148 |
| 2,799 | 2,799 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 2,911 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,027 | 3,148 | 3,148 |
| 26,833 | 26,001 | 21,729 | 151,947 | 21,993 | 22,599 | 19,817 | 150,389 | 19,082 | 17,562 | 22,534 | 26,058 | 27,249 | 26,400 | 22,045 | 154,867 | 22,314 | 22,932 | 20,094 | 153,278 | 19,345 | 17,795 | 22,866 | 26,460 | 27,675 | 26,810 | 22,369 | 157,848 |
| 26,833 | 26,001 | 21,729 | 151,947 | 21,993 | 22,599 | 19,817 | 150,389 | 19,082 | 17,562 | 22,534 | 26,058 | 27,249 | 26,400 | 22,045 | 154,867 | 22,314 | 22,932 | 20,094 | 153,278 | 19,345 | 17,795 | 22,866 | 26,460 | 27,675 | 26,810 | 22,369 | 157,848 |
| 91,112 | 91,944 | 96,216 | (34,001) | 95,352 | 95,347 | 98,129 | (32,444) | 98,863 | 103,898 | 98,926 | 95,402 | 94,211 | 95,060 | 99,416 | (33,406) | 99,146 | 98,528 | 101,366 | (31,818) | 102,115 | 107,286 | 102,215 | 98,621 | 97,405 | 98,271 | 102,712 | (32,767) |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 |
| (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) |
| (14,240) | (13,408) | (9,136) | (139,353) | (9,400) | (10,005) | (7,223) | (137,796) | (6,489) | (1,454) | (6,426) | (9,950) | (11,141) | (10,292) | (5,936) | (138,758) | (6,206) | (6,824) | (3,986) | (137,170) | (3,237) | 1,934 | (3,137) | (6,731) | (7,947) | (7,081) | (2,640) | (138,119) |
| 1,483 | 2,243 | 1,835 | 2,699 | 3,348 | 1,446 | 1,441 | 1,217 | 3,421 | 1,932 | 1,479 | 1,053 | 1,103 | 1,962 | 1,671 | 2,234 | 3,478 | 1,770 | 2,446 | 3,460 | 1,291 | 1,554 | 3,488 | 1,851 | 1,120 | 3,173 | 1,093 | 3,452 |
| (14,240) | (13,408) | (9,136) | (139,353) | (9,400) | (10,005) | (7,223) | (137,796) | (6,489) | (1,454) | (6,426) | (9,950) | (11,141) | (10,292) | (5,936) | (138,758) | (8,206) | (6,824) | (3,988) | (137,170) | (3,237) | 1,934 | (3,137) | (8,731) | (7,947) | (7,081) | (2,640) | (138,119) |
| 15,000 | 13,000 | 10,000 | 140,000 | 7,500 | 10,000 | 10,000 | 140,000 | 5,000 | 1,000 | 6,000 | 10,000 | 12,000 | 10,000 | 6,500 | 140,000 | 4,500 | 7,500 | 5,000 | 135,000 | 3,500 | 1,500 | 8,000 | 10,000 | 10,000 | 5,000 | 5,000 | 145,000 |
| 2,243 | 1,835 | 2,699 | 3,346 | 1,446 | 1,441 | 1,217 | 3,421 | 1,932 | 1,479 | 1,053 | 1,103 | 1,962 | 1,671 | 2,234 | 3,478 | 1,770 | 2,446 | 3,460 | 1,291 | 1,554 | 3,488 | 1,851 | 1,120 | 3,173 | 1,093 | 3,452 | 10,334 |

| | 1/31/29 | 2/28/29 | 3/31/29 | 4/30/29 | 5/31/29 | 6/30/29 | 7/31/29 | 8/31/29 | 9/30/29 | 10/31/29 | 11/30/29 | 12/31/29 | 1/31/30 | 2/28/30 | 3/31/30 | 4/30/30 | 5/31/30 | 6/30/30 | 7/31/30 | 8/31/30 | 9/30/30 | 10/31/30 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 131,878 | 131,878 | 131,878 | 131,878 | 131,878 | 8,680,081 |
| | 124,308 | 124,308 | 124,308 | 124,308 | 124,308 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 128,037 | 131,878 | 131,878 | 131,878 | 131,878 | 131,878 | 8,680,081 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 55,656 |
| | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 773 | 55,656 |
| | 125,081 | 125,081 | 125,081 | 125,081 | 125,081 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 128,810 | 132,651 | 132,651 | 132,651 | 132,651 | 132,651 | 8,735,737 |
| | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 90,000 |
| | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 90,000 |
| | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 546,912 |
| | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 7,596 | 546,912 |
| | 10,650 | 11,280 | 8,386 | 6,380 | 7,621 | 6,040 | 11,213 | 14,879 | 16,118 | 5,805 | 10,583 | 8,140 | 10,863 | 11,506 | 8,553 | 6,488 | 7,774 | 6,161 | 11,437 | 15,177 | 16,441 | 5,922 | 718,058 |
| | 10,650 | 11,280 | 8,386 | 6,380 | 7,621 | 6,040 | 11,213 | 14,879 | 16,118 | 5,805 | 10,583 | 8,140 | 10,863 | 11,506 | 8,553 | 6,488 | 7,774 | 6,161 | 11,437 | 15,177 | 16,441 | 5,922 | 718,058 |
| | 0 | 0 | 0 | 137,873 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 140,630 | 0 | 0 | 0 | 140,630 | 0 | 0 | 0 | 0 | 0 | 0 | 1,606,972 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 137,873 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 140,630 | 0 | 0 | 0 | 140,630 | 0 | 0 | 0 | 0 | 0 | 0 | 1,606,972 |
| | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 212,681 |
| | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 3,148 | 212,681 |
| | 22,644 | 23,274 | 20,380 | 156,227 | 19,615 | 18,034 | 23,207 | 26,873 | 28,113 | 17,800 | 22,577 | 160,765 | 22,857 | 23,500 | 20,547 | 159,112 | 19,768 | 18,155 | 23,431 | 27,171 | 28,435 | 17,916 | 3,172,621 |
| | 22,644 | 23,274 | 20,380 | 156,227 | 19,615 | 18,034 | 23,207 | 26,873 | 28,113 | 17,800 | 22,577 | 160,765 | 22,857 | 23,500 | 20,547 | 159,112 | 19,768 | 18,155 | 23,431 | 27,171 | 28,435 | 17,916 | 3,172,621 |
| | 102,437 | 101,807 | 104,701 | (31,146) | 105,465 | 110,776 | 105,603 | 101,937 | 100,698 | 111,011 | 106,233 | (31,955) | 105,953 | 105,310 | 108,263 | (30,302) | 109,042 | 114,496 | 109,220 | 105,481 | 104,216 | 114,736 | 5,563,117 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 60,000 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 60,000 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 7,585,344 |
| | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 7,705,344 |
| | | | | | | | | | | | | | | | | | | | | | | | 37,500 |
| | | | | | | | | | | | | | | | | | | | | | | | 37,500 |
| | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 7,742,844 |
| | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 105,352 | 7,705,344 |
| | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (105,352) | (7,742,844) |
| | (2,915) | (3,545) | | 113 | 5,424 | 251 | (3,415) | (4,654) | 5,659 | 881 | (137,307) | 601 | (42) | 2,911 | (135,654) | 3,690 | 9,144 | 3,868 | 129 | (1,136) | | 9,384 | (2,179,727) |
| | 10,334 | 7,418 | 3,873 | 3,222 | 16,724 | 16,837 | 22,262 | 22,513 | 19,098 | 14,443 | 20,102 | 20,983 | 8,677 | 9,278 | 9,238 | 12,147 | 1,493 | 5,184 | 14,328 | 18,196 | 18,325 | 17,189 | 26,573 |
| | (2,915) | (3,545) | (651) | (138,498) | 113 | 5,424 | 251 | (3,415) | (4,654) | 5,059 | 881 | (137,307) | 601 | (42) | 2,911 | (135,654) | 3,690 | 9,144 | 3,868 | 129 | (1,136) | 9,384 | |
| | | | | 150,000 | | | | | | | | 125,000 | | | | 125,000 | | | | | | | |
| | 7,418 | 3,873 | 3,222 | 16,724 | 16,837 | 22,262 | 22,513 | 19,098 | 14,443 | 20,102 | 20,983 | 8,677 | 9,278 | 9,238 | 12,147 | 1,493 | 5,184 | 14,328 | 18,196 | 18,325 | 17,189 | 26,573 | 26,573 |

# **EXHIBIT E**

## **(FINANCIAL RECORDS)**

The Disclosure Statement and Plan is not reliant on operating income or projected cash-flow.  As such, there are no balance sheets, income and expense statements, or cash flow statements for the period covering the duration of the plan. However, as of the Effective Date of the Plan, the Debtor will have sufficient cash on hand to effectuate the Effective Date payments, which payments will be derived from existing cash on hand, and capital contributions from Leonid Pustilnikov and/or Ely Dromy.

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**EXHIBIT F**

**(DECLARATION OF JACK ALEXANDER, STATE CERTIFIED GENERAL
APPRAISER, IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN)**

I, Jack Alexander, hereby declare and state as follows:

1.      I have personal knowledge of the facts set forth in this declaration.  I am licensed by the State of California as a real estate appraiser, license/state certificate number AG032464.  I am the President and principal of Alexander Valuation Group ("AVG"), whose business address is 200 S Pacific Coast Highway, Redondo Beach, California 90277.

2.      AVG provides consulting, investment, and valuation services with regards to all types of commercial and improved real property.  For more than thirty years, I have provided real estate valuation services to clients including financial institutions, developers, law firms, and individuals. I have extensive experience in valuing commercial real properties throughout the State of California.  I have been qualified as an expert witness in the fields of real estate and real estate appraisal, and have so testified in deposition and in various state court and bankruptcy court matters hundreds of times. A true and correct copy of my resume is affixed to the end of my declaration.

3.      In February 2023, AVG was retained to provide an appraisal and to determine the fair market value of the real property located at 1100 N. Harbor Drive, Redondo Beach, California 90277, bearing APN Nos. 7503-013-819,820/7503-013-014,015 (the "Harbor Drive Property").

4.      In this regard, AVG prepared a written appraisal report (the "Appraisal Report") with respect to its appraisal of the Harbor Drive Property, dated as of February 28, 2023.  I was then retained by 9300 Wilshire, LLC, a Delaware limited liability company (the "Debtor"), the debtor and debtor in possession herein, to update my Appraisal Report in connection with the submission of the "Debtor and Debtor in Possession's Disclosure Statement and Plan of Reorganization" (the "Disclosure Statement and Plan").

5.      As such, AVG prepared an updated appraisal report (the "Updated Appraisal Report") of the Harbor Drive Property, dated as of June 14, 2024.  A true and correct copy of the Updated Appraisal Report is affixed to the end of my declaration.  The attached Updated Appraisal Report accurately reflects my expert opinion of value of the Harbor Drive Property, including, but not limited to, the valuation methods utilized to arrive at such opinion of value.  As more completely described in the attached Updated Appraisal Report, as a result of my personal valuation of the Harbor Drive Property and my investigation and analysis of the factual data stated in the Updated Appraisal Report, it is my expert opinion that the "as-is" fair market value of the Harbor Drive Property, as of June 14, 2024, is $110,000,000, and the "as entitled" fair market value of the Harbor Drive Property, as of June 14, 2024, is $600,000,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of July, 2024, at Los Angeles, California.

Jack Alexander

DAL 57943048v1



Alexander Valuation Group

# A Narrative Appraisal Report

of



Four Existing Parcels of Land

**LOCATED AT**
1100 N Harbor Dr
Redondo Beach, CA 90277

**APPRAISED FOR**
Victor A. Sahn
Greenspoon Marder LLP
333 South Grand Ave, 34th Floor
Los Angeles, CA 90071

**DATE OF VALUATION**
May 20, 2024

**DATE OF REPORT**
June 23, 2024

**PREPARED BY**
Jack Alexander
California Certified General Appraiser
#AG032464

www.alexanderValuationGroup.com
admin@alexandervg.com
310.545.8700

AVG

June 23, 2024

Victor A. Sahn
Greenspoon Marder LLP
333 South Grand Ave, 34th Floor
Los Angeles, CA 90071

Re:    Four existing parcels of land located at 1100 N Harbor Dr, Redondo Beach, CA 90277

To Whom it May Concern:

As requested, enclosed is a narrative appraisal report of the above referenced property. This report has been prepared in accordance with the Uniform Standards of Professional Appraisal Practice; the Code of Ethics and Standards of Professional Practice of the Appraisal Institute; Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA: 12 CFR Part 323); and the appraisal requirements of Greenspoon Marder LLP (the client).

This report is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report; however, the level of discussion, as agreed upon with our client, is consistent with the definition of a Summary Appraisal Report (Standards Rule 2- 2(b) of the 2012-13 USPAP). As such, it presents only summary discussions of the data, reasoning and analyses used in the appraisal process to develop the appraisers' opinions of value.

This appraisal is prepared for the exclusive use of Greenspoon Marder LLP. The intended use of the appraisal report is to assist Greenspoon Marder LLP for ongoing litigation purposes by the client and may be used in connection with the acquisition, disposition, and financing of the property. The intended users of this report will be Greenspoon Marder LLP, or its designated representatives. No other users and intended and the report may not be used for any other purpose without the appraiser's written consent. Unauthorized third-party readers should not rely upon this report.

We have the knowledge and experience necessary to complete this appraisal assignment, and the appraisal assignment was not based on a requested minimum or specific valuation or the approval of a loan. The values contained herein exclude business value, going concern and goodwill. The purpose of this appraisal is to estimate the following:

•   The "As-Is" and "As Entitled" market values of the fee simple estate in the subject property as of May 20, 2024.

Based upon the research undertaken, the analyses made, and subject to the enclosed assumptions and limiting conditions, it is our opinion that the "As-Is" and "As Entitled" market values of the fee simple estate in the subject property, as of May 20, 2024, is as follows:

## "As Is" Market Value - $110,000,000

## "As Entitled" Market Value - $600,000,000

A\VG

We hereby certify that we have no interest, present or prospective, in the property appraised, and that our employment is not contingent upon the values derived or any other contingency of employment. We further certify that to the best of our knowledge and belief, the statements and opinions contained in this appraisal are correct. This appraisal is made in conformity with Title XI of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) and the regulation promulgated thereunder, the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation, and any applicable state licensing requirements. This letter is invalid as an opinion of value if detached from the report, which contains the description, analysis, definitions, qualifications, assumptions, limiting conditions, certification, and Addenda. **Acceptance of, and/or use of this appraisal report constitutes acceptance of these conditions.**

The following narrative report sets forth our data, analyses, and conclusions. Additional material relied upon is retained in the work paper files and available upon written request. Thank you for the opportunity to be of service in this matter. If we can be of further assistance, please contact us at your convenience

Respectfully,

President, Alexander Valuation Group
California Certified General Appraiser License #AG032464



# CONTENTS

SUMMARY OF SALIENT DATA ........................................................................................5

IDENTIFICATION OF THE APPRAISAL PROBLEM  AND SCOPE OF WORK .........................................7

REAL PROPERTY INTEREST AND RIGHTS  APPRAISED IN THIS ASSIGNMENT ..............................9

GENERAL ASSUMPTIONS AND LIMITING CONDITIONS IN THIS APPRAISAL ASSIGNMENT......11

SCOPE OF WORK USED TO DEVELOP  APPRAISAL ASSIGNMENT RESULTS ...................................14

PRESENTATION OF DATA.............................................................................................16

ECONOMIC OVERVIEW ...............................................................................................23

SUBJECT SITE AND IMPROVEMENTS ..............................................................................26

HIGHEST AND BEST USE ANALYSIS................................................................................67

ANALYSIS OF DATA AND CONCLUSIONS .........................................................................69

   COST APPROACH TO VALUE .......................................................................................69

   SALES COMPARISON APPROACH TO VALUE ...................................................................70

   INCOME CAPITALIZATION APPROACH TO VALUE.............................................................214

RECONCILIATION AND FINAL OPINION OF VALUE ...........................................................215

EXPOSURE AND MARKETING TIME.................................................................................216

CERTIFICATION OF APPRAISAL......................................................................................217

LETTER OF TRANSMITTAL ...........................................................................................218

QUALIFICATIONS .......................................................................................................220



# SUMMARY OF SALIENT DATA

| | |
|---|---|
| <u>Type of Property:</u> | The subject property consists of four (4), existing, land parcels. |
| <u>Location:</u> | 1100 N Harbor Dr, Redondo Beach, CA 90277 |
| <u>Owner:</u> | AES Redondo Beach LLC / SBE 1101 19 1 Par 1 (APNs 7503-013-819, 820) |
| | 9300 Wilshire LLC / 1112 Investment Company LLC (APNs 7503-013-014, 015) |
| <u>Purpose/Function:</u> | The purpose of this appraisal is to estimate the market value of the fee simple interest of the subject property in the **"As Is"** condition, as of the inspection/appraisal date, May 20, 2024. |
| | The function of this narrative appraisal report is for the exclusive use by Greenspoon Marder LLP for ongoing litigation purposes by the client and may be used in connection with the acquisition, disposition, and financing of the property. |
| <u>Site Area:</u> | Approximately 2,173,644 square feet or 49.90 acres, according to information from the Assessor's Parcel Map and public records. |
| <u>Zoning:</u> | The subject is currently zoned P-GP, Public and Institutional – generating plant zone, which allows for utility plant uses. The subject's current general plan land use is P, Public and Institutional, which allows a range of different public and quasi-public uses. |
| <u>Flood Zone:</u> | Not part of a flood zone. |
| <u>Environmental or Toxic Hazards:</u> | The appraiser has not been provided with any Geo-Technical report. A Phase-I environmental report performed by Fulcrum Resources Environmental was provided which states, "This assessment has revealed no evidence of Recognized Environmental Conditions (RECs) during the course of this assessment with the property. FR recommends no further investigations for the subject property at this time." Inspection of the subject property did not disclose any exterior storage of potentially hazardous or toxic waste. However, please see standard Underlying Assumptions and Contingent Conditions with respect to environmental hazards. |

| | |
|---|---|
| <u>Building Area:</u> | The subject property is currently improved with the AES Redondo power plant. The improvements are not valued in this appraisal. |
| <u>Building Age/Condition:</u> | The improvements are not valued in this appraisal. |
| <u>Highest and Best Use:</u> | *As Though Vacant:* <br> Some type of commercial, multi-family, or mixed-use (commercial & residential) use would represent highest and best use, as if vacant. <br><br> *As If Improved:* <br> The existing use represents the highest and best use of this site, as if improved. |
| <u>Legal Description:</u> | No legal descriptions for the subject property are provided in the public record. All the property profiles say, "For Description See Assessors Map." This map is provided later in this appraisal. |
| <u>Marketing Time Estimate</u>: | 6 - 12 mos. |
| <u>Sales History:</u> | The subject last sold in 2018 at an undisclosed sales price. |
| <u>Cost Approach:</u> | N/A |
| <u>Income Approach:</u> | N/A |
| <u>"As-Is" Sales Comparison Approach:</u> | $110,000,000 |
| **<u>"As Is" Value:</u>** | **$110,000,000** |
| <u>"As-Entitled" Sales Comparison Approach:</u> | $600,000,000 |
| **<u>"As Entitled" Value:</u>** | **$600,000,000** |
| **<u>Date of Value:</u>** | **May 20, 2024** |
| **<u>Date of Report:</u>** | **June 23, 2024** |

# IDENTIFICATION OF THE APPRAISAL PROBLEM
# AND SCOPE OF WORK

**Property Identification Overview**: The real estate that is the subject of this appraisal assignment is 1100 N Harbor Dr, Redondo Beach, CA 90277. The site is currently improved with AES Redondo power plant. However, only the land is being valued in this appraisal. No value is given to the existing improvements. The subject property is described in the narrative description, valuation analyses, supporting information, photographs, and other pertinent exhibits submitted either in following appropriate report sections or otherwise submitted in the Addenda of this report.

The existing use of the subject property as of the effective date of the appraisal consists of the AES Redondo power plant that was constructed of good quality materials. The improvements in place are those of the owner of the land. The scope of our assignment is to value the site only with no value given to the improvements.

**Property Identification Number (APNs):**  7503-013-819, 820 / 7503-013-014, 015
**Property Address:**   1100 N Harbor Dr, Redondo Beach, CA 90277
**Property Owner:**   AES Redondo Beach LLC / SBE 1101 19 1 Par 1 (APNs 7503-013-819, 820)
     9300 Wilshire LLC / 1112 Investment Company LLC
     (APNs 7503-013-014, 015)

## APPRAISAL CLIENT

The client identification for this appraisal assignment is as follows:

- Client Name:      **Greenspoon Marder LLP**
- Address:      **333 South Grand Ave, 34th Floor**
- City:      **Los Angeles, CA 90071**

## INTENDED USE OF THIS APPRAISAL REPORT

The purpose of this appraisal is to form an opinion of the "As Is" and As Entitled" fair market value of the fee simple estate of 1100 N Harbor Dr, Redondo Beach, CA 90277. The function of the appraisal report is to convey the data and analysis that were used to form my opinion of market value. The report is for use by the client to determine the fair market value of the property for ongoing litigation purposes.

## INTENDED USER(S) OF THIS APPRAISAL REPORT

This appraisal report is for use by the client, Greenspoon Marder LLP, and no other party shall have any right to rely upon any service provided by Alexander Valuation Group without our consent. If any third party relies upon this report, they do so on their own; if anyone that worked on this appraisal is contacted by any third party or is subpoenaed, that third party will be billed for any time or services.

## TYPE OF APPRAISAL REPORT

Each written real property appraisal report as a requirement of USPAP must be prepared under one of two report options and prominently state which report option is used including (1) Appraisal Report, (2) Restricted Appraisal Report. According to USPAP, when the intended users include parties other than the client, an Appraisal Report must be provided.

This is an appraisal report.

## DEFINITION OF VALUE

**Market Value** which is defined as follows: *"Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*
*1.      buyer and seller are typically motivated;*
*2.      both parties are well informed or well advised, and acting in what they consider their own best interests;*
*3.      payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*
*4.      the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."*

Source of definition: This market value definition is from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 between July 5, 1990, and August 24, 1990, by the Federal Reserve System (FRS), National Credit Union Administration (NCUA), Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the Office of Comptroller of the Currency (OCC). This definition is also referenced in regulations jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994, and in the Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994.

USPAP requires when reporting an opinion of market value that the appraiser must state whether the opinion of value is:

•       *"in terms of cash or of financing terms equivalent to cash, or*
•       *based on non-market financing or financing with unusual conditions or incentives."*

This appraisal assumes a value based on payment made in terms of cash in United States Dollars or of financing terms equivalent to cash.

# REAL PROPERTY INTEREST AND RIGHTS
# APPRAISED IN THIS ASSIGNMENT

The subject property consists of "specified property rights" which must be defined for this appraisal assignment. The three-common property right ownership rights are defined as follows:

- <u>Fee Simple Estate</u>: "*Absolute ownership unencumbered by any other interest or estate; subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.*"
- <u>Leased Fee Estate</u>: "*Landlord's (lessor's) interest in fee estate, bound by a stated term and other conditions of a lease or leases conveying rights, usually use and occupancy, to one or more tenants ("lessee's).*"
- <u>Leasehold Estate</u>: "*Tenant's (lessee's) property rights, usually use and occupancy, conveyed by a lease establishing a stated term and other conditions*."

The subject property rights appraised in this assignment consist of a Fee Simple estate ownership of the subject property. A preliminary title report has not been reviewed by the individual completing this assignment.


## EFFECTIVE DATE OF APPRAISAL AND VALUE AND DATE OF THE APPRAISAL REPORT

The property inspection revealed land and improvements as described elsewhere in this report.

This is a <u>current valuation premise</u> appraisal based on current market conditions with the date of appraisal report completion on May 20, 2024.


## COMPETENCY STATEMENT PERTAINING TO THIS APPRAISAL ASSIGNMENT

The appraisers possess the appropriate knowledge, education, and experience to complete this assignment with competence. Appraisal qualifications are submitted for review in the addenda of this report.


## EXTRAORDINARY ASSUMPTIONS NECESSARY IN THIS APPRAISAL ASSIGNMENT

Extraordinary assumptions are defined by USPAP as "*an assumption, directly related to a specific assignment, which, if found to be false, could alter the Appraiser's opinions or conclusions*" subject to the following comment: "*Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis.*"



Extraordinary assumptions may be used per USPAP in an assignment only if:

• "*It is required to properly develop credible opinions and conclusions*;

• *The appraiser has a reasonable basis for the extraordinary assumption*;

• *Use of the extraordinary assumption results in a credible analysis; and*

• *The appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions*."


HYPOTHETICAL CONDITIONS NECESSARY IN THIS APPRAISAL ASSIGNMENT

Hypothetical Conditions are defined by USPAP as "*that which is contrary to what exists but is supposed for the purpose of analysis*" subject to the following comment "*Hypothetical conditions assume conditions contrary to known facts about physical, legal, economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis.*" Hypothetical conditions may be used per USPAP in an assignment only if:

• "*Use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison*;

• *Use of the hypothetical condition results in a credible analysis; and*

• *The appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions.*"

**This appraisal is made under the hypothetical condition that, "the subject property's improvements have been removed and the necessary site remediation has been completed."**

**Additionally, for the "As Entitled" value, this appraisal is made under the hypothetical condition that, "the subject has been entitled for the construction of the provided plans."**


JURISDICTIONAL EXCEPTION CONDITIONS NECESSARY IN THIS APPRAISAL ASSIGNMENT

Jurisdictional Exception is defined by USPAP as "an assignment condition that voids the force of a part or parts of USPAP, when compliance with part or parts of USPAP is contrary to law or public policy applicable to the assignment." Jurisdictional Exception considered in this appraisal report consists of the following:

• None



# GENERAL ASSUMPTIONS AND LIMITING CONDITIONS IN THIS APPRAISAL ASSIGNMENT

This appraisal report has been prepared considering the following general assumptions and limiting conditions as well as other specific assumptions and limiting conditions otherwise described in this report. These are critical to the analysis and conclusions contained in this report.

**General Assumptions Considered in This Appraisal Report:**

- The liability of the appraiser is limited to the client only and to the amount of the fee received by the appraiser. Further, there is no accountability, obligation, or liability to any third party. If this appraisal report is placed in the hands of anyone other than the client, the client shall make such party and/or parties aware of all limiting conditions and assumptions of the assignment and related discussions. The appraiser is not in any way responsible for any costs incurred to discover or correct deficiencies of any type present in the property, including physical, financial, and/or legal.
  Acceptance of and/or use of this appraisal report by client or any third party constitutes acceptance of the above condition.
- If the client or any third party brings legal action against Jack Alexander, the signer of this report and the appraiser prevails, the initiating party of such legal action shall reimburse Jack Alexander for all costs of any nature, including attorneys' fees, incurred in their defense.
- No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the subject property is assumed to be good and marketable unless otherwise stated.
- The subject property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.
- Responsible ownership and competent property management are assumed.
- The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.
- All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.
- It is assumed that there are no hidden or unapparent conditions of the subject property, subsoil, or structures that render it valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them. No soils or geologic reports were made available to provide further input in this area unless previously discussed in this report.
- It is assumed that the subject property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.
- It is assumed that the subject property conforms to all applicable zoning and use regulations and restrictions unless non-conformity has been identified, described, and considered in the appraisal.

- It is assumed that all required licenses, certificates of occupancy, consents and any legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any such use on which the opinion of value contained in this report is based.

- It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

- Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the subject property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the subject property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the subject property. This appraised value estimate is predicated on the assumption that there is no such material on or in the subject property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report. No environmental impact studies were either requested or made in conjunction with this appraisal, and the appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, or investigation.

- On all appraisals involving prospective or proposed construction subject to satisfactory completion, repairs, or alterations the appraisal report and value conclusion are contingent upon completion of the proposed improvements in a workmanlike manner essentially in accordance with the plans and specification submitted for review to the appraiser.

- The forecasts, projections or operating estimates contained in this report are based on current market conditions, anticipated short-term supply and demand factors and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

- The appraiser assumes that the reader or user of this report has been provided with copies of available building plans and all leases and amendments, if any, that encumber the subject property.

- Only preliminary plans and specifications were available for use in the preparation of this appraisal. The analysis, therefore, is subject to a review of the final plans and specifications when available.

- No legal description or survey was furnished, so the appraiser used the county tax plat to ascertain the physical dimensions and land area of the subject property. Should a subsequent survey prove this information to be inaccurate, it may be necessary for this appraisal to be adjusted to reflect the change in property conditions.

- Acceptance of and/or use of this appraisal report by the client or any third party constitutes acceptance of all limiting conditions. The appraiser's liability extends only to the stated client, not subsequent parties, or users, and is limited to the amount of fee received by the



appraiser. Further, there is no accountability, obligation, or liability to any third party. If the appraisal report is placed in the hands of anyone other than the client for whom it was prepared, the client shall make such party and/or parties aware of all limiting conditions and assumptions of this assignment and related discussions.

- Possession of this report, or a copy of it, does not carry with it the right of publication. Without the written consent of the appraiser, any person other than the party to whom it is addressed may not use this report for any purpose. In any event, this report may be used only with proper written qualification and only in its entirety for it stated purpose. Neither all nor any part of this report, including any conclusions of value, the identity of the appraisers, or the firm with which they are connected, shall be disseminated to the public through advertising media, public relations, news media, sales media, or any other public means of communication without prior written consent and approval of the appraiser.

**General Limiting Conditions Considered in This Appraisal Report:**

- The Americans with Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of the subject property to determine whether it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the subject property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact upon the value of the subject property. Since the appraiser has no direct evidence relating to this issue, possible non-compliance with the requirements of ADA was not considered in estimating the value of the property This value estimate is predicated on the assumption that, except as identified by the appraiser, the subject improvements comply with the ADA.

- Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

- Possession of this report, or a copy thereof, does not carry with it the right of publication.

- The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

- Neither all nor any part of the contents of this report especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

**EXISTING OWNERSHIP OF THE SUBJECT PROPERTY**

| | |
|---|---|
| Name: | AES Redondo Beach LLC / SBE 1101 19 1 Par 1 |
| Address: | 1100 N Harbor Dr, Redondo Beach, CA 90277 |
| Name: | 9300 Wilshire LLC / 1112 Investment Company LLC |
| Address: | 9744 Wilshire Blvd #203, Beverly Hills, CA 90212 |



## SCOPE OF WORK USED TO DEVELOP
## APPRAISAL ASSIGNMENT RESULTS

The purpose of this appraisal report is to determine the current fair market value of the subject property and is as of May 20, 2024.

The appraisal will address the value of the <u>fee simple estate in the real estate</u>. This is both common and appropriate for this type of property type. It is typical that the appraiser is requested to value the fee simple estate if the property is owner-occupied.

The Fee Simple ownership is defined as, "The greatest possible estate in land, wherein the owner has the right to use it, exclusively possess it, commit waste upon it, dispose of it by deed or will, and take its fruits. A fee simple represents absolute ownership of land, and therefore the owner may do whatever he or she chooses with the land. If an owner of a fee simple dies intestate, the land will descend to the heirs.

The sales comparison approach is meaningful in the valuation of similar other fee simple estates that the appraiser can analyze. We found sales of similar fee simple estates.

For purposes of this appraisal, the cost approach and income approach are deemed not applicable to the valuation of the fee simple estate for the subject property type.

The appraiser is required to determine and perform the scope of work necessary to develop credible appraisal assignment results that are supported to the degree necessary for the intended use of the assignment. It is important that both the appraiser and the client fully understand the scope of work to ensure that it is appropriate for the intended use of the appraisal report.

This process requires that the appraiser identify the problem to be solved, determine the type and extent of research, and analyses necessary to develop credible appraisal assignment results and disclose this scope of work in the appraisal report. USPAP requires the appraiser to complete the research and analysis necessary to produce credible assignment results requiring support, by relevant evidence and logic, to the degree necessary for the intended use. It is the intent of this assignment that all appropriate data regarded to be pertinent to the development of this appraisal be collected, confirmed, and reported in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) (and the Code of Professional Ethics of the Appraisal Institute) in conformity with the intended use of the appraisal.

The Scope of Work used to develop credible appraisal assignment results for the subject property is described as follows:

1. The basic problem(s) to be solved associated with achieving credible appraisal assignment results are identified as: (1) Produce an opinion of value supported by an analysis of comparable market data; (2) The highest and best use of the comparable sales will focus on land to be held for future development.

2. An inspection of the subject land and improvements is required for this assignment. An inspection of the subject improvements is not regarded by the appraiser to be necessary to

produce credible assignment results. Characteristics of the subject property relevant to value are obtained from public records. The property inspection is conducted by Jack Alexander.

3. Discussions between the client and appraiser resulted in agreement that the appropriate report option for this assignment is a <u>Summary Appraisal Report</u> with a narrative report format subject to a Current valuation premise.

4. The appraisal client and any other intended users, intended use of the appraiser's opinions and conclusions, type and definition of value, effective date of the appraiser's opinions and conclusions and subject of the assignment and its relevant characteristics are described in detail previously in this section of this appraisal report.

5. Acceptable atypical assignment conditions, Extraordinary Assumptions, Hypothetical Conditions or Jurisdictional Exceptions considered in this appraisal assignment were previously discussed consisting of none.

6. Information concerning the subject property was obtained from property inspection and public record.

7. This assignment requires an in-depth analysis and description of the subject region, community, neighborhood, land, zoning, improvements, and highest and best considerations sufficient to accommodate the decision-making processes involved in the appraisal process.

8. Comparable land sales and listings were obtained from in-house appraiser data files; confirmation with buyers and sellers; public property records; assessor's office; real estate brokers; data sources available to REALTORS®; and are submitted for review in the Addenda section of this report.

9. Appropriate research was conducted pertaining to current market conditions relating to the specific market demand for the subject property. The geographic area searched for market data generally is limited to within a past time span of about three years with the type of market data.

10. The Sales Comparison Approach to Value is one of three traditional valuation methods used in the appraisal of un-improved real estate, and it is regarded by this appraiser <u>to be applicable</u> and necessary in this appraisal assignment.

11. The Income Capitalization Approach to Value is one of three traditional valuation methods used in the appraisal of improved real estate, and it is regarded by this appraiser <u>to be applicable</u> and necessary in this appraisal assignment.

12. The Cost Approach to Value is one of three traditional valuation methods used in the appraisal of improved real estate, and it is regarded by this appraiser <u>not to be applicable</u> in this appraisal assignment.

AVG

# **PRESENTATION OF DATA**

NEIGHBORHOOD DESCRIPTION



**Redondo Beach** is a coastal city in Los Angeles County, California, United States, located in the South Bay region of the Greater Los Angeles area. It is one of three adjacent beach cities along the southern portion of Santa Monica Bay. The population was 71,576 at the 2020 census, up from 66,748 at the 2010 census.

Redondo Beach was originally part of the 1785 Rancho San Pedro Spanish land grant that later became the South Redondo area. The primary attractions include Municipal Pier and the sandy beach, popular with tourists and a variety of sports enthusiasts. The western terminus of the Metro Rail C Line (formerly the Green Line) is in North Redondo Beach.

Geography

According to the United States Census Bureau, the city has a total area of 6.2 square miles, over 99% of it land.

Redondo Beach was originally part of the 1784 Rancho San Pedro Spanish land grant of the 43,000-acre Dominguez Rancho that later became the ten-mile ocean frontage of Rancho Sausal Redondo.

<u>Neighborhoods</u>

The ocean side of Pacific Coast Highway (PCH) has restaurants and boating activities while inland of PCH is largely residential. Redondo Breakwall is a well-known surf spot in the South Bay. This power plant sports Whaling Wall number 31, a 586 ft × 95 ft (179 m × 29 m) whale mural by artist Robert Wyland titled "Gray Whale Migration".

Redondo Beach has a distinct division between the north and south sections of the city, with 190th, Anita, and Herondo streets forming its east–west boundary line. South Redondo is along the beachfront with the pier and marina/harbor complex. The small business district near the pier and marina was revived in the 1990s. That district was once focused on fishing and canning when the pier was used to transport fish-based foodstuffs and canned fish to American and Asian consumers, but that industry experienced an economic downfall in the 1970s and 1980s. The main library is located in the Civic Center.

North Redondo, north of 190th Street, is an inland community separated from the beachfront by Hermosa Beach and Manhattan Beach. While primarily residential, North Redondo contains some of the city's major industrial and commercial space, including the inland aerospace and engineering firms that are part of Southern California's long space legacy. It is also home to the South Bay Galleria shopping center and Artesia Boulevard. North Redondo is the home of the Redondo Beach Performing Arts Center and the Los Angeles Ballet. The North Branch of the Redondo Beach Library serves this area.

Zoning allows properties within two to three blocks of the beach to be developed as large, two to three-unit luxury townhomes; inland areas are more likely to have single-family homes. There is a citywide height limit of 32 ft for new homes but rooftop living spaces and decks are allowed.

The Marina, Harbor and Pier complexes are planned centers of activity that host seafood restaurants, bars, and smaller shops.

<u>Demographics</u>

**2010**

The 2010 United States Census reported that Redondo Beach had a population of 66,748. The population density was 10,751.1 inhabitants per square mile. The racial makeup of Redondo Beach was 49,805 (74.6%) White (65.2% Non-Hispanic White), 1,852 (2.8%) African American, 291 (0.4%) Native American, 8,004 (12.0%) Asian, 199 (0.3%) Pacific Islander, 2,725 (4.1%) from other races, and 3,872 (5.8%) from two or more races. Hispanic or Latino of any race were 10,142 persons (15.2%).

The Census reported that 66,317 people (99.4% of the population) lived in households, 367 (0.5%) lived in non-institutionalized group quarters, and 64 (0.1%) were institutionalized.

There were 29,011 households, out of which 7,825 (27.0%) had children under the age of 18 living in them, 12,507 (43.1%) were opposite-sex married couples living together, 2,515 (8.7%) had a female householder with no husband present, 1,207 (4.2%) had a male householder with no wife present. There were 1,904 (6.6%) unmarried opposite-sex partnerships, and 179 (0.6%) same-sex married couples or partnerships. 9,252 households (31.9%) were made up of individuals, and 2,145 (7.4%) had someone living alone who was 65 years of age or older. The average household size was 2.29. There were 16,229 families (55.9% of all households); the average family size was 2.94.

Redondo Beach had 12,887 people (19.3%) under the age of 18, 4,198 people (6.3%) aged 18 to 24, 23,149 people (34.7%) aged 25 to 44, 19,532 people (29.3%) aged 45 to 64, and 6,982 people (10.5%) who were 65 years of age or older. The median age was 39.3 years. For every 100 females, there were 99.1 males. For every 100 females aged 18 and over, there were 97.2 males.

There were 30,609 housing units at an average density of 4,930.2 per square mile, of which 14,917 (51.4%) were owner-occupied, and 14,094 (48.6%) were occupied by renters. The homeowner vacancy rate was 0.9%; the rental vacancy rate was 5.3%. 36,796 people (55.1% of the population) lived in owner-occupied housing units and 29,521 people (44.2%) lived in rental housing units.

According to the 2010 United States Census, Redondo Beach had a median household income of $99,496, with 5.4% of the population living below the federal poverty line.

Economy

According to the city's 2020 Comprehensive Annual Financial Report, the top employers in the city are:

| # | Employer | # of Employees | % of Total City Employment |
|---|----------|----------------|----------------------------|
| 1 | Northrop Grumman | 6,045 | 33.04% |
| 2 | Redondo Beach Unified School District | 868 | 4.74% |
| 3 | City of Redondo Beach | 402 | 2.2% |
| 4 | The Cheesecake Factory | 261 | 1.43% |
| 5 | United States Postal Service | 260 | 1.42% |
| 6 | Target | 241 | 1.32% |
| 7 | Macy's | 232 | 1.27% |
| 8 | DHL Global Forwarding | 227 | 1.24% |
| 9 | Frontier | 164 | 0.9% |
| 10 | Silverado Beach Cities | 140 | 0.77% |

Education

The Redondo Beach Unified School District serves the city. Redondo Union High School is the zoned high school, with the adjoining campus of Patricia Dreizler Continuation High School located to the east of the Redondo Union High School main grounds serving as a continuation school. The Redondo Beach Learning Academy, a community day school houses 9th-12th graders, is located on the South Bay Adult School campus in Redondo Beach. Dreizler continues to be recognized as a California Model Continuation High School The Independent Study Program supports grades 9-12 and is housed on the Patricia Deizler campus.[ Additionally, Redondo Beach has two middle schools, Adams Middle School and Parras Middle School. Adams Middle School, located in North Redondo Beach, primarily serves 6th to 8th grade students in the North Redondo area, with Parras Middle School being the designated middle school of South Redondo Beach. The city also has eight established elementary schools: Alta Vista, Beryl Heights, Birney, Jefferson, Lincoln, Madison, Tulita and Washington. All twelve schools are evenly divided throughout the North and South areas of Redondo Beach, with five elementary schools and one middle school located in North/Central Redondo Beach; and three elementary schools, one middle school, and the singular designated high school placed in South Redondo Beach. The Redondo Beach Educational Foundation was founded in 1992 and revitalized in 2008. Residents of Redondo Beach were in South Bay Union High School

District until 1993, when it dissolved. Valor Christian Academy (formerly Coast Christian School) is in Redondo Beach.

Infrastructure

The United States Postal Service operates the Redondo Beach Post Office at 1201 North Catalina Avenue, the Redondo Beach Station #2 Post Office at 1715 Via El Prado, the North Redondo Beach Post Office at 2215 Artesia Boulevard, and the Galleria Post Office at Suite 377D at 1815 Hawthorne Boulevard.

The Los Angeles County Department of Health Services operates the Torrance Health Center in Harbor Gateway, Los Angeles, near Torrance and serving Redondo Beach.

Redondo Beach Police Department

The Redondo Beach Police Department was established in the 1920s. The Police Department consists of 90 sworn members (officers) plus 57 non-sworn members.

Redondo Beach Public Library

The first library in Redondo Beach began as a reading room in 1895. The first five-member Library Commission for the city was formed in November 1908. The library moved into the then City Hall's west wing in 1909 and eventually filled the entire west wing at 301 Emerald Street. In 1928 the Chamber of Commerce recommended a new library be built on the site previously occupied by the Hotel Redondo in what is now Veterans Park. The Veterans Park Library is a Spanish/Dutch colonial building designed by architect Lovel Bearse Pemberton and opened on July 2, 1930. It was placed on the National Register of Historic Places in 1981. After serving as the Main Library for the city for 60 years, a site adjacent to City Hall was identified for a new, modern Main Library building. The new Main Library for the City of Redondo Beach opened on July 8, 1995, at 303 N. Pacific Coast Highway. A North Branch Library was also established in 1930 and started at the Grant Community Hall, it then moved to its current location at 2000 Artesia Boulevard in 1949. A new North Branch Library was constructed on the site in 2009 and opened its doors on September 28, 2010. The North Branch Library is the first City owned Green building and received Gold LEED certification.

Public transportation

Redondo Beach is served by Beach Cities Transit and the Redondo Beach C Line station.

Historically, the city was served by the Santa Fe Railroad and Pacific Electric's Venice-Playa del Rey and Redondo Beach via Gardena lines.



**Zip Code 90277, Redondo Beach, CA**



## ZIP Code 90277 Details

| | |
|---|---|
| Zip Code: | 90277 |
| City: | Redondo Beach |
| State: | CA [California] |
| Counties: | LOS ANGELES, CA |
| Multi County: | No |
| City Alias(es): | Redondo Beach |
| Area Code: | 424 / 310 |
| City Type: | P [Post Office] |
| Classification: | [Non-Unique] |
| Time Zone: | Pacific (GMT -08:00) |
| Observes Daylight Saving: | Yes |
| Latitude: | 33.830793 |
| Longitude: | -118.387452 |
| Elevation: | 82 ft |
| State FIPS: | 06 |
| County FIPS: | 037 |
| Region: | West |
| Division: | Pacific |
| Intro Date: | <2004-10 |



## ZIP Code 90277 2010 Census Demographics

| | |
|---|---|
| Current Population: | 37,226 |
| 2010 Population: | 35,293 |
| Households per ZIP Code: | 16,910 |
| Average House Value: | $1,143,800 |
| Avg. Income Per Household: | $111,859 |
| Persons Per Household: | 2.07 |
| White Population: | 29,595 |
| Black Population: | 1,042 |
| Hispanic Population: | 4,118 |
| Asian Population: | 4,553 |
| American Indian Population: | 401 |
| Hawaiian Population: | 230 |
| Other Population: | 1,388 |
| Male Population: | 17,521 |
| Female Population: | 17,772 |
| Median Age: | 42.00 years |
| Male Median Age: | 41.90 years |
| Female Median Age: | 42.10 years |

## ZIP Code 90277 Other Demographics

| | |
|---|---|
| # Residential Mailboxes: | 17,984 |
| # Business Mailboxes: | 1,415 |
| Total Delivery Receptacles: | 20,712 |
| Number of Businesses: | 1520 |
| 1st Quarter Payroll: | $107,174,000 |
| Annual Payroll: | $418,875,000 |
| # of Employees: | 10,645 |
| Water Area: | 1.356 sq mi |
| Land Area: | 3.579 sq mi |
| 118th Congressional District: | 36 |
| 118th Congressional Land Area: | 5912.64 sq mi |
| Single Family Delivery Units: | 8,016 |
| Multi Family Delivery Units: | 9,514 |
| # Residential Mailboxes: | 17,984 |
| # Business Mailboxes: | 1,415 |
| Total Delivery Receptacles: | 20,712 |

## ZIP Code 90277 Statistical Areas

| | |
|---|---|
| CBSA: | 31080 |
| CBSA Name: | Los Angeles-Long Beach-Anaheim, CA |
| CBSA Type: | Metro |
| CBSA Division: | 31084 |
| CBSA Division Name: | Los Angeles-Long Beach-Glendale, CA |
| CBSA Population: | 0 |
| CBSA Division Population: | 9,818,605 |
| MSA: | 4472 |
| MSA Name: | Los Angeles-Riverside-Orange County, CA |
| PMSA: | 4480 |
| PMSA Name: | Los Angeles-Long Beach, CA PMSA |
| City State Key: | Z22636 |
| Preferred Last Line Key: | Z22636 |

# ECONOMIC OVERVIEW

UCLA Anderson Forecast Sees Higher Interest Rates and Restrained Growth in 2024, but Likelihood of U.S. Recession Fades

California's economy grows faster than the nation's but faces the same political and geopolitical risks

Los Angeles (March 13, 2024) — The UCLA Anderson Forecast ended 2023 ringing an up note as its December forecast asserted that the long, lingering possibility of a recession had faded because of expansionary fiscal policy, new national industrial policy and a national consumer base that continued to spend, despite the perception of economic uncertainty. The first forecast of 2024 continues these themes, while also noting that the recurring threats of a government shutdown are short-lived and no longer sounding any serious alarms, and the strong second half of 2023 will carry into the new year.

While it is true that January 2024 retail sales housing starts were down, the cause looks to be severe weather experienced in the eastern United States and not pullback by consumers or builders. Hiring remained strong in January and February and, though core inflation is coming down slowly, the forecast does not expect the Federal Reserve to decrease the Fed Funds rate until later in the year.

In California, the state's GDP grew at a 3.8% compound annual rate from the first to the third quarter of 2023 (the latest data available), faster than the U.S. and all but three large states: Washington, Florida, and Texas. Like California, Washington's growth was driven by tech and aerospace, while part of the superior growth in Texas and Florida is attributed to in-migration, with more people moving to those states and working, rather than productivity and income gains. (In both of those states, construction of housing for new residents, and in Florida reconstruction of hurricane-devastated areas, contributed to their growth rates.) With a loss in population in California, per capita income growth continues to rival similar large states across the country. While there are still challenges ahead — notably, state, and local government finance, homelessness, and out-migration — the forces driving California's economy remain robust.

The national forecast

At least one thing is clear regarding recent activity in the U.S. economy: In spite of — or because of — feeling uncertain about the future, Americans went shopping in a big way over the holidays. In December, the Forecast predicted gross domestic product growth in the fourth quarter of 2023 to be 1.7%. It ended up coming in at a much higher 3.2% annual rate of growth. That was owing, in part, to strong consumer spending, but also to inventory replacement after the holidays. The forecast now expects less inventory adjustment in the current quarter and a moderation of consumer spending growth. As a result, the GDP growth forecast for the first quarter of 2024 Q1 is lower, but still a respectable 2.2%.



U.S. labor markets remain strong, as they have been throughout the post-pandemic economic recovery. Total nonfarm payroll jobs increased by 2.5% and are forecasted to increase by 1.5% in 2024. That 2024 is lower is more a function of running out of workers than an absence of jobs.

With underbuilding over the last 15 years and a growing population, there remains latent demand for new housing. This is exacerbated by population migration to the Sun Belt and the lack of existing housing inventory since the onset of the pandemic. As a result, the March forecast is for housing to remain close to, but under, the historical average of 1.5 million per year, enough to create a little weakness in 2024, but not enough to induce a recession. Although the January new home starts were at a level suggesting further weakness in housing, the issuance of new permits at approximately 1.5 million units, and the unseasonal weather in the east and Midwest, indicate this is only a temporary downturn in residential construction.

The oft predicted but never seen "recession next quarter" possibility has now faded in the face of expansionary fiscal policy, new national industrial policy and a consumer who is happy to continue spending. However, the impact of higher interest rates will be felt in restraining growth in 2024. As inflation slowly works its way back to the neighborhood of 2.5% to 3.0% per annum — kept high primarily because of residential rents, automobile repair and new health insurance premiums — the UCLA Anderson Forecast expects Fed policy to adopt a neutral stance and GDP growth to rebound to trend rates.

Nevertheless, there are risks to the forecast. A protracted shutdown of government has been averted, but the possibility still exists. Geopolitical events might upset the current growth pattern. The election could result in different national economic policies in 2025. These uncertainties are substantial and bear watching, as they could drive the economy off the current growth path that would return the U.S. economy to trend 2.5% growth. The upside of the forecast is productivity growth thanks to new technology that drives higher wages and higher GDP. While our view of AI and robotics is that the impact will be felt after 2026 because technology adoption tends to take time, current tight labor markets could accelerate that.

<u>The California forecast</u>
The employment picture in California varies, depending on which survey one consults. The household survey, which counts the number of people employed, reports that the number of people employed in December 2023 was 2.0% below the number in the pre-pandemic peak. The decline in employment over and above the decline in the labor force led to an increase in the unemployment rate to 5.1% in December. The labor force decline is attributable to retirements, migration out of state and individuals' choosing to spend their time in non-market activities such as child raising. According to the enterprise survey metric, which counts the number of payroll jobs, California's non-farm payroll jobs increased, and it now exceeds the pre-pandemic level by 508,100 jobs, over the same period.



The difference between the two metrics can be partly explained by the difference in the definition of employment in the two surveys. The household survey is a measure based on the domicile of the worker. If a former San Francisco office worker now works remotely in Phoenix, then that employee would not be counted in the state labor force or employment numbers for California in the household survey. This would represent a decrease in the state's aggregate labor force. However, if the job were still at an enterprise in San Francisco, the worker would remain in the enterprise survey as employed in San Francisco. They are working in San Francisco (virtually) and living in Phoenix (in true life). This, at least in part, explains the large decline in San Francisco's labor force.

Nevertheless, there seems to be a disconnect between the two surveys. Since the household survey is based on a small number of interviews with individuals and the enterprise payroll job survey is based on a large number of required regulatory reports, the March 8 benchmark partially resolved the disconnect in the direction of the payroll employment data, but not entirely.

The housing market in California continues to misbehave. Higher mortgage rates should send prices lower. Although home prices are lower than their previous peak, and the median price of existing single-family homes sold in the state declined on a seasonally adjusted basis by 4.5% as of May 2022, they have been climbing since December 2022 in San Diego by 9.3%, in Los Angeles by 9.0% and in San Francisco by 3.9%. With existing home sales at depression levels, builders are responding with new developments. The Winter 2024 Allen Matkins/UCLA Anderson Forecast Commercial Real Estate Survey reported that 32% of the panelists in northern California and 55% in Southern California would begin one or more new multifamily projects in 2024.

The California economy is forecasted to continue to grow faster than the U.S. but not by much. The risks to the forecast are the same as those for the nation: political and geopolitical. There is the potential for interest rates to disrupt the current expansion on the downside and increased international immigration and accelerated onshoring of technical manufacturing on the upside.

The unemployment rate for the first quarter of this year is expected to average 4.7%, and the average for 2024, 2025 and 2026 is expected to be 4.6%, 3.8% and 3.9%, respectively. The forecast for 2024, 2025 and 2026 is for total employment growth rates to be -0.6%, 2.1% and 1.5%. Non-farm payroll jobs are expected to grow at a 1.4%, 1.7% and 1.2% rate during the same two years.

Real personal income is forecast to grow by 2.0% in 2024, 2.9% in 2025 and 2.7% in 2026. In spite of the higher interest rates, the continued demand for a limited housing stock coupled with state policies that induce new homebuilding should result in the beginning of a recovery this year, followed by solid growth in new home production thereafter. Our expectation is for 123,000 net new units to be permitted in 2024 and permitted new units to grow to 159,500 by the end of 2026. Needless to say, this level of home building means that the prospect for the private sector to build out of the housing affordability problem over the next three years is nil.

## SUBJECT SITE AND IMPROVEMENTS



**Site Description:**

The subject property at 1100 N Harbor Dr sits on approximately 2,173,644 square feet or 49.90 acres on a commercial lot in Redondo Beach, a city in Los Angeles County.

The subject property has typical site and utility for the area. No adverse easements or encroachments noted or observed. The site is well located and afforded good access and visibility from roadway frontage. The size of the site is well above average for the area and use, and there are no known detrimental uses in the immediate vicinity. Overall, there are no known factors which are considered to prevent the site from development to its highest and best use, as if vacant, or adverse to the existing use of the site.

The site is generally level and at street grade. The topography of the site is not seen as an impediment to the development of the property. During our inspection of the site, we observed no drainage problems and assume that none exist. A soils analysis for the site has not been provided for the preparation of this appraisal. However, the subject has housed a power plant since 1907 and some soil contamination is known. It is a specific assumption that after remediation, the site has adequate soils to support the highest and best use.

There are no known easements or encroachments impacting the site that are considered to affect the marketability or highest and best use. It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.



**Plat Map**





## **Flood Map**



**FLOOD INFORMATION**

Community: City of Rendondo Beach

Property is NOT in a FEMA Special Flood Hazard Area

Map Number: 06037C1907G

Panel: 06037C1907

Zone: X

Map Date: 04-21-2021

FIPS: 06037

Source: FEMA DFIRM

**LEGEND**

= FEMA Special Flood Hazard Area – High Risk

= Moderate and Minimal Risk Areas

Road View:

= Forest

= Water

### Sky Flood™

No representations or warranties to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors differ between map layers and are separate from flood zone information at marker location. No liability is assumed to any third party for any use or misuse of this flood map or its data.

## Improvement Description:

The subject property is located on N Harbor Drive, a primary north / south ocean front thoroughfare, located in the City of Redondo Beach. The city is approximately 20.5 miles southeast of Downtown Los Angeles, 7.0 miles south of Los Angeles International Airport, and 15.5 miles northeast of the Port of Los Angeles, in an area of primarily commercial and residential uses with limited industrial developments. The surrounding area supports all modern conveniences and amenities with ready availability of shopping, entertainment, recreation, and school facilities. The upkeep in this area is average to good. The city is located in Los Angeles County, the most populous county in the State of California. The 105 and 405 freeways are the major vehicular thoroughfares in the area. The subject is located approximately seven miles south of the 105 Freeway and five miles west of the 405 Freeway.

Site Improvements
Subject is a flat parcel of land that is comprised of four APNs (7503-013-014, 015, 819, 820) containing 2,173,644 SF (49.90 Acres).

The subject has approximately 2,220 feet of frontage on N Harbor Drive, 1,240 feet of frontage on Herondo Ave, and 820 feet of frontage on Francisca Ave, for a total of 4,280 feet.

Improvements comments
The subject property houses the AES Redondo Beach power plant. The plant is currently online with a pending decommission date. When the plant is decommissioned, the site has plans for multiple structures including a hotel, multi-family residential, office, retail, and open space / park improvements. The present improvements are not valued in this appraisal.

Condition and Assessment:

Although not valued in this appraisal, the improvements appear to have been well maintained. Improvements represent legal, pre-existing, and conforming use. The street appeal to the subject property is good being near the intersection of N Harbor Dr and Herondo Ave. The outside of the building appears to be well maintained, of average quality, and in average condition.

**Subject Photos**









 

 

 







































## Property Profiles

## Property Detail Report

**For Property Located At :**
**1100 N HARBOR DR, REDONDO BEACH, CA 90277-2017**



### Owner Information
| | |
|---|---|
| Owner Name: | AES REDONDO BEACH LLC/SBE 1101 19 1 PAR 1 |
| Mailing Address: | 1100 N HARBOR DR, REDONDO BEACH CA 90277-2017 C001 |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | FOR DESC SEE ASSESSORS MAP | | |
| County: | LOS ANGELES, CA | APN: | 7503-013-819 |
| Census Tract / Block: | 6212.04 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | RANCHO SAN PEDRO |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | 2 | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/27/2020 / 03/27/2019 | Deed Type: | GRANT DEED |
| Sale Price: | $28,000,000 | 1st Mtg Document #: | 359852 |
| Document #: | 359849 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | 1st Mtg Amount/Type: | / |
| Sale Price: | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | 1st Mtg Document #: | |
| Document #: | | 2nd Mtg Amount/Type: | / |
| Deed Type: | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | | | |
| Lender: | | | |
| Seller Name: | | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | RBP-GP | Acres: | 27.06 | County Use: | VACANT GOVERNMENT (880X) |
| Lot Area: | 1,178,946 | Lot Width/Depth: | x | State Use: | |
| Land Use: | FEDERAL PROPERTY | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | | Assessed Year: | 2023 | Property Tax: | |
| Land Value: | | Improved %: | | Tax Area: | 13511 |
| Improvement Value: | | Tax Year: | | Tax Exemption: | |
| Total Taxable Value: | | | | | |



## Property Detail Report

**For Property Located At :**
**1100 N HARBOR DR, REDONDO BEACH, CA 90277-2017**



| Owner Information | |
|---|---|
| Owner Name: | AES REDONDO BEACH LLC/SBE 1101 19 1 PAR 1 |
| Mailing Address: | 1100 N HARBOR DR, REDONDO BEACH CA 90277-2017 C001 |
| Vesting Codes: | / / |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | REDONDO BEACH FOR DESC SEE ASSESSORS MAP | | |
| County: | LOS ANGELES, CA | APN: | 7503-013-820 |
| Census Tract / Block: | 6212.04 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | RANCHO SAN PEDRO |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | 2 | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/27/2020 / 03/27/2019 | Deed Type: | GRANT DEED |
| Sale Price: | $28,000,000 | 1st Mtg Document #: | 359852 |
| Document #: | 359849 | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | 1st Mtg Amount/Type: | / |
| Sale Price: | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | 1st Mtg Document #: | |
| Document #: | | 2nd Mtg Amount/Type: | / |
| Deed Type: | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | | | |
| Lender: | | | |
| Seller Name: | | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | RBPI* | Acres: | 0.02 | County Use: | VACANT COMMERCIAL (100V) |
| Lot Area: | 708 | Lot Width/Depth: | x | State Use: | |
| Land Use: | COMMERCIAL (NEC) | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | | Assessed Year: | 2023 | Property Tax: | |
| Land Value: | | Improved %: | | Tax Area: | 13510 |
| Improvement Value: | | Tax Year: | | Tax Exemption: | |
| Total Taxable Value: | | | | | |



## Property Detail Report
**For Property Located At :**
,, CA



### Owner Information
| | |
|---|---|
| Owner Name: | 9300 WILSHIRE LLC/1112 INVESTMENT COMPANY LLC |
| Mailing Address: | 9744 WILSHIRE BLVD STE 203, BEVERLY HILLS CA 90212-1812 C073 C/O SLH FUND LLC |
| Vesting Codes: | / A / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | REDONDO BEACH FOR DESC SEE ASSESSORS MAP | | |
| County: | LOS ANGELES, CA | APN: | 7503-013-014 |
| Census Tract / Block: | / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | RANCHO SAN PEDRO |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/27/2020 / 03/27/2019 | Deed Type: | GRANT DEED |
| Sale Price: | $28,000,000 | 1st Mtg Document #: | 359852 |
| Document #: | 359849 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | 1st Mtg Amount/Type: | / |
| Sale Price: | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | 1st Mtg Document #: | |
| Document #: | | 2nd Mtg Amount/Type: | / |
| Deed Type: | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | | | |
| Lender: | | | |
| Seller Name: | | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | RBPI* | Acres: | 0.43 | County Use: | VACANT INDUSTRIAL (300V) |
| Lot Area: | 18,775 | Lot Width/Depth: | x | State Use: | |
| Land Use: | INDUSTRIAL LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $1,508,440 | Assessed Year: | 2023 | Property Tax: | $17,070.72 |
| Land Value: | $1,508,440 | Improved %: | | Tax Area: | 13510 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $1,508,440 | | | | |



## Property Detail Report

**For Property Located At :**
**1100 N HARBOR DR, REDONDO BEACH, CA 90277-2017**



### Owner Information
| | |
|---|---|
| Owner Name: | 9300 WILSHIRE LLC/1112 INVESTMENT COMPANY LLC |
| Mailing Address: | 9744 WILSHIRE BLVD STE 203, BEVERLY HILLS CA 90212-1812 C073 C/O SLH FUND LLC |
| Vesting Codes: | / A / |

### Location Information
| | | | | | |
|---|---|---|---|---|---|
| Legal Description: | FOR DESC SEE ASSESSORS MAP | | | | |
| County: | LOS ANGELES, CA | | APN: | | 7503-013-015 |
| Census Tract / Block: | 6212.04 / 2 | | Alternate APN: | | |
| Township-Range-Sect: | | | Subdivision: | | RANCHO SAN PEDRO |
| Legal Book/Page: | | | Map Reference: | | / |
| Legal Lot: | | | Tract #: | | |
| Legal Block: | | | School District: | | REDONDO BEACH |
| Market Area: | 157 | | School District Name: | | REDONDO BEACH |
| Neighbor Code: | | | Munic/Township: | | REDONDO BCH |

### Owner Transfer Information
| | | | | |
|---|---|---|---|---|
| Recording/Sale Date: | 03/27/2020 / 03/27/2019 | | Deed Type: | GRANT DEED |
| Sale Price: | $28,000,000 | | 1st Mtg Document #: | 359852 |
| Document #: | 359849 | | | |

### Last Market Sale Information
| | | | | |
|---|---|---|---|---|
| Recording/Sale Date: | / | | 1st Mtg Amount/Type: | / |
| Sale Price: | | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | | 1st Mtg Document #: | |
| Document #: | | | 2nd Mtg Amount/Type: | / |
| Deed Type: | | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | | Price Per SqFt: | |
| New Construction: | | | Multi/Split Sale: | |
| Title Company: | | | | |
| Lender: | | | | |
| Seller Name: | | | | |

### Prior Sale Information
| | | | | |
|---|---|---|---|---|
| Prior Rec/Sale Date: | / | | Prior Lender: | |
| Prior Sale Price: | | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | RBP-GP | Acres: | 21.50 | County Use: | GOVERNMENT VACANT (880V) |
| Lot Area: | 936,366 | Lot Width/Depth: | x | State Use: | |
| Land Use: | MUNICIPAL PROPERTY | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $67,904,030 | Assessed Year: | 2023 | Property Tax: | $971,799.01 |
| Land Value: | $67,904,030 | Improved %: | | Tax Area: | 13511 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $67,904,030 | | | | |



# Property Summary Report

### 1100 N Harbor Dr



Redondo Beach, CA 90277 - Beach Cities/Palos Verdes Submarket



**BUILDING**

| Type | 2 Star  Utility Sub-Station |
|---|---|

**LAND**

| Land Acres | 51.00 AC |
|---|---|
| Zoning | P-GP |
| Parcels | 7503-013-013, 7503-013-014, 7503-013-015 |

**SALE**

| Sold Price | $150,000,000 |
|---|---|
| Date | Mar 2020 |
| Sale Type | Investment |

**TRANSPORTATION**

| Airport | 16 min drive to Los Angeles International Airport |
|---|---|
| Walk Score® | Very Walkable (76) |

**TENANTS**

| AES California | 500 SF |
|---|---|

**PROPERTY CONTACTS**

| True Owner | Leonid Pustilnikov | Recorded Owner | 9300 Wilshire LLC |
|---|---|---|---|
| | 6225 Coldwater Canyon Ave | | |
| | North Hollywood, CA 91606 | | |
| | (818) 425-9776 (p) | | |
| Previous True Owner | The AES Corporation | | |
| | 4300 Wilson Blvd | | |
| | Arlington, VA 22203 | | |
| | (703) 522-1315 (p) | | |
| | (703) 528-4510 (f) | | |

**BUILDING NOTES**

Location Corner: SE

Property Description: Electrical Generating Plant

Property Use Description: Utility Sub-Station

©2023 CoStar Group - Licensed to Alexander Valuation Group - 109858

CoStar™  Y21/2023
Page 1



Newmark Knight Frank (NKF) has announced the sale of 51 acres of land in Redondo Beach, CA for an undisclosed amount. Located at 1100 North Harbor Drive, the property is home to the AES Redondo Beach Power Plant.

The sale represents one of the largest coastal redevelopment land sale opportunities ever in Southern California. The power plant will continue operating through 2023 should it be needed to support electric reliability needs. NKF Co-Head of U.S. Capital Markets Kevin Shannon, Executive Managing Director Ken White and Senior Managing Director Scott Schumacher along with a team led by CBRE's Executive Vice President Laurie Lustig-Bower and Vice President Kadie Presley Wilson co-represented the seller AES Corporation. The buyer, a private local investor, was self-represented.

"The sale and the future redevelopment of the site is a win-win for the city, the new owner and AES," said Shannon. "This generational opportunity had significant interest from both domestic and international capital sources. It is extremely rare to obtain 51 acres of land in such a desirable coastal location."

Alexa Nestlerode
Public Relations & Communications Manager

NEWMARK KNIGHT FRANK
O 949-608-2170
M 805-660-2227
alexa.nestlerode@ngkf.com



## Location Maps













**Aerial View**





**Zoning Map**





## Division 9. Public and Institutional Zones

## 10-2.1100 Specific purposes, P public and institutional zones.

In addition to the general purposes listed in Section 10-2.102, the specific purposes of the P Public and Institutional zone regulations are to:

(a)    Provide lands for park, recreation and open space areas, schools, civic center uses, cultural facilities, public safety facilities, and other public uses which are beneficial to the community;

(b)    Establish appropriate and flexible development standards for the development of necessary public uses and facilities;

(c)    Allow the Planning Commission and City Council to consider the most appropriate use of a site following discontinuance of a public or utility use without the encumbrance of a pre-determined zoning designation that may or may not provide appropriate regulations for the development of the site;

(d)    Ensure that public buildings and uses are designed to be compatible with other buildings and uses on the site and with the neighborhood in which they are located.

(Ord. 2756 c.s., eff. January 18, 1996)



**10-2.1110 Land use regulations: P-CIV Civic Center zone, P-RVP Riviera Village parking zone, P-GP generating plant zone, P-ROW right-of-way zone, P-CF community facility zone, P-PRO parks, recreation, and open space zone, and P-SF school facility zone.**

In the following schedule the letter "P" designates use classifications permitted in the specified zone and the letter "C" designates use classifications permitted subject to approval of a Conditional Use Permit, as provided in Section 10-2.2506. Where there is neither a "P" nor a "C" indicated under a specified zone, or where a use classification is not listed, that classification is not permitted. The "Additional Regulations" column references regulations located elsewhere in the Municipal Code.

| Use Classifications | P-CIV | P-RVP | P-GP | P-ROW | P-CF | P-PRO | P-SF | Additional Regulations See Section: |
|---|---|---|---|---|---|---|---|---|
| **Public and Other Uses** | | | | | | | | |
| Parks, parkettes, open space, recreational facilities, beaches, and coastal bluffs | P | P | P | P | P | P | P | 10-2.1111(a), 10-2.1111(b) |
| Public buildings in parks, recreation areas, open space areas, and beaches | C | C | C | C | C | C | C | 10-2.1111(a), 10-2.1111(b) |
| Adult education centers | — | — | — | — | C | — | C | |
| Agricultural and horticultural uses | C | — | — | C | C | C | C | 10-2.1111(a) |
| Child day care centers | C | — | — | — | C | C | C | 10-2.1111(a) |
| Community centers | C | — | — | — | C | C | C | 10-2.1111(a) |
| Cultural institutions | C | — | — | — | C | C | C | 10-2.1111(a) |
| Government maintenance facilities | C | — | — | — | C | C | C | 10-2.1111(a) |
| Government offices | C | — | — | — | C | C | C | 10-2.1111(a) |
| Public gymnasiums and athletic clubs | C | — | — | — | C | C | C | 10-2.1111(a) |
| Hospitals | — | — | — | — | C | — | — | |
| Medical offices and health-related facilities | — | — | — | — | C | — | — | |
| Nurseries, wholesale and retail | C | — | — | C | C | C | C | 10-2.1111(a) |
| Performance art facilities | C | — | — | — | C | C | C | 10-2.1111(a) |
| Parking lots | C | C | — | C | C | C | C | 10-2.1111(a) |
| Public safety facilities | C | — | — | — | C | C | C | 10-2.1111(a) |
| Public utility facilities | C | C | C | C | C | C | C | 10-2.1614, 10-2.1111(a) |
| Residential care facilities | — | — | — | — | C | — | — | |
| Railroad uses | — | — | — | P | — | — | — | |
| Schools, public and private | — | — | — | — | C | — | C | |
| Accessory uses/structures | P | P | — | P | P | P | P | 10-2.1111(c) |

(Ord. 2756 c.s., eff. January 18, 1996, as amended by § 2, Ord. 2837 c.s., eff. August 20, 1999; § 8, Ord. 2884 c.s., eff. May 2, 2002, and § 4, Ord. 2966 c.s., eff. July 21, 2005)

## General Plan Land Use Map





## PUBLIC AND INSTITUTIONAL USES

The Public and Institutional ("P") designation is comprised of lands that are owned by public agencies, special use districts, and public utilities. Although this designation encompasses a range of different public and quasi-public uses, they share a common thread in that these uses do not fit well under the typical standards for residential, commercial, or industrial uses.

Since this designation includes a variety of uses with a variety of characteristics, no attempt has been made to establish specific development standards within the General Plan. The Zoning Ordinance, however, will implement the Public/Institutional designation through multiple zoning districts more focused on the different classes of public/quasi-public uses. These zones will also contain more specific development standards.

Reference should also be made to the Harbor/Civic Center Specific Plan, Civic Center Sub-Area; Harbor/Pier Sub-Area, Zone 1; and Catalina Avenue Sub-Area, Zones 1 and 2, which establishes additional standards and policies for certain areas designated as "P."

| *Goal* | *It shall be the goal of the City of Redondo Beach to:* |

1K        Provide for public uses which support the needs and functions of the residents and businesses of the City.

*Objective*   *It shall be the objective of the City of Redondo Beach to:*

1.46       Provide for the continuation of existing and expansion of governmental administrative and capital, recreation, public safety, human service, cultural and educational, infrastructure, and other public land uses and facilities to support the existing and future population and development of the City.

*Policies*   *It shall be the policy of the City of Redondo Beach to:*



Permitted Uses

1.46.1   Accommodate governmental administrative and maintenance facilities, parks and recreation, public open space, police, fire, educational (schools), cultural (libraries, museums, performing and visual arts, etc.), human health, human services, public utility and infrastructure (transmission corridors, etc.), public and private secondary uses, and other public uses in areas designated as "P" *(I1.1).*

1.46.2   Allow for the reuse of public and utility properties and facilities for private use (and the reuse of school sites subject to the provisions of California Government Code Section 65852.9), with the type and density/intensity of use to be permitted on the site determined by:

    a.  their compatibility with the type, character, and density/intensity of adjacent uses;

    b.  objectives for the area defined by the General Plan;

    c.  contribution of public benefits (e.g., affordable housing);

    d.  revenue contribution to the City; and

    e.  formulation and approval of a specific or development plan *(I1.5, I 1.6, I1.7).*

1.46.3   Accommodate religious facilities in residential and commercial areas of the City and in the portion of the industrial zone adjacent to the north side of Manhattan Beach Boulevard, east of Redondo Beach Avenue and provided that they are compatible in function, scale, and character with adjacent uses *(I1.1, I1.7).*

Design and Development

1.46.4   Establish standards for the City and coordinate with other public agencies to ensure that public buildings and sites are designed to be compatible in scale, mass, character, and architecture with the existing buildings and pertinent design characteristics prescribed by this Plan for the district or neighborhood in which they are located *(I1.18).*



1.46.5    Require, where the City has jurisdiction, that public sites be designed to incorporate landscaped setbacks, walls, and other appropriate elements to mitigate operational and visual impacts on adjacent land uses *(I1.18)*.

1.46.6    Monitor the operations of public uses and facilities and periodically review the adequacy of and, as necessary, implement additional impact mitigation measures *(I1.18)*.

1.46.7    Require that only passive secondary uses of public transmission rights-of-way be permitted (e.g., uses where groups of people are not permitted to congregate).

**AVG**

## 5.6  CATALINA AVENUE CORRIDOR SUB-AREA GOALS, OBJECTIVES, AND POLICIES

### 5.6.1  Goals and Objectives

- Establish a distinctive district of the City which accommodates a mix of light industrial, automobile related, coastal/harbor related and supporting commercial uses.

- Ensure that the scale and mix of the various land uses, building densities, and design styles permitted and encouraged within the corridor are appropriate and compatible, both internally (i.e., within the corridor itself) and externally (i.e., to other areas in the Specific Plan area which are adjacent to the corridor), and promote effective use and patronage.

- Ensure that the physical and environmental (relative to noise, light and glare, and traffic) integrity of the larger, intact, and established lower-density residential areas along the corridor (particularly on the eastern side of the Avenue between Beryl Street and Garnet Street) are respected, maintained, and protected.

- Recognize the various and significant adverse environmental impacts which the Southern California Edison Company Electricity Plant creates in the local area.

- In anticipation of the end of its useful economic and physical life and activity, undertake and pursue (as appropriate and environmentally viable) planning and feasibility studies leading to the ultimate future recycling of the SCE site into a more attractive, modern, and compatible alternative land use.

- Work with the Southern California Edison Company during the remainder of the electricity plant's useful economic and physical life, in order to pursue specific, implementable, and enforceable means of mitigating entirely or reducing, as much as possible, the range of significant environmental impacts that are created and generated upon the community by the day-to-day operation of the facility.

### 5.6.2  Policies

For policy purposes, the Catalina Avenue Corridor Sub-Area of the Harbor/Civic Center Specific Plan has been further subdivided into seven smaller geographic zones, with specific policies provided for each of the seven zones (**Figure 15**).









**ZONE 2**
Catalina Avenue Sub-Area

## _Land Use/Development Policies_

### _Primary Land Uses_

- Public Utility Land Uses, subject to the granting of a Conditional Use Permit (including, but not limited to, facilities, structures, equipment, and storage related to the operation of a public utility) to the extent determined to be legally permissible. Minor additions or changes may be exempted from the requirement of a Conditional Use Permit.
- Parks, Recreation and Open Space

### _Alternative Land Uses_

- None

## _Urban/Architectural Design Policies_

### _Maximum Permitted Building Density_

- To be determined by the City Planning Commission during the appropriate Site Plan and Design Review procedures associated with and necessary for the issuance of a conditional use permit.

### _Maximum Permitted Building Height_

- To be determined by the City Planning Commission during the appropriate Site Plan and Design Review procedures associated with and necessary for the issuance of a conditional use permit.

### _Required (Horizontal) Building Setbacks_

- To be determined by the City Planning Commission during the appropriate Site Plan and Design Review procedures associated with and necessary for the issuance of a conditional use permit.

### _Recommended Massing/Articulation_

- To be determined by the City Planning Commission during the appropriate Site Plan and Design Review procedures associated with and necessary for the issuance of a conditional use permit.



### *Supplemental Land Use Policies*

- In anticipation of the end of the useful economic and physical life of the AES Redondo Generating Plant, investigate funding options for development of parks, open space, and recreational facilities on the site.

### *Supplemental Recommended Urban/Architectural Design Policies*

In consideration of the various lower and moderate-density commercial and residential land uses surrounding the Zone, implement, as possible and financially feasible any reasonable means, methods, or ways of eliminating entirely or reducing, as much as possible, the range of significant adverse environmental impacts that are created through operation of the Southern California Edison Plant (these measures could include, but are not limited to: external noise walls or fences, landscaping shields and buffering, additional internal noise insulation or air quality filtering systems, etc.).

### *Supplemental Transportation/Circulation Policies*

No additional transportation/circulation policies, above and beyond those previously included within the Specific Plan Area-Wide policies, have been specified for Zone 2 of the Catalina Avenue Corridor Sub-Area.

### *Supplemental Infrastructure/Utilities Policies*

No additional infrastructure/utilities policies, above and beyond those previously included within the Specific Plan Area-Wide policies, have been specified for Zone 2 of the Catalina Avenue Corridor Sub-Area.



Measure G is an amendment to the land use plan and zoning ordinance for the coastal zone of Redondo Beach which is reflected in the zoning and land use information above.

## BALLOT TEXT

## MEASURE G

### RESOLUTION NO. CC-1008-356

### A RESOLUTION OF THE PEOPLE OF THE CITY OF REDONDO BEACH, CALIFORNIA APPROVING AMENDMENTS TO THE COASTAL LAND USE PLAN AND ZONING ORDINANCE FOR THE COASTAL ZONE

WHEREAS, the City Council passed, approved, and adopted amendments to the Redondo Beach Coastal Land Use Plan ("Coastal LUP") and to the Zoning Ordinance for the Coastal Zone ("Coastal Zoning Ordinance") for the AES Power Plant site and Catalina Avenue corridor areas of the City in Resolution No. CC-0508-83 and Ordinance Nos. 2971-05 and 2972-05 on August 2, 2005; and

WHEREAS, the City Council passed, approved, and adopted amendments to the Coastal LUP and to the Coastal Zoning Ordinance for the Harbor/Pier area of the City in Resolution No. CC-0805-46-CC and Ordinance No. 3013-08 on May 6, 2008; and

WHEREAS, certain further modifications to the Coastal LUP amendments and Coastal Zoning Ordinance amendments were approved by the City Council in Resolution No. 1004-306 on April 6, 2010 and in Ordinance No. 3050-10 on April 20, 2010, and said modifications have been incorporated into the text of the Coastal LUP amendments and Coastal Zoning amendments being submitted to the voters; and

WHEREAS, the foregoing Coastal LUP amendments and Coastal Zoning Ordinance amendments have been deemed to constitute a Major Change in Allowable Land Use as defined in Article XXVII of the City Charter; and

WHEREAS, Section 27.4(a) of Article XXVII of the City Charter provides that no Major Change in Allowable Land Use approved by the City Council after the date specified in Section 27.3(b) of Article XXVII shall become effective unless approved by an affirmative vote of the registered voters of the City at a general municipal election or special election called for that purpose; and

WHEREAS, the qualified registered voters of the City of Redondo Beach by this resolution intend to approve the foregoing Coastal LUP amendments and Coastal Zoning Ordinance amendments approved by the City Council  in accordance with Section 27.4(a) of Article XXVII of the City Charter, so that these Coastal LUP amendments and Coastal Zoning Ordinance amendments may become legally effective for all purposes in the manner otherwise provided by law, including certification by the California Coastal Commission to the extent required by law; and

NOW THEREFORE, THE PEOPLE OF THE CITY OF REDONDO BEACH, CALIFORNIA, DO HEREBY ORDAIN:

SECTION 1:

The repeal of City Council Resolution No. CC-0203-21, which amended the Coastal Land Use Plan in conjunction with adoption of the Heart of the City Specific Plan, is hereby approved.

RESOLUTION NO. CC-1008-356
November 2, 2010 ELECTION
PAGE NO. 1







## Section 33:

The amendment of the zoning map for the area bounded by N. Catalina Avenue, Beryl Str[e]
N. Harbor Drive, and Herondo Street, as shown in the following map and as listed Table 1
below, is hereby approved:





10-5.1114      Development standards: P-GP generating plant zone.

(a)      Floor area ratio. The floor area ratio shall be determined subject to Planning Commission Review.

(b)      Building height. Height of buildings or structures shall be determined subject to Planning Commission Review.

(c)      Stories. The number of stories of any building shall be determined subject to Planning Commission Review.

(d)      Setbacks. Setbacks shall be determined subject to Planning Commission Review.

(e)      General regulations. See Article 3 of this chapter.

(f)      Parking regulations. See Article 5 of this chapter.

(g)      Sign regulations. See Article 6 of this chapter.

(h)      Landscaping regulations. See Article 7 of this chapter.

(i)      Coastal Development Permits. See Article 10 of this chapter.

(j)      Procedures. See Article 12 of this chapter.

(k)      Water Quality Measures. See Chapter 7, Title 5 of the Redondo Beach Municipal Code.

**The appraiser notes that there were four additional parcels (APNs 7503-003-012, 7503-013-013, 016, 017) that are part of the AES power plant, were included in the original sale, are currently owned by the AES power plant entities, but are not part of the development plans for the subject site. These four parcels have a commercial zoning designation and a commercial general plan land use. Plat maps, zoning maps, and land use maps for these parcels are included on the pages to follow.**



**Ownership Documentation**

## Property Detail Report

**For Property Located At :**
**1100 N HARBOR DR, REDONDO BEACH, CA 90277-2017**



| Owner Information | | | |
|---|---|---|---|
| Owner Name: | 1112 INVESTMENT COMPANY LLC | | |
| Mailing Address: | 9300 WILSHIRE BLVD #420, BEVERLY HILLS CA 90212-3223 C055 C/O LEONID PUSTILNIKOV | | |
| Vesting Codes: | / / | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | OCEAN BEACH SUB VAC ALLEY ADJ ON NE AND LOTS 59, 60 AND LOTS 102 AND 103 | | |
| County: | LOS ANGELES, CA | APN: | 7503-003-012 |
| Census Tract / Block: | 6212.04 / 2 | Alternate APN: | 7503-003-803 |
| Township-Range-Sect: | | Subdivision: | OCEAN BEACH SUB |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 59 | Tract #: | |
| Legal Block: | 2 | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |

## Property Detail Report

**For Property Located At :**
**,, CA**



| Owner Information | | | |
|---|---|---|---|
| Owner Name: | A E S REDONDO BEACH LLC | | |
| Mailing Address: | 1100 N HARBOR DR, REDONDO BEACH CA 90277-2017 C001 | | |
| Vesting Codes: | / / | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | REDONDO BEACH FOR DESC SEE ASSESSOR MAP | | |
| County: | LOS ANGELES, CA | APN: | 7503-013-013 |
| Census Tract / Block: | 6212.04 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | RANCHO SAN PEDRO |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |



## Property Detail Report

**For Property Located At :**
**1100 N HARBOR DR, REDONDO BEACH, CA 90277-2017**

**Owner Information**

| | |
|---|---|
| Owner Name: | NEW COMMUNE DTLA LLC |
| Mailing Address: | 9744 WILSHIRE BLVD #203, BEVERLY HILLS CA 90212-1812 C073 C/O LEONID PUSTILNIKOV |
| Vesting Codes: | / / |

**Location Information**

Legal Description:   LOTS 84 THRU 88 TR=1326 AND VAC ALLEY ADJ ON E AND LOTS 74 THRU 78 M B 2-35

| | | | |
|---|---|---|---|
| County: | LOS ANGELES, CA | APN: | 7503-013-016 |
| Census Tract / Block: | 6212.04 / 2 | Alternate APN: | 7503-013-821 |
| Township-Range-Sect: | | Subdivision: | 1326 |
| Legal Book/Page: | 18-67 | Map Reference: | / |
| Legal Lot: | 84 | Tract #: | 1326 |
| Legal Block: | 2 | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |



## Property Detail Report

**For Property Located At :**
**1100 N HARBOR DR, REDONDO BEACH, CA 90277-2017**

**Owner Information**

| | |
|---|---|
| Owner Name: | NEW COMMUNE DTLA LLC |
| Mailing Address: | 9744 WILSHIRE BLVD #203, BEVERLY HILLS CA 90212-1812 C073 C/O LEONID PUSTILNIKOV |
| Vesting Codes: | / / |

**Location Information**

Legal Description:   OCEAN BEACH SUB VAC ST AND ALLEY AND EX OF ST LOTS 73 AND 89

| | | | |
|---|---|---|---|
| County: | LOS ANGELES, CA | APN: | 7503-013-017 |
| Census Tract / Block: | 6212.04 / 2 | Alternate APN: | 7503-013-822 |
| Township-Range-Sect: | | Subdivision: | OCEAN BEACH SUB |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 73 | Tract #: | |
| Legal Block: | 2 | School District: | REDONDO BEACH |
| Market Area: | 157 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |



## Plat Maps











**AVG**

## Reconciliation of the Zoning and Land Use of the Subject Property

Upon review of the Redondo Beach Zoning Code, General Plan Land Use documentation (both of which are available on the Redondo Beach city website), and the Measure G ballot measure, the appraiser finds that there is not a definitive plan in place for the future use of the subject site. The information regarding future use as "parks, open space, recreational facilities" seems unrealistic unless the subject parcels were purchased by the city, which they were not. No reasonable investor would pay millions of dollars for a site without any future development potential. The wording of the General Plan Land Use and Measure G documentation makes it appear that city has postponed making a definitive decision on the future use of the site and will address the situation as it arose. This is seen in the land use documentation regarding onsite development with wording such as, "To be determined by the City Planning Commission during the appropriate Site Plan and Design Review procedures associated with and necessary for the issuance of a conditional use permit." Also in the Measure G documentation which states under development standards for P-GP zoning, "shall be determined subject to Planning Commission Review." Basically, when we get there, we will figure it out. However, there are statements in the General Plan Land Use that would suggest potential future use of the subject site. Under the "Public and Institutional Uses," which is the subject property's land use designation, it states the following regarding "Permitted Uses."

1.46.2 Allow for the reuse of public and utility properties and facilities for private use (and the reuse of school sites subject to the provisions of California Government Code Section 65852.9), with the type and density/intensity of use to be permitted on the site determined by:

**a. their compatibility with the type, character, and density/intensity of adjacent uses;**

b. objectives for the area defined by the General Plan;

**c. contribution of public benefits (e.g., affordable housing);**

**d. revenue contribution to the City; and**

e. formulation and approval of a specific or development plan (I1.5, I 1.6,I1.7).

As shown above on both the zoning and land use maps, the subject property's adjacent uses are commercial and mixed-use (commercial & residential) with multi-family residential nearby. Additionally, the subject property at the time of purchase included four additional parcels, which are still owned by the ownership entities of the subject but are not included in this valuation as they are not part of the development plan. These parcels have commercial zoning and land use designations, and although three of the parcels are located west of N Harbor Dr, one parcel, APN 013, borders the subject parcels valued in this appraisal. With these four parcels, it appears that portions of the original subject site have already been converted to alternative zoning besides P-GP, Public and Institutional, Generating Plant, and land use besides P, Public and Institutional. Also, upon review of the plat maps, the subject parcels already have partially created subdivisions with smaller lots and roads. Based on the available documentation from the City of Redondo Beach, it appears reasonable that the subject site should allow commercial, mixed-use (commercial & residential), and multi-family residential uses.



## HIGHEST AND BEST USE ANALYSIS

**Introduction:** The critical element in valuations, particularly like this one, is the estimation of the land's highest and best use. It is critical because this determines what sales are appropriate to form an opinion of value.

The highest and best use of the subject real estate may be defined as *"The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported and financially feasible and that results in the highest value."* This definition is quoted from the 2008 Thirteenth Edition of the Appraisal of Real Estate, published by the Appraisal Institute. In support of the highest and best use determination for the subject land as if vacant and as improved, the basic elements of the definition are considered in the following analysis of highest and best use for the subject property.

**Legally Permissible:** This includes consideration of municipal zoning, private restrictions, building codes, comprehensive plans, environmental regulations, wetland restrictions and other public regulations that impact the potential use of the site. Based on a review of only zoning and planning facts, the permitted highest and best use of the subject land is utility / generating plant uses. However, as the AES power plant located on site it set to go offline and out of use, the perceived probable highest and best use for the subject land is regarded by this appraiser to be construction of a commercial, multi-family, or mixed-use (commercial & residential) development based on the zoning and general plan land uses of the adjacent and nearby properties.

**Physically Possible:** The physical characteristics concerning development of the subject land to its highest and best use. The physical characteristics that predominately positively influence the probable highest and best use of the subject land are commercial, multi-family, or mixed-use development or other similar use.

The possibility of physical achievement for the perceived probable highest and best use for the subject land is regarded by this appraiser to be average to good based on the commentary regarding future permitting in the general plan land use document above regarding the permitted uses in the "Public and Institutional" use areas which states, "Allow for the reuse of public and utility properties and facilities for private use (and the reuse of school sites subject to the provisions of California Government Code Section 65852.9), with the type and density/intensity of use to be permitted on the site determined by…  a. their compatibility with the type, character, and density/intensity of adjacent uses."

**Financially Feasible:** The highest and best use must be financially feasible as of the effective date of valuation. A review of demographic information relating to local, regional, state and national economic conditions has a cumulative influence on the subject probable highest and best use regarded by the appraiser as (poor; fair; average; good; excellent). Marketability issues are considered as a part of this analysis with a cumulative influence on the subject probable highest and best use regarded by the appraiser as average to good. Availability of supportive financing for the subject's probable highest and best use is regarded by the appraiser as average. In general, financial market considerations indicate that the potential for developing the subject land to the probable highest and best use of a commercial, multi-family, or mixed-use development as of the date of valuation is regarded to be average to good.

**Highest and Best Use of the Subject Land as if Vacant:** The highest and best use of the subject as if vacant is influenced by the considerations influencing the subject land. The subject property is located in the City of Redondo Beach. The surrounding area supports all modern conveniences and amenities with availability of shopping, entertainment, recreation, and school facilities. The upkeep in this area is average to good. The construction of a commercial, multi-family, or mixed-use (commercial & residential) development or other commercial use would be an ideal alternative use of the site.

As vacant, the property may be improved with a variety of commercial uses based on potential future land use from the general plan. The surrounding area is improved and there appears to be only utility easements that do not unduly affect development of the site. It is my opinion that the site is legally developable for commercial, multi-family, or mixed-use (commercial & residential) utilization.

The second concern is those permissible uses that are physically possible to be developed upon the land parcel. Observation of the neighborhood leads me to the conclusion that the land is properly sized and orientated. All utilities are available to the site, as is typical to the area. Access and visibility of the site is good. Predominate land utilization in the area is commercial and medium to high density residential. The configuration of the site poses no design challenges for the developer to achieve an optimal development. The subject property has sufficient size, frontage, access, and lack of hazards; none of its physical attributes preclude any of the permissible land uses if vacant.

Under the existing zoning classification, a feasible use would be one that produces the highest net return to land and is permitted by zoning. It is our judgment that the financially feasible and highest and best use of the site, as vacant, is to construct a commercial, multi-family, or mixed-use (commercial & residential) development. The use of the site under the P-GP, Public and Institutional – generating plant zone, zoning classification was established for utility / generating plant uses. The subject site is currently legally conforming, but as it is going offline and out of use, it is not currently developed to its highest and best use.

There are numerous development scenarios that are possible; however, each would require a separate marketing study to estimate the feasibility and optimal profitability. Since this investigation is beyond the scope and extent of this assignment, it is not attempted.

<u>Conclusion:</u>   Based upon the preceding factors, it is my opinion that the highest and best use of the site as unimproved is to hold for future commercial, multi-family, or mixed-use (commercial & residential) development. The likely buyer of the subject property is an investor. The subject site should be improved with a commercial, multi-family, or mixed-use (commercial & residential) building as if vacant. The development of the site needs to meet the criteria of the community needs and the maximal use of the site, as well as a feasible use.

**Highest and Best Use of the Subject Property as Improved Conclusion:** The highest and best use of the subject property as improved is influenced by the previously mentioned considerations influencing the subject land as if vacant.

<u>The existing use of the subject property represents a legal and conforming use but is not considered the highest and best use of this site. The highest and best use of the subject site is future development as a commercial, multi-family, or mixed-use (commercial & residential) development.</u>

## ANALYSIS OF DATA AND CONCLUSIONS

### COST APPROACH TO VALUE

The Cost Approach to Value is one of three traditional valuation methods used in the appraisal of improved real estate, and it is regarded by this appraiser <u>not to be applicable</u> in this appraisal assignment. A Cost Approach to Value is not regarded to be a necessary part in developing a credible result to this appraisal assignment, and therefore will not be completed as a part of this appraisal assignment by the appraiser based on the intended use and scope of this appraisal.

Reasons for the Cost Approach to Value not being applicable in this appraisal assignment are:

- This valuation method not being typical practice based on the characteristics of this assignment.

## SALES COMPARISON APPROACH TO VALUE

**Introduction to the Sales Comparison Approach to Value**

The subject real estate (land hypothetically assumed to be vacant and available to its highest and best use) will be valued by use of a Sales Comparison Approach to Value. The following is a summary of important procedures used in applying the Sales Comparison Approach to Value:

1. Market data information must be obtained for similar type of property for which sale price, option price, listing price, offer to purchase or other cost information is available for comparison to the subject property.

2. The market data information must be reviewed to determine the terms of sale, motivating factors, interest and property rights conveyed, and whether it is an arm's length transaction to determine the cash equivalent effective price level to be considered in the subsequent valuation analysis.

3. A comparison of the comparable sale or other related market data information important property characteristics is accomplished considering relevant issues including the time difference between date of sale and effective date of value, location, land contribution to overall value.

4. An adjustment analysis in a grid type format is completed considering material differences in the property characteristics identified in above procedures #2 and #3 comparing the market data information to the subject property focusing on probable effect on the value.

5. **This valuation analysis concludes with an indication of the value of the subject property as of** a specified effective date of value, which may be a past or retrospective date, a current date or prospective date in the future.

The comparable market data that is submitted in detail in the report is summarized and located on a map in relation to the subject property on the following page. Similar real estate sales or other related market data are adjusted to the subject property in a grid format in the following valuation analysis using a price per unit comparisons.  The comparable market data is adjusted resulting in cash equivalent effective price levels considering: (1) Exclusion of any non-real estate assets included in the sale price or other related assets such as movable equipment, items of personal property and "blue-sky" business value consideration and (2) Conditions of sale or financing atypical of the prevailing real estate market. In general, the following property characteristics are considered in the selection of the comparable market data used in this Sales Comparison Approach to Value:

**Analysis of the Market Data**

The sales comparison approach examines the price or price per unit area of similar properties being sold in the marketplace. Simply put, the sales of properties similar to the subject are analyzed and the sale prices adjusted to account for differences in the comparable sales to the subject to determine the value of the subject. This approach is generally considered the most reliable if adequate comparable sales exist. In any event, it is the only independent check on the reasonability of an appraisal opinion.

The sales used were the most recent and most similar zoned properties that were sold in the immediate area. Sales from the immediate neighborhood are the most reliable indicator of market value. All were verified for accuracy and closing. All adjustments were within acceptable market norms.

In this market, the most probably buyer is an investor.  This is both common and typical in our market, the most probable buyers being investors who target locations more than the availability of similar properties based on their expectations of a return on their investment. It is expected that due to the subject size, the exposure and marketing time are estimated to be 6 - 12 months.

The Comparable Sales Comparison Grids, Comparable Sales Market Data, Explanation of Adjustments, and Value Conclusion Reconciliation are on the following pages.

SALES COMPARISON APPROACH

Part 1

"As Is" Market Value

**Comparable Power Plant Land Sales Location Map**





## Comparable Power Plant Land Sales

### Comp 1 – Closed Sale – $147,458/AC; $3.39/SF





## 183 N Harbor Blvd - Vacant Land                                                        SOLD
Commercial Land of 59 AC (2,570,040 SF) (con't)

### Transaction Notes

On 3/29/22, the land at 183 N Harbor Blvd was sold for $8,700,000. Phase 1 and 2 done, and came back clean. There is a decommissioned power plant on the site, and it is expected to cost approximately $10-12 million dollars to demolish.

The property had an initial asking price of $8,700,000.  The transaction was in escrow for approximately ten months.

The buyer was attracted to the property because they plan to develop on the land. The buyer has not decided what they are planning to develop but they want it to be something thoughtful and good for the community.

### Current Land Information                                                              ID: 5963

| | | | |
|---|---|---|---|
| Zoning: | EC | Proposed Use: | - |
| Density Allowed: | - | Land Area: | 59 AC (2,570,040 SF) |
| Number of Lots: | - | On-Site Improv: | Previously developed lot |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Individual |
| Improvements: | - | | |
| | | | |
| Name: | Vacant Land | | |
| Topography: | Level | | |
| | | | |
| Street Frontage: | 1,941 feet on North Harbor Boulevard | | |
| Traffic Count: | 0 cars per day on North Harbor Boulevard | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | Ventura South/Oxnard/Port Hueneme |
| County: | Ventura |
| CBSA: | Oxnard-Thousand Oaks-Ventura, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



NEWS

## Oxnard's Mandalay power plant site sells for $8.7M



🐦 in f ✉ 🖨  👍 Like  💬 Comment                          📅 Apr 12, 2022  👁 708 views

**By:** Brian J. Varela

Source: Ventura County Star

Santa Barbara-based Mandalay Solvere, LLC has purchased the Mandalay Generation Station and property on Oxnard's coast for $8.7 million, according to documents filed with the Ventura County Clerk-Recorder's office last month.



The property and power plant, which has been decommissioned for years, was owned by GenOn, a Texas-based power generation company.

William Gustafson, a partner with Mandalay Solvere, declined to comment Monday on the 59-acre property's future, citing non-disclosure agreements. The company was formed in January in Delaware, according to business filings with the California Secretary of State.

"We are very excited about the opportunity to improve this unique and beautiful area," Gustafson said in a statement Monday. "We have assembled a group of experts, including best-in-class environmental planners, to help us create a new vision for this blighted stretch of coastline."

Oxnard city officials directed questions about the property to GenOn last week. The power company did not respond to a phone call or email last week about the power plant, property or sale.

Carmen Ramirez, chairwoman of the Ventura County Board of Supervisors, said Friday she hopes the property's new owners will turn the land into something that's appropriate for a beach community.

"Oxnard already has too much industry and abuse of its coastline," said Ramirez, represents District 5, including Oxnard. "I'm hoping that this owner has something to offer our city of Oxnard and our region."

Ramirez, who has been an advocate of doing away with industrial uses on the coast, served on Oxnard's City Council prior to her election to the board of supervisors.

In 2010, the California State Water Resources Control Board ordered power plants that draw in sea water for cooling to shut down by the end of 2020, according to the board's website. Both the Mandalay plant and its sister facility, the Ormond Generation Station, also owned by GenOn, were affected by the order.

The Mandalay plant was decommissioned in February 2018, according to the California Energy Commission. However, the Ormond facility was able to secure an extension until Dec. 31, 2023, according to the board's website.



## Property Detail Report

**For Property Located At :**
**183 N HARBOR BLVD, OXNARD, CA 93035**



| Owner Information | | | |
|---|---|---|---|
| Owner Name: | MANDALAY SOLVERE LLC | | |
| Mailing Address: | 1230 COAST VILLAGE CIR #K, SANTA BARBARA CA 93108-3752 C027 | | |
| Vesting Codes: | / / CO | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | VENTURA, CA | APN: | 183-0-022-025 |
| Census Tract / Block: | 29.05 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | OXNARD UN |
| Market Area: | VC31 | School District Name: | OXNARD UN |
| Neighbor Code: | | Munic/Township: | |

| Owner Transfer Information | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

| Last Market Sale Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/29/2022 / 02/15/2022 | 1st Mtg Amount/Type: | $11,000,000 / CONV |
| Sale Price: | $8,700,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 40229 |
| Document #: | 40228 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | FIDELITY NATIONAL TITLE CO | | |
| Lender: | BAY PT CAP PTRS II LP | | |
| Seller Name: | GENON CALIFORNIA SOUTH LP | | |

| Prior Sale Information | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

| Property Characteristics | | | |
|---|---|---|---|
| Gross Area: | | Parking Type: | Construction: |
| Living Area: | | Garage Area: | Heat Type: |
| Tot Adj Area: | | Garage Capacity: | Exterior wall: |
| Above Grade: | | Parking Spaces: | Porch Type: |
| Total Rooms: | | Basement Area: | Patio Type: |
| Bedrooms: | | Finish Bsmnt Area: | Pool: |
| Bath(F/H): | / | Basement Type: | Air Cond: |
| Year Built / Eff: | / | Roof Type: | Style: |
| Fireplace: | / | Foundation: | Quality: |
| # of Stories: | | Roof Material: | Condition: |
| Other Improvements: | | | |

| Site Information | | | |
|---|---|---|---|
| Zoning: | EC | Acres: | 36.01 | County Use: | 4812 |
| Lot Area: | 1,568,408 | Lot Width/Depth: | x | State Use: |
| Land Use: | | Res/Comm Units: | / | Water Type: |
| Site Influence: | | | Sewer Type: |

| Tax Information | | | | | |
|---|---|---|---|---|---|
| Total Value: | $21,856,953 | Assessed Year: | 2022 | Property Tax: | $261,605.20 |
| Land Value: | $21,839,550 | Improved %: | | Tax Area: | 03040 |
| Improvement Value: | $17,403 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $21,856,953 | | | | |









**Comp 2 – Closed Sale – $118,391/AC; $2.72/SF**



| Multi-Property | | | | | SOLD |
|---|---|---|---|---|---|
| Multi-Property sale on 3/10/2021 of 2 Land parcels, for $41,000,000 ($2.72/AC) - Research Complete | | | | | |

**Summary of Property Info - at time of sale**

| | Address | City, State | Type-Class | Property SF | Built | Sale Price |
|---|---|---|---|---|---|---|
| 1 | Willow Pass Rd | Bay Point, CA | Land | - | - | $36,600,000 (Full Value) |
| 2 | 696 W 10th St | Pittsburg, CA | Land | - | - | $4,400,000 (Full Value) |

**Buyer & Seller Contact Info**

| | |
|---|---|
| Recorded Buyer: | **Pittsburg Owner LPV LLV** |
| True Buyer: | **Integral Communities - Northern CA Division** |
| | **Mark Butler** |
| | 500 La Gonda Way |
| | Danville, CA 94526 |
| | (925) 362-3749 |
| Buyer Type: | **Developer/Owner-RGNL** |
| Buyer Broker: | **No Buyer Broker on Deal** |

| | |
|---|---|
| Recorded Seller: | **Genon Delta LLC** |
| True Seller: | **GenOn** |
| | **Jonathan Sacks** |
| | 1360 Post Oak Blvd |
| | Houston, TX 77056 |
| | (832) 910-9140 |
| Seller Type: | **Corporate/User** |
| Listing Broker: | **No Listing Broker on Deal** |

**Transaction Details**                                                    ID: 5446178

| | | | |
|---|---|---|---|
| Sale Date: | **03/10/2021** | Sale Type: | **Investment** |
| Escrow Length: | - | RBA: | - |
| Sale Price: | **$41,000,000-Full Value** | Land Area: | **346.31 AC (15,085,176 SF)** |
| Asking Price: | - | | |
| Price/SF: | - | | |
| | | | |
| Pro Forma Cap Rate: | - | Percent Improved: | - |
| Transfer Tax: | **$40,260** | Total Value Assessed: | **$2,834,032** |
| | | Improved Value Assessed | - |
| | | Land Value Assessed: | **$2,834,032** |
| | | Land Assessed/AC: | **$8,183** |
| | | | |
| Legal Desc: | **Please refer to deed** | | |
| Parcel No: | **096-100-031-2, 096-100-034-6** | | |
| Document No: | **072453** | | |
| Financing: | **Down payment of $6,100,000.00 (14.9%)** | | |
| | **$30,500,000.00 from Private Lender** | | |



## Multi-Property                                                              SOLD

Multi-Property sale on 3/10/2021 of 2 Land parcels, for $41,000,000 ($2.72/AC) - Research Complete (con't)

### Transaction Notes

Parties involved in this deal could not be reached for comment.

Per public record, this is the sale of 346.3 acres of land for $41 million or about $118k per acre.

Part of the land includes a Decommissioned Power Plant.

### Current Land Information: Willow Pass Rd                          ID: 1351337

| | | | |
|---|---|---|---|
| Zoning: | IG-O | Proposed Use: | Commercial/Single Family Development |
| Density Allowed: | - | Land Area: | 230.81 AC (10,054,084 SF) |
| Number of Lots: | - | Land Area - Net: | 230.81 AC |
| Max # of Units: | - | On-Site Improv: | - |
| Units per Acre: | - | Lot Dimensions: | - |
| Improvements: | - | Owner Type: | Developer/Owner-RGNL |
| Topography: | Rolling | | |

### Location Information

| | |
|---|---|
| Metro Market: | East Bay/Oakland |
| Submarket: | Highway 4/Antioch/Pittsburg |
| County: | Contra Costa |
| CBSA: | Oakland-Hayward-Berkeley, CA |
| CSA: | San Jose-San Francisco-Oakland, CA |
| DMA: | San Francisco-Oakland-San Jose, CA |

### Current Land Information: 696 W 10th St                          ID: 11077605

| | | | |
|---|---|---|---|
| Zoning: | IG | Proposed Use: | Commercial/Industrial |
| Density Allowed: | - | Land Area: | 115.50 AC (5,031,093 SF) |
| Number of Lots: | - | On-Site Improv: | - |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Developer/Owner-RGNL |
| Improvements: | - | | |
| Off-Site Improv: | Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water | | |

### Location Information

| | |
|---|---|
| Metro Market: | East Bay/Oakland |
| Submarket: | Highway 4/Antioch/Pittsburg |
| County: | Contra Costa |
| CBSA: | Oakland-Hayward-Berkeley, CA |
| CSA: | San Jose-San Francisco-Oakland, CA |
| DMA: | San Francisco-Oakland-San Jose, CA |



## Property Detail Report

**For Property Located At :**
**WILLOW PASS RD, PITTSBURG, CA 94565**



| Owner Information | | | |
|---|---|---|---|
| Owner Name: | PITTSBURG OWNER LPV LLC | | |
| Mailing Address: | 888 SAN CLEMENTE DR #100, NEWPORT BEACH CA 92660-6367 C063 | | |
| Vesting Codes: | // CO | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | POR RO LOS MEDANOS ADJ PCL 4 PMW 12-01 | | |
| County: | CONTRA COSTA, CA | APN: | 096-100-031-2 |
| Census Tract / Block: | 3132.05 / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | MOUNT DIABLO BASE & MERIDIAN |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 1 | Tract #: | |
| Legal Block: | | School District: | PITTSBURG |
| Market Area: | | School District Name: | PITTSBURG |
| Neighbor Code: | | Munic/Township: | |

| Owner Transfer Information | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

| Last Market Sale Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/10/2021 / 03/10/2021 | 1st Mtg Amount/Type: | $30,500,000 / PRIVATE PARTY |
| Sale Price: | $36,600,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 72455 |
| Document #: | 72453 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | MULTIPLE |
| Title Company: | FIDELITY NAT'L TITLE GRP | | |
| Lender: | PRIVATE INDIVIDUAL | | |
| Seller Name: | GENON DELTA LLC | | |

| Prior Sale Information | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

| Property Characteristics | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

| Site Information | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | 230.81 | County Use: | STATE BD ASSESSED (83) |
| Lot Area: | 10,053,953 | Lot Width/Depth: | x | State Use: | |
| Land Use: | STATE PROPERTY | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

| Tax Information | | | | | |
|---|---|---|---|---|---|
| Total Value: | $15,555,000 | Assessed Year: | 2022 | Property Tax: | $183,573.48 |
| Land Value: | $15,555,000 | Improved %: | | Tax Area: | 07076 |
| Improvement Value: | | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $15,555,000 | | | | |



## Property Detail Report

**For Property Located At :**
**696 W 10TH ST, PITTSBURG, CA 94565-1806**



### Owner Information
| | |
|---|---|
| Owner Name: | **PITTSBURG OWNER LPV LLC** |
| Mailing Address: | **888 SAN CLEMENTE DR #100, NEWPORT BEACH CA 92660-6367 C063 C/O INTEGRAL COMMUNITI** |
| Vesting Codes: | / / CO |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **POR RO LOS MEDANOS ADJ PCL 7 PMW 12-01** | | |
| County: | CONTRA COSTA, CA | APN: | 096-100-034-6 |
| Census Tract / Block: | 3090.00 / 3 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | RANCHO LOS MEDANOS |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 1 | Tract #: | |
| Legal Block: | | School District: | PITTSBURG |
| Market Area: | | School District Name: | PITTSBURG |
| Neighbor Code: | | Munic/Township: | |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/10/2021 / 03/10/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $4,400,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 72454 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIDELITY NAT'L TITLE GRP | | |
| Lender: | | | |
| Seller Name: | GENON CALIFORNIA NORTH LLC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | 115.50 | County Use: | VACANT INDUSTRIAL (50) |
| Lot Area: | 5,031,093 | Lot Width/Depth: | x | State Use: | |
| Land Use: | INDUSTRIAL ACREAGE | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $4,488,000 | Assessed Year: | 2022 | Property Tax: | $85,644.38 |
| Land Value: | $4,488,000 | Improved %: | | Tax Area: | 07076 |
| Improvement Value: | | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $4,488,000 | | | | |









**Comp 3 – Closed Sale – $983,237/AC; $22.57/SF**





## Etiwanda Ave                                                                                    SOLD

107,821 SF - Sold for Land Value, Utility Sub-Station Building  (con't)

### Transaction Notes

On December 30, 2020 the former Etiwanda Power Facility was sold for $61,000,000 as a redevelopment project.

The buyer was the Black Creek Group.  The area has multiple large distribution hubs such as the Goodman Logistics Center within minutes of the asset.  The property is located along a train line.

Located in the heart of the Inland Empire West, Etiwanda Commerce Center will be situated on 64 acres, which is a former, decommissioned power plant. Working closely with Roux & Associates, for environmental oversight, and the city of Rancho Cucamonga, the firm plans to demolish the existing structures and develop a Class A 1.0 million square foot industrial facility, which will include additional trailer and auto parking.

Demolition is scheduled to begin in Q2 2021 and construction is estimated to begin in Q1 2023. Mike Condon, Jr., Erica Finck, Chuck Belden, Phil Lombardo, Kyle Kehner, Andrew Starnes with Cushman & Wakefield were instrumental in completing the acquisition of the site. Cushman and Wakefield will also be retained for leasing. Please see CoStar Group Property ID#12140881 for additional details.

"It can be challenging to find opportunities to develop big-box, Class A facilities in the Inland Empire as it's one of the strongest industrial markets in the nation. Finding desirable sites takes creativity and resourcefulness and we are very excited to embark on both developments," said Gregg Boehm, managing director at Black Creek Group. "Given the ideal access to major transportation routes across the Western U.S., as well as the large population base in California, e-commerce and third party logistics providers are a common tenant in this highly-sought after market, which already boasts all time low vacancy rates and positive net absorption."

The seller was GenOn which closed the facility after financial issues June 1, 2018.

### Income Expense Data

| Expenses | | |
|---|---|---|
| | - Taxes | $149,724 |
| | - Operating Expenses | |
| | Total Expenses | $149,724 |

### Current Building Information                                                        ID: 11620306

| | | | | |
|---|---|---|---|---|
| Bldg Type: | Utility Sub-Station | | Bldg Status: | Existing |
| Class: | - | | RBA: | 107,821 SF |
| Total Avail: | 0 SF | | % Leased: | 100.0% |
| Bldg Vacant: | 0 SF | | Rent/SF/Yr: | - |
| Tenancy: | - | | Elevators: | 0 |
| Owner Type: | Developer/Owner-NTL | | Core Factor: | - |
| Owner Occupied | - | | Stories: | 1 |
| Zoning: | HI | | Typical Floor Size: | 107,821 SF |
| Land Area: | 62.04 AC | | Building FAR: | 0.04 |
| Expenses: | 2021 Tax @ $1.41/sf | | | |

### Location Information

| | |
|---|---|
| Metro Market: | Inland Empire (California) |
| Submarket: | Inland Empire West/Airport Area |
| County: | San Bernardino |
| CBSA: | Riverside-San Bernardino-Ontario, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |





# Black Creek Group Continues to Develop in the Inland Empire as Need for Logistics Space Remains High

Firm to develop 1.7 million square feet and approaches completion of 624,000 square feet

March 17, 2021 11:00 ET | Source: Black Creek Group, LLC

DENVER, March 17, 2021 (GLOBE NEWSWIRE) -- Black Creek Group, a Denver-based real estate investment management firm with a more than 25-year history, today announced it will be kicking off two development projects in the Inland Empire, Etiwanda Commerce Center and Riverside Logistics Center. The developments will add approximately 1.7 million square feet to the firm's existing 7.3 million square feet of industrial holdings within the market.

Located in the heart of the Inland Empire West, Etiwanda Commerce Center will be situated on 64 acres, which is a former, decommissioned power plant. Working closely with Roux & Associates, for environmental oversight, and the city of Rancho Cucamonga the firm plans to demolish the existing structures and develop a Class A 1.0 million square foot industrial facility, which will include additional trailer and auto parking. Demolition is scheduled to begin in Q2 2021 and construction is estimated to begin in Q1 2023. Mike Condon, Jr., Erica Finck, Chuck Belden, Phil Lombardo, Kyle Kehner, Andrew Starnes with Cushman & Wakefield were instrumental in completing the acquisition of the site. Cushman and Wakefield will also be retained for leasing.

In addition to this development, the firm will begin construction on Riverside Logistics Center, a 683,000 square foot facility in the Inland Empire East, in Q2 2021.

"It can be challenging to find opportunities to develop big-box, Class A facilities in the Inland Empire as it's one of the strongest industrial markets in the nation. Finding desirable sites takes creativity and resourcefulness and we are very excited to embark on both developments," said Gregg Boehm, managing director at Black Creek Group. "Given the ideal access to major transportation routes across the Western U.S., as well as the large population base in California, e-commerce and third party logistics providers are a common tenant in this highly-sought after market, which already boasts all time low vacancy rates and positive net absorption."

Additionally, the firm is nearing completion of 624,000 square feet of Class A distribution warehouse space within the market.



## Property Detail Report

**For Property Located At :**
ETIWANDA AVE, RANCHO CUCAMONGA, CA
91739



| Owner Information | |
|---|---|
| Owner Name: | RRI ENERGY ETIWANDA INC |
| Mailing Address: | 2151 MICHELSON DR #282, IRVINE CA 92612-1374 C038 C/O MARVIN F POER & COMPANY |
| Vesting Codes: | / / |

**Location Information**

Legal Description: THAT PORTION OF THE NORTHWEST ONE-QUARTER AND THE NORTHEAST ONE-QUARTER OF SECTION 17, TOWNSHIP I SOUTH, RANGE 6 WEST, AND THE SOUTHWEST ONE-QUARTER AND THE SOUTHEAST ONE-QUARTER OF SECTION 8, TOWNSHIP 1 SOUTH, RANGE 6 WEST, BEING DESCRIBED AS FOLLOW S: COMMENCING AT THE SOUTHWEST CORNER OF THE NORTH ONE-HALF OF THE SOUTH ONE-HALF OF THE EAST ONE-HALF OF THE NORTHWEST ONE-QUARTER OF SAID SECTION 17, THENCE N.89 DEG 56'11"E. ALONG THE SOUTH LINE OF SAID NORTH ONE-HALF OF THE SOUTH ONE-HALF OF THE EAST ONE-HALF OF THE NORTHWEST ONE-QUARTER, A DISTANCE OF 1210.76 FEET; THENCE N.00 DEG 04'40"W., A DISTANCE OF 1067.20 FEET; THENCE N.00 DEG 00'23"W., A DISTANCE OF 624.08 FEET, TO THE POINT OF BEGINNING; THENCE S.89 DEG 27'10'E., A DISTANCE OF 852

| | | | | | |
|---|---|---|---|---|---|
| County: | SAN BERNARDINO, CA | APN: | | 0229-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 | |
| Census Tract / Block: | 20.45 / | Alternate APN: | | | |
| Township-Range-Sect: | | Subdivision: | | | |
| Legal Book/Page: | 0229-283 | Map Reference: | / | | |
| Legal Lot: | | Tract #: | | | |
| Legal Block: | | School District: | CHAFFEY UN | | |
| Market Area: | 688 | School District Name: | CHAFFEY UN | | |
| Neighbor Code: | 073 | Munic/Township: | ONTARIO | | |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 12/30/2020 / 12/29/2020 | 1st Mtg Amount/Type: | / |
| Sale Price: | $61,000,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 532553 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | OTHER | | |
| Lender: | | | |
| Seller Name: | GENON CALIFORNIA SOUTH LP | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | 0.00 | County Use: | ELECTRIC PWR PLANT (0161) |
| Lot Area: | 9 | Lot Width/Depth: | x | State Use: | |
| Land Use: | ELECTRICAL FACILITY | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $14,696,610 | Assessed Year: | 2022 | Property Tax: | $154,292.32 |
| Land Value: | $12,667,378 | Improved %: | 14% | Tax Area: | 15019 |
| Improvement Value: | $2,029,232 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $14,696,610 | | | | |









**South Bay Beach Cities Comparable Land Sales Location Map**



## South Bay Beach Cities Comparable Land Sales

## Comp 1 – Closed Sale – $5,500,757/AC; $126.28/SF / Adjusted to $6,050,920/AC; $138.91/SF

(- 15% for size, +2.5% for frontage, +7.5% for ocean / harbor view, and +15% for location)



**A V G**

| Multi-Property | SOLD |
|---|---|
| Multi-Property sale on 6/15/2023 of 3 Retail properties, for $21,000,000 ($280.15/SF) - Research Complete (con't) | |

| Document No: | 0392723 |
|---|---|

### Transaction Notes

On June 26th, 2023, Michael Cogan, individual owner, sold three retail buildings on 3.84 acres to Intracorp Homes for $21 Million.

There are no current plans for the property as the buyer is in the process of getting engineering approvals. News sources project a redevelopment of the site into a mixed-use project.

The information provided for this sale comparable report was verified by sources deemed reliable.

### Current Retail Information: 22501 Hawthorne Blvd                                    ID: 1175449

| | | | |
|---|---|---|---|
| Property Type: | Retail - Freestanding (Neighborhood Center) | GLA: | 40,364 SF |
| Center: | Gable House Bowl Center | Total Avail: | 0 SF |
| Bldg Status: | Built in 1959 | % Leased: | 100.0% |
| Owner Type: | Developer - Regional | Bldg Vacant: | 0 SF |
| Zoning: | TOHC-CTR | Land Area: | 1.27 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.73 |
| Rent/SF/Yr: | - | No. of Stores: | 12 |
| CAM: | - | | |
| Expenses: | 2021 Tax @ $1.12/sf; 2011 Ops @ $2.16/sf | | |
| Parking: | 200 free Surface Spaces are available | | |
| Features: | Bus Line, Signage, Signalized Intersection | | |

### Location Information

| | |
|---|---|
| Second Address: | 22411-22553 Hawthorne Blvd |
| Park Name: | Gable House Bowl Center |
| Metro Market: | Los Angeles |
| Submarket: | South Bay/Torrance |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

### Current Retail Information: 22529-22549 Hawthorne Blvd                                    ID: 6734887

| | | | |
|---|---|---|---|
| Property Type: | Retail - Freestanding (Neighborhood Center) | GLA: | 27,397 SF |
| Center: | Gable House Bowl Center | Total Avail: | 0 SF |
| Bldg Status: | Built in 1959 | % Leased: | 100.0% |
| Owner Type: | Developer - Regional | Bldg Vacant: | 0 SF |
| Zoning: | TOHC-CTR | Land Area: | 1.27 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.50 |
| Rent/SF/Yr: | - | No. of Stores: | 12 |
| CAM: | - | | |
| Street Frontage: | 312 feet on Hawthorne Blvd (with 0 curb cut) | | |
| Expenses: | 2020 Tax @ $1.63/sf | | |
| Parking: | 42 free Surface Spaces are available | | |

### Location Information



| Multi-Property | | | SOLD |
|---|---|---|---|
| Multi-Property sale on 6/15/2023 of 3 Retail properties, for $21,000,000 ($280.15/SF) - Research Complete (con't) | | | |

| | | | |
|---|---|---|---|
| Park Name: | Gable House Bowl Center | | |
| Metro Market: | Los Angeles | | |
| Submarket: | South Bay/Torrance | | |
| County: | Los Angeles | | |
| CBSA: | Los Angeles-Long Beach-Glendale, CA | | |
| CSA: | Los Angeles-Long Beach, CA | | |
| DMA: | Los Angeles, CA-NV | | |
| Map(Page): | Thomas Bros. Guide 763-D7 | | |

| Current Retail Information: 22411 Hawthorne Blvd | | | ID: 6791378 |
|---|---|---|---|
| Property Type: | Retail - Freestanding (Neighborhood Center) | GLA: | 7,200 SF |
| Center: | Gable House Bowl Center | Total Avail: | 0 SF |
| Bldg Status: | Built in 1959 | % Leased: | 100.0% |
| Owner Type: | Developer - Regional | Bldg Vacant: | 0 SF |
| Zoning: | TOHC-CTR | Land Area: | 1.27 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.13 |
| Rent/SF/Yr: | - | No. of Stores: | 12 |
| CAM: | - | | |
| Expenses: | 2020 Tax @ $6.21/sf | | |

| Location Information | | | |
|---|---|---|---|
| Park Name: | Gable House Bowl Center | | |
| Metro Market: | Los Angeles | | |
| Submarket: | South Bay/Torrance | | |
| County: | Los Angeles | | |
| CBSA: | Los Angeles-Long Beach-Glendale, CA | | |
| CSA: | Los Angeles-Long Beach, CA | | |
| DMA: | Los Angeles, CA-NV | | |
| Map(Page): | Thomas Bros. Guide 763-D7 | | |

# Gable House Apartments

**Under Construction**

Longtime Torrance institution Gable House Bowl, whose name will live on, will be home to a new thriving mixed-use development. Located at 22501 Hawthorne Boulevard, the new community will feature 218 luxury apartment homes for rent, alongside approximately 12,000 square feet of retail, including future dining and shopping opportunities. Gable House represents Intracorp's first new multi-family community in Los Angeles County in several years and will provide much-needed new housing in an under-supplied South Bay market.

The new building's architecture draws inspiration from the post-modern gables of the former, iconic bowling alley. Once complete, Gable House will offer five stories of residential living and include an extraordinary amount of amenity space. Fashioned after LA's hottest rooftop decks, the pinnacle of this community will be a sky deck and pool lounge, a modern oasis and respite from life in the fast lane. Other best-in-class amenities will include state-of-the-art wellness center, view decks, social club, business center and much more. The highly curated interiors will be home to those seeking a uniquely soulful experience and patterned after LA's hottest hospitality environments.

Located within the urban core of Torrance, Gable House is close to numerous South Bay employers, and is close to the 405, 110 and 105 freeways, a short distance to Downtown Los Angeles.

Construction is anticipated to begin spring 2023 and leasing early 2025.

**WHAT'S EXTRAORDINARY ABOUT GABLE HOUSE?**

The extraordinary opportunity to build new, luxury apartments in Torrance where little to no new supply exists. Residents can live within minutes of employment and major transportation centers.  The building's nod to its namesake and post-modern architecture, coupled with its vibrant interiors and boutique-style amenities, will provide an extraordinary combination for those seeking a luxury lifestyle in the heart of the South Bay.

**Details**

A new, mixed-use residential and retail development in the heart of the South Bay with 218 modern residences for rent and best-in class amenities focused on living well, including a trendy sky deck with pool lounge.

**Architecture**

Van Tilburg, Banvard & Soderbergh (VTBS)

**Interior Design**

Preen, Inc.

**Landscape Architecture**

Urban Arena

**Completion**

2025



# Property Detail Report

**For Property Located At :**
**22501 HAWTHORNE BLVD, TORRANCE, CA 90505-2509**

| Owner Information | | | Bldg Card: 000 of 004 |
|---|---|---|---|
| Owner Name: | GABLE HOUSE DEV LLC | | |
| Mailing Address: | 895 DOVE ST STE 400, NEWPORT BEACH CA 92660-8921 C012 | | |
| Vesting Codes: | / / CO | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | TRACT # 454 EX OF STS LOT 11 | | |
| County: | LOS ANGELES, CA | APN: | 7368-001-015 |
| Census Tract / Block: | 6512.21 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | 454 |
| Legal Book/Page: | 15-13 | Map Reference: | 68-A5 / |
| Legal Lot: | 11 | Tract #: | 454 |
| Legal Block: | | School District: | TORRANCE |
| Market Area: | 129 | School District Name: | TORRANCE |
| Neighbor Code: | | Munic/Township: | TORRANCE |

| Owner Transfer Information | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

| Last Market Sale Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 06/15/2023 / 05/30/2023 | 1st Mtg Amount/Type: | $16,000,000 / PRIVATE PARTY |
| Sale Price: | $21,000,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 392724 |
| Document #: | 392723 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $322.60 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | PRIVATE INDIVIDUAL | | |
| Seller Name: | GABLE HOUSE INC | | |

| Prior Sale Information | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

| Property Characteristics | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1959 / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 65,096 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 65,096 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | NONE |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

| Site Information | | | | | |
|---|---|---|---|---|---|
| Zoning: | TOHC-CTR | Acres: | 3.82 | County Use: | SHOPPING CENTER-REGION (1600) |
| Lot Area: | 166,299 | Lot Width/Depth: | x | State Use: | |
| Land Use: | SHOPPING CENTER | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

| Tax Information | | | | | |
|---|---|---|---|---|---|
| Total Value: | $2,806,546 | Assessed Year: | 2023 | Property Tax: | $48,382.28 |
| Land Value: | $1,769,708 | Improved %: | 37% | Tax Area: | 9340 |
| Improvement Value: | $1,036,838 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $2,806,546 | | | | |







**Comp 2 – Closed Sale – $10,534,632/AC; $241.84/SF / Adjusted to $9,217,732/AC; $211.61/SF**

(-30% for size, +5% for frontage, +7.5% for ocean / harbor view, and +5% for location)





## 222 N Sepulveda Blvd - N Sepulveda Blvd MB Land                    SOLD

Commercial Land of 0.38 AC (16,540 SF) (con't)

### Transaction Notes

The 0.3797 acres at 222 N Sepulveda Blvd in Manhattan Beach, California was sold for $4M. The land is zoned MBGC and was proposed for commercial use with 101 feet along North Sepulveda Blvd. The lot was being used for auto repair purposes at the time of sale.

### Current Land Information                                            ID: 12865156

| | | | |
|---|---|---|---|
| Zoning: | MBGC Zoning | Proposed Use: | Commercial |
| Density Allowed: | - | Land Area: | 0.38 AC (16,540 SF) |
| Number of Lots: | 1 | On-Site Improv: | Previously developed lot |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Individual |
| Improvements: | 4,770 sf  Concrete block building. | | |
| Topography: | Level | | |
| Off-Site Improv: | Electricity, Gas, Sewer, Streets, Water | | |
| Street Frontage: | 101 feet on North Sepulveda Boulevard | | |
| Traffic Count: | 0 cars per day on North Sepulveda Boulevard | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | South Bay/Beach Cities/Palos Verdes |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



## Property Detail Report

**For Property Located At :**
**222 N SEPULVEDA BLVD, MANHATTAN BEACH, CA**
**90266-6802**



| Owner Information | | | | For Sale |
|---|---|---|---|---|
| Owner Name: | PHMB LLC | | | |
| Mailing Address: | PO BOX 3573, MANHATTAN BEACH CA 90266-1573 B071 C/O PASI HAMALAINEN | | | |
| Vesting Codes: | / / | | | |

| Location Information | | | | |
|---|---|---|---|---|
| Legal Description: | TRACT NO 142 S 110 FT OF LOTS 10, 11 AND LOT 12 | | | |
| County: | LOS ANGELES, CA | APN: | 4167-023-032 | |
| Census Tract / Block: | 6208.02 / 1 | Alternate APN: | | |
| Township-Range-Sect: | | Subdivision: | 142 | |
| Legal Book/Page: | 13-182 | Map Reference: | 62-C4 / | |
| Legal Lot: | 12 | Tract #: | 142 | |
| Legal Block: | 35 | School District: | MANHATTAN BEACH | |
| Market Area: | 147 | School District Name: | MANHATTAN BEACH | |
| Neighbor Code: | | Munic/Township: | MANHATTAN B | |

| Owner Transfer Information | | | | |
|---|---|---|---|---|
| Recording/Sale Date: | 12/14/2012 / 12/09/2012 | Deed Type: | QUIT CLAIM DEED | |
| Sale Price: | | 1st Mtg Document #: | | |
| Document #: | 1936574 | | | |

| Last Market Sale Information | | | | |
|---|---|---|---|---|
| Recording/Sale Date: | 08/15/2012 / 07/25/2012 | 1st Mtg Amount/Type: | / | |
| Sale Price: | $2,050,000 | 1st Mtg Int. Rate/Type: | / | |
| Sale Type: | FULL | 1st Mtg Document #: | | |
| Document #: | 1213710 | 2nd Mtg Amount/Type: | / | |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / | |
| Transfer Document #: | | Price Per SqFt: | $429.77 | |
| New Construction: | | Multi/Split Sale: | | |
| Title Company: | CHICAGO TITLE CO | | | |
| Lender: | | | | |
| Seller Name: | AUSTIN BROTHERS LLC | | | |

| Prior Sale Information | | | | |
|---|---|---|---|---|
| Prior Rec/Sale Date: | 01/19/2000 / 03/17/1999 | Prior Lender: | | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / | |
| Prior Doc Number: | 71029 | Prior 1st Mtg Rate/Type: | / | |
| Prior Deed Type: | QUIT CLAIM DEED | | | |

| Property Characteristics | | | | | | |
|---|---|---|---|---|---|---|
| Year Built / Eff: | 1964 / 1964 | Total Rooms/Offices | | Garage Area: | | |
| Gross Area: | 4,770 | Total Restrooms: | | Garage Capacity: | | |
| Building Area: | 4,770 | Roof Type: | | Parking Spaces: | | |
| Tot Adj Area: | | Roof Material: | ROLL COMPOSITION | Heat Type: | | |
| Above Grade: | | Construction: | | Air Cond: | | |
| # of Stories: | 1 | Foundation: | CONCRETE | Pool: | | |
| Other Improvements: | | Exterior wall: | CONCRETE BLOCK | Quality: | AVERAGE | |
| | | Basement Area: | | Condition: | | |

| Site Information | | | | | | |
|---|---|---|---|---|---|---|
| Zoning: | MNCG | Acres: | 0.38 | County Use: | AUTO SVC SHOP (2600) | |
| Lot Area: | 16,539 | Lot Width/Depth: | 110 x 150 | State Use: | | |
| Land Use: | AUTO REPAIR | Res/Comm Units: | / | Water Type: | | |
| Site Influence: | | | | Sewer Type: | | |

| Tax Information | | | | | | |
|---|---|---|---|---|---|---|
| Total Value: | $2,378,820 | Assessed Year: | 2022 | Property Tax: | $27,979.08 | |
| Land Value: | $2,088,722 | Improved %: | 12% | Tax Area: | 6174 | |
| Improvement Value: | $290,098 | Tax Year: | 2022 | Tax Exemption: | | |
| Total Taxable Value: | $2,378,820 | | | | | |









**Comp 3 – Closed Sale – $10,362,976/AC; $237.90/SF / Adjusted to $9,067,450/AC; $208.16/SF**

(-30% for size, +5% for frontage, +7.5% for ocean / harbor view, and +5% for location)



**A**V**G**

| 700 Pacific Coast Hwy - 700 Pacific Coast HWY | SOLD |
|---|---|
| Commercial Land of 0.33 AC (14,401 SF) (con't) | |

| | |
|---|---|
| On-Site Improv: | Asphalt paved lot |
| Off-Site Improv: | Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water |
| Improvements: | approx. 5,000 sqft office/garage Used to be a used |
| Parcel No: | 4186-012-014 |
| Document No: | 0208699 |

### Transaction Notes

On March 31, 2023 this 0.3306 property located at 700 Pacific Coast Hwy in Hermosa Beach, California has sold for $3,426,000  in the submarket in Beach Cities, Palos Verdes.  The information was confirmed by sources deeemed reliable.

### Current Land Information
ID: 13885606

| | | | |
|---|---|---|---|
| Zoning: | HBC3 | Proposed Use: | Auto Dealership/Auto Repair |
| Density Allowed: | - | Land Area: | 0.33 AC (14,401 SF) |
| Number of Lots: | - | Land Area - Net: | 0.33 AC |
| Max # of Units: | - | On-Site Improv: | Asphalt paved lot |
| Units per Acre: | - | Lot Dimensions: | - |
| Improvements: | approx. 5,000 sqft office/garage Used to be a used | Owner Type: | Developer - Regional |
| Topography: | Level | | |
| Off-Site Improv: | Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water | | |
| Street Frontage: | 149 feet on East Pacific Coast Highwa 140 feet on PCH | | |
| Traffic Count: | 0 cars per day on East Pacific Coast Highwa 0 cars per day on PCH | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | South Bay/Beach Cities/Palos Verdes |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



# Property Detail Report

**For Property Located At :**
**700 PACIFIC COAST HWY, HERMOSA BEACH, CA 90254-4840**



### Owner Information
| | |
|---|---|
| Owner Name: | REFOUA LLC/1032 PCH LLC |
| Mailing Address: | 1559 S SEPULVEDA BLVD, LOS ANGELES CA 90025-3311 C061 |
| Vesting Codes: | // CO |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | WILSON AND LIND'S TRACT LOTS 14,15 AND LOT 16 | | |
| County: | LOS ANGELES, CA | APN: | 4186-012-014 |
| Census Tract / Block: | 6211.02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | WILSON & LINDS TR |
| Legal Book/Page: | | Map Reference: | 67-C1 / |
| Legal Lot: | 16 | Tract #: | |
| Legal Block: | | School District: | |
| Market Area: | 150 | School District Name: | |
| Neighbor Code: | | Munic/Township: | HERMOSA BCH |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 04/03/2023 / 03/17/2023 | 1st Mtg Amount/Type: | / |
| Sale Price: | $3,426,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 208699 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $673.35 |
| New Construction: | | Multi/Split Sale:: | |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | LOWENSTEIN J R & 1996 TRUST | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 10/28/1977 / | Prior Lender: | |
| Prior Sale Price: | $158,500 | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 1197568 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | DEED (REG) | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1945 / 1949 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 5,088 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 5,088 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | HBC3* | Acres: | 0.33 | County Use: | AUTO SVC SHOP (2600) |
| Lot Area: | 14,402 | Lot Width/Depth: | x | State Use: | |
| Land Use: | AUTO REPAIR | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $216,741 | Assessed Year: | 2023 | Property Tax: | $3,494.54 |
| Land Value: | $169,643 | Improved %: | 22% | Tax Area: | 4340 |
| Improvement Value: | $47,098 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $216,741 | | | | |









**Comp 4 – Closed Sale – $10,000,000/AC; $229.57/SF / Adjusted to $9,750,035/AC; $223.83/SF**

(-25% for size, +5% for frontage, +7.5% for ocean / harbor view, and +10% for location)



## 707 N Pacific Coast Hwy

**SOLD**

9,100 SF - Sold for Land Value, Retail Building Built in 1966 (con't)

| Sale History: | Sold on 4/5/2022 Non-Arms Length |
| | Sold for $6,800,000 ($747.25/SF) on 3/17/2022 |

### Transaction Notes

Prime El Segundo Owner-User or Redevelopment Opportunity. The site is comprised of approximately 9,100 square feet of existing improvements on approximately 29,795 square feet of land. The building was formerly occupied by a restaurant (last occupied in 2014). Plans for the property were not disclosed.

### Current Retail Information
ID: 12396023

| | | | | |
|---|---|---|---|---|
| Property Type: | Retail | GLA: | 9,100 SF | |
| Center: | - | Total Avail: | 0 SF | |
| Bldg Status: | Built in 1966 | % Leased: | 100.0% | |
| Owner Type: | Individual | Bldg Vacant: | 0 SF | |
| Zoning: | C3 | Land Area: | 0.68 AC | |
| Owner Occupied: | No | Lot Dimensions: | - | |
| | | Building FAR: | 0.31 | |
| Rent/SF/Yr: | - | No. of Stores: | - | |
| CAM: | - | | | |
| Street Frontage: | 222 feet on North Pacific Coast Highw (with 2 curb cuts) | | | |
| Expenses: | 2020 Tax @ $6.04/sf | | | |
| Parking: | 46 free Surface Spaces are available | | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | South Bay/El Segundo |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



## Property Detail Report

**For Property Located At :**
**703 N PACIFIC COAST HWY, EL SEGUNDO, CA 90245**



| Owner Information | | | |
|---|---|---|---|
| Owner Name: | SMOKY HOLLOW INDUSTRIES LLC | | |
| Mailing Address: | 703 N PACIFIC COAST HWY, EL SEGUNDO CA 90245 C008 | | |
| Vesting Codes: | // CO | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | EL SEGUNDO EX OF ST LOT 1 | | |
| County: | LOS ANGELES, CA | APN: | 4139-018-001 |
| Census Tract / Block: | 6200.01 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | EL SEGUNDO |
| Legal Book/Page: | | Map Reference: | 56-C5 / |
| Legal Lot: | 1 | Tract #: | |
| Legal Block: | 112 | School District: | EL SEGUNDO |
| Market Area: | 141 | School District Name: | EL SEGUNDO |
| Neighbor Code: | | Munic/Township: | EL SEGUNDO |

| Owner Transfer Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 04/05/2022 / 03/25/2022 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 375387 | | |

| Last Market Sale Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/17/2022 / 03/15/2022 | 1st Mtg Amount/Type: | / |
| Sale Price: | $6,800,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 309624 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $935.35 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | STEWART TITLE/CA | | |
| Lender: | | | |
| Seller Name: | SEGUNDO HOUSE HOTEL LLC | | |

| Prior Sale Information | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 10/05/2018 / 09/11/2018 | Prior Lender: | CATHAY BK |
| Prior Sale Price: | $6,580,000 | Prior 1st Mtg Amt/Type: | $3,290,000 / CONV |
| Prior Doc Number: | 1017714 | Prior 1st Mtg Rate/Type: | / ADJUSTABLE INT RATE LOAN |
| Prior Deed Type: | GRANT DEED | | |

| Property Characteristics | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1957 / 1966 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,270 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,270 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | YES |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

| Site Information | | | | | |
|---|---|---|---|---|---|
| Zoning: | ESC3* | Acres: | 0.68 | County Use: | RESTAURANT/TAVERN (2100) |
| Lot Area: | 29,795 | Lot Width/Depth: | x | State Use: | |
| Land Use: | RESTAURANT BUILDING | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

| Tax Information | | | | | |
|---|---|---|---|---|---|
| Total Value: | $4,874,313 | Assessed Year: | 2022 | Property Tax: | $56,775.95 |
| Land Value: | $4,264,631 | Improved %: | 13% | Tax Area: | 3710 |
| Improvement Value: | $609,682 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $4,874,313 | | | | |









**Comp 5 – Closed Sale – $1,345,425/AC; $30.89/SF / Adjusted to $1,742,400/AC; $40.00/SF**

(-5% for size, +2% for frontage, +7.5% for ocean / harbor view, and +25% for location)





## N of Outer Loop Rd

**SOLD**

Industrial Land of 10.71 AC (466,528 SF) (con't)

| Current Land Information | | ID: 12671595 |
|---|---|---|

| | | | |
|---|---|---|---|
| Zoning: | ESCM* | Proposed Use: | **Hold for Development** |
| Density Allowed: | - | Land Area: | **10.71 AC (466,528 SF)** |
| Number of Lots: | - | On-Site Improv: | - |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | **Developer/Owner-RGNL** |
| Improvements: | - | | |

**Location Information**

| | |
|---|---|
| Metro Market: | **Los Angeles** |
| Submarket: | **South Bay/El Segundo** |
| County: | **Los Angeles** |
| CBSA: | **Los Angeles-Long Beach-Glendale, CA** |
| CSA: | **Los Angeles-Long Beach, CA** |
| DMA: | **Los Angeles, CA-NV** |



## Property Detail Report

**For Property Located At :**
,, CA

### Owner Information
| | |
|---|---|
| Owner Name: | **CDC MAR EAST CAMPUS 1 LLC** |
| Mailing Address: | **2041 ROSECRANS AVE #200, EL SEGUNDO CA 90245-4792 C022** |
| Vesting Codes: | / / CO |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **TR=71551 LOT 11** | | |
| County: | LOS ANGELES, CA | APN: | 4138-032-011 |
| Census Tract / Block: | / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 11 | Tract #: | 71551 |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | | Munic/Township: | EL SEGUNDO |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/11/2022 / 03/08/2022 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 285155 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/11/2022 / 03/08/2022 | 1st Mtg Amount/Type: | / PRIVATE PARTY |
| Sale Price: | $14,409,500 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 285160 |
| Document #: | 285151 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | CHICAGO TITLE CO | | |
| Lender: | PRIVATE INDIVIDUAL | | |
| Seller Name: | RAYTHEON CO | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | ESCM* | Acres: | 7.53 | County Use: | HEAVY MANUFACTURING (3200) |
| Lot Area: | 328,215 | Lot Width/Depth: | x | State Use: | |
| Land Use: | HEAVY INDUSTRIAL | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $6,665,100 | Assessed Year: | 2022 | Property Tax: | $118,725.50 |
| Land Value: | $5,630,111 | Improved %: | 16% | Tax Area: | 9888 |
| Improvement Value: | $1,034,989 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $6,665,100 | | | | |









**Comp 6 – Closed Sale – $7,333,333/AC; $168.80/SF / Adjusted to $6,985,282/AC; $160.36/SF**

(-27.5% for size, +5% for frontage, +7.5% for ocean / harbor view, and +10% for location)



## Multi-Property

SOLD

Multi-Property sale on 5/24/2021 of 2 Retail properties, for $3,300,000 ($415.09/SF) - Research Complete (con't)

| | |
|---|---|
| Parcel No: | 4157-002-008, 4157-002-009, 4157-002-057 |
| Document No: | 0830993 |
| Financing: | Down payment of $1,650,000.00 (50.0%) |
| | $1,650,000.00 from First Republic Bank |

### Transaction Notes

This was an investment sale of an existing commercial site totaling 0.97 of an acre. The site was confirmed to have been sold for land value only. It was reported the buyer will be re-developing the site for a future commercial project. The exact date of ground break for the project could not be confirmed at the time of research. The properties on-site were stated to have been 100% vacant for roughly one year prior to sale. No 1031 exchanges were reported for this transaction. The site was sold 'as-is'. This was also reported to have been a probate sale, which was the motivation for the sale.

### Current Retail Information: 2404 Artesia Blvd

ID: 1474095

| | | | |
|---|---|---|---|
| Property Type: | Retail - Freestanding | GLA: | 6,500 SF |
| Center: | - | Total Avail: | 0 SF |
| Bldg Status: | Built in 1946 | % Leased: | 100.0% |
| Owner Type: | Investment Manager | Bldg Vacant: | 0 SF |
| Zoning: | RBC-2-PD | Land Area: | 0.20 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.76 |
| Rent/SF/Yr: | - | No. of Stores: | - |
| CAM: | - | | |
| Expenses: | 2021 Tax @ $2.26/sf | | |
| Parking: | 10 Surface Spaces are available | | |
| Features: | 24 Hour Access, Bus Line, Monument Signage, Pylon Sign, Security System, Signage, Signalized Intersection, Skylights | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | South Bay/Beach Cities/Palos Verdes |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

### Current Retail Information: 2400 Artesia Blvd

ID: 4169809

| | | | |
|---|---|---|---|
| Property Type: | Retail - Freestanding | GLA: | 1,450 SF |
| Center: | - | Total Avail: | 0 SF |
| Bldg Status: | Built in 1956 | % Leased: | 100.0% |
| Owner Type: | Investment Manager | Bldg Vacant: | 0 SF |
| Zoning: | RBC-2-PD | Land Area: | 0.25 AC |
| Owner Occupied: | No | Lot Dimensions: | |
| | | Building FAR: | 0.13 |
| Rent/SF/Yr: | - | No. of Stores: | - |
| CAM: | - | | |
| Expenses: | 2020 Tax @ $10.34/sf | | |
| Parking: | 31 Surface Spaces are available | | |
| Features: | 24 Hour Access, Bus Line, Corner Lot, Pylon Sign, Signage, Signalized Intersection | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |



## Property Detail Report

For Property Located At :
**2404 ARTESIA BLVD, REDONDO BEACH, CA 90278-3208**



**Owner Information**

| | |
|---|---|
| Owner Name: | **SRC ARTESIA OWNER LLC** |
| Mailing Address: | **898 N PACIFIC COAST HWY #500, EL SEGUNDO CA 90245-2738 C008 C/O TIMOTHY T RONAN JR** |
| Vesting Codes: | // |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | **REDONDO VILLA TR EX OF ST LOT 10 BLK 4** | | |
| County: | LOS ANGELES, CA | APN: | 4157-002-057 |
| Census Tract / Block: | 6206.01 / 4 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | REDONDO VILLA TR |
| Legal Book/Page: | 10-90 | Map Reference: | / |
| Legal Lot: | 10 | Tract #: | |
| Legal Block: | 4 | School District: | REDONDO BEACH |
| Market Area: | 152 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 05/24/2021 / 05/21/2021 | 1st Mtg Amount/Type: | $1,650,000 / |
| Sale Price: | $3,300,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 830994 |
| Document #: | 830993 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $550.00 |
| New Construction: | | Multi/Split Sale: | MULTIPLE |
| Title Company: | USA NAT'L TITLE CO | | |
| Lender: | FIRST REPUBLIC BK | | |
| Seller Name: | HYDE CAROLINE | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 11/30/1999 / 09/21/1999 | Prior Lender: | CHASE MANHATTAN MTG |
| Prior Sale Price: | $315,000 | Prior 1st Mtg Amt/Type: | $240,000 / CONV |
| Prior Doc Number: | 2207447 | Prior 1st Mtg Rate/Type: | 7.37 / ADJUSTABLE INT RATE LOAN |
| Prior Deed Type: | GRANT DEED | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1946 / 1948 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 6,000 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 6,000 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | NONE |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | RBC-2-PD | Acres: | 0.15 | County Use: | STORES (1100) |
| Lot Area: | 6,500 | Lot Width/Depth: | x | State Use: | |
| Land Use: | STORE BUILDING | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $1,601,400 | Assessed Year: | 2022 | Property Tax: | $18,925.95 |
| Land Value: | $785,400 | Improved %: | 51% | Tax Area: | 8060 |
| Improvement Value: | $816,000 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $1,601,400 | | | | |









**Comp 7 – Closed Sale – $1,748,863/AC; $40.15/SF / Adjusted to $2,264,684/AC; $51.99/SF**

(-5% for size, +2% for frontage, +7.5% for ocean / harbor view, and +25% for location)



## S of Outer Loop Rd - Por of Raytheon El Segundo Campus

Commercial Land of 11.44 AC (498,152 SF) (con't)

**SOLD**

### Income Expense Data

| | Expenses | | |
|---|---|---|---|
| | | - Taxes | $25,848 |
| | | - Operating Expenses | |
| | | Total Expenses | |

### Current Land Information

ID: 12250443

| | | | |
|---|---|---|---|
| Zoning: | ESCM* | Proposed Use: | Office |
| Density Allowed: | - | Land Area: | 11.44 AC (498,152 SF) |
| Number of Lots: | - | On-Site Improv: | - |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | - |
| Improvements: | - | | |

Off-Site Improv:  **Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water**

### Location Information

| | |
|---|---|
| Metro Market: | **Los Angeles** |
| Submarket: | **South Bay/El Segundo** |
| County: | **Los Angeles** |
| CBSA: | **Los Angeles-Long Beach-Glendale, CA** |
| CSA: | **Los Angeles-Long Beach, CA** |
| DMA: | **Los Angeles, CA-NV** |



## Property Detail Report

**For Property Located At :**
,, CA



**Owner Information**

| | |
|---|---|
| Owner Name: | CDC MAR EAST CAMPUS 1 LLC |
| Mailing Address: | 2041 ROSECRANS AVE #200, EL SEGUNDO CA 90245-4792 C022 C/O LEONARD E BLAKESLEY JR |
| Vesting Codes: | / / |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | TR=71551 LOT 20 | | |
| County: | LOS ANGELES, CA | APN: | 4138-032-020 |
| Census Tract / Block: | 9800.13 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 20 | Tract #: | 71551 |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | | Munic/Township: | EL SEGUNDO |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 04/07/2021 / 04/05/2021 | 1st Mtg Amount/Type: | $50,000,000 / |
| Sale Price: | $20,000,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 545520 |
| Document #: | 545515 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | CHICAGO TITLE CO-COM'L DIV | | |
| Lender: | CITY NAT'L BK | | |
| Seller Name: | RAYTHEON CO | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | ESCM* | Acres: | 0.35 | County Use: | HEAVY MANUFACTURING (3200) |
| Lot Area: | 15,183 | Lot Width/Depth: | x | State Use: | |
| Land Use: | HEAVY INDUSTRIAL | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $290,700 | Assessed Year: | 2022 | Property Tax: | $4,847.24 |
| Land Value: | $290,700 | Improved %: | | Tax Area: | 9888 |
| Improvement Value: | | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $290,700 | | | | |









**Comp 8 – Closed Sale – $14,851,485/AC; $339.87/SF / Adjusted to $12,361,892/AC; $283.79/SF** (-20% for size, +3.5% for frontage)



AVG

## 401 Rosecrans Ave - Verandas Beach House

**SOLD**

7,178 SF - Sold for Land Value, Lodge/Meeting Hall Building Built in 1971 (con't)

| | | |
|---|---|---|
| | Land Value Assessed: | $2,132,150 |
| | Land Assessed/AC: | $2,830,788 |

| | |
|---|---|
| No. of Tenants: | **1** |
| Tenants at time of sale: | **Verandas** |
| Financing: | **Down payment of $10,000,000.00 (100.0%)** |
| Legal Desc: | **Lengthy legal; refer to deed.** |
| Parcel No: | **4137-001-031** |
| Document No: | **0274141** |
| Sale History: | **Sold for $10,000,000 ($1,393.15/SF) on 3/9/2020** |
| | **Sold on 5/12/2015 Non-Arms Length** |
| | **Sold for $346,500 ($48.27/SF) on 5/6/2015** |
| | **Sold on 11/12/2013 Non-Arms Length** |

### Transaction Notes

This property sold on March 9th, 2020, along with 3770 Highland Ave. 3770 Highland sold for $5 million, while 401 Rosecrans sold for $10 million. The two properties had separate and distinct sellers who were united in offering this opportunity for sale together. The buyer was required to submit separate offers for each property, but the offers were considered as if combined. For the sale of 3770 Highland, please refer to COMP ID: 5088046. The properties together sit on a total of 1.0176 acres. The buildings were fully occupied at the time of sale, but the tenants' leases all expire in 2020 or 2021. The buyer purchased the site for land value but had no intent to develop at the time of sale. Per the buyer, he plans on investing and upgrading at a minimum. This was not part of a 1031 exchange. There were no other sale conditions reported. Sellers found that it was the right time of them to sell. The buyer was represented in-house.

### Income Expense Data

| | | | |
|---|---|---|---|
| | **Expenses** | - Taxes | $42,118 |
| | | - Operating Expenses | |
| | | Total Expenses | $42,118 |

### Current Building Information

ID: 9106616

| | | | | |
|---|---|---|---|---|
| Bldg Type: | **Lodge/Meeting Hall** | | Bldg Status: | **Built in 1971** |
| Class: | **-** | | RBA: | **7,178 SF** |
| Total Avail: | **0 SF** | | % Leased: | **100.0%** |
| Bldg Vacant: | **0 SF** | | Rent/SF/Yr: | **-** |
| Tenancy: | **-** | | Elevators: | **0** |
| Owner Type: | **Individual** | | Core Factor: | **-** |
| Owner Occupied | **-** | | Stories: | **1** |
| Zoning: | **MNCNE** | | Typical Floor Size: | **7,178 SF** |
| Land Area: | **0.75 AC** | | Building FAR: | **0.22** |
| Expenses: | **2020 Tax @ $5.87/sf** | | | |

### Location Information

| | |
|---|---|
| Metro Market: | **Los Angeles** |
| Submarket: | **South Bay/Beach Cities/Palos Verdes** |
| County: | **Los Angeles** |
| CBSA: | **Los Angeles-Long Beach-Glendale, CA** |
| CSA: | **Los Angeles-Long Beach, CA** |
| DMA: | **Los Angeles, CA-NV** |





## 3770 Highland Ave - TradeWind Village Center **SOLD**

11,822 SF - Sold for Land Value, Class C Office Building Built in 1977 (con't)

| | | | |
|---|---|---|---|
| Recorded Buyer: | **Highrose El Porto LLC** | Recorded Seller: | **Henrietta Wright Lane Living Trust** |
| | | | **Kelly A Ross** |
| | | | **Kathleen Ross Pepper** |
| | | | **Kelly A Ross Trust** |
| | | | **Kathleen Ann Ross Trust** |
| True Buyer: | **David McGovern** | True Seller: | **Henrietta Wright Lane Living Trust** |
| | **David McGovern** | | **Henrietta Lane** |
| | 338 Pier Ave | | 6001 Dry Creek Rd |
| | Hermosa Beach, CA 90254 | | Healdsburg, CA 95448 |
| | (310) 364-0100 | | (707) 431-1531 |
| | | | **Kelly A Ross** |
| | | | **Kelly Ross-Faro** |
| | | | 5458 Windward Ave |
| | | | Long Beach, CA 90814 |
| | | | (310) 977-0031 |
| | | | **Kathleen Ross Pepper** |
| | | | **Kathleen Pepper** |
| | | | 8481 Colonial Dr |
| | | | Lone Tree, CO 80124 |
| | | | (303) 725-2892 |
| | | | **Kelly A Ross Trust** |
| | | | **Kelly Ross** |
| | | | 5458 Windward Ave |
| | | | Long Beach, CA 90814 |
| | | | (310) 977-0031 |
| | | | **Kathleen Ann Ross Trust** |
| | | | **Kathleen Pepper** |
| | | | 9800 Pyramid Ct |
| | | | Englewood, CO 80112 |
| | | | (303) 725-2892 |
| Buyer Type: | **Individual** | Seller Type: | **Trust** |
| | | | **Individual** |
| Buyer Broker: | **No Buyer Broker on Deal** | Listing Broker: | **Newmark** |
| | | | **Eric Lastition** |
| | | | (310) 491-2047 |
| | | | **Geoffrey Ludwig** |
| | | | (310) 491-2077 |
| | | | **Sharene Sehr** |
| | | | (310) 491-2057 |

| **Transaction Details** | | | ID: 5088046 |
|---|---|---|---|
| Sale Date: | **03/09/2020 (172 days on market)** | Sale Type: | **Investment** |
| Escrow Length: | **-** | Bldg Type: | **Office** |
| Sale Price: | **$5,000,000-Confirmed** | Year Built/Age: | **Built in 1977 Age: 43** |
| Asking Price: | **-** | RBA: | **11,822 SF** |
| Price/SF: | **$422.94** | Land Area: | **0.26 AC (11,326 SF)** |
| Price/AC Land Gross: | **$19,230,769.23** | | |
| Percent Leased: | **100.0%** | | |
| Tenancy: | **Multi** | Percent Improved: | **34.3%** |
| Transfer Tax: | **$5,500** | Total Value Assessed: | **$2,171,263 in 2019** |
| | | Improved Value Assessed | **$743,911** |
| | | Land Value Assessed: | **$1,427,352** |
| | | Land Assessed/AC: | **$5,489,815** |

## 3770 Highland Ave - TradeWind Village Center

**SOLD**

11,822 SF  - Sold for Land Value, Class C Office Building Built in 1977 (con't)

| | |
|---|---|
| No. of Tenants: | **19** |
| Tenants at time of sale: | **Art & Motion Inc; Beauty Within Inc; C B Foothill Ranch; C B Newark Partners; CalBay Development LLC; CalBay Retail Properties; Caplinked University; CBT Treatment Center; Coastline Chiropractic; Dragon Fly Technologies LLC; Gregan, Steven J; Mark Approved Nutrition; Rexel; Schlee lp Intl; Sherry Darling Management; South Bay Massage College; Stress Free With Kay; Summers Sports Bar; Wild Rabbit Productions Inc** |
| Financing: | **Down payment of $5,000,000.00 (100.0%)** |
| Legal Desc: | **Lot1 trt40624 bk1011 pgs19thru20** |
| Parcel No: | **4137-001-027** |
| Document No: | **0274138** |
| Sale History: | **Sold for $5,000,000 ($422.94/SF) on 3/9/2020**
**Sold on 11/13/2017 Non-Arms Length**
**Sold on 9/4/2015 Non-Arms Length**
**Sold on 5/12/2015 Non-Arms Length**
**Sold for $665,000 ($168.77/SF) on 11/15/2013 Non-Arms Length** |

### Transaction Notes

This property sold on March 9th, 2020, along with 401 Rosecrans Ave.  3770 Highland sold for $5 million, while 401 Rosecrans sold for $10 million.  The two properties had separate and distinct sellers who were united in offering this opportunity for sale together.  The buyer was required to submit separate offers for each property, but the offers were considered as if combined.  For the sale of 401 Rosecrans, please refer to  COMP ID: 5102273.  The properties together sit on a total of 1.0176 acres.  The buildings were fully occupied at the time of sale, but the tenants' leases all expire in 2020 or 2021.  The buyer purchased the site for land value but had no intent to develop at the time of sale.  Per the buyer, he plans on investing and upgrading at a minimum.  This was not part of a 1031 exchange.  There were no other sale conditions reported.  Sellers found that it was the right time for them to sell.  The buyer was represented in-house.

### Income Expense Data

| Expenses | | |
|---|---|---|
| | - Taxes | **$26,486** |
| | - Operating Expenses | |
| | Total Expenses | **$26,486** |

### Current Building Information

ID: 9252794

| | | | |
|---|---|---|---|
| Bldg Type: | **Office** | Bldg Status: | **Built in 1977** |
| Class: | **C** | RBA: | **11,822 SF** |
| Total Avail: | **0 SF** | % Leased: | **100.0%** |
| Bldg Vacant: | **0 SF** | Rent/SF/Yr: | **-** |
| Tenancy: | **Multi** | Elevators: | **0** |
| Owner Type: | **Individual** | Core Factor: | **-** |
| Owner Occupied | **No** | Stories: | **2** |
| Zoning: | **MNCNE** | Typical Floor Size: | **5,911 SF** |
| Land Area: | **0.26 AC** | Building FAR: | **1.04** |
| | | | |
| Expenses: | **2020 Tax @ $2.24/sf** | | |
| Amenities: | **Hardwood Floors, Natural Light** | | |

### Location Information

| | |
|---|---|
| Metro Market: | **Los Angeles** |
| Submarket: | **South Bay/Beach Cities/Palos Verdes** |
| County: | **Los Angeles** |
| CBSA: | **Los Angeles-Long Beach-Glendale, CA** |
| CSA: | **Los Angeles-Long Beach, CA** |
| DMA: | **Los Angeles, CA-NV** |



# Property Detail Report

**For Property Located At :**
**401 ROSECRANS AVE, MANHATTAN BEACH, CA 90266-3401**



## Owner Information
| | |
|---|---|
| Owner Name: | HIGHROSE EL PORTO LLC |
| Mailing Address: | 338 PIER AVE, HERMOSA BEACH CA 90254-3617 C031 C/O DAVID MCGOVERN |
| Vesting Codes: | / / |

## Location Information
| | | | |
|---|---|---|---|
| Legal Description: | TR=3701 VAC ST AND LOT 1 AND EX OF ST LOTS 16 THRU 27 BLK 3 | | |
| County: | LOS ANGELES, CA | APN: | 4137-001-031 |
| Census Tract / Block: | 6202.01 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | 3701 |
| Legal Book/Page: | 41-36 | Map Reference: | / |
| Legal Lot: | 1 | Tract #: | 3701 |
| Legal Block: | 3 | School District: | MANHATTAN BEACH |
| Market Area: | 141 | School District Name: | MANHATTAN BEACH |
| Neighbor Code: | | Munic/Township: | MANHATTAN B |

## Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

## Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/09/2020 / 02/26/2020 | 1st Mtg Amount/Type: | / |
| Sale Price: | $10,000,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 274141 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $1,393.15 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | ROSS KELLY A | | |

## Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 05/06/2015 / 04/29/2015 | Prior Lender: | |
| Prior Sale Price: | $346,500 | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 524563 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

## Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1971 / 1990 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,178 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,178 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | YES |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

## Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | MNCNE | Acres: | 0.75 | County Use: | RESTAURANT/TAVERN (2100) |
| Lot Area: | 32,793 | Lot Width/Depth: | x | State Use: | |
| Land Use: | RESTAURANT BUILDING | Res/Comm Units: | 1 / 1 | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

## Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $10,305,671 | Assessed Year: | 2022 | Property Tax: | $121,499.11 |
| Land Value: | $9,378,161 | Improved %: | 9% | Tax Area: | 6174 |
| Improvement Value: | $927,510 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $10,305,671 | | | | |



# Property Detail Report

**For Property Located At :**
**3770 HIGHLAND AVE, MANHATTAN BEACH, CA
90266-3252**



### Owner Information
| | |
|---|---|
| Owner Name: | **HIGHROSE EL PORTO LLC** |
| Mailing Address: | 338 PIER AVE, HERMOSA BEACH CA 90254-3617 C031 C/O DAVID MCGOVERN |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **TR=40624 LOT 1** | | |
| County: | LOS ANGELES, CA | APN: | 4137-001-027 |
| Census Tract / Block: | 6202.01 / 2 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | 40624 |
| Legal Book/Page: | 1011-19 | Map Reference: | 62-A2 / |
| Legal Lot: | 1 | Tract #: | 40624 |
| Legal Block: | | School District: | MANHATTAN BEACH |
| Market Area: | 141 | School District Name: | MANHATTAN BEACH |
| Neighbor Code: | | Munic/Township: | MANHATTAN B |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/09/2020 / 02/25/2020 | 1st Mtg Amount/Type: | / |
| Sale Price: | $5,000,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 274138 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $846.17 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | LANE HENRIETTA W L/TR | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 11/15/2013 / 11/12/2013 | Prior Lender: | PRIVATE INDIVIDUAL |
| Prior Sale Price: | $665,000 | Prior 1st Mtg Amt/Type: | $10,000,000 / PRIVATE PARTY |
| Prior Doc Number: | 1628549 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1977 / 1977 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 5,909 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 5,909 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | MNCNE | Acres: | 0.26 | County Use: | OFFICE BLDG (1700) |
| Lot Area: | 11,513 | Lot Width/Depth: | x | State Use: | |
| Land Use: | OFFICE BUILDING | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $5,152,835 | Assessed Year: | 2022 | Property Tax: | $59,349.85 |
| Land Value: | $4,431,438 | Improved %: | 14% | Tax Area: | 6174 |
| Improvement Value: | $721,397 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $5,152,835 | | | | |







The appraiser notes that although these two properties sold in separate transactions, they were purchased by the same buyer on the same day. Therefore, they are considered a single sale in this appraisal. Although this is a dated sale, it is the most recent closed land sale with an ocean view.

**A|V|G**

## Comparable Sales Comparison Grid

| Land Sales Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Summary of Adjustments** | | | | | | | | |
| | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Sale 7 | Sale 8 |
| Unadjusted Price/Unit | $126.28 | $241.84 | $237.90 | $229.57 | $30.89 | $168.80 | $40.15 | $339.87 |
| Property Rights | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $126.28 | $241.84 | $237.90 | $229.57 | $30.89 | $168.80 | $40.15 | $339.87 |
| Financing Terms | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $126.28 | $241.84 | $237.90 | $229.57 | $30.89 | $168.80 | $40.15 | $339.87 |
| Conditions of Sale | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $126.28 | $241.84 | $237.90 | $229.57 | $30.89 | $168.80 | $40.15 | $339.87 |
| Market Conditions | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $126.28 | $241.84 | $237.90 | $229.57 | $30.89 | $168.80 | $40.15 | $339.87 |
| Other Adjustments | | | | | | | | |
| Physical Characteristics: | | | | | | | | |
| - Size (2,134,279 SF) | -15% | -30% | -30% | -25% | -5% | -27.5% | -5% | -20% |
| - Shape (Irregular) | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| - Frontage (5,402' LF) | 2.5% | 5% | 5% | 5% | 2% | 5% | 2% | 3.5% |
| - Topography (Mostly Level) | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| - View (Ocean, Harbor) | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 0% |
| Subtotal Physical | -5.0% | -17.5% | -17.5% | -12.5% | 4.5% | -15.0% | 4.5% | -16.5% |
| Location | 15% | 5% | 5% | 10% | 25% | 10% | 25% | 0% |
| Availability of Utilities | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Zoning (Multiple) | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Highest and Best Use | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Total Adjustments | 10.0% | -12.5% | -12.5% | -2.5% | 29.5% | -5.0% | 29.5% | -16.5% |
| Value Indication $/Unit | $138.91 | $211.61 | $208.16 | $223.83 | $40.00 | $160.36 | $51.99 | $283.79 |
| Value Conclusion - Subject | $50.50 | | | | | | | |

[1] The adjustment grid summarizes the direction and magnitude of adjustments judged appropriate to the comparable sales. In some cases, adjustments may be derived directly from quantifiable data. However, in many instances the adjustments involve judgment of the appraiser.

Source: Alexander Valuation Group

**Explanation of the Adjustments Used in the Previous Valuation Analysis Grids**

The following comments relate to the previous Sales Comparison Approach to Value adjustment grid line items. Items and adjustments not commented upon are regarded to be either obvious comments or professional judgment supported by pertinent valuation experience.

**The cash equivalent** effective sale prices of the most similar of the researched comparable building sales are reported and in this analysis are adjusted to the subject property using a percentage per unit of comparison basis. In this adjustment analysis, the price per unit is the most recognized comparison element for this property type.

**This property rights adjustment** considers that comparable sales typically involve either 100% undivided ownership interests in fee simple estate or leased fee estate property rights compared to the subject (fee simple estate/leased fee estate) with (no/nominal/significant) adjustments for this factor. The objective of this report section for the subject property is to ascertain its value in the fee simple estate.

The adjustments, if any, for this line item could be significant in either a plus or minus direction especially when comparing leased fee estate comparable sales to a fee simple estate property. In most instances, marketable leasehold estates do not result due to such disparities; but this is a consideration with leased sale transactions. Ownership interests such as fractional interests, physical segments or partial holdings are not considered as a part of this valuation assignment.

All Comparable Sales are 100% undivided fee simple ownership interests like the subject property.

**The conditions of sale** - The adjustments for conditions of sale usually relate to the extraordinary motivations of the buyer or the seller in the transfer of real property. Examples of circumstances requiring adjustments include purchase for assemblage, quick sale for cash, sales made under duress, legal auctions, eminent domain transactions, certain Real Estate Owned transactions, and sales that were not arm's length. This category is also utilized to reflect the adjustment required for listings, negotiations, offers, non-closed escrows and extraordinary seller/buyer transactions.

No adjustments warranted in this appraisal.

**The market conditions** – Real estate values normally change over time. The rate of change fluctuates due to investor's perceptions of prevailing market conditions and market supply and demand characteristics. This adjustment category reflects value changes, if any, that may occur between the setting of the sales price and the effective date of appraisal. The market in this locale was most likely stable during the period considered. Due to the decline of real estate owned and short sales in the area, it appears the market is stabilizing along with the financing market. The recent land sales, although fewer in number than developed properties, has shown the same market stabilization over the past year. The time interval in months between the comparable date for price negotiation and closing and recording of the sale on equivalent date is estimated at 6-12 months.

No adjustments warranted in this appraisal.

**These descriptive items** comparing the building sales to the subject property indicate that the comparable sales are reasonably like the subject property and can be used for comparison purposes in this Sales Comparison Approach to Value.

**The Physical characteristics** pertain to the site portion of the sale and the location, economic factors, etc. as enumerated pertain to the land contribution to the overall sale price.

Only the local comparable sales, those from the South Bay beach cites, were adjusted in this appraisal. Due to the extreme locational distances and variance of market areas, no adjustments were made to the decommissioned power plant sales. The unadjusted value indicators for these properties are considered in the selection of the subject's value indicators in the final value conclusion.

**A Size adjustment** considers the comparable sale gross land area vs. the subject property land area with adjustments applied for significant differences in size. Typically, small properties have a larger pool of buyers and sell for higher square foot prices than otherwise similar larger properties. Conversely, investment demand sometimes is greater for larger properties vs. small properties while user demand is typically greater for the smaller properties. This is called an "Economy of Scale." Extremely large or small sales vs. the subject would be difficult comparisons with less significance reflected for such sales. This adjustment would be minimized by the selection of comparable sales in the same size range as the subject property with nominal positive adjustments for larger sales and nominal negative adjustments for smaller sales using a $PSF unit of comparison.

Properties of reasonably similar site sizes were basic criteria in the search for comparable sales but this was unattainable in this instance. Land sales are limited and the sales included are the most similar to the subject presently available and demonstrate the market range. A percentage of $PSF of their sale price was utilized for this adjustment and was based on the overall size difference between the subject and the comparable sale.

Downward adjustments were made for all of the comparable sales for having a smaller lot size.

**A frontage adjustment** considers the visibility of a property. Those with corner lots and multiple street accesses along arterial or large streets are considered as premium due to the added visibility of multiple vantage points along with greater traffic count. All comparable sales adjusted for frontage as the subject has a long frontage, almost one mile, on three streets. A percentage of $PSF of the sale price was utilized for this adjustment and was based on the overall contributory value of the frontage difference between the subject and the comparable sale.

In this case, the subject property is located on a signalized corner parcel along an ocean front thoroughfare, with approximately 2,220 feet of frontage on N Harbor Drive and, 1,240 feet of frontage on Herondo Ave, and 820 feet of frontage on Francisca Ave, for a total of 4,280 feet.

Upward adjustments were made for all of the comparable sales for having for having inferior frontage.

**A location adjustment** considers the perceived rating for the comparable sale location as compared to the subject property as a valuation opinion based on market experience. Factors for consideration of location ratings include distance from freeways, arterial or large street location, and overall neighborhood condition, or a combination of the factors. Ratings used for comparison purposes are selected from a range of poor, fair, average, good and excellent.

In this case, the subject located a signalized corner parcel along an ocean front thoroughfare, N Harbor Drive, located in the heart of the King Harbor commercial district of Redondo Beach. Also, it is rare that a parcel in the subject's location near the beach and harbor comes available. Although several of the comparable sales are located on larger arterial streets than the subject, the loss of vehicular traffic is compensated by the increase of foot, bicycle, beach, and harbor traffic. A premium would likely be paid for the subject parcel.

Upward adjustments were made for all sales except sale 8, which is located one block from the beach. No other beach and harbor front land properties have recently been sold.

**A view adjustment** considers above average vantages that include natural sites such as mountains, forests, lakes, the ocean, coastlines, and panoramas. Manmade sites such as city lights, harbors, bridges, and skyline views are also considered. The subject property has ocean and harbor views.

Upward adjustments were made for all sales except sale 8, which has an ocean view. No other beach and harbor view land properties have recently been sold.

**An availability of utilities** adjustment considers the distance to and requirements and cost of installing utilities to a site in the future process of building in the future. The surrounding area of the subject is suburban with utilities readily available. A percentage of $PSF of the sale price was utilized for this adjustment and was based on the overall contributory value of the availability of utilities difference between the subject and the comparable sale.

No adjustments made in this valuation

**A zoning adjustment** considers the available uses of a property. The subject property is currently zoned P-GP, which allows for generating plant uses. However, based on the zoning and land use information above, the City of Redondo Beach has not made a specific zoning or land use for the subject property once it is decommissioned. The best information points to the subject having the possibility of utilizing the adjacent and surrounding properties or zoning which include commercial, multi-family, and mixed use (commercial & residential). For these reasons, all of the comparable sales considered to have a zoning or land use available to the subject upon decommission.

No adjustments made in this valuation

## Conclusion of the Sales Comparison Approach

The sales comparison approach examines the price or price per unit area of similar properties being sold in the marketplace. Simply put, the sales of properties similar to the subject are analyzed to determine the value of the subject. This approach is generally considered the most reliable if adequate comparable sales exist. In any event, it is the only independent check on the reasonability of an appraisal opinion.

The sales used were the most recent and most similar zoned properties that were sold in the immediate area. Sales from the immediate neighborhood are the most reliable indicator of market value. All were verified for accuracy and closing. Based on the limited research, which includes data found in public records and other resources, we were able to draw a potential fair market value for the property. However, the subject property is a power plant set to be decommissioned, of which only three similar use properties sold within the state in the last five years. All were over 50 miles from the subject. As such, local sales from the immediate surrounding market were also used to determine the fair market value of the subject property.

The subject is reported to be four parcels with a total size of 2,173,644 SF (49.90 AC). It was preferred to seek out sales comps from the nearby and competing areas. These comps were used to derive a fair market $/AC and $/SF.

### Comparable Sales Data

Power Plant Land:

Unadjusted Range of $/AC – $118,391 - $147,458 - $983,237

Unadjusted $/AC Mean Average – $416,362/AC

Unadjusted $/AC Median Value – $147,458/AC

Unadjusted Range of $/SF – $2.72 - $3.39 - $22.57

Unadjusted $/SF Mean Average – $9.56/SF

Unadjusted $/SF Median Value – $3.39/SF

Of the three comparable power plant sales, the most similar in location is sale 1, 183 N Harbor Blvd, which is on the coast in Oxnard. However, the Costar notes say the clean-up is expected to be $10,000,000 to $12,000,000, which is higher than the sales price, which suggests a discount was involved. Additionally, the political landscape wanted to get rid of blighted properties and have less industrial use, so it was sold below market. Also, the future development is not known so little to no weight was given to this sale. Sale 2 is located in Pittsburg, nearly 350 miles from the subject. Due to the locational distance, little weight is given to this sale, Sale 3, Etiwanda Ave; wash purchased with plans in place for redevelopment, as was the subject property. Additionally, it is supported by a strong market and international airport. For these reasons, sale 3 is considered the most similar to the subject and given the most weight of the power plant sales.



South Bay Land:

Unadjusted Range of $/AC – $1,345,425 - $1,748,863 - $5,500,757 - $7,333,333 - $10,000,000 – $10,362,976 - $10,534,632 - $14,851,485

Adjusted Range of $/AC – 1,742,400 - $2,264,684 - $6,050,920 - $6,985,282 - $9,067,450 - $9,217,732 - $9,750,035 - $12,361,892

Adjusted $/AC Mean Average – $7,180,049/AC

Adjusted $/AC Median Value – $8,026,366/AC

Unadjusted Range of $/SF – $30.89 - $40.15 - $126.28 - $168.80 - $229.57 - $237.90 - $241.84 - $339.87

Adjusted Range of $/SF – $40.00 - $51.99 - $138.91 - $160.36 - $208.16 - $211.61 - $223.83 - $283.79/SF

Adjusted $/SF Mean Average – $164.83/SF

Adjusted $/SF Median Value – $184.26/SF

The appraiser notes that the subject property is significantly larger than all of the land sales from the South Bay. However, the sales used in this appraisal are the best available and, as only the subject's land is being valued; sales from the local market are considered the most indicative of the subject property's true market value. In review of the South Bay land sales, the two largest parcels have the lowest $/SF and $/Acre value indicators. This is indicative of the "Economy of Scale" discussed above. Due to the size of the subject parcel, the most weight is given to the adjusted values of sale 5, $40.00/SF, and Sale 7, $51.99/SF, as they have the two largest sized land parcels of the comparable sales. As noted above about the power plant sales, the most weight was given to sale 3, Etiwanda Ave, with a value indicator of $22.57/SF. However, this property is located in San Bernardino County which is considered an inferior economic market to Los Angeles County, especially along the coast. For these reasons, the subject property's fair market value indicators are placed above that of power plant sale 3 and between that of South Bay land sales 5 and 7 at $50.50/SF and $2,205,000/Acre

The appraiser notes that there will be a substantial cost for demolition and remediation of the subject site to make it buildable. However, these costs are considered to be offset by the salvage value of the components and additional tax savings provided through the City of Redondo Beach Enhanced Infrastructure Financing District (EIFD) upon development of the site. For these reasons, no deduction is made for demolition and remediation in this appraisal.

The concluded Fair Market Rate $/AC is $2,205,000/AC x 49.90 AC = $110,029,500

Rounded to $110,030,000

The concluded Fair Market Rate $/SF is $50.50/SF x 2,173,644 SF = $109,769,022

Rounded to $109,770,000

The Estimated "As Is" Site Value is $110,000,000

**"As Is" Sales Comparison Approach Value Conclusion   $110,000,000**

SALES COMPARISON APPROACH

Part 2

"As Entitled" Market Value



## Subject Property Development Plans















**Entitled Comparable Land Sales Location Map**



**Comp 1 – Closed Sale – $9,314,999/AC; $213.84/SF / Adjusted to $8,849,214/AC; $203.15/SF**

(-20% for size, +2.5% for frontage, +7.5% for ocean / harbor view, and +5% for location)



**AVG**

## 200-290 E 4th St - Bldg. B - Mosaic — SOLD

46,572 SF - Sold for Land Value, Retail (Power Center) Building Built in 2003 (con't)

| | | | |
|---|---|---|---|
| Price/SF: | $315.64 | Land Area: | 1.58 AC (68,742 SF) |
| Price/AC Land Gross: | $9,314,999.05 | | |
| | | | |
| Percent Leased: | 100.0% | | |
| Tenancy: | Multi | Percent Improved: | 68.7% |
| | | Total Value Assessed: | $15,006,827 in 2023 |
| | | Improved Value Assessed | $10,303,043 |
| | | Land Value Assessed: | $4,703,784 |
| | | Land Assessed/AC: | $2,980,662 |
| | | | |
| No. of Tenants: | 3 | | |
| Tenants at time of sale: | Fashion Island; GameStop; T-Mobile | | |
| | | | |
| Parcel No: | 7280-005-025 | | |
| Document No: | 0288622 | | |
| Sale History: | Sold for $14,700,000 ($315.64/SF) on 5/1/2024 | | |
| | Portfolio sale of 9 properties sold on 3/15/2021 Non-Arms Length | | |
| | Portfolio sale of 9 properties sold on 8/12/2015 Non-Arms Length | | |
| | Portfolio sale of 9 properties sold on 8/12/2015 Non-Arms Length | | |

### Transaction Notes

A group of three investors sold the 46,572 square foot property in Long Beach, CA to JPI for $14.7 MM or about $315 per square foot. The property was sold for land value as the buyer is looking to develop the property in multifamily and ground floor commercial space. The property is entitled for 272 units, 16 affordable and ground floor commercial space. There was no information on the when the development was supposed to start.

The information on the sale comparable was confirmed by the brokers involved.

### Current Retail Information — ID: 6912393

| | | | |
|---|---|---|---|
| Property Type: | Retail - (Power Center) | GLA: | 46,572 SF |
| Center: | Mosaic | Total Avail: | 0 SF |
| Bldg Status: | Built in 2003 | % Leased: | 100.0% |
| Owner Type: | Developer - National | Bldg Vacant: | 0 SF |
| Zoning: | PD30 | Land Area: | 1.58 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.68 |
| | | | |
| Rent/SF/Yr: | - | No. of Stores: | 6 |
| CAM: | - | | |
| | | | |
| Street Frontage: | 369 feet on 4th St | | |
| | 326 feet on 5th St | | |
| | 348 feet on The Promenade Rd | | |
| | 348 feet on Long Beach Blvd | | |
| Expenses: | 2020 Tax @ $5.35/sf; 2011 Ops @ $3.84/sf, 2012 Est Ops @ $5.04/sf | | |
| Parking: | 100 Covered Spaces are available | | |

### Location Information

| | |
|---|---|
| Second Address: | 205-295 E 4th St |
| Park Name: | Mosaic |
| Metro Market: | Los Angeles |
| Submarket: | South Bay/Long Beach: Downtown |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



# JPI acquires portion of Mosaic site in Downtown Long Beach, plans 272 apartments

The mall was approved for redevelopment with up to 900 homes

MAY 09, 2024, 9:30AM    STEVEN SHARP

One year removed from obtaining approvals to redevelop the site with **housing and commercial uses**, the owners of the Mosaic shopping mall in Downtown **Long Beach** are offloading a portion the property to developer **JPI**.

JPI, which is headquartered in Dallas, Texas, is buying a 1.58-acre section of the property bounded by Long Beach Boulevard, 4th Street, The Promenade North, and 5th Street, where it intends to move forward with the entitled plan for 272 rental apartments. The project, to be branded as Jefferson Long Beach, will include 16 affordable units and 19,000 square feet of ground-floor commercial space.





## Property Detail Report

**For Property Located At :**
450 THE PROME N, LONG BEACH, CA 90802-2482



### Owner Information
| | |
|---|---|
| Owner Name: | JEFFERSON LONG BEACH LLC |
| Mailing Address: | 9001 CYPRESS WATERS BLVD # 2A, DALLAS TX 75019-4786 R009 C/O JPI COMPANIES |
| Vesting Codes: | // CO |

### Location Information
| | | | | | |
|---|---|---|---|---|---|
| Legal Description: | TR=53306 LOT 13 | | | | |
| County: | LOS ANGELES, CA | | APN: | | 7280-005-025 |
| Census Tract / Block: | 5762.00 / 5 | | Alternate APN: | | |
| Township-Range-Sect: | | | Subdivision: | | 53306 |
| Legal Book/Page: | 126-- 31 | | Map Reference: | | / |
| Legal Lot: | 13 | | Tract #: | | 53306 |
| Legal Block: | | | School District: | | LONG BEACH |
| Market Area: | 4 | | School District Name: | | LONG BEACH |
| Neighbor Code: | | | Munic/Township: | | LONG BEACH |

### Owner Transfer Information
| | | | | |
|---|---|---|---|---|
| Recording/Sale Date: | / | | Deed Type: | |
| Sale Price: | | | 1st Mtg Document #: | |
| Document #: | | | | |

### Last Market Sale Information
| | | | | |
|---|---|---|---|---|
| Recording/Sale Date: | 05/02/2024 / 05/01/2024 | | 1st Mtg Amount/Type: | / |
| Sale Price: | $14,700,000 | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | | 1st Mtg Document #: | 288623 |
| Document #: | 288622 | | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | | Price Per SqFt: | $244.26 |
| New Construction: | | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | | |
| Lender: | CITIZENS NAT'L BK/TX | | | |
| Seller Name: | LONG BEACH CENTER LOAN LLC | | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 08/03/2005 / 07/21/2005 | Prior Lender: | WACHOVIA BK NA |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | $51,000,000 / CONV |
| Prior Doc Number: | 1847749 | Prior 1st Mtg Rate/Type: | / FIXED RATE LOAN |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 2003 / 2003 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 60,181 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 60,181 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | LBPD30 | Acres: | 1.58 | County Use: | SHOPPING CENTER-LOCAL (1500) |
| Lot Area: | 68,755 | Lot Width/Depth: | x | State Use: | |
| Land Use: | SHOPPING CENTER | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $15,006,827 | Assessed Year: | 2023 | Property Tax: | $249,933.25 |
| Land Value: | $4,703,784 | Improved %: | 69% | Tax Area: | 5542 |
| Improvement Value: | $10,303,043 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $15,006,827 | | | | |









**Comp 2 – Closed Sale – $6,535,714/AC; $150.04/SF / Adjusted to $7,908,318/AC; $181.55/SF**

(-10% for residential only entitlements (conditions of sale), -15% for size, +2.5% for frontage, +7.5% for ocean / harbor view, and +15% for location)



### 3848 W Carson St                                    SOLD
**Torrance, CA 90503**
Sale on 5/2/2023 for $18,300,000 ($6,535,714.29/AC) - Research Complete
Commercial Land of 2.80 AC (121,968 SF) - Sold for Land Value

#### Buyer & Seller Contact Info

| | | | |
|---|---|---|---|
| Recorded Buyer: | **Rar2-del Amo Crossing Owner LLC** | Recorded Seller: | **Del Amo 5 LLC** |
| True Buyer: | **Legacy Partners** | True Seller: | **PCCP** |
| | 950 Tower Ln | | **Aaron Giovara** |
| | Foster City, CA 94404 | | 100 Pine St |
| | (650) 571-2250 | | San Francisco, CA 94111 |
| | | | (415) 732-7645 |
| Buyer Type: | **Developer - National** | Seller Type: | **Investment Manager** |

#### Transaction Details                                    ID: 6388812

| | | | |
|---|---|---|---|
| Sale Date: | **05/02/2023** | Sale Type: | **Investment** |
| Escrow Length: | - | Land Area: | **2.80 AC (121,968 SF)** |
| Sale Price: | **$18,300,000-Confirmed** | Proposed Use: | - |
| Price/AC Land Gross: | **$6,535,714.29 ($150.04/SF)** | | |
| Zoning: | **TOHC-CTR** | Percent Improved: | **1.8%** |
| | | Total Value Assessed: | **$3,052,567 in 2022** |
| | | Improved Value Assessed: | **$53,566** |
| | | Land Value Assessed: | **$2,999,001** |
| | | Land Assessed/AC: | **$1,071,071** |
| Topography: | **Level** | | |
| On-Site Improv: | **Asphalt paved lot** | | |
| Parcel No: | **7525-023-034, 7525-023-035** | | |
| Document No: | **0283718** | | |

#### Transaction Notes

On May 2nd, 2023, PCCP sold the 2.8 acres to Legacy Partners for $18.3 Million.

The buyers are planning to develop a multi-family building known as the Del Amo Village. Please see PID 10623310.

The information provided for the sale comparable report was verified by sources deemed reliable.



## 3848 W Carson St                                                                    SOLD
Commercial Land of 2.80 AC (121,968 SF) - Sold for Land Value (con't)

| Current Land Information | | ID: 14966729 |
|---|---|---|

| | | | |
|---|---|---|---|
| Zoning: | TOHC-CTR | Proposed Use: | - |
| Density Allowed: | - | Land Area: | 2.80 AC (121,968 SF) |
| Number of Lots: | 1 | On-Site Improv: | Asphalt paved lot |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Developer - National |
| Improvements: | - | | |
| Topography: | Level | | |

| Location Information | |
|---|---|

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | South Bay/Torrance |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



# NEWMARK ARRANGES SALE OF TORRANCE DEVELOPMENT SITE

May 21, 2023 by Paul Bubny for Connect CRE



Newmark completed the $18.3-million sale of Del Amo Village, a multifamily development site located in Torrance, within Los Angeles County's South Bay submarket. Situated on 2.8 acres, Del Amo Village's development plan includes entitlements for 200 market-rate units.

Co-head, U.S. capital markets Kevin Shannon, executive managing director Ken White, senior managing directors Chris Benton and Michael Moore and managing director Anthony Muhlstein represented the sellers, PCCP, LaCaze, Muller Company and Bentall GreenOak. The buyer was Legacy Partners.

"Del Amo Village presented investors with an extraordinary opportunity to execute a new development strategy in one of the South Bay's most supply-constrained submarkets," said Benton. "There has not been multifamily development of this scale and quality in the South Bay in the past 30 years, and with current demand for housing in Southern California, Del Amo Village received high investor interest."



## Property Detail Report

**For Property Located At :**
,, CA



### Owner Information

| | |
|---|---|
| Owner Name: | **RAR2-DEL AMO CROSSING OWNER LL** |
| Mailing Address: | **222 S RIVERSIDE PLZ, CHICAGO IL 60606 C016** |
| Vesting Codes: | // CO |

### Location Information

| | | | |
|---|---|---|---|
| Legal Description: | **P M 399-45-49 LOT 2** | | |
| County: | LOS ANGELES, CA | APN: | 7525-023-034 |
| Census Tract / Block: | / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 2 | Tract #: | |
| Legal Block: | | School District: | TORRANCE |
| Market Area: | | School District Name: | TORRANCE |
| Neighbor Code: | | Munic/Township: | TORRANCE |

### Owner Transfer Information

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 05/02/2023 / 04/28/2023 | 1st Mtg Amount/Type: | / |
| Sale Price: | $11,300,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 283718 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | DEL AMO 5 LLC | | |

### Prior Sale Information

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | TOHC-CTR | Acres: | 1.69 | County Use: | PARKING LOT (2700) |
| Lot Area: | 73,769 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $2,309,468 | Assessed Year: | 2023 | Property Tax: | $27,564.86 |
| Land Value: | $2,268,768 | Improved %: | 2% | Tax Area: | 9340 |
| Improvement Value: | $40,700 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $2,309,468 | | | | |



# Property Detail Report

**For Property Located At :**
**,, CA**



## Owner Information
| | |
|---|---|
| Owner Name: | **RAR2-DEL AMO CROSSING OWNER LL** |
| Mailing Address: | **222 S RIVERSIDE PLZ # F, CHICAGO IL 60606 C016** |
| Vesting Codes: | / / CO |

## Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **P M 399-45-49 LOT 3** | | |
| County: | LOS ANGELES, CA | APN: | 7525-023-035 |
| Census Tract / Block: | / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 3 | Tract #: | |
| Legal Block: | | School District: | TORRANCE |
| Market Area: | | School District Name: | TORRANCE |
| Neighbor Code: | | Munic/Township: | TORRANCE |

## Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

## Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 05/02/2023 / 04/28/2023 | 1st Mtg Amount/Type: | / |
| Sale Price: | $7,000,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 283719 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | HAWTHORNE PARCEL 3 OWNER LLC | | |

## Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

## Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

## Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | TOHC-CTR | Acres: | 1.14 | County Use: | PARKING LOT (2700) |
| Lot Area: | 49,536 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

## Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $804,149 | Assessed Year: | 2023 | Property Tax: | $10,535.12 |
| Land Value: | $790,212 | Improved %: | 2% | Tax Area: | 9340 |
| Improvement Value: | $13,937 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $804,149 | | | | |









**Comp 3 – Closed Sale – $30,416,667/AC; $698.27/SF / Adjusted to $25,854,167/AC; $593.53/SF**

(-15% for size, +2.5% for frontage, +7.5% for ocean / harbor view, and -10% for location)



**AVG**

| **710 Broadway - Vons** | **SOLD** |
|---|---|

35,768 SF - Sold for Land Value, Retail Supermarket Building Built in 1995 (con't)

| | |
|---|---|
| Parcel No: | 4291-022-003, 4291-022-004, 4291-022-005, 4291-022-006, 4291-022-025, 4291-022-026 |
| Document No: | 0044744 |
| Sale History: | Sold for $73,000,000 ($2,040.93/SF) on 1/23/2023 |
| | Sold on 1/23/2023 Non-Arms Length |

### Transaction Notes

On January 23rd, 2023, Albertsons Companies, Inc. sold the property for $73 Million.

The subject property is a 35,768 SF retail building located at 710 Broadway, Santa Monica, CA, known as Vons.

Community Corporation of Santa Monica and Related California acquired the property. The buyer's secured a construction loan of $385 Million from Bank of America.

According to a third-party news source, the buyer is planning to develop a 280 unit multifamily with 53,500 SF grocery store on the ground floor and an additional 34,000 sf of retail. See PID 13922891 to track the construction.

The information provided for this sale comparable report was obtained via public record. The parties involved were not able to be reached for confirmation.

| **Current Retail Information** | | ID: 5802545 |
|---|---|---|

| | | | |
|---|---|---|---|
| Property Type: | Retail - Supermarket | GLA: | 35,768 SF |
| Center: | Vons | Total Avail: | 0 SF |
| Bldg Status: | Built in 1995 | % Leased: | 100.0% |
| Owner Type: | Non Profit | Bldg Vacant: | 0 SF |
| Zoning: | SMC3YY | Land Area: | 2.40 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.34 |
| Rent/SF/Yr: | - | No. of Stores: | - |
| CAM: | - | | |
| Street Frontage: | 633 feet on broadway St | | |
| | 619 feet on lincoln Blvd | | |
| Expenses: | 2020 Tax @ $9.92/sf | | |
| Parking: | 90 free Surface Spaces are available | | |
| Features: | Dedicated Turn Lane, Pylon Sign, Signalized Intersection | | |

### Location Information

| | |
|---|---|
| Second Address: | 1507 7th St |
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



# 710 Broadway

## Related California

Development of a new 84' mixed-use residential building in Downtown Santa Monica with a new Vons market (more than 50,000 sf) at the key intersection of Lincoln and Broadway and additional ground floor retail and fitness uses. The project, designed by LARGE architecture, includes 280 new residences, including 84 affordable units provided in partnership with local non-profit affordable housing provider Community Corporation of Santa Monica.

Entitlements secured include: Development Review Permit, Conditional Use Permits for General Market size and alcohol sales/on-site tastings, Conditional Use Permit for a large fitness center, Zoning Ordinance Minor Modification (to allow enough ground floor height for the market), Subdivision Map (vesting airspace and including an alley vacation and dedication of new/realigned alley), CEQA Exemption and Architectural Review Board approval.

Hearing bodies: Santa Monica Planning Commission, Santa Monica City Council, Santa Monica Architectural Review Board



LARGE architecture

AlexanderValuationGroup.com    admin@alexandervg.com    310.545.8700

154



# Related California announces $385m construction financing for downtown Santa Monica mixed-use project

California/Mar 06, 2023

*Located at 710 Broadway, the development will be a gateway to downtown Santa Monica offering 280 mixed-income residences; a 55,000-square-foot Vons supermarket operated by the Albertsons Companies, Inc.; and 35,000 square feet of retail.*
Related California, the West Coast affiliate of the nation's most prominent privately-owned real estate firm, today announced $385m in construction financing for 710 Broadway, a mixed-use development that will be a gateway to downtown Santa Monica. Located at the intersection of Lincoln Boulevard and Broadway, the development is designed by LARGE Architecture with interiors by the AD100 Designer Marmol Radziner and landscaping by the acclaimed Studio-MLA. The investment is a testament to Related California's experience delivering complex developments across the West Coast.

710 Broadway will offer 280 rental apartments for a range of income levels including below market rate and affordable units in partnership with the Community Corporation of Santa Monica—a Santa Monica-based nonprofit organization that restores, builds and manages affordable housing for people of modest means. Once complete, the development will also feature a 30,000-square-foot private park, 35,000 square feet of community-serving retail and a 55,000-square-foot state-of-the-art Vons supermarket operated by the Albertsons Companies, Inc., one of the largest food and drug retailers in the U.S. Groundbreaking is anticipated for March 2023 with completion Q4 2025.

Bank of America, one of the world's leading financial institutions, is providing construction financing.



## Property Detail Report

**For Property Located At :**
**710 BROADWAY, SANTA MONICA, CA 90401-2608**



### Owner Information
| | |
|---|---|
| Owner Name: | **710 BROADWAY LLC** |
| Mailing Address: | 333 S GRAND AVE #4450, LOS ANGELES CA 90071-1595 C046 C/O RELATED CALIFORNIA |
| Vesting Codes: | / / CO |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | LOS ANGELES, CA | APN: | |
| Census Tract / Block: | 7019.02 / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | | Munic/Township: | |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/23/2023 / 12/28/2022 | 1st Mtg Amount/Type: | / |
| Sale Price: | $73,000,000 A | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 44744 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | Z |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | VONS COMPANIES INC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Gross Area: | | Parking Type: | | Construction: | |
| Living Area: | | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | | Exterior wall: | |
| Above Grade: | | Parking Spaces: | | Porch Type: | |
| Total Rooms: | | Basement Area: | | Patio Type: | |
| Bedrooms: | | Finish Bsmnt Area: | | Pool: | |
| Bath(F/H): | / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | / | Roof Type: | | Style: | |
| Fireplace: | / | Foundation: | | Quality: | |
| # of Stories: | | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | | County Use: | |
| Lot Area: | | Lot Width/Depth: | x | State Use: | |
| Land Use: | | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | |
|---|---|---|---|---|
| Total Value: | | Assessed Year: | | Property Tax: |
| Land Value: | | Improved %: | | Tax Area: |
| Improvement Value: | | Tax Year: | | Tax Exemption: |
| Total Taxable Value: | | | | |



## Property Detail Report

**For Property Located At :**
**1518 LINCOLN BLVD, SANTA MONICA, CA 90401**



**Owner Information**

| | |
|---|---|
| Owner Name: | 710 BROADWAY LLC |
| Mailing Address: | 333 S GRAND AVE #4450, LOS ANGELES CA 90071-1595 C046 C/O RELATED CALIFORNIA |
| Vesting Codes: | / / CO |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | LOS ANGELES, CA | APN: | |
| Census Tract / Block: | 7019.02 / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | | Munic/Township: | |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/23/2023 / 12/28/2022 | 1st Mtg Amount/Type: | / |
| Sale Price: | $73,000,000 A | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 44744 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | Z |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | VONS COMPANIES INC | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Gross Area: | | Parking Type: | | Construction: | |
| Living Area: | | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | | Exterior wall: | |
| Above Grade: | | Parking Spaces: | | Porch Type: | |
| Total Rooms: | | Basement Area: | | Patio Type: | |
| Bedrooms: | | Finish Bsmnt Area: | | Pool: | |
| Bath(F/H): | / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | / | Roof Type: | | Style: | |
| Fireplace: | / | Foundation: | | Quality: | |
| # of Stories: | | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | | County Use: | |
| Lot Area: | | Lot Width/Depth: | x | State Use: | |
| Land Use: | | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | | Assessed Year: | | Property Tax: | |
| Land Value: | | Improved %: | | Tax Area: | |
| Improvement Value: | | Tax Year: | | Tax Exemption: | |
| Total Taxable Value: | | | | | |



## Property Detail Report

**For Property Located At :**
**1526 LINCOLN BLVD, SANTA MONICA, CA 90401**



### Owner Information
| | |
|---|---|
| Owner Name: | 710 BROADWAY LLC |
| Mailing Address: | 333 S GRAND AVE #4450, LOS ANGELES CA 90071-1595 C046 C/O RELATED CALIFORNIA |
| Vesting Codes: | / / CO |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | LOS ANGELES, CA | APN: | |
| Census Tract / Block: | 7019.02 / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | | Munic/Township: | |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/23/2023 / 12/28/2022 | 1st Mtg Amount/Type: | / |
| Sale Price: | $73,000,000 A | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 44744 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | Z |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | VONS COMPANIES INC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Gross Area: | | Parking Type: | | Construction: | |
| Living Area: | | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | | Exterior wall: | |
| Above Grade: | | Parking Spaces: | | Porch Type: | |
| Total Rooms: | | Basement Area: | | Patio Type: | |
| Bedrooms: | | Finish Bsmnt Area: | | Pool: | |
| Bath(F/H): | / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | / | Roof Type: | | Style: | |
| Fireplace: | / | Foundation: | | Quality: | |
| # of Stories: | | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | | County Use: | |
| Lot Area: | | Lot Width/Depth: | x | State Use: | |
| Land Use: | | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | | Assessed Year: | | Property Tax: | |
| Land Value: | | Improved %: | | Tax Area: | |
| Improvement Value: | | Tax Year: | | Tax Exemption: | |
| Total Taxable Value: | | | | | |



## Property Detail Report

**For Property Located At :**
**1534 LINCOLN BLVD, SANTA MONICA, CA 90401-2735**



### Owner Information
| | |
|---|---|
| Owner Name: | 710 BROADWAY LLC |
| Mailing Address: | 333 S GRAND AVE #4450, LOS ANGELES CA 90071-1595 C046 C/O RELATED CALIFORNIA |
| Vesting Codes: | / / CO |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | | | |
| County: | LOS ANGELES, CA | APN: | |
| Census Tract / Block: | 7019.02 / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | | Munic/Township: | |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/23/2023 / 12/28/2022 | 1st Mtg Amount/Type: | / |
| Sale Price: | $73,000,000 A | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 44744 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | Z |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | | |
| Lender: | | | |
| Seller Name: | VONS COMPANIES INC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Gross Area: | | Parking Type: | | Construction: | |
| Living Area: | | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | | Exterior wall: | |
| Above Grade: | | Parking Spaces: | | Porch Type: | |
| Total Rooms: | | Basement Area: | | Patio Type: | |
| Bedrooms: | | Finish Bsmnt Area: | | Pool: | |
| Bath(F/H): | / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | / | Roof Type: | | Style: | |
| Fireplace: | / | Foundation: | | Quality: | |
| # of Stories: | | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | | County Use: | |
| Lot Area: | | Lot Width/Depth: | x | State Use: | |
| Land Use: | | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | | Assessed Year: | | Property Tax: | |
| Land Value: | | Improved %: | | Tax Area: | |
| Improvement Value: | | Tax Year: | | Tax Exemption: | |
| Total Taxable Value: | | | | | |



## Property Detail Report

**For Property Located At :**
**1500 LINCOLN BLVD, SANTA MONICA, CA 90401**



| Owner Information | | |
|---|---|---|
| Owner Name: | 710 BROADWAY LLC | |
| Mailing Address: | 333 S GRAND AVE #4450, LOS ANGELES CA 90071-1595 C046 C/O RELATED CALIFORNIA | |
| Vesting Codes: | / / CO | |

| Location Information | | |
|---|---|---|
| Legal Description: | | |
| County: | LOS ANGELES, CA | APN: |
| Census Tract / Block: | 7019.02 / | Alternate APN: |
| Township-Range-Sect: | | Subdivision: |
| Legal Book/Page: | | Map Reference: / |
| Legal Lot: | | Tract #: |
| Legal Block: | | School District: |
| Market Area: | | School District Name: |
| Neighbor Code: | | Munic/Township: |

| Owner Transfer Information | | |
|---|---|---|
| Recording/Sale Date: | / | Deed Type: |
| Sale Price: | | 1st Mtg Document #: |
| Document #: | | |

| Last Market Sale Information | | |
|---|---|---|
| Recording/Sale Date: | 01/23/2023 / 12/28/2022 | 1st Mtg Amount/Type: / |
| Sale Price: | $73,000,000 A | 1st Mtg Int. Rate/Type: / |
| Sale Type: | FULL | 1st Mtg Document #: |
| Document #: | 44744 | 2nd Mtg Amount/Type: / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: / |
| Transfer Document #: | | Price Per SqFt: |
| New Construction: | | Multi/Split Sale: Z |
| Title Company: | FIRST AMERICAN TITLE INS CO NA | |
| Lender: | | |
| Seller Name: | VONS COMPANIES INC | |

| Prior Sale Information | | |
|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: / |
| Prior Deed Type: | | |

| Property Characteristics | | | | | |
|---|---|---|---|---|---|
| Gross Area: | | Parking Type: | | Construction: | |
| Living Area: | | Garage Area: | | Heat Type: | |
| Tot Adj Area: | | Garage Capacity: | | Exterior wall: | |
| Above Grade: | | Parking Spaces: | | Porch Type: | |
| Total Rooms: | | Basement Area: | | Patio Type: | |
| Bedrooms: | | Finish Bsmnt Area: | | Pool: | |
| Bath(F/H): | / | Basement Type: | | Air Cond: | |
| Year Built / Eff: | / | Roof Type: | | Style: | |
| Fireplace: | / | Foundation: | | Quality: | |
| # of Stories: | | Roof Material: | | Condition: | |
| Other Improvements: | | | | | |

| Site Information | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | | County Use: | |
| Lot Area: | | Lot Width/Depth: | x | State Use: | |
| Land Use: | | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

| Tax Information | | | | | |
|---|---|---|---|---|---|
| Total Value: | | Assessed Year: | | Property Tax: | |
| Land Value: | | Improved %: | | Tax Area: | |
| Improvement Value: | | Tax Year: | | Tax Exemption: | |
| Total Taxable Value: | | | | | |







**Comp 4 – Closed Sale – $7,600,000/AC; $174.47/SF / Adjusted to $9,279,587/AC; $213.03/SF**

(-10% for residential only entitlements (conditions of sale), -15% for size, +3.5% for frontage, +7.5% for ocean / harbor view, and +15% for location)



# AVG

| **2829 190th St** | **SOLD** |
|---|---|
| Residential Land of 2.25 AC (98,010 SF) (con't) | |

## Transaction Notes

The 2.25-acre site sold for $17,100,000 or about $7,600,000 per acre.

The former buildings onsite had been demolished by the seller, and the soil remediated. All utilities to site. The R-3 zoned low density multifamily residential parcels sold with entitlements obtained by the seller (TTM and site plan). The buyer is to build 36 three story townhomes.

The seller will be exchanging into a new property and had not yet closed on their upleg at time of this report.

## Current Land Information                                          ID: 12720195

| | | | |
|---|---|---|---|
| Zoning: | **R-3, Low Densty MF Res** | Proposed Use: | **Single Family Development** |
| Density Allowed: | **-** | Land Area: | **2.25 AC (98,010 SF)** |
| Number of Lots: | **-** | On-Site Improv: | **Previously developed lot** |
| Max # of Units: | **-** | Lot Dimensions: | **-** |
| Units per Acre: | **-** | Owner Type: | **Developer/Owner-NTL** |
| Improvements: | **Rough Graded, Entitlements for 36 Townhomes** | | |
| Topography: | **Level** | | |
| Off-Site Improv: | **Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water** | | |

## Location Information

| | |
|---|---|
| Metro Market: | **Los Angeles** |
| Submarket: | **South Bay/Torrance** |
| County: | **Los Angeles** |
| CBSA: | **Los Angeles-Long Beach-Glendale, CA** |
| CSA: | **Los Angeles-Long Beach, CA** |
| DMA: | **Los Angeles, CA-NV** |



## Property Detail Report

**For Property Located At :**
**2829 190TH ST, REDONDO BEACH, CA 90278-5402**



| Owner Information | | | Bldg Card: 000 of 005 |
|---|---|---|---|
| Owner Name: | SHEA HMS LP | | |
| Mailing Address: | 2 ADA #200, IRVINE CA 92618-5325 C053 | | |
| Vesting Codes: | // LP | | |

**Location Information**
Legal Description:      MCDONALD TRACT SAN PEDRO RANCHO LOT ON N LINE OF 190TH ST PER DOC # 2824 1-29-57
COM E 134 FT FROM W LINE OF LOT 10 TH E 114 FT TH N 488.46 FT TH W 114 FT TH S 488.46 FT
TO BEG PART OF LOT 10

| | | | |
|---|---|---|---|
| County: | LOS ANGELES, CA | APN: | 4083-015-010 |
| Census Tract / Block: | 6505.01 / 3 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | MCDONALD TR |
| Legal Book/Page: | 14-76 | Map Reference: | 67-F1 / |
| Legal Lot: | 10 | Tract #: | |
| Legal Block: | | School District: | REDONDO BEACH |
| Market Area: | 153 | School District Name: | REDONDO BEACH |
| Neighbor Code: | | Munic/Township: | REDONDO BCH |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 03/30/2022 / 03/25/2022 | 1st Mtg Amount/Type: | / |
| Sale Price: | $17,100,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 354767 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $748.56 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | FIDELITY NATIONAL TITLE | | |
| Lender: | | | |
| Seller Name: | ALCAST FOUNDRY INC | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 08/01/1983 / | Prior Lender: | |
| Prior Sale Price: | $1,293,000 | Prior 1st Mtg Amt/Type: | $170,000 / CONV |
| Prior Doc Number: | 879975 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | DEED (REG) | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1950 / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 22,844 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 22,844 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | RBR-3 | Acres: | 1.28 | County Use: | LIGHT MANUFACTURING (3100) |
| Lot Area: | 55,640 | Lot Width/Depth: | 114 x 488 | State Use: | |
| Land Use: | LIGHT INDUSTRIAL | Res/Comm Units: | 5 / 1 | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $2,196,460 | Assessed Year: | 2022 | Property Tax: | $28,607.05 |
| Land Value: | $1,366,690 | Improved %: | 38% | Tax Area: | 8066 |
| Improvement Value: | $829,770 | Tax Year: | 2022 | Tax Exemption: | |
| Total Taxable Value: | $2,196,460 | | | | |









**Comp 5 – Closed Sale – $46,474,359/AC;$1,066.90/SF/Adjusted to $39,503,257/AC;$906.87/SF**

(-15% for size, +2.5% for frontage, +7.5% for ocean / harbor view, and -10% for location)

### Bulk Portfolio: The Santa Monica Collection — SOLD

Bulk Portfolio sale on 1/4/2022 of 8 properties, for $145,000,000 - Research Complete

#### Summary of Property Info - at time of sale

| | Address | City, State | Type-Class | Property SF | Built | Sale Price |
|---|---|---|---|---|---|---|
| 1 | 1650-1660 Lincoln Blvd | Santa Monica, CA | Retail | 24,933 SF | 1954 | $19,727,000 (Full Value) |
| 2 | 501 Broadway | Santa Monica, CA | Retail | 10,500 SF | 2004 | $23,113,500 (Full Value) |
| 3 | 1318 Lincoln Blvd | Santa Monica, CA | Office B | 6,600 SF | 1974 | $9,155,500 (Full Value) |
| 4 | 1323 5th St | Santa Monica, CA | Land | - | - | $10,854,500 (Full Value) |
| 5 | 711 Colorado Ave | Santa Monica, CA | Land | - | - | $5,600,000 (Full Value) |
| 6 | 1325 6th St | Santa Monica, CA | Land | - | - | $16,800,000 (Full Value) |
| 7 | 1338 5th St | Santa Monica, CA | Land | - | - | $26,050,500 (Full Value) |
| 8 | 1430 Lincoln Blvd | Santa Monica, CA | Land | - | - | $33,699,000 (Allocated) |

#### Buyer & Seller Contact Info

**Recorded Buyer:** 501 Broadway Owner LLC
Tishman Speyer
1318 Lincoln Blvd Owner LLC
1650 Lincoln Blvd Owner LLC
1338 5th Street Owner LLC
1323 5th Street Owner LLC
1430 Lincoln Blvd Owner LLC
711 Colorado Ave Owner LLC

**Recorded Seller:** NMS - Lux 1410

**True Buyer:** Tishman Speyer
2120 Colorado Ave
Santa Monica, CA 90404
(213) 443-5030

**True Seller:** WSC Communities
Scott Walter
1430 5th St
Santa Monica, CA 90401
(424) 286-9977

**Buyer Type:** Developer - National
**Buyer Broker:** No Buyer Broker on Deal

**Seller Type:** Developer - Regional
**Listing Broker:** Walker & Dunlop
Blake Rogers
(310) 979-5743
Alexandra Caniglia
(858) 410-1200
Walker & Dunlop
Hunter Combs
(858) 205-7939

#### Transaction Details — ID: 5826984

| | |
|---|---|
| **Sale Date:** | 01/04/2022 |
| **Escrow Length:** | - |
| **Sale Price:** | $145,000,000-Confirmed |
| **Asking Price:** | - |
| **Price/SF:** | - |

| | |
|---|---|
| **Sale Type:** | Investment |
| **RBA:** | - |
| **Land Area:** | 3.12 AC (135,790 SF) |

| | |
|---|---|
| **Pro Forma Cap Rate:** | - |
| **Sale Conditions:** | Bulk/Portfolio Sale |
| **Transfer Tax:** | $25,644.85 |

| | |
|---|---|
| **Percent Improved:** | 0.0% |
| **Total Value Assessed:** | $73,139,912 in 2021 |
| **Improved Value Assessed:** | $5,087 |
| **Land Value Assessed:** | $73,134,825 |
| **Land Assessed/AC:** | $23,460,951 |

**Legal Desc:** Parcel 2 PM 71418 bk 371 pgs 35 & 36

AVG

| Bulk Portfolio: The Santa Moniica Collection | SOLD |
|---|---|

Bulk Portfolio sale on 1/4/2022 of 8 properties, for $145,000,000 - Research Complete (con't)

| Parcel No: | 4291-019-027, 4291-009-021, 4291-008-025, 4290-002-008, 4290-002-007, 4290-002-006, 4291-011-019, 4291-011-020, 4291-010-029, 4291-021-006, 4291-021-007, 4291-021-008, 4291-021-009, 4291-021-010, 4291-022-012 |
|---|---|
| Document No: | 0007644 |
| Financing: | $228,000,000.00 from Blackstone Mortgage Trust Inc. |

### Transaction Notes

The sales price was confirmed by one of the listing brokers. The sale is comprised of The Santa Monica Collection, an eight-site portfolio spanning 3.1 acres located in the iconic city of Santa Monica, CA. The sales price was reported at $145 million.

The portfolio represents one of the largest entitled land sales on the West Coast and the largest in Santa Monica history.

The development portfolio will include 325,391 net rentable SF, including 31,473 SF of commercial space and 627 multifamily units - all of which are fully entitled and approved by the Architectural Review Board, affording the buyer the luxury of bypassing the stringent Santa Monica development hurdles.

Santa Monica, the epicenter of "Silicon Beach" is one of the most desirable areas of Los Angeles, renowned for its globally-recognized beaches and countless retailers, restaurants and nightlife options. The city also boasts accessibility to Los Angeles' residential, economic, cultural and entertainment hubs. Each property within The Santa Monica portfolio is well-located and features exceptional walkability, with an average portfolio Walk Score of 91.

| Current Retail Information: 1650-1660 Lincoln Blvd | | | | ID: 809142 |
|---|---|---|---|---|

| Property Type: | Retail - Storefront | GLA: | 24,933 SF |
|---|---|---|---|
| Center: | - | Total Avail: | 0 SF |
| Bldg Status: | Built in 1954 | % Leased: | 100.0% |
| Owner Type: | Developer - National | Bldg Vacant: | 0 SF |
| Zoning: | C-4 | Land Area: | 0.72 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.80 |
| Rent/SF/Yr: | - | No. of Stores: | - |
| CAM: | - | | |
| Expenses: | 2021 Tax @ $4.30/sf | | |
| Parking: | 1 Surface Spaces @ $200.00/mo | | |

### Location Information

| Metro Market: | Los Angeles |
|---|---|
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |
| Map(Page): | Thomas Bros. Guide 671-F2 |



## Bulk Portfolio: The Santa Moniica Collection **SOLD**

Bulk Portfolio sale on 1/4/2022 of 8 properties, for $145,000,000 - Research Complete (con't)

| Current Retail Information: 501 Broadway | | | ID: 1443854 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Property Type: | Retail - Freestanding | GLA: | 10,500 SF |
| Center: | - | Total Avail: | 0 SF |
| Bldg Status: | Built in 2004 | % Leased: | 100.0% |
| Owner Type: | Developer - National | Bldg Vacant: | 0 SF |
| Zoning: | C3C* | Land Area: | 0.34 AC |
| Owner Occupied: | No | Lot Dimensions: | - |
| | | Building FAR: | 0.70 |
| Rent/SF/Yr: | - | No. of Stores: | - |
| CAM: | - | | |
| Street Frontage: | 151 feet on Broadway (with 0 curb cut) | | |
| Expenses: | 2021 Tax @ $15.63/sf | | |
| Parking: | 4 free Surface Spaces are available | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

| Current Building Information: 1318 Lincoln Blvd | | | ID: 847434 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Bldg Type: | Loft/Creative Space | Bldg Status: | Built in 1974 |
| Class: | B | RBA: | 6,600 SF |
| Total Avail: | 0 SF | % Leased: | 100.0% |
| Bldg Vacant: | 0 SF | Rent/SF/Yr: | - |
| Tenancy: | Multi | Elevators: | 0 |
| Owner Type: | Developer - National | Core Factor: | - |
| Owner Occupied | No | Stories: | 1 |
| Zoning: | C4, Santa Monica | Typical Floor Size: | 6,600 SF |
| Land Area: | 0.34 AC | Building FAR: | 0.44 |
| | | Const Type: | Masonry |
| Expenses: | 2021 Tax @ $18.04/sf; 2010 Est Ops @ $0.12/sf | | |
| Parking: | 15 Surface Spaces are available;  Ratio of 2.00/1,000 SF | | |

### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



## Bulk Portfolio: The Santa Moniica Collection     SOLD

Bulk Portfolio sale on 1/4/2022 of 8 properties, for $145,000,000 - Research Complete (con't)

| Current Land Information: 1323 5th St | | ID: 4507251 |
|---|---|---|

| | | | |
|---|---|---|---|
| Zoning: | C3, Santa Monica | Proposed Use: | Hold for Development |
| Density Allowed: | - | Land Area: | 0.17 AC (7,405 SF) |
| Number of Lots: | 1 | On-Site Improv: | Asphalt paved lot |
| Max # of Units: | - | Lot Dimensions: | 50x150 |
| Units per Acre: | - | Owner Type: | Developer - National |
| Improvements: | Asphalt paved lot | | |
| | | | |
| Name: | Retail + Apartments | | |
| Legal Desc: | Lot T blk 144 bk 3 pgs 80, 81 bk 39 pg 45 | | |
| Topography: | Level | | |
| Off-Site Improv: | Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water | | |
| | | | |
| Street Frontage: | 52 feet on 5th St | | |

| Location Information | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

| Current Land Information: 711 Colorado Ave | | ID: 7649593 |
|---|---|---|

| | | | |
|---|---|---|---|
| Zoning: | M1 | Proposed Use: | Hold for Development |
| Density Allowed: | - | Land Area: | 0.17 AC (7,405 SF) |
| Number of Lots: | 2 | On-Site Improv: | Previously developed lot |
| Max # of Units: | 31 | Lot Dimensions: | 75x100 |
| Units per Acre: | - | Owner Type: | Developer - National |
| Improvements: | Previously developed lot | | |
| | | | |
| Off-Site Improv: | Cable, Curb/Gutter/Sidewalk, Electricity, Gas, Irrigation, Sewer, Streets, Telephone, Water | | |
| | | | |
| Street Frontage: | 75 feet on Colorado Ave | | |

| Location Information | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

| Current Land Information: 1325 6th St | | ID: 12603671 |
|---|---|---|

| | | | |
|---|---|---|---|
| Zoning: | SMC3* | Proposed Use: | Hold for Development |
| Density Allowed: | - | Land Area: | 0.34 AC (14,810 SF) |
| Number of Lots: | - | On-Site Improv: | - |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Developer - National |
| Improvements: | - | | |

| Location Information | |
|---|---|
| Metro Market: | Los Angeles |



## Bulk Portfolio: The Santa Moniica Collection    SOLD

Bulk Portfolio sale on 1/4/2022 of 8 properties, for $145,000,000 - Research Complete (con't)

| | |
|---|---|
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

### Current Land Information: 1338 5th St    ID: 12603728

| | | | |
|---|---|---|---|
| Zoning: | SMC3C* | Proposed Use: | Apartment Units |
| Density Allowed: | - | Land Area: | 0.34 AC (14,810 SF) |
| Number of Lots: | - | On-Site Improv: | - |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Developer - National |
| Improvements: | - | | |

#### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |

### Current Land Information: 1430 Lincoln Blvd    ID: 12627562

| | | | |
|---|---|---|---|
| Zoning: | SMC4* | Proposed Use: | Hold for Development |
| Density Allowed: | - | Land Area: | 0.69 AC (30,056 SF) |
| Number of Lots: | - | On-Site Improv: | - |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | Developer - National |
| Improvements: | - | | |

#### Location Information

| | |
|---|---|
| Metro Market: | Los Angeles |
| Submarket: | West Los Angeles/Santa Monica |
| County: | Los Angeles |
| CBSA: | Los Angeles-Long Beach-Glendale, CA |
| CSA: | Los Angeles-Long Beach, CA |
| DMA: | Los Angeles, CA-NV |



# Tishman Speyer takes over eight entitled Santa Monica developments

## WS Communities sells sites approved for 620 apartments and retail

JANUARY 20, 2022, 10:00AM    STEVEN SHARP

One year after putting up its immense Santa Monica real estate portfolio up for sale, prolific local developer **WS Communities** has found a buyer.



Sidewalk view of 1430 Lincoln

City of Santa Monica

Earlier this month, **Walker & Dunlop, Inc. announced** that New York-based **Tishman Speyer** has agreed to purchase eight properties in Santa Monica in a transaction billed as one of the largest entitled land sales on the West Coast, and the largest in Santa Monica history.

The eight sites, which total 3.1 acres of land, are approved for the construction of a combined total of 627 residential units and 31,473 square feet of ground-floor commercial uses.

According to the Santa Monica Daily Press, **116 of the approved apartments are to be set aside for rent by lower-income households.** Construction of the first of the eight projects is slated to begin in late 2022, with the first deliveries to follow in 2024.

A l e x a n d e r V a l u a t i o n G r o u p . c o m    a d m i n @ a l e x a n d e r v g . c o m    3 1 0 . 5 4 5 . 8 7 0 0

171





View of 1323 5th Street looking northeast

KFA Architecture

The Real Deal reports that the $150-million transaction includes properties located at 1318 Lincoln Boulevard, 1430 Lincoln Boulevard, 1650 Lincoln Boulevard, 501 Broadway, 711 Colorado Avenue, 1313 6th Street, 1323 5th Street and 1338 5th Street.







## Property Detail Report

**For Property Located At :**
**1650 LINCOLN BLVD, SANTA MONICA, CA 90404-3712**



| Owner Information | |
|---|---|
| Owner Name: | 1650 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / CO |

### Location Information

| Legal Description: | CENTRAL ADDITION TO SANTA MONICA LOTS 131 AND LOT 132 | | |
|---|---|---|---|
| County: | LOS ANGELES, CA | APN: | 4290-002-008 |
| Census Tract / Block: | 7019.02 / 3 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | CENTRAL ADD |
| Legal Book/Page: | | Map Reference: | 49-A1 / |
| Legal Lot: | 132 | Tract #: | |
| Legal Block: | | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information

| Recording/Sale Date: | / | Deed Type: | |
|---|---|---|---|
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information

| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
|---|---|---|---|
| Sale Price: | $19,727,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7643 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $2,148.91 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | 1650 LINCOLN NMS LLC | | |

### Prior Sale Information

| Prior Rec/Sale Date: | 02/14/2011 / 02/11/2011 | Prior Lender: | CALIFORNIA REPUBLIC BK |
|---|---|---|---|
| Prior Sale Price: | $3,467,500 | Prior 1st Mtg Amt/Type: | $2,035,000 / CONV |
| Prior Doc Number: | 240702 | Prior 1st Mtg Rate/Type: | / ADJUSTABLE INT RATE LOAN |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics

| Year Built / Eff: | 1954 / 1954 | Total Rooms/Offices | | Garage Area: | |
|---|---|---|---|---|---|
| Gross Area: | 9,180 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 9,180 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information

| Zoning: | SMC4* | Acres: | 0.37 | County Use: | LIGHT MANUFACTURING (3100) |
|---|---|---|---|---|---|
| Lot Area: | 16,190 | Lot Width/Depth: | x | State Use: | |
| Land Use: | LIGHT INDUSTRIAL | Res/Comm Units: | 1 / 1 | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information

| Total Value: | $9,921,540 | Assessed Year: | 2023 | Property Tax: | $123,897.52 |
|---|---|---|---|---|---|
| Land Value: | $9,921,540 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $9,921,540 | | | | |



## Property Detail Report

**For Property Located At :**
**1658 LINCOLN BLVD, SANTA MONICA, CA 90404-3712**



### Owner Information
| | |
|---|---|
| Owner Name: | **1650 LINCOLN BLVD OWNER LLC** |
| Mailing Address: | **2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER** |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **CENTRAL ADDITION TO SANTA MONICA LOT 130** | | |
| County: | LOS ANGELES, CA | APN: | 4290-002-007 |
| Census Tract / Block: | 7019.02 / 3 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | CENTRAL ADD |
| Legal Book/Page: | | Map Reference: | 49-A1 / |
| Legal Lot: | 130 | Tract #: | |
| Legal Block: | | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $19,727,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7643 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $3,287.83 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | 1650 LINCOLN NMS LLC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1954 / 1954 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 6,000 | Total Restrooms: | 3 | Garage Capacity: | |
| Building Area: | 6,000 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0.17 | County Use: | WHSE-UNDER 10000 SF (3300) |
| Lot Area: | 7,542 | Lot Width/Depth: | x | State Use: | |
| Land Use: | WAREHOUSE | Res/Comm Units: | 1 / 1 | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $5,100,000 | Assessed Year: | 2023 | Property Tax: | $63,602.56 |
| Land Value: | $5,100,000 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $5,100,000 | | | | |



## Property Detail Report

**For Property Located At :**
**1660 LINCOLN BLVD, SANTA MONICA, CA 90404-3712**

**Owner Information**

| | |
|---|---|
| Owner Name: | 1650 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | CENTRAL ADDITION TO SANTA MONICA LOT 129 | | |
| County: | LOS ANGELES, CA | APN: | 4290-002-006 |
| Census Tract / Block: | 7019.02 / 3 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | CENTRAL ADD |
| Legal Book/Page: | | Map Reference: | 49-A1 / |
| Legal Lot: | 129 | Tract #: | |
| Legal Block: | | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $19,727,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7643 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $3,287.83 |
| New Construction: | | Multi/Split Sale: | MULTIPLE |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | 1650 LINCOLN NMS LLC | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1954 / 1954 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 6,000 | Total Restrooms: | 1 | Garage Capacity: | |
| Building Area: | 6,000 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0.17 | County Use: | WHSE-UNDER 10000 SF (3300) |
| Lot Area: | 7,572 | Lot Width/Depth: | x | State Use: | |
| Land Use: | WAREHOUSE | Res/Comm Units: | 1 / 1 | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $5,100,000 | Assessed Year: | 2023 | Property Tax: | $63,603.66 |
| Land Value: | $5,100,000 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $5,100,000 | | | | |









## Property Detail Report

**For Property Located At :**
**501 BROADWAY, SANTA MONICA, CA 90401-2405**



**Owner Information**

| | |
|---|---|
| Owner Name: | 501 BROADWAY OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O T SPEYER & D LAPIDUS |
| Vesting Codes: | // |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | TR=SANTA MONICA LOTS M AND LOT N | | |
| County: | LOS ANGELES, CA | APN: | 4291-019-027 |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 49-A1 / |
| Legal Lot: | N | Tract #: | |
| Legal Block: | 169 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $23,313,500 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7644 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $2,810.89 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | WSC 501 BROADWAY LLC | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 09/13/2019 / 09/13/2019 | Prior Lender: | HANKEY CAP LLC |
| Prior Sale Price: | $13,469,500 | Prior 1st Mtg Amt/Type: | $12,733,000 / CONV |
| Prior Doc Number: | 947401 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 8,294 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 8,294 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC3C* | Acres: | 0.34 | County Use: | OFFICE BLDG (1700) |
| Lot Area: | 15,012 | Lot Width/Depth: | x | State Use: | |
| Land Use: | OFFICE BUILDING | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $14,158,846 | Assessed Year: | 2023 | Property Tax: | $169,850.32 |
| Land Value: | $14,157,271 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | $1,575 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $14,158,846 | | | | |









## Property Detail Report

**For Property Located At :**
**1318 LINCOLN BLVD, SANTA MONICA, CA 90401-1706**



### Owner Information
| | |
|---|---|
| Owner Name: | 1318 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | // |

### Location Information
| | | | | | |
|---|---|---|---|---|---|
| Legal Description: | SANTA MONICA LOTS D AND LOT E | | | | |
| County: | LOS ANGELES, CA | | APN: | | 4291-008-025 |
| Census Tract / Block: | 7019.02 / 1 | | Alternate APN: | | |
| Township-Range-Sect: | | | Subdivision: | | SANTA MONICA |
| Legal Book/Page: | 3-80 | | Map Reference: | | 41-A6 / |
| Legal Lot: | E | | Tract #: | | |
| Legal Block: | 142 | | School District: | | SANTA MONICA MALIBU |
| Market Area: | C14 | | School District Name: | | SANTA MONICA MALIBU |
| Neighbor Code: | | | Munic/Township: | | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $9,155,500 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7646 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | WSC 1318 LINCOLN BLVD LLC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 09/13/2019 / 09/13/2019 | Prior Lender: | HANKEY CAP LLC |
| Prior Sale Price: | $9,551,500 | Prior 1st Mtg Amt/Type: | $8,595,000 / CONV |
| Prior Doc Number: | 947405 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0.34 | County Use: | VACANT COMMERCIAL (100V) |
| Lot Area: | 15,007 | Lot Width/Depth: | x | State Use: | |
| Land Use: | COMMERCIAL (NEC) | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $10,039,804 | Assessed Year: | 2023 | Property Tax: | $123,096.17 |
| Land Value: | $10,039,804 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $10,039,804 | | | | |





### Zoning District Lookup



1318 Lincoln Boulevard, Santa Monica, CA

Results:1

LT: Lincoln Transition

The zoning district for this location is **LT: Lincoln Transition**.
Learn more about this district and permitted uses here.

There is no zoning district overlay at this location.



## Property Detail Report

**For Property Located At :**
**,, CA**



**Owner Information**

| | |
|---|---|
| Owner Name: | **1323 5TH STREET OWNER LLC** |
| Mailing Address: | **2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O DAVID LAPIDUS** |
| Vesting Codes: | / / |

**Location Information**

| | | | |
|---|---|---|---|
| Legal Description: | **SANTA MONICA LOT T BLK 144** | | |
| County: | LOS ANGELES, CA | APN: | 4291-010-029 |
| Census Tract / Block: | / | Alternate APN: | 4291-010-026 |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 40-F6 / |
| Legal Lot: | T | Tract #: | |
| Legal Block: | 144 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

**Owner Transfer Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**

| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $10,854,500 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7647 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $1,447.27 |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | 1323 5TH STREET LLC | | |

**Prior Sale Information**

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 02/28/2018 / 02/15/2018 | Prior Lender: | HANKEY CAP LLC |
| Prior Sale Price: | $2,800,000 | Prior 1st Mtg Amt/Type: | $6,000,000 / CONV |
| Prior Doc Number: | 196802 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

**Property Characteristics**

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1978 / 1978 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,500 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,500 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

**Site Information**

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC3C* | Acres: | 0.17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,514 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $4,669,868 | Assessed Year: | 2023 | Property Tax: | $56,548.11 |
| Land Value: | $4,669,868 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $4,669,868 | | | | |





## Zoning District Lookup





## Property Detail Report

**For Property Located At :**
**711 COLORADO AVE, SANTA MONICA, CA 90401-2609**



### Owner Information
| | |
|---|---|
| Owner Name: | 711 COLORADO AVE OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | SANTA MONICA NE 75 FT OF LOTS M AND LOT N | | |
| County: | LOS ANGELES, CA | APN: | 4291-022-012 |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 49-A1 / |
| Legal Lot: | N | Tract #: | |
| Legal Block: | 192 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 7641 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 07/16/2015 / 07/16/2015 | 1st Mtg Amount/Type: | $1,500,000 / CONV |
| Sale Price: | $3,000,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 860372 |
| Document #: | 860371 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | UNITI BK | | |
| Seller Name: | ROBHANA INC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 09/16/2005 / 07/19/2005 | Prior Lender: | |
| Prior Sale Price: | $2,200,000 | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 2236395 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | |
|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: |
| Gross Area: | | Total Restrooms: | | Garage Capacity: |
| Building Area: | | Roof Type: | | Parking Spaces: |
| Tot Adj Area: | | Roof Material: | | Heat Type: |
| Above Grade: | | Construction: | | Air Cond: |
| # of Stories: | | Foundation: | | Pool: |
| Other Improvements: | | Exterior wall: | | Quality: |
| | | Basement Area: | | Condition: |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC3* | Acres: | 0.17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,491 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $5,712,000 | Assessed Year: | 2023 | Property Tax: | $74,341.92 |
| Land Value: | $5,712,000 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $5,712,000 | | | | |





Los Angeles County **Assessor Portal**    4291-022-012    🔍    Map Search    PAIS    Assessor Internet

Show Re-Assessable Only: ☐

| | Recording Date | Seq. # | Re-Assessed | # Parcels | % | Ver. Code | DTT Sale Price | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| − | 01/04/2022 | 50 | Yes | 1 | 00%-0 | K | $ 5,600,056 | $ 5,600,000 |

**Sequence Number:** 50
**Document Number:** 0007641
**Ownership Code 1:** 3 - Review Not Required
**Ownership Code 2:** 5 - Reappraisable
**Document Type:** Y - Sale for Consideration - Full DTT
**Document Reason Code:** A - Good Transfer - Typical Change in Ownership
**# of Parcels Transferred:** 1
**% Interest Transferred:** 00%-0
**Verification Code:** K - PCOR-Single Parcel









## Property Detail Report

**For Property Located At :**
**1313 6TH ST, SANTA MONICA, CA 90401-1603**



### Owner Information
| | |
|---|---|
| Owner Name: | 1325 6TH STREET OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | // |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | PM 371-35-36 LOT 2 | | |
| County: | LOS ANGELES, CA | APN: | 4291-009-021 |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | 4291-009-805 |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 40-F6 / |
| Legal Lot: | 2 | Tract #: | |
| Legal Block: | 143 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | $228,000,000 / CONV |
| Sale Price: | $16,800,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 7649 |
| Document #: | 7645 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $1,120.00 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | HUSKY FINCO LLC | | |
| Seller Name: | 1313 6TH STREET LLC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1950 / 1950 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 15,000 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 15,000 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC3* | Acres: | 0.34 | County Use: | PARKING LOT (2700) |
| Lot Area: | 15,014 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $5,915,677 | Assessed Year: | 2023 | Property Tax: | $73,971.53 |
| Land Value: | $5,914,475 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | $1,202 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $5,915,677 | | | | |









## Property Detail Report

**For Property Located At :**
,, CA



### Owner Information
| | |
|---|---|
| Owner Name: | **1338 5TH STREET OWNER LLC** |
| Mailing Address: | **2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER** |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | **SANTA MONICA LOT H BLK 145** | | |
| County: | LOS ANGELES, CA | APN: | 4291-011-019 |
| Census Tract / Block: | / | Alternate APN: | 4291-011-007 |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 49-A1 / |
| Legal Lot: | H | Tract #: | |
| Legal Block: | 145 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $26,050,500 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7648 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $3,473.40 |
| New Construction: | | Multi/Split Sale: | MULTIPLE |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | 1338 5TH STREET LLC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 02/28/2018 / 02/15/2018 | Prior Lender: | HANKEY CAP LLC |
| Prior Sale Price: | $5,250,000 | Prior 1st Mtg Amt/Type: | $12,000,000 / CONV |
| Prior Doc Number: | 196800 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1949 / 1950 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,500 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,500 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC3C* | Acres: | 0.17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,512 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $6,649,367 | Assessed Year: | 2023 | Property Tax: | $79,462.31 |
| Land Value: | $6,649,367 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $6,649,367 | | | | |



## Property Detail Report

**For Property Located At :**
**1342 5TH ST, SANTA MONICA, CA 90401-1415**



### Owner Information
| | |
|---|---|
| Owner Name: | **1338 5TH STREET OWNER LLC** |
| Mailing Address: | **2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER** |
| Vesting Codes: | / / |

### Location Information
| | | | | | |
|---|---|---|---|---|---|
| Legal Description: | **SANTA MONICA LOT I BLK 145** | | | | |
| County: | LOS ANGELES, CA | APN: | | 4291-011-020 | |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | | 4291-011-008 | |
| Township-Range-Sect: | | Subdivision: | | SANTA MONICA | |
| Legal Book/Page: | 3-80 | Map Reference: | | 49-A1 / | |
| Legal Lot: | I | Tract #: | | | |
| Legal Block: | 145 | School District: | | SANTA MONICA MALIBU | |
| Market Area: | C14 | School District Name: | | SANTA MONICA MALIBU | |
| Neighbor Code: | | Munic/Township: | | SANTA MONIC | |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | 1st Mtg Amount/Type: | / |
| Sale Price: | $26,050,500 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | |
| Document #: | 7648 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | COMMONWEALTH LAND TITLE CO. | | |
| Lender: | | | |
| Seller Name: | 1338 5TH STREET LLC | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 02/28/2018 / 02/15/2018 | Prior Lender: | HANKEY CAP LLC |
| Prior Sale Price: | $5,250,000 | Prior 1st Mtg Amt/Type: | $12,000,000 / CONV |
| Prior Doc Number: | 196800 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC3C* | Acres: | 0.17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,487 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $6,649,367 | Assessed Year: | 2023 | Property Tax: | $79,463.48 |
| Land Value: | $6,649,367 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $6,649,367 | | | | |









## Property Detail Report

**For Property Located At :**
**1430 LINCOLN BLVD, SANTA MONICA, CA 90401-2733**

### Owner Information
| | |
|---|---|
| Owner Name: | 1430 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | // |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | SANTA MON1CA LOT F | | |
| County: | LOS ANGELES, CA | APN: | 4291-021-006 |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 41-A6 / |
| Legal Lot: | F | Tract #: | |
| Legal Block: | 167 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 7642 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 06/28/2012 / 06/26/2012 | 1st Mtg Amount/Type: | $1,500,000 / CONV |
| Sale Price: | $2,500,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 959446 |
| Document #: | 959445 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $333.33 |
| New Construction: | | Multi/Spit Sale: | |
| Title Company: | LAWYERS TITLE | | |
| Lender: | PACIFIC WSTRN BK | | |
| Seller Name: | ARYA LP | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 10/20/1993 / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 2040345 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | QUIT CLAIM DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 2017 / 2017 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,500 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,500 | Roof Type: | | Parking Spaces: | |
| TotAdj Area: | | Roof Material: | | Heat Type: | HEATED |
| Above Grade: | | Construction: | | Air Cond: | NONE |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0.17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,510 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $3,018,197 | Assessed Year: | 2023 | Property Tax: | $39,146.38 |
| Land Value: | $3,016,995 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | $1,202 | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $3,018,197 | | | | |



# Property Detail Report

**For Property Located At :**
**1432 LINCOLN BLVD, SANTA MONICA, CA 90401-2733**

## Owner Information
| | |
|---|---|
| Owner Name: | 1430 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / |

## Location Information
| | | | |
|---|---|---|---|
| Legal Description: | SANTA MON1CA LOT G | | |
| County: | LOS ANGELES, CA | APN: | 4291-021-007 |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 41-A6 / |
| Legal Lot: | G | Tract #: | |
| Legal Block: | 167 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

## Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 7642 | | |

## Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 06/28/2012 / 06/26/2012 | 1st Mtg Amount/Type: | $4,560,000 / CONV |
| Sale Price: | $7,600,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 959450 |
| Document #: | 959449 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $1,013.33 |
| New Construction: | | Multi/Split Sale: | MULTIPLE |
| Title Company: | CHICAGO TITLE CO | | |
| Lender: | PACIFIC WSTRN BK | | |
| Seller Name: | KRYSTAL GROUP SANTA MONICA LP | | |

## Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 10/20/1993 / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 2040346 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | QUIT CLAIM DEED | | |

## Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 2017 / 2017 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,500 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,500 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | NONE |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

## Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0.17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,494 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

## Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $4,523,428 | Assessed Year: | 2023 | Property Tax: | $56,552.40 |
| Land Value: | $4,523,428 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $4,523,428 | | | | |



## Property Detail Report

**For Property Located At :**
**1438 LINCOLN BLVD, SANTA MONICA, CA 90401-2733**



### Owner Information
| | |
|---|---|
| Owner Name: | 1430 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | SANTA MON1CA NW 25 FT OF LOT H | | |
| County: | LOS ANGELES, CA | APN: | 4291-021-008 |
| Census Tract / Block: | 7019,02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 41-A6 / |
| Legal Lot: | H | Tract #: | |
| Legal Block: | 167 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 7642 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 06/28/2012 / 06/26/2012 | 1st Mtg Amount/Type: | $4,560,000 / CONV |
| Sale Price: | $7,600,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 959450 |
| Document #: | 959449 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $2,026,67 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | CHICAGO TITLE CO | | |
| Lender: | PACIFIC WSTRN BK | | |
| Seller Name: | KRYSTAL GROUP SANTA MONICA LP | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 10/20/1993 / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 2040347 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | QUIT CLAIM DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 2017 / 2017 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 3,750 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 3,750 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | ROLL COMPOSITION | Heat Type: | |
| Above Grade: | | Construction: | FRAME | Air Cond: | YES |
| # of Stories: | 1 | Foundation: | CONCRETE | Pool: | |
| Other Improvements: | | Exterior wall: | STUCCO | Quality: | FAIR |
| | | Basement Area: | | Condition: | AVERAGE |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0,09 | County Use: | PARKING LOT (2700) |
| Lot Area: | 3,752 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $2,264,503 | Assessed Year: | 2023 | Property Tax: | $28,564.70 |
| Land Value: | $2,264,503 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $2,264,503 | | | | |



## Property Detail Report
**For Property Located At :**
**1440 LINCOLN BLVD, SANTA MONICA, CA 90401-2733**



### Owner Information
| | |
|---|---|
| Owner Name: | 1430 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | SANTA MONICA SE 25 FT OF LOT H | | |
| County: | LOS ANGELES, CA | APN: | 4291-021-009 |
| Census Tract / Block: | 7019.02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 41-A6 / |
| Legal Lot: | H | Tract #: | |
| Legal Block: | 167 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 7642 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 06/28/2012 / 06/26/2012 | 1st Mtg Amount/Type: | $4,560,000 / CONV |
| Sale Price: | $7,600,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 959450 |
| Document #: | 959449 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $2,026.67 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | CHICAGO TITLE CO | | |
| Lender: | PACIFIC WSTRN BK | | |
| Seller Name: | KRYSTAL GROUP SANTA MONICA LP | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 03/09/2012 / 02/15/2012 | Prior Lender: | |
| Prior Sale Price: | $250,000 | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 372392 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 2017 / 2017 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 3,750 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 3,750 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0.09 | County Use: | PARKING LOT (2700) |
| Lot Area: | 3,751 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $2,264,503 | Assessed Year: | 2023 | Property Tax: | $28,564.38 |
| Land Value: | $2,264,503 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $2,264,503 | | | | |



## Property Detail Report

**For Property Located At :**
**1444 LINCOLN BLVD, SANTA MONICA, CA 90401-2733**



### Owner Information
| | |
|---|---|
| Owner Name: | 1430 LINCOLN BLVD OWNER LLC |
| Mailing Address: | 2120 COLORADO AVE STE 230, SANTA MONICA CA 90404-3768 C025 C/O TISHMAN SPEYER |
| Vesting Codes: | / / |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | SANTA MON1CA LOT I | | |
| County: | LOS ANGELES, CA | APN: | 4291-021-010 |
| Census Tract / Block: | 7019,02 / 1 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | SANTA MONICA |
| Legal Book/Page: | 3-80 | Map Reference: | 41-A6 / |
| Legal Lot: | I | Tract #: | |
| Legal Block: | 167 | School District: | SANTA MONICA MALIBU |
| Market Area: | C14 | School District Name: | SANTA MONICA MALIBU |
| Neighbor Code: | | Munic/Township: | SANTA MONIC |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 01/04/2022 / 12/30/2021 | Deed Type: | GRANT DEED |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | 7642 | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | 06/28/2012 / 06/26/2012 | 1st Mtg Amount/Type: | $4,560,000 / CONV |
| Sale Price: | $7,600,000 | 1st Mtg Int. Rate/Type: | / ADJ |
| Sale Type: | FULL | 1st Mtg Document #: | 959450 |
| Document #: | 959449 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $1,013.33 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | CHICAGO TITLE CO | | |
| Lender: | PACIFIC WSTRN BK | | |
| Seller Name: | KRYSTAL GROUP SANTA MONICA LP | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 03/09/2012 / 02/15/2012 | Prior Lender: | |
| Prior Sale Price: | $250,000 | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | 372392 | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | GRANT DEED | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 2017 / 2017 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 7,500 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 7,500 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | NONE |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | SMC4* | Acres: | 0,17 | County Use: | PARKING LOT (2700) |
| Lot Area: | 7,493 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $4,523,428 | Assessed Year: | 2023 | Property Tax: | $56,551.68 |
| Land Value: | $4,523,428 | Improved %: | | Tax Area: | 8004 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $4,523,428 | | | | |





**Los Angeles County Assessor Portal** — 4291-021-006

Map Search    PAIS    Assessor Internet

Show Re-Assessable Only: ☐

| | Recording Date | Seq. # | Re-Assessed | # Parcels | % | Ver. Code | DTT Sale Price | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| − | 01/04/2022 | 50 | Yes | 5 | 00%-0 | M | $ 33,500,335 | $ 3,018,197 |

Sequence Number: 50
Document Number: 0007642
Ownership Code 1: 3 - Review Not Required
Ownership Code 2: 5 - Reappraisable
Document Type: Y - Sale for Consideration - Full DTT
Document Reason Code: A - Good Transfer - Typical Change in Ownership
# of Parcels Transferred: 5
% Interest Transferred: 00%-0
Verification Code: M - PCOR-Multiple Parcels







**Comp 6 – Closed Sale – $19,161,983/AC; $439.90/SF / Adjusted to $18,204,160/AC; $417.91/SF**

(-20% for size, +2.5% for frontage, +7.5% for ocean / harbor view, and +5% for location)



## 338 Pacific Ave
Commercial Land of 1.17 AC (51,148 SF) (con't)

**SOLD**

### Transaction Notes

The sales price was confirmed by the broker. The sale is comprised of a parking lot totaling 1.1742 gross acres located at 338 Pacific Ave. in Long Beach, CA. The sales price was reported at $22.5 million or $440/SF.

The motivation for the buyer was to develop a multifamily property totaling 271 units that was fully entitled at the time of sale.

### Current Land Information
ID: 11288056

| | | | |
|---|---|---|---|
| Zoning: | LBCR* | Proposed Use: | **MultiFamily** |
| Density Allowed: | - | Land Area: | **1.17 AC (51,148 SF)** |
| Number of Lots: | - | On-Site Improv: | **Asphalt paved lot** |
| Max # of Units: | - | Lot Dimensions: | - |
| Units per Acre: | - | Owner Type: | **Developer - Regional** |
| Improvements: | - | | |
| Topography: | Level | | |

### Location Information

| | |
|---|---|
| Metro Market: | **Los Angeles** |
| Submarket: | **South Bay/Long Beach: Downtown** |
| County: | **Los Angeles** |
| CBSA: | **Los Angeles-Long Beach-Glendale, CA** |
| CSA: | **Los Angeles-Long Beach, CA** |
| DMA: | **Los Angeles, CA-NV** |







CA.GOV    🏠                                                                    Contact Us    ⚙ Settings

## CEQA

Recent Postings    About    Contact Us    Search    Advanced Search

# 3rd and Pacific Modified Project (City of Long Beach Downtown Plan [EIR 04-08])

16 Documents in Project

## Summary

| | |
|---|---|
| **SCH Number** | 2009071006 |
| **Lead Agency** | City of Long Beach |
| **Document Title** | 3rd and Pacific Modified Project (City of Long Beach Downtown Plan [EIR 04-08]) |
| **Document Type** | NOD - Notice of Determination |
| **Received** | 4/16/2021 |
| **Posted** | 4/16/2021 |
| **Document Description** | Site Plan Review for the construction of 271 residential units in one mid-rise, mixed-use building (8 stories in height with 2 levels of subterranean parking and 2 levels of at-grade/above grade parking). The mixed-use building includes 11,912 sq. ft. of retail space, 352 parking spaces (unique) (395 spaces including tandem), and 59 bicycle parking spaces. Vacations were approved for an existing named alley (Roble Way) and a portion of the Pacific Avenue right-of-way in conformance with the General Plan under the previous approval (App. No. 1807-11). A revised Vesting Tentative Tract Map is proposed to merge six lots into one 1.22-acre ground lot and create six airspace lots. The project is consistent with the Downtown Plan (PD-30) zoning ordinance and Program Environmental Impact Report (EIR-04-08, State Clearinghouse #2009071006) and PEIR Addendum (EIRA-02-19). |

## Notice of Determination

| | |
|---|---|
| **Approving Agency** | City of Long Beach |
| **Approving Agency Role** | Lead Agency |
| **Approved On** | 4/15/2021 |
| **County Clerk** | Los Angeles |
| **Final Environmental Document Available at** | http://www.longbeach.gov/lbds/planning/environmental/reports/ |



## Property Detail Report

For Property Located At :
,, CA



### Owner Information
| | |
|---|---|
| Owner Name: | NASH HOLLAND 3PAC INVESTORS LLC |
| Mailing Address: | 1111 MAIN ST STE 700, VANCOUVER WA 98660-2970 C044 C/O HOLLAND PARTNERS GROUP |
| Vesting Codes: | // |

### Location Information
| | | | |
|---|---|---|---|
| Legal Description: | LONG BEACH VAC ST, LOTS 17 TO 21, EX ST LOTS 2,4,6,8,10,12,14,16 AND 22 BLK 81 | | |
| County: | LOS ANGELES, CA | APN: | 7280-016-040 |
| Census Tract / Block: | / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | / |
| Legal Lot: | 17 | Tract #: | |
| Legal Block: | 81 | School District: | LONG BEACH |
| Market Area: | | School District Name: | LONG BEACH |
| Neighbor Code: | | Munic/Township: | LONG BEACH |

### Owner Transfer Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

### Last Market Sale Information
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | 1st Mtg Amount/Type: | / |
| Sale Price: | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | 1st Mtg Document #: | |
| Document #: | | 2nd Mtg Amount/Type: | / |
| Deed Type: | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | | | |
| Lender: | | | |
| Seller Name: | | | |

### Prior Sale Information
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

### Property Characteristics
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | / | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

### Site Information
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | LBCR | Acres: | 1.24 | County Use: | VACANT COMMERCIAL (100V) |
| Lot Area: | 53,907 | Lot Width/Depth: | x | State Use: | |
| Land Use: | COMMERCIAL LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

### Tax Information
| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $22,950,000 | Assessed Year: | 2023 | Property Tax: | $304,877.98 |
| Land Value: | $22,950,000 | Improved %: | | Tax Area: | 5542 |
| Improvement Value: | | Tax Year: | 2023 | Tax Exemption: | |
| Total Taxable Value: | $22,950,000 | | | | |









**Location**

**300 PACIFIC AVE**

**General Information**

| | |
|---|---|
| Community Development Block Grant Area (CDBG) | Within CDBG? Yes<br>(562) 570-7403<br>More CDBG Info |
| New Employment Credit Area | Within Area? Yes<br>(916) 845-3464<br>3321 Power Inn Rd., Suite 250<br>Sacramento, CA 95826-3893<br>More Employment Credit info |
| Zoning | Zip code: 90802<br>Class: PD-30<br>Overlay:<br>Subzone:<br>Subarea:<br>(562) 570-6194<br>More zoning info |
| Census | 2020 Tract: 575902<br>2020 Block: 1019 |
| Census | 2010 Tract: 575902<br>2010 Block: 1018 |
| Flood Zone | Within Flood Zone? N<br>X<br>Base Flood Elevation:<br>FEMA Doc: STUDY12<br>FEMA Case No: N/A<br>Effective Date: 4/20/2021, 5:00 PM |



**Comp 7 – Pending Sale – $9,342,857/AC; $214.48/SF / Adjusted to $11,818,699/AC; $271.32/SF**
(+2.5% for size, +7.5% for ocean / harbor view, and +5% for location)



Brookfield is poised to buy 70 acres of land from the City of Irvine for $654 million, with plans to build more than 1,200 homes in what could be the last single-family residential village in the city.

The city approved the land deal with the Canada-based developer last week to build the Gateway Village at the northeast corner of Jeffrey Road and Portola Parkway, the Orange County Register reported.

Depending on the final deal, the Toronto-based developer could pay Irvine $654 million, or $9.34 million per acre. Escrow is expected to close within six months, a city official said.

Plans for Gateway Village include 927 single-family homes, which would average 1,844 square feet, with a typical asking price of $1.4 million, according to a staff report. The project would also include 300 affordable apartments, to be built throughout the development.

The project, among the last single-family residential villages in Irvine, would include parks, a community garden and a recreation center with a clubhouse, meeting rooms, event areas and swimming pools.

Pending approvals, Brookfield could break ground in 2026 or 2027, with home sales to begin in 2027.





# Brookfield Nears Land Deal To Build Sought-After Housing in Affluent California Suburb

Orange County Site Purchase From City of Irvine Could Top $650 Million



The city of Irvine, California, is looking to develop houses and apartments near the former site of an asphalt plant. (City of Irvine)

By Lou Hirsh
CoStar News

April 9, 2024 | 1:52 P.M.

Developer Brookfield Residential is planning a mixed-use residential project in California's Orange County that would involve one of the region's priciest land purchases in several years — up to $654 million — as government leaders look to boost the stock of affordable housing.

The Irvine City Council authorized the city manager to negotiate exclusively with Toronto-based Brookfield for the sale of a 70-acre, city-owned land parcel for a planned new residential development called Gateway Village.



The land is part of a larger span that was acquired last year by the city after the closure of the All American Asphalt plant, and where Irvine officials hope to develop new residential, commercial and recreational amenities.

Like other Southern California regions, Orange County is looking to deploy surplus land to increase the stock of housing that has been in short supply statewide for several decades relative to demand. California is short some 3 million houses to accommodate the state's population, according to the Public Policy Institute of California.

Housing has become particularly tough to afford in the state's southern coastal regions.

"Demand for housing in the Irvine area north of Interstate 5 is extremely strong, with apartment vacancies trending near 3%," said Jesse Gundersheim, senior director of market analytics for CoStar Group in Orange County. "No apartment buildings have been developed in the area since 2016 and I think virtually any new housing construction in Irvine will be in high demand."

## Expensive Market

City filings show Brookfield would pay Irvine between $601 million and $654 million for the 70-acre parcel, based on submissions from several builders in a competitive proposal process. Brookfield's preliminary plans for the site include 1,236 residential units, including 927 market-rate single-family houses with an average unit size of 1,844 square feet and average unit price of $1.4 million.

Also planned are 309 deed-restricted affordable apartments placed in multiple locations within the development rather than consolidated in one complex, with rent pricing to be determined. The city wants at least 25% of housing in the development to be affordable to families making 80% of the region's median income.

"We are looking forward to working with the city of Irvine but don't have anything else to share at this time," Brookfield spokesperson Christina Salicco told CoStar News in an email.

CoStar data shows affordable housing in the area is extremely limited, with Orange County market rates ranging from $2,700 for one-bedroom apartments to $3,400 for two-bedroom units and over $4,000 for three-bedroom apartments.

"Orange County ranks as the fifth most expensive major market in the U.S. and nearly leads the nation in annual rent growth," Gundersheim said. "Additional housing is needed, but development remains constrained by land availability. Building more housing makes a lot of sense, particularly in Irvine near job centers and retail."

AVG

## Comparable Sales Comparison Grid

| | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Pending 7 |
|---|---|---|---|---|---|---|---|
| **Land Sales Analysis** | | | | | | | |
| **Summary of Adjustments** | | | | | | | |
| Unadjusted Price/Unit | $213.84 | $150.04 | $698.27 | $174.47 | $1,066.90 | $439.90 | $214.48 |
| Property Rights | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $213.84 | $150.04 | $698.27 | $174.47 | $1,066.90 | $439.90 | $214.48 |
| Financing Terms | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $213.84 | $150.04 | $698.27 | $174.47 | $1,066.90 | $439.90 | $214.48 |
| Conditions of Sale | 0% | 10% | 0% | 10% | 0% | 0% | 10% |
| Subtotal | $213.84 | $165.04 | $698.27 | $191.92 | $1,066.90 | $439.90 | $235.93 |
| Market Conditions | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Subtotal | $213.84 | $165.04 | $698.27 | $191.92 | $1,066.90 | $439.90 | $235.93 |
| Other Adjustments | | | | | | | |
| Physical Characteristics: | | | | | | | |
| - Size (2,134,279 SF) | -20% | -15% | -15% | -15% | -15% | -20.0% | 2.5% |
| - Shape (Irregular) | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| - Frontage (5,402' LF) | 2.5% | 2.5% | 2.5% | 3.5% | 2.5% | 2.5% | 0% |
| - Topography (Mostly Level) | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| - View (Ocean, Harbor) | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% |
| Subtotal Physical | -10.0% | -5.0% | -5.0% | -4.0% | -5.0% | -10.0% | 10.0% |
| Location | 5% | 15% | -10% | 15% | -10% | 5% | 5% |
| Availability of Utilities | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Zoning (Multiple) | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Highest and Best Use | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Total Adjustments | -5.0% | 10.0% | -15.0% | 11.0% | -15.0% | -5.0% | 15.0% |
| Value Indication $/Unit | $203.15 | $181.55 | $593.53 | $213.03 | $906.87 | $417.91 | $271.32 |
| Value Conclusion - Subject | $275.00 | | | | | | |

[1] The adjustment grid summarizes the direction and magnitude of adjustments judged appropriate to the comparable sales. In some cases, adjustments may be derived directly from quantifiable data. However, in many instances the adjustments involve judgment of the appraiser.

Source: Alexander Valuation Group

**Explanation of the Adjustments Used in the Previous Valuation Analysis Grids**

The following comments relate to the previous Sales Comparison Approach to Value adjustment grid line items. Items and adjustments not commented upon are regarded to be either obvious comments or professional judgment supported by pertinent valuation experience.

**The cash equivalent** effective sale prices of the most similar of the researched comparable building sales are reported and in this analysis are adjusted to the subject property using a percentage per unit of comparison basis. In this adjustment analysis, the price per unit is the most recognized comparison element for this property type.

**This property rights adjustment** considers that comparable sales typically involve either 100% undivided ownership interests in fee simple estate or leased fee estate property rights compared to the subject (fee simple estate/leased fee estate) with (no/nominal/significant) adjustments for this factor. The objective of this report section for the subject property is to ascertain its value in the fee simple estate.

The adjustments, if any, for this line item could be significant in either a plus or minus direction especially when comparing leased fee estate comparable sales to a fee simple estate property. In most instances, marketable leasehold estates do not result due to such disparities; but this is a consideration with leased sale transactions. Ownership interests such as fractional interests, physical segments or partial holdings are not considered as a part of this valuation assignment.

All Comparable Sales are 100% undivided fee simple ownership interests like the subject property.

**The conditions of sale** - The adjustments for conditions of sale usually relate to the extraordinary motivations of the buyer or the seller in the transfer of real property. Examples of circumstances requiring adjustments include purchase for assemblage, quick sale for cash, sales made under duress, legal auctions, eminent domain transactions, certain Real Estate Owned transactions, and sales that were not arm's length. This category is also utilized to reflect the adjustment required for listings, negotiations, offers, non-closed escrows and extraordinary seller/buyer transactions.

Upwards adjustments made for comparable sales 2, 4, and 7 for residential only entitlements.

**The market conditions** – Real estate values normally change over time. The rate of change fluctuates due to investor's perceptions of prevailing market conditions and market supply and demand characteristics. This adjustment category reflects value changes, if any, that may occur between the setting of the sales price and the effective date of appraisal. The market in this locale was most likely stable during the period considered. Due to the decline of real estate owned and short sales in the area, it appears the market is stabilizing along with the financing market. The recent land sales, although fewer in number than developed properties, has shown the same market stabilization over the past year. The time interval in months between the comparable date for price negotiation and closing and recording of the sale on equivalent date is estimated at 6-12 months.

No adjustments warranted in this appraisal.

**These descriptive items** comparing the building sales to the subject property indicate that the comparable sales are reasonably like the subject property and can be used for comparison purposes in this Sales Comparison Approach to Value.

**The Physical characteristics** pertain to the site portion of the sale and the location, economic factors, etc. as enumerated pertain to the land contribution to the overall sale price.

**A Size adjustment** considers the comparable sale gross land area vs. the subject property land area with adjustments applied for significant differences in size. Typically, small properties have a larger pool of buyers and sell for higher square foot prices than otherwise similar larger properties. Conversely, investment demand sometimes is greater for larger properties vs. small properties while user demand is typically greater for the smaller properties. This is called an "Economy of Scale." Extremely large or small sales vs. the subject would be difficult comparisons with less significance reflected for such sales. This adjustment would be minimized by the selection of comparable sales in the same size range as the subject property with nominal positive adjustments for larger sales and nominal negative adjustments for smaller sales using a $PSF unit of comparison.

Properties of reasonably similar site sizes were basic criteria in the search for comparable sales but this was unattainable in this instance. Land sales are limited and the sales included are the most similar to the subject presently available and demonstrate the market range. A percentage of $PSF of their sale price was utilized for this adjustment and was based on the overall size difference between the subject and the comparable sale.

Downward adjustments were made for comparable sales 1 through 6 for having a smaller lot size. Pending sale 7 was adjusted upward for having a larger lot size.

**A frontage adjustment** considers the visibility of a property. Those with corner lots and multiple street accesses along arterial or large streets are considered as premium due to the added visibility of multiple vantage points along with greater traffic count. The subject has a long frontage, almost one mile, on three streets. A percentage of $PSF of the sale price was utilized for this adjustment and was based on the overall contributory value of the frontage difference between the subject and the comparable sale.

In this case, the subject property is located on a signalized corner parcel along an ocean front thoroughfare, with approximately 2,220 feet of frontage on N Harbor Drive and, 1,240 feet of frontage on Herondo Ave, and 820 feet of frontage on Francisca Ave, for a total of 4,280 feet.

Upward adjustments were made for all of the comparable sales except pending sale 7 for having for having inferior frontage.

**A location adjustment** considers the perceived rating for the comparable sale location as compared to the subject property as a valuation opinion based on market experience. Factors for consideration of location ratings include distance from freeways, arterial or large street location, and overall neighborhood condition, or a combination of the factors. Ratings used for comparison purposes are selected from a range of poor, fair, average, good and excellent.

In this case, the subject located a signalized corner parcel along an ocean front thoroughfare, N Harbor Drive, located in the heart of the King Harbor commercial district of Redondo Beach. Also, it is rare that a parcel in the subject's location near the beach and harbor comes available. Although several of the comparable sales are located on larger arterial streets than the subject, the loss of vehicular traffic is compensated by the increase of foot, bicycle, beach, and harbor traffic. A premium would likely be paid for the subject parcel.

Upward adjustments were made comparable sales 1, 2, 4, 6, and for pending sale 7 for having an inferior location to the subject. Downward adjustments were made for comparable sales 3 and 5 which are located in downtown Santa Monica which is a superior economic location.

**A view adjustment** considers above average vantages that include natural sites such as mountains, forests, lakes, the ocean, coastlines, and panoramas. Manmade sites such as city lights, harbors, bridges, and skyline views are also considered. The subject property has ocean and harbor views.

Upward adjustments were made for all of the comparable and pending sales, as although several are located close to the ocean, none have ocean or harbor views.

**An availability of utilities** adjustment considers the distance to and requirements and cost of installing utilities to a site in the future process of building in the future. The surrounding area of the subject is suburban with utilities readily available. A percentage of $PSF of the sale price was utilized for this adjustment and was based on the overall contributory value of the availability of utilities difference between the subject and the comparable sale.

No adjustments made in this valuation

**A zoning adjustment** considers the available uses of a property. The subject property is currently zoned P-GP, which allows for generating plant uses. However, based on the zoning and land use information above, the City of Redondo Beach has not made a specific zoning or land use for the subject property once it is decommissioned. The best information points to the subject having the possibility of utilizing the adjacent and surrounding properties or zoning which include commercial, multi-family, and mixed use (commercial & residential). For these reasons, all of the comparable sales considered to have a zoning or land use available to the subject upon decommission.

No adjustments made in this valuation

**Conclusion of the Sales Comparison Approach**

The sales comparison approach examines the price or price per unit area of similar properties being sold in the marketplace. Simply put, the sales of properties similar to the subject are analyzed to determine the value of the subject. This approach is generally considered the most reliable if adequate comparable sales exist. In any event, it is the only independent check on the reasonability of an appraisal opinion.

The sales used were the most recent and most similar zoned properties that were sold in the immediate area. Sales from the immediate neighborhood are the most reliable indicator of market value. All were verified for accuracy and closing. Based on the limited research, which includes data found in public records and other resources, we were able to draw a potential fair market value for the property.

There were a limited number of comparable land properties on the market with similar entitlements to the subject property. For this reason, the comparable search radius was expanded to included the comparable and pending sales utilized in this appraisal.

The subject is reported to be four parcels with a total size of 2,173,644 SF (49.90 AC). It was preferred to seek out sales comps from the nearby and competing areas. These comps were used to derive a fair market $/AC and $/SF.

**Comparable Sales Data**

Unadjusted Range of $/AC – $6,535,714 - $7,600,000 - $9,314,999 - $9,342,857 -  $19,161,983 - $30,416,667 - $46,474,359

Adjusted Range of $/AC – $7,908,318 - $8,849,214 - $9,279,587 - $11,818,699 - $18,204,160 - $25,854,167 - $39,503,257

Adjusted $/AC Mean Average – $17,345,343/AC

Adjusted $/AC Median Value – $11,818,699/AC


Unadjusted Range of $/SF – $150.04 - $174.47 - $213.84 - $214.48 - $439.90 - $698.27 - $1,066.90

Adjusted Range of $/SF – $181.55 - $203.15 - $213.03 - $271.32 - $417.91 - $593.53 - $906.87

Adjusted $/SF Mean Average – $398.19/SF

Adjusted $/SF Median Value – $271.32/SF

AVG

This "As Entitled" market value is based on the hypothetical condition that, "the subject has been entitled for the construction of the provided plans." The plans for the subject property include residential, office, retail, and hotel components. There were a limited number of comparable or pending sales of land properties with similar entitlements to he subject. The two comparable sales from the South Bay market area, where the subject is located, are both located a significant distance from the ocean and were only entitled as residential developments. The two comparable sales from Long Beach were entitled as residential and retail developments. These are similar to the subject's proposed plans. However, downtown Long Beach, although located near the ocean and a harbor, is considered an inferior market area to the subject area. The two comparable sales from Santa Monica also have entitlements for residential and retail developments. Downtown Santa Monica is located near the ocean and a pier. Santa Monica Pier is a major Los Angeles tourist attraction and downtown Santa Monica has a significant draw from across the Los Angeles region. It is considered a superior economic market area to the subject market area. The pending sale from Irvine is included as it is the largest land parcel available with plans for development moving forward. It is rare in Southern California for such large parcels to be available and sold approved for development.

The appraiser notes that there will be a substantial cost for demolition and remediation of the subject site to make it buildable. However, these costs are considered to be offset by the salvage value of the components and additional tax savings provided through the City of Redondo Beach Enhanced Infrastructure Financing District (EIFD) upon development of the site. For these reasons, no deduction is made for demolition and remediation in this appraisal.

Considering the similarities and differences between the subject and the comparable and pending sales, with consideration given to site size, location, market area, and in place entitlements, the selected $/Acre and $/SF "As Entitled" value indicators for the subject are placed at $12,000,000/Acre and $275.00/SF, which are within the average and median of the market range.

The concluded Fair Market Rate $/AC is $12,000,000/AC x 49.90 AC = $598,800,000
Rounded to $598,800,000

The concluded Fair Market Rate $/SF is $275.00/SF x 2,173,644 SF = $597,752,100
Rounded to $597,750,000

The Estimated "As Entitled" Site Value is $600,000,000

**"As Entitled" Sales Comparison Approach Value Conclusion    $600,000,000**

## INCOME CAPITALIZATION APPROACH TO VALUE

The Income Capitalization Approach to Value is one of three traditional valuation methods used in the appraisal of improved real estate, and it is regarded by this appraiser <u>not to be applicable</u> in this particular appraisal assignment.

The income approach to value is based upon the premise that a relationship exists between the income that a property can produce and the value of that property. The principles of anticipation and change are central to this approach. Value is created by the expectation of future benefits, and future benefits are predicated upon anticipated changes. Since the future is less certain than the present, investors will pay less for future payments than they would for the same sum received today. The impact of future events on value is a function of the time value of money, as well as perceived risks. Risks can be viewed by investors in many ways ranging from relatively "risk free" to highly speculative. In general, higher risks equate to higher rewards.

To use the income approach, the appraiser must first estimate the annual income the property can generate; deduct from this the anticipated expenses to be incurred with the operation of the property; determine the appropriate capitalization technique; and then mathematically process the net income stream into an indication of value.

The two methods available to value the subject using the income approach are direct capitalization and discounted cash flow. The direct capitalization technique converts one year's estimate of net income into an indication of value by rates developed from market sales and analysis of debt and equity requirements. The discounted cash flow approach estimates value by forecasting income and expenses over a typical investment-holding period and converting all future benefits (including resale proceeds) to present worth at an appropriate rate of return. Direct capitalization is more appropriate when income is expected to remain stable, leases are month-to-month or short term, rents are uniform among the units, and vacancy and expenses are stable. The direct capitalization approach has been utilized herein, as most buyers use such an analysis in the buy/sell decision-making process for a retail property of the subject size.



# RECONCILIATION AND FINAL OPINION OF VALUE

The valuation analyses for the subject property were described in detail in this appraisal report in order to convey the data and analysis that were used to form my opinion of market value. The report is for use by the client to determine the fair market value of the property.

### SUMMARY OF VALUATION ANALYSES AND APPRAISAL REPORT CONCLUSIONS

| Valuation Analysis | Current "As Is" Value Premise |
|---|---|
| Cost Approach | Not Appropriate |
| "As Is" Sales Comparison Approach | $110,000,000 |
| "As Entitled" Sales Comparison Approach | $600,000,000 |
| Income Approach | Not Appropriate |
| "As Is" Final Value Conclusion | $110,000,000 |
| "As Entitled" Final Value Conclusion | $600,000,000 |

The Sales Comparison Approach to Value indication is based on the principle of substitution that assumes a prudent purchaser probably will not pay more for a specific property than for an equally desirable and available substitute property. Consequently, the Sales Comparison Approach to Value provides a good indication of value for an improved property when adequate and similar market data is available for review by the appraiser.

It is estimated that the available market data as it is considered for this report is similar enough to the subject property to be worthy of consideration. The value indicated by this Sales Comparison Approach to Value is rated to be of primary importance for the valuation of the subject in fee simple ownership terms.

It is the conclusion of this appraisal that the opinion of market value in the property of the fee simple estate property right of the subject property subject to a current valuation premise with an effective date of appraisal and value as of May 20, 2024, subject to the definitions, certification, assumptions and limiting conditions set forth in the attached appraisal report is as follows:

**"AS IS" – ONE HUNDRED TEN MILLION DOLLARS………………...   $110,000,000**

**"AS ENTITLED" – SIX HUNDRED MILLION DOLLARS………………...   $600,000,000**

## EXPOSURE AND MARKETING TIME

The USPAP definition of Marketing Time is *"the reasonable marketing time is an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal."* The estimated reasonable marketing time for the subject property is estimated to be (6-12) months based on the following reasoning:

- Statistical information about days on market for past recent sales suggests a 6-12-month exposure.

- Information gathered through comparable sales verification suggests a stable market.

- Interviews of market participants suggest a stable market during the period of the sales.

- Anticipated changes in market conditions suggest that the market is stable and modest to moderate growth will occur.

# CERTIFICATION OF APPRAISAL

This valuation is based upon the attached report and all the assumptions and limiting conditions contained therein, including the understanding that the appraiser has no control of the use at which the report may be put by any subsequent reader of this report.

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analysis, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, unbiased, professional analysis, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and I have no personal interest or bias with respect to the parties involved.

4. I have performed no valuation services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

5. I have no bias with respect to the property that is subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment is not contingent upon the development or reporting of a predetermined value

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended se of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Practice Appraisal Practice.

9. I have made a personal inspection of the property that is the subject of this report.

10. No one provided significant real property assistance to the person signing this certification.

_Jack Alexander_

_____

President, Alexander Valuation Group
California Certified General Appraiser License #AG032464



## LETTER OF TRANSMITTAL

**ALEXANDER VALUATION GROUP**

www.AlexanderValuationGroup.com
admin@alexandervg.com
+1.310.545.8700

May 13, 2024

Victor A. Sahn
Greenspoon Marder LLP
1875 Century Park East, 19th Floor
Los Angeles, CA 90067

Re:    Fair Market Site Valuations – One Redondo

### Proposal for Summary Appraisal Report

Dear Victor,

The purpose of this assignment is to provide an opinion of the Fair Market Values for the subject property listed below:

Land (site) values

**"As Is" – a 50 acre parcel**

**"As Entitled" – 22.7 acres Residential, 11.9 acres commercial,
15.6 acres mixed (Com/Res)**

The valuations are to be presented in a summary appraisal format with an "As Is" and an "As Entitled" land (site) valuations for the purposes of determining the current fair market values; the vehicle for delivery is a summary appraisal report, and the report will be completed approximately one three weeks from the inspection date.

The function of the appraisal report is for the use by my client or its assignees to determine the overall market values of the subject property for ongoing litigation purposes. The report will set forth the data, analysis and conclusions that will lead to the opinions of value as of the valuation date. This signed and returned document will serve as our letter of engagement, the binding contract for this appraisal assignment.





The preparation of the report is to be consistent with the appraisal standards as set forth by the Appraisal Institute (USPAP) and the state of California. This letter summarizes the agreement for performance of these services.

The fee for this assignment is $2,500 for the "As Is" land valuation and $12,500 for the "As Entitled" valuation, for a total of $15,000. The retainer payment is 50% of the total fee ($7,500) and the remaining balance will be due upon completion of the reports ($7,500).

Additional services such as rebuttals, trial appearances, or otherwise will be billed at an hourly rate of $450 per hour.

The reports will be sent via PDF email for your review upon completion and satisfactory review by the client and assignees.

Sincerely,

Jack Alexander
President, Alexander Valuation Group
State of California State Certified General License #AG032464

Accepted by:

Signature: _____     Date: _____

Printed Name: Leo Avstihikon     Title: _____



# QUALIFICATIONS



**EXHIBIT F**

**(DECLARATION OF ELY DROMY IN SUPPORT OF DISCLOSURE STATEMENT AND**

**PLAN)**

I, Ely Dromy, hereby declare and state as follows:

1. I have personal knowledge of the facts set forth in this declaration, and am actively involved in, oversee, and am intimately familiar with, all aspects of the operations of 9300 Wilshire, LLC, a Delaware limited liability company (the "Debtor"), the debtor and debtor in possession in the above-captioned case, including, but not limited to, the Debtor's assets and liabilities.

2. I have reviewed the "Debtor and Debtor in Possession's Disclosure Statement and Plan of Reorganization" (the "Disclosure Statement and Plan"), and/or the accompanying exhibits.

3. Since the Petition Date, I have funded significant sums to the Debtor in the form of capital contributions totaling $850,512.50. I am aware that the Disclosure Statement and Plan provide that I will continue to make capital contributions to the Debtor in order to fund payments that must be made on the Effective Date of the Plan, as well as other payments that may need to be made throughout the duration of the Plan. I am fully committed to making these payments and I have the financial ability to do so. Presently, I have liquid assets in the approximate sum of $50,000,000 in the form of cash, marketable securities, bonds and other assets which can immediately be reduced to cash. I have interests in multiple real properties that are worth more than $450,000,000. My net worth is approximately $258,000,000 when deducting trust deed indebtedness and other debt that I owe.

4. In addition, I have interests in multiple real properties that I can use to make the Effective Date and post-Effective Date payments required under the Plan, and I remain committed and will guarantee the Debtor's performance under this Plan. We have the resources now to make all of the payments required under the Plan and we have the wherewithal to pay off through other property sales or by refinancing the

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

1  properties in this bankruptcy case in order to pay off "all due and payable" indebtedness

2  which becomes due under the Plan.

3          I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct.

5          Executed this 1st day of July, 2024, at Los Angeles, California.

6

7

8  _____
   Ely Dromy

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL 213.626.2311 · FAX 954.771.9264

DAL 5794304 8v1

# EXHIBIT G

## (CORRECTIVE ACTION CONSENT AGREEMENT)

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

DAL 57943048v1

STATE OF CALIFORNIA
ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

In the Matter of:

AES Redondo Beach, L.L.C.
1100 North Harbor Drive
Redondo Beach, California 90277

EPA ID No. CAR000038893

Owner/Operator:
AES Redondo Beach, L.L.C.
1100 North Harbor Drive
Redondo Beach, California 90277

Docket HWCA-FY16/17-002

CORRECTIVE ACTION
CONSENT AGREEMENT

Health and Safety Code
Section 25187

## INTRODUCTION

1.  The Department of Toxic Substances Control (DTSC) and AES Redondo Beach, L.L.C., a Delaware limited liability company, the site owner and operator, (Respondent) enter into this Corrective Action Consent Agreement (Consent Agreement) and agree as follows:

1.1.  Jurisdiction exists pursuant to Health and Safety Code section 25187, which authorizes DTSC to issue an order to require corrective action when DTSC determines that there is or may be a release of hazardous waste or hazardous waste constituents into the environment from a hazardous waste facility.

1.2.  The parties enter into this Consent Agreement to avoid the expense of litigation and to carry out promptly the corrective action described below.

1.3.  Respondent is the owner and operator of a hazardous waste facility located at 1100 North Harbor Drive, Redondo Beach, California (Facility).

1.4.  Respondent is a successor in interest to the land and facilities at Redondo Beach previously owned by Southern California Edison (SCE). In 1995, SCE entered a settlement with DTSC under the Hazardous Waste Control Act (HWCA) regarding hazardous waste at the Facility, as memorialized in its Final Judgment pursuant to Stipulation ("1995 Final Judgment"). Respondent represents, and DTSC relies on this representation, that it took fee title to the Facility on May 18, 1998. The closure activities required under the 1995 final Judgment were not completed.

1.5.  The terms used in this Consent Agreement are as defined in California Code of Regulations, title 22, section 66260.10, except as otherwise provided.

1.6.  Respondent agrees to implement all DTSC-approved workplans and to undertake all actions required by the terms and conditions of this Consent Agreement, including any portions of this Consent Agreement incorporated by reference.

1.7.  By entering into this Consent Agreement, Respondent does not admit to any liability for any release of hazardous waste or hazardous waste constituents into the environment at or from the Facility. Respondent agrees not to challenge the Department's jurisdiction to enter into and enforce this Consent Agreement.

1.8.  Respondent waives any right to request a hearing on this Consent Agreement pursuant to Health and Safety Code section 25187.

1.9  Respondent has agreed to enter into this Consent Agreement because Respondent is not a party to the 1995 Final Judgment.

<u>FINDINGS OF FACT</u>

2.1.  The 1995 Final Judgment ordered SCE to close its Boiler Cleaning Chemical Basins and its Retention Basins pursuant to DTSC's Interim Status regulations.  These are solid waste management units (SWMUs) as defined in title 22, California Code of Regulations, section 66260.10, that may either have released or may release hazardous waste or hazardous waste constituents into the environment.

2.1.1.  The three (3) SWMUs identified to date are as follows: (1) Polishing Demineralizer Sumps, (2) Boiler Chemical Cleaning Basins, and (3) Retention Basins.

2.1.2.  A groundwater monitoring network was installed in the late 1990s as a leak detection system for the Facility.

2.1.3.  Respondent acquired the Facility on May 18, 1998.

2.2.  Based on the 1995 Judgment and information available to DTSC, DTSC concludes that further investigation is needed to determine the nature and extent of any release of hazardous waste or hazardous waste constituents that may exist at or from the Facility.  Further work and oversight are also necessary to complete closure of the SWMUs listed above.

2.3.  The hazardous waste and hazardous waste constituents of concern at the Facility are total petroleum hydrocarbons (TPH), metals (other than arsenic, which is known to naturally exist), polychlorinated biphenyls (PCBs), volatile organic compounds (VOCs), and semi-VOCs.

2.4.  Hazardous wastes or hazardous waste constituents have migrated or may migrate from the Facility into the environment through the following pathways: soil vapor, vadose zone, groundwater, and surface water.

2.5.  The Facility is located near a residential neighborhood which is approximately 100 feet to the north, a commercial/industrial business area approximately 100 feet to the east, a hotel directly adjacent to the south, and King Harbor and the Pacific Ocean approximately 100 feet to the west.  Groundwater measured from monitoring wells located throughout the east end of the Facility occurs at approximately 5 feet below ground surface.

2.6.  To the extent that there may have been releases from the Facility, those releases may have migrated or have the potential to migrate into groundwater which

could further migrate toward the Pacific Ocean and impact ecological receptors.  The closest potential human receptors include the current workers on-site and those working at adjacent facilities, visitors to King Harbor, guests staying at adjacent hotels and a residential neighborhood located across the street from the Facility.

2.7   Respondent acquired the facility following the entry of a Stipulated Judgment between Respondent's predecessor, SCE, and DTSC. To the extent that there may have been releases from the facility, DTSC's present project manager for this Site is not aware of  any releases caused by Respondent.

<u>PROJECT COORDINATOR</u>

3.  Within 14 days of the effective date of this Consent Agreement, Respondent shall designate a Project Coordinator and shall notify DTSC in writing of the Project Coordinator selected.  DTSC's Project Coordinator is Steven Rounds.  Each Project Coordinator shall be responsible for overseeing the implementation of this Consent Agreement and for designating a person to act in his/her absence.  All communications between Respondent and DTSC, and all documents, report approvals, and other correspondence concerning the activities performed pursuant to this Consent Agreement shall be directed through the Project Coordinators.  Each party may change its Project Coordinator with at least seven days' prior written notice.

<u>WORK TO BE PERFORMED</u>

4.  Respondent agrees to perform the work required by this Consent Agreement in accordance with the applicable state and federal laws, their implementing regulations, and the applicable DTSC and the United States Environmental Protection Agency guidance documents.

<u>RCRA FACILITY ASSESSMENT (RFA)</u>

5.1.  Within 60 days of the effective date of this Consent Agreement, Respondent shall submit a RCRA Facility Assessment (RFA) to identify all solid waste management units (SWMUs) and areas of concern (AOCs) that either have released or may release hazardous waste or hazardous waste constituents into the environment.  The RFA shall 1) identify all potential releases of concern; 2) identify all SWMUs and/or AOCs; 3) determine which areas need further investigation; 4) determine which areas require interim measures; and 5) screen out releases that do not require any further investigation.  The RFA shall be prepared consistent with the USEPA guidance document for RFA dated 1986.

5.2.  The scope of the RFA is limited to parcels identified in the Map attached as Exhibit A which contains Parcel 1 (Assessor's Parcel Number: 7503-013-014 and Assessor's Parcel Number: 7503-013-015) and Parcel 2 (Assessor's Parcel Number: 7503-013-819 and Assessor's Parcel Number: 7503-013-820), which are currently owned by the Respondent.

## INTERIM MEASURES (IM)

6.1.  Respondent shall evaluate available data and assess the need for interim measures in addition to those specifically required by this Consent Agreement. Interim measures shall be used whenever possible to control or abate immediate threats to human health and/or the environment, and to prevent and/or minimize the spread of contaminants while long-term corrective action alternatives are being evaluated.

6.2.  Within 120 days of the effective date of this Consent Agreement, Respondent shall submit a Current Conditions Report to DTSC.  The Current Conditions Report is subject to approval by DTSC and shall be developed in a manner consistent with the Scope of Work for a RCRA Facility Investigation contained in Attachment 1. The Current Conditions Report shall contain an assessment of interim measures.  The assessment must include both previously implemented interim measures and other interim measures that could be implemented at the Facility.  The assessment must also identify any additional data needed for making decisions on interim measures.  This new data or information shall be collected during the early stages of the RCRA Facility Investigation.  DTSC will review the Respondent's assessment and determine which interim measures, if any, Respondent will implement at the Facility.  If deemed appropriate by DTSC, such determination may be deferred until additional data are collected.

6.2.1.  If interim measures are required, Respondent shall submit to DTSC a Workplan for the implementation of Interim Measures ("IM Workplan").  The IM Workplan is subject to approval by DTSC and shall provide for the performance of all Interim Measures necessary to achieve stabilization at the Facility.  The IM Workplan shall include a schedule for submitting to DTSC an IM Operation and Maintenance Plan and IM Plans and Specifications.  The IM Workplan, IM Operation and Maintenance Plan, and IM Plans and Specifications shall be developed in a manner consistent with the Scope of Work for Interim Measures Implementation contained in Attachment 2.

6.3.  If at any time Respondent identifies an immediate or potential threat to human health and/or the environment, discovers new releases of hazardous waste and/or hazardous waste constituents, or discovers new solid waste management units not previously identified, Respondent shall notify DTSC Project Coordinator orally within 48 hours of discovery and notify DTSC in writing within ten (10) days of discovery summarizing the findings, including the immediacy and magnitude of the potential threat to human health and/or the environment.  Within thirty (30) days of receiving DTSC's written request, Respondent shall submit to DTSC an IM Workplan for approval.  The IM Workplan shall include a schedule for submitting to DTSC an IM Operation and Maintenance Plan and IM Plans and Specifications.  The IM Workplan, IM Operation and Maintenance Plan, and IM Plans and Specifications shall be developed in a manner consistent with the Scope of Work for Interim Measures Implementation contained in as Attachment 2.  If DTSC determines that immediate action is required, DTSC Project Coordinator may orally authorize the Respondent to act prior to DTSC's receipt of the IM Workplan.

6.4.  If DTSC identifies an immediate or potential threat to human health and/or the environment, discovers new releases of hazardous waste and/or hazardous

waste constituents, or discovers new solid waste management units not previously identified, DTSC will notify Respondent in writing. Within thirty (30) days of receiving DTSC's written notification, Respondent shall submit to DTSC for approval an IM Workplan that identifies Interim Measures that will mitigate the threat. The IM Workplan shall include a schedule for submitting to DTSC an IM Operation and Maintenance Plan and IM Plans and Specifications. The IM Workplan, IM Operation and Maintenance Plan, and IM Plans and Specifications shall be developed in a manner consistent with the Scope of Work for Interim Measures Implementation contained in Attachment 2. If DTSC determines that immediate action is required, DTSC Project Coordinator may orally authorize Respondent to act prior to receipt of the IM Workplan.

6.5. All IM Workplans shall ensure that the Interim Measures are designed to mitigate current or potential threats to human health and/or the environment, and should, to the extent practicable, be consistent with the objectives of, and contribute to the performance of, any remedy which may be required at the Facility.

6.6. Concurrent with the submission of an IM Workplan, Respondent shall submit to DTSC a Health and Safety Plan in accordance with the Scope of Work for a Health and Safety Plan contained in Attachment 3.

6.7. Concurrent with the submission of an IM Workplan, Respondent shall submit to DTSC for approval a Community Profile in accordance with Attachment 4. Based on the information provided in the Community Profile, if DTSC determines that there is a high level of community concern about the Facility, DTSC may require Respondent to prepare a Public Participation Plan.

## RCRA FACILITY INVESTIGATION (RFI)

7.1. Within 60 days from the approval of the RFA by DTSC, Respondent shall submit to DTSC a Current Conditions Report (unless an earlier submittal date is specified in this Consent Agreement) and a Workplan for a RCRA Facility Investigation ("RFI Workplan"). The Current Conditions Report and RFI Workplan are subject to approval by DTSC and shall be developed in a manner consistent with the Scope of Work for a RCRA Facility Investigation contained in Attachment 1. DTSC will review the Current Conditions Report and RFI Workplan and notify Respondent in writing of DTSC's approval or disapproval.

7.2. The RFI Workplan shall detail the methodology to: (1) gather data needed to make decisions on interim measures/ stabilization during the early phases of the RCRA Facility Investigation; (2) identify and characterize all sources of contamination; (3) define the nature, degree and extent of contamination; (4) define the rate of movement and direction of contamination flow; (5) characterize the potential pathways of contaminant migration; (6) identify actual or potential human and/or ecological receptors; and (7) support development of alternatives from which a corrective measure will be selected by DTSC. A specific schedule for implementation of all activities shall be included in the RFI Workplan.

7.3. Respondent shall submit a RFI Report to DTSC for approval in accordance with DTSC-approved RFI Workplan schedule. The RFI Report shall be developed in a manner consistent with the Scope of Work for a RCRA Facility

Investigation contained in Attachment 1.  If there is a phased investigation, separate RFI Reports and a report that summarizes the findings from all phases of the RFI must be submitted to DTSC.  DTSC will review the RFI Report(s) and notify Respondent in writing of DTSC's approval or disapproval.

7.4.  Concurrent with the submission of a RFI Workplan, Respondent shall submit to DTSC a Health and Safety Plan in accordance with Attachment 3.  If Workplans for both an IM and RFI are required by this Consent Agreement, Respondent may submit a single Health and Safety Plan that addresses the combined IM and RFI activities.

7.5.  Respondent shall submit a RFI Summary Fact Sheet to DTSC that summarizes the findings from all phases of the RFI.  The RFI Summary Fact Sheet shall be submitted to DTSC in accordance with the schedule contained in the approved RFI Workplan.  DTSC will review the RFI Summary Fact Sheet and notify Respondent in writing of DTSC's approval or disapproval, including any comments and/or modifications.  When DTSC approves the RFI Summary Fact Sheet, Respondent shall mail the approved RFI Summary Fact Sheet to all individuals on the Facility mailing list established pursuant to California Code Regulations, title 22, section 66271.9(c)(1)(D), within fifteen (15) calendar days of receipt of written approval.

7.6.  Concurrent with the submission of a RFI Workplan, Respondent shall submit to DTSC for approval a Community Profile in accordance with Attachment 4.  Based on the information provided in the Community Profile and any Supplement to the Community Profile, if DTSC determines that there is a high level of community concern about the Facility, Respondent shall prepare a Public Participation Plan.

<u>RISK ASSESSMENT</u>

8.  Based on the information available to DTSC, Respondent may be required to conduct a Risk Assessment to evaluate potential human health risk and ecological risk and to establish site-specific action levels and cleanup standards.  If DTSC determines that a Risk Assessment is required, Respondent shall submit to DTSC for approval a Risk Assessment Workplan within sixty (60) days of receipt of DTSC's determination.  Respondent shall submit to DTSC for approval a Risk Assessment Report in accordance with DTSC-approved Risk Assessment Workplan schedule.

<u>CORRECTIVE MEASURES STUDY (CMS)</u>

9.  For the implementation of the RFI Workplan and/or if it becomes necessary to perform subsequent phase(s) of work, DTSC and Respondent will negotiate another consent agreement or amend this Consent Agreement to address the additional work.  If another consent agreement or an amendment is not reached within 90 days, DTSC reserves its right to issue an order or take any other action provided for by law.  DTSC's costs incurred in negotiating the subsequent consent agreement or the amendment are considered costs incurred pursuant to this Consent Agreement and are payable under this Consent Agreement.

## CALIFORNIA ENVIRONMENTAL QUALITY ACT

10.  DTSC must comply with the California Environmental Quality Act (CEQA) insofar as activities required by this Consent Agreement are projects subject to CEQA.  Respondent shall provide all information necessary to facilitate any CEQA analysis.  DTSC will make an initial determination regarding the applicability of CEQA.  If the activities are not exempt from CEQA, DTSC will conduct an Initial Study.  Based on the results of the Initial Study, DTSC will determine if a Negative Declaration or an Environmental Impact Report (EIR) should be prepared.  DTSC will prepare and process any such Negative Declaration.  However, should DTSC determine that an EIR is necessary, such an EIR would be prepared under a separate agreement between DTSC and Respondent.

## DTSC APPROVAL

11.1.  Respondent shall revise any workplan, report, specification, or schedule in accordance with DTSC's written comments.  Respondent shall submit to DTSC any revised documents by the due date specified by DTSC.  Revised submittals are subject to DTSC's approval or disapproval.

11.2.  Upon receipt of DTSC's written approval, Respondent shall commence work and implement any approved workplan in accordance with the schedule and provisions contained therein.

11.3.  Any DTSC-approved workplan, report, specification, or schedule required under this Consent Agreement shall be deemed incorporated into this Consent Agreement.

11.4.  Verbal advice, suggestions, or comments given by DTSC representatives will not constitute an official approval or decision.

## SUBMITTALS

12.1.  Beginning with the first full month following the effective date of this Consent Agreement, Respondent shall provide DTSC with quarterly progress reports of corrective action activities conducted pursuant to this Consent Agreement.  Progress reports are due on the 15th day (or the first business day afterward if the 15th falls on a weekend) of the first month following the close of each reporting period.  The progress reports shall conform to the Scope of Work for Progress Reports contained in Attachment 5.  DTSC may adjust the frequency of progress reporting to be consistent with site-specific activities.

12.2.  Any report or other document submitted by Respondent pursuant to this Consent Agreement shall be signed and certified by the project coordinator, a responsible corporate officer, or a duly authorized representative.

12.3.  The certification required by paragraph 13.2 above, shall be in the following form:

I certify that the information contained in or accompanying this submittal is true, accurate, and complete.  As to those portions of this submittal for which

I cannot personally verify the accuracy, I certify that this submittal and all
attachments were prepared at my direction in accordance with procedures
designed to assure that qualified personnel properly gathered and evaluated
the information submitted.

Signature: _____

Name: _____

Title: _____

Date: _____

12.4.  Respondent shall provide three (3) copies of all documents, of which
one (1) copy must be electronic, including but not limited to, workplans, reports, and
correspondence.

12.5.  Unless otherwise specified, all reports, correspondence, approvals,
disapprovals, notices, or other submissions relating to this Consent Agreement shall be
in writing and shall be sent to the current Project Coordinators.

## PROPOSED CONTRACTOR/CONSULTANT

13.  All work performed pursuant to this Consent Agreement shall be under
the direction and supervision of a professional engineer or registered geologist,
registered in California, with expertise in hazardous waste site cleanup.  Respondent's
contractor or consultant shall have the technical expertise sufficient to fulfill his or her
responsibilities.  Within 14 days of any change in Respondent's consultant, Respondent
shall notify DTSC Project Coordinator in writing of the name, title, and qualifications of
the professional engineer or registered geologist and of any contractors or consultants
and their personnel to be used in carrying out the terms of this Consent Agreement.

## ADDITIONAL WORK

14.  DTSC may determine or Respondent may propose that certain tasks,
including investigatory work, engineering evaluation, or procedure/methodology
modifications are necessary in addition to, or in lieu of, the tasks and deliverables
included in any part of DTSC-approved workplans.  DTSC shall request in writing that
Respondent perform the additional work and shall specify the basis and reasons for
DTSC's determination that the additional work is necessary.  Within 30 days after the
receipt of such determination, Respondent may confer with DTSC to discuss the
additional work DTSC has requested.  If required by DTSC, Respondent shall submit to
DTSC a workplan for the additional work.  Such workplan shall be submitted to DTSC
within 30 days of receipt of DTSC's determination or according to an alternate schedule
established by DTSC.  Upon approval of a workplan, Respondent shall implement it in
accordance with the provisions and schedule contained therein.  The need for, and
disputes concerning, additional work are subject to the dispute resolution procedures
specified in this Consent Agreement.

## QUALITY ASSURANCE

15.1.  All sampling and analyses performed by Respondent under this Consent Agreement shall follow applicable DTSC and U.S. EPA guidance for sampling and analysis.  Workplans shall contain quality assurance/quality control and chain of custody procedures for all sampling, monitoring, and analytical activities.  Any deviations from the approved workplans must be approved by DTSC prior to implementation, must be documented, including reasons for the deviations, and must be reported in the applicable report.

15.2.  The names, addresses, and telephone numbers of the California State certified analytical laboratories Respondent proposes to use must be specified in the applicable workplans.

## SAMPLING AND DATA/DOCUMENT AVAILABILITY

16.1.  Respondent shall submit to DTSC upon request the results of all sampling and/or tests or other data generated by its employees, agents, consultants, or contractors pursuant to this Consent Agreement.

16.2.  Respondent shall notify DTSC in writing at least seven days prior to beginning each separate phase of field work approved under any workplan required by this Consent Agreement.  If Respondent believes it must commence emergency field activities without delay, Respondent may seek emergency telephone authorization from DTSC Project Coordinator or, if the Project Coordinator is unavailable, his/her Branch Chief, to commence such activities immediately.

16.3.  At the request of DTSC, Respondent shall provide or allow DTSC or its authorized representative to take split or duplicate samples of all samples collected by Respondent pursuant to this Consent Agreement.  Similarly, at the request of Respondent, DTSC shall allow Respondent or its authorized representative to take split or duplicate samples of all samples collected by DTSC under this Consent Agreement.

## ACCESS

17.  Subject to the Facility's security and safety procedures, Respondent agrees to provide DTSC and its representatives access at all reasonable times to the Facility and any off-site property owned by Respondent to which access is required for implementation of this Consent Agreement and shall permit such persons to inspect and copy all records, files, photographs, documents, including all sampling and monitoring data, that pertain to work undertaken pursuant to this Consent Agreement and that are within the possession or under the control of Respondent or its contractors or consultants.

## RECORD PRESERVATION

18.1.  Respondent shall retain, during the pendency of this Consent Agreement and for a minimum of six years after its termination, all data, records, and

documents that relate in any way to the performance of this Consent Agreement or to hazardous waste management and/or disposal at the Facility.  Respondent shall notify DTSC in writing 90 days prior to the destruction of any such records, and shall provide DTSC with the opportunity to take possession of any such records.  Such written notification shall reference the effective date, caption, and docket number of this Consent Agreement and shall be addressed to:

> Chief
> Brownfields and Environmental Restoration Program
> Department of Toxic Substances Control
> 9211 Oakdale Avenue
> Chatsworth, California 91311

18.2.  If Respondent retains or employs any agent, consultant, or contractor for the purpose of carrying out the terms of this Consent Agreement, Respondent will require any such agents, consultants, or contractors to provide Respondent a copy of all documents produced pursuant to this Consent Agreement.

18.3.  All documents pertaining to this Consent Agreement shall be stored in a central location at the Facility, or at a location otherwise agreed to by the parties, to afford easy access by DTSC and its representatives.

<u>DISPUTE RESOLUTION</u>

19.1.  The parties agree to use their best efforts to resolve all disputes informally.  The parties agree that the procedures contained in this section are the sole administrative procedures for resolving disputes arising under this Consent Agreement.  If Respondent fails to follow the procedures contained in this section, it shall have waived its right to further consideration of the disputed issue.

19.2.  If Respondent disagrees with any written decision by DTSC pursuant to this Consent Agreement, Respondent's Project Coordinator shall orally notify DTSC's Project Coordinator of the dispute.  The Project Coordinators shall attempt to resolve the dispute informally.

19.3.  If the Project Coordinators cannot resolve the dispute informally, Respondent may pursue the matter formally by placing its objection in writing.  Respondent's written objection must be forwarded to Chief, Brownfields and Environmental Restoration Branch, Hazardous Waste Management Program, Department of Toxic Substances Control, with a copy to DTSC's Project Coordinator.  The written objection must be mailed to the Branch Chief within fourteen (14) days of Respondent's receipt of DTSC's written decision.  Respondent's written objection must set forth the specific points of the dispute and the basis for Respondent's position.

19.4.  DTSC and Respondent shall have 14 days from DTSC's receipt of Respondent's written objection to resolve the dispute through formal discussions.  This period may be extended by DTSC for good cause.  During such period, Respondent may meet or confer with DTSC to discuss the dispute.

19.5.  After the formal discussion period, DTSC will provide Respondent with its written decision on the dispute.  DTSC's written decision will reflect any agreements

reached during the formal discussion period and be signed by the Branch Chief or his/her designee.

19.6. During the pendency of all dispute resolution procedures set forth above, the time periods for completion of work required under this Consent Agreement that are affected by such dispute shall be extended for a period of time not to exceed the actual time taken to resolve the dispute. The existence of a dispute shall not excuse, toll, or suspend any other compliance obligation or deadline required pursuant to this Consent Agreement.

## RESERVATION OF RIGHTS

20.1. DTSC reserves all of its statutory and regulatory powers, authorities, rights, and remedies, which may pertain to Respondent's failure to comply with any of the requirements of this Consent Agreement. Respondent reserves all of its statutory and regulatory rights, defenses and remedies, as they may arise under this Consent Agreement. This Consent Agreement shall not be construed as a covenant not to sue, release, waiver, or limitation on any powers, authorities, rights, or remedies, civil or criminal, that DTSC or Respondent may have under any laws, regulations or common law.

20.2. DTSC reserves the right to disapprove of work performed by Respondent pursuant to this Consent Agreement and to request that Respondent perform additional tasks.

20.3. DTSC reserves the right to perform any portion of the work consented to herein or any additional site characterization, feasibility study, and/or remedial actions it deems necessary to protect human health and/or the environment. DTSC may exercise its authority under any applicable state or federal law or regulation to undertake response actions at any time. DTSC reserves its right to seek reimbursement from Respondent for costs incurred by the State of California with respect to such actions. DTSC will notify Respondent in writing as soon as practicable regarding the decision to perform any work described in this section.

20.4. If DTSC determines that activities in compliance or noncompliance with this Consent Agreement have caused or may cause a release of hazardous waste and/or hazardous waste constituents, or a threat to human health and/or the environment, or that Respondent is not capable of undertaking any of the work required, DTSC may order Respondent to stop further implementation of this Consent Agreement for such period of time as DTSC determines may be needed to abate any such release or threat and/or to undertake any action which DTSC determines is necessary to abate such release or threat. The deadlines for any actions required of Respondent under this Consent Agreement affected by the order to stop work shall be extended to take into account DTSC's actions.

20.5. This Consent Agreement is not intended to be nor shall it be construed to be a permit. This Consent Agreement is not a substitute for, and does not preclude DTSC from requiring, any hazardous waste facility permit, post closure permit, closure plan or post closure plan. The parties acknowledge and agree that DTSC's approval of any workplan, plan, and/or specification does not constitute a warranty or representation

that the workplans, plans, and/or specifications will achieve the required cleanup or performance standards. Compliance by Respondent with the terms of this Consent Agreement shall not relieve Respondent of its obligations to comply with the Health and Safety Code or any other applicable local, state, or federal law or regulation.

## OTHER CLAIMS

21.  Except as provided in this Consent Agreement, nothing in this Consent Agreement shall constitute or be construed as a release by DTSC or Respondent from any claim, cause of action, or demand in law or equity against any person, firm, partnership, or corporation for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous constituents, hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken or migrating from the Facility.

## COMPLIANCE WITH WASTE DISCHARGE REQUIREMENTS

22.  Respondent shall comply with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California regional water quality control board.

## OTHER APPLICABLE LAWS

23.  All actions required by this Consent Agreement shall be conducted in accordance with the requirements of all local, state, and federal laws and regulations. Respondent shall obtain or cause its representatives to obtain all permits and approvals necessary under such laws and regulations.

## REIMBURSEMENT OF DTSC'S COSTS

24.1.      Respondent shall pay DTSC's costs incurred in the implementation of this Consent Agreement.  Such costs must include DTSC's costs incurred in the preparation and implementation of this Consent Agreement prior to the effective date of this Consent Agreement.

24.2.      An estimate of DTSC's costs is attached as Exhibit A showing the amount of $75,185.00.  It is understood by the parties that this amount is only a cost estimate for the activities shown on Exhibit A and it may differ from the actual costs incurred by DTSC in overseeing these activities or in implementing this Consent Agreement.  DTSC will provide additional cost estimates to Respondent as the work progresses under the Consent Agreement.

24.3.      Respondent shall make an advance payment to DTSC in the amount of $20,000.00 within 30 days of the effective date of this Consent Agreement.  If the advance payment exceeds DTSC's costs, DTSC will refund the balance within 120 days after the execution of the Acknowledgment of Satisfaction pursuant to Section 26 of this Consent Agreement.

24.4.    DTSC will provide Respondent with a billing statement at least quarterly, which will include the name(s) of the employee(s), identification of the activities, the amount of time spent on each activity, and the hourly rate charged.  If Respondent does not pay an invoice within 60 days of the date of the billing statement, the amount is subject to interest as provided by Health and Safety Code section 25360.1.

24.5.    DTSC will retain all costs records associated with the work performed under this Consent Agreement as required by state law.  DTSC will make all documents that support the DTSC's cost determination available for inspection upon request, as provided by the Public Records Act.

24.6.    Any dispute concerning DTSC's costs incurred pursuant to this Consent Agreement is subject to the Dispute Resolution provision of this Consent Agreement and the dispute resolution procedures as established pursuant to Health and Safety Code section 25269.2.  DTSC reserves its right to recover unpaid costs under applicable state and federal laws.

24.7.    All payments shall be made within 30 days of the date of the billing statement by check payable to the Department of Toxic Substances Control and shall be sent to:

Accounting Unit
Department of Toxic Substances Control
P. O. Box 806
Sacramento, California 95812-0806

All checks shall reference the name of the Facility, the Respondent's name and address, the project code 400939, and the docket number of this Consent Agreement.  Copies of all checks and letters transmitting such checks shall be sent simultaneously to DTSC's Project Coordinator.

<u>INCORPORATION OF EXHIBITS/ATTACHMENTS</u>

25.  All exhibits and/or attachments are incorporated into this Agreement by this reference.  All plans, schedules and reports that require DTSC's approval and are submitted by Proponent pursuant to this Agreement are incorporated in this Agreement upon DTSC's approval.

<u>MODIFICATION</u>

26.1.  This Consent Agreement may be modified by mutual agreement of the parties.  Any agreed modification shall be in writing, shall be signed by both parties, shall have as its effective date the date on which it is signed by all the parties, and shall be deemed incorporated into this Consent Agreement.

26.2.  Any requests for revision of an approved workplan requirement must be in writing.  Such requests must be timely and provide justification for any proposed workplan revision.  DTSC has no obligation to approve such requests, but if it does so, such approval will be in writing and signed by the Chief, Brownfields and Environmental

Restoration Branch, Department of Toxic Substances Control, or his or her designee. Any approved workplan revision shall be incorporated by reference into this Consent Agreement.

## TERMINATION AND SATISFACTION

27. The provisions of this Consent Agreement shall be deemed satisfied upon the execution by both parties of an Acknowledgment of Satisfaction (Acknowledgment). DTSC will prepare the Acknowledgment for Respondent's signature. The Acknowledgment will specify that Respondent has demonstrated to the satisfaction of DTSC that the terms of this Consent Agreement including payment of DTSC's costs have been satisfactorily completed. The Acknowledgment will affirm Respondent's continuing obligation to preserve all records after the rest of the Consent Agreement is satisfactorily completed.

## EFFECTIVE DATE

28. The effective date of this Consent Agreement shall be the date on which this Consent Agreement is signed by all the parties. Except as otherwise specified, "days" means calendar days.

## SIGNATORIES

29. Each undersigned representative certifies that he or she is fully authorized to enter into this Consent Agreement. Should Respondent's signatory below not be authorized to bind Respondent fully, any and all costs to rectify the error shall be paid by the Respondent with 30 days of the date of demand.

## COUNTERPARTS

30. This Consent Decree may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

DATE: Sep 8, 2016  BY: _____

Sayareh Amirebrahimi, Chief
Brownfields and Environmental Restoration Program,
Department of Toxic Substances Control

DATE: 07/13/16  BY: _____

Representing Respondent, AES Redondo Beach, LLC

Stephen O'Kane, Manager
_____
Name and Title of Respondent's Representative

{00365859;1}
Corrective Action Consent Agreement            14            AES Redondo Beach, L.L.C

Attachment List at Consent Agreement Execution:

Att. 1  RCRA Facility Investigation Scope of Work (SOW)
Att. 2  Interim Measures Implementation SOW
Att. 3  Health and Safety Plan SOW
Att. 4  Community Profile & Public Participation Plan Outline
Att. 5  Progress Reports SOW

# EXHIBIT G

## (TOXICITY CRITERIA FOR HUMAN HEALTH RISK ASSESSMENTS, SCREENING LEVELS, AND REMEDIATION GOALS IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN)

**Greenspoon Marder LLP**
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**Add Chapter 50.  Corrective Action**

**Article 1. Toxicity Criteria for Human Health Risk Assessments, Screening Levels, and Remediation Goals**

**68400.5.  Toxicity Criteria for Human Health Risk Assessments, Screening Levels, and Remediation Goals**

For any release of hazardous waste or hazardous constituents, the human health risk assessment calculations, including, but not limited to, all cancer risk and non-cancer hazard screening levels and corrective action objectives, shall use the toxicity criteria specified in California Code of Regulations, title 22, section 69021 and attain the human health protection specified in section 69022, subdivisions (a) and (b).

Authority cited: sections 25150, 25159, 25159.5, 58004, and 58012, Health and Safety Code. Reference: sections 25150, 25159, 25159.7, 25187, and 116365, Health and Safety Code; section 71110, Public Resources Code.

**Add Chapter 51. Site Remediation**

**Article 2.  Toxicity Criteria for Human Health Risk Assessments, Screening Levels, and Remediation Goals**

**69020.  Applicability and Purpose**

(a)    This Chapter applies to the cleanup (e.g., response or remedial action) of releases of hazardous waste or hazardous waste constituents, hazardous materials, and hazardous substances (collectively, hazardous substances) to the environment that are subject to the provisions of Health and Safety Code, Division 20, Chapters 6.8 and 6.82.  Section 69021 specifies the required toxicity criteria for use in setting all human health risk-based screening levels and human health risk-based remediation goals, and in all human health risk assessments for those sites.

(b)    The purpose of this Chapter is to establish toxicity criteria, consistent with Health and Safety Code section 25356.1.5, for all human health risk assessments, human health risk-based screening levels, and human health risk-based remediation goals statewide, approved after the effective date of this Chapter.  This Chapter does not replace applicable Maximum Contaminant Levels (MCLs) established under Health and Safety Code section 116365 or Title 42 United States Code section 300g as remediation goals.

(c)    Terms used in this Chapter shall have the following meanings:

(1)    "Contaminant of Potential Concern" (COPC) is a chemical or contaminant at or from the Site that is identified as a potential threat to human health or the environment, and whose site-specific data are of sufficient quality for use in any risk assessment.

(2)    "Department" means the California Department of Toxic Substances Control.

(3)    "IRIS" means the United States Environmental Protection Agency's (U.S. EPA's) Integrated Risk Information System identified in the U.S. EPA Office of Solid Waste and Emergency Response Directive Number 9285.7-53 (December 5, 2003, at page 3), for the unit risk factor, oral slope factor, reference dose, and reference concentration values in this U.S. EPA IRIS database, available online at https://www.epa.gov/iris, as it may be updated.

(4)    "OEHHA" means the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment.

(5)    "Remediation Goal" is a contaminant concentration that is: (i) media-specific (e.g., for the air, groundwater, surface water, or soil affected by a release); (ii) site-specific (factoring in, for example, potential receptors, exposure pathways, contaminant background concentrations and reasonably anticipated future land uses); (iii) protective of human health and the environment; and (iv) used as a final cleanup goal for the response or corrective action.

(6)    "Screening Level" is a generic risk-based concentration derived from standardized risk assessment equations combining exposure information assumptions with applicable toxicity criteria. Screening Levels are contaminant concentrations considered to be protective for humans (including sensitive groups) over a lifetime.  Screening Levels calculated using the toxicity criteria under this Chapter do not address non-human health endpoints such as ecological impacts.

(7)    "Site" has the same meaning as the term "facility" as defined by Health and Safety Code section 25323.9 and also includes "hazardous waste facilities" and "sites" as those terms are defined in 22 CCR 66260.10.

(8)    "Total Petroleum Hydrocarbons" (TPH) is a term to describe a large family of several hundred chemical compounds derived from crude oil.

(d)   Any other terms not defined above shall have the meanings specified in the following:

(1)    Health and Safety Code section 25100 et seq., and its implementing regulations.
(2)    Health and Safety Code section 25300 et seq.

Authority cited: sections 25150, 25159, 25159.5, 25351.5, 25395.64, 25395.71, 25395.92, 58004, and 58012, Health and Safety Code.  Reference: sections 25150, 25159, 25159.7, 25187, 25355.8, 25356.1, 25356.1.5, 25395.92, 25395.94 and 116365, Health and Safety

Code; section 71110, Public Resources Code; and section 300.430 of Title 40 of the Code of Federal Regulations; sections 300g and 9621 of Title 42 of the United States Code.

**69021.        Applicable Toxicity Criteria**

Consistent with Health and Safety Code section 25356.1.5, all human health risk assessments, human health risk-based screening levels, and human health risk-based remediation goals used for the cleanup of sites described under section 69020, subdivision (b), shall use the cancer and non-cancer toxicity criteria for each COPC from the following sources in the order listed below:

(a)    The OEHHA peer-reviewed unit risk factors, oral slope factors, chronic reference exposure levels, reference dose(s) (RfDs), and blood lead valu*e*s in Table A and B of Appendix I to this Chapter, shall be used for the COPCs that are listed in that Appendix, so long as the Appendix I values remain no less stringent than toxicity criteria available from the source in subdivision (b) below.  If Appendix I does not list toxicity criteria for a specific COPC or contains a value that is less stringent, then the toxicity criteria listed under section 69021, subdivision (b) shall be used.

(b)    The peer-reviewed unit risk factors, oral slope factors, RfDs, and reference concentrations, in IRIS shall be used where either Appendix I does not specify toxicity criteria for a particular COPC, or the IRIS toxicity criteria value is more stringent than the value listed in Appendix I.  If neither Appendix I nor IRIS lists toxicity criteria for a specific COPC, then the toxicity criteria listed under section 69021, subdivision (c) shall be used.

(c)    Toxicity criteria from another source, that applies the best available science and is health-based, may be used in human health risk assessments upon approval by the Supervising Toxicologist, of the Department's Human and Ecological Risk Office, or his or her designee, when neither subdivision (a) nor subdivision (b) above specifies toxicity criteria for the particular COPC.  Other sources include, but are not limited to:  OEHHA toxicity criteria that are not listed in Appendix I (e.g., those toxicity criteria used in U.S. EPA's Regional Screening Levels), U.S. EPA Provisional Peer Reviewed Toxicity Values (PPRTVs), Agency for Toxic Substances and Disease Registry Minimal Risk Levels, PPRTV Appendix Screening Toxicity Values, and U.S. EPA Superfund Health Effects Assessment Summary Table values.  However, use of TPH PPRTVs is not required, but may be determined to be appropriate based on site-specific circumstances.  Any selected toxicity criteria or value used under this subdivision shall be consistent with Health and Safety Code section 25356.1.5, subdivisions (b) and (c).

Authority cited: sections 25150, 25159, 25159.5, 25351.5, 25395.64, 25395.71, 25395.92, 58004, and 58012, Health and Safety Code.  Reference: sections 25150, 25159, 25159.7,

25187, 25355.8, 25356.1, 25356.1.5, 25395.92 and 25395.94, Health and Safety Code; section 71110, Public Resources Code; and section 300.430 of Title 40 of the Code of Federal Regulations.

**69022.      Screening Levels and Remediation Goals**

(a)    All human health risk assessments, human health risk-based screening levels, and human health risk-based remediation goals shall protect human health by using the toxicity criteria specified in section 69021 above.

(b)    When based on human health risk or non-cancer hazard, to protect human health, screening levels for individual COPCs shall be set to:

    (1)    An incremental excess lifetime cancer risk to an individual of 1 x 10-6, and

    (2)    A hazard quotient of 1.

(c)    All human health risk-based remediation goals for response actions conducted under Health and Safety Code, Division 20, Chapter 6.8, shall comply with Health and Safety Code section 25356.1.5.


Authority cited: sections 25150, 25159, 25159.5, 25351.5, 25395.64, 25395.71, 25395.92, 58004, and 58012, Health and Safety Code.  Reference: sections 25150, 25159, 25159.7, 25187, 25355.8, 25356.1, 25356.1.5, 25395.92 and 25395.94, Health and Safety Code; section 71110, Public Resources Code; and section 300.430 of Title 40 of the Code of Federal Regulations.

1

## EXHIBIT G

## (FINAL JUDGMENT PURSUANT TO STIPULATION)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Greenspoon Marder LLP
1875 Century Park East, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
TEL. 213.626.2311 • FAX 954.771.9264

**DANIEL E. LUNGREN**
*Attorney General*

State of California
DEPARTMENT OF JUSTICE

300 SOUTH SPRING STREET, SUITE 5212
LOS ANGELES, CA 90013
(213) 897-2000

FACSIMILE:(213) 897-2802
(213) 897-2614

February 3, 1995

RECEIVED

FEB 6 1995

Law Department

Dawn Wilson, Esq.
Southern California Edison Company
Law Department
P.O. Box 800
2244 Walnut Grove Avenue
Rosemead, California 91770

RE:  Edison Consent Agreement

Dear Ms. Wilson:

Enclosed for your files is a fully executed copy of the Judgment which has been signed by Judge O'Brien. Thank you for your assistance.

Sincerely,

DANIEL E. LUNGREN
Attorney General

PEARL LATTAKER
Deputy Attorney General

cc:  Bonnie Wolstoncroft
     Sharon Fair
     Rich Hubbell

1   DANIEL E. LUNGREN, Attorney General
       of the State of California
2   THEODORA BERGER
           Assistant Attorney General
3   PEARL LATTAKER- State Bar # 74680
           Deputy Attorney General
4   300 South Spring Street, 11th Floor
    Los Angeles, California 90013
5   Telephone:  (213) 897-2614

6

7   Attorney for Plaintiffs

ORIGINAL FILED

FEB X1 1995

LOS ANGELES
SUPERIOR COURT

Dept. No.
of Judge O'Brien

FEB 01 1995

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF LOS ANGELES

10

11  PEOPLE OF THE STATE OF CALIFORNIA,     )   No. BC 121219
    ex rel. William Soo Hoo, Director,     )
12  California Department of Toxic          )   FINAL JUDGMENT PURSUANT
    Substances Control,                     )   TO STIPULATION
13                                          )
                   Plaintiffs,              )
14                                          )
         v.                                 )
15                                          )
    SOUTHERN CALIFORNIA EDISON              )
16                                          )
                                            )
17                                          )
                   Defendant.               )
18                                          )

19  Judgment is hereby entered in the above captioned case pursuant

20  to the following terms as stipulated by the parties:

21  I.   Introduction

22      On or about February 1, 1995, the People of the State of

23  California ex rel. William Soo Hoo, Director, State Department of

24  Toxic Substances Control ("Department") filed a Complaint

25  ("Complaint") in the Superior Court for the County of Los Angeles

26  pursuant to § 25187 of the California Health and Safety Code

27  against  Southern California Edison (hereinafter " Edison")

1

1   alleging violations of the Health and Safety Code at its

2   Alamitos, Cool Water, El Segundo, Etiwanda, Huntington Beach,

3   Highgrove, Long Beach, Mandalay, Ormond Beach, Redondo Beach, San

4   Bernardino generating stations ("facilities").  The Department

5   and Edison now stipulate to judgment on the terms set forth in

6   this Final Judgment Pursuant to  Stipulation ("Stipulation").

7   The effective date of this Stipulation shall be the date on which

8   it is signed by the Department.  All further proceedings in this

9   case, including the filing of an answer by Edison, are stayed

10  during the pendency of this Stipulation.

11  II.      Complaint

12      The Complaint in this case (attached hereto as Exhibit A)

13  alleges that Edison violated provisions of the Hazardous Waste

14  Control Law ("HWCL"), Cal. Health and Safety Code §§25100 et seq.

15  and the regulations thereunder, California Code of Regulations,

16  Title 22, Division 4 ("Title 22"), with respect to its hazardous

17  waste operations at the facilities named above, and requests

18  certain corrective action.

19  III. Jurisdiction

20      The Department and Edison agree that the Los Angeles

21  Superior Court has subject matter jurisdiction over the matters

22  alleged in the Complaint and personal jurisdiction over the

23  parties to this Stipulation.

24  IV.  Settlement of Disputed Claim

25      The parties enter into this Stipulation pursuant to a

26  compromise and settlement of disputed claims for the purpose of

27  avoiding prolonged and complicated litigation and furthering the

2.

1  public interest. For the purposes of this Stipulation, Edison
2  admits none of the allegations of the Complaint, except for the
3  limited purposes of any subsequent action brought by the
4  Department pursuant to the Hazardous Waste Control Act, Health &
5  Safety Code §§25100 et seq., within 5 years of the date of the
6  Complaint, Edison admits the allegations of the Complaint.

7  V.   Waiver of Hearing

8      By signing this Stipulation, Edison waives its right to a
9  hearing on the allegations of the Complaint.

10  VI.   Settlement Amount

11     Edison agrees to pay the Department a total of $950,000.00
12  in civil penalties and reimburse the Department's administrative
13  costs in the amount of $300,000.00 within 30 days of the
14  effective date of this Stipulation. Payment shall be delivered
15  to: Cashier, DTSC Accounting, Department of Toxic Substances
16  Control, P. O. Box 806, Sacramento, California 95812-0806.
17  Copies of all checks shall be sent to:

18  Chief
    Statewide Compliance Division             Pearl Lattaker
19  Department of Toxic Substances Control     Deputy Attorney General
    Region 4                                   300 S. Spring Street
20  245 West Broadway                          11th Floor North
    Suite 425                                  Los Angeles, California
21  Long Beach, California 90802               90013

22     FUNDING OF ENVIRONMENTAL PROJECTS: Edison agrees to fund
23  five environmental projects: PETE, SPECTRA, Compliance School,
24  bill stuffers and the Western States Hazardous Waste Project as
25  set forth below. Edison shall contribute $700,000.00 to fund
26  these projects. If Edison fails to fund any of these projects,
27  then Edison shall contribute any unused funds to alternate

1   projects mutually agreed upon by the Department and Edison.

2        A.   (PETE): Within 30 days of the effective date of this

3   Stipulation, Edison shall contribute $100,000.00 to the

4   Partnership for Environmental Technology Education (PETE) for the

5   purpose of promoting science education at the community college

6   level by funding equipment acquisition and commencement of degree

7   programs for environmental professionals.  Payment shall be made

8   in two separate checks of $50,000.00 each and specifically

9   designated for the above uses by Rio Hondo College and El Camino

10  College, Los Angeles, California.  Payments shall be mailed to:

11  Western Partnership for Environmental Technology Education
    2150 River Plaza Drive, Suite 170
12  Sacramento, CA 95833

13       B.   (SPECTRA): Within 30 days after the Department notifies

14  Edison of the effective date of SPECTRA implementation, Edison

15  shall contribute $316,800.00 toward marketing and distribution of

16  the Department's SPECTRA software.  The $316,800.00 shall be

17  apportioned as set forth below:

18        1.   $50,000.00 for a marketing study.  The $50,000.00

19  allotted for marketing shall be used to increase an existing

20  SPECTRA marketing study contract with Sacramento State

21  University.  Payment for this project shall be made to the

22  manager of contracts at Sacramento State University.

23        2.   $266,800.00 for a user's station and subsidy

24  account for the purchase of SPECTRA by Edison rate payers.

25  Edison shall establish a dedicated SPECTRA account to subsidize

26  part or all of the purchase of SPECTRA software.  Edison shall

27  establish a SPECTRA user's station at the Edison Irwindale

4.

1  facility.

2      3.  Within 60 days after the Department notifies Edison
3  of the effective date of SPECTRA implementation, Edison shall
4  submit for Department review and approval a procedure for
5  establishing and utilizing the SPECTRA users's station at the
6  Edison Irwindale CTAC facility.  The user's station shall be
7  operational within 30 days of the Department's approval of the
8  procedure.  The procedure shall also include an accounting which
9  demonstrates that the cost of establishing the user's station is
10  at least $40,000.00.  If the cost of establishing the user's
11  station is less than $40,000.00, then the difference shall be
12  added to the SPECTRA subsidy account.

13      4.  Edison and the Department shall jointly develop a
14  strategy for utilizing the subsidy account.  Within 60 days of
15  the Department's notification to Edison of the implementation of
16  SPECTRA, Edison shall submit procedures for implementing the
17  subsidy account to Don Johnson, Chief, Program Coordination and
18  Policy Development Branch, Department of Toxic Substances
19  Control, 400 P Street, P.O. Box 806, Sacramento, CA 95812-0806
20  for review and approval.  The procedures shall include, at a
21  minimum, methods for public notification of the availability of
22  the subsidy, the amount of money available to each user, and
23  accounting and reimbursement to the Department for each SPECTRA
24  unit purchased.

25      5.  The SPECTRA account shall be available for three
26  years, with additional one year renewals if directed by the
27  Department or until funds are exhausted..

6.  If, in the Department's judgment, the SPECTRA subsidy account funds would be better spent elsewhere, the Department may require Edison to direct the funds to the PETE program and/or Compliance School, or Edison and the Department may confer and agree on another environmental project to receive the unused funds.

C.  COMPLIANCE SCHOOL:  Within 30 days of the execution of this Stipulation, Edison shall contribute $200,000.00 to the Kern Community College District to support the management of Compliance School by the Environment and Safety Institute at Bakersfield College. Funds will be used for program development activities, including promotion, registration, augmenting instructional materials and instructor training, responding to public inquiries, statewide planning and program evaluation. The Compliance School curriculum, developed by Bakersfield College under contract with the Department, will provide basic hands – on training on hazardous waste management laws to hazardous waste generators and on-site treatment facilities. Expenditure and accounting of these funds will be made by the Kern Community College District pursuant to a written agreement with the Department.

1.  Payment shall be made by check payable to Kern Community College District and shall be mailed by certified mail, return receipt requested to:

Ann Boyce
Bakersfield College -ESI
1801 Panorama Drive
Bakersfield, CA 93305

1  A copy of the check shall be sent to:

2                    Ann Carberry
3                    Tiered Permitting Compliance Section
       Hazardous Waste Management Program
4                    Department of Toxic Substances Control
       400 P Street
5                    P. O. Box 806
       Sacramento, CA 95812-0806

6          2. If Kern Community College District returns unused

7  funds to Edison, Edison and the Department shall confer and agree

8  on another environmental project to receive the unused funds.

9      D.  BILL STUFFERS:  Edison shall expend $60,000.00 on bill

10 stuffers to be inserted in bills mailed to rate payers.  The bill

11 stuffers shall contain information relating to protection of

12 public health and safety and the environment from toxic

13 substances.  The Department's Chief of Communications shall

14 prepare text and review and approve the bill stuffers prior to

15 mailing.  Edison shall provide an accounting to the Department

16 demonstrating that the cost of the bill stuffers is $60,000.00.

17 The bill stuffers shall be mailed within 180 days of the

18 effective date of this Stipulation.

19     E.  WESTERN STATES PROJECT:  Within 30 days of the

20 effective date of this Stipulation, Edison shall pay the

21 Department's fiscal year 1994-95 membership dues of $23,200.00

22 for the Western States Hazardous Waste Project.  Payment shall be

23 made to:

24
                   Western States Hazardous Waste Project
25                    Arizona Office of the Attorney General
       1275 W. Washington
26                    Phoenix, Arizona 85007
       (602) 542- 3881 FAX (602) 542-3522
27

1  A copy of the check shall be sent to:

2                    Chief, Statewide Compliance Division
3                    Department of Toxic Substances Control
      400 P Street
4                    P. O. Box 806
      Sacramento, CA 95812-0806

5  VII.   Funding of Permitting Activities

6         Edison agrees to fund, on a Fee - For - Service basis, all

7  permitting, closure, and other document review and approval

8  activities required by this Stipulation.  Within 60 days of the

9  effective date of this Stipulation, Edison shall enter into a Fee

10  - For - Service agreement with the Department  for all of the

11  permitting, closure and other document review and approval

12  activities required under this Stipulation.

13  VIII.    Compliance Schedule

14      A.   As conditions of this Stipulation, Edison shall do the

15  following with regard to the violations alleged in the Complaint:

16            1.  Within 30 days of the effective date of this

17  Stipulation, Edison shall submit to the Department for approval a

18  general sampling plan to determine whether or not the following

19  materials are hazardous wastes: air pre-heater wash water and

20  fireside wash water.  After the effective date of this

21  Stipulation, whenever Edison performs the initial air pre -

22  heater wash or fireside wash at any of its generating facilities,

23  Edison shall (1) notify the Chief of Statewide Compliance

24  Division - Region 4, 30 days in advance of the event; (2) collect

25  and analyze representative samples of the wash waters according

26  to the approved sampling plan; and (3) submit the results to the

27  Department within 30 days of the sampling event.

8.

2. Within 60 days of the effective date of this Stipulation, Edison shall submit to the Department, for review and approval, a proposal on the method of conducting integrity tests for the polishing demineralizer sumps listed in column D of Exhibit 1. Edison shall conduct integrity tests and submit a report to the Department within 90 days of the Department's approval of Edison's proposed tank integrity testing procedure. Any future re-use of the sumps depends upon the outcome of the integrity tests. If Edison intends to use the sumps for elementary neutralization, Edison shall comply with the notice requirements of the Tierred Permitting System.

3. CLOSURE OF BOILER CHEMICAL CLEANING BASINS: For each facility, Edison shall submit a report containing information and data demonstrating that there have been no releases in the past from the Boiler Chemical Cleaning Basins (BCCB's). The Department will review each report including the supporting information and data to determine whether it is adequate to demonstrate whether or not there has been a release. If existing data in the report is adequate and shows no evidence of any releases, the Department shall deem the appropriate units clean closed. The reports submitted shall provide the basis for RCRA closure of the BCCB's to satisfy the applicable provisions of Title 22 California Code of Regulations ("CCR"), Chapter 15, Article 7. (Closure/Post Closure 66265.110 — 120

If existing data is not adequate to demonstrate whether or not there has been a release, Edison shall submit a work plan, in accordance with the schedule set forth in Exhibit 2, for

9.

1  Department review and approval, to conduct additional soil
2  sampling, as necessary, and/or installation of ground water
3  monitoring wells and collect monitoring data before closure can
4  be accomplished. Edison shall upgrade the ground water monitoring
5  systems to meet the requirements of 22 CCR Chapter 15, article 6
6  in a timely manner. Edison shall implement the approved work plan
7  to demonstrate whether or not there has been a release.  After
8  implementation of the approved work plan, Edison shall submit to
9  the Department a report of the findings. The units which have
10  been deemed clean closed may be operated so long as they handle
11  non-RCRA hazardous waste or solid waste that does not generate a
12  RCRA hazardous sludge.

13      If there is evidence of a past release to soil and /or
14  groundwater from the BCCB's, the Department will issue a
15  Corrective Action Order to Edison requiring that corrective
16  action work be performed.  Corrective action requires Edison to
17  define the nature and extent of the release, evaluate the risk
18  posed, and perform remediation to background or health-based
19  levels.  The Department will determine on a case by case basis
20  whether or not the BCCB's can continue to be used during
21  corrective action.  If contamination cannot be remediated, the
22  unit will be closed with waste in place and Edison shall apply
23  for a post-closure permit.

24      For the purpose of this Stipulation, the Department will
25  assume that there has been a release if the pH or heavy metal
26  constituents that are present in the Edison waste stream are
27  found beneath or adjacent to the BCCB's at levels exceeding the

10

1  background concentrations for the same constituents.

2      4. <u>CLOSURE OF RETENTION BASINS</u>:  Edison shall conduct RCRA

3  closure of the Retention Basins identified in Exhibit 1 of this

4  Stipulation, in accordance with 22 CCR, Chapter 15, Article 7

5  closure requirements.  The procedures outlined in above ¶3 of

6  this Stipulation entitled CLOSURE OF BCCB'S shall be followed in

7  closing the Retention Basins with the following additional

8  requirements:

9      1.  Since these units do not meet the minimum technology

10  requirements specified in 22 CCR, Chapter 15, Article 11,

11  the <u>initial report</u> for each facility containing the no

12  release demonstration shall include at least one year of

13  groundwater monitoring data from a Department approved

14  monitoring system.

15      2.  If the units do not have a groundwater monitoring system

16  meeting the requirements of 22 CCR, Chapter 15, Article 6,

17  Edison shall submit a work plan for each facility for

18  installing such a system.  Upon Department approval, Edison

19  shall implement the plan and obtain groundwater monitoring

20  data for a minimum of one year.  If the background

21  information, along with the groundwater monitoring data,

22  indicates that there have been no releases from these units,

23  the Department will proceed with granting closure for these

24  units.

25      5.  Within 90 days after receiving written guidance for

26  preparing surface impoundment closure plans from the Department,

27  Edison shall prepare and submit to the Department a complete

11.

1  closure plan for the north and south retention basins, make - up
2  demineralizer sump, polisher demineralizer sump, and boiler
3  chemical cleaning basin located at the Alamitos Generating
4  Station.   To streamline the closure process, the Department
5  intends to review and approve the closure plan for the Alamitos
6  Generating Station as a model closure plan.   When the Alamitos
7  closure plan is deemed technically complete by the Department, it
8  shall serve as the model for all other retention basin closures
9  covered by this Stipulation.   Within 60 days after the
10 Department's determination of completeness of the Alamitos
11 closure plan, Edison shall sequentially submit the closure plans
12 for the remaining Edison facilities in accordance with the
13 closure plan schedule of submittal specified in Exhibit 2.   The
14 closure plans shall comply with the closure requirements of
15 chapter 15, Division 4.5, Title 22, CCR, including but not
16 limited to $ 66265.228 (closure/post... remove all residues)

17        6.   Within 90 days of the effective date of this
18 Stipulation, Edison shall submit to the Department for approval,
19 a water quality monitoring and response program under Title 22,
20 CCR, Chapter 15, Article 6, § 66265.90 for the units at the
21 Alamitos Generating Station listed in rectangle C1 of Exhibit 1.
22 To streamline the process, the Department intends to review and
23 approve the water quality monitoring plan for the Alamitos
24 Generating Station as a model plan.   In the event that Edison
25 receives a Notice of Deficiency ("NOD"), it shall respond to the
26 NOD within 45 days from issuance of the NOD.   A written approval
27 will be issued when all deficiencies listed in the NOD have been

12

1  addressed.  When the Alamitos plan is deemed technically complete
2  by the Department, it shall serve as the model for all other
3  water quality monitoring programs covered by this Stipulation.
4  Within 120 days of the effective date of the Department's
5  approval, Edison shall complete installation of the approved
6  detection monitoring program at Alamitos generating station.
7  Edison shall sequentially submit Water Quality Monitoring and
8  Response Programs for the remaining facilities listed in column C
9  of Exhibit 1 in accordance with the closure plan schedule of
10  submittal specified in Exhibit 2.  Within 120 days of the
11  effective date of the Department's approval of each Water Quality
12  Monitoring and  Response Program, Edison shall complete
13  installation of the approved detection monitoring program for
14  each facility.

15       7.  For all facilities listed in column C of Exhibit 1
16  that have groundwater monitoring systems, Edison shall submit to
17  the Department for review and approval within 90 days of the
18  effective date of this Stipulation, a water quality sampling and
19  analysis plan pursuant to Title 22, §66265.91.  In the event that
20  Edison receives a Notice of Deficiency, (NOD) it shall respond to
21  the NOD within 45 days from issuance of the NOD.  A written
22  approval will be issued by the Department when all deficiencies
23  in the NOD have been addressed.  Edison shall implement the
24  approved water quality sampling and analysis plans during
25  subsequent groundwater sampling events.  The plans shall be self
26  implementing.  However, the Department may require changes to the
27  plans if changes are deemed necessary to protect public health

13.

1   and the environment.

2          8.   For all facilities in column C of Exhibit 1 that do *all basins*

3   not have existing groundwater monitoring systems, Edison shall

4   sequentially submit water quality sampling and analysis plans to

5   the Department for review and approval. Edison shall begin

6   sequentially submitting the plans within 90 days of completion of

7   installation of the approved detection monitoring program.  The

8   plans shall be submitted in accordance with the schedule

9   specified in Exhibit 2.  These plans shall be submitted pursuant

10  to Title 22 CCR §66265.91.  In the event that Edison receives a

11  Notice of Deficiency, (NOD) it shall respond to the NOD within 45

12  days from issuance of the NOD.  A written approval will be issued

13  by the Department when all deficiencies in the NOD have been

14  addressed.  Edison shall implement the approved water quality

15  sampling and analysis plans during subsequent groundwater

16  sampling events.  The plans shall be self-implementing.  However,

17  the Department may require changes to the plans to protect human

18  health and the environment.

19         9.   A.   This Stipulation shall serve as a Grant of

20  Authorization for continuing operation of those surface

21  impoundments which are specifically designated as the BCCB's at

22  six Edison facilities, and which are currently used for storage

23  of California-only (non-RCRA) hazardous wastes, pending proposed

24  legislation.  This Stipulation shall be deemed a permit only as

25  set forth below for purposes of the Health & Safety Code and

26  payment of the annual facility fee pursuant to Health & Safety

27  Code §§25205.2 and 25205.4.  The facility size and type pursuant

14

1  to this Stipulation shall be "Series A Standardized Permit"
2  during calendar years 1994, 1995, and 1996. Thereafter, the
3  facilities shall be regarded as "large treatment" unless
4  otherwise authorized by legislation.

5      B.  Within 30 days after the close of the 1996 legislative
6  session, if authorized by legislation, Edison shall submit a
7  standardized permit notification to the Department, to include a
8  complete application, pursuant to legislation, for the BCCB at
9  the Alamitos generating station.  To streamline the permit
10 process, the Department intends to review and approve the
11 notification and Part "B" standardized permit application for the
12 BCCB at the Alamitos generating station as a model standardized
13 permit application for BCCB's.  The Alamitos application, when
14 deemed technically complete by the Department, will serve as the
15 model for all other BCCB standardized permit applications covered
16 by this Stipulation.  Edison shall submit the remaining
17 applications for the facilities listed in column A of Exhibit 1
18 in accordance with the schedule of submittal specified in Exhibit
19 2.

20     C.  If the legislation fails to authorize operation of the
21 BCCBs under the Standardized Permit tier by the close of the 1996
22 legislative session, within 90 days after receiving written
23 guidance from the Department for preparing surface impoundment
24 permits, Edison shall complete, sign and submit Part A and Part B
25 hazardous waste surface impoundment permit applications to the
26 Department for the BCCB at Alamitos generating station.  To
27 streamline the permit process, the Department intends to review

15.

1   and approve the Part A and Part B permit application for the
2   BCCB's at the Alamitos generating station as a model permit
3   application for BCCB's.   The Alamitos permit application, when
4   deemed technically complete by the Department, will serve as the
5   model for all other BCCB permit applications covered by this
6   Stipulation.   Edison shall submit the remaining applications for
7   the facilities listed in column A of Exhibit 1 in accordance with
8   the schedule of submittal specified in Exhibit 2.

9        D. If the Department determines that any report, plan,
10  schedule or other document submitted for approval fails to comply
11  with this Stipulation or fails to protect public health or safety
12  or the environment, the Department may return the document to
13  Edison with recommended changes and a date by which Edison must
14  submit to the Department a revised document incorporating the
15  recommended changes for approval by the Department.

16  IX.  Matters Covered by This Stipulation

17       This Stipulation settles all violations alleged in the
18  Complaint filed against Edison, including Department costs of
19  inspection and investigation and costs of suit, relating to the
20  Complaint.  The Department agrees that it will not refer or
21  recommend that any criminal charges be filed based on the
22  allegations in the complaint. The provisions of this paragraph
23  are expressly conditioned on full and complete performance by
24  Edison of all of the terms and conditions of this Stipulation.
25       Nothing in this Stipulation shall constitute or be construed
26  as a satisfaction or release from liability for any conditions or
27  claims arising as a result of current, or future operations of

16.

1  Edison which are not covered by this Stipulation, nor shall this

2  Stipulation be construed to preclude the Department or any state

3  agency, board, or entity from exercising its authority under any

4  law, statute or regulation.

5  X.  Requirement of the Department

6     The duties imposed on Edison by this Stipulation shall be

7  construed to be requirements of the Department issued pursuant to

8  the HWCL.  Any violation of this Stipulation is separate and in

9  addition to any violation of any provision of the HWCL.

10 XI.  Notice and Submittals

11    All submittals required pursuant to ¶¶VIII(A)(1),

12 VIII(A)(2), VIII(A)(3), VIII(A)(4), VIII(A)(6), and VIII(A)(7) of

13 this Stipulation shall be submitted to the following:

14        Chief
          Statewide Permitting Division
15        Department of Toxic Substances Control, Region 4
          245 West Broadway, Suite 425
16        Long Beach, CA 90802

17        Unit Chief, Geology Services
          Statewide Permitting Division
18        Department of Toxic Substances Control, Region 4
          245 West Broadway, Suite 425
19        Long Beach, CA 90802

20    In addition, a copy of the transmittal letter for the above

21 submittals and all other submissions and notices including copies

22 of all checks required by this Stipulation shall be sent to:

23        Chief
          Statewide Compliance Division
24        Department of Toxic Substances Control, Region 4
          245 West Broadway, Suite 425
25        Long Beach, California 90802

26    All approvals and decisions of the Department regarding any

27 matter requiring approval or decision under the terms of this

17.

1   Stipulation shall be communicated in writing to:

2           Robert Reid
            Southern California Edison Company
3           2244 Walnut Grove Avenue
            Rosemead, CA 91770.
4

5   No advice, guidance, suggestions or comments by employees or
6   officials of the Department regarding submissions or notices
7   shall be construed to relieve Edison of its obligation to obtain
8   the final written approvals required by this Stipulation.

9   XII.  Department Not Liable

10       The Department shall not be liable for any injury or damage
11  to persons or property resulting from acts or omissions by
12  Edison, its directors, officers, employees, agents,
13  representatives or contractors in carrying out activities
14  pursuant to this Stipulation , nor shall the Department be held
15  as a party to or guarantor of any contract entered into by
16  Edison, its directors, officers, employees, agents,
17  representatives or contractors in carrying out activities
18  required pursuant to this stipulation.

19  XIII.    Modification of Settlement and Order

20       This Stipulation may be modified upon written approval of
21  the parties hereto and the Court.

22  XIV.     Extensions

23       Edison may request in writing an extension of the compliance
24  schedule provided herein prior to the date compliance is due.  If
25  the Department determines that good cause exists for an
26  extension, it will grant the request and specify in writing a new
27  compliance schedule.  Approval shall not be unreasonably

18.

1  withheld; however, silence does not constitute approval of the

2  extension.   Edison is not authorized to modify the compliance

3  schedule herein unless and until the Department agrees to the

4  modification in writing.

5  XV.   <u>Application of Stipulation</u>

6       This Stipulation shall apply to and be binding upon the

7  Department and Edison and the successors or assigns of either of

8  them.

9  XVI. <u>Authority to Enter Stipulation</u>

10      Each signatory to this Stipulation certifies that he or she

11  is fully authorized by the party he or she represents to enter

12  into this Stipulation, to execute it on behalf of the party

13  represented and legally to bind that party.

14  XVII.     <u>Integration</u>

15      This Stipulation constitutes the entire agreement between

16  the parties and may not be amended or supplemented except as

17  provided for herein.

18  XVIII. <u>Counterparts</u>

19      This Stipulation may be executed in one or more

20  counterparts, each of which shall be  deemed an original, but all

21  of which together shall constitute one and the same instrument.

22  /

23  /

24  /

25  /

26  /

27  /

# XIX. Termination of Order

This action shall be dismissed with prejudice upon Edison's satisfaction of the terms and conditions herein.

IT IS SO STIPULATED:

DEPARTMENT OF TOXIC SUBSTANCES CONTROL

Dated: ___, 1994 By: _____

TED RAUH, Deputy Director
Department of Toxic Substances Control

Approved as to Form and Content:

DANIEL E. LUNGREN, Attorney General
of the State of California
THEODORA BERGER,
Assistant Attorney General
PEARL LATTAKER,
Deputy Attorney General

Dated: ___, 1995 By: _____

PEARL LATTAKER
Attorneys for Department of
Toxic Substances Control

SOUTHERN CAL. EDISON CO.

Dated: _____, 1995 By: _____

BRYANT C. DANNER
Senior Vice President

Approved as to Form and Content:

DAWN WILSON

Dated: _____, 1995 By: _____

Attorneys for Edison

In accordance with the terms of the above written Stipulation between plaintiff and defendant,

IT IS SO ORDERED AND ADJUDGED:

DATED: 2﹒1﹒95

ROBERT H. O'BRIEN

_____

JUDGE OF THE SUPERIOR COURT

20.

1   XIX. **Termination of Order**

2         This action shall be dismissed with prejudice upon Edison's

3   satisfaction of the terms and conditions herein.

4         IT IS SO STIPULATED:

5                                    DEPARTMENT OF TOXIC SUBSTANCES CONTROL

6

7   Dated: JAN. 30, 1994 By:

8                                    TED RAUH, Deputy Director
                                     Department of Toxic Substances Control

9   Approved as to Form and Content:

10                                   DANIEL E. LUNGREN, Attorney General
                                         of the State of California
11                                   THEODORA BERGER,
                                             Assistant Attorney General
12                                   PEARL LATTAKER,
                                             Deputy Attorney General
13  Dated: Jan 31, 1995 By:

14                                   PEARL LATTAKER
                                     Attorneys for Department of
15                                   Toxic Substances Control

16

17  Dated: January 29, 1995 By:     SOUTHERN CAL. EDISON CO.

18                                   BRYANT C. DANNER
                                     Senior Vice President

19  Approved as to Form and Content:

20                                   DAWN WILSON

21  Dated:            , 1995 By:

22                                   Attorneys for Edison

23  In accordance with the terms of the above written Stipulation

24  between plaintiff and defendant,

25  IT IS SO ORDERED AND ADJUDGED:

26  DATED:

27                                   JUDGE OF THE SUPERIOR COURT

EXHIBIT "1"

## DEPARTMENT OF TOXIC SUBSTANCES CONTROL

### EXHIBIT NO. 1
SOUTHERN CALIFORNIA EDISON CONSENT DECREE

| FACILITY | A UNITS REQUIRING PERMITS | B UNITS REQUIRING CLOSURE PLAN APPROVAL | C UNITS REQUIRING GROUNDWATER MONITORING | D UNITS REQUIRING INTEGRITY TESTS |
|---|---|---|---|---|
| Alamitos Generating Station, Long Beach<br>690 North Studebaker Road<br>Long Beach, CA 90815<br>EPA ID No.: CAD008594795 | BCCB - 2 UNITS | HR BASIN - 1 UNIT<br>SR BASIN - 1 UNIT<br>MD SUMP - 1 UNIT<br>PD SUMP - 1 UNIT<br>BCCB - 2 UNIT | BCCB - 2 UNIT<br>NR BASIN - 1 Unit<br>SR BASIN - 1 Unit | PD SUMP - 1 UNIT<br>MD SUMP - 1 UNIT |
| El Segundo Generating Station, El Segundo<br>301 Vista Del Mar<br>El Segundo, CA 90245<br>EPA ID No.: CAD008630952 | BCCB - 1 UNIT | R BASIN - 1 UNIT<br>BCCB - 1 UNIT<br>MRD SUMP - 1 UNIT | BCCB - 1 UNIT<br>R BASIN - 1 UNIT | RD SUMP - 1 UNIT |
| Ellwanda Generating Station, Ellwanda<br>696 Ethwanda Avenue<br>Ellwanda, CA 91739<br>EPA ID No.: CAD097548574 | BCCB - 1 UNIT | R BASIN - 1 UNIT<br>MRD BASIN - 1 UNIT<br>BCCB - 1 UNIT | MCCB - 1 UNIT<br>MD BASIN - 1 UNIT<br>R BASIN - 1 UNIT | |
| Huntington Beach Generating Station<br>21730 Newland Street<br>Huntington Beach, CA 92646<br>EPA ID No.: CAD000631081 | BCCB - 1 UNIT | R BASIN - 1 UNIT<br>BCCB - 1 UNIT | R BASIN - 1 UNIT<br>BCCB - 1 UNIT | |
| Mandalay Generating Station, Oxnard<br>393 North Harbor Blvd.<br>Oxnard, CA 93030<br>EPA ID No.: CAD000630912 | BCCB - 1 UNIT | R BASIN - 2 UNIT<br>BCCB - 1 UNIT | R BASIN - 2 UNIT<br>BCCB - 1 UNIT | |
| Redondo Beach Generating Station<br>1100 Harbor Drive<br>Redondo Beach, CA 90277<br>EPA ID No.: CAD000631093 | BCCB - 1 UNIT | HR BASIN - 1 UNIT<br>SR BASIN - 1 UNIT<br>PD SUMP - 1 UNIT<br>BCCB - 1 UNIT<br>MD SUMP - 1 UNIT | BCCB - 1 UNIT<br>HR BASIN - 1 UNIT<br>SR BASIN - 1 UNIT | PD SUMP - 1 UNIT<br>MD SUMP - 1 UNIT |
| Ormond Beach Generating Station<br>6835 South Edison Drive<br>Oxnard, CA 93033<br>EPA ID No.: CAD080631035 | | PD SUMP - 1 UNIT<br>R BASIN - 2 UNIT | R BASIN - 2 UNIT | PD SUMP - 1 UNIT |

# DEPARTMENT OF TOXIC SUBSTANCES CONTROL
## EXHIBIT NO. 1
## SOUTHERN CALIFORNIA EDISON CONSENT DECREE

| FACILITY | A<br>UNITS REQUIRING<br>PERMITS | B<br>UNITS REQUIRING<br>CLOSURE PLAN APPROVAL | C<br>UNITS REQUIRING<br>GROUNDWATER MONITORING | D<br>UNITS REQUIRING<br>INTEGRITY TESTS |
|---|---|---|---|---|
| 8 Highgrove Generating Station<br>12700 Taylor Street<br>Colton, CA 92324<br>EPA ID No.: CAD000931028 | | R BASIN - 1 UNIT<br>MD SUMP - 1 UNIT | MD BASIN - 1 UNIT | |
| 9 Long Beach Generating Station<br>2665 West Seaside Boulevard<br>Long Beach, CA 90813<br>EPA ID No. CAD000931150 | | R BASIN - 1 UNIT | R BASIN - 1 UNIT | |
| 10 San Bernardino Generating Station<br>25770 San Bernardino Avenue<br>San Bernardino, CA 92408<br>EPA ID No.: CAD000931150 | | R BASIN - 1 UNIT<br>MD BASIN - 1 UNIT | R BASIN - 1 UNIT<br>MD BASIN - 1 UNIT | |
| 11 Coal Water Generating Station<br>37021 East Santa Fe<br>Daggett, CA 92327<br>EPA ID No.: CAD080630925 | | PD SUMP - 1 UNIT | | PD SUMP - 1 UNIT |

KEY:
DCCB=BOILER CHEMICAL CLEARING BASIN
PD SUMP=POLISHER DEMINERALIZER SUMP
MD SUMP=MAKE-UP DEMINERALIZER SUMP
R BASIN=RETENTION BASIN

SR BASIN=SOUTH RETENTION BASIN
NR BASIN=NORTH RETENTION BASIN

DEPARTMENT OF TOXIC SUBSTANCES CONTROL
SCHEDULE OF SUBMITTAL FOR
SOUTHERN CALIFORNIA EDISON HAZARDOUS WASTE MANAGEMENT UNITS

Revised 12/02/94

| | A FACILITY | B CLOSURE PLAN UNIT TYPE | C UNITS | D SCHEDULE OF SUBMITTAL |
|---|---|---|---|---|
| 1 | Alamitos Generating Station, Long Beach<br>690 North Studebaker Road<br>Long Beach, CA 90815<br>EPA ID No.: CAD000604795 | North Retention basin<br>South Retention basin<br>Makeup demineralizer sump<br>Polish demineralizer sump<br>Boiler chemical cleaning basin | 1<br>1<br>1<br>1<br>2 | Within 90 days of receiving Department's closure plan guidance |
| 2 | El Segundo Generating Station, El Segundo<br>301 Vista Del Mar<br>El Segundo, CA 90245<br>EPA ID No.: CAD000630982 | Retention basin<br>Makeup demineralizer sump<br>Boiler chemical cleaning basin | 1<br>1<br>1 | 30 days from the Completeness determination of Alamitos Closure Plan |
| 3 | Etiwanda Generating Station, Etiwanda<br>8996 Etiwanda Avenue<br>Etiwanda, CA 91739<br>EPA ID No.: CAD076546573 | Retention basin<br>Makeup demineralizer basin<br>Boiler chemical cleaning basin | 1<br>1<br>1 | 30 days from submittal of El Segundo Closure Plan |
| 4 | Huntington Beach Generating Station<br>21730 Newland Street<br>Huntington Beach, CA 92646<br>EPA ID No.: CAD000831093 | Retention basin<br>Boiler chemical cleaning basin | 1<br>1 | 30 days from submittal of Etiwanda Closure Plan |
| 5 | Mandalay Generating Station, Oxnard<br>393 North Harbor Blvd.<br>Oxnard, CA 93030<br>EPA ID No.: CAD000630613 | Retention basin<br>Boiler chemical cleaning basin | 2<br>1 | 30 days from submittal of Huntington Beach Closure Plan |
| 6 | Redondo Beach Generating Station<br>1100 Harbor Drive<br>Redondo Beach, CA 90277<br>EPA ID No.: CAD000631092 | North Retention basin<br>South Retention basin<br>Polish demineralizer sump<br>Boiler chemical cleaning basin<br>Makeup demineralizer sump | 1<br>1<br>1<br>1<br>1 | 30 days from submittal of Mandalay Closure Plan |
| 7 | Ormond Beach Generating Station<br>6835 South Edison Drive<br>Oxnard, CA 93033<br>EPA ID No.: CAD000637036 | Retention basin<br>Polish demineralizer sump | 1<br>1 | 30 days from submittal of Redondo Beach Closure Plan |
| 8 | Highgrove Generating Station<br>12700 Taylor Street<br>Colton, CA 92324<br>EPA ID No.: CAD000637623 | Retention Basin<br>Makeup demineralizer sump | 1<br>1 | 30 days from submittal of Ormond Beach Closure Plan |
| 9 | Long Beach Generating Station<br>3645 West Seaside Boulevard<br>Long Beach, CA 90813<br>EPA ID No.: CAD000631143 | Retention basin | 1 | 30 days from submittal of Highgrove Closure Plan |
| 10 | San Bernardino Generating Station<br>13770 San Bernardino Avenue<br>San Bernardino, CA 92408<br>EPA ID No.: CAD000631158 | Retention basin<br>Makeup demineralizer basin | 1<br>1 | 30 days from submittal of Long Beach Closure Plan |
| 11 | Cool Water Generating Station<br>37673 East Santa Fe<br>Daggett, CA 92327<br>EPA ID No.: CAD000630932 | Polish demineralizer sump | 1 | 30 days from submittal of San Bernardino Closure Plan |

E X H I B I T   "A"

EXHIBIT B

SCOPE OF WORK
FEE FOR SERVICE AGREEMENT
SOUTHERN CALIFORNIA EDISON
CONTRACT NUMBER:  94-T0783

1.0    GENERAL:

In accordance with the Compliance Schedule of the Settlement
Agreement between Southern California Edison (SCE) and the
Department of Toxic Substances Control (DTSC) dated February 1,
1995.  The scope of SCE's Fee For Service project includes eleven
(11) generating stations with various units (Exhibit A).  Since
most of these SCE facilities are similar in operation, DTSC and
SCE have agreed to streamline the review and approval process.
To accomplish this objective, the Alamitos Generating Station
will be handled as a pilot project.

To the extent possible, the plans and reports generated from
the Alamitos Generating Station will be used as protocols for
other facilities to expedite reviews.  The plans and reports from
subsequent facilities should clearly present any deviations from
these protocols.

Due to the similarities of units at all eleven generating
stations, the work required at each facility can be further
divided into four general groups:

1.    Closure Demonstration of Boiler Chemical Cleaning Basins
2.    Closure Demonstration of Retention Basins
3.    Closure Demonstration of Demineralizer Sumps
4.    Miscellaneous Items

The following general procedures will be adhered to in achieving
the closure objectives for these units at various SCE generating
stations beginning with Alamitos.

1.1    BOILER CHEMICAL CLEANING BASINS:

(a)    Closure Demonstration Report:

       SCE shall submit a Closure Demonstration Report (CDR).
       The report shall be based on existing data, demonstrating
       compliance with the Closure Performance Standard of Title
       22, California Code of Regulations, Section 66265.111.
       The Report should include at a minimum facility maps,
       location of samples, analytical data, and discussion of
       conclusions.

(b)    DTSC review, comment and/or approve CDR:

Southern California Edison
Scope of Work
FFS Contract No. 94-T0783

> DTSC will review and provide written comments on the CDR,
> request additional information if necessary, accept the
> report without modifications, or provide comments and
> request a workplan for additional work.

(c)   SCE submits sampling work plan at DTSC's request:

> If DTSC requests SCE to prepare a work plan for additional
> data collection, the work plan should include a detailed
> sampling plan, analysis plan, monitoring well installation
> plan, a work schedule, and any other necessary information
> required by DTSC.

> DTSC will provide guidance to SCE for the development of
> the work plan if necessary.

(d)   DTSC will review the work plan, provide written comments
      on the work plan, request additional information if
      necessary, or accept the work plan without modification.

(e)   SCE implements the work plan and submits a final report:

> Once DTSC approves the work plan, SCE shall implement the
> work plan in accordance with the approved schedule. DTSC
> will provide oversight during implementation of the work
> plan. When complete, SCE shall prepare a final work plan
> report to demonstrate clean closure. The report shall      CDR
> include a discussion of findings and all supporting data.
> The conclusion of the report shall either certify the unit
> as clean closed or discuss contamination found and
> recommend remedial action if possible.

(f)   DTSC reviews and approves the final report:

> After review of the final report, DTSC will either accept
> the closure certification for the unit, or issue a
> Corrective Action Order (CAO) to characterize and
> remediate the contamination found in item (e) above.

(g)   Public Notice of DTSC approved action:

> If DTSC finds that SCE has demonstrated compliance with
> closure performance standards, DTSC will public notice its
> intent to approve the closure. This decision may also be
> subject to the California Environmental Quality Act
> (CEQA).

2

Southern California Edison
Scope of Work
FFS Contract No. 94-T0783

(h)    Response to public comments and issuance of final
decision:

At the close of the public comment period, DTSC will
prepare a response to public comments and issue the final
clean closure approval.

(i)    DTSC issues Corrective Action Order if necessary:

If a corrective action order(CAO)is issued, the closure
shall be deemed incomplete until provisions of the CAO are
satisfied.

NOTE:  Although further DTSC staff support for report
review, remedial oversight and/or Post Closure Permit
application review maybe required after the issuance of
the CAO, these services are not included in the scope of
this   current Fee for Service agreement.  Any additional
work associated with the unit(s) after the issuance of the
CAO will be renegotiated with SCE.

1.2    **RETENTION BASINS:**

(a)    SCE shall follow the procedures outlined in items 1.1 to
demonstrate closure of the retention basins.

NOTE:  Paragraph 4 of the February 1, 1995 compliance
schedule required SCE to include in the CDR (See step
1.1(a)) at least one year of ground water monitoring data
from a DTSC approved monitoring system since the Retention
Basins do not meet the minimum technology requirements.
If SCE does not have data from at least one year of ground
water monitoring, the subject CDR will not be deemed
adequate for demonstration of clean closure and the
following additional steps must be taken.

(b)    SCE submits a work plan for the installation of a ground
water monitoring system:

If SCE does not have at least one year of ground water
monitoring data, a DTSC approved ground water monitoring
system in place, or if the monitors are deemed inadequate
by the DTSC, SCE shall submit a work plan for the
installation of a ground water monitoring system.  SCE
must also develop a water quality monitoring and response
program and a water quality sampling and analysis plan.

3

Southern California Edison
Scope of Work
FFS Contract No. 94-T0783

DTSC will provide guidance for SCE in the development of
the above plans.  SCE will send Ms. Karen Baker of DTSC
the maps on tidal flow, ground water direction and the
location of the current wells for review for the Los
Alamitos generating station.  DTSC will review the
submittal and set up a meeting with SCE to provide
additional guidance once this agreement is signed.

1.3     SUMPS:

(a)     SCE shall propose methods to conduct integrity tests on
        the demineralizer sumps in writing.

        DTSC understands SCE may not be able to conduct integrity
        tests on some sumps due to size limitations and that SCE
        may elect to conduct soil and or ground water sampling to
        demonstrate clean closure.  If sampling or monitoring is
        decided, SCE shall provide a sampling/ monitoring plan for
        DTSC's review and approval.

(b)     DTSC reviews and approve the sampling/ monitoring plan.

(c)     SCE shall implement the DTSC approved integrity test
        procedure and submit a report of findings.

(d)     DTSC reviews and approves the report of findings:

        After the review of the report of findings, DTSC will
        either accept the closure certification for the unit,
        comment and request additional information, or issue a CAO
        to characterize and remediate contamination found.

(e)     Public Notice of DTSC approval action:

        See step 1.1 (g) of BCCB closure procedures.

(f)     DTSC will issue a corrective action order if contamination
        is found:

        See step 1.1 (i) of BCCB closure procedures.


1.4     MISCELLANEOUS ITEMS:

(a)     SCE shall submit a sampling plan for waste determination
        of the fireside wash and the air preheater wash.


4

Southern California Edison
Scope of Work
FFS Contract No. 94-T0783

DTSC agrees that SCE will not have to conduct a waste
determination sampling of the fireside wash or the air
preheater wash until SCE conducts a routine maintenance of
the boilers.   To comply with paragraph 1 of the Agreement,
SCE agrees to submit a sampling plan for DTSC review and
approval.   Upon completion of the FFS agreement, DTSC will
review and comment upon the sampling plan submitted for
the Cool Water Generating Station dated February 22, 1995.
Once this plan is approved, the plan can be adopted for
the other SCE facilities.


2.0   <u>COMPLIANCE WITH THE CALIFORNIA ENVIRONMENTAL QUALITY ACT</u>:

The California Environmental Quality Act (CEQA) requires
the DTSC to conduct an initial study and adopt an environmental
impact finding for any discretionary project undertaken by the
DTSC.   It is our intent to conduct a CEQA study for each facility
prior to acceptance of clean closure certification.   For any
units which do not meet the closure performance standards for
clean closure, DTSC may issue a Corrective Action Order and
compliance with CEQA will be addressed at that time.


3.0   <u>SCHEDULE FOR SUBMITTAL</u>:

The Alamitos pilot project shall begin upon the execution of the
Fee For Service Agreement.   The schedule for subsequent projects
shall adhere to Exhibit 2 of the February 1, 1995 Settlement
Agreement (See copy attached).

5

# DEPARTMENT OF TOXIC SUBSTANCES CONTROL
### EXHIBIT NO. 2
### SCHEDULE OF SUBMITTAL FOR
### SOUTHERN CALIFORNIA EDISON HAZARDOUS WASTE MANAGEMENT UNITS

Revised 12/03/94

| A<br>FACILITY | B<br>CLOSURE PLAN<br>UNIT TYPE | C<br>UNITS | D<br>SCHEDULE OF SUBMITTAL |
|---|---|---|---|
| 1 Alamitos Generating Station, Long Beach<br><br>690 North Studebaker Road<br>Long Beach, CA 90815<br><br>EPA ID No.: CAD009694795 | North Retention basin<br>South Retention basin<br>Makeup demineralizer sump<br>Polish demineralizer sump<br>Boiler chemical cleaning basin | 1<br>1<br>1<br>1<br>2 | Within 90 days of<br>receiving Department's<br>closure plan guidance |
| 2 El Segundo Generating Station, El Segundo<br><br>301 Vista Del Mar<br>El Segundo, CA 90245<br><br>EPA ID No.: CAD000630962 | Retention basin<br>Makeup demineralizer sump<br>Boiler chemical cleaning basin | 1<br>1<br>1 | 60 days from the<br>Completeness determination<br>of Alamitos Closure Plan |
| 3 Etiwanda Generating Station, Etiwanda<br><br>8996 Etiwanda Avenue<br>Etiwanda, CA 91739<br><br>EPA ID No. CAD079548574 | Retention basin<br>Makeup demineralizer basin<br>Boiler chemical cleaning basin | 1<br>1<br>1 | 30 days from submittal<br>of El Segundo<br>Closure Plan |
| 4 Huntington Beach Generating Station<br><br>21730 Newland Street<br>Huntington Beach, CA 92646<br><br>EPA ID No.: CAD000631085 | Retention basin<br>Boiler chemical cleaning basin | 1<br>1 | 30 days from submittal<br>of Etiwanda Closure Plan |
| 5 Mandalay Generating Station, Oxnard<br><br>393 North Harbor Blvd.<br>Oxnard, CA 93030<br><br>EPA ID No.: CAD000630913 | Retention basin<br>Boiler chemical cleaning basin | 2<br>1 | 30 days from submittal<br>of Huntington Beach<br>Closure Plan |
| 6 Redondo Beach Generating Station<br><br>1100 Harbor Drive<br>Redondo Beach, CA 90277<br><br>EPA ID No.: CAD000631093 | North Retention basin<br>South Retention basin<br>Polish demineralizer sump<br>Boiler chemical cleaning basin<br>Makeup demineralizer sump | 1<br>1<br>1<br>1<br>1 | 30 days from submittal<br>of Mandalay Closure Plan |
| 7 Ormond Beach Generating Station<br><br>6535 South Edison Drive<br>Oxnard, CA 93033<br><br>EPA ID No.: CAD000637036 | Retention basin<br>Polish demineralizer sump | 2<br>1 | 30 days from submittal<br>of Redondo Beach<br>Closure Plan |
| 8 Highgrove Generating Station<br><br>12700 Taylor Street<br>Colton, CA 92324<br><br>EPA ID No.: CAD000631028 | Retention basin<br>Makeup demineralizer sump | 1<br>1 | 30 days from submittal<br>of Ormond Beach<br>Closure Plan |
| 9 Long Beach Generating Station<br><br>2665 West Seaside Boulevard<br>Long Beach, CA 90813<br><br>EPA ID No. CAD000631143 | Retention basin | 1 | 30 days from submittal<br>of Highgrove<br>Closure Plan |
| 10 San Bernardino Generating Station<br><br>28770 San Bernardino Avenue<br>San Bernardino, CA 92408<br><br>EPA ID No.: CAD000631150 | Retention basin<br>Makeup demineralizer basin | 1<br>1 | 30 days from submittal<br>of Long Beach<br>Closure Plan |
| 11 Cool Water Generating Station<br><br>37072 East Santa Fe<br>Daggett, CA 92327<br><br>EPA ID No.: CAD000630905 | Polish demineralizer sump | 1 | 30 days from submittal<br>of San Bernardino<br>Closure Plan |

Southern California Edison
Fee For Service Agreement
Contract No. 94-T0783

**EXHIBIT C**

**Fee for Service Program Cost Estimates -
Alamitos Pilot Project**

Exhibit C

## DEPARTMENT OF TOXIC SUBSTANCES CONTROL
### FEE FOR SERVICE PROGRAM COST ESTIMATES - PILOT PROJECT
CONTRACT NUMBER: 94-T0703
(BASED ON ESTIMATED 100% WORKLOAD STANDARD)
SOUTHERN CALIFORNIA EDISON ALAMITOS STATION: CLOSURE OF TWO (2) BOILER CHEMICAL CLEANING BASINS,
THREE (3) RETENTION BASINS, AND TWO (2) SUMPS

| A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Activity | Estimated Hours / Fees | Title | Hazardous Substances Engineer | 1st Line Supervisor | Clerical | Public Participation | Legal Support | Staff Geologist | Senior Geologist | Staff Toxicologist | Associate Hygienist | Public Works Fee | Total |
| | | Hourly Rate | | | | | | | | | | | |
| **Part I** | | | | | | | | | | | | | |
| Pre-application assistance | | | | | | | | | | | | | $0 |
| Contract Initiation Fee (non-returnable) | | | | | | | | | | | | | $1,000 |
| **Part II** | Estimated Hours | | 732 | 140 | 510 | 977 | 37 | 200 | 625 | 100 | 33 | | |
| Site Visit | Estimated Fee | | $61,400 | $12,180 | $4,240 | $5,060 | $3,456 | $32,700 | $12,125 | $11,664 | $3,036 | | $146,997 |
| Review Closure Demo. Report (CDR) | | | | | | | | | | | | | |
| Issue Comments on CDR | | | | | | | | | | | | | |
| Review Revised CDR | | | | | | | | | | | | | |
| Approve Revised CDR | | | | | | | | | | | | | |
| Guidance on GW Monitoring Work Plan | | | | | | | | | | | | | |
| Review GW Monitoring Work Plan | | | | | | | | | | | | | |
| Comment on GW Monitoring Work Plan | | | | | | | | | | | | | |
| Approve GW Monitoring Work Plan | | | | | | | | | | | | | |
| Review Sump Integrity Test Proposal | | | | | | | | | | | | | |
| Comment on Sump Integrity Test | | | | | | | | | | | | | |
| Approve Sump Integrity Test Protocol | | | | | | | | | | | | | |
| Review WSP for location & Air Pockets, Wash | | | | | | | | | | | | | |
| Comment on WSP | | | | | | | | | | | | | |
| Review and Approve Revised WSP | | | | | | | | | | | | | |
| Review Sampling Work Plan | | | | | | | | | | | | | |
| Comment on Sampling Work Plan | | | | | | | | | | | | | |
| Approve Sampling Work Plan | | | | | | | | | | | | | |
| Review Final Reports | | | | | | | | | | | | | |
| **Part III** | Estimated Hours | | 150 | 44 | 90 | 20 | 8 | 43 | 40 | 37 | 0 | | |
| Public Notice | Estimated Fee | | $12,600 | $3,828 | $2,340 | $1,460 | $664 | $7,700 | $7,380 | $1,998 | $0 | $1,500 | $34,268 |
| Respond to Public Comments | | | | | | | | | | | | | |
| Issuance of Final Determination | | | | | | | | | | | | | |
| Issuance of Corrective Action Order | | | | | | | | | | | | | |
| CEQA | | | | | | | | | | | | | |
| ND | | | | | | | | | | | | | |
| Prepare IS | | | | | | | | | | | | | |
| Public Review | | | | | | | | | | | | | |
| Review response to comments | | | | | | | | | | | | | |
| Approve ND | | | | | | | | | | | | | $11,000 |

SUBTOTAL    $183,265
15% Cost     $27,540
TOTAL       $211,990
ROUNDOFF    $222,000

LEGEND:
- if Necessary
WSP:Waste Sampling Plan    ND:Negative Declaration

Southern California Edison
Fee For Service Agreement
Contract No. 94-T0783

## EXHIBIT D

## Fee for Service Program Cost Estimates - Streamlined Projects

1. El Segundo Generating Station: Closure of 1 Retention Basin, 1 Boiler Chemical Cleaning Basin, and 1 Sump.

2. Etiwanda Generating Station: Closure of 1 Retention Basin, 1 Boiler Chemical Cleaning Basin, and 1 Sump.

3. Huntington Beach Generating Station: Closure of 1 Retention Basin, and 1 Boiler Chemical Cleaning Basin.

4. Mandalay Generating Station: Closure of 1 Retention Basin, and 1 Boiler Chemical Cleaning Basin.

5. Redondo Beach Generating Station: Closure of 2 Retention Basin, 1 Boiler Chemical Cleaning Basin, and 1 Sump.

6. Ormond Beach Generating Station: Closure of 2 Retention Basin and 1 Sump.

7. Highgrove Generating Station: Closure of 1 Retention Basin and 1 Sump.

8. Long Beach Generating Station: Closure of 1 Retention Basin.

9. San Bernardino Generating Station: Closure of 1 Retention Basin and 1 Sump.

10. Cool Water Generating Station: Closure of 1 Sump.

Exhibit D

## DEPARTMENT OF TOXIC SUBSTANCES CONTROL
### FEE FOR SERVICE PROGRAM COST ESTIMATES - SUCCEEDING PROJECTS
### Southern California Edison, Contract Number 84-T0783
### (BASED ON ESTIMATED 30% INCREASED EFFICIENCY)

| A Activity | B Estimated Hours / Fees | C Title / Hourly Rate | D Hazardous Substances Engineer | E 1st Line Supervisor | F Chemist | G Public Participation | H Legal Support | I Staff Geologist | J Senior Geologist | K Staff Toxicologist | M Associate Hygienist | L Public Notice Fee | N Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Part I** | | | | | | | | | | | | | |
| Pre-application assistance | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 |
| Contract Initiation Fee (nonrefundable) | | | | $97 | $39 | $74 | $108 | $84 | $97 | $108 | $92 | | $1,000 |
| **Part II** | | | | | | | | | | | | | |
| Site Visit | Estimated hours | | 642 | 98 | 110 | 34 | 32 | 274 | 114 | 78 | 23 | | $107,574 |
| | Estimated Fee | | $43,608 | $8,526 | $4,280 | $3,995 | $3,450 | $23,058 | $11,058 | $8,299 | $2,116 | | |
| Review Closure Demo. Report (CDR) | | | | | | | | | | | | | |
| Issue Comments on CDR | | | | | | | | | | | | | |
| Review Revised CDR | | | | | | | | | | | | | |
| Approve Revised CDR | | | | | | | | | | | | | |
| Guidance on GW Monitoring Work Plan | | | | | | | | | | | | | |
| Review GW Monitoring Work Plan | | | | | | | | | | | | | |
| Comment on GW Monitoring Work Plan | | | | | | | | | | | | | |
| Approve GW Monitoring Work Plan | | | | | | | | | | | | | |
| Review Sump Integrity Test Proposal | | | | | | | | | | | | | |
| Comment on Sump Integrity Test | | | | | | | | | | | | | |
| Approve Sump Integrity Test Protocol | | | | | | | | | | | | | |
| Review WSP for Sitewide & Air Preheat (Wash. Comment on WSP | | | | | | | | | | | | | |
| Review and Approve Revised WSP | | | | | | | | | | | | | |
| Review Sampling Work Plan | | | | | | | | | | | | | |
| Comment on Sampling Work Plan | | | | | | | | | | | | | |
| Approve Sampling Work Plan | | | | | | | | | | | | | |
| Review Final Reports | | | | | | | | | | | | | |
| **Part III** | Estimated hours | | 195 | 31 | 80 | 11 | 6 | 32 | 28 | 20 | 0 | | $35,489 |
| Public Notice | Estimated Fee | | $6,820 | $2,997 | $2,340 | $11,006 | $884 | $2,988 | $2,716 | $3,808 | $0 | $1,503 | |
| Respond to Public Comments | | | | | | | | | | | | | |
| Issuance of Final Declaration (DR) | | | | | | | | | | | | | |
| Issuance of Corrective Action Order | | | | | | | | | | | | | |
| **CEQA** | | | | | | | | | | | | | |
| **IID** | | | | | | | | | | | | | |
| Prepare IS | | | | | | | | | | | | | |
| Public Review | | | | | | | | | | | | | $11,268 |
| Review response to comments | | | | | | | | | | | | | |
| Approve IID | | | | | | | | | | | | | |

LEGEND: - = if necessary    WSP=Work Sampling Plan    ND=Negative Declaration    IS=Initial Study    IID Cont=5% Contingency    $(4,374) / $21,742 / $164,991 SUBTOTAL / 15% Cont / TOTAL ROUNDOFF $167,000

# EXHIBIT H

| Acq. Date | Property Address | Entity Owner | Property Type / # of Units | Acquisition Cost | Dromy/Leo % Owned | As Is Value | Loan Balance | LTV | Equity | Dromy/Leo Equity | Lender | Annual Income | Property Taxes | Insurance | Other Expenses | Operating Expenses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/7/21 | 174 Kinney St & 169-177 Pier, Santa Monica, CA 90405 | 362 Camden Fee LLC: 38.55%; 9300 Wilshire LLC: 22.5%; BH Kankal LLC: 28.95%; EJT Kinney Pier LLC: 10% | 10k Sq Ft Restaurant Space 11 Offices & Retail Spaces | $11,186,000 | 90% | $13,500,000 | $7,000,000 | 52% | $6,500,000 | $5,850,000 | Valley Bank | $694,356 | $137,262 | 29,301 | 30,806 | $197,360 |
| 10/25/19 | 126 & 128 S Linden Dr, Beverly Hills, CA 90212 | Dromy 1995 FT: 28%; 9300 Wilshire, LLC: 10.55%; 9300 Wilshire Fee, LLC: 43.95%; E.D. Flores, LLC: 2.5%; 1112 Inv Co., LLC: 5%; EJT Wilshire Linden, LLC: 10% | 21,675 Sq. Ft. Development Site | $16,000,000 | 90% | $27,500,000 | $7,080,141 | 26% | $20,419,859 | $18,377,873 | East West Bank | $144,000 | $203,072 | - | - | $203,072 |
| 9/4/20 | 232 S Tower Dr, Beverly Hills, CA 90211 | Beachside Suites LLC (9300 Wilshire LLC): 85%, Oak Investment Company, LLC (ED Flores LLC): 15% | 8 Apts. 10,063 Sq Ft Lot | $3,950,000 | 100% | $4,250,000 | $2,601,762 | 61% | $1,648,238 | $1,648,238 | Valley Bank | $231,604 | $53,221 | 4,320 | 17,615 | $75,156 |
| 9/12/19 | 346 N Maple Dr, Beverly Hills, CA 90211 | Beachside Suites LLC (9300 Wilshire LLC): 85%, Oak Investment Company, LLC (ED Flores LLC): 15% | 8 Apts. 7,598 Sq Ft Lot | $4,000,000 | 100% | $4,500,000 | $2,666,806 | 59% | $1,833,194 | $1,833,194 | Valley Bank | $258,266 | $51,424 | 7,174 | 28,029 | $86,626 |
| 11/6/19 | 1127-1137 Horn Ave, West Hollywood, CA 90069 | Beachside Suites LLC (9300 Wilshire LLC): 85%, Oak Investment Company, LLC (ED Flores LLC): 15% | 11 Apts. 18,745 Sq Ft Lot | $4,200,000 | 100% | $5,000,000 | $2,813,156 | 56% | $2,186,844 | $2,186,844 | Valley Bank | $272,811 | $59,001 | 7,010 | 11,122 | $77,133 |
| 12/31/19 | 201 S Arnaz Dr, Beverly Hills, CA 90211 | Beachside Suites LLC (9300 Wilshire LLC): 85%, Oak Investment Company, LLC (ED Flores LLC): 15% | 6 Apts. 6,326 Sq Ft Lot | $2,840,000 | 100% | $3,250,000 | $1,902,539 | 59% | $1,347,461 | $1,347,461 | Valley Bank | $176,255 | $40,365 | 5,734 | 13,820 | 59,918 |
|  |  |  |  | $42,176,000 |  | $58,000,000 | $24,064,404 | 41% | 33,935,596 | $31,243,611 |  | $1,777,293 | $544,334 | 53,539 | $101,392 | $699,285 |
| 10/25/19 | 9740-9744 Wilshire Blvd, Beverly Hills, CA 90212 | Dromy 1995 FT: 28%; 9300 Wilshire, LLC: 10.55%; 9300 Wilshire Fee, LLC: 43.95%; E.D. Flores, LLC: 2.5%; 1112 Inv Co., LLC: 5%; EJT Wilshire Linden, LLC: 10% | 46,185 SF Office Bldg | $14,000,000 | 90% | $12,500,000 | $6,195,123 | 50% | $6,304,877 | $5,674,390 | East West Bank | $1,276,434 | $46,680 | 24,045 | $590,576 | $661,401 |
| 12/23/20 | 1241 3rd St, Santa Monica, CA 90401 | 1241 3rd Street LLC (ED Flores) 80%; 1247 3rd Street LLC (9300 Wilshire) 20%; EJT 3rd Street Prom. LLC: 20% | 1 Retail Units, 3,900 Sq Ft | $6,682,500 | 80% | $5,400,000 | $5,293,877 | 98% | $106,123 | $84,899 | Wilmington Trust | $30,000 | $80,858 | 5,175 | 4,466 | 90,500 |
| 6/29/21 | 1245-1251 3rd St, Santa Monica, CA 90401 | 1241 3rd Street LLC (ED Flores) 80%; 1247 3rd Street LLC (9300 Wilshire) 20%; EJT 3rd Street Prom. LLC: 20% | 3 Retail Units, 10,500 Sq Ft | $17,848,500 | 80% | $12,075,000 | $12,304,116 | 102% | $(229,116) | $(183,293) | Wilmington Trust | $1,457,434 | $215,967 | 11,573 | 11,930 | $239,469 |
|  |  |  |  | $38,531,000 |  | $29,975,000 | $23,793,116 |  | 6,181,884 | $5,575,995 |  | $2,763,868 | $343,505 | 40,794 | $607,072 | $991,370 |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1875 Century Park East, Suite 1900, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (*specify*): **FIRST AMENDED DEBTOR AND DEBTOR IN POSSESSION'S DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>August 12, 2024</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following

- **Todd M Arnold** tma@lnbyg.com
- **Melissa Boey** melissa.boey@morganlewis.com
- **Steve Burnell** Steve.Burnell@gmlaw.com, sburnell@ecf.courtdrive.com; sburnell@ecf.inforuptcy.com;cheryl.caldwell@gmlaw.com;denise.walker@gmlaw.com
- **Jason M Caruso** jason.caruso@ndlf.com
- **Michael J Gomez** mgomez@frandzel.com, dmoore@frandzel.com
- **Maya Hill** mhill@ttc.lacounty.gov
- **Joseph Isenstadt** joseph.isenstadt@doj.ca.gov
- **Clifford P Jung**clifford@jyllp.com, ry@jyllp.com;jessica@jyllp.com
- **Daniel A Lev** daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Kelly L Morrison** kelly.l.morrison@usdoj.gov
- **David L. Neale** dln@lnbyg.com
- **Abigail V O'Brient** aobrient@cov.com, docketing@cov.com
- **Aron M Oliner** roliner@duanemorris.com
- **Mitchell E Rishe** mitchell.rishe@doj.ca.gov
- **Victor A Sahn** victor.sahn@gmlaw.com, vsahn@ecf.courtdrive.com; pdillamar@ecf.courtdrive.com;patricia.dillamar@gmlaw.com,Karen.Files@gmlaw.com
- **Alan Schindler** alan.schindler@gmlaw.com, lindsay.broderick@gmlaw.com
- **Alice Segal** alice.segal@doj.ca.gov
- **Alan G Tippie** Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com; Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Craig A Wolfe** craig.wolfe@morganlewis.com
- **Hatty K Yip** hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) <u>August 12, 2024</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Debtor**
9300 Wilshire LLC
9744 Wilshire Blvd, Ste 203
Los Angeles, CA 90212-1812

Office of the U.S. Trustee
915 Wilshire Blvd #1850,
Los Angeles, CA 90017

Hon. Vincent Zurzolo
United States Bankruptcy Court
Central District of California
Edward R. Royal Federal Building and Courthouse
255 E. Temple Street, Suite 1360 / Courtroom 1368
Los Angeles, CA 90012

PMD 58317673v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1. PROOF.SERVICE**

⊠ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 12, 2024 | Patricia Dillamar | */s/ Patricia Dillamar* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**Additional Service Information**

2. **SERVED BY UNITED STATES MAIL**:

**20 Largest Unsecured Creditors**

CBRE
Attn Neal Golub
2000 Avenue of the Stars, Suite 800
Los Angeles, CA 90067-2110

Cohen Law Group
Attn Marc Cohen
541 S. Spring Street, Suite 1208
Los Angeles, CA 90013

Englander Knabe Allen & Associates
LLC
Attn Erik Rose
801 S. Figueroa St, Ste 1050
Los Angeles, CA 90017-5507

KFA
Attn John Arnold
3573 Hayden Ave
Culver City, CA 90232-2412

KPFF
Attn Sharad Ganja
700 S Flower St, Ste 2100
Los Angeles, CA 90017-4208

Manella & Company
Attn Limo Amrani
6300 Wilshire Blvd. Suite 2030
Los Angeles, CA 90048-5268

Newmeyer Dillion
Attn Michael Shonafelt
895 Dove St, 5th FL
Newport Beach, CA 92660-2999

Rutan Tucker
Attn Doug Dennington
18575 Jamboree Rd, 9th FL
Irvine, CA 92612-2559

Sturgis Holdings LLC
Attn Jason Sturgis
1515 Foothill Road
Gardnerville Nevada 89460

**Attorney for Sturgis Holdings, LLC**
David T. Moran, Esq.
Manatt Phelps & Phillips
2049 Century Park Est, Ste. 1700
Los Angeles, CA 90067

Lisa Haage
California Coastal Commission
Chief of Enforcement
455 Market Street, Ste. 300
San Francisco, CA 91405

Mark Miller
President & CEO
AES Redondo Beach L.L.C.
690 N. Studebaker Road
Long Beach, CA 90803

AES Redondo Beach LLC
Attn: Joseph Strines
One Monument Circle
Indianapolis, Indiana 46204

Joshua Dorchak on behalf of
Creditor AES Redondo Beach, L.L.C
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178

Los Angeles County Treasurer and
Tax Collector
Attn: Bankruptcy Unit
PO Box 54110
Los Angeles CA 90054-0110

California Coastal Commission
45 Fremont, Suite 2000
San Francisco, CA 95105-2219

East West Bank
Attn: Curtis C. Jung
c/o Jung & Yuen, LLP
2667 E Colorado Blvd., 2nd Fl
Pasadena, CA 91107